JS 44   (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

City of Hartford and
Hartford Board of Education

**(b)** County of Residence of First Listed Plaintiff   Hartford
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
(See Attached)

## DEFENDANTS

Monsanto Company
Solutia Inc. and
Pharmacia Corporation

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☒ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | ☐ 820 Copyrights | ☐ 450 Commerce |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | | Corrupt Organizations |
| Student Loans | ☐ 340 Marine | Injury Product | | **LABOR** | ☐ 480 Consumer Credit |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 710 Fair Labor Standards | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | | Act | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | | ☐ 720 Labor/Management | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | | Relations | ☐ 890 Other Statutory Actions |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | | ☐ 740 Railway Labor Act | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | | ☐ 751 Family and Medical | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | | Leave Act | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury - | Product Liability | | ☐ 790 Other Labor Litigation | Act |
| | Medical Malpractice | | | ☐ 791 Employee Retirement | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | Income Security Act | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | or Defendant) | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | ☐ 871 IRS—Third Party | State Statutes |
| ☒ 245 Tort Product Liability | Accommodations | ☐ 530 General | | 26 USC 7609 | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | | | |
| | Employment | **Other:** | **IMMIGRATION** | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | Other | ☐ 550 Civil Rights | ☐ 465 Other Immigration | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | Actions | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from Another District *(specify)*  ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332

Brief description of cause:
Polychlorinated biphenyls (PCBs) contamination of public schools and buildings in Hartford, Connecticut

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $  In excess of $75,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE   10/23/15

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## ATTACHMENT TO CIVIL COVER SHEET


### ATTORNEYS FOR PLAINTIFFS:

Henri Alexandre, Corporation Counsel
City of Hartford
550 Main Street, Suite 210
Hartford, CT 06103
Tel:  (860) 757-9700
Fax:  (860) 722-8114
Fed. Bar #05412
Henri.alexandre@hartford.gov

**BARON & BUDD, P.C.**
Scott Summy (*pending Pro Hac Vice*)
Carla Burke Pickrel (*pending Pro Hac Vice*)
Celeste A. Evangelisti (*pending Pro Hac Vice*)
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Tel:  (214) 521-3605
Fax:  (214) 520-1181
ssummy@baronbudd.com
evangelisti@baronbudd.com
cpickrel@baronbudd.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CITY OF HARTFORD
HARTFORD BOARD OF EDUCATION,          Case No. _____
*Plaintiffs,*

v.

MONSANTO COMPANY,
SOLUTIA INC., and
PHARMACIA CORPORATION,                OCTOBER 23, 2015
*Defendants*

## PLAINTIFFS' ORIGINAL COMPLAINT

## I.      INTRODUCTION

1.  Plaintiffs CITY OF HARTFORD ("City") and HARTFORD BOARD OF EDUCATION ("Board") operate public schools and buildings in Hartford, Connecticut.  The City has detected toxic chemical compounds known as PCBs in one or more of its buildings. Working with the US Environmental Protection Agency ("EPA"), the Board has closed one school until PCBs can be removed or reduced to a safe level for children.

2.  Polychlorinated biphenyls ("PCBs") are man-made organic chemical compounds that were used in hundreds of industrial and commercial applications in the United States. Among other uses, PCBs were incorporated into building products including electrical equipment, fluorescent lighting ballasts, paints, sealants, and caulks that were used in the construction of commercial and school buildings.

3. PCBs cause a variety of adverse health effects. PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system, and other health effects.

4. PCBs easily escape into the atmosphere when they are produced and through the normal, intended uses of products that contain PCB compounds. As a result, PCBs are a near global environmental contaminant. To stem the contamination, and to prevent health risks associated with exposure to PCBs, Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979.

5. Plaintiffs seek damages for the costs of investigating, removing toxic PCB compounds, and remediating all PCB contamination from its school buildings and properties.

## II.    PARTIES

6. The Board and City share responsibility for operating and maintaining public schools in Hartford, Connecticut and have detected PCBs in one or more of its school buildings.

7. The City owns the buildings, facilities, and properties of public schools in Hartford and has the authority to construct, renovate, and remodel school buildings and school property. C.G.S.A. § 10-241. The City also has the financial obligation for investigation and remediation activities conducted at school buildings and school properties.

8. In Connecticut, towns are considered "school districts" for educational purposes. C.G.S.A. § 10-240. Therefore, the City of Hartford is a school district and may sue and be sued as provided by C.G.S.A. § 10-241.

9. The Board maintains public schools in the City of Hartford and has a duty imposed by the Connecticut General Assembly to provide an appropriate learning environment for its

students, which requires the Board to provide adequate facilities, proper maintenance of facilities, and a safe school setting. C.G.S.A. § 10-220. The Board, as it relates to this action, is acting as an agent of the City and may sue and be sued as provided by C.G.S.A. § 52-73.

10. Plaintiffs and all of Plaintiffs' school buildings and properties are located in Hartford, Connecticut.

11. Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri.

12. Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

13. Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to Old Monsanto) is a Delaware LLC with its principal place of business in Peapack, New Jersey.

14. The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceuticals and nutrition business, and a chemical products business. Old Monsanto began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late 1970s.

15. Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations. The corporation now known as Monsanto operates Old Monsanto's agricultural products business. Old Monsanto's chemical products business is now operated by Solutia. Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

16. Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business. Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.[1]

17. Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.[2]

18. In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia, and New Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.[3]

19. Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as "Defendants."

## III.   JURISDICTION AND VENUE

20. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiffs and Defendants. Each Plaintiff is a citizen of Connecticut, but

---

[1] See MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v. Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October 8, 2013); see also Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx (last accessed July 13, 2015).
[2] *See id.*
[3] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed July 13, 2015).

no Defendant is a citizen of Connecticut.  Monsanto is a Delaware corporation with its

principal place of business in St. Louis, Missouri.  Solutia is a Delaware corporation with

its principal place of business in St. Louis, Missouri.  Pharmacia is a Delaware limited

liability company with its principal place of business in Peapack, New Jersey.

21. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a

substantial part of the property that is the subject of the action is situated in this judicial

district.

## IV.    FACTUAL ALLEGATIONS

### A. Monsanto Manufactured PCBs for Use in the United States Until the 1979 Ban.

22. Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms attached

to a double carbon-hydrogen ring (a "biphenyl" ring).  A "PCB congener" is any single,

unique chemical compound in the PCB category.  Over two hundred congeners have been

identified.[4]

23. PCBs were generally manufactured as mixtures of congeners.  From approximately 1935

to 1979, Monsanto Company was the only manufacturer in the United States that

intentionally produced PCBs for commercial use.[5]  The most common trade name for

PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

24. Before 1979, Monsanto's commercially-produced PCBs were used in a wide range of

industrial applications in the United States.  Products containing PCBs were widely used

in the construction and renovation of buildings throughout the United States.

---

[4] Table of PCB Congeners, available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/congeners.htm (last accessed July 13, 2015).
[5] See 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole manufacturer of PCB's is concerned . . . ."); 121 Cong. Record 33879, 94th Congress, (October 23, 1975) ("The sole U.S. producer, Monsanto Co. . . . .").  See also MONS 058730-058753 at 058733 (identifying other producers as "all ex-USA."), attached as Exhibit A.

25. Some PCB-containing products were used in applications that enclosed the PCBs completely within the equipment such as transformers, motor start capacitors, and lighting ballasts. These are generally known as "closed" uses.

26. Other PCB-containing products were used in applications in which the PCBs were not enclosed --- *e.g.*, caulks, paints, and sealants. These are known as "open" or "non-totally enclosed" uses because no physical barrier prevents PCBs from direct contact with the surrounding environment.

27. Between approximately 1950 and 1979, PCBs were widely and foreseeably used in the construction and renovation of commercial buildings and schools. Accordingly, PCBs are likely to be present in any number of materials present in a school built or renovated during this period including paint, caulk, fluorescent light ballasts, and other materials.

28. In response to widespread environmental contamination, Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979.

29. As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another product.

**B.  PCB-Containing Materials Cause Contamination and Property Damage.**

30. PCBs easily migrate from open use building materials (such as caulk) into surrounding materials such as masonry, wood, drywall, and soil, thereby causing damage to those surrounding materials. PCBs can also escape from closed use materials (such as light ballasts) and similarly contaminate and damage surrounding materials.

31. Migration of PCBs may begin as soon as PCBs or PCB-containing products are installed or applied, regardless of climate and without any prior deterioration.

32. The Environmental Protection Agency ("EPA") conducted research of PCBs in school buildings and confirmed that emissions from caulk and fluorescent light ballasts cause elevated PCBs in the surrounding air.

33. EPA concluded that some building materials (*e.g.*, paint and masonry walls) and indoor dust can absorb PCB emissions and become potential secondary sources of contamination that begin emitting PCBs on their own.

34. At no point did Monsanto warn or alert the City or Board that PCBs may migrate and contaminate ambient air or secondary sources.

**C.  PCB Exposure and Toxicity**

35. PCBs can enter the human body through ingestion, inhalation, and dermal contact.

36. Children, teachers, school visitors, and employees who work in school buildings may inhale PCBs that are emitted into the air from caulk, paint, light ballasts, and contaminated secondary sources.  They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks.  And they may absorb PCBs from physical contact with PCB-containing materials, secondary sources, or surfaces that have become contaminated by air or dust.

37. Exposure is a concern to a reasonable school district because PCBs are associated with serious health risks.

38. EPA has determined that Monsanto's PCBs are probable human carcinogens.  In 1996, EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242,

1254, and 1260.[6]  EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia, and industry, all of whom agreed that PCBs are probable human carcinogens.

39. In addition, EPA concluded that PCBs are associated with serious non-cancer health effects.  From extensive studies of animals and primates using environmentally relevant doses, EPA has found evidence that PCBs exert significant toxic effects, including effects on the immune system, the reproductive system, the nervous system, and the endocrine system.

40. PCBs affect the immune system by causing a significant decrease in the size of the thymus gland, lowered immune response, and decreased resistance to viruses and other infections.  The animal studies were not able to identify a level of PCB exposure that did not affect the immune system.  Human studies confirmed immune system suppression.

41. Studies of reproductive effects in human populations exposed to PCBs show decreased birth weight and a significant decrease in gestational age with increasing exposures to PCBs.  Animal studies have shown that PCB exposures reduce birth weight, conception rates, live birth rates, and sperm counts.

42. Human and animal studies confirm that PCB exposure causes persistent and significant deficits in neurological development, affecting visual recognition, short-term memory, and learning. Some of these studies were conducted using the types of PCBs most commonly found in human breast milk.

---

[6] EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures, EPA/600/P-96/001F (September 1996), available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed July 13, 2015).

43. PCBs may also disrupt the normal function of the endocrine system. PCBs have been shown to affect thyroid hormone levels in both animals and humans. In animals, decreased thyroid hormone levels have resulted in developmental deficits, including deficits in hearing. PCB exposures have also been associated with changes in thyroid hormone levels in infants in studies conducted in the Netherlands and Japan.

44. PCBs have been associated with other health effects including elevated blood pressure, serum triglyceride, and serum cholesterol in humans; dermal and ocular effects in monkeys and humans; and liver toxicity in rodents.

45. Children may be affected to a greater extent than adults. The Agency for Toxic Substances and Disease Registry explained: "Younger children may be particularly vulnerable to PCBs because, compared to adults, they are growing more rapidly and generally have lower and distinct profiles of biotransformation enzymes, as well as much smaller fat deposits for sequestering the lipophilic PCBs."[7]

**D. Monsanto's Knowledge of PCB Toxicity**

46. Monsanto's internal documents show that Monsanto knew that PCBs were toxic as early as the 1930s.

47. An October 11, 1937 Monsanto memorandum advises that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects. Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."[8]

---

[7] Agency for Toxic Substances and Disease Registry, Toxicological Profile for Polychlorinated Biphenyls (PCBs), (November 2000), at 405, available at www.atsdr.cdc.gov (last accessed July 13, 2015).
[8] MONS 061332, attached as Exhibit B.

48. A September 20, 1955 memo from Emmet Kelly set out Monsanto's position with respect

to PCB toxicity: "We know Aroclors are toxic but the actual limit has not been precisely

defined. It does not make too much difference, it seems to me, because our main worry is

what will happen if an individual develops [*sic*] any type of liver disease and gives a

history of Aroclor exposure. I am sure the juries would not pay a great deal of attention

to [maximum allowable concentrates]."[9]

49. On November 14, 1955, Monsanto's Medical Department provided an opinion that

workers should not be allowed to eat lunch in the Aroclor department:

> It has long been the opinion of the Medical Department that eating
> in process departments is a potentially hazardous procedure that
> could lead to serious difficulties. While the Aroclors are not
> particularly hazardous from our own experience, this is a difficult
> problem to define because early literature work claimed that
> chlorinated biphenyls were quite toxic materials by ingestion or
> inhalation.[10]

50. On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S.

Navy decided against using Monsanto's Aroclors: "No matter how we discussed the

situation, it was impossible to change their thinking that Pydraul 150 is just too toxic for

use in a submarine."[11]

51. In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated

that PCBs "appeared to be the most injurious chlorinated compounds of all tested."[12]

Jensen refers to a 1939 study associating PCBs with the deaths of three young workers

and concluding that "pregnant women and persons who have at any time had any liver

---

[9] MONS 095197, attached as Exhibit C.
[10] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number), attached as Exhibit D.
[11] MONS 095640, attached as Exhibit E.
[12] *See* JDGFOX00000037-63, attached as Exhibit F.

disease are particularly susceptible."[13]  Kelly does not dispute any of Jensen's remarks,

noting only, "As far as the section on toxicology is concerned, it is true that chloracne

and liver trouble can result from large doses."[14]

52. On March 6, 1969, Monsanto employee W. M. Richard wrote a memorandum discussing

a recent article that criticized PCBs as a "toxic substance" and "uncontrollable

pollutant."[15]  Richard explained that Monsanto could take steps to reduce PCB releases

from its own plants but cautioned, "It will be still more difficult to control other end uses

such as cutting oils, adhesives, plastics, and NCR paper.  In this applications exposure to

consumers is greater and the disposal problem becomes complex."

53. On September 9, 1969, Monsanto employee W.R. Richard wrote an interoffice memo

titled "Defense of Aroclor."[16]  He advised that the company could not defend itself

against all criticism:  "We can't defend vs. everything.  Some animals or fish or insects

will be harmed.  Aroclor degradation rate will be slow.  Tough to defend against.  Higher

chlorination compounds will be worse [than] lower chlorine compounds.  Therefore we

will have to restrict uses and clean-up as much as we can, starting immediately."[17]

54. Monsanto expressed a desire to keep profiting from PCBs despite the environmental

havoc in a PCB Presentation to Corporate Development Committee.  The report suggests

possible reactions to the contamination issue.  It considered that doing nothing was

"unacceptable from a legal, moral, and customer public relations and company policy

viewpoint."  But the option of going out of the Aroclor business was also considered

---

[13] *Id.* at JDGFOX00000039.
[14] *Id.* at JDGFOX00000037.
[15] MONS 096509-096511, attached as Exhibit G.
[16] DSW 014256-014263, attached as Exhibit H.
[17] *Id.*

unacceptable: "there is too much customer/market need and selfishly too much

Monsanto profit to go out."[18]

55. The Aroclor Ad Hoc Committee held its first meeting on September 5, 1969. The

committee's objectives were to continue sales and profits of Aroclors in light of the fact

that PCB "may be a global contaminant."[19]  The meeting minutes acknowledge that PCB-

containing products rapidly contaminate the environment: "In one application alone

(highway paints), one million lbs/year are used.  Through abrasion and leaching we can

assume that nearly all of this Aroclor winds up in the environment."[20]

56. A month later, on October 2, 1969, the Committee reported that it could not protect the

environment from Aroclors as "global" contaminants but could protect the manufacture

and sale of Aroclors:

> There is little probability that any action that can be taken will
> prevent the growing incrimination of specific polychlorinated
> biphenyls (the higher chlorinated – e.g. Aroclors 1254 and 1260)
> as nearly global environmental contaminants leading to
> contamination of human food (particularly fish), the killing of
> some marine species (shrimp), and the possible extinction of
> several species of fish eating birds.
> Secondly, the committee believes that there is no practical course
> of action that can so effectively police the uses of these products as
> to prevent environmental contamination.  There are, however a
> number of actions which must be undertaken to prolong the
> manufacture, sale and use of these particular Aroclors as well as to
> protect the continued use of other members of the Aroclor series.[21]

57. On January 29, 1970, Elmer Wheeler of the Medical Department, circulated laboratory

reports discussing results of animal studies.  He noted: "Our interpretation is that the

PCB's are exhibiting a greater degree of toxicity in this chronic study than we had

---

[18] Ex. A at 058737.
[19] MONS 030483-030486, at 030483, attached as Exhibit I.
[20] *Id.* at 030485.
[21] DSW 014612-014624, at 014615, attached as Exhibit J.

anticipated.  Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals."[22]

58. An interoffice memorandum circulated on February 16, 1970 provided talking points for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and 1260:  "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment."  Nevertheless, the memo acknowledges that Monsanto "can't afford to lose one dollar of business."  To that end, it says, "We want to avoid any situation where a customer wants to return fluid. . . . We would prefer that the customer use up his current inventory and purchase [new products] when available.  He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system.  We don't want to take fluid back." [23]

59. In July of 1970, Monsanto began trying to downplay the existence of PCBs in open uses, like caulk and paint.  In a press release, the company claimed:  "What should be emphasized . . . is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors.  It is also used in commercial heating and cooling systems.  It is not a 'household' item." [24]

60. At no point did Monsanto contradict this statement by alerting consumers, including Plaintiffs, that PCBs could be found in "open" use building materials, including paint and caulk, and could cause contamination and property damage.  Plaintiffs would have acted on this alert had they received it.

---

[22] MONS 098480, attached as Exhibit K.
[23] MONS 100123-100124, attached as Exhibit L.
[24] *See* Press release (July 16, 1970), MCL000647-50, at MCL000648, attached as Exhibit M.

61. In 1970, the year after Monsanto formed the "ad hoc" committee to address PCBs, PCB production in the United States peaked at 85 million pounds.

### E.  Legal and Regulatory Standards Applicable to PCBs

62. Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979.

63. More than thirty years passed before EPA announced that schools may have been built with PCB-containing materials.  In a press release issued on September 25, 2009, EPA advised that although PCBs were banned by 1979, they remained in place in buildings that were constructed before the ban.[25]

64. On December 12, 2013, EPA issued a press release advising that PCB-containing fluorescent light ballasts that were installed prior to the ban may still be in use in schools and may leak PCBs.[26]

### F.     Plaintiffs' Schools are Contaminated with PCBs.

65. Plaintiffs Board and City operate and maintain a public school system in Hartford, Connecticut and have detected PCBs in one or more of its schools that were built or renovated between 1950 and 1978.

66. For example, dangerous levels of PCBs were detected in paint and caulk at Clark Elementary School during ordinary maintenance projects in late 2014.  Further testing showed PCBs in the school's air at concentrations exceeding EPA's recommended levels.

---

[25] Press Release, *EPA Announces Guidance to Communities on PCBs in Caulk of Buildings Constructed or Renovated Between 1950 and 1978* (September 25, 2009), available at http://yosemite.epa.gov/opa/admpress.nsf/e51aa292bac25b0b85257359003d925f/28c8384eea0e67ed8525763c0059 342f!OpenDocument&Highlight=0,PCB (last accessed July 13, 2015).

[26] Press Release, *EPA Provides Updated Guidance to Schools on PCB-containing Lighting Fixtures* (December 12, 2013), available at http://yosemite.epa.gov/opa/admpress.nsf/e51aa292bac25b0b85257359003d925f/2e548f3ed779c8a085257c3f00614 7ad!OpenDocument&Highlight=0,PCB#area (last accessed July 13, 2015).

Page  14

The Board, with EPA oversight, has closed the school until all PCB contamination can be identified and removed.

67. In addition to Clark Elementary School, PCBs have been detected in other Hartford public school buildings.

68. Plaintiffs were not aware of potential harms related to PCBs at the time of renovations or constructions that used PCBs. Had they known, Plaintiffs would not have used PCBs or PCB-containing products.

69. Pursuant to the educational interests of the state, the State of Connecticut imposes a duty upon Plaintiffs to provide adequate facilities, proper maintenance of schools, and a safe school setting. C.G.S.A. § 10-220.

70. The State of Connecticut imposes a duty upon Plaintiffs to "adopt and implement an indoor air quality program that provides for ongoing maintenance and facility reviews necessary for the maintenance and improvement of the indoor air quality of its facilities[.]" C.G.S.A. § 10-220.

## FIRST CAUSE OF ACTION

### CONNECTICUT PRODUCTS LIABILITY ACT
### STRICT LIABILITY

71. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this cause of action.

72. Monsanto was the sole manufacturer of PCBs in the United States and engaged in the business of selling PCBs and PCB products.

73. PCBs and PCB-containing products are in a defective condition and are unreasonably dangerous for their reasonably anticipated use in school buildings for the following reasons:

    a.   PCB-containing products were used to construct commercial buildings and schools throughout Connecticut, including Plaintiffs';

    b.   PCB readily migrates from the site of its original application and contaminates adjacent materials, dust, air, interior surfaces, exterior surfaces, and soil;

    c.   PCB persists in the environment;

    d.   PCB is invisible to the naked eye;

    e.   Children and teachers may be exposed to PCB through inhalation, ingestion, and dermal contact;

    f.   PCB is a known animal carcinogen and a probable human carcinogen and is associated with other serious health risks;

    g.   PCB exposure may be prevented only by physical removal of the original PCB products and any secondary materials that have become contaminated;

    h.   Such remediation is extremely expensive to undertake, disrupts normal classroom activities, and may cause undue concern on the part of students, teachers, school employees, and parents.

74. These defects existed at the time Monsanto sold their PCBs and PCB-containing products.

75. Monsanto knew and expected that PCBs would be used as component parts in building materials. In these materials, Monsanto's PCBs would have been expected to and did reach consumers, like Plaintiffs, without substantial change in chemical condition.

76. Products containing PCBs pose greater dangers to school buildings than would be expected by ordinary persons such as Plaintiffs, schoolchildren, teachers, and employees, and the general public.

77. There existed an alternative design for Monsanto's products that was capable of preventing the claimant's damage.

78. The risks posed by PCBs and PCB-containing products outweigh the products' utility as building materials.

79. The likelihood that PCBs would contaminate Plaintiffs' property and the gravity of that damage outweighed any burden on Monsanto to adopt an alternative design and outweighed the adverse effect, if any, of such alternative design on the utility of the product.

80. As a direct and proximate result of Monsanto's unreasonably dangerous design, manufacture, and sale of PCB-containing products, Plaintiffs have suffered and continue to suffer property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

81. Monsanto knew or was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of commercial and school properties. Monsanto committed each of the above described acts and omissions knowingly, willfully, and/or with reckless disregard for the health and safety of others, and for Plaintiffs' property rights.

## SECOND CAUSE OF ACTION

### CONNECTICUT PRODUCTS LIABILITY ACT
### FAILURE TO WARN

82. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

83. As a manufacturer of PCBs and PCB-containing products, Monsanto had a duty to provide adequate warnings to Plaintiffs, the public, and public officials of the risks posed by PCBs and PCB-containing products.

84. PCBs and PCB-containing products are in a defective condition and are unreasonably dangerous for their reasonably anticipated use in school buildings for the following reasons:

   a.  PCB-containing products were used to construct commercial buildings and schools throughout Connecticut, including Plaintiffs';

   b.  PCB readily migrates from the site of its original application and contaminates adjacent materials, dust, air, interior surfaces, exterior surfaces, and soil;

   c.  PCB persists in the environment;

   d.  PCB is invisible to the naked eye;

   e.  Children and teachers may be exposed to PCB through inhalation, ingestion, and dermal contact;

   f.  PCB is a known animal carcinogen and a probable human carcinogen and is associated with other serious health risks;

   g.  PCB exposure may be prevented only by physical removal of the original PCB products and any secondary materials that have become contaminated;

   h.  Such remediation is extremely expensive to undertake, disrupts normal classroom activities, and may cause undue concern on the part of students, teachers, school employees, and parents.

85. Monsanto knew of the risks associated with PCBs and failed to provide a warning that would lead an ordinary reasonable user or handler of a product to contemplate the

dangers associated with PCB-containing products or an instruction that would have allowed Plaintiffs to avoid the damage to their property.

86. At the time of manufacture, Monsanto should have reasonably anticipated that consumers would not be aware of the risks and nature of potential harm of its PCBs and PCB-containing products.

87. Despite Monsanto's knowledge of the presence of PCB-containing products in commercial buildings and schools nationwide, Monsanto has not issued any warning, instruction, recall, or advice regarding PCB-containing products to schools, communities, parents, or governmental agencies.

88. Plaintiffs would have heeded legally adequate warnings and would not have purchased products containing PCBs or would have taken steps to ensure that PCBs were treated differently to prevent potential exposure and contamination of the environment.

89. As a direct and proximate result of Monsanto's failure to warn, Plaintiffs have suffered, and continue to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

## THIRD CAUSE OF ACTION

### CONNECTICUT PRODUCTS LIABILITY ACT
### NEGLIGENCE

90. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

91. As a manufacturer and seller of PCBs, Monsanto owed a duty to Plaintiffs and to all persons whom its products might foreseeably harm to exercise due care in the formulation, manufacture, sale, labeling, warning, and use of PCBs and products containing PCBs.

92. Monsanto knew or should have known that:

    a.  PCB-containing products were used to construct commercial buildings and schools throughout Connecticut, including Plaintiffs';

    b.  PCB readily migrates from the site of its original application and contaminates adjacent materials, dust, air, interior surfaces, exterior surfaces, and soil;

    c.  PCB persists in the environment;

    d.  PCB is invisible to the naked eye;

    e.  Children, teachers and visitors to school buildings may be exposed to PCB through inhalation, ingestion, and dermal contact;

    f.  PCB is a known animal carcinogen and a probable human carcinogen and is associated with other serious health risks;

    g.  PCB exposure may be prevented only by physical removal of the original PCB products and any secondary materials that have become contaminated;

    h.  Such remediation is extremely expensive to undertake, disrupts normal classroom activities, and may cause undue concern on the part of students, teachers, school employees, and parents.

93. Monsanto breached its duty of care to Plaintiffs by:

    a.  Formulating, designing, manufacturing, and selling PCBs for use in school buildings;

    b.  Manufacturing, selling, promoting, and defending the continued manufacture and sale of PCBs without disclosing the risks associated with exposure to PCBs;

   c.   Failing to restrict sales of PCB products to avoid risks of exposure at schools;

   d.   Failing to advise school districts about the presence of PCBs in products including caulk, paint, and light ballasts;

   e.   Failing to inspect and/or test for the presence of PCBs in products in school buildings, including but not limited to caulk, paint, and light ballasts;

   f.   Failing to warn the public, regulators, and school districts about the continued presence of PCBs in construction materials used during the relevant time period; and

   g.   Failing to make any attempt to remove PCB-laden materials from schools.

94. Damage and contamination of Plaintiffs' property by PCBs are the results of Monsanto's reckless disregard for the safety of consumers and users of PCBs and PCB-containing products.

95. As a direct and proximate result of Monsanto's negligence, Plaintiffs have suffered, and continue to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

## FOURTH CAUSE OF ACTION

### PUBLIC NUISANCE

96. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

97. Monsanto manufactured, distributed, marketed, and promoted PCBs in a manner that created or participated in creating a public nuisance that unreasonably endangers or injures the property, health, safety, and comfort of the general public and Plaintiffs, causing inconvenience and annoyance.

Page 21

98. Monsanto's intentional, negligent, and reckless acts and omissions have created widespread contamination of property with PCBs.

99. By their conduct, Monsanto violated and continues to violate public rights and rights of the community at large to a clean and unpolluted natural environment and school buildings.

100.    The presence of PCBs interferes with Plaintiffs' use and/or enjoyment of their property in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.

101.    Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any property where PCBs were used.

102.    As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiffs have suffered, and continue to suffer, contamination requiring investigation, remediation, and monitoring costs to be determined at trial.

## FIFTH CAUSE OF ACTION

### PRIVATE NUISANCE

103.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

104.    Plaintiffs' school buildings and grounds have been contaminated with PCBs.

105.    The presence of PCBs unreasonably interferes with Plaintiffs' use, benefit, and enjoyment of their property.

106.     Monsanto knew or, in the exercise of reasonable care, should have known that the

manufacture and sale of PCBs would seriously and unreasonably interfere with the

ordinary comfort, use, and enjoyment of any property where PCBs were used.

107.     Monsanto's intentional, negligent, and reckless acts and omissions have

contaminated Plaintiffs' property with PCBs.

108.     As a direct and proximate result of Monsanto's creation of a private nuisance,

Plaintiffs have suffered, and continue to suffer, contamination requiring investigation,

remediation, and monitoring costs to be determined at trial.

## SIXTH CAUSE OF ACTION

### TRESPASS

109.     Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding

paragraphs as if fully restated in this count.

110.     Plaintiffs are the owners, operators, and/or actual possessor of real property and

improvements used for public schools in Hartford, Connecticut.

111.     Monsanto manufactured, distributed, marketed, and promoted PCBs with the

actual knowledge and/or substantial certainty that PCB-containing products would,

through normal use, release PCBs that would migrate throughout ambient air and onto

adjacent surfaces, causing property contamination.

112.     Monsanto negligently, recklessly, and/or intentionally produced and marketed

PCBs in a manner that caused PCBs to contaminate Plaintiffs' property.

113.     As a direct and proximate result of Monsanto's trespass, Plaintiffs have suffered

and continue to suffer contamination requiring investigation, remediation, and monitoring

costs to be determined at trial.

Page  23

**PRAYER FOR RELIEF**

Plaintiffs prays for judgment against Defendants, jointly and severally, as follows:

1.  Compensatory damages according to proof including, but not limited to:

    (a) the costs of investigating, sampling, testing, and assessing the extent of PCB contamination on Plaintiffs' properties;

    (b) the costs of interim measures implemented to reduce further contamination prior to complete removal of PCBs and PCB-containing materials;

    (c) the costs of removing PCBs and PCB-containing materials from Plaintiffs' properties;

    (d) the costs of informing parents and community members about the efforts to remove PCBs from schools.

    (e) Costs of relocating students and staff, e.g. portable classrooms, swing space, and transportation.

2.  Punitive damages;

3.  Prejudgment and post-judgment interest;

4.  Any other and further relief as the Court deems just, proper, and equitable.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial.

Dated:  October 23, 2015

   /s/ Henri Alexandre
Henri Alexandre, Corporation Counsel
City of Hartford
550 Main Street, Suite 210
Hartford, CT 06103
Fed. Bar # Ct 05412
Tel:  (860) 757-9700
Fax:  (860) 722-8114
Henri.alexandre@hartford.gov

Page  24

**BARON & BUDD, P.C.**
Scott Summy (*pending Pro Hac Vice*)
Carla Burke Pickrel (*pending Pro Hac Vice*)
Celeste A. Evangelisti (*pending Pro Hac Vice*)
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Tel:  (214) 521-3605
Fax:  (214) 520-1181
ssummy@baronbudd.com
evangelisti@baronbudd.com
cpickrel@baronbudd.com