**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

CITY OF HARTFORD and                          :
HARTFORD BOARD OF EDUCATION,                  :          Case No.  3:15-cv-01544 (RNC)
                                              :
     Plaintiffs,                            :
                                              :
vs.                                           :
                                              :
MONSANTO COMPANY,                             :
SOLUTIA INC., and                             :
PHARMACIA CORPORATION,                        :
                                              :
     Defendants.                            :

---

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

---

## I.     INTRODUCTION

1.  Plaintiffs CITY OF HARTFORD ("City") and HARTFORD BOARD OF EDUCATION ("Board") operate public schools and buildings in Hartford, Connecticut, including Clark Elementary School, 75 Clark Street, Hartford, CT 06120.  The City has detected toxic chemical compounds identified as Aroclors 1248 and 1254 in Clark Elementary School. Working with the US Environmental Protection Agency ("EPA"), the Board has closed Clark Elementary School until these chemicals can be removed or reduced to a safe level for children.

2.  Defendant Monsanto Company made Aroclors 1248 and 1254, plasticizers unique to, and trademarked by, Monsanto for use in caulks and paints, among other products.

3. Aroclors 1248 and 1254 are dangerous because they were formulated and designed with polychlorinated biphenyls ("PCBs"), compounds that cause a variety of adverse health effects.  Exposure to Aroclors 1248 and 1254 is associated with cancer and serious non-cancer health effects including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects.

4. Wherever Aroclor 1248 or 1254 is used as a plasticizer, the PCBs easily escape into the atmosphere through the normal, intended uses of products that contain these Aroclors.  PCBs migrate out of their original source products, including Aroclors 1248 and 1254 used to plasticize caulks and paints, and contaminate air, dust, and adjacent substrate materials, causing extensive property damage and presenting an exposure risk for teachers, students, and employees who occupy contaminated classrooms.

5. This Complaint generally refers to Aroclor plasticizers made with PCBs as "PCB-Aroclors."

6. As a result of their propensity to migrate out of products that used PCB-Aroclors, PCBs have become a near global environmental contaminant.  To stem the contamination, to prevent health risks associated with exposure to PCBs, and for other reasons, Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979.  The Act forbids the continued use of in-place caulk or paint that contains PCBs at a concentration above 50 parts per million ("ppm").

7. The Plaintiffs seek damages for the costs of investigating, removing toxic Aroclors 1248 and 1254 compounds, remediating all Aroclors 1248 and 1254 contamination, and other damages resulting from the contamination of Clark Elementary School.

## II.    PARTIES

8.  The Board and City share responsibility for operating and maintaining public schools in Hartford, Connecticut and have detected Aroclors 1248 and 1254 in Clark Elementary School.

9.  The City owns the buildings, facilities, and properties of public schools in Hartford and has the authority to construct, renovate, and remodel school buildings and school property. C.G.S.A. § 10-241.  The City also has the financial obligation for investigation and remediation activities conducted at school buildings and school properties.

10. In Connecticut, towns are considered "school districts" for educational purposes.  C.G.S.A. § 10-240.  Therefore, the City of Hartford is a school district and may sue and be sued as provided by C.G.S.A. § 10-241.

11. The Board maintains public schools in the City of Hartford and has a duty imposed by the Connecticut General Assembly to provide an appropriate learning environment for its students, which requires the Board to provide adequate facilities, proper maintenance of facilities, and a safe school setting.  C.G.S.A. § 10-220.  The Board, as it relates to this action, is acting as an agent of the City and may sue and be sued as provided by C.G.S.A. § 52-73.

12. Plaintiffs and all of Plaintiffs' school buildings and properties are located in Hartford, Connecticut.

13. Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri.

14. Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

15. Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to Old Monsanto) is a Delaware LLC with its principal place of business in Peapack, New Jersey.

16. The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceuticals and nutrition business, and a chemical products business.  Old Monsanto began manufacturing Aroclor plasticizers in the 1930s and continued to manufacture them until the late 1970s.

17. Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations.  The corporation now known as Monsanto operates Old Monsanto's agricultural products business.  Old Monsanto's chemical products business is now operated by Solutia.  Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

18. Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business.  Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.

19. Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.

20. In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code.  Solutia's reorganization was completed in 2008.  In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia, and New Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.

21. Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as "Defendants."

## III.    JURISDICTION AND VENUE

22. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiffs and Defendants.  Each Plaintiff is a citizen of Connecticut, but no Defendant is a citizen of Connecticut.  Monsanto is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Solutia is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Pharmacia is a Delaware limited liability company with its principal place of business in Peapack, New Jersey.

23. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the property that is the subject of the action is situated in this judicial district.

## IV.    FACTUAL ALLEGATIONS

### A.  Monsanto Manufactured PCBs for Use in the United States Until the 1979 Ban.

24. A plasticizer is a commercial product that adds flexibility and other qualities to plastic and other materials.  Plasticizers are not natural raw materials but commercial products that companies including Monsanto synthesized specifically for their plasticizing properties.

25. Monsanto developed an expansive line of plasticizers, some of which were known by the trade name "Aroclors." Although the majority of Monsanto's plasticizers did not contain PCBs, at least ten of the Aroclor products were made with PCBs. These include Aroclor 1016, 1221, 1232, 1242, 1248, 1254, 1260, 1262, 1268, and 1270. The specific products at issue in this case are Aroclors 1248 and 1254, PCB-containing plasticizer products unique to, and trademarked by, Monsanto.

26. Between approximately 1950 and 1970, Monsanto promoted and sold PCB-Aroclors, including Aroclors 1248 and 1254, for formulators to use in window caulks, paints, sealants, and mastics for the construction and renovation of buildings throughout the United States.

27. In addition to developing plasticizers, Monsanto created the Plasticizer Council to recommend particular plasticizers to formulators for specific applications. The company instructed formulators in product selection, formulation, use, and applications. Monsanto would also formulate a particular plasticizer for a customer's needs.

28. Upon information and belief, it was Monsanto --- and not the formulator --- that decided whether that formulator would use a PCB-Aroclor or a non-PCB plasticizer.

29. Only Monsanto, and not the formulators, had full knowledge of the risks of using Aroclors 1248, 1254 and other PCB-Aroclors.

30. Monsanto did not market plasticizers to formulators as "PCBs" but as "Aroclors." The marketing materials neither disclose which Aroclors contained PCBs nor explain the properties and potential risks of using plasticizers containing PCBs.

31. Although Monsanto eventually withdrew PCB-containing plasticizers from the market in 1970, the company never advised either the formulators or the foreseeable users of plasticizer-containing products of the dangers of PCB-Aroclors or attempt to recall the

products.  In fact, Monsanto continued to urge customers to purchase PCB-Aroclors until the very end of production, even encouraging them to stockpile product for use after production ceased.  Accordingly, PCB-containing products are likely to remain present in any number of materials present in a school built or renovated during this period.

32. Because PCBs are highly volatile, they evaporate out of whatever products contain them.

33. Plasticizer applications are known as "open uses" or "open systems" because no physical barrier prevents PCBs from direct contact with the surrounding environment.  In open uses, Aroclors 1248 and 1254 readily shed PCBs.  These PCBs then migrate into and contaminate surrounding materials including "adjacent substrates" such as masonry, wood, drywall, and soil.  PCBs also contaminate the air, dust, and indoor surfaces.  Caulks, paints, sealants, and mastics are "open uses."  The caulks, paints, and other materials that contain PCB-Aroclors in the Hartford school are "open uses." PCB-Aroclors including Aroclor 1254 were also occasionally used in the electrical capacitors attached to fluorescent lights.  Because the PCB-Aroclor in that application is contained within the hardware, this is considered an "enclosed use" or "closed system."  Despite the physical enclosure of the Aroclor, PCBs can leak from light fixtures and similarly contaminate and damage surrounding materials.

34. The Environmental Protection Agency ("EPA") conducted research of PCBs in school buildings and confirmed that emissions from PCB-Aroclors including 1254 in caulk and fluorescent light ballasts cause elevated PCBs in the surrounding air.

35. EPA concluded that some building materials (*e.g*., paint and masonry walls), adjacent substrates, and indoor dust can absorb PCB emissions and become potential secondary sources of contamination that begin emitting PCBs on their own.

**EXPOSURE TO PCBs IS ASSOCIATED WITH SERIOUS HEALTH EFFECTS**

36. The emissions of PCBs from PCB-Aroclors including 1248 and 1254 and resulting contamination of school buildings may present health risks to building occupants including students, teachers, other employees, and visitors.

37. PCBs can enter the human body through ingestion, inhalation, and dermal contact.

38. Children, teachers, and employees who work in school buildings may inhale PCBs that are emitted into the air from Aroclors 1248 and 1254 in caulk, paint, light ballasts, and other secondary sources.   They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks.  And they may absorb PCBs from physical contact with Aroclor 1248- and 1254-containing materials, secondary sources, or surfaces that have become contaminated by air or dust.

39. Any exposure is a concern to a reasonable school district because Aroclors 1248 and 1254 and PCBs are associated with serious health risks.

40. In 2015, the International Agency for Research on Cancer (IARC) published Monograph 107, finding that sufficient scientific evidence exists to conclude that PCBs are carcinogenic to humans.  The United States EPA has likewise determined that the PCBs in Monsanto's PCB-Aroclors are probable human carcinogens.

41. In addition, EPA concluded that PCBs are associated with serious non-cancer health effects. EPA has found evidence that PCBs may exert effects on the immune system, the reproductive system, the nervous system, and the endocrine system.

42. Children may be affected to a greater extent than adults.  The Agency for Toxic Substances and Disease Registry explained:  "Younger children may be particularly vulnerable to PCBs because, compared to adults, they are growing more rapidly and generally have lower and

distinct profiles of biotransformation enzymes, as well as much smaller fat deposits for sequestering the lipophilic PCBs."

43. Monsanto's internal documents show that Monsanto knew that PCB-Aroclors were toxic as early as the 1930s.

44. A 1937 memorandum reflects the company's knowledge that studies of animal exposure by inhalation or ingestion led to systemic toxic effects.

45. Monsanto specifically advised against exposure to airborne PCB-Aroclor vapors in the 1940s.

46. Emmet Kelly, Monsanto's Medical Director, acknowledged in 1955 that the company knew that PCB-Aroclors are toxic.  Later that year, Monsanto's Medical Department advised that workers should not be allowed to eat lunch in the Aroclor department because these compounds are quite toxic by ingestion or inhalation.

47. Monsanto's potential customers also reported the results of their own toxicity studies to the company.  After conducting its own tests, the U.S. Navy decided against using Monsanto's PCB-Aroclors because the Navy felt them too toxic for use in submarines.

48. In 1966, Kelly reviewed and did not dispute a presentation that referred to a 1939 study associating PCBs with the deaths of three young workers and concluding that pregnant women and persons who have at any time had any liver disease are particularly susceptible to their effects.

**PCBs CANNOT BE CONTAINED IN PLASTICIZERS**

49. Monsanto's documents also show that the company knew that Aroclors emitted PCBs that could not be contained in products or applications and recognized that, as a result, PCBs were becoming a widespread environmental contaminant.

50. In the early 1950s, Monsanto became aware that research indicated that Aroclors volatilized out of indoor paints plasticized with PCB-Aroclors,  resulting in vapor concentrations that exceeded safe levels.  Based on this evidence, Monsanto acknowledged that "[t]here must clearly be circumstances under which the use of Aroclor containing paints will constitute a health hazard," and recognized the need to test each paint for safety before distributing it freely for household use.  Monsanto had specifically "barred" the use of certain PCB-Aroclors as plasticizers intended for use in indoor home paints for these reasons.

51. The company's own testing of paint plasticized with Aroclor 1248 provided evidence that airborne PCB concentrations persisted for at least a month.  Monsanto also recognized that using such a paint over a large area could create a hazardous condition, especially considering the long exposure to these concentrations.

52. Monsanto was also aware by the mid-1960s that PCBs were becoming a major environmental contaminant due, in large part, to the use of PCB-Aroclors as plasticizers.  A Monsanto consultant advised that a substantial percentage of the PCB used in plasticizers and other products escapes into the environment.  He urged the company to stop using PCBs in Aroclor plasticizers:  "it seems to the writer that the evidence regarding PCB effects of environmental quality is sufficiently substantial, widespread, and alarming to require immediate corrective action on the part of Monsanto."

53. Despite the clear knowledge of the dangers posed by selling PCB-Aroclors as plasticizers, Monsanto did not immediately discontinue the sale of these products, recall the products, and ensure that no additional PCB-Aroclors be used in open systems.  Rather, Monsanto continued to manufacture, market, promote, and sell these plasticizers for several more years to maximize profits.  Had Monsanto stopped selling these products when it unquestionably

became aware of the risks --- *i.e.*, by the mid-1960s --- the Clark Elementary School would not be contaminated.

54. Monsanto's Aroclor Ad Hoc Committee held its first meeting on September 5, 1969.  The committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB "may be a global contaminant."   The meeting minutes acknowledge that PCB-containing products rapidly contaminate the environment and specifically implicate highway paints:  "In one application alone (highway paints), one million lbs/year are used.  Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."

55. The Committee reported in 1969 significant vapor losses from plasticizers used in paints and caulks.  One employee recognized that  releases from end uses would result in greater consumer exposure.

56. Still, the Committee identified a number of actions to prolong the manufacture, sale, and use of PCB-containing Aroclors.

57. By May 1970, Monsanto internally admitted that the potential harm to human health and the environment required that they no longer sell PCB-Aroclors (including Aroclors 1248 and 1254) for open uses including paints, caulks, and sealants.

58. Despite this decision, however, the company continued to sell these Aroclors until August 1970.

59. In 1970, after Monsanto had acknowledged the catastrophic problem of PCB contamination and exposure, PCB production in the United States peaked at 85 million pounds.

60. During the summer of 1970, Monsanto encouraged its customers to stockpile these plasticizers to use after that date.

61. Monsanto urged a customer in Cambridge, Massachusetts to "stock up" on sufficient quantities of Aroclor 1200 series products to cover its needs for up to two years.  Monsanto was aware that another customer stockpiled enough Aroclor 1254 to last through 1971.

62. At the same time, Monsanto began trying to downplay the ubiquity of PCB-Aroclors that remain present in open uses, like caulk and paint.  In a press release, the company claimed: "What should be emphasized . . . is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors.  It is also used in commercial heating and cooling systems.  It is not a 'household' item."

63. At no point did Monsanto contradict this statement by alerting foreseeable users of plasticizer-containing products, including Plaintiffs, that PCB-Aroclors could be found in "open" use building materials, including paint and caulk, and could cause contamination and property damage.  Plaintiffs would have acted on this alert had they received it.

64. As a result, Aroclor 1248 and 1254 products remain in use in schools and buildings across the United States, notwithstanding the ban.

**LEGAL AND REGULATORY STANDARDS APPLICABLE TO PCBs**

65. Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of all PCB-containing products as of January 1, 1979.

66. More than thirty years passed before EPA announced that homes, schools, and other commercial buildings may have been built with PCB-containing materials.  In a press release issued on September 25, 2009, EPA advised that although PCBs were banned by 1979, they remained in place in buildings that were constructed before the ban.

67. On December 12, 2013, EPA issued a press release advising that PCB-containing fluorescent light ballasts that were installed prior to the ban may still be in use in schools and may leak PCBs.

68. EPA has held that allowing caulk or paint with a PCB concentration over 50 ppm to remain in place is prohibited "use" under TSCA.

69. EPA has not issued any information regarding possible PCB-Aroclor contamination in schools in Hartford.

**PLAINTIFFS' CLARK ELEMENTARY SCHOOL IS CONTAMINATED WITH PCB-PLASTICIZERS.**

70. Plaintiffs Board and City operate and maintain a public school system in Hartford, Connecticut and have detected PCBs in Clark Elementary School.

71. Clark Elementary School was built in 1971.  In 2014, dangerous levels of Aroclors 1248 and 1254 were detected in indoor paint samples taken at the school, necessitating removal and remediation.

72. Further testing showed PCBs in the school's air at concentrations exceeding EPA's recommended levels.  The Board, with EPA oversight, has closed the school until all PCB 1248 and 1254 contamination can be identified and removed.

73. Plaintiffs were not aware of potential harms related to PCB-Aroclors at the time of renovations or constructions that used these plasticizers.  Had they known, Plaintiffs would not have used PCB-Aroclors or products plasticized with PCB-Aroclors.

74. Pursuant to the educational interests of the state, the State of Connecticut imposes a duty upon Plaintiffs to provide adequate facilities, proper maintenance of schools, and a safe school setting.  C.G.S.A. § 10-220.

75. The State of Connecticut imposes a duty upon Plaintiffs to "adopt and implement an indoor air quality program that provides for ongoing maintenance and facility reviews necessary for the maintenance and improvement of the indoor air quality of its facilities[.]" C.G.S.A. § 10-220.

76. By 1969, before Clark Elementary School was built, Monsanto had accumulated decades of evidence that PCB-Aroclors were toxic to humans, that PCBs would volatilize out of Aroclors 1248 and 1254 used in indoor paints and caulks reaching dangerous levels in indoor air, that PCBs would migrate onto and contaminate nearby materials causing property damage, and that occupants of buildings would be exposed to potentially dangerous levels of PCBs.

77. In fact, the company had actual knowledge about the dangers associated with the use of PCB-Aroclors in paints.

78. Migration of PCBs may begin as soon as PCBs or PCB-containing products are installed or applied, regardless of climate and without any prior deterioration.

79. At no point did Monsanto warn or alert the City or Board that PCBs may migrate and contaminate ambient air or secondary sources.

<u>**FIRST CAUSE OF ACTION**</u>

**CONNECTICUT PRODUCTS LIABILITY ACT
STRICT LIABILITY**

80. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this cause of action.

81. Monsanto created a line of commercial plasticizer products including Aroclors 1248 and 1254.   Although Aroclors 1248 and 1254 were made with PCBs, Monsanto made Aroclor plasticizers that did not contain PCBs.   As a large and sophisticated chemical company,

Monsanto was in the business of producing, making, fabricating, constructing, designing, marketing, and selling PCB-containing Aroclors for placement into trade or commerce.

82. All of Monsanto's Aroclor plasticizers were manufactured for placement into trade or commerce.

83. Monsanto marketed and sold PCB-Aroclors as commercial plasticizers for incorporation into other products, including those for "open use" applications in schools and other buildings.

84. Monsanto was heavily involved in determining which plasticizer to sell to a formulator for a particular use. Monsanto recognized that "even the most experienced formulator is bewildered by the maze of possibilities from which to select" a plasticizer "for his particular application" and advertised that its Plasticizer Council provided "much more than simply the products;" it also provided "expert guidance in their use." The Council studied applications in its laboratory and recommended specific plasticizers to its customers.

85. Monsanto alone controlled the formulation of its plasticizer products and determined which ones would contain PCBs and which would not.

86. Monsanto also provided advice and recommendations as to whether PCB-Aroclor plasticizer should be used in a particular formulator's application.

87. Monsanto's customers used the plasticizers in the intended manner and in a substantially unchanged way.

88. As a manufacturer, Monsanto owed a duty to all persons whom its products might foreseeably harm, including Plaintiffs, not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

89. PCB-Aroclors are in a defective condition and are unreasonably dangerous for their reasonably anticipated use in school buildings for the following reasons:

a.  Monsanto selected a plasticizer for a formulator's needs without disclosing whether that plasticizer was a PCB-Aroclor;

b.  Monsanto did not advise the formulators regarding which Aroclor plasticizers contained PCBs and which did not;

c.  When PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, are used in open applications, the PCB compounds readily volatilize out of the original application;

d.  PCB volatilization begins soon after the Aroclor-containing product is installed or put into use;

e.  Once volatilized, PCBs migrate to and contaminate adjacent materials, dust, air, interior surfaces, exterior surfaces, and soil;

f.  PCBs can then volatilize out of these materials and contaminate still other materials;

g.  When PCBs volatilize, building occupants including students, teachers, employees, and visitors may be exposed to PCBs via inhalation, ingestion, and dermal contact;

h.  PCB is a human and animal carcinogen and is associated with other serious health risks;

i.  PCB exposure may be halted and prevented only by physical removal of the original PCB-Aroclors and any secondary materials that have become contaminated;

    j.  Because remediation involves removal of all damaged property, it can require removal of building materials such as interior walls and brick that were not made with PCB-Aroclors;

    k.  Such remediation is extremely expensive to undertake, disrupts normal classroom activities, and may cause undue concern on the part of students, teachers, school employees, and parents.

90. At the time of sale, Monsanto knew of these risks associated with PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, and failed to use reasonable care in the design of its plasticizer products.

91. PCB-Aroclor plasticizers for open uses, including Aroclors 1248 and 1254, pose greater dangers to school buildings than would be expected by ordinary persons such as Plaintiffs, schoolchildren, teachers and employees, and the general public.

92. At all times, Monsanto and other companies made plasticizers that did not contain PCBs. These were reasonable alternative designs capable of preventing the Plaintiffs' damage.

93. The risks posed by PCB-Aroclors far outweigh the products' utility as plasticizers in indoor applications.

94. The likelihood that PCBs would migrate out of Aroclor plasticizers, including Aroclors 1248 and 1254, and contaminate Plaintiffs' property and the gravity of that damage far outweighed any burden on Monsanto to adopt an alternative design and outweighed the adverse effect, if any, of such alternative design on the utility of the product.

95. The PCBs began to volatilize and migrate out of their applications shortly after the products were installed or applied.  The migration contaminated underlying and adjacent materials

while the paint, caulk, and other plasticizer-containing materials remained intact and performed their intended functions.

96. Plaintiffs' building was contaminated by Aroclors 1248 and 1254 after their  application in paint or caulk when the building was constructed in 1971.  The contamination began while the paint or caulk was in its useful safe life.

97. Monsanto also fraudulently concealed information about PCB-Aroclors' dangers in open uses in school and other buildings.

98. At least twenty years before Clark Elementary School was constructed, Monsanto had actual knowledge that the use of PCB-Aroclors in paints resulted in air concentrations that exceeded the accepted safe maximum for continuous exposure.  By the mid-1950s, Monsanto acknowledged that the use of Aroclor paints will constitute a health hazard in some circumstances.  The company also had actual knowledge that exposure to airborne Aroclors 1248 and 1254, the plasticizers used in Hartford, caused injury to test animals and led to the conclusion that a painted room could be hazardous.

99. Monsanto also had actual knowledge that PCB-Aroclors emanated out of open uses causing contamination.  It knew, too, that plasticizer use and volatilization represented a substantial percentage of the contamination found in the environment.

100. Despite the company's growing awareness of the dangers of open-use plasticizers containing PCBs, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite – that the compounds were not toxic and that the company would not expect to find PCBs in the environment in a widespread manner.

101.    In a March 24, 1969 letter to the Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."

102.    A similar letter to the San Francisco Bay Regional Water Quality Control Board explained that PCB plasticizers (found in surface coatings, such as paints, industrial adhesives and window sealants), in normal use, present no special health problems.

103.    In May 1969, Monsanto's Manager, Environmental Health, Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."

104.    Monsanto delivered the same message to the New Jersey Department of Conservation in July 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic."  The letter then reiterates Monsanto's position regarding environmental contamination:  "We are unable at this time to conceive of how the PCBs can become wide spread in the environment."

105.    One year later, in a letter to Congressman William Ryan dated April 28, 1970, Monsanto disclaimed all potential human health threats and misrepresented the risk facing occupants of schools and other buildings where plasticizers remained in open uses:  "It should be emphasized that the apparent PCB problem relates only to the possible effects on some species of birds.  Manufacturing and use experience for thirty years, earlier animal toxicity studies, and the interim reports on current extensive toxicological studies with various species of animals indicate that there is no threat to the public health."

106.   Monsanto, thus, had actual knowledge of and misrepresented the very dangers alleged here --- the volatilization of PCBs from plasticizers in open-use applications.  And Monsanto knew of and concealed these dangers before Clark Elementary School was constructed.

107.   Had Plaintiffs known of these dangers, they would not have purchased products containing PCB-Aroclor plasticizers.

108.   Plaintiffs relied on Monsanto's implied warranty that their PCB-Aroclor plasticizers were safe for open use applications.

109.   As a direct and proximate result of Monsanto's unreasonably dangerous design, manufacture, and sale of PCB-Aroclor plasticizers, Plaintiffs have suffered, and continue to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

110.   Monsanto knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of commercial and school properties.  Monsanto committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiffs' property rights.

111.   Monsanto knew and expected that PCB-Aroclors would be used as plasticizers in building materials.  In these materials, Monsanto's PCB-Aroclors would have been expected to and did reach consumers, like Plaintiffs, without substantial change in chemical condition.

## CONNECTICUT PRODUCTS LIABILITY ACT
## FAILURE TO WARN

112.    As a manufacturer of PCB-Aroclor plasticizers, Monsanto had a duty to provide adequate warnings of the risks of these products to all persons whom its product might foreseeably harm, including Plaintiffs, the public, and public officials.

113.    PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, are unreasonably dangerous for their reasonably anticipated use in school buildings for the following reasons:

    a.   When PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, are used in open applications, the PCB compounds readily volatilize out of the original application;

    b.   PCB volatilization begins soon after the plasticizer-containing product is installed or put into use;

    c.   Once volatilized, PCBs migrate to and contaminate adjacent materials, dust, air, interior surfaces, exterior surfaces, and soil;

    d.   PCBs can then volatilize out of these secondary materials and contaminate still other materials;

    e.   When PCBs volatilize, building occupants including students, teachers, employees, and visitors may be exposed to PCBs via inhalation, ingestion, and dermal contact;

    f.   PCB is human and animal carcinogen and is associated with other serious health risks;

    g.   PCB exposure may be halted and prevented only by physical removal of the original PCB-Aroclor products and any secondary materials that have become contaminated;

h.  Because remediation involves removal of all damaged property, it can require removal of building materials such as interior walls and brick that were not made with PCB-plasticizers;

i.  Such remediation is extremely expensive to undertake, disrupts normal classroom activities, and may cause undue concern on the part of students, teachers, school employees, and parents.

114.  Monsanto knew of the health and property damage risks associated with PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, and failed to provide a warning that would lead an ordinary reasonable user or handler of a product to contemplate the dangers associated with PCB-Aroclor plasticizers or an instruction that would have allowed Plaintiffs to avoid the damage to their property.

115.  At the time of manufacture, Monsanto knew or should have reasonably anticipated that formulators and foreseeable users would not be aware of the risks and nature of potential harm of its PCB-Aroclor plasticizer products.

116.  Despite Monsanto's knowledge of the presence of PCB-Aroclor  plasticizers that remain present in "open uses" in commercial buildings and schools nationwide, including Aroclors 1248 and 1254, Monsanto has not issued any warning, instruction, recall, or advice regarding PCB-containing products to schools, communities, parents, or governmental agencies.

117.  Plaintiffs would have heeded legally adequate warnings and would not have purchased products containing PCB-Aroclors or would have taken steps to ensure that PCB-Aroclors were treated differently to prevent potential exposure and contamination of the environment.

118.    As a direct and proximate result of Monsanto's failure to warn, Plaintiffs have suffered, and continue to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

119.    Monsanto knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of commercial and school properties.  Monsanto committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiffs' property rights.

**CONNECTICUT PRODUCTS LIABILITY ACT**
**NEGLIGENCE**

120.    As a manufacturer and seller of PCB-Aroclor plasticizers, Monsanto owed a duty to Plaintiffs and to all persons whom its products might foreseeably harm to exercise due care in the formulation, manufacture, sale, labeling, warning, and use of PCB-Aroclor plasticizers including Aroclors 1248 and 1254.

121.    Monsanto held itself out as an industry expert in plasticizers.  Through its Plasticizer Council, Monsanto advised customers regarding plasticizers for their needs and suggested particular plasticizers for specific applications.

122.    Monsanto sold Aroclor and PCB-Aroclor plasticizers to be used in a wide variety of applications including paints, glues, sealants, caulks, mastics, and others.  Each of those applications could then be used in many different settings – indoor, outdoor, commercial, residential.

123.    Monsanto knew or should have known that Aroclors were volatilizing out of open use applications including Aroclor 1248 and 1254 plasticizers used in indoor paints by the early 1950s.  Monsanto recognized a need to perform testing of Aroclor plasticizers used in paints.

124.    Despite this knowledge, Monsanto breached its duty of care to Plaintiffs by:

    a.   intentionally deciding not to perform testing on all PCB-containing plasticizers, including Aroclors 1248 and 1254, used in indoor paints to determine the rate and concentration of air dispersion and toxicity levels;

    b.   intentionally deciding not to perform studies of the long-term health effects of exposure to PCB-containing plasticizers, including Aroclors 1248 and 1254, used in indoor open use applications;

    c.   intentionally deciding not to perform studies of the causes and extent of environmental PCB contamination;

    d.   intentionally advising formulators to use PCB-Aroclors, including Aroclors 1248 and 1254, for indoor open use applications;

    e.   intentionally marketing plasticizers as "Aroclors" with no distinction between PCB-Aroclors and available alternatives;

    f.   intentionally concealing, or failing to disclose to formulators whether the Aroclor plasticizer selected for their applications contained PCBs;

    g.   failing to require product labeling warning of the risks of exposure to PCB-Aroclor plasticizers, including Aroclors 1248 and 1254, used in open use indoor applications;

    h.   intentionally deciding not to stop the use of PCB-Aroclor plasticizers, including Aroclor 1254, for indoor open use applications in schools, commercial buildings, hospitals, etc.;

i.   intentionally concealing information from or misleading regulatory agencies about the potential for open use PCB-Aroclor plasticizers to volatilize and to cause dangerous indoor air conditions;

j.   intentionally mischaracterizing PCB-Aroclors, including Aroclor 1254, as nontoxic;

k.   intentionally concealing the fact that PCBs migrate from PCB-Aroclors onto adjacent materials including substrate, causing extensive property damage; and

l.   intentionally allowing open use PCB-Aroclor plasticizers including Aroclors 1248 and 1254 to remain in place for decades after concerns about toxicity and volatility led Monsanto to stop selling these products for open uses.

125.   Damage and contamination of Plaintiffs' property is the result of Monsanto's reckless disregard for the safety of consumers and users of PCB-Aroclors and products plasticized with PCB-Aroclors.  Monsanto knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of commercial and school properties.  Monsanto committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiffs' property rights.

126.   As a direct and proximate result of Monsanto's negligence, Plaintiffs have suffered, and continue to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

## **PRAYER FOR RELIEF**

Plaintiffs prays for judgment against Defendants, jointly and severally, as follows:

1.  Compensatory damages according to proof including, but not limited to:

    (a) the costs of investigating, sampling, testing, and assessing the extent of

    Aroclor 1248 and 1254 contamination at Clark Elementary School;

    (b) the costs of interim measures implemented to reduce further contamination

    prior to complete removal of Aroclors 1248 and 1254 from Clark Elementary

    School;

    (c) the costs of removing  adjacent substrates and other contaminated materials

    from Clark Elementary School;

    (d) the costs of informing parents and community members about the efforts to

    remove Aroclors 1248 and 1254 from Clark Elementary School.

    (e) the costs of relocating students and staff, e.g. portable classrooms, swing

    space, and transportation from Clark Elementary School.

2.  Punitive damages;

3.  Prejudgment and post-judgment interest;

4.  Any other and further relief as the Court deems just, proper, and equitable.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial.

Dated:  September 9, 2016

<div style="margin-left: 40%">

  /s/  Carla Burke Pickrel

**BARON & BUDD, P.C.**
Scott Summy  (*Pro Hac Vice*)
Carla Burke Pickrel  (*Pro Hac Vice*)
Celeste A. Evangelisti  (*Pro Hac Vice*)
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219

</div>

Tel:  (214) 521-3605
Fax:  (214) 520-1181
ssummy@baronbudd.com
evangelisti@baronbudd.com
cburkepickrel@baronbudd.com

Howard Rifkin, Corporation Counsel
City of Hartford
550 Main Street, Suite 210
Hartford, CT   06103
Tel:  (860) 757-9700
Fax:  (860) 722-8114
Howard.Rifkin@hartford.gov

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing document has

been served by email to the following counsel of record, on this the 9th day of September 2016.

Paul d. Williams (ct05244)
pdwilliams@daypitney.com
Elizabeth C. Barton (ct07660)
ecbarton@daypitney.com
Michael Thad Allen (ct29813)
mallen@dayptiney.com
Michael L. Miller (ct29137)
mlmiller@daypitney.com
Day Pitney LLP
242 Trumbull Street
Hartford, CT 06103-1212
(860) 275-0100
(860) 275-0343 (fax)

/s/  Carla Burke Pickrel