# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CITY OF HARTFORD and HARTFORD BOARD OF EDUCATION, | : | CIVIL ACTION NO. |
| | : | |
| | : | 3: 15-CV-01544(RNC) |
| *Plaintiffs* | : | |
| | : | |
| v. | : | |
| | : | |
| MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA CORPORATION, | : | JUNE 15, 2018 |
| | : | |
| *Defendants* | : | |
| | : | |

---

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

**WHITE AND WILLIAMS LLP**
Thomas M. Goutman (*pro hac vice*)
Richard L. Campbell (*pro hac vice*)
Kim Kocher (*pro hac vice*)
1650 Market Street, Suite 1800
Philadelphia, PA 19103
*Attorneys for Defendants*
*Monsanto Company; Solutia Inc.;*
*and Pharmacia LLC*

**DAY PITNEY LLP**
Paul D. Williams (ct05244)
Elizabeth C. Barton (ct07660)
Michael L. Miller (ct29137)
Elizabeth P. Retersdorf (ct29178)
242 Trumbull Street
Hartford, CT 06103
*Attorneys for Defendants*
*Monsanto Company; Solutia Inc.;*
*and Pharmacia LLC*

**CAPES, SOKOL, GOODMAN & SARACHAN, P.C.**
Adam E. Miller (*pro hac vice*)
7701 Forsyth Blvd., 12th Fl.
St. Louis, MO 63105
*Attorneys for Defendants*
*Monsanto Company; Solutia Inc.; and Pharmacia LLC*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ..................................................................................................... 1

STATEMENT OF THE CASE.................................................................................... 1

    A.    Factual Background ................................................................... 1

    B.    Procedural History ................................................................... 3

    C.    The Dismissal of the *Westport* Case ..................................... 4

    D.    Plaintiffs' Expert Admissions .................................................. 5

STANDARD FOR SUMMARY JUDGMENT.............................................................. 7

ARGUMENT ............................................................................................................. 7

I.     PLAINTIFFS FAILED, AS A MATTER OF LAW, TO ESTABLISH A DESIGN DEFECT CLAIM......... 7

    A.    Plaintiffs Failed to Establish Design Defect Under the Risk-Utility Alternative Design Theory............................................................. 8

        1.    No Alternative Design Existed for PCBs................................... 8

        2.    No Likelihood of Harm Existed in 1970 or Today .................... 9

    B.    Plaintiffs Failed to Establish Design Defect Under the Risk-Utility Manifestly Unreasonable Design Theory............................................. 11

    C.    Plaintiffs Failed to Establish Design Defect Under the Consumer Expectations Theory ........................................................................ 14

II.    PLAINTIFFS FAILED, AS A MATTER OF LAW, TO ESTABLISH A FAILURE TO WARN CLAIM .. 16

    A.    No Duty to Warn of the Alleged Harm Existed in 1970......................... 17

    B.    Defendants Discharged any Duty to Warn by Warning Their Customers............. 17

    C.    Plaintiffs Failed to Establish Causation .................................. 20

III.   PLAINTIFFS FAILED, AS A MATTER OF LAW, TO ESTABLISH A NEGLIGENCE CLAIM............ 21

    A.    Plaintiffs Failed to Establish a Negligent Design Claim ....................... 21

    B.    Plaintiffs Failed to Establish a Negligent Failure to Warn Claim ......................... 21

           1.       Plaintiffs' Negligent Failure to Warn Claim Is Not Cognizable...............21

           2.       Plaintiffs' Post-Sale Warning Theory Is Not Cognizable.........................22

     C.      Plaintiffs Failed to Establish a Failure to Test Claim .............................................23

IV.     PLAINTIFFS FAILED, AS A MATTER OF LAW, TO ESTABLISH A COMPENSABLE INJURY ........24

V.      PLAINTIFFS' DAMAGE CLAIMS SHOULD BE DISMISSED IN THEIR ENTIRETY AND, IN THE
ALTERNATIVE, CAPPED AT THE FAIR MARKET VALUE OF THE CLARK SCHOOL ................26

     A.      Plaintiffs Failed, as a Matter of Law, to Establish Their Damage Claims.............26

     B.      Plaintiffs' Damages Claims Should Be Capped at Fair Market Value .................27

           1.       Fair Market Value Represents the Damages Ceiling.................................28

           2.       Plaintiffs' Damages Claims Should Be Capped at $1.00 .........................29

VI.    PLAINTIFFS' CLAIMS ARE TIME-BARRED, AS A MATTER OF LAW, BY THE STATUTE OF
LIMITATIONS..................................................................................................................32

     A       Plaintiffs Knew of the Alleged Harm Before 2012 ..............................................32

     B.      Plaintiffs Should Have Discovered the Alleged Harm Before 2012 ....................33

CONCLUSION.........................................................................................................................36

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

CASES:                                                                                          PAGE

*Avoletta v. State,*
   152 Conn. App. 177 (2014) ....................................................................................35, 36

*Bagley v. Adel Wiggins Grp.,*
   327 Conn. 89 (2017) ...................................................................8, 11, 15, 16, 22, 23, 24

*BellSouth Telecomms. v. W.R. Grace & Co.,*
   77 F.3d 603 (2d Cir. 1996)...............................................................................24, 25, 33

*Beyer v. Anchor Insulation Co.,*
   2017 U.S. Dist. Lexis 23434 (D. Conn. Feb. 17, 2017)..........................................15

*Bifolck v. Philip Morris, Inc.,*
   324 Conn. 402 (2016) ................................................7, 8, 10, 12, 13, 15, 21, 22

*Bowerman v. United Illuminating,*
   1998 Conn. Super. LEXIS 3575 (Conn. Super. Ct. Dec. 15, 1998) ........................26

*Burns v. Hartford Hosp.,*
   192 Conn. 451 (1984) ................................................................................................32

*Catz v. Rubenstein,*
   201 Conn. 39 (1986) ..................................................................................................33

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986).....................................................................................................7

*City of San Diego v. U.S. Gypsum Co.,*
   30 Cal. App. 4th 575, 35 Cal. Rptr. 2d 876 (1994)..................................................33

*Dennis v. ICL, Inc.,*
   957 F. Supp. 376 (D. Conn. 1997) ...........................................................................26

*Densberger v. United Techs. Corp.,*
   297 F.3d 66 (2d Cir. 2002)...................................................................................21, 22

*Dickerson v. Little,*
   1992 Conn. Super. LEXIS 1674 (Conn. Super. Ct. June 3, 1992) ..........................26

*Gajewski v. Pavelo,*
   36 Conn. App. 614 (1994) ........................................................................................18

*Gnazzo v. G.D. Searle & Co.,*
   973 F.2d 136 (2d Cir. 1992)................................................................................34, 36

*Izzarelli v. R.J. Reynolds Tobacco Co.*,
  321 Conn. 172 (2016) ............................................................7, 8, 9, 10, 13, 15, 17

*Jarmie v. Troncale*,
  306 Conn. 578 (2012) ........................................................................................23

*Junk v. Terminix Int'l Co. L.P.*,
  2008 U.S. Dist. LEXIS 103176 (S.D. Iowa Nov. 3, 2008) ...................................12

*Karavitis v. Makita U.S.A., Inc.*,
  243 F. Supp.3d 235 (D. Conn. 2017) ..........................................................8, 12, 15

*Kraft Gen. Foods v. Cattell*,
  18 F. Supp. 2d 280 (S.D.N.Y. 1998) ....................................................................6

*Meiri v. Dacon*,
  759 F.2d 989 (2d Cir. 1985)..................................................................................7

*Parish v. ICON Health & Fitness, Inc.*,
  719 N.W.2d 540 (Iowa 2006) ..............................................................................12

*Peerless Ins. Co. v. Tucciarone*,
  48 Conn. App. 160 (1998) ...................................................................................32

*Pitterman v. GM LLC*,
  2016 U.S. Dist. Lexis 57165 (D. Conn. April 29, 2016) .................................10, 13

*Potter v. Chicago Pneumatic Tool Co.*,
  241 Conn. 199 (Conn.)......................................................................................10, 13

*Sharp v. Wyatt, Inc.*,
  31 Conn. App. Ct. 824, 848-49 (1993) ...........................................................18, 20

*Shulins v. New England Ins. Co.*,
  360 F.2d 781 (2d Cir. 1966).................................................................................6

*Tomer v. Am. Home Prod. Corp.*,
  170 Conn. 681 (1976) .........................................................................................17

*Town of Lexington v. Pharmacia Corp.*,
  133 F. Supp. 3d 258 (D. Mass. 2015) ...................................................................4

*Tuscumbia City Sch. Sys. v. Pharmacia Corp.*,
  2105 U.S. Dist. Lexis 182581 (N.D. Ala. Sept. 1, 2015)......................................4

*Vector–Springfield Properties, Ltd. v. Central Illinois Light Co., Inc.*,
  108 F.3d 806 (7th Cir.1997) ...........................................................................34, 36

*Vitanza v. Upjohn Co.*,
  257 Conn. 365 (2001) ...........................................................................................18

*Water Pollution Control Auth. of Norwalk v. Flowserve US Inc.*,
  2018 U.S. Dist. LEXIS 52168 (D. Conn. 2018) .....................................................8

*Weinstock v. Columbia Univ.*,
  224 F.3d 33 (2d Cir. 2000)......................................................................................7

*Westport v. Monsanto*,
  No. CV 14-12041, 2017 U.S. Dist. Lexis 53815 (D. Mass. Apr. 7, 2017),
  *aff'd*, 877 F.3d 58 (1st Cir. 2017) ................................................................*Passim*

*Whitman Hotel Corp. v. Elliott & Watrous Eng'g Co.*,
  137 Conn. 562 (1951) .........................................................................25, 26, 28, 29

## STATUTES AND COURT RULES:

Fed. R. Civ. P. 56 ..........................................................................................................6, 7

Conn. Gen. Stat. § 52–584 ............................................................................................32

Conn. Gen. Stat. § 52-572q...................................................................................16, 18

Conn. Gen. Stat. § 52-572q(b) .....................................................................................18

Conn. Gen. Stat. § 52-572q(b)(1) ................................................................................17

Conn. Gen. Stat. § 52-572q(b)(2) ................................................................................17

Conn. Gen. Stat. § 52-577a ....................................................................................32, 34

Conn. Gen. Stat. § 52-577c....................................................................................32, 34

## INTRODUCTION

Defendants Monsanto Company, Solutia Inc., and Pharmacia LLC (improperly referred to as Pharmacia Corporation) seek the dismissal of this action.  This is a products liability action brought by the City of Hartford and Hartford Board of Education ("Hartford" or "Plaintiffs") for alleged property damage due to the volatilization of polychlorinated biphenyls ("PCBs") from caulk used in the construction of the Clark Elementary School ("Clark" or "Clark School") in 1971.  Relying on many of the same experts, Plaintiffs make the identical claims rejected in *Westport v. Monsanto*, No. CV 14-12041 (D. Mass. Apr. 7, 2017), *aff'd*, 877 F.3d 58 (1st Cir. 2017).  Based on equivalent Connecticut law, Plaintiffs' complaint should, likewise, be dismissed.  Plaintiffs failed, as a matter of law, to establish a design defect claim, a failure-to-warn claim, any negligence claim, a compensable injury, or damages, for the principal reason that Plaintiffs' experts, as in *Westport*, admit that no scientific study exists even today purporting to demonstrate that PCBs volatilize from caulk at levels capable of causing human disease.  Plaintiffs' claims should also be dismissed for untimeliness under the applicable statute of limitations.

## STATEMENT OF THE CASE

### A.    Factual Background

Defendants incorporate by reference herein their concurrently-filed Statement of Material Facts ("SOF").  In summary, PCBs were an industrial chemical sold in bulk to sophisticated manufacturers who incorporated PCBs into their products because of their unique constellation of chemical properties, including non-flammability, and low vapor pressure.  (SOF ¶¶4,7). Manufacturers of polysulfide caulk (called "formulators") used two pure PCB products (called Aroclor 1248 and 1254) as plasticizers because, among other things, PCBs tended to stay put within the caulk and made it more durable.  (SOF ¶¶6,17,70).

Beginning in the 1930s, Pharmacia provided its customers with product bulletins and warnings that included information on toxicity and chemical properties. (SOF ¶¶24,30,40-41). Relevant to Plaintiffs' claims here, Pharmacia warned that PCBs could cause systemic toxicity, based on animal tests by Harvard University scientists who also concluded that PCBs were of relative low toxicity and could be safely manufactured and used. (SOF ¶38). Plaintiffs' experts agree that all chemicals can be systemically toxic and, quoting Paracelsus, "the dose differentiates the poison from the remedy." (SOF ¶37). Also, in product bulletins and warnings, Pharmacia described the chemical properties of PCBs, including vapor pressure, stability, and resistance to biological and chemical degradation, properties that Plaintiffs' formulator expert testified would mean to Pharmacia's customers that PCBs were "the definition" of environmentally persistent. (SOF ¶45). It was also common knowledge, according to Plaintiffs' experts, that all plasticizers would volatilize from caulk. (SOF ¶19).

The Clark School was built in 1971 and, because of delayed maintenance and pervasively obsolete building systems from basement to roof, the school had been scheduled – before PCBs were ever detected in the building – to be gutted and reconstructed beginning in 2019. (SOF ¶¶56-59) Plaintiffs now seek costs for the very same work – gutting the building and replacing its obsolete building systems – as hypothetical future PCB remediation damages in this case. As it relates to PCBs, independent reviews of the PCB test data at the Clark School by the Connecticut Department of Public Health, the Hartford Department of Health and Human Services, the Hartford Board of Education, and the Agency for Toxic Substances and Disease Registry (a division of the Centers for Disease Control) each confirm that the levels of PCBs found at the Clark School did not present a health risk. (SOF ¶¶72-74). A publication by the Connecticut Department of Public Health, dated January 1, 2015, entitled, Understanding PCB

Exposures at the Clark School, announced "the CT Department of Public Health reviewed the air tests. Even the highest level of 571 nanograms per cubic meter in air found in hallway is way below level that could cause health problems."  (SOF ¶73).

Nonetheless, Plaintiffs moved Clark students to other schools and undertook a cascade of unnecessary and counterproductive rounds of testing and remediation costing $270,986 that only made the already-safe levels of PCBs in the air increase by a factor of 20.  (SOF ¶¶113,121-22). The Clark School, which was less than half-capacity at the time it closed for PCB remediation, has since been permanently closed as part of the city-wide school consolidation program to address declining enrollment.  (SOF ¶83).

### B.    Procedural History

Plaintiffs brought this lawsuit against Defendants on October 23, 2015.  Plaintiffs seek over $11 million in damages allegedly caused by the volatilization of PCBs from PCB-containing caulk in the indoor air and surfaces at the Clark School.  (SOF ¶¶2,137) ("Based upon the concentrations of caulking within the school space, caulking would be considered a primary source.").  In their operative complaint, Plaintiffs assert causes of action for defective design, failure to warn, and negligence under the Connecticut Products Liability Act ("CPLA"), Conn. Gen. Stat. § 52-572n(a).  (ECF No. 71).

During discovery, Plaintiffs disclosed the following experts:  chemical waste engineer Jack V. Matson, PE; industrial hygienist Robert F. Herrick, Ph.D.; toxicologist James R. Olson, Ph.D.; caulk expert Jerome M. Klosowski; property appraiser Patrick S. Craffey; and environmental contractor Ross A. Hartman.  After the expert disclosure deadline, Plaintiffs disclosed rebuttal experts including Lisa Rodenburg, Ph.D.; Mark Tebbets, and Richard DeGrandchamp Ph.D.

By agreement of the parties, approved by the Court, *Daubert* motions relevant to summary judgment are to be filed after the dispositive motions.  Defendants reserve their right to renew this motion for summary judgment, if necessary, after the Court's disposition of Defendants' *Daubert* motions.

C.      **The Dismissal of the *Westport* Case**[1]

Before filing this lawsuit, Plaintiffs' counsel brought the nearly identical *Westport* lawsuit against Defendants in Massachusetts in 2014.  As in this case, Plaintiffs' counsel sought to recover for alleged property damage due to the volatilization of PCBs from caulk used in the construction of a school over forty years ago.  *See Westport v. Monsanto*, No. CV 14-12041, 2017 U.S. Dist. Lexis 53815 (D. Mass. Apr. 7, 2017) (granting defendants' motion for summary judgment), *aff'd*, 877 F.3d 58 (1st Cir. 2017).  In support of the *Westport* plaintiffs' claims, Plaintiffs' counsel proffered the same experts as in this case:  Matson, Olson, Herrick, and Hartman.  Based substantially on the plaintiffs' experts' admissions, the Massachusetts District Court granted Defendants' motion for summary judgment, and the First Circuit affirmed the dismissal of the *Westport* action, during the pendency of this action.  *Id.*

Based on the admissions of Matson, Herrick, and Olson, that there are no scientific studies even today that purport to demonstrate that PCBs volatizing from building products, or PCBs at the levels found at the Westport school, cause human disease, the District Court in *Westport* concluded that the *Westport* plaintiffs could not establish that "it was reasonably foreseeable more than forty years ago when it is not clear today that the PCBs contained in caulks posed a danger to human health."  *Westport*, 2017 U.S. Dist. Lexis 53815, at *26-*27.

---

[1]The dismissal of the *Westport* action followed the dismissal by summary judgment of other PCB school cases in Alabama, *Tuscumbia City Sch. Sys. v. Pharmacia Corp.*, 2105 U.S. Dist. Lexis 182581 (N.D. Ala. Sept. 1, 2015), and Massachusetts, *Town of Lexington v. Pharmacia Corp.*, 133 F. Supp. 3d 258 (D. Mass. 2015).

Citing Dr. Olson's admission that, even if Defendants had conducted studies of PCBs in the 1950s and 1960s, "he could not say that the company would have discovered anything to suggest a risk of harm," the District Court also rejected the plaintiffs' claim that the risk of harm was discoverable in 1969. *Id.* at *27-*28.

Based on Dr. Matson's admission that PCBs used as plasticizers were pure PCBs, and the *Westport* plaintiffs' experts' failure to identify any reasonable alternative design to PCBs other than not using PCBs at all, the District Court held that the plaintiffs did not establish a reasonable alternative design but, instead, proffered an impermissible categorical challenge to PCBs as PCBs. *Id.* at *16-*17.

The District Court also held that the *Westport* plaintiffs failed to establish a failure-to-warn claim, the only holding that the plaintiffs appealed. The First Circuit affirmed. *Westport*, 877 F.3d at 58. Based on the plaintiffs' experts' admissions, the First Circuit recognized:

- "Given that PCBs are 'invisible to the naked eye' and 'lack a characteristic odor or appearance to alert users of their presence,' their only deleterious effect is their potential to harm human health. In other words, no remediation is necessary – and hence, no property damage results – unless the PCB contamination in a building poses an actual health risk." *Id.* at 65-66.

- "Westport's own experts conceded that there is no scientific literature to date demonstrating that PCBs volatilize from caulk at a rate that is hazardous to human health." *Id.* at 58, 66; *see also id.* at 67 ("Westport's own experts have conceded this point[:] there is no evidence in the record, from either 1969 or the present day . . . that PCBs volatilize from caulk at levels harmful to human health."); *Id.* at *3 ("there are still no studies to date that establish PCBs volatilize from caulk at levels harmful to human health.").

Based on Plaintiffs' experts' admissions in this case, Defendants now move for summary judgment on the equivalent bases under Connecticut law.

### D.    Plaintiffs' Expert Admissions

Plaintiffs have proffered the same experts, Matson, Olson, Herrick, and Hartman, with the same opinions as the *Westport* plaintiffs. Like the *Westport* plaintiffs, Plaintiffs lack the

essential expert opinions required to establish any viable claim.  During depositions in this case, Matson, Olson, Herrick, and Hartman each adopted his prior opinions in *Westport* and/or testified under oath that his opinions have not changed.  (SOF ¶¶7n.1, 37n.2, 46n.3, 95n.4).[2]  In *Westport*, no expert identified an alternative design to PCBs other than not using PCBs and, in this case, Plaintiffs' experts likewise challenge PCBs as PCBs and, therefore, seek to impermissibly impose categorical liability.  Also, here, as in *Westport*, Plaintiffs claim property damage allegedly as the result of PCBs volatilizing from caulk, but, here, as in *Westport*, Dr. Olson and Dr. Herrick both admit there exist no scientific studies purporting to demonstrate either that PCB-containing building products cause disease or that PCBs at the levels found in the Clark School cause disease.  (SOF ¶¶47,77).  Plaintiffs' two other experts, Matson and Klosowski, also admittedly know of no studies purporting to demonstrate that PCB-containing building products cause disease.  (SOF ¶46).  Instead, here, as in *Westport*, Plaintiffs impermissibly seek to eliminate their burden of proof that PCBs made the Clark School unsafe. And, here, Plaintiffs' new caulk expert, Klosowski, admits that plasticizer formulators knew of the very properties of PCBs about which Plaintiffs claim Defendants failed to warn, i.e., that PCBs could be systemically toxic, could volatilize from their formulations, and could persist in the environment.  (SOF ¶19,30,44,45).  Because Plaintiffs cannot recover under any theory based on their own experts' admissions, Defendants are entitled to summary judgment as a matter of law.

---

[2]"Sworn testimony from another trial is admissible for summary judgment."  *Kraft Gen. Foods v. Cattell*, 18 F. Supp. 2d 280, 284 (S.D.N.Y. 1998) ("transcript testimony serves the same purpose as an affidavit under Fed. R. Civ. P. 56 . . . and is comparable in that each form of testimony is sworn and submitted without cross-examination by the adverse party"); *Shulins v. New England Ins. Co.*, 360 F.2d 781, 785 (2d Cir. 1966) (stating that certified transcripts of testimony from another trial "ha[ve] the same evidentiary value and safeguards as affidavits provided for in Rule 56(e)").

## STANDARD FOR SUMMARY JUDGMENT

As "a tool for clearing the calendar of doomed lawsuits," the summary judgment rule requires the plaintiff "'to put up or shut up,'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 40-41 (2d Cir. 2000).  The purpose of summary judgment is to avoid "protracted, expensive, and harassing trials."  *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).  Accordingly, after the movant shows an absence of evidence supporting the non-movant's case, the non-movant must affirmatively "set forth specific facts showing that there is a genuine issue for trial."  *Weinstock*, 224 F.3d at 40-41.  Unsupported allegations do not create a material issue of fact.  *Id.*  "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).

## ARGUMENT

### I.   PLAINTIFFS FAILED, AS A MATTER OF LAW, TO ESTABLISH A DESIGN DEFECT CLAIM

All products liability claims under the CPLA require proof that "the product was in a defective condition unreasonably dangerous to the consumer or user" at the time of sale. *Izzarelli v. R.J. Reynolds Tobacco Co.*, 321 Conn. 172, 184-85 (2016).  For a strict liability claim based on defective design, the plaintiff may prove that the product was in a defective condition unreasonably dangerous to the consumer or user under:  (1) the risk-utility alternative design theory;  (2) the risk-utility manifestly unreasonable design theory;  or (3) the consumer expectations test.  *Bifolck v. Philip Morris, Inc.*, 324 Conn. 402, 434-36 (2016).  Plaintiffs failed to establish design defect under any theory.

A.    **Plaintiffs Failed to Establish Design Defect Under the Risk-Utility Alternative Design Theory**

Under the alternative design theory, the plaintiff's essential burden is to establish that the product had "excessive preventable danger":

> A reasonable alternative design was available that would have avoided or reduced the risk of harm and the absence of that alternative design renders the product unreasonably dangerous. In considering whether there is a reasonable alternative design, the jury must consider the feasibility of the alternative. Other relevant factors that a jury may consider include, but are not limited to, the ability of the alternative design to reduce the product's danger without unreasonably impairing its usefulness, longevity, maintenance, and esthetics, without unreasonably increasing cost, and without creating other equal or greater risks of danger. . . .

*Bifolck*, 324 Conn. at 434-35.

### 1.    *No Alternative Design Existed for PCBs*

Under the risk-utility alternative design theory, the plaintiff is required to prove the existence of a reasonable alternative design. *Id*. Proof of an alternative safe design cannot consist of an entirely different product. *See, e.g.*, *Izzarelli*, 321 Conn. at 204-06 (holding that application of risk-utility test to cigarettes would not impermissibly result in absolute ban on cigarettes as long as the plaintiff identifies a defect beyond a categorical attack on cigarettes, such as a manipulation of nicotine levels by the manufacturer). The Supreme Court recognizes that, for certain products, no alternative design may exist. *Bifolck*, 324 Conn. at 429.

Plaintiffs are required to establish a feasible alternative design for PCBs through expert testimony. *See Karavitis v. Makita U.S.A., Inc.*, 243 F. Supp.3d 235, (D. Conn. 2017) (rejecting alternative design claim for defective power saw in the absence of expert testimony); *Water Pollution Control Auth. of Norwalk v. Flowserve US Inc.*, 2018 U.S. Dist. LEXIS 52168, *69-70 (D. Conn. 2018) (requiring expert testimony to establish alternative design for wastewater treatment facility pump); *see also Bagley v. Adel Wiggins Grp.*, 327 Conn. 89, 101 (2017)

(requiring expert testimony to establish unreasonable dangerousness of asbestos-containing product).

Plaintiffs' experts do not, because they cannot, identify an alternative design to PCBs. As in *Westport*, Matson admits that PCBs used as plasticizers, including Aroclor 1248 and Aroclor 1254 detected at the Clark School, were pure PCBs.  (SOF ¶¶6,70).  It is, thus, undisputed that Aroclors 1248 and 1254 were the actual plasticizers themselves, not ingredients among others contained in PCB plasticizers.  In other words, the product at issue is pure PCBs used as a caulk plasticizer.  Plaintiffs' experts allege that chemicals other than PCBs could have been used as plasticizers by the formulators.  Contrary to *Izzarelli*, Plaintiffs, thus, seek to prove an alternative safe design with an entirely different product.  Plaintiffs do not contend that PCBs could have been made safer, but impermissibly seek to impose absolute or categorical product liability on PCBs.  Because Plaintiffs, like the *Westport* plaintiffs, point to no aspect of Defendants' design of PCBs, other than the PCBs themselves, as "defective," Plaintiffs simply challenge PCBs as PCBs.  Plaintiffs, therefore, failed, as a matter of law, to establish an alternative design defect claim.

### 2.    *No Likelihood of Harm Existed in 1970 or Today*

Even if Plaintiffs could establish the existence of a reasonable alternative design for PCBs, Plaintiffs cannot establish that the absence of that alternative design rendered PCBs unreasonably dangerous.  Plaintiffs' experts, as in *Westport*, concede that there is no scientific study today that purports to demonstrate that PCBs volatilizing from caulk cause human disease. (SOF ¶¶46-51,77); *see Westport*, 877 F.3d at 66 ("Westport's own experts conceded that there is no scientific literature to date demonstrating that PCBs volatilize from caulk at a rate that is hazardous to human health."); *id.* at 67 ("Westport's own experts have conceded this point[:] there is no evidence in the record, from either 1969 or the present day . . . that PCBs volatilize

from caulk at levels harmful to human health."); *id*. at 63 ("there are still no studies to date that establish PCBs volatilize from caulk at levels harmful to human health.").   Plaintiffs, thus, failed to establish that PCBs at levels found in the Clark School rendered the building unsafe.   Indeed, the Connecticut Department of Health, the Hartford Department of Health, the CDC, and the Hartford Board of Education all certified that, with respect to PCBs, the Clark School was safe. (SOF ¶¶72-76).

 "[N]o product liability action can succeed without proof of a defective condition unreasonably dangerous to the consumer or user."   *Bifolck*, 324 Conn. at 439.   Under the alternative design theory, the plaintiff must prove that "the absence of that alternative design renders the product unreasonably dangerous."   *Id*. at 434-35.   A defective product is defined as one that is unreasonably dangerous, not in the abstract, but for its "***intended use***."   *Potter v. Chicago Pneumatic Tool Co.*, 241 Conn. 199, 223 (Conn.) (emphasis added).   In other words, Plaintiffs must prove that PCBs were unsafe for use in caulk, not in the abstract.

As part of the risk-utility test, the plaintiff must establish the magnitude and probability of the risk of harm.   *Bifolck*, 324 Conn. at 416, 435.   Because the plaintiff bears the burden of proving that the defect existed at the time of the sale, *Izzarelli*, 321 Conn. at 184-85, a product defect must be measured by what was known at the time of sale.   *See Pitterman v. GM LLC*, 2016 U.S. Dist. Lexis 57165, *18 (D. Conn. April 29, 2016) ("it is inappropriate to apply modern sensibilities and notions of safety to products that were created in an earlier era").   Accordingly, to establish that PCBs used as plasticizers were defective at the time of sale in 1970, Plaintiffs must show the likelihood and severity of the risk as measured by "evidence concerning injuries or knowledge of the danger of the product in that time."   *Id.*   Plaintiffs, however, failed to

establish that it was known in 1970, or even today, that PCBs are capable of volatilizing from caulk at levels dangerous to human health.

In the Connecticut Supreme Court's most recent pronouncement in *Bagley*, a products liability action for asbestos-related disease, the Court set aside a plaintiff's verdict because "the plaintiff's case lacked essential expert testimony to prove a vital fact in support of her negligence and strict liability claims, that respirable asbestos fibers in a ***quantity sufficient to cause mesothelioma*** were released from [the product] FM-37 when it was used in the manner that it was in the . . . blade shop during the decedent's tenure there." *Bagley*, 327 Conn. at 103-04 (emphasis added).  Recognizing the dose-response relationship between asbestos exposure and disease, the Court concluded that proof of this fact was necessary to prove that FM-37 was dangerous.  *Id*.  Like the plaintiff in *Bagley*, Plaintiffs failed, as a matter of law, to establish, through expert or any other evidence, that PCBs volatilized from the caulk at the Clark School (or anywhere else) in levels capable of causing human disease.

**B.    Plaintiffs Failed to Establish Design Defect Under the Risk-Utility Manifestly Unreasonable Design Theory**

Plaintiffs do not explicitly plead a manifestly unreasonable design theory.  (ECF No. 71).  Nor do Plaintiffs proffer expert opinions in support of a manifestly unreasonable design defect claim.  Regardless of the scope of Plaintiffs' pleading and expert submissions, Plaintiffs failed, as a matter of law, to establish a manifestly unreasonable design defect claim because:  (1) the manifestly unreasonable design theory is applicable to only the rare type of product that is clearly more dangerous than useful; (2) both Plaintiffs' caulk expert, Klosowski, and chemical waste expert, Matson, acknowledged that sophisticated formulators recognized the great utility of PCBs as used in building products, (¶¶4,29); and (3) Plaintiffs' toxicology expert, Olson, and industrial hygiene expert, Herrick, admitted that there exist no scientific studies that purport to

demonstrate that PCBs volatilizing from building products cause human disease, (SOF ¶¶46-51).
In short, there can be no jury issue on a manifestly unreasonable design where Plaintiffs' experts
admit that PCBs, as used in the products involved in this case, had great utility and have not been
established to cause injury.

Under the risk-utility manifestly unreasonable design theory, a product is in a defective
condition unreasonably dangerous to the consumer or user if its risks clearly outweigh its utility.
*Bifolck*, 324 Conn. at 435.  The manifestly unreasonable design defect theory applies only in the
rare case where the product's risks clearly outweigh its utility.  *Id*. at 432 ("The greater the
utility, the greater the risk must be to render the product unreasonably dangerous.").

As recognized by the Connecticut Supreme Court, "not many products will be more
dangerous than useful."  *Id*. at 433.  In fact, there is no known reported decision finding that a
plaintiff established a manifestly unreasonable design defect claim.  To the contrary, the courts
that have addressed the issue have uniformly rejected manifestly unreasonable design claims pre-
trial.  *See, e.g.*, *Karavitis v. Makita U.S.A., Inc.*, 243 F. Supp.3d 235, 242 (D. Conn. 2017)
(granting summary judgment in favor of circular saw manufacturer on manifestly unreasonable
design claim where circular saw functioned without incident for 15 years prior to the plaintiff's
injury); *Parish v. ICON Health & Fitness, Inc.*, 719 N.W.2d 540, 545 (Iowa 2006) (affirming
grant of summary judgment in favor of backyard trampoline manufacturer on manifestly
unreasonable design claim finding, notwithstanding the plaintiff's claim of serious personal
injury, "The benefits of trampolining include use in cardiovascular workouts and other medical
treatments, including "bouncing" therapy for children with cystic fibrosis. Trampolining
obviously provides valuable exercise and entertainment."); *Junk v. Terminix Int'l Co. L.P.*, 2008
U.S. Dist. LEXIS 103176, *9 (S.D. Iowa Nov. 3, 2008) (granting summary judgment in favor of

insecticide manufacturer on manifestly unreasonable design claim in personal injury lawsuit involving alleged neuromuscular injury to fetus, finding product "highly effective at eliminating insects in the home").

This is not the rare type of case to which the manifestly unreasonable design theory would apply.  As with all design defect claims, the safety of the product is not measured in the abstract, but for its "intended use," *Potter.*, 241 Conn. at 223, which, in this case is the specific application of PCBs as plasticizers in caulk.  "[W]hen a product has been designed for and marketed to a limited group with specialized needs and/or knowledge, such as industrial equipment not suited for use by the general public, and the product is accompanied by adequate warnings, whether the product's design is manifestly unreasonable is determined by reference to the intended consumer."  *Bifolck*, 324 Conn. at 435, n.18.  The "reasonableness" of PCB plasticizers is, therefore, measured by the specialized needs and knowledge of the consumer to whom the product is marketed, *id.*, who, as Plaintiffs admit in this case, is the sophisticated caulk formulator.

Also, as in all design defect claims, the plaintiff bears the burden of proving that the defect existed at the time of the sale, *Izzarelli*, 321 Conn. at 184-85, and, therefore, the safety of the product must be measured by what was known at the time of sale, *Pitterman*, 2016 U.S. Dist. Lexis 57165, at *18.

Accordingly, Plaintiffs bear the burden of establishing that, from the perspective of the specialized needs and knowledge of sophisticated caulk formulators in 1970, the risk of using PCB as plasticizers in caulk formulations clearly outweighed its utility.  The evidence regarding the utility and risk of use of PCBs in caulk, from the admissions of Plaintiffs' own experts, defeats Plaintiffs' manifestly unreasonable design claim.

Regarding utility, it is undisputed that polysulfide caulk manufacturers were large sophisticated companies with teams of scientists and engineers who determined the specific formulas used in their products.  (SOF ¶29).  Plaintiffs' caulk expert, Klosowski, conceded that PCBs had numerous positive characteristics that made them well-suited as plasticizers for building products such as caulk, including low volatility; durability; flame-resistance; low solubility; and resistance to chemical and bacterial degradation.  (SOF ¶17).  Likewise, Matson admitted that PCBs, as used in building products such as caulk, possessed those same valuable qualities.  (SOF ¶12).  Regarding risk, Plaintiffs' experts are unanimous that there are no scientific studies that purport to demonstrate that PCBs volatilizing from caulk cause human disease.  (SOF ¶46).  Thus, Plaintiffs failed, as a matter of law, to establish that the alleged risk of PCBs, as used by formulators in caulk, clearly outweighed its utility.  Plaintiffs, therefore, failed, as a matter of law to establish a manifestly unreasonable design clam.

### C.    Plaintiffs Failed to Establish Design Defect Under the Consumer Expectations Theory

Plaintiffs cannot, as a matter of law, establish a design defect under the consumer expectations test because it is not applicable to this case.  It is reserved for *res ipsa*-type cases that do not require expert testimony, and this is clearly not a *res ipsa*-type case, but rather one involving complex issues of chemistry, polymer science, toxicology, and epidemiology.

Under the consumer expectations theory, a product is in a defective condition unreasonably dangerous to the consumer or user if:

> it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." The product must fail to meet legitimate, commonly held, minimum safety expectations of that product when used in an intended or reasonably foreseeable manner. Those expectations may be informed by consumers' experience with the product, the seller's express representations, and product safety laws.

*Bifolck*, 324 Conn. at 436 (citations omitted).  The Connecticut Supreme Court has essentially limited the consumer expectations theory to *res ipsa*-like cases where "the very circumstances of a product's failure provide strong evidence that it was defective."  *Izzarelli*, 321 Conn. at 229-30. Therefore "the consumer expectations test is reserved for cases in which the everyday experience of the product's users permits a conclusion that the product's design violated minimum safety assumptions . . .  All other cases should be determined under the [risk-utility] test."  *Izzarelli*, 321 Conn. at 202-03 (citations omitted).

The consumer expectations theory is inapplicable to this case because the alleged risk of harm posed by PCBs volatilizing from caulk is not within the everyday experience of the ordinary consumer.  *See Bagley*, 327 Conn. at 101 (overturning plaintiff's verdict on consumer expectations test because question regarding release of respirable asbestos fibers from defendant's product was not within common knowledge of lay jurors); *Bifolck*, 324 Conn. at 436 ("a product is in a defective condition unreasonably dangerous to the consumer or user only if it is 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics").  The question of whether the chemical properties of PCBs render them unreasonably dangerous requires expert testimony.  *See Beyer v. Anchor Insulation Co.*, 2017 U.S. Dist. Lexis 23434, *52 (D. Conn. Feb. 17, 2017) (collecting cases requiring expert testimony).  Because this is not a *res ipsa*-like case, Plaintiffs cannot proceed under the consumer expectations test as a matter of law.  *See, e.g., Izzarelli*, 321 Conn. at 202-04 (holding that to establish cigarette defect and alternative design requires expert testimony and, therefore, the plaintiff could only proceed under risk-utility theory); *Karavitis*, 243 F. Supp.3d at 250 (finding kickback of circular saw did not present *res ipsa*-like case falling within consumer

expectations test).   And, because Plaintiffs lack the essential expert testimony required to establish unreasonable dangerousness, as discussed above, Plaintiffs' claim would require impermissible jury speculation.  *See, e.g., Bagley*, 327 Conn. at 104.

## II.   PLAINTIFFS FAILED, AS A MATTER OF LAW, TO ESTABLISH A FAILURE TO WARN CLAIM

The CPLA codifies the substantive elements of failure-to-warn claims:

(a)   A product seller may be subject to liability for harm caused to a claimant who proves by a fair preponderance of the evidence that the product was defective in that adequate warnings or instructions were not provided.

(b)   In determining whether instructions or warnings were required and, if required, whether they were adequate, the trier of fact may consider: (1) The likelihood that the product would cause the harm suffered by the claimant; (2) the ability of the product seller to anticipate at the time of manufacture that the expected product user would be aware of the product risk, and the nature of the potential harm; and (3) the technological feasibility and cost of warnings and instructions.

(c)   In claims based on this section, the claimant shall prove by a fair preponderance of the evidence that if adequate warnings or instructions had been provided, the claimant would not have suffered the harm.

(d)   A product seller may not be considered to have provided adequate warnings or instructions unless they were devised to communicate with the person best able to take or recommend precautions against the potential harm.

Conn. Gen. Stat. § 52-572q.  Plaintiffs failed, as a matter of law, to establish a failure to warn claim because:  (1) no duty to warn arose in 1970 based on Plaintiffs' own experts' admissions; (2) alternatively, to the extent any duty to warn arose in 1970, Defendants undisputedly discharged that duty by providing warnings to their sophisticated formulator customers; and (3) Plaintiffs' experts admissions defeat any causal connection between any failure to warn and Plaintiffs' alleged harm.

A.     **No Duty to Warn of the Alleged Harm Existed in 1970**

To establish that a warning was required, Plaintiffs must establish the "likelihood" that PCBs would cause the alleged harm.  Conn. Gen. Stat. § 52-572q(b)(1).  As with all product liability claims, Plaintiffs must prove that the alleged defect existed at the time of sale.  *Izzarelli*, 321 Conn. at 184.  The CPLA requires consideration of "the ability of the product seller to ***anticipate at the time of manufacture*** that the expected product user would be aware of the product risk."  Conn. Gen. Stat. § 52-572q(b)(2) (emphasis added); *see also Tomer v. Am. Home Prod. Corp.*, 170 Conn. 681, 687 (1976) ("It is evident that [defendant's] duty to warn of the alleged dangerous propensities of Halothane was dependent upon the state of knowledge concerning Halothane at the time that its breach of duty was alleged to have occurred.").  It is impossible to warn of an unknown risk.  As with Plaintiffs' design defect claim, Plaintiffs cannot establish that any duty to warn arose in 1970 because of the lack of proof of the likelihood that PCBs would volatilize from caulk at harmful levels.  (SOF ¶46).  Plaintiffs cannot satisfy their burden of proving a failure to warn without establishing the danger about which Defendants allegedly failed to warn – that PCBs would volatilize from caulk at levels sufficient to cause human disease.

B.     **Defendants Discharged any Duty to Warn by Warning Their Customers**

Alternatively, as found by the District Court in *Westport* under the sophisticated user doctrine, *Westport*, 2017 U.S. Dist. Lexis 53815 at *32, Defendants fulfilled any duty to warn by communicating, through technical bulletins and marketing materials, with their customers – sophisticated formulators – who were in the best position to take or recommend precautions against any potential harm to end users.  Plaintiffs' experts' admissions mandate the same result under Connecticut law.

The CPLA authorizes consideration of "the impact of a purchaser's sophistication and knowledgeability" in determining whether the plaintiff met its burden of proving whether a warning was required and, if so, whether it was inadequate. *See Sharp v. Wyatt, Inc.*, 31 Conn. App. Ct. 824, 848-49 (1993) (citing Conn. Gen. Stat. § 52-572q.), *aff'd*, 230 Conn. 12 (1994) (*per curiam* affirmance on basis of appellate court opinion). The analysis of the sophistication of the product "user" extends to the sophisticated intermediary. *See Vitanza v. Upjohn Co.*, 257 Conn. 365, 390 (2001) (addressing sophisticated intermediary doctrine).

Under the CPLA, the factors relevant to whether a warning was required and, if so, whether it was adequate, include:

- "the ability of the product seller to anticipate at the time of manufacture that the expected product user would be aware of the product risk, and the nature of the potential harm,"

- "the technological feasibility and cost of warnings and instructions," and

- whether the product seller devised warnings or instructions "to communicate with the person best able to take or recommend precautions against the potential harm."

Conn. Gen. Stat. § 52-572q(b); *Sharp*, 31 Conn. App. Ct. at 847-49.

"The Connecticut Product Liability Act; General Statutes § 52-572m et seq.; does not impose a duty to warn of known or open and obvious dangers, and, accordingly, there can be no liability for injuries resulting from open, obvious and known dangers." *Gajewski v. Pavelo*, 36 Conn. App. 614, 617 (1994). Accordingly, no warning is required to be given to sophisticated users who know or should know of the alleged dangerous condition of the product.

The admissions of Plaintiffs' caulk expert, Klosowski, affirmatively establish that Defendants' sophisticated formulator customers knew of the risks about which Plaintiffs claim Defendants failed to warn:

- Plaintiffs acknowledge that Defendants sold PCBs as plasticizers in bulk to formulators who incorporated the PCBs into building products like caulk. (ECF No. 71, ¶83).

- Klosowski admits that Defendants' customers were sophisticated industrial formulators. (SOF ¶¶4,29).

- Klosowski admits that the formulators knew of the very properties of PCBs about which Plaintiffs claim Defendants failed to warn, such as systemic toxicity, volatilization from caulk, and persistence in the environment.  (SOF ¶¶30,45).

- Klosowski directly identifies information Pharmacia regularly provided as the information formulators would consider before performing formulation-specific assessments, and agreed that Pharmacia provided appropriate information for formulators to determine that PCBs would be "the definition" of environmentally persistent.  (SOF ¶30).

- He confirmed that a formulator would know about the general properties of all materials in their formulations and that the formulator would have tested and known the rate of material loss from their product using tests that had been known in industry for many years. (SOF ¶25).

- He further testified that PCBs were known in the industry to have a low vapor pressure and to be large molecular structures that stayed put in the products they were placed in. (SOF ¶17).

- Klosowski admitted that, as a formulator, he understood that statements indicating that a material, such as PCBs, could be systemically toxic indicated the material could pose serious health consequences, and that he was aware Pharmacia did provide this information to its customers beginning in the 1930s.  (SOF ¶30).

- Klosowski acknowledged that, as a formulator himself, he is responsible for deciding which materials and the particular concentrations of the materials that are needed for a formulation for a particular application.  (SOF ¶28).

- Klosowski further acknowledged that polysulfide caulk formulators would not have shared propriety formulas with Defendants.  (SOF ¶28).

- Klosowski described how he, as a formulator, focused on product-specific testing to assess volatility and other factors that may affect availability and health impact of a composition.  (SOF ¶¶25-27,44).

- Klosowski testified that multiple characteristics of a formulation and application including diffusion coefficients of individual constituents, surface area, thickness, chemical compatibility, temperature, time, amount of plasticizer, and individual vapor pressures would all affect the volatility of a component. (SOF ¶¶21,22).

- Klosowski recognized that formulation characteristics (i.e. plasticizer migration, vapor pressure of components, cure characteristics, etc.), application characteristics (surface area, thickness, painted layers, etc.), and external factors (i.e. temperature, air circulation, humidity, etc.) all affect the volatility of a particular chemical within a sealant

formulation, and, therefore, it is undisputed that Defendants had no ability to predict the volatilization rate in end-use conditions.  (SOF ¶¶21,22).

In *Westport*, it was, likewise, uncontroverted that it was well known in the industry that plasticizers would volatilize out of end products; Defendants' technical bulletins and marketing materials addressed the persistence of PCBs; and, because the reformulation of the plasticizers influenced the volatilization rates in end products, Defendants were not in a position to communicate more specific warnings to end users.  *Westport*, 2017 U.S. Dist. Lexis 53815, at *31.  As in *Westport*, therefore, there is no dispute that, if Defendants had a duty to warn of a risk that PCBs would volatilize and be persistent, "Pharmacia reasonably relied upon intermediary manufacturers to pass on the necessary warnings to the end users of PCB-containing plasticizers."  *Id.* at *27-*28.

### C.      Plaintiffs Failed to Establish Causation

The causation provision of CPLA § 52-572q(c) requires the plaintiff to prove that, had adequate warnings been provided, the alleged harm would not have occurred.   *Sharp*, 31 Conn. App. at 838.   Because Defendants' sophisticated customers produced PCB-containing caulk while fully aware of the alleged risks, Plaintiffs cannot show that any additional warnings would have changed the formulators' use of PCBs. *Id.* at 850 n.18   Plaintiffs' chemical waste expert, Matson, in fact, admitted that whether additional warnings would have had any effect on formulators is "unknowable."   (SOF ¶20).   While Plaintiffs' expert, Matson, claims that Pharmacia understated Aroclor vapor pressure in its product bulletins (alleging that it should have been $10^{-4}$ instead of $10^{-5}$), Klosowski specifically admitted that such a small discrepancy would have made no difference to the caulk formulator in its decision to use PCBs. (SOF ¶20).

III.   **PLAINTIFFS FAILED, AS A MATTER OF LAW, TO ESTABLISH A NEGLIGENCE CLAIM**

A.   **Plaintiffs Failed to Establish a Negligent Design Claim**

"[A]ny product liability claim, no matter the type or theory, is governed by the same essential elements." *Bifolck*, 324 Conn. at 438.   Plaintiff's negligent design claims are limited by Connecticut law to the risk-utility theories. *Id*. at 444.   As Plaintiffs' negligent design claims are governed by the same standard as their strict liability risk-utility claims, *id*. at 445 n.23, Plaintiffs' negligent design claims fail for the same reasons. *Id*. at 1209 ("the failure to prove that the product is in a defective condition unreasonably dangerous to the consumer would equally doom strict liability and negligence").   Because, for the above reasons, Plaintiffs failed to establish any strict liability risk-utility claim, Plaintiffs likewise cannot establish a claim for negligent design as a matter of law.

Plaintiffs' negligence-based claims also require proof of the foreseeability in 1971 that PCBs were capable of volatilizing from caulk at dangerous levels.   *See id*. at 443 ("the defendant's actual or imputed knowledge of the danger . . . is an essential element of negligence, which in turn gives rise to the defendant's duty to exercise reasonable care to protect product users from that danger"); *see Westport*, 877 F.3d at 65.   As in *Westport*, Plaintiffs' experts admit that there are no scientific studies even today purporting to demonstrate that PCBs volatizing from building products, or PCBs at the levels found at the Clark School, cause human disease. (SOF ¶¶46-51,77).   Because, like the *Westport* plaintiffs, Plaintiffs failed to establish the foreseeability of harm in 1971, Plaintiffs cannot establish any negligence-based claim.

B.   **Plaintiffs Failed to Establish a Negligent Failure to Warn Claim**

1.   ***Plaintiffs' Negligent Failure to Warn Claim Is Not Cognizable***

Plaintiffs' negligent failure-to-warn claim is not cognizable because it is pre-empted by the CPLA. *See Densberger v. United Techs. Corp.*, 297 F.3d 66, 70 (2d Cir. 2002).   To the

extent, if any, that a negligent failure-to-warn claim survived the CPLA, Plaintiffs' negligence-based claim fails for the same reasons as their strict liability failure-to-warn claim. *See Bagley*, 327 Conn. at 94 n.7. And, Plaintiffs' negligent failure-to-warn claim fails for the additional reason that, like the *Westport* plaintiffs, Plaintiffs failed, as a matter of law, to establish the foreseeability of harm in 1971. *See Westport*, 877 F.3d at 65.

### 2.     *Plaintiffs' Post-Sale Warning Theory Is Not Cognizable*

The CPLA is silent with respect to any post-sale duty to warn. No known Connecticut appellate court has recognized a post-sale duty to warn after the enactment of the CPLA. Recognizing, however, that the Second Circuit has predicted that the Connecticut Supreme Court would find that the CPLA encompasses a post-sale duty to warn, *Densberger*, 297 F.3d at 71, Defendants address the substance of Plaintiffs' post-sale warning claim, but reserve their right to challenge the existence of a post-sale warning theory under Connecticut law.

If a post-sale duty to warn survived the CPLA, it sounds exclusively in negligence, not strict liability. *See id.* (opining that common law post-sale duty to warn sounding exclusively in negligence survived the CPLA). As with all negligence-based claims, the foreseeability of harm is an essential element of the plaintiff's burden of proof. *See Bifolck*, 324 Conn. at 443. Plaintiffs, failed, as a matter of law to establish a post-sale failure to warn because Plaintiffs cannot establish the foreseeability of harm at any point after 1970. To the contrary, Plaintiffs' experts admit that no scientific studies at any time purport to demonstrate that PCB-containing building products cause disease or that PCBs at the levels found in the Clark School cause disease. (SOF ¶46-51,77).

Alternatively, if any duty to warn arose post-sale, Plaintiffs failed, as a matter of law, to establish that they were identifiable end-users to whom a duty would have run. Under general negligence principles, Plaintiffs have the burden of proving that they were identifiable

consumers/users to whom a post-sale duty to warn would have run.  *See Jarmie v. Troncale*, 306 Conn. 578, 596 (2012) ("Related areas of Connecticut negligence law . . . provide support for the proposition that proof that the victim was an identifiable target is ordinarily an essential element of an action in negligence.").  In *Westport*, the District Court rejected the plaintiffs' post-sale warning claim due to the lack of evidence that Defendants could have identified the plaintiffs as an end user of PCBs.  *Westport*, 2017 U.S. Dist. Lexis 53815, at *33.  Affirming the District Court, the First Circuit concluded that, given Defendants' complex supply chain, the plaintiffs' assertion that they were an identifiable end user was sheer speculation.  *Id.* at *67.

As in *Westport*, it is undisputed that PCBs were an industrial chemical sold in bulk to sophisticated formulators who incorporated PCBs into their products.  As in *Westport*, it is undisputed that the formulators' customers then resold the PCB-containing products to other manufacturers, who incorporated them into another product, or to distributors, who might sell the products to general contractors, who sold the caulk to contractors, builders, and architects, and who then resold the caulk to subcontractors, who ultimately included the product into a building. (SOF ¶¶3,29,31).  Hartford admittedly cannot even identify the manufacturer, distributor, supplier, or installer of the caulk, (SOF ¶3), and, therefore, cannot possibly establish that Hartford itself was identifiable to Defendants.  (SOF ¶¶3,29,31).  Like the *Westport* plaintiffs, Plaintiffs, thus, offer nothing but sheer speculation that they were identifiable by Defendants post-sale.

### C.     Plaintiffs Failed to Establish a Failure to Test Claim

For Plaintiffs to establish their claim that Defendants failed to conduct research on PCBs volatilizing from caulk, Plaintiffs bear the burden of proving that it was unreasonable and a legal cause of Plaintiffs' alleged property damage, *Bagley*, 327 Conn. at 113, which Plaintiffs cannot do.  Beginning in the 1930s, Pharmacia commissioned hundreds of toxicological tests of PCBs

from leading institutions such as the Harvard School of Public Health and the Kettering Institute of the University of Cincinnati.  (SOF ¶38).  Those tests disclosed that PCBs, like all industrial chemicals, were capable of causing systemic toxicity at high does, but could be safely manufactured and used.  (SOF ¶38).  As recognized by the First Circuit, "Monsanto was not legally required to test the volatilization of PCBs from consumer end products that it did not manufacture," *Westport*, 877 F.3d at *6, which Plaintiffs' experts concede in this case, (SOF ¶27).  Even if Plaintiffs could establish a duty to test end products, Plaintiffs cannot meet their burden of proving that, had Defendants performed the testing, they would have learned that PCBs volatilize from caulk at dangerous levels.  *Bagley*, 327 Conn. at 113 (setting aside plaintiff's verdict on negligent failure to test absent expert testimony showing that, had the defendant performed the testing or research, it would have discovered the alleged harm; "otherwise, the defendant's lack of testing would be of no consequence.").  Because Plaintiffs' experts concede that, if any testing had been done, no test would have shown that PCBs volatilize from caulk at dangerous levels or that the levels of PCBs at the Clark School cause human disease, (SOF ¶¶50,51,77), Plaintiffs' failure-to-test claim fails as a matter of law.

## IV.   PLAINTIFFS FAILED, AS A MATTER OF LAW, TO ESTABLISH A COMPENSABLE INJURY

Under Connecticut law, the property damage claimant may not recover purely economic loss caused by an allegedly defective product, but must establish harm to its property caused by the product.  *BellSouth Telecomms. v. W.R. Grace & Co*., 77 F.3d 603, 610 (2d Cir. 1996).  Plaintiffs define their alleged property damage in terms of the alleged danger to human health caused by the volatilization of PCBs from building products in the Clark School.  (ECF No. 71 ¶¶ 3, 4, 71, 72, 76, 89).  Plaintiffs' own claim, therefore, demands that they establish that PCBs volatilize from caulk at dangerous levels.  Plaintiffs, however, failed to establish that PCBs are

capable of volatilizing from caulk at levels dangerous to humans or that the levels of PCBs at the Clark School were capable of causing human disease.  (SOF ¶¶46-51).

In *Westport*, the District Court recognized that "the risk of adverse health effects is inextricably linked with the risk of property damage . . . from PCBs volatilizing from caulk." *Westport*, 2017 U.S. Dist. Lexis 53815, at *26 n.2.  On appeal, the First Circuit confirmed that it "makes sense" that no property damage results unless PCB contamination rises to a level harmful to human health:

> Given that PCBs are 'invisible to the naked eye,' and 'lack a characteristic odor or appearance to alert users of their presence,' their only deleterious effect is their potential harm to health.  In other words, no remediation is necessary – hence no property damage results – unless the PCB contamination in a building poses an actual health risk.

*Westport*, 877 F.3d at 66.  The First Circuit relied on the same general rules of property damage that govern Connecticut property damage claims in determining that the plaintiffs bore the burden of proving actual health risks from PCBs.  *Compare id. at 65* (referencing general Massachusetts property damage rules) *with Whitman Hotel Corp. v. Elliott & Watrous Eng'g Co.*, 137 Conn. 562, 573 (1951) (referencing identical Connecticut property damage rules).

The general principles of Connecticut law also dictate that Plaintiffs bear the burden of proving levels of PCBs at the Clark School capable of causing human disease in order to establish a compensable injury.  Under Connecticut law, for a cause of action for property damage to accrue, "there must have existed *actual injury*" to the plaintiff's property.  *BellSouth*, 77 F.3d at 611-12 (finding cause of action for asbestos contamination accrued where plaintiff knew there were "dangerously high levels" of asbestos-containing dust and that airborne asbestos posed a serious health risk).  In the analogous toxic tort personal injury context, Connecticut Courts do not recognize asymptomatic changes as a compensable physical injury, but require

detrimental physical harm. *See, e.g.*, *Bowerman v. United Illuminating*, 1998 Conn. Super. LEXIS 3575, at *6-9 (Conn. Super. Ct. Dec. 15, 1998) (unreported) (citing *Dennis v. ICL, Inc.*, 957 F. Supp. 376, 379 (D. Conn. 1997) (holding that mere presence of asbestos fibers in the plaintiff's lungs did not constitute an injury, recognizing "harm" implies "a loss or detriment to a person and not a mere change or alteration in some physical person, object or thing."); *Dickerson v. Little*, 1992 Conn. Super. LEXIS 1674, at *7-8 (Conn. Super. Ct. June 3, 1992) (finding child's exposure to lead-based paint resulted in no harm).  Because the asymptomatic personal injury plaintiff exposed to toxic substances cannot establish a compensable harm, it follows that the property damage claimant cannot establish compensable harm by the mere presence of an allegedly toxic, but imperceptible substance, but must demonstrate that the level of the substance is harmful to human health.  In the absence of proof that PCBs volatilized at dangerous levels in the Clark School, Plaintiffs failed, therefore, to establish a compensable injury.  (SOF ¶¶46-51,72-79).

## V.   PLAINTIFFS' DAMAGE CLAIMS SHOULD BE DISMISSED IN THEIR ENTIRETY AND, IN THE ALTERNATIVE, CAPPED AT THE FAIR MARKET VALUE OF THE CLARK SCHOOL

### A.   Plaintiffs Failed, as a Matter of Law, to Establish Their Damage Claims

If Plaintiffs had established a compensable injury, their measure of damages would be governed by the general rules that the plaintiff is entitled to recover the lesser of: (1) diminution in value of the property or (2) the cost of repairs which are "reasonably necessary to restore the building to its former condition."  *Whitman*, 137 Conn. at 573.  Regardless of whether Plaintiffs established a compensable injury, Plaintiffs cannot recover their claimed damages.

Plaintiffs' own experts admit that remediation was not required by any federal or state law and, therefore, Plaintiffs cannot establish that the cost of repairs was reasonably necessary:

- Peter J. Folino, one of Plaintiffs' environmental contractors, admitted that he initially believed that PCB testing of paint samples performed in conjunction with the sprinkler

installation was required by Connecticut law, but later admitted that it was not required. (SOF ¶97).

- Folino admitted that the additional air, bulk, and wipe tests performed were not required by Connecticut or federal law. (SOF ¶98).

- Hartman admitted that the costly Pilot Project, pursuant to which Plaintiffs gutted a quarter of the building, was not required by federal or state law. (SOF ¶104).

- Prior to any remediation, the Connecticut Department of Public Health, the Hartford Department of Health and Human Services, the Hartford Board of Education, and the CDC stated that the levels of PCBs found at the Clark School did not present a health risk. (SOF ¶72).

- Hartman admitted that the EPA's regulations do not require the removal of any PCB-containing materials. (SOF ¶¶102,106).

There was, therefore, no regulatory compulsion to remediate PCBs from the Clark School. (SOF ¶¶102,106). Nor was there any reason to remediate PCBs from the school for the protection of the health of students. (SOF ¶¶46-51,72-80). Based on Plaintiffs' own experts' admissions, Plaintiffs, thus, failed to establish that the remediation of PCBs was "reasonably necessary to restore the building to its former condition." (SOF ¶¶95-107). Plaintiffs' damage claims should, therefore, be dismissed in their entirety.

## B. Plaintiffs' Damages Claims Should Be Capped at Fair Market Value

Defendants alternatively seek partial summary judgment on Plaintiffs' damage claims. Plaintiffs' compensatory damages cannot exceed the fair market value of the school, which represents the highest amount recoverable under the Connecticut property damage rules. Based on the *Uniform Standards of Professional Appraisal Practice*, Defendants' property appraisal expert, John J. Leary, determined that the fair market value of the Clark School is $1.00. (SOF ¶135).

To arrive as this conclusion, Leary reviewed historical documents evaluating the deteriorating condition of the Clark School over time, and he conducted an inspection of the

building and its environs, aided by expert assessments of complex buildings systems including boilers, HVAC systems and the roof.  (SOF ¶135).  He did so because a prudent, knowledgeable purchaser would want to know the condition of such major building systems, (SOF ¶136), and would pay no more for a property than the cost to acquire a comparable site and construct improvements of a similar utility, less building depreciation.  (SOF ¶136).  Leary also evaluated, among other factors, declining overall enrollment in the Hartford Public Schools, excess school capacity in neighborhoods served by the Clark School as reflected by the Clark School operating at 50% capacity, and the comparable sale of an adjacent school building and lot for $1.00.  (SOF ¶135).

Plaintiffs' property appraisal expert, Patrick S. Craffey, in contrast, did none of this work. (SOF ¶137).  Admittedly ignoring recognized and accepted appraisal methodology, and failing to consider the sale of the adjacent property for $1.00, Craffey arrived at an inflated fair market value estimate of $5,800,000.   (SOF  ¶137).   Defendants will move to preclude Craffey's opinions as methodologically unsound at the time for filing *Daubert* motions.  In the meantime, Defendants seek to cap Plaintiffs' damages at $1.00.

### 1.      *Fair Market Value Represents the Damages Ceiling*

As stated, the property damage claimant is entitled to recover the lesser of: (1) diminution in value of the property or (2) the cost of repairs which are "reasonably necessary to restore the building to its former condition." *Whitman*, 137 Conn. at 573.  In *Whitman*, the Connecticut Supreme Court upheld the trial court's conclusion that the plaintiff was required to prove that: (1) the costs do not exceed the former value of the property and (2) the repairs do not enhance the value of the property.  *Id*.  The Court may not, therefore, permit Plaintiffs to recover more to restore the property to its former condition than the fair market value of the property itself.

The diminution in property value, thus, can never exceed the pre-injury fair market value of the property.  For example, by analogy, if a motor vehicle worth only $400 because of deferred-maintenance is rear-ended, and the owner is given a repair bill of $2,000, he can recover no more than the value of the car, or $400.  In other words, post-accident, the diminution in fair market value of the car equaled its pre-accident fair market value, or $400.  The pre-accident fair market value of the property, therefore, constitutes the cap on damages.  If it were otherwise, the law would reward deferred maintenance and permit windfall recoveries, which it does not.  *See id*.  This is precisely the situation here.

### 2.    *Plaintiffs' Damages Claims Should Be Capped at $1.00*

The Clark School, constructed in 1971, is a monument to deferred maintenance, with virtually every building system obsolete and well beyond its useful life.  In 1999, Hartford commissioned a facilities study by Jeter, Cook and Jepson Architect, Inc., which identified the Clark School as one of 18 schools in need of major renovations.  (SOF ¶60).  The report listed most major building systems, including the HVAC system, as obsolete and in need of repair or replacement within five or ten years.  (SOF ¶60).  Fifteen years later, Paul Drummey, the CREC employee who oversaw the 2014 summer renovations at the Clark School, testified that, in his lifetime, he had "never seen a school in such disrepair."  (SOF ¶64).  As part of that project, CREC commissioned Environmental Testing and Balancing, Inc. ("ET&B") to inspect the HVAC system at Clark which revealed an obsolete and non-functional HVAC system.  (SOF ¶68).  In the 15 years since the 1999 Jeter Report, none of the deficient HVAC systems that had been identified as obsolete in the Clark School had been replaced by the time of the 2014 inspection by ET&B.  (SOF ¶¶56-61).

Because of the age and condition of the Clark School, it was placed on a "renovate as new" list for the 2004/2005 school year, which would involve a gutting of the building and

replacement of all internal components at a budgeted cost of $24.2 million. (SOF ¶57). Hartford deferred that planned renovation, and the Clark School was next scheduled to be renovated as new during the 2010/2011 school year at a budgeted cost of $35 million. (SOF ¶58). That renovation was also deferred, and the can was again kicked to 2019. (SOF ¶59). In the end, the Clark School was permanently closed with decades of deferred maintenance and without ever undergoing an as-new renovation. (SOF ¶¶56-59,83). In all, at the time of its closing, the Clark School required $36 million in long-overdue renovations. (SOF ¶¶90-94). At the time the Clark School was closed in January 2015, it had only 247 students, (SOF ¶83), half its capacity of 750 students, (SOF ¶1), and in December, 2017, it was announced that the Clark School would be one of a number of Hartford schools to be permanently closed as part of a school consolidation plan to address under-enrollment, (SOF ¶83). Because of Hartford's deferred maintenance and resulting general state of disrepair at the Clark School, the following was needed:

- o Removal and replacement of all exterior windows and exterior doors ($1,329,530);
- o Removal and replacement of all HVAC Systems, including ductwork, air handling units, exhaust units, and energy management controls ($4,749,423);
- o Removal and replacement of vinyl asbestos floor tile and asbestos containing floor mastic ($358,499);
- o Removal and replacement of ceilings ($569,717);
- o Roof replacement ($1,217,916);
- o Installation of lateral bracing to remedy design flaw creating structural instability ($57,233);
- o Accessibility improvements ($1,188,224);
- o Asbestos, lead, and mold abatement ($726,745);
- o Replacement of spray applied fireproofing ($2,684,531);
- o Renovation of locker rooms ($65,818);
- o Replacement of boilers, chillers, and cooling tower ($1,216,201);

    o   Replacement of all water piping and original plumbing fixtures ($596,562);

    o   Replacement of fire alarm system ($171,699);

    o   Electrical system upgrades ($4,302,519);

    o   Installation of automatic fire suppression systems throughout the building ($1,988,542)

    o   Interior reconstruction, selective demolition, additional construction, elevator work, furnishings, fixtures and equipment, and exterior improvements to provide an "As - New" pre-kindergarten through eighth grade school environment ($15,676,841).

(SOF ¶93).

Plaintiffs' $11 million damages claim includes only a small fraction, approximately $270,986, attributed to the alleged remediation of PCBs. (SOF ¶113). As discussed, that $270,986 consists largely of unnecessary testing and a misbegotten "Pilot Project" that resulted in PCB air concentrations, which were deemed to be safe before the Project, increasing by a factor of 20. (SOF ¶121). The bulk of Plaintiffs' damage claim, hypothetical costs of $9,559,110, arise from plans in existence since 1999, before a single PCB molecule was detected in the building, to gut and reconstruct the building due to deferred maintenance. (SOF ¶¶56-61). Plaintiffs seek $9,559,110 in hypothetical PCB abatement costs which would entail, according to their experts, the gutting and replacement of building components, to reuse the building. (SOF ¶138). In the alternative, if Plaintiffs decide not to gut and rebuild the Clark School, Plaintiffs allege the hypothetical costs of $4,289,450 to demolish and dispose of the building. (SOF ¶139).

Taking into consideration the age and condition of the building and market conditions, consistent with the *Uniform Standards of Professional Appraisal Practice*, Defendants' property appraisal expert, Leary, determined that the fair market value of the Clark School is $1.00. (SOF ¶135). As fair market value represents the highest amount recoverable under the Connecticut

property damage rules, Plaintiffs' damages should not exceed $1.00. Plaintiffs' damage claims in excess of $1.00 should, therefore, be dismissed.

## VI. PLAINTIFFS' CLAIMS ARE TIME-BARRED, AS A MATTER OF LAW, BY THE STATUTE OF LIMITATIONS

Plaintiffs brought this action on October 23, 2015 after years of notice that their schools were constructed with PCB-containing building materials such as paint and caulk. Their claims are time barred.

### A. Plaintiffs Knew of the Alleged Harm Before 2012

The maximum statute of limitations applicable to Plaintiffs' claims is three years. *Compare* Conn. Gen. Stat. § 52-577a (three-year statute of limitations applicable to product liability claims) *with* Conn. Gen. Stat. § 52-577c (two-year statute of limitations applicable to claims for property damage caused by exposure to a hazardous chemical substance or pollutant "released into the environment"). Under Connecticut law, statutes of limitations start to run upon notice of "actionable harm." *Burns v. Hartford Hosp.*, 192 Conn. 451, 460 (1984). But the "harm need not have reached its fullest manifestation before the statute begins to run." *Id.* (affirming statute of limitations bar under Connecticut limitations for malpractice actions, Conn. Gen. Stat. § 52–584); *Peerless Ins. Co. v. Tucciarone*, 48 Conn. App. 160, 167 (1998) (same applied to Conn. Gen. Stat. § 52-577a). Here, Plaintiffs knew of the alleged harm, the presence of PCBs in their school properties, well before 2012. (SOF ¶¶123-34). They knew the Clark School's light ballasts contained PCBs in 1992. (SOF ¶125). And, Plaintiffs tested at least three schools for PCB-containing building materials, and *found* the presence of PCBs at each of the schools.[3] (SOF ¶¶126,138). Their claims are time barred.

---

[3] As discussed above, Plaintiffs failed, as a matter of law to establish a compensable injury, but, assuming arguendo that Plaintiffs established actionable harm, their claims are time-barred.

That Plaintiffs did not discover the full *extent* of the alleged harm by not testing the Clark School does not change this analysis.  One need only look to their initial Complaint to confirm that Plaintiffs' alleged injury is not divisible by individual Hartford public school buildings – they originally brought suit with respect to the presence of PCBs in their "buildings" and "schools" generally, only amending their Complaint to specifically claim harm to the Clark School after Defendants moved to dismiss the claims as untimely (the motion was denied without prejudice).  (Compare ECF No. 22, ¶¶ 1, 70, 97, 99, Prayer for Relief ¶ 1 *with* ECF No. 71, ¶¶ 1, 70, 96, 98, Prayer for Relief ¶ 1).   *See also City of San Diego v. U.S. Gypsum Co.*, 30 Cal. App. 4th 575, 583-584, 35 Cal. Rptr. 2d 876, 881-882 (1994) ("the trial court properly rejected City's argument concerning its causes of action on a building-by-building and product-by-product basis because City's admissions of continuing injury since installation and sale [of asbestos materials] … establish[ed] appreciable and actual harm beyond the three-year limitations period") (citations omitted); *Bellsouth.*, 77 F.3d at 612-13 (cause of action accrued when plaintiff discovered some form of actionable harm with respect to floors of building, despite no indication of building-wide abatement necessary).  Plaintiffs cannot avoid the statute of limitations by attempting to limit their claim for damages to that portion of an injury they claim to have confirmed within the statute of limitations period.

B.      **Plaintiffs Should Have Discovered the Alleged Harm Before 2012**

Even if Plaintiffs' claim for harm to the Clark School constitutes a separate injury from the alleged harm to its other buildings, Plaintiffs' claims are barred by the CPLA's statute of limitations.  In Connecticut, as elsewhere, "the statute of limitations begins to run when the claimant has knowledge of facts which would put a reasonable person on notice of the nature and extent of an injury."  *Catz v. Rubenstein*, 201 Conn. 39, 47 (1986) (finding Connecticut law of constructive notice the same as the law acknowledged by the "overwhelming majority of state

appellate courts which have addressed the issue").   Specifically, the CPLA's statute of limitations starts running when the damage is "first sustained or discovered *or in the exercise of reasonable care should have been discovered*." Conn. Gen. Stat. § 52-577a; Conn. Gen. Stat. § 52-577c.  When barring an untimely PCB products liability suit, this Court has explained why the law must be the way it is:

> Were the law otherwise, potential plaintiffs could manipulate the limitations period through the simple expedient of closing their eyes to what they suspect or even believe to be true.  This concern is particularly salient in the context of toxic clean-up cases.  A party … on notice of likely contamination, might rationally keep mum in the hope that regulators would never order it to remediate.  In the event remediation happened to be mandated, the party would lose nothing; it would simply sue then.  And if contamination were to escape official notice indefinitely, so much the better—no need to sue, and no need to remediate.

*Hubbard-Hall*, 98 F. Supp. 3d at 496.   *Hubbard-Hall* favorably cited *Vector–Springfield Properties, Ltd. v. Central Illinois Light Co., Inc.*, 108 F.3d 806, 810 n. 3 (7th Cir.1997), in which the Seventh Circuit barred a claim on statute-of-limitations grounds where alleged contamination was caused by a former gas plant.  *Hubbard-Hall*, 98 F. Supp. 3d at 497.  The plaintiff did not have actual notice of contamination on its property, but a consultant had reported that "investigations at similar former gas plant sites … revealed contamination of soils and groundwater."  *Id*. at 807.   Notice of contamination at similarly situated properties—even properties plaintiff did not own—sufficed to put a "reasonable person … on notice of its injury." *Id.* at 810.  Courts applying Connecticut law have similarly found a claim barred by the statute of limitations when the claimant had reason to suspect the presence of actionable harm.  *See, e.g., Gnazzo v. G.D. Searle & Co.,* 973 F.2d 136, 138 (2d Cir. 1992) (statute of limitations began to run not when the plaintiff was officially diagnosed with infertility but rather earlier, when she read an article identifying a relationship between IUDs and infertility and suspected her IUD

may have caused her difficulties becoming pregnant); *Avoletta v. State,* 152 Conn. App. 177, 191-92 (2014) (statute of limitations on suit for failure to provide free, safe education began to run not when parents learned they could appeal denial of claim for alternative school placement, or upon denial, but earlier, when parents took children out of school, indicating they had knowledge of some form of harm at that time).

The information in Plaintiffs' possession put them on notice of their claimed injury. Plaintiffs claim that they were aware that PCBs were a potential hazard in their schools for decades. (SOF ¶¶ 123-134). The EPA had issued regulations relating to PCBs incorporated into building products by 1979. (SOF ¶ 124). Plaintiffs knew that the Clark School contained PCB-containing building materials as early as 1992. (SOF ¶125). From at least as early as 2009, Plaintiffs received an advisory from the Connecticut Department of Environmental Protection to its School Superintendent and Chief Elected Official recommending inspections of school and municipal buildings due to the potential presence of PCBs in certain equipment and building materials. (SOF ¶128). That same year, the EPA published guidance to communities on PCBs in caulk of buildings constructed or renovated between 1950 and 1978 and issued a press release warning of PCBs in school air.[4] (SOF ¶127). Plaintiffs apparently investigated the issue somewhat, as the Hartford Public Schools Director of Facilities produced from its files a photocopy of a September 2009 Boston Globe article reporting on the risk of PCBs at "older N.E. schools." (SOF ¶128). In 2009, the Office of School Facilities published a Plan Review Checklist for PCBs noting that PCBs may be encountered in schools. (SOF ¶129). By the end of 2011, Plaintiffs had tested at least four of their schools for PCBs in building materials – Quirk Middle School, M.D. Fox School, International Baccalaureate School, and Barbour School – and

---

[4] Hartford even pleads knowledge of a September 25, 2009 EPA warning of PCBs "in buildings that were constructed before [1979]." (ECF No. 22, ¶ 66).

found PCB concentrations at all four schools.[5]   (SOF ¶¶126,130).   Plaintiffs even formally applied for and received EPA approvals for PCB Cleanup and Disposal Approval for the former two.[6]   (SOF ¶130; ECF No. 22, ¶¶ 73).   Similarly, Plaintiffs implemented a PCB Abatement plan for Barbour School's renovation after receiving a report from Eagle Environmental explaining, among other things, that PCBs were a "concern in caulking compounds" which were added between 1950 and 1977.   (SOF ¶¶131,132).   The statute of limitations does not depend on when Plaintiffs decided it was desirable to renovate or test the Clark School.   *Vector-Springfield Props*, 108 F.3d at 810.   *See also Gnazzo*, 973 F.2d at 1378 (statute of limitations started to run before Plaintiff saw a doctor about suspected infertility); *Avoletta*, 152 Conn. App. at 191-92 (statute of limitations began to run before Plaintiffs consulted a lawyer to learn they had a cause of action against state).   Plaintiffs, thus, had both actual and constructive notice of the likely presence of PCBs at the Clark School substantially before 2012.   (SOF ¶¶123-34).   Their claims are time barred.

## CONCLUSION

Based on the foregoing, Defendants respectfully request this Honorable Court to grant this motion, dismiss Plaintiffs' claims in their entirety, and enter judgment in Defendants' favor. In the alternative, Defendants request that the Court grant partial summary judgment and dismiss Plaintiffs' damages claims in excess of fair market value.   Also, in the alternative, Defendants reserve their right to renew this motion summary judgment, if necessary, on liability and damages after the disposition of Defendants' *Daubert* motions.

---

[5] Quirk Middle School is now known as Global Communications School.   Barbour School became the Hartford Journalism & Media Academy, but was sometimes initially referred to in renovation plans as Global Communications Academy.
[6] Notably, Plaintiffs initially attempted to bring causes of action for alleged damage to these schools, but withdrew them after Defendants moved to dismiss them as time-barred.   (*Compare* ECF No. 22 *with* ECF No. 71).

Respectfully submitted,

/s/ Thomas M. Goutman

**WHITE AND WILLIAMS LLP**
Thomas M. Goutman (*pro hac vice*)
Richard L. Campbell (*pro hac vice*)
Kim Kocher (*pro hac vice*)
1800 One Liberty Place
Philadelphia, PA 19103-7395
215-864-7000
*Attorneys for Defendants*
*Monsanto Company; Solutia Inc.;*
*and Pharmacia LLC*


**DAY PITNEY LLP**
Paul D. Williams (ct05244)
Elizabeth C. Barton (ct07660)
Michael L. Miller (ct29137)
Elizabeth P. Retersdorf (ct29178)
242 Trumbull Street
Hartford, CT 06103
860-275-0100
*Attorneys for Defendants*
*Monsanto Company; Solutia Inc.;*
*and Pharmacia LLC*


**CAPES, SOKOL, GOODMAN & SARACHAN, P.C.**
Adam E. Miller (*pro hac vice*)
7701 Forsyth Blvd., 12th Floor
St. Louis, MO 63105
314-721-7701
*Attorneys for Defendants*
*Monsanto Company; Solutia Inc.;*
*and Pharmacia LLC*

<u>CERTIFICATE OF ELECTRONIC FILING</u>

I hereby certify that on June 15, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


       */s/ Paul D. Williams*
      Paul D. Williams (ct05244)
      Day Pitney LLP
      242 Trumbull Street
      Hartford, CT  06103-1212
      (860) 275-0100
      (860) 275-0343 (fax)
      pdwilliams@daypitney.com