## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CITY OF HARTFORD and HARTFORD
BOARD OF EDUCATION,

CIVIL ACTION NO.

3: 15-CV-01544(RNC)

*Plaintiffs*

v.

MONSANTO COMPANY, SOLUTIA INC.,
and PHARMACIA CORPORATION,

JUNE 15, 2018

*Defendants*

## DEFENDANTS' LOCAL RULE 56(a)1
## STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants Monsanto Company, Solutia Inc., and Pharmacia LLC (collectively "the Defendants") submit the following Statement of Material Facts in support of their Motion for Summary Judgment:

## I.   WHEN THE CLARK SCHOOL WAS BUILT IN 1971, IT WAS CONSTRUCTED WITH BUILDING PRODUCTS THAT CONTAINED INDUSTRIAL CHEMICALS CALLED POLYCHLORINATED BIPHENYLS (PCBS).

1.   The John C. Clark Elementary School ("Clark School") is a two-story educational facility for pre-kindergarten through eighth grade students. Construction of the school was completed in 1971.   Eagle, "Draft Executive Summary Polychlorinated Biphenyl Pilot Study Area", at 2, Mar. 16, 2016, attached as Exhibit 1.  The Clark School was designed to support a capacity of approximately 750 students.  Harrall-Michaiowski Assoc., "Analysis of the Hartford Public Schools Facilities – Capital Improvements Program: Final Report" ("CIP Final Report") at 24, Table 14, Feb. 2006, attached as Exhibit 2.

2.   City of Hartford and Hartford Board of Education (collectively "Plaintiffs") claim that PCB-containing caulk was the primary source of PCBs within Clark School.  Expert Report of Ross Hartman ("Hartman Rpt.") at 12, July 17, 2017, attached as Exhibit 3; Deposition of

Robert Herrick, Sc.D. ("Herrick Dep.") at 234, Aug.25, 2017 & Feb. 16, 2018, excerpts attached as Exhibit 4.

       3.     Plaintiffs cannot identify the manufacturer, distributor, supplier or installer of this caulk. *See* Plts' Amended Resps. to Defs' First Set of Request for Admissions, Nos. 41, 47 and 50 (Aug. 31, 2017), attached as Exhibit 5. Plaintiffs cannot identify when the caulk was manufactured or installed. Id. No. 94.

## II.    WHAT ARE PCBS?

       4.     PCBs were an industrial product sold in bulk to sophisticated manufacturers of electrical and other industrial equipment as well as manufacturers of building products, such as caulk. *See* Deposition of Robert G. Kaley, II, Ph.D., Volume I, *Town of Westport v. Monsanto et al.*, 1:14-cv-12041 ("Kaley Dep. Vol. I") at  72, Apr. 5, 2016 , excerpts attached as Exhibit 6; Deposition of Robert G. Kaley, II, Ph.D. Volume II, *Town of Westport v. Monsanto et al.*, 1:14-cv-12041 ("Kaley Dep. Vol. II") at 573-74, Apr. 6, 2016, excerpts attached as Exhibit 7; Expert Report of Maureen Reitman, Sc.D. ("Reitman Rpt.") at  14-15, 18-19, 26-27, Oct. 30, 2017, attached as Exhibit 8; Deposition of Jerome M. Klosowski ("Klosowski Dep.") at 31, 79, 179-80, Aug. 29, 2017, excerpts attached as Exhibit 9; Deposition of Jack Matson ("Matson Dep.") at 105, 107, Sept. 1, 2017, excerpts attached as Exhibit 10.

       5.     PCBs are a class of 209 compounds, called congeners, consisting of chlorinated hydrocarbons with a biphenyl nucleus on which one to ten of the hydrogens have been replaced, by chemical reactions, with chlorine.  Kaley Dep. Vol. I at 55-56; Reitman Rpt. at 15; Expert Report of Jack V. Matson, Ph.D., PE ("Matson Rpt.") at 5-6, July 17, 2017, attached as Exhibit 11; *see* Matson Dep. at 15.

       6.     Pharmacia, d/b/a Monsanto Company, began the manufacture and sale of PCB

mixtures in 1935 when it purchased the Swann Chemical Company.  Reitman Rpt. at 13; Matson

Rpt. at 6.  The Pharmacia PCB mixtures were sold under the registered trademark of Aroclor.

Kaley Dep. Vol. I at 50; Reitman Rpt. at 13.  The Pharmacia PCB-containing Aroclor numbers

included 1016, 1221, 1232, 1242, 1248, 1254, 1260, 1262, and 1268.  *See* Reitman Rpt. at 16, n.

8; Matson Rpt. at 7-8.  Each PCB-containing Aroclor was a pure PCB product comprised of a

mixture of different PCB congeners.  Matson Dep. at 15.  With the exception of 1016, the last

two digits of the Aroclor series number correspond to the percent of chlorine.  Reitman Rpt. at

16, n. 8; Matson Rpt. at 7.  For example, Aroclor 1254 contains 54% chlorine by weight.

Reitman Rpt. at 16, n. 8; Matson Rpt. at 7.

7.     PCB production in the United States began in response to the electrical industry's

need for improved dielectric insulating fluids which would also provide increased fire resistance

when used in transformers and capacitors.  *See* Reitman Rpt. at 13; Kaley Dep. Vol. II at 568.

As the unique functional characteristics of these materials became more fully understood

additional uses were found.  *See* Reitman Rpt. at 16-17.  Their non-flammability made them an

excellent choice in high pressure hydraulic applications associated with high risk of fire such as

die casting and steel production.  *See* Matson Rpt. at 8.  Their thermal stability and non-

flammability were valuable in heat transfer systems.  *See* Kaley Dep. Vol. II at 567-68.  Their

non-flammability, thermal stability and viscosity characteristics made their use desirable in hot

melt adhesives and other plasticizer applications.  Erickson, "Applications of polychlorinated

biphenyls", 18 ENVIRON SCI POLLUT RES. 135, 147 (2011), attached as Exhibit 12; *see* Kaley

Dep. Vol. II at 571-72.  PCBs therefore evolved as a unique class of chemicals which met

important needs for both industry and society. *See* Matson Rpt. at 8, 14; Kaley Dep. Vol. II at

567-69, 571-72.  In many instances fire and building codes required PCBs for the protection of

life and property.   Kaley Dep. Vol. II at 569; Deposition of Jack Vincent Matson, *Town of Westport v. Monsanto et al.*, 1:14-cv-12041 ("Matson Westport Dep."), [1] at 148-49, Sept. 9, 2016, excerpts attached as Exhibit 13.

8.      PCBs used in building products such as caulk, even if they have volatilized from the caulk, are invisible and have no scent.  *Town of Westport  v. Monsanto et al.*, 877 F.3d 58, 65-66 (1st Cir. 2017).

9.      PCBs were produced in many countries, including: USA (1930-1977);West Germany (1930-1983); Russian Federation (1939-1993); France (1930-1984); United Kingdom (1954-1977); Japan (1954-1972); Italy (1958-1983); Democratic Republic of Korea (1960s-2012); Spain (1955-1984); former Czechoslovakia (1959-1984); China (1965-1980); Poland (1966-1977). International Agency for Research on Cancer ("IARC (2016)"), "Polychlorinated and Polybrominated Biphenyls", Vol. 107 at 72, Table 1.14 (2016), excerpt attached as Exhibit 14; INTERDEPARTMENTAL TASK FORCE ON PCBs, POLYCHLORINATED BIPHYENLS AND THE ENVIRONMENT, COM-72-10419, at 84 (May 1972) ("ITF Rpt."), excerpts attached as Exhibit 15. PCBs were also manufactured in Poland, East Germany and Austria in unknown amounts. Breivik et al., "Towards a global historical emission inventory for selected PCB congeners–a mass balance approach", 290 THE SCIENCE OF THE TOTAL ENVIRONMENT 181, 183 (2002), attached as Exhibit 16.

10.     In 1966, PCBs were first detected in the environment by Swedish scientists using experimental equipment.  *See* S. Jensen, "The PCB Story," *Ambio* at 123 (Aug.1972), attached as Exhibit 17.  In 1970, in response to growing information regarding PCBs in the environment, Pharmacia began to voluntarily phase out the sale of PCBs for various applications.  Letter, Monsanto Company to customers (Feb. 27, 1970), attached as Exhibit 18.  Sales of PCBs for use

---

[1] Matson adopted his admissions from the *Town of Westport* case.  Matson Dep. at 10, 12.

in building products such as caulk were phased out as of August 1970.  Letter, Monsanto Company to customers (June 1, 1970), attached as Exhibit 19.  By 1972, Pharmacia had ceased the manufacture and sale of PCBs for all uses other than as a dielectric fluid for use in enclosed electrical equipment.  *See* Kaley Dep. Vol. II at 644-45. Sales of PCBs for electrical equipment continued because, according to the United States Government and the electrical industry, a cessation of sales would shut down the United States electrical power grid and cripple United States industry.  ITF Report at 4; St. Louis Meeting with General Electric Co., "The PCB-Pollution Problem ", Jan. 21 & 22, 1970, attached as Exhibit 20.

11.    Pharmacia voluntarily ended the manufacture and sale of PCBs for all uses in 1977 after the electrical industry identified alternative dielectric fluids.  Kaley Dep. Vol. II at 644-45. Before that time, the termination of sales for dielectric uses would have resulted in severe economic and social dislocation.  Kaley Dep. Vol. II at 640-41.

12.    Jerome M. Klosowski, Plaintiffs' formulator expert, and Dr. Jack Matson, Plaintiffs' chemical waste expert, agree that PCBs had many useful properties and were included by manufacturers and formulators in a wide array of products including caulks and sealants. Reitman Rpt. at 20-21, 26, 28; Matson Rpt. at 14; Klosowski Dep. at 51.

13.    With respect to building products such as caulk, PCBs were used as plasticizers. A plasticizer is a raw material used as part of various industrial mixtures.  Reitman Rpt. at 20-21, 26; Matson Rpt. at 14.  At no time in its corporate history did Pharmacia manufacture, formulate, sell, or market caulks or paints.  Kaley Dep. Vol. II at 575; Matson Dep. at 84.  It did sell plasticizers used by formulators in these products.  Reitman Rpt. at 20-21; Letter, Maureen Reitman, Sc.D. to Richard Campbell, "City of Hartford et al v. Monsanto et al", at 3, (Mar. 16, 2018) ("Reitman Sur-Rebuttal"), attached as Exhibit 21; Matson Rpt. at 8.    Pharmacia

manufactured dozens of different plasticizers for use by industry. Reitman Rpt. at 18-19; *see* Matson Rpt. at 8.

14.     Caulk compositions were determined by formulators, not Pharmacia, and typically included multiple interacting components, including the base resin, one or more fillers, one or more plasticizers, and other additives.  Kaley Dep. Vol. II at 575-76; Reitman Rpt. at 25-26; Klosowski Dep. at 30-32.   The specific composition, including the chemical types and relative amounts of the components, affects physical and chemical properties of the caulk, including durability and lifetime of the caulk.  Reitman Rpt. 23-27; Klosowski Dep. at 31-32, 61-69, 216-17.

15.     Because PCB plasticizers for use in polysulfide caulks "showed almost ideal behavior", "nearly all the early polysulfide sealants produced during the period from the early 1950s to the late 1970s contained 5% to 30% polychlorinated biphenyls".  Klosowski Dep. at 51-53; *see also* Reitman Rpt. at 28, Matson Rpt. at 13.

16.     In 1970, when Pharmacia withdrew PCB plasticizers from the market, there was no one-for-one replacement for polysulfide caulks, such that products made with PCBs had to be discontinued or reformulated to have different properties and characteristics.  Reitman Rpt. at 29, 51; Reitman Sur-Rebuttal at 4; Klosowski Dep. at 122; Kaley Dep. Vol. II at 523-24.

17.     Product formulators selected PCBs because of PCBs' unique and desirable combination of properties. One reason formulators chose PCBs for caulks was their low volatility and large molecular weight, which meant PCBs stayed put in mixtures and rendered caulk formulations longer lasting, more flexible and durable.  Reitman Rpt. at 16-17, 23, 28; Klosowski Dep. at 35-39, 53, 51-69, 124-29, 216-18; Kaley Dep. Vol. II at 571-72.   PCBs also imparted chemical, biological and flame resistance onto caulk formulations.  Reitman Rpt. at 16-

17; Klosowski Dep. at 35-39, 53, 51-69, 124-29, 216-18; Matson Westport Dep. at 308-09; Kaley Dep. Vol. II at 576.  PCBs have low water solubility and low vapor pressures. Reitman Rpt. at 16-17; Klosowski Dep. at 162-70.

18.    At all times relevant to this matter, formulators were not interested in one specific property imparted by a plasticizer, but rather a range of properties.  Klosowski Dep. at 76-77.  At all times relevant to this matter, including the time when formulators selected PCBs for use as a plasticizer in its caulk formulations, formulators knew that all plasticizers, including PCBs, could volatilize to some degree from the consumer product.  Klosowski Dep. at 71, 79, 162-70; Matson Dep. at 95; Matson Rpt. at 15; Matson Westport Dep. at 308-09, 318.

19.    Klosowski, Plaintiffs' formulator expert, testified that formulators knew that all plasticizers volatilize at some rate.  Klosowski Dep. at 79.  Matson, Plaintiffs' chemical waste expert, testified that it was common knowledge in science and industry that all plasticizers will volatilize to some degree.  Matson Westport Dep. at 318-19.

20.    Matson, Plaintiffs' chemical waste expert, testified that he could not determine whether any caulk manufacturer would not have used Aroclor 1254 as a plasticizer if they were presented with vapor pressure extrapolations from Southern Research Institute as opposed to the vapor pressure presented in Pharmacia's technical bulletins, because he could not "reconstruct what was in the minds of plasticizer purchasers back in the 1950s". Matson Westport Dep. at 310-11. Klosowski testified that when formulating a product, it did not matter whether an ingredient's vapor pressure was $10^{-4}$ or $10^{-5}$.  Klosowski Dep. at 78.

21.    The rate at which PCBs volatilize from a formulation like caulk depends on a large number of factors, including the selection and quantities of other chemicals in the formula and the end use conditions where it was used (e.g., the thickness with which the caulk is applied,

the surface area of its application, and the temperature, air circulation, and humidity where applied).  Klosowski Dep. at 80, 162-70; Herrick Dep. at 278-79; Reitman Rpt. at 23-24; *see* Matson Rpt. at 15-16, 19; Matson Westport Dep. at 188, 326-28; Kaley Dep. Vol. II at 583-84.

22.    Because the composition of a formulation will affect the rate at which PCBs volatilize, PCB volatilization rates vary from substance to substance.  Reitman Rpt. at 23-24; Reitman Sur-Rebuttal at 2-3; *see* Matson Rpt. at 15-16, 19.

23.    Neither the formulation nor the end use conditions could be defined or controlled by Pharmacia.  Reitman Rpt. at 23-24; Klosowski Dep. at 163, 167-68; Herrick Dep. at 278-79; Matson Westport Dep. at 326-28.  Therefore, even if Pharmacia knew the specifics of the caulk application including the temperature, humidity, and other conditions of the space in which it is applied, Pharmacia could not predict the rate of volatilization of PCBs from caulk.  Reitman Rpt. at 23-24, 30; *see* Matson Rpt. at 15-16; Kaley Dep. Vol. I at 106-07.

24.    Beginning in the 1930s, Pharmacia sent its customers product bulletins with the results of its own weight-loss tests on PCBs and PCB-containing products.  *See e.g.* Memo, Cumming Paton to NW Touchette, "Thiokol Work Request 69-22" (Feb. 12, 1969), HARTOLDMON0029371 attached as Exhibit 22; Al Morgan, Norman Touchette, Gene Wilde, "Polysulfide Modifiers: Special Report from Monsanto Research", HARTOLDMON0029395, attached as Exhibit 23; Monsanto, "Monsanto Modifiers for Thiokol polysulfide liquid polymers", Technical Bulletin No. Pl-331 (Apr. 1962), TOWOLDMON0005003, attached as Exhibit 24.  Weight loss testing of PCB containing products has also been discussed in the scientific literature. *See* Matson Rpt. at 16.

25.    At all times relevant to this matter, it was standard practice among formulators to perform weight loss tests to determine the rate of plasticizer loss from their products.  Klosowski

Dep. at 72, 177-79.  It was the formulators' responsibility to test their final products and not to simply rely on the properties of the individual components to determine the properties of their formulations.  Klosowski Dep. at 72, 177-78; Reitman Rpt. at 18; Reitman Sur-Rebuttal at 1-2.

26.     Specifications promulgated by the federal government in the 1960's required caulk manufacturers to perform weight loss tests on their products.  Matson Report at 16; Federal Specification, "Sealing Compound, Synthetic-Rubber Base, Single Component, Chemically Curing (for Calking [sic], and Glazing in Building Construction)", TT-S-00230(a) (Feb. 3, 1964), attached as Exhibit 25.

27.     Klosowski testified that it is "[t]he responsibility of the formulator to determine the toxicity of the product they're putting on the market."  Klosowski Dep. at 215:12-17.

## III.   PCB PLASTICIZERS WERE SOLD IN BULK TO SOPHISTICATED FORMULATORS OF CAULKS AND SEALANTS.

28.     Caulk formulations were proprietary to their manufacturer.  Reitman Rpt. at 14-15; Klosowski Dep. at 31-32, 243-245; Matson Westport Dep. at 58-60; Kaley Dep. Vol. I at 53-54.  Formulators included the PCBs as one component within a proprietary formula for products such as caulk and sealants.  Reitman Rpt. at 25-26; Matson Westport Dep. at 58-60.  Formulators, not Pharmacia, made decisions as to which chemicals – including plasticizers – they would include in their formulae.  Klosowski Dep. at 30-32; Reitman Rpt. at 14-15, 18-19, 26-27; Matson Westport Dep. at 156; Kaley Dep. Vol. II at 575-76.  Formulators did not share their proprietary formula with Monsanto.  Klosowski Dep. at 245.

29.     Pharmacia shipped its raw PCBs in 55 gallon drums (or railroad cars or tank trucks) to distributors and product manufacturers (or "formulators").  Kaley Dep. Vol. I at 72; see Reitman Rpt. at 14.  Polysulfide caulk manufacturers, such as PRC and Thiokol were large sophisticated companies, which employed large staffs of scientists who determined the specific

formulas used to manufacture their products.  Kaley Dep. Vol. II at 573-74; Reitman Rpt. at 14-15, 18-19, 26-27; Matson Rpt. at 13; Klosowski Dep. at 31, 79, 179-80; Matson Dep. at 105, 107; *see* Kaley Dep. Vol. I at 196-97; Matson Westport Dep. at 28, 154, 156, 318-19; Products Research & Chemical Corporation, Annual Report (1968), attached as Exhibit 26.

30.     Pharmacia provided its customers with many technical bulletins describing the chemical properties of its Aroclors, such as their vapor pressure and solubility, as well as their toxicity.  Reitman Rpt. at 14, 18-19; Klosowski Dep. at 102-03, 218-25.

31.     Formulators resold the PCB-containing products they formulated to other manufacturers who incorporated them into another product, or to distributors, who might sell the products to general contractors, who sold the caulk to contractors, builders, and architects, and who then resold the caulk to subcontractors who ultimately included the product into a building. Kaley Dep. Vol. I at 54, 60-61, 196-99.

## IV.   PCBS ARE PRODUCED TODAY INADVERTENTLY IN MANUFACTURING PROCESSES, ARE PRESENT IN MANY CONSUMER AND INDUSTRIAL PRODUCTS, AND ARE PERMITTED BY THE EPA.

32.     PCBs have been and continue to be inadvertently manufactured as a byproduct of a number of chemical processes that involve carbon, chlorine and high temperatures. CCA Expert Report ("CCA Rpt.") at 69, Oct 30, 2017, attached as Exhibit 27.

33.     Currently, the EPA allows products manufactured today to contain up to 50 ppm of inadvertent PCBs.  CCA Rpt. at 69.

34.     There are over 100 different PCB congeners associated with inadvertent PCBs. Some of those congeners are also found in Pharmacia manufactured Aroclors.  CCA Rpt. at 69. EPA Method 8082, the preferred method for identifying PCBs, looks for three to five characteristic peaks.  *See* City of Spokane Wastewater Management Department, "PCBs in Municipal Products, Revised" ("Spokane Rpt.") at Figure 20, Figure 23, Figure 26, July 21,

2015, attached as Exhibit 28.  Because it is unclear to which congeners those peaks correspond, it is not possible to determine whether those congeners are also associated with inadvertently produced PCBs or Pharmacia-manufactured Aroclors.  *See id.*

35.     Inadvertent PCBs are ubiquitous.  Spokane Rpt. at 5.  Up to 375 different products manufactured today contain inadvertent PCBs, including those associated with the manufacture of products as diverse as surfactants, fungicides, fuel additives, PVC, solvents, lubricants, adhesives, coatings, paint pigments, flame retardants used in plastics, paints, adhesives, sealants and caulks, and numerous consumer products from toothpaste to antifreeze. *See generally* Spokane Rpt.; Hu, D., Hornbuckle, K.C., *Inadvertent polychlorinated biphenyls in commercial paint pigments*, 44 ENVIRON. SCI. TECHNOL. 2822, 2825 (2010), attached as Exhibit 29; Reitman Rpt. at 43; CCA Rpt. at 69.

36.     Ongoing sources of inadvertent PCBs found in paint and other material are present in schools.  CCA Rpt. at 69-70.

## V.     PHARMACIA APPROPRIATELY WARNED ITS CUSTOMERS.

37.     All substances, including industrial chemicals, are systemically toxic at some dose, but simply because a product is capable of causing systemic toxicity does not mean that the product should be removed from the market.  Deposition of James R. Olson, PhD., *Town of Westport v. Monsanto et al.*, 1:14-cv-12041  ("Olson Westport Dep.") [2] at 55-56, 135, 225, 228, Aug. 24, 2016, excerpts attached as Exhibit 30.  Olson, Plaintiffs' toxicologist, testified: "[T]he dose differentiates the poison from the remedy."  Olson Westport Dep. at 55-56.

38.     Beginning in the 1930s, Pharmacia commissioned hundreds of toxicological tests of PCBs from leading institutions such as the Harvard School of Public Health and the Kettering Institute of the University of Cincinnati.  Expert Report of John D. Schell, Ph.D. ("Schell Rpt.")

---

[2] Olson adopted his admissions from the *Town of Westport* case.  Olson Dep. at 9-10.

at 38-41, 43, Oct 30, 2017, attached as Exhibit 31.  Those tests disclosed that PCBs, like all industrial chemicals, were capable of causing systemic toxicity at high doses, but could be safely manufactured and used.  *See* Olson Westport Dep. at 137, 155, 182-83, 225, 228-29.

39.    At all times relevant to this case, there was no legal requirement, government or industry standard, or recommendation from any source that required long-term toxicology tests of chronic low-level exposures to PCBs prior to its sale.  Olson Westport Dep. at 121-22, 143, 229-31, 234-35.

40.    At all times relevant to this case, Pharmacia supplied Aroclor product bulletins and warning labels to each of its customers.  Reitman Rpt. at 18-19; Kaley Dep. Vol. I at 85-87, 90-91.  These bulletins contained then-known toxicological information regarding exposures to PCBs and information on their safe handling.  *See e.g.* L.A. Watt (Oct. 11, 1937) (warning) MONS 046543, attached as Exhibit 32.  These bulletins also provided physical and chemical characteristics for the Aroclors.  Reitman Rpt. at 14; Kaley Dep. Vol. I at 85-87.  Pharmacia also issued warnings on its labeling for barrels and tank cars.  Kaley Dep. Vol. I at 88-89, 102.

41.    In 1937, Pharmacia warned its customers: "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects."  Watt (Oct. 11, 1937) (warning).  This warning was repeated in a 1943 application data bulletin, in which Pharmacia warned: "Experimental work on animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects."  Monsanto Chemical Company, "The Aroclors: Physical Properties and Suggested Applications", No. P-115 (Apr. 1943), attached as Exhibit 33.  In a 1955 technical bulletin, Pharmacia provided the following warning: "The vapors emitted by Aroclor 1248 heated to elevated temperatures are injurious to the liver on prolonged

exposure and should not be breathed." Monsanto Chemicals Plastics, "An Indirect Aroclor Heater for Unit Chemical Operators", Monsanto Technical Bulletin No. O-130, at 4 (Oct 1955), attached as Exhibit 34. In a 1966 technical bulletin, Pharmacia warned: "If these precautions are neglected acne may develop and excessive exposure may cause liver damage." Monsanto, "Aroclor for Capacitors" at 23 (1966), attached as Exhibit 35.

42.     In early 1970, Pharmacia issued warning letters to all of its known customers and distributors alerting them to the developing information regarding the environmental presence of PCBs. Letter, Monsanto Company to customers (Feb. 27, 1970), *supra* para. 10. Pharmacia encouraged its customers to provide similar information to the customers of their customers. Id.

43.     In March 1970, Pharmacia reissued its Aroclor technical bulletins, including Technical Bulletin o/PL-306A entitled, Aroclor Plasticizers. Attached as Exhibit 36. In that bulletin, Pharmacia included the following Environmental Hazard warning:

> **Environmental Hazards**
>
> Aroclor 1232, Aroclor 1242, Aroclor 1248, Aroclor 1254, Aroclor 1260, Aroclor 1262, Aroclor 1268, Aroclor 4465, and Montar 1 all contain polychlorinated biphenyls (PCB) of various types and in varying amounts. PCB residues in small amounts have been found in the environment and some studies have indicated that they may be harmful to certain forms of animal life. Extreme care should therefore be taken by all users of PCB-containing products to prevent any entry into the environment through spills, leakage, use, disposal, vaporization or otherwise. Further, the products in which PCB materials are used, or which are formulated using PCB materials as a component, should be given careful study to eliminate the possibility that PCB might reach the environment as a result of use in a given application.
>
> Some specific applications where the use of PCB should definitely be avoided are in paints and sealants for swimming pools, paints and waterproofing agents in silos and other buildings where food products for humans or animals are stored, and as a component of any container or wrapping used in the packaging of food products.

44.     Klosowski, Plaintiffs' expert formulator, testified that Pharmacia warned formulators that PCBs could pose serious health consequences from exposure. Klosowski Dep. at 103.

45.    Pharmacia advised its customers of PCBs' chemical properties, including their low vapor pressure, resistance to chemical and biological breakdown, and stability, calling them "virtually indestructible," all of which Klosowski described as the "definition of persistent". Klosowski Dep. at 219-25; "Genie" of a Thousand and One Engineering Feats, Chemical and Engineering News: Industrial Research, 60-OMC-2790, TOWOLDMON0047971, attached as Exhibit 37.

## VI.    PHARMACIA CANNOT WARN OF HARMS THAT ARE NOT KNOWN.

46.    There are no scientific studies, either during the period of Pharmacia's manufacture of PCBs or today, that purport to demonstrate that PCBs in indoor air and surfaces from PCB-containing building products cause human disease.  Klosowski Dep. at 119, 198; Olson Westport Dep. at 54-55, 104-05, 245; Matson Westport Dep. at 122, 201, 332; Deposition of Robert F. Herrick, *Town of Westport v. Monsanto et al.*, 1:14-cv-12041 ("Herrick Westport Dep.")[3] at 151 & 152, Aug. 18, 2016, excerpts attached as Exhibit 38.

47.    There are no scientific studies, either during the period of Pharmacia's manufacture of PCBs or today, that purport to demonstrate that the levels of PCBs found at Clark School cause human disease.  Klosowski Dep. at 119, 198; Deposition James Raymond Olson ("Olson Dep.") at 221-22, 224, 227, 229, 230-31, Aug.22. 2017, excerpts attached as Exhibit 39; Herrick Westport Dep. at 151 & 152; Olson Westport Dep. at 54-55, 104-05, 245; Matson Westport Dep. at 122, 201, 332.

48.    Matson, Plaintiffs' chemical waste expert, admitted that, during the period of Pharmacia's manufacture of PCBs, there were no scientific studies that showed injury to humans due to exposure to environmental levels of PCBs.  Matson Westport Dep. at 122.  Matson also

---

[3] Herrick adopted his admissions from the *Town of Westport* case.  Herrick Dep. at 9, 11.

admitted that there are no scientific studies that demonstrate adverse health effects caused by PCBs volatilizing from building products.  Matson Westport Dep. at 201-02.

49.    Herrick, Plaintiffs' industrial hygiene expert, testified that there are no studies which demonstrate that PCBs found in buildings cause health problems.  Herrick Westport Dep. at 151-52.

50.    Olson, Plaintiffs' toxicologist, admitted that he could not testify as to whether PCBs caused any adverse human condition.  Olson Dep. at 43.  Olson also testified that if Pharmacia had commissioned toxicity studies of PCBs at ambient dosage levels, it would not have found any adverse health effects.  Olson Westport Dep. at 245.  Olson acknowledged at his deposition that, by "low-level exposure," he was not referring to levels to which one might be exposed from PCB building products, but to levels in laboratory animal studies which are orders of magnitude higher. Olson Westport Dep. at 159, 242-245.

51.    Klosowski, Plaintiffs' formulator expert, testified that there are no studies which demonstrate that PCBs volatilizing from building products cause human disease.  Klosowski Dep. at 119-20, 198-99.

52.    During the period of Pharmacia's manufacture of PCBs from the 1930s to the 1960s, the available analytical methods that might be used to detect PCBs in the environment measured chlorine and could not distinguish between chlorine molecules originating from PCBs as opposed to numerous other substances found in the environment that contain chlorine. Klosowski Dep. at 188-90.  The first scientific test investigating PCB volatilization from caulk did not occur until the 2000s.  Herrick Dep. at 155; Klosowski Dep. at 229, 231; Matson Dep. at 168, 175, 177; Matson Westport Dep. at 188.

53.     Paint studies conducted by Pharmacia in the 1950s involved experimental PCB-containing latex paints that were never marketed.   Mem. DVN Hardy to Dr. J.W. Barrett, "Aroclors – Toxicological Examination" at 2 (Aug. 19. 1955), MONS09521, attached as Exhibit 40; Stanley C. Ballard, AROCHLOR IN AIR ("Ballard Rpt."), Monsanto Chemical Company, Plastics Division (Dec. 31, 1952), MONS061753, attached as Exhibit 41.   The conditions of the tests included little or no ventilation, and in ambient temperatures that exceeded 80ºF.   Ballard Rpt. at 1; Kaley Dep. Vol. II at 345-48; Kaley Dep. Vol I at 229-288; *see also* H.B. Richards, Jr., "Final Report on Aroclor in Gases", Report No. 2970 (Mar. 15, 1954), TOWOLDMON0054584-4607 (Report No. 2970, Mar. 15, 1954), attached as Exhibit 42.

54.     PCBs are resistant to water and latex paints are water-based.   Kaley Dep. Vol. I. at 110, 149, 235, 249.   Klosowski, Plaintiffs' expert chemist and formulator, testified that it is impossible to predict volatilization rates from caulk based on volatilization rates from paint tests. Klosowski explained that comparing volatilization from latex paint and polysulfide caulk is like comparing "an apple and an orange." Klosowski Dep. at 184:10-19.   Matson testified that he is not aware of any information that would suggest that when PCBs were used in non-latex paint they would readily volatilize. Matson Westport Dep. at 268.

55.     Further, the test methods made it impossible to distinguish PCB molecules from molecules containing chlorine from other sources, such as solvents or pesticides.   Ballard Rpt. at 1.

## VII.   DUE TO ITS AGE AND CONDITION, THE CLARK SCHOOL WAS SCHEDULED TO BE GUTTED AND RENOVATED "AS NEW" BEFORE PCBS WERE EVER DISCOVERED.

56.     Prior to any testing for PCBs, the Clark School was scheduled to be renovated "as new."   Claudio Bazzano, Executive Director of Facilities for the Hartford Public Schools, explained that this meant that "you basically gut everything out" and "the only thing standing is

the foundation, the exterior walls of the building, and everything else within it [is] replaced"; complete systems are taken out and replaced.  Deposition of Claudio Bazzano ("Bazzano Dep.") at 9, 47, 150-51, Apr. 13, 2017, excerpts attached as Exhibit 43.  The Clark school required a complete overhaul of all its internal systems, such as the HVAC system.  Bazzano Dep. at 45-47, 150-51.

57.     The first planned renovate-as-new project for the Cark School was scheduled during the 2004/2005 school year and budgeted to cost $24,200,000. CIP Final Report at 22, Table 12.  Beginning in the early 2000s, the Facilities Department recommended replacing the ventilation system, exhaust fans, rooftop units, air compressors and cooling towers at the Clark School.  None of this was ever done.  Bazzano Dep. at 172-73.  None of the estimated $24,200,000 allocated for necessary Clark repairs for the 2004/2005 year was ever spent to renovate Clark School.  Bazzano Dep. at 177.

58.     A second planned renovate-as-new project for the Clark School was scheduled for the 2010/2011 school year and budgeted to cost $35,000,000.  CIP Final Report at 23, Table 13.

59.     The Clark School was next scheduled to be renovated as new beginning in 2019.  Bazzano Dep. at 45-46.

## VIII. FOR DECADES PLAINTIFFS HAS DEFERRED REPAIRS TO AND INVESTMENT IN THE CLARK SCHOOL.

60.     In 1999, Plaintiffs commissioned a facilities study by Jeter, Cook and Jepson Architect, Inc., which identified Clark School as one of eighteen schools in need of major renovations.  Jeter, Cook and Jepson Architects, Inc., "1999 Hartford Public Schools Facilities Study" ("Jeter Report") at 19, (July 22, 1999), attached as Exhibit 44.  The report listed all the major building systems as in need of repair or replacement.  It recommended: replacing all built-up roofs, exhaust fans and rooftop units, replacing oil pumps and cooling tower, upgrading

emergency exterior and emergency lighting, resealing wall control joints, repointing masonry, repainting exterior doors, frames, and railings, and providing interior painting, new resilient floor tile and ceiling tiles.  Id.

61.     Of those deficiencies identified in the report only the roof was replaced.   None of the other recommended work was ever completed.  Jeter Report at 19; Letter, Patrick Craffey to Brett Land, "Rebuttal to John Leary's appraisal review report, dated Oct. 30, 2017" at 3, (Jan. 11, 2018), attached as Exhibit 45.

62.     In March 2008, the CT DEP conducted an inspection of Clark School in response to complaints about indoor air quality, rodent infestation and poor sanitation practices.  Letter, Edna Pestana, CT DEP, to Dr. Alexander Nardone, Hartford Public Schools, "Re: Inspection Report of the John C. Clark School" at 1 (Apr. 8, 2008), attached as Exhibit 46.  Several staff members complained about poor indoor air quality during the inspection.  Id. at 5.   The inspection found an accumulation of dust and debris in classrooms, the gym, the gym equipment storage room, throughout the boys' locker room and in the air vents/registers throughout the building.  Id. at 4-5.  Human feces were observed on stairs; carpet was stained with vomit.  Id. at 4.   The inspection also found mouse droppings in classrooms, in multiple locations in the teacher's lounge, in the gym equipment storage room, and in a stair case.  Id.  The lead custodian of the Clark School catches two or three rodents every month.  Deposition of Edwin Arroyo ("Arroyo Dep.") at 40-41, Apr. 20, 2017, excerpts attached as Exhibit 47.  The CT DEP noted that several of these conditions violated Connecticut Statutes.  Letter, Pestana (Apr. 8, 2008), at 2-4.

## IX.   THE CLARK SCHOOL WAS IN SUCH POOR CONDITION IN 2014 THAT MANAGEMENT OF THE SCHOOL WAS TAKEN OVER BY THE CAPITOL REGION EDUCATION COUNCIL ("CREC").

63.   In 2014, six years after the 2008 CT DEP inspection, the Clark School was identified by the CREC as a school in need of intervention.   *See generally* Hartford Public Schools and CREC, Mem. Understanding (June 18, 2014), HRTFDSCHL036274, attached as Exhibit 48.  CREC took over management of Clark School and undertook a cosmetic upgrade of the building.  Id.

64.   Paul Drummey, the CREC employee assigned to the 2014 summer renovations at the Clark School, testified that in his lifetime, he had "never seen a school in such disrepair." Deposition of Paul M. Drummey ("Drummey Dep.") at 22, 55-56, Apr. 19, 2017, excerpts attached as Exhibit 48.  The Clark School was "a sad, dark and dreary place that needed a lot of work".  Drummey Dep. at 47-48, 52.

65.   The CREC project was intended to be a cosmetic update to extend life of school by 3 years until it was again scheduled to be gutted and renovated. Construction drawings, Capital Region Education Council, "Clark Street Elementary School Cosmetic Upgrades" (General Construction Notes & Project Scope), HRP001070, attached as Exhibit 50.   The upgrades included interior painting, replacement of glass with bullet-resistant glass, removal of asbestos, removal of ceiling pads, grit painting, new clocks in the classrooms and replacement of ceiling tiles.  Id.

66.   CREC intentionally did not test for PCBs since PCB testing was not required for any work performed.   CREC did not know that its work could disturb building materials containing PCBs.  Drummey Dep. at 126; Email, Mason Thrall, CREC, to Claudio Bazzano, Hartford Schools, "Clark School Sequence – revised" (Jan. 14, 2015), HRTFDSCHL044426, attached as Exhibit 51; HRP handwritten notes ("Bob Saunder [CREC]: do NOT sample for

PCBs"), HRP1001, attached as Exhibit 52; 30(b)(6) Deposition of Claudio Bazzano, Volume I & II ("Bazzano Dep. Vol. I") at 219-21, Sept. 12, 2017 & Oct 13, 2017 excerpts attached as Exhibit 53.

67.     Consequently, the CREC project spread PCBs throughout the building.  *See* Email, Pete Folino, Eagle, to Sal Salafia, Arcadis, "Re: Clark Phoenix AIR results" (Dec. 15, 2015), HRTFRDSCHL062061, attached as Exhibit 54; Email, Paul Drummey to Robert Saunders, "Clark" (Jan. 12, 2015), CREC00001308, attached as Exhibit 55; Drummey Dep. at 133; John P. Woodyard, PE, Expert Report ("Woodyard Rpt.") at 24-25, attached as Exhibit 56.

68.     CREC commissioned environmental testing and balancing to inspect the HVAC system at the Clark School which revealed an obsolete and non-functional HVAC system. Bazzano Dep. at 49.  The report noted multiple problems with the HVAC system, including: blocked air louvers, dirty grilles, missing branch dampers, inoperable air handling units, fans unable to operate long enough for testing, and motors that do not work.  Environmental Testing and Balancing, Inc., Certified Testing and Balancing Report ("ETB Report"), at 1-2 (Sept. 2, 2014), EES00003651, attached as Exhibit 56; Deposition of Ross A. Hartman ("Hartman Dep. Vol. I") at 189-91, Sept. 11, 2017, excerpts attached as Exhibit 58; *see* para. 90, *infra*.

## X.     FOLLOWING THE CONCLUSION OF THE CREC PROJECT, PLAINTIFFS DECIDED TO INSTALL A SPRINKLER SYSTEM IN THE CLARK SCHOOL.  AS PART OF THAT PROJECT, THEIR ENVIRONMENTAL CONSULTANT EAGLE ENVIRONMENTAL, INC. ("EAGLE") CONDUCTED UNNECESSARY TESTS FOR PCBS.

69.     In the summer of 2014, following the cosmetic upgrade project by CREC, Plaintiffs decided to install a fire protection system at the Clark School.  Drummey Dep. at 133-34, 138.  The project was managed by Jack Butkus, the senior program manager at Arcadis/O&G, which is an entity retained by Plaintiffs to manage construction projects at all

Hartford schools.  Deposition of Jack Butkus, Volume I ("Butkus Dep. Vol. I") at 65, 111, 140-41, June 22, 2017, excerpts attached as Exhibit 59.

70.    As part of the project, Peter Folino, the principal of Eagle, Plaintiffs' on-call environmental consultant, unnecessarily tested paint in several locations for PCBs.  Letter, Peter Folino, Eagle, to Sal Salafia, Arcadis/O&G, "RE: Polychlorinated Biphenyl (PCB) Containing Materials 'Source' Sampling and Analysis Report: Clark School – Fire Protection Project", at 2 (Oct.  22, 2014) (encl.), EE00000009, attached as Exhibit 60; Deposition of Peter J. Folino ("Folino Dep.") at 43-44, 65-66, June 2, 2017, excerpts attached as Exhibit 61.  The bulk tests identified Aroclor 1248 and Aroclor 1254 in caulk.  Letter, Peter Folino (Oct.  22, 2014); CCA Rpt. Appendix C.

71.    After PCBs were discovered in the paint in October 2014, Eagle conducted additional unnecessary air and dust sampling at the Clark School in December 2014.  Folino Dep. at 65-66; Eagle, "Polychlorinated Biphenyl (PCB) Investigation Summary Report John C. Clark Elementary School", at 2 (Jan. 29, 2015), HRTFDSCHL020654, attached as Exhibit 62; Hartman Dep. Vol. I at 40-44; Folino Dep. at 43-46, 65-66; Woodyard Rpt. at 9.

## XI.    THE CLARK SCHOOL WAS SAFE.

72.    Dr. Tung Nguyen, Interim Health Director for the City of Hartford Department of Health and Human Services, testified as a 30(b)(6) designee for Harford.  He testified that independent reviews of the PCB conditions at Clark School by the Department Connecticut Department of Public Health ("CT DPH"), the City of Hartford Department of Health and Human Services ("HHS"), the Hartford Board of Education and the Agency for Toxic Substances and Disease Registry ("ATSDR ") (a division of the Centers for Disease Control) confirmed that PCBs did not present at health risk at the Clark School. *See* 30(b)(6) Deposition

of Tung Nguyen ("Nguyen Dep.") at 7, 31-34, 36-40, 44-46, Sept. 12, 2017, excerpts attached as Exhibit 63.

73.     In January 2015, the CT DPH published a fact sheet that was provided to parents that addressed PCB levels in the air at the Clark School, which stated: "The CT Department of Public Health reviewed the air tests.  Even the highest level of 571 nanograms per cubic meter in air found in hallway is way below level that could cause health problems."   CT DPH, "Understanding PCB Exposures at Clark School" (Jan. 2015) ("CT DPH Publication"), attached as Exhibit 64; Nguyen Dep. at 31-34.  The publication stated that the PCBs in the air were almost 200 times lower than the dose required to cause minor symptoms in laboratory studies, and "several thousand times lower than the PCB dose that caused serious harm to laboratory animals."  CT DPH Publication; Nguyen Dep. at 36-37.

74.     The HHS regularly monitors the health of the City of Hartford residents through several surveillance systems from the Center for Disease Control and the CT DPH.  Nguyen Dep. at 9.  The HHS found no epidemiologic evidence that the health of students and staff at Clark School had been adversely affected by PCBs or had an unusual incidence of disease. Id. at 10-11.  The HHS agreed with the CT DPH's conclusions that the PCBs in the air at the Clark School would not adversely affect human health.  Id. at 32.

75.     In January 2015, David Medina, the Director of External Communications for the Hartford Public Schools ("HPS"), addressed PCBs in the Clark School with parents at the Clark School Open House.   Nguyen Dep. at 44.   On behalf of the HPS, David Medina advised: "Although the Connecticut Department of Public Health has informed us that PCB levels at the school are nowhere near high enough to pose an immediate or long-term health risk and that treatment to correct the situation could have been carried out with the building occupied, **we**

**decided to relocate students out of an abundance of caution to avoid unnecessary disruptions that remediation would take place.**"  Email, David Medina, HPS, to Kelvin Roldan, HPS, "Subject: Revised talking points" (Jan. 21, 2015) (emphasis added), MHIS-7352, attached as Exhibit 65; *see also* Nguyen Dep. at 45-46.

76.     In March 2015, the ATSDR reviewed the PCB test data.  Nguyen Dep. at 39. ATSDR confirmed that PCBs at the Clark School did not present a health risk.  "ATSDR Technical Assistance Form" (Mar. 10, 2015), CDC000003, attached as Exhibit 66; Nguyen Dep. at 39-40.  ATSDR concluded: "Our primary message to health care providers was that medical testing was not warranted based on the exposures at the school."  ATSDR Technical Assistance Form.

77.     Plaintiffs' experts admit that there are no scientific studies which demonstrate that PCB-containing building products either cause disease or that PCB levels found in the Clark School will cause disease.  Olson Dep. at p. 221-22, 224, 227, 229, 230-31; Herrick Dep. 160-61; Olson Westport Depo. at 159; Herrick Westport Dep. at 151; *see* paras. 46-51, *supra*.

78.     The pre-pilot air levels at the Clark School averaged 195 ng/m3. Hartman Dep. Vol. I at 49-50, 50; Herrick Dep. at 250-251; Woodyard Rpt. at 11.  These levels are below the EPA Evaluation Level for indoor PCB air level of 200 ng/m$^3$ for children between 3 years and less than 6 years old.  *See* EPA, "Public Health Levels for PCBs in Indoor School Air" (Sept. 25, 2009), attached as Exhibit 67.   Donald Slater, Chief Operating Officer for Hartford Public Schools, admitted that there were no children less than 3 years of age attending Clark School. 30(b)(6) Deposition of Donald Slater ("Slater Dep.") at 18, 43, 23-25, Sept. 27, 2017, excerpts attached as Exhibit 68; Woodyard Rpt. at 11; Schell Rpt. at 3

79.     The EPA has explained that its PCB evaluation levels "are not meant to be interpreted or applied as a 'bright line' or 'not-to-exceed' criteria."  EPA, "PCBs in Building Materials – Questions and Answers" (July 28, 2015), attached as Exhibit 69.  The EPA further stated that "[i]solated or infrequent indoor air PCB measurements that exceed the exposure levels would not signal unsafe exposure to PCBs", but measurements above these levels may trigger the need for further investigation.  Id.  These indoor school air levels do not represent real risk because they encompass a safety factor of 3,000; the risk may be zero.  Schell Rpt. at 3, 30.

80.     Pre-pilot PCB wipe samples of occupied spaces were all non-detect.  Folino Dep. at 68; Eagle, "Polychlorinated Biphenyl (PCB) Investigation Summary Report John C. Clark Elementary School", at 15 (Feb. 23, 2015), attached as Exhibit 70.  Pre-pilot wipe samples for surfaces within the ventilation system averaged 2.42 μg/100 cm$^2$.  Schell Rpt. at 4; Woodyard Rpt. at 11.  None of the wipe samples taken prior to the pilot study exceeded the regulatory level of 10 μg/100 cm$^2$.  Herrick Dep. at 92, 107; Woodyard Rpt. at 8, 11; Hartman Dep. Vol. I at 53.

81.     Pre-pilot bulk sampling of the ceiling tile averaged 0.5 ppm; bulk samples of paint averaged 48 ppm; bulk samples of air handling unit filters averaged 18.38 ppm; bulk samples of sprayed-on insulation averaged 10.83 ppm.  CCA Rpt., Appendix C Hartford PCB Data.

82.     In January 2015, the Plaintiffs voluntarily closed the Clark School.  Slater Dep. at 36, 61, 109.  John Motley, chairman of the Hartford School Building Committee, testified that neither the EPA nor the CT DEEP, nor any other governmental authority, mandated that the Clark School be closed.  30(b)(6) Deposition of John Motley, Volume I & II ("Motley Dep.") at 38, 76, Oct.  12 & 19, 2017, excerpts attached as Exhibit 71; *see also* Slater Dep. at 36, 61; Bazzano Dep. at 119; Deposition of Jack Butkus, Volume II ("Butkus Dep. Vol. II") at 430, Aug.13, 2017, excerpts attached as Exhibit 72.

83.     In March 2016, the Clark School's enrollment was reported to be 247.  *See* Achieve Hartford (Mar. 3, 2016), Arcadis00000156, attached as Exhibit 73.  In December, 2017, it was announced that the Clark School would be one of a number of Hartford schools to be permanently closed as part of a school consolidation plan to address under-enrollment.  Kathleen Megan, "New Reorganization Plan Would Close Hartford Schools, Consolidate Programs", HARTFORD COURANT (Dec. 19, 2017), available at http://www.courant.com/education/hc-news-hartford-schools-consolidation-20171218-story.html, attached as Exhibit 74.

## XII.  WHEN EAGLE FOUND PCBS IN THE AIR AT CLARK SCHOOL IT RETAINED ENVIRONMENTAL CONSULTANT ROSS HARTMAN; HARTMAN DID NOT DISCLOSE TROUBLING CONFLICTS OF INTEREST TO EAGLE OR TO HARTFORD.

84.     In January 2015, Ross Hartman of Strategic Environmental Services learned about PCBs being found at Clark and solicited the EPA for work at the Clark School; the EPA then recommended Hartman to Eagle.   Email, Ross Hartman, JM Env. Corp., to Kim Tisa, EPA, Re: Hello (Jan. 9. 2015), HRTFDSCHL063627, attached as Exhibit 75; Email, Pete Folino, Eagle, to Kim Tisa, EPA, "Re: Availability Friday" (Jan. 12, 2015), EPACLARK0165, attached as Exhibit 76.  On January 14, 2015, Eagle hired Hartman to help address the PCBs in the Clark School.   Contract, JM Env. Corp., Inc. and Eagle (Jan. 14, 2015), EE00009461, attached as Exhibit 77.

85.     One day before he was hired by Eagle, Hartman signed a consulting agreement with Plaintiffs' lawyers Baron & Budd.  Hartman Dep. Vol. I at 135-37; Letter, Mitchell E. McCrea, Baron & Budd, to Ross Hartman, JM Env. Corp. Inc., "Re: Consultant Retention Agreement" (Jan. 12, 2015), attached as Exhibit 78.

86.     Hartman never disclosed this conflict to Hartford or Eagle.  Hartman Dep. Vol. I. at 104, 106, 111; Folino Dep. at 96; Bazzano Dep. at 126; Slater Dep. at 49.

87.     Upon being engaged by Eagle to offer advice on the Clark School, Hartman immediately began soliciting Folino to introduce Baron & Budd lawyers to Plaintiffs.  Folino Dep. at 106-07.

88.     Hartman also solicited Folino on behalf of Baron & Budd for other Connecticut schools where Eagle had done PCB testing.  Folino Dep. at 109; Email, Pete Folino to Ross Hartman, "Re: Hello and PCB testing" (July 5, 2016), EE00007617, attached as Exhibit 79.

89.     Shortly after being retained by Eagle, Hartman and Folino recommended that Hartford conduct a pilot project on remediation of PCBs at the Clark School. Folino Dep. at 98; *see generally* Eagle (Jan. 29, 2015), *supra* para. 71.

## XIII.  CLARK SCHOOL WAS A MONUMENT TO NEGLECT AND DEFERRED MAINTENANCE.

90.     The HVAC system was original to the Clark School.  Butkus Dep. Vol. II at 356.  HVAC systems require replacement after 20 to 25 years.  Slater Dep. at 90.  Thomas Welcome, the facility manager at the Hartford Public Schools, testified that there were no written policies or procedures for maintaining the boilers, chiller, HVAC system, exhaust fans or air handling units or for inspecting the same.  Deposition of Thomas Welcome ("Welcome Dep.") at 102, 106-07, 188, Jul 13, 2017, excerpts attached as Exhibit 80; Arroyo Dep. at 47, 56.  Air filters were not replaced and heating coils were never cleaned.  Welcome Dep. at 188; Arroyo Dep. at 47, 56.  Many exhaust fans were broken, which prevented air from moving out of the building; the air handling units were blocked, which prevented outside air from coming into the building.  Welcome Dep. at 190-92. The air handling units were scheduled to be replaced in 2014 or 2015 because they had outlived their useful life.  Welcome Dep. at 143.

91.     In 2014 and 2015, AirTemp Mechanical Services Inc. (Airtemp) was hired to "feed as much outside air into the school as possible."  AirTemp Mechanical Serv. Inc., Call Slip

(Dec. 29, 2014), AirTemp036-37, attached as Exhibit 81.  AirTemp technicians unsuccessfully attempted to repair the rooftop exhaust fans, but the fans continued to have an overload shutdown after running for a short while. Id.; ETB Report.  AirTemp technicians also opened all outside dampers and closed all return dampers, which effectively left the indoor air with nowhere to escape and resulted in elevated PCB in air levels.  *See* AirTemp Call Slip; Eagle, at 2 (Feb. 23, 2015), EE00000424, *supra* para. 80; *see* Second Expert Report of Wayne Hubbard, P.E. at 2, 8-9 (Mar. 16, 2018), attached as Exhibit 82.

92.      Other structural issues and deferred maintenance at the Clark School include:

a. A degraded roof in need of replacement due to structural issues, age and roof leaks, David Peraza, PE, "Structural Evaluation of John C. Clark Elementary School" ("Peraza Rpt."), at 4, 7, 8 (Oct.  27, 2017), attached as Exhibit 83;

b. Absence of a lateral structural support system, Peraza Rpt. at 6-7;

c. Degradation of exterior building façade including deteriorated mortar joints, cracking bricks, missing caulk along construction joints, graffiti, damaged and dented door units, scratched and broken Lexan window panels on the windows, some with bullet damage, CCA Rpt. at 15;

d. Water stains and water damage on ceiling tiles from roof leaks, CCA Rpt. at 17, 26-27; and

e. Deteriorated or missing asbestos floor tiles, CCA Rpt. at 31.

93.      In total, the Clark School would require approximately $36,900,000 to renovate its obsolete building systems.  CCA Rpt. at 5.  These repairs include:

a. Removal and replacement of all exterior windows and exterior doors ($1,329,530);

b.   Removal and replacement of all HVAC Systems, including ductwork, air handling units, exhaust units, and energy management controls ($4,749,423);

c.   Removal and replacement of vinyl asbestos floor tile and asbestos containing floor mastic ($358,499);

d.   Removal and replacement of ceilings ($569,717);

e.   Roof replacement ($1,217,916);

f.   Installation of lateral bracing to remedy design flaw creating structural instability ($57,233);

g.   Accessibility improvements ($1,188,224);

h.   Asbestos, lead, and mold abatement ($726,745);

i.   Replacement of spray applied fireproofing ($2,684,531);

j.   Renovation of locker rooms ($65,818);

k.   Replacement of boilers, chillers, and cooling tower ($1,216,201);

l.   Replacement of all water piping and original plumbing fixtures ($596,562);

m.   Replacement of fire alarm system ($171,699);

n.   Electrical system upgrades ($4,302,519);

o.   Installation of automatic fire suppression systems throughout the building ($1,988,542); and

p.   Interior reconstruction, selective demolition, additional construction, elevator work, furnishings, fixtures and equipment, and exterior improvements to provide an "As - New" pre-kindergarten through eighth grade school environment ($15,676,841).

CCA Rpt. at 5.

94.     In addition, the Clark School is afflicted with numerous other issues that impacted the health and safety of its occupants, including:

a.   Lead in the drinking water, the highest sample result was 275,000 ppb, which is 2,000 times higher than the Maximum Contaminant Limit for lead in public water systems under the Safe Drinking Water Act.  Schell Rpt. at 5; CCA Rpt. at 58. Lead is a well-known health hazard, to which children are particularly vulnerable. Herrick Dep. at 133.

b.   Asbestos, a known carcinogen, present in many building products, including floor tile, caulk, insulation and mastic.  CCA Rpt. at 50-51; Bazzano Dep. Vol. I at 97; Herrick Dep. at 135.  Friable asbestos was also present in two of the air handling units.  CCA Rpt. at 56.

c.   Mold and fungi in several air handling units.  Mold is a human health hazard because it is allergenic, may cause extrinsic asthma, and may be associated with disease in humans.  Schell Rpt. at 5; Herrick Dep. at 137.

## XIV.   EVERY ACTION TAKEN BY PLAINTIFFS WAS VOLUNTARY AND NOT REQUIRED UNDER FEDERAL OR CONNECTICUT LAW.

95.     The Toxic Substances Control Act and the regulations promulgated thereunder by the EPA are the sole source of authority on what is required in a PCB remediation project.  *See* Woodyard Rpt. at 8.  Guidance documents do not supersede published regulations and do not have the force of law.  Woodyard Rpt. at 8; Deposition of Ross Hartman, *Town of Westport v. Monsanto et al.*, 1:14-cv-12041 ("Hartman Westport Dep.") [4] at 244, Sept. 8, 2016, excerpts attached as Exhibit 84; *see generally* Mem. US DOJ, "Limiting Use of Agency Guidance Documents in Affirmative Civil Enforcement Cases" (Jan. 25, 2018), attached as Exhibit 85.

---

[4] Hartman adopted his admissions from the *Town of Westport* case.  Hartman Dep. Vol. I at 11.

96.     In Connecticut, the Connecticut General Statute §§ 22a-463 through 469a is the sole source of authority on what is required with PCB-containing building products.  While there is a statutory prohibition on use of PCBs in open systems, this prohibition is subject to certain limited exemptions, including the request for waiver of this requirement.  *See* Conn. Gen. Stat. §§ 22a-463 through 469a.

97.     Folino, the principal of Eagle, told Plaintiffs that paint had to be tested in conjunction with the sprinkler project. *See* Folino Dep. at 16, 64-65.  However, Folino admitted that no regulation required that testing.  Id. at 65-66.  Folino mistakenly believed that paint testing was required for the school to get funding for the sprinkler project. Id. at 41-42. Yet, the Office of School Facility only required such PCB testing when the project impacted caulk.  Id. at 43-46.  Caulk was not impacted by the sprinkler project.  Folino Dep. at 46.

98.     The additional air, bulk, and wipe tests performed were not required by Connecticut or federal law.  Hartman Dep. Vol. I at 40-44; Herrick Dep. at 64-65, Folino Dep. at 65-66.

99.     There was no state or federal regulatory requirement to test the paint for PCBs prior to the sprinkler installation project.  Folino Dep. at 44-46; Hartman Dep. Vol. I at 38-45; Hartman Rpt. at 2; Herrick Dep. at 65; Woodyard Rpt. at 4.

100.    None of the PCB testing conducted by Eagle at the Clark School was required by Connecticut or EPA regulation.  *See* Hartman Dep. Vol. I at 40-44; Motley Dep. at 173; Folino Dep. at 43-46, 65-66.

101.    There was no state or federal regulatory requirement to test for PCBs in the air. Woodyard Rpt. at 4-5; Hartman Dep. Vol. I at 41-42.

102.    The regulations do not mandate that building owners remove all PCB-containing building products once they are discovered.  Hartman Westport Dep. at 238; Woodyard Rpt. at 6.

103.    Finally, the regulations do not require building owners to notify the EPA or to submit a PCB remediation plan for the EPA's review.  Woodyard Rpt. at 5-7; Folino Dep. at 65-66; Hartman Dep. Vol. I at 41-42.

104.    None of the activities performed during the pilot test were required under any state or federal regulations.  Woodyard Rpt. at 6; Hartman Dep. Vol. I at 44-45.

105.    Herrick, Plaintiffs' industrial hygiene expert, testified that the pilot project "was not driven by the regulation".  Herrick Dep. at 143.

106.    Ross Hartman, Plaintiffs' designated remediation expert, admitted that none of those steps in the pilot project were required under any EPA regulation.  Hartman Dep. Vol. I at 44-45.

107.    The EPA did not take any enforcement actions against Plaintiffs concerning the Clark School.  *See* Email, Kim Tisa, EPA, to Pete Folino, Eagle, "Clark ES Status Update" (Mar. 2, 2016), EE00029453, attached as Exhibit 86; Woodyard Rpt. at 9-10.

**XV.    THE PILOT PROJECT WAS POORLY DESIGNED AND INEPTLY EXECUTED. IT RESULTED IN THE CLARK SCHOOL PCB AIR LEVELS INCREASING TWENTY-FOLD AND RENDERED USELESS AS A SCHOOL BUILDING.**

108.    Environmental contractors should understand and adopt their client's objectives as their own.  Deposition of Ross A. Hartman ("Hartman Dep. Vol. II") at 42, Sept. 13, 2017, excerpts attached as Exhibit 87; Folino Dep. at 36-37.  They have an ethical obligation to provide their clients with the most effective and least expensive option.  Hartman Dep. Vol. I at 133-34; Folino Dep. at 36.

109.    Plaintiffs' purpose for engaging Eagle and Hartman to conduct the pilot project was to lower PCBs air levels at the school.  Motley Dep. at 75, 153; Press Release, Hartford Public Schools, "Superintendent Seeks Board Approval to Address Air Quality Issues at Clark School" (Mar. 6, 2015), attached as Exhibit 88; Letter, Schiavino-Narvaez, Superintendent, to Hartford Public Schools Family (Mar. 13, 2015), attached as Exhibit 89; Eagle, "Polychlorinated Biphenyl (PCB) Investigation Summary Report John C. Clark Elementary School", at 2 (Jan. 23, 2015), EE00014720, attached as Exhibit 90; Eagle, at 2 (Jan. 29, 2015), *supra* para. 71; Eagle, at 2 (Feb. 23, 2015), EE00000424, *supra* para. 80; Eagle, "Polychlorinated Biphenyl (PCB) Investigation Summary Report John C. Clark Elementary School", at 2 (Mar. 6, 2015), HRTFDSCHL041443, attached as Exhibit 91.

110.    Douglas Roger of CREC provided Eagle and Arcadis with a copy of the Clark Balancing Report.  *See* Email, Douglas Roger to Thomas Welcome & Mason Thrall, "Re: Clark school information" (Jan. 20, 2015) (list of attachments), EE00009369, attached as Exhibit 92.

111.    To address PCBs in air in schools, the EPA's best management practices recommend "ensur[ing] that ventilation systems are operating properly and are regularly inspected and maintained according to system manufacturer instructions and guidelines." Hartman Dep. Vol. I at 170, 172; EPA, "PCBs in Building Materials – Questions and Answers" (July 28, 2015), *supra* para. 79.

112.    The HVAC inspection commissioned by CREC identified numerous problems that rendered the Clark School HVAC system non-functional and those problems were never resolved.  ETB Report; Hartman Dep. Vol. I at 189, 190-91.  None of the environmental consultants recommended fixing the HVAC system prior to remediation, and Eagle did not do anything to ensure that the HVAC system worked properly.  Hartman Dep. Vol. I at 190-91;

Slater Dep. at 62; Bazzano Dep. Vol. I at 198-99; Folino Dep. at 15, 76. As a result, between September 2014 and January 2015, significant problems with the HVAC system were left unaddressed. Bazzano Dep. Vol. I at 54-55.

113. Plaintiffs spent $270,986 to develop and execute the pilot study. Hartman Rpt. at 14. It would cost about $25,000 to fix the HVAC system as recommended by EPA. CCA Rpt. at 4, 48. Doubling the amount of fresh air in a room would cut the PCBs in air by half, reducing the PCB air levels from an average of 195 $ng/m^3$ to an average of 97.5 $ng/m^3$. CCA Rpt. at 65; Hartman Dep. Vol. I at 46-47, 195-96; Herrick Dep. at 53, 79.

114. Another reason that the Clark School pilot project was poorly designed and poorly executed was that it removed multiple PCB-containing materials at the same time, rather than one at a time, which made it impossible to determine which individual PCB source contributed to PCB in air concentrations. Woodyard Rpt. at 18; Hartman Dep. Vol. I at 220; Herrick Dep. at 129.

115. Eagle and Hartman were absent from the Clark School work site for long periods of time, leaving the workers of the remediation contractor, AAIS, unsupervised during the pilot project tasks. *See* Foley Dep. at 97; Appendix E: Eagle Daily Logs, attached as Exhibit 93.

116. Consequently, the specifications of the pilot project were not followed. For example, AAIS did not provide a work plan as required by the specifications. Folino Dep. at 143; Deposition of Gilbrato DeValle ("DeValle Dep.") at 86, Apr. 25, 2017, excerpts attached as Exhibit 94; J.C. Clark Elementary School: PCB Pilot Remediation Study, REV 2 at 18 (May 18, 2015) ("Specifications"), AAIS01022, excerpts attached as Exhibit 95. John Terrill, an Eagle employee, testified that duct cleaning was not performed under the supervision of air systems cleaning specialist following the National Air Duct Cleaner's Association duct cleaning protocol

as required by the specifications.  Deposition of John M. Terrill ("Terrill Dep.") at 23-24, Apr. 27, 2017, excerpts attached as Exhibit 96; DeValle Dep. 146; Folino Dep. at 138-39; Specifications at 15.  To clean ducts, the National Air Duct Cleaner's Association also requires a combination of mechanical air whips and ball whips; these were never used.  NADCA, "ACR: The NADCA Standard for Assessment, Cleaning, Restoration of HVAC Systems" at 16 & 25, (2013), attached as Exhibit 97; Folino Dep. 143; DeValle Dep. at 151-52.

117.    DeValle, the AAIS foreman on site supervising the workers performing the pilot project, was not involved in PCB remediation projects prior to being employed by AAIS. DeValle Dep. at 23, 27-28, 65-66.  As an AAIS employee, 80 percent of his time was spent on asbestos projects while the remaining 20 percent of the projects involved mold and PCBs. DeValle Dep. at 40-41.   AAIS used inappropriate asbestos abatement practices at the Clark School, including the use of leaf blowers to clean dust from hard-to-reach areas immediately before air tests, resulting in elevated PCB in air test results. Appendix E: Eagle Daily Logs (Oct. 28, 2015), *supra* para. 115; Hartman Dep. Vol. II at 163-64; Terrill Dep. at 9, 91, 102-04; DeValle Dep. at 131-32, 137.

118.    Hartman admitted that when you have negative air exchange and containment in PCB remediation projects, you run the negative air exchange 24/7.  Hartman Dep. Vol. I at 241-42.  During the Clark pilot project, the negative air machines were turned off at the end of the work day. DeValle  Dep. at 105; Terrill Dep. at 27; Hartman Dep. Vol. I at 244. As a result of the abatement activities, dust moved outside the containment area and PCB air levels increased. Terrill Dep. at 68-69; Appendix C: DustTrak Reports (Nov. 3-5, 9-10, 2015), excerpts attached as Exhibit 98; Hartman Dep. Vol. I at 212-13; Email, Folino to Salafia (Dec. 15, 2015), HRTFRDSCHL062061, *supra* para. 67.

119.    Other deviations from the pilot study specifications contributed to increased dust levels:

    a.    Negative air filter was not changed with sufficient frequency, Folino Dep. at 144 - 45;

    b.    Debris was not appropriately bagged, Deposition of Erik J. Foley at 87, Apr. 28, 2017, excerpts attached as Exhibit 99;

    c.    Visible dust was present during the pilot project, Terrill Dep. at 88-89;

    d.    The Dustrak was not calibrated properly to monitor the dust, Terrill Dep. at 77-79; and

    e.    Dust machines were turned off at night, Hartman Dep. Vol. I at 243-44.

120.    Eagle had no prior experience with drafting or participating in a PCB pilot study prior to the Clark School.  Folino Dep. at 24.  Eagle employees did not follow standard methods and procedures when conducting PCB sampling.  Field blanks required by EPA rules and standards were not collected.  Terrill Dep. at 36-37, 39-40.  The standard for characterizing typical exposures is to conduct representative sampling.  Woodyard Rpt. at 16; Hartman Dep. Vol. I at 47-50.  But instead of a representative sampling, Eagle employees only collected samples from locations that had the highest potential PCB levels.  Terrill Dep. at 52; Woodyard Rpt. at 16.  Also, Eagle employees failed to analyze the air samples in a manner that would distinguish between vapor phase PCBs from particulate PCBs.  Woodyard Rpt. at 16.

121.    PCB surface and air concentrations continued to "spike upward significantly" after the pilot test.  Email, Sal Salafia (Dec. 15, 2015), HRTFRDSCHL06206, *supra* para. 67. As a result of the abatement activities, post-pilot study PCB air levels increased twenty-fold, ranging from 1828 ng/m$^3$ to 4290 ng/m$^3$.  CCA Rpt., Appendix C Hartford PCB Data; Hartman

*Dep.* Vol. I at 212-13; *see also* Bazzano Dep. at 157; Terrill Dep. at 103; Welcome Dep. at 160;; Woodyard Rpt. at 4, 19, 27.

122.    After hundreds of thousands of dollars spent remediating PCB-containing building materials without any reduction in PCB in air levels, the pilot project was considered a failure.  Bazzano Dep. at 157; Motley Dep. at 159; Deposition of Sal Salafia at 166-67, Apr. 18, 2017, excerpts attached as Exhibit 100; Welcome Dep. at 160; Terrill Dep. at 103.

## XVI.  PLAINTIFFS HAS KNOWN FOR DECADES ABOUT THE PRESENCE OF PCBS IN ITS SCHOOLS.

123.    Plaintiffs were aware that PCBs were a potential hazard in their schools for decades.  Slater Dep. at 128, 130.

124.    In 1979, the EPA issued regulations relating to PCBs in building products, such as paints and caulks. *See e.g.* 40 CFR § 761 *et seq.*

125.    In 1992, Plaintiffs contemplated the disposal of PCB-containing fluorescent light ballasts from the Clark School.   Ventana Corp., "Lighting Systems Retrofit Detailed Specifications: Clark Elementary School, Simpson Waverly Elementary School" at 3, July 27, 1992, COHDPW00001960, excerpts attached as Exhibit 101; Plts' Amended Resps. to Defs' First Set of Request for Admissions, No. 130 (Jan. 27, 2017), attached as Exhibit 102.

126.    In 2008, Plaintiffs were notified about the discovery of PCBs at the M.D. Fox School during asbestos remediation.  Bazzano Dep. at 194-99.  In 2011, Plaintiffs proposed a self-implementing clean-up plan to address PCBs at the M.D. Fox School.  *See* Letter, James T. Owens III, EPA, to James A. Kearney, Jr., Director of Capital Projects, "Re: PCB Cleanup and Disposal Approval under 40 CFR §§ 761.61(a) and 761.79(h), M.D. Fox School" (Aug. 24, 2011), TRC-000101, attached as Exhibit 103; TRC Mem., "PCB Testing; Facility Name M.D. Fox Elementary School, Hartford" (Apr. 11, 2011), TRC-000121, attached as Exhibit 104; TRC,

"Self-Implementing Cleanup Plan M.D. Fox School" (May 2011), TRC-0001480, attached as Exhibit 105.

127.    On September 2009, the EPA issued a pamphlet titled, "Preventing Exposure to PCBs in Caulking Material", which informed schools that "[c]aulk containing high levels of PCBs (polychlorinated biphenyls) has been found in many schools and other buildings built or remodeled before 1978." EPA, PREVENTING EXPOSURE TO PCBs IN CAULKING MATERIAL, EPA-747-F-09-005, Sept. 2009, attached as Exhibit 106.

128.    In 2009, the Connecticut Department of Environmental Protection ("CT DEP")[5] issued an advisory to Connecticut school superintendents recommending inspections of school buildings for the potential presence of PCBs in certain equipment and building materials. CT DEP, "Advisory – PCBs in Schools and Municipal Buildings" at 1 (Dec. 18, 2009), CTDAS3558, attached as Exhibit 107. In September 2009, the Boston Globe published an article on the risk of PCBs in caulk found at older New England Schools. Beth Daley, "PCB risk feared at older N.E. schools", BOSTON GLOBE, at A11 (Sept. 6, 2009), HPSDF0125, attached as Exhibit 108.

129.    In 2009, the Connecticut State Department of Education's Bureau of School Facilities issued the Plan Review Checklist for PCBs in schools. CT SDE, "Overview: School Construction Process" at 7 & 9 (Jan. 23, 2009), attached as Exhibit 109. It notified school administrators about the potential of encountering PCBs during projects funded through the construction grant process and during demolition projects. *See id.*

130.    In 2011, Plaintiffs tested four schools for PCB-containing building products – Quirk Middle School, M.D. Fox School, International Baccalaureate School, and Barbour School. Plts The City of Hartford and Hartford Bd. of Ed.'s Am. Resps. To Monsanto

---

[5] Now known as the Connecticut Department of Energy and Environmental Protection ("CT DEEP").

Company's First Set of Interrogatories, No. 4 (May 22, 2018), attached as Exhibit 110. The Hartford School Board Committee was notified about the discovery of PCBs at the International Baccalaureate School the M.D. Fox School, and received EPA approvals to manage and dispose of the PCBs. Motley Dep. at 117, 119-20; *see* Letter, James T. Owens, EPA, to James A. Kearney Jr., City of Hartford, "PCB Cleanup and Disposal Approval under 50 CFR §§ 761.61(a) and (c) and § 761.79(h) – International Baccalaureate School", EPAIBS0215, (Sept. 8, 2011), attached as Exhibit 111; Letter, James T. Owens (Aug.24, 2011), *supra* para. 126.

131.    Plaintiffs also implemented a PCB Abatement Plan at the Barbour School to address PCBs in caulking compounds. Letter, Chris Liberti, Eagle, to John H. Motley, Hartford School Building Committee, "Re: Pre-Renovation Hazardous Building Materials Inspection, Former Barbour School" at 13-14 (Mar. 30, 2011) (with encl.), HRTFDSCHL020430, attached as Exhibit 112; Contract Documents, "Abatement of PCB-Containing Interior/Exterior Materials: Journalism & Media Academy" (July 15, 2011), HRTFDSCHL083781, attached as Exhibit 113.

132.    During the Barbour PCB abatement, Eagle reported to Plaintiffs:

"PCB's have been identified by the USEPA as a concern in caulking compounds. The USEPA has identified numerous cases where PCBs have been added to caulk compounds between 1950 and 1977 to improve adhesion and flexibility."

Letter, Chris Liberti, at 3 (Mar. 30, 2011), *supra* para. 131.

133.    In 2014, Claudio Bazzano, Executive Director of Facilities for the Hartford Public Schools, was notified about PCBs at the Simpson-Waverly School. Bazzano Dep. at 101-05. Air and dust sampling were never conducted at the Simpson-Waverly School; the PCBs were never addressed. Id.; Woodyard Rpt. at 5. At present, the Simpson-Waverly School remains open to students. Bazzano Dep. at 105.

134.    Plaintiffs filed this action on October 23, 2015. Compl., Doc. 1.

## XVII. PLAINTIFFS' DAMAGES SHOULD BE LIMITED TO THE FAIR MARKET VALUE OF THE CLARK SCHOOL, APPRAISED AT ONE DOLLAR.

135.    Defendants' damages expert, John J. Leary, MAI, CRE, provided an appraisal that was consistent with the Uniform Standards of Professional Appraisal Practice.   John J. Leary, "Real Property Appraisal Report: John C. Clark Elementary School", Oct. 30, 2017 ("Leary Rpt."), attached as Exhibit 114.   Leary reviewed historical documents evaluating the deteriorating condition of the Clark School over time; he conducted an inspection of the building and its environs, aided by expert assessments of complex buildings systems including boilers, HVAC systems and the roof.   Leary Rpt. at 3-4, A-17.   Leary also evaluated, among other factors, declining enrollment in the Hartford Public Schools, excess school capacity in neighborhoods served by the Clark School as reflected by the Clark School operating at 50% capacity, and the comparable sale of an adjacent school building and lot for $1.00.   Leary Rpt. at A-22, A-23.   Leary determined that the fair market value of the Clark School is $1.00.   Leary Rpt. at 3, A-30

136.    It is standard practice to assess the condition of the property before an appraisal because the extent of deferred maintenance significantly affects its market value.   Deposition of Patrick S. Craffey ("Craffey Dep.") at 75-76, Aug. 17, 2017 & Jan. 17, 2018, excerpts attached as Exhibit 115.   A prudent, knowledgeable purchaser would want to know the condition of major building systems.   Craffey Dep. at 62-63.   A prudent knowledgeable purchaser would pay no more for a property than the cost to acquire a comparable site and construct improvements of a similar utility, less building depreciation.   *See id.*; Leary Rpt. at A-25.

137.    Patrick Craffey, Hartford's designated damages expert and professional appraiser, did not review reports documenting the dilapidated condition of the facilities including the heating and cooling systems, age of the roof, plumbing, and electrical systems.   Craffey Dep. at

75-77, 80, 83, 88, 135, 159-60.  Even though Craffey admitted to having no expertise in the function or design of plumbing systems, HVAC systems, building envelopes, roofing, boiler systems or electrical systems, he did not consult any experts to assess the condition of those systems at the Clark School before coming to his value opinion.  Craffey Dep. at 66-67, 83, 88, 135, 159-60.  His value opinion is based on assumptions that the heating and cooling systems and electrical and plumbing systems were adequate and functional.  Craffey Dep. at 256-60.  His inspection of the building lasted less than an hour and did not include an inspection of the roof.  Craffey Dep. at 83. Craffey valued the school at $5,800,000.  Valbridge Property Advisers, Appraisal Report ("Craffey Rpt.") at 3, July 13, 2017, attached as Exhibit 116.

138.    Hartman estimates that it will cost approximately $9,599,110 to fully remediate and abate the PCBs at Clark.  Hartman Rpt. at 13.  This abatement is hypothetical because in December 2017, it was announced that the Clark School would be permanently closed due to under-enrollment.  *See* para. 83, *infra*.  The hypothetical abatement also includes costs for replacing or repairing the roof, floor tiles, ceiling, HVAC and electrical systems.  Hartman Rpt., Exhibit 9.

139.    Hartman estimates that it will cost approximately $4,289,450 to demolish and dispose of Clark School.  Hartman Rpt. at 13.

Respectfully submitted,

/s/ Thomas M. Goutman
**WHITE AND WILLIAMS LLP**
Thomas M. Goutman (*pro hac vice*)
Richard L. Campbell (*pro hac vice*)
Kim Kocher (*pro hac vice*)
1800 One Liberty Place
Philadelphia, PA 19103-7395
215-864-7000
*Attorneys for Defendants*
*Monsanto Company; Solutia Inc.;*
*and Pharmacia LLC*


**DAY PITNEY LLP**
Paul D. Williams (ct05244)
Elizabeth C. Barton (ct07660)
Michael L. Miller (ct29137)
Elizabeth P. Retersdorf (ct29178)
242 Trumbull Street
Hartford, CT 06103
860-275-0100
*Attorneys for Defendants*
*Monsanto Company; Solutia Inc.;*
*and Pharmacia LLC*


**CAPES, SOKOL, GOODMAN & SARACHAN, P.C.**
Adam E. Miller (*pro hac vice*)
7701 Forsyth Blvd., 12th Floor
St. Louis, MO 63105
314-721-7701
*Attorneys for Defendants*
*Monsanto Company; Solutia Inc.;*
*and Pharmacia LLC*

<u>CERTIFICATE OF ELECTRONIC FILING</u>

   I hereby certify that on June 15, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

             */s/ Paul D. Williams*
             Paul D. Williams (ct05244)
             Day Pitney LLP
             242 Trumbull Street
             Hartford, CT  06103-1212
             (860) 275-0100
             (860) 275-0343 (fax)
             pdwilliams@daypitney.com