# EXHIBIT 4

1          ROBERT HERRICK, D.S.

2      IN THE UNITED STATES DISTRICT COURT

3        FOR THE DISTRICT OF CONNECTICUT

4                        Civil Action

5                        No. 3:15-CV-01544(RNC)

6    - - - - - - - - - - - - - - - - - - - - - - -

7    CITY OF HARTFORD and HARTFORD

8    BOARD OF EDUCATION,

9          Plaintiffs,

10         v.

11   MONSANTO COMPANY, SOLUTIA INC.,

12   and PHARMACIA CORPORATION,

13                        Defendants.

14   - - - - - - - - - - - - - - - - - - - - - - -

15    VIDEOTAPED DEPOSITION OF ROBERT HERRICK, D.S.

16        Friday, August 25, 2017 10:04 a.m.

17            White and Williams LLP

18        101 Arch Street, Boston, MA 02110

19

20

21

22   Reported by:

23   Janet Sambataro, RMR, CRR, CLR

24   JOB NO. 128909

25

Page 222

1

2       UNITED STATES DISTRICT COURT

3      FOR THE DISTRICT OF CONNECTICUT

4

5

6  - - - - - - - - - - - - - - x

7  CITY OF HARTFORD and HARTFORD        Civil Action

                                        No. 3:15-CV-01544(RNC)

8  BOARD OF EDUCATION,

9          Plaintiffs,

10    V.

11  MONSANTO COMPANY, SOLUTIA INC.,

12  and PHARMACIA LLC,

13          Defendants.

14  - - - - - - - - - - - - - - x

15

16

17    CONTINUED VIDEOTAPED DEPOSITION OF

18          ROBERT HERRICK, Sc.D.

19         Boston, Massachusetts

20       Friday, February 16, 2018

21

22  Reported By: MaryJo O'Connor, RMR CSR

23  Job No: 136760

24

25

1              ROBERT HERRICK, D.S.

2    can get down my question before you answer.

3    Okay?

4        A.    Okay.

5        Q.    You're here essentially to give the

6    same opinions that you gave in the Westport case

7    with the exception of some data pertaining to the

8    Clark School and some new literature that you've

9    cited.  Is that right?

10       A.    Yeah.  I think that's -- that's

11   generally true.  Yeah.

12       Q.    Okay.  And a little over a year ago,

13   you gave a deposition here in the Westport case.

14   And Mr. Goutman took your deposition at that

15   time.  Do you remember that?

16       A.    I do.

17       Q.    And is the testimony that you gave at

18   that time true and correct?

19       A.    It was, yes.

20       Q.    And is it still true and correct?

21       A.    Oh, yes.

22       Q.    Okay.  And you also gave a deposition

23   in the Lexington case.

24       A.    I did.

25       Q.    And was the testimony that you gave

1            ROBERT HERRICK, D.S.

2  small matters that I had some preliminary

3  conversations with other attorneys about, but

4  nothing that had really grown up into any, you

5  know, reports or any depositions or anything of

6  any real size.

7      Q.   And what were the nature of those small

8  matters?

9      A.   One is a case involving benzene

10  exposures and the possibility of being involved

11  in a case there.  And another was with a firm I

12  had been working with for a number of years that

13  usually involves adverse reproductive outcomes

14  associated with work in the semiconductor

15  industry.

16      Q.   I'm sorry.  Adverse?

17      A.   Oh, reproductive outcomes.

18      Q.   Okay.  And working with what?

19      A.   Oh, these are people who worked in

20  semiconductor manufacturing.

21      Q.   Okay.  And who was the law firm that

22  you were consulting with for that?

23      A.   On the second one, it's Thornton, here

24  in Boston.

25      Q.   And for the benzene exposure matter?

1          ROBERT HERRICK, D.S.

2    samplings so that you can determine the typical

3    exposures of the building occupants?

4          A.   Well --

5               MR. LAND:  Objection.  Vague.  You can

6    answer.

7          A.   No.  I'm just trying to think through

8    to make sure I give you a good answer.  You know,

9    a lot of the measurements we're looking at, for

10   example, here in this weren't really directed at

11   the building occupants, per se.  They were

12   assessing more the levels of contamination in

13   particular environmental media, like the air and

14   the surfaces and things like that.

15        So I don't know that that actually answers

16   your question.  I think -- could you restate.

17   I'll try to --

18        Q.   Wouldn't you want to make sure that you

19   do representative sampling inside of the building

20   so that you can determine the typical exposures

21   of the building occupants?

22               MR. LAND:  Objection.  Vague.

23        A.   Let me try to respond this way:  I

24   mean, I think it is important that you do

25   representative sampling.

1          ROBERT HERRICK, D.S.

2   reasonable thing to do.

3          MS. SCHNALL:  I'm going to object and

4   move to strike.

5       Q.   If Mr. Folino said that the -- an

6   objective -- the objective was to decrease the

7   PCB levels in the indoor air and that that

8   objective could have been accomplished by fixing

9   the HVAC system, then there would be no need to

10  do any further work at Clark.  Correct?

11         MR. LAND:  Objection.  Incorporating

12  all the objections I made last time and adding

13  on, objection, asked and answered.

14      A.   Well, I'm trying to be responsive here.

15  You know, the air is only one part of the whole

16  package.  You still had the contamination on the

17  surfaces and in the dust and in the ceiling

18  tiles.

19      So, you know, reducing the air levels really

20  wouldn't have completely resolved the concern.

21  And I would argue that you would still need to

22  address these other sources.

23      Q.   Do any regulations require testing to

24  search for sources of PCBs?

25      A.   I can speak to the EPA regulations; in

Page 65

                    ROBERT HERRICK, D.S.

1

2  which case, the answer would be no.  What I'm not

3  as familiar with is whether there are any

4  Connecticut regulations that needed to be

5  observed here.

6       Q.   So, to your knowledge, there's no

7  regulations that require testing to search for

8  PCBs -- to search for sources of PCBs.  Right?

9            MR. LAND:   Objection.

10 Mischaracterization of prior testimony.

11      A.   I'm aware that EPA doesn't have a

12 regulation, you know, that requires that.  They

13 do have these guidelines that we looked at.  What

14 I'm not aware of is whether Connecticut has any

15 such regulation or not.

16      Q.   So you're aware that all the wipe

17 samples on the surfaces that were taken in

18 December were nondetect.  Correct?

19      A.   I do remember that.  Yes.

20      Q.   And there was no requirement to do that

21 sampling.  Correct?

22      A.   Well, there was no regulatory

23 requirement?

24      Q.   Right.  So there was no regulatory

25 requirement to do that, so that was voluntary

1          ROBERT HERRICK, D.S.

2     Right?

3               MR. LAND:  Objection.  Compound.  Lacks

4     foundation.

5          Q.   You would agree that in analyzing the

6     sampling data, averages are frequently used.

7     Right?

8               MR. LAND:  Objection.  Lacks

9     foundation.

10         A.   I would agree that they're frequently

11    used.  They're not necessarily the best depiction

12    of -- of the data overall.

13              MS. SCHNALL:  I'm going to move to

14    strike and try again with a yes or no.

15         Q.   Would you agree that in analyzing

16    sampling data, averages are frequently used?

17              MR. LAND:  Objection.  Lacks

18    foundation.  Asked and answered.

19         A.   Yes.

20         Q.   And the -- and the reason for that is

21    that it may give a clearer picture of typical

22    exposures.  Right?

23              MR. LAND:  Objection.  Lacks

24    foundation.

25         A.   I would argue that it's -- that's

1            ROBERT HERRICK, D.S.

2   cleanup standards.  It's not a problem?

3            MR. LAND:  Objection.  Vague.

4   Mischaracterization of what's written.

5       A.   Well, I wouldn't agree that it's not a

6   problem.  But you are correct in saying that

7   values below this number of ten in these

8   high-occupancy areas aren't required to be

9   cleaned up.

10           MS. SCHNALL:  Is this 17?

11           COURT REPORTER:  Yes.

12           (Document entitled

13      "Toxicological Profile for Polychlorinated

14      Biphenyls (PCBs)" marked Exhibit 17.)

15      Q.   Doctor, that standard was based on an

16   evaluation of health risk.  Correct?

17      A.   I actually don't know the scientific

18   basis for this.  I don't think EPA, in this

19   regulation, anchors that value in some specific

20   health risk.  I've never seen it in here.

21      Q.   Okay.

22           MS. SCHNALL:  Okay.  This is the next

23   document.

24      Q.   And, Doctor, I'm showing you the

25   toxicological profile for PCBs from ATSDR.  And

1           ROBERT HERRICK, D.S.

2     A.    Taken before the pilot study?

3     Q.    Correct.

4     A.    Let me just take a look at the data

5 here for a second.

6     Q.    Doctor, I withdraw that question.

7     A.    Okay.

8     Q.    None of the wipe samples taken before

9 the pilot project exceeded the regulatory level

10 of 10 micrograms per 100 centimeters squared.

11 Correct?

12     A.    Let me just -- can I just take a peek

13 at the data?  I just want to make sure I'm giving

14 you the best answer.

15     I think that is true.  I don't recall seeing

16 any wipe samples that were greater than 10.

17     Q.    Doctor, what's the -- we were talking

18 about the dust track --

19     A.    Mm-hmm.

20     Q.    -- right?

21     And would it be important -- and you said

22 that you were familiar with the dust track.

23 Correct?

24     A.    I am.  Yeah.

25     Q.    And what's the purpose of the dust

1                ROBERT HERRICK, D.S.

2    know, I just don't want to --

3        Q.   Is one of the possible reasons why the

4    PCB levels went up was because the pilot project

5    was poorly designed?

6             MR. LAND:  Objection.  Calls for

7    speculation.  And lacks foundation.

8        A.   I would say it's certainly in the realm

9    of possibility.  Yeah.

10       Q.   Okay.  And could a reason why the

11   levels went up was because the pilot project was

12   poorly executed?

13            MR. LAND:  Objection.  Calls for

14   speculation.  Lacks foundation.

15       A.   I would give the same answer.  It's

16   certainly in the realm of possibility.

17       Q.   Doctor, you're aware that the Clark

18   School closed.  Correct?

19       A.   I am.  Yeah.  Yeah.

20       Q.   And the EPA never recommended the

21   closure of Clark, did it?

22            MR. LAND:  Objection.  Calls for

23   speculation.  Lacks foundation.

24       A.   I actually don't know what EPA

25   recommended, you know, one way or the other.

1         ROBERT HERRICK, D.S.

2    medical condition among the students, teachers

3    and staff at Clark compared to the general

4    population?

5              MR. LAND:  Objection.  Calls for

6    speculation.  Lacks foundation.

7         A.    I'm not aware of any.

8         Q.    Okay.  Is lead a health hazard?

9         A.    Is?  I'm sorry?

10        Q.    Lead.

11        A.    Oh, is lead a health hazard?  Yes.

12        Q.    Okay.  Do you know when it was

13   determined that lead was a health hazard?

14        A.    It probably goes back to the Romans.

15   People have been aware of risks associated with

16   lead for centuries.

17        Q.    And what is your understanding of the

18   health hazards of lead?

19        A.    Well, the classic symptoms are

20   neurologic symptoms.  It also has effects on the

21   hematopoietic system.  It has reproductive

22   effects.  There's a wide range of -- of

23   toxicities.

24        Q.    Are children more vulnerable to the

25   health hazards of lead?

1          ROBERT HERRICK, D.S.

2   drinking water to offer, you know, an answer on

3   that.

4        Q.   Do you know how lead levels in the

5   water at Clark compared to the levels at Flint?

6        A.   I don't know that, no.

7        Q.   Can lead be present in paint?

8        A.   Yes.

9        Q.   Is there any level of lead in paint in

10  a school that would be unreasonable to remediate?

11            MR. LAND:   Objection.   Vague.

12       A.   I'm sorry.   I'm really not familiar

13  enough with, you know, the whole lead and paint

14  issue to really have an opinion on that.

15       Q.   Do you know if there was lead

16  contamination present at Clark?

17       A.   I don't know.   I don't recall if they

18  mentioned that in any of the documents I saw.

19       Q.   Do you know whether Clark did any

20  testing for lead?

21       A.   I don't know if they did or not.

22       Q.   Is asbestos a known carcinogen?

23       A.   Asbestos is a known carcinogen.   Yes.

24       Q.   And do you know when it was determined

25  that asbestos was a carcinogen?

1          ROBERT HERRICK, D.S.

2    know, I don't remember the numbers right offhand,

3    but where if asbestos is found above some air

4    concentrations or above a certain level in bulk

5    materials that indicate -- that remediation is

6    indicated.

7          Q.   Was asbestos contamination present at

8    Clark?

9          A.   I'm trying to remember from the report.

10   I remember they mentioned that there had been --

11   I think there had been an abatement project that

12   was mentioned briefly.  But I don't remember

13   there being any real discussion of whether there

14   was still asbestos present in the building.

15         Q.   Is mold a human health hazard?

16         A.   It is.

17         Q.   Do you know whether there was any mold

18   found at Clark?

19         A.   You know, I don't recall that being

20   mentioned in any of the reports I reviewed.  I

21   just don't remember that they brought it up.

22         Q.   Would it be a reasonable practice for a

23   school to monitor for mold?

24         A.   Well, I -- I think it's a fair

25   question.  People who really study mold and work

1          ROBERT HERRICK, D.S.

2   you test only the materials that are going to

3   potentially be disturbed.

4       Q.   And that didn't include the caulk.

5   Correct?

6       A.   Well, in this case, my impression was

7   that, you know, the sprinkler system was going to

8   involve disrupting the paint.  And that was the

9   only bulk material in play.

10      Q.   Did the EPA regulations require testing

11  of any bulk material?

12      A.   No.  They don't.

13      Q.   And there was nothing done during the

14  pilot project that was required by regulation.

15  Correct?

16      A.   The pilot remediation.  No.  That

17  wasn't driven by the regulation.

18      Q.   You know what, Doctor, I'm going to

19  have you look at this Marek article.

20           (Article entitled "Airborne PCBs

21      and OH-PCBs and Outside Urban and Rural U.S.

22      Schools" marked Exhibit 22.)

23           MR. LAND:  What are we looking at?  A

24  different one than the one I have.  Right?

25           MS. SCHNALL:  Yes.

1              ROBERT HERRICK, D.S.

2    BY MS. SCHNALL:

3        Q.    Dr. Herrick, in the 1990s is the first

4    time that the hypothesis that PCBs in building

5    materials might result in higher levels of indoor

6    PCBs was scientifically tested.  Correct?

7        A.    1990s.  I think so.  I'm just trying to

8    recall.  It was -- you know, some of the early

9    stuff that was published was in German.  It was

10   in German language journals.  And abstracts were

11   in English, and so they made it across.

12       In the U.S., the first real indication was

13   actually something that was printed in the Boston

14   Globe.  It was about a school on Cape Cod that

15   had high PCB levels found in the caulking.  So,

16   anyway, a long answer.  Yes.  The '90s.

17       Q.    Yes.  And isn't it true that the first

18   study that found a statistically significant

19   excess of malignant tumors in laboratory animals

20   was in 1974?

21          MR. LAND:  Objection.  Vague.

22       A.    You know, I'm afraid I don't really

23   know the dates on all the animal toxicology.

24       Q.    Okay.  Doctor, in your report, there is

25   about a page and a half of your report that you

Page 160

1                ROBERT HERRICK, D.S.

2    Yeah.

3         Q.    So the answer to my question is yes?

4         A.    Mm-hmm.

5         Q.    Am I correct that you have not

6    discussed any limitations that the authors of

7    those studies have discussed in their studies?

8         A.    Could you help me understand --

9         Q.    Well, typically when there's a research

10   paper, oftentimes the authors will discuss in

11   their paper the limitations of their study.

12   Isn't that right?

13        A.    Sure.   Absolutely.   Yeah.

14        Q.    Well, do you discuss any of the

15   limitations that any of the authors discussed in

16   their papers?

17        A.    Oh, I see.   No.   I didn't.   This is a

18   very concise and brief summary of a lot of

19   articles, and so I didn't get into that level of

20   detail.   No.

21        Q.    And so your summary of the health

22   effects is concise and one-sided.   Isn't it?

23             MR. LAND:   Objection.   Misleading.

24        A.    Well, I wouldn't -- you know, I would

25   suggest that, you know, of the thousands and

1        ROBERT HERRICK, D.S.

2    thousands of articles that are in the literature

3    on PCB, you know, I did try to highlight the ones

4    that tend to give us signals that there are

5    associations with health effects.  So to that

6    extent, that's where I put the emphasis in this

7    review.

8        Q.   So you only highlighted the positive

9    studies.  Is that right?

10        A.   Well, and as I said, there are some

11    examples here of studies that were, you know, not

12    overwhelmingly positive or had mixed results,

13    like the one we just talked about with

14    Fitzgerald.  So -- but I, you know, in the space

15    that I, you know, allocated to this review, I did

16    focus on studies that contributed evidence of

17    associations.  Yeah.

18        Q.   You agree that associations can be

19    causal and not causal?

20        A.   In epidemiology, yeah, that's always,

21    you know, kind of the challenge is that

22    associations can just be random in nature or just

23    happen to occur, and that may not really be

24    evidence of causality.  Yeah.

25        Q.   Like, for example, like gray hair and

1                          R. Herrick

2    and your rebuttal report, you did that with

3    the purpose of providing full disclosure of

4    the opinions that you're going to be giving

5    at trial.  That's what you did when you wrote

6    those reports, right?

7            A.  Yes.

8            Q.  And just so that I'm clear, it's

9    your opinion that it's the PCB-containing

10   caulk that's responsible for the PCBs in the

11   indoor air and surface at Clark in 2014 and

12   2015?

13           A.  That is my opinion, yes.

14           Q.  And it's your hypothesis that the

15   PCBs volatilized from the caulk, and that's

16   the mechanism that causes the PCBs in the air

17   and the surface concentrations that were

18   measured at the Clark School in 2014 and

19   2015?

20           A.  I would agree with that.  I think

21   that's fair.

22           Q.  Okay.  And have you ever been to

23   the Clark School?

24           A.  I have not.

25           Q.  And you're not a polymer

1                       R. Herrick

2        Q.   And why is that?

3        A.   Well, it's a measure of, in some

4   distributions of data, it's a good measure of

5   the center of the distribution.  I would just

6   qualify that by saying in a lot of

7   environmental data, people report another

8   measure called the "median," which is

9   calculated in a different fashion because the

10  mean may not actually be in the middle.

11            MS. SCHNALL:  I'm going to strike

12        everything when you started with the

13        median, because I just asked about the

14        mean.

15        Q.   Now, do you remember you gave a

16  deposition in this case in August of 2017?

17        A.   I do.

18        Q.   And during that case, we talked

19  about the indoor air levels at the Clark

20  School prior to the remediation.

21        A.   I do.

22        Q.   And we went over those values, and

23  you agreed that the average indoor air level

24  of PCBs prior to the remediation was 195

25  nanograms per cubic meter?

                              R. Herrick

1

2      A.   That sounds familiar, yeah.

3      Q.   And so we can agree that the

4  indoor air levels at the Clark School were at

5  least three times lower than the levels that

6  were found here in the Heudorf paper,

7  correct?

8      A.   Well, I don't -- no, I wouldn't

9  characterize it as three times.  I mean, here

10  it looks like they had -- oh, okay, I see

11  what --

12      Q.   709.

13      A.   They had 709 for the average.  And

14  what did you say was --

15      Q.   195.

16      A.   So these levels do, at least the

17  mean value, appears to be higher.  Yes, I

18  would agree with that.

19      Q.   And in this study, the maximum

20  indoor air level in the Heudorf study was

21  seven times higher than the mean indoor air

22  level of PCBs that were found at Clark,

23  right?

24      A.   Well, I'd have to do the math in

25  my head.  Yeah, I'd say that's close.  It's

1                          R. Herrick

2          Q.   Doctor, "yes" or "no" I'm asking

3     you.  I'm not asking if you didn't have to do

4     it or not.  I'm asking you "yes" or "no," to

5     verify your hypothesis is to analyze the

6     factors recognized as affecting the extent of

7     volatilization of PCBs or any other chemical

8     from an indoor building product, but you did

9     not do that, correct?

10              MR.  LAND:   Same objections.

11         A.   Just so I understand the question,

12    are you asking could I have done that or --

13         Q.   I'm asking did you do that.

14         A.   No, I didn't do it.

15         Q.   And factors that affect the

16    volatilization of PCBs from caulk are such

17    things as the co-constituents of the caulk,

18    right?

19         A.   That can with a factor, yes.

20         Q.   And diffusion coefficient of the

21    PCBs in the caulk can also be a factor?

22         A.   I'm thinking of the researchers,

23    you know, especially the EPA research, you

24    know, that certainly is a possibility, but it

25    isn't really mentioned as one of the most

1                        R. Herrick

2    prominent factors.

3              Q.   But it can be a factor, the

4    diffusion coefficient of PCBs in caulk can be

5    a factor, correct?

6              A.   Correct.

7              Q.   And the amount of caulk that's

8    exposed to air can also be a factor?

9              A.   That can be a factor, yes.

10             Q.   And surface temperature can also

11   be a factor?

12             A.   Correct.

13             Q.   And the air temperature in the

14   room can also be a factor that affects the

15   volatilization of PCBs from caulk?

16             A.   Yeah, I think it's probably a

17   minor factor, but I wouldn't rule it out.

18             Q.   And the number of air exchanges in

19   a room is also a factor that can affect

20   volatilization of PCBs from caulk?

21             A.   That I'm less sure about.  I mean,

22   you know, the air exchange rate will have an

23   impact on the concentration that you measure

24   at any given moment, but I'm not really sure

25   it's such a powerful factor in the

# EXHIBIT 5

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CITY OF HARTFORD and | : | |
| HARTFORD BOARD OF EDUCATION, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No.  3:15-cv-01544-RNC |
| vs. | : | |
| | : | |
| MONSANTO COMPANY, SOLUTIA INC., | : | |
| and PHARMACIA CORPORATION, | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFFS' AMENDED RESPONSES TO
## DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSION

Pursuant to the Court's Order dated August 17, 2017 [Dkt. 185], Plaintiffs City of

Hartford and Hartford Board of Education make the following Responses to Defendants'

Requests for Admission Nos. 41, 44, 47, 50, 53, 56, 59, 62, 94, and 97:

**REQUEST FOR ADMISSION NO. 41:** Hartford cannot identify any brand-name of any PCB-Containing Building Product it alleges was used at the Clark School.

**RESPONSE:**        Admit.

**REQUEST FOR ADMISSION NO. 44:** Hartford cannot identify the specific brand-name of any PCB-containing paint it alleges was used at Clark School.

**RESPONSE:**        Admit.

**REQUEST FOR ADMISSION NO. 47:** Hartford cannot identify the specific brand-name of any component of any PCB-Containing Building Product it alleges was used at Clark School.

**RESPONSE:**        Admit.

**REQUEST FOR ADMISSION NO. 50:** Hartford cannot identify the specific brand-name of any PCB-containing caulk it alleges was used at Clark School.

**RESPONSE:**        Admit.

**REQUEST FOR ADMISSION NO. 53:** Hartford cannot identify the specific brand-name of any PCB-containing window glazing it alleges was used at Clark School.

**RESPONSE:**     Admit.

**REQUEST FOR ADMISSION NO. 56:** Hartford cannot identify the specific brand-name of any PCB-containing mastic it alleges was used at Clark School.

**RESPONSE:**     Admit.

**REQUEST FOR ADMISSION NO. 59:** Hartford cannot identify the specific brand-name of any PCB-containing ceiling tiles it alleges were used at Clark School.

**RESPONSE:**     Admit.

**REQUEST FOR ADMISSION NO. 62:** Hartford cannot identify the specific brand-name of any PCB-containing fire retardant foam coating it alleges was used at Clark School.

**RESPONSE:**     Admit.

**REQUEST FOR ADMISSION NO. 94:** Hartford cannot identify when any specific PCB- Containing Building Product was applied to the Clark School.

**RESPONSE:**   Denied in part and admitted in part.   Every PCB-containing product applied at Clark School was applied prior to 1972, but Hartford admits that it does not know the date prior to 1972 when "specific" PCB-containing products were applied.

**REQUEST FOR ADMISSION NO. 97:** Hartford cannot identify any Formulator of any PCB-Containing Building Product it claims was used at Clark School.

**RESPONSE:**     Admit.

Dated:  August 31, 2017                              **BARON & BUDD, P.C.**

                                                       /s/ Alicia Butler
                                                     Celeste A. Evangelisti *(pro hac vice)*
                                                     Scott Summy *(pro hac vice)*
                                                     Carla Burke Pickrel *(pro hac vice)*
                                                     Cary McDougal *(pro hac vice)*
                                                     Alicia Butler *(pro hac vice)*
                                                     Brett Land *(pro hac vice)*
                                                     Zachary Sandman *(pro hac vice)*
                                                     3102 Oak Lawn Avenue, Suite 1100
                                                     Dallas, Texas  75219

Telephone:  214-521-3605
Facsimile:  214-520-1181
evangelisti@baronbudd.com
ssummy@baronbudd.com
cburkepickrel@baronbudd.com
cmcdougal@baronbudd.com
abutler@baronbudd.com
bland@baronbudd.com
zsandman@baronbudd.com

Jill Cutler Hodgman
Howard G. Rifkin
Cynthia Lauture
**CORPORATION COUNSEL**
**CITY OF HARFORD**
550 Main Street, Suite 210
Hartford, CT  06103
Telephone:  860-757-9700
Facsimile:  860-722-8114
Howard.Rifkin@hartford.gov
Cynthia.lauture@hartford.gov

Ross H. Garber
Jared S. Baumgart
**SHIPMAN & GOODWIN LLP**
One Constitution Plaza
Hartford, CT  06103
Telephone:  860-251-5733
rgarber@goodwin.com
jbaumgart@goodwin.com

***Attorneys for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 31, 2017, a copy of the foregoing document was served via e-mail to all counsel of record.

     /s/ Alicia Butler
Celeste A. Evangelisti *(pro hac vice)*
Scott Summy *(pro hac vice)*
Carla Burke Pickrel *(pro hac vice)*
Cary McDougal *(pro hac vice)*
Alicia Butler *(pro hac vice)*
Brett Land *(pro hac vice)*
Zachary Sandman *(pro hac vice)*
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas  75219
Telephone:  214-521-3605
Facsimile:  214-520-1181
evangelisti@baronbudd.com
ssummy@baronbudd.com
cburkepickrel@baronbudd.com
cmcdougal@baronbudd.com
abutler@baronbudd.com
bland@baronbudd.com
zsandman@baronbudd.com

# EXHIBIT 6

Robert G. Kaley, II, Ph.D.

```
 1            UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2

     TOWN OF WESTPORT and      )
 3   WESTPORT COMMUNITY         )
     SCHOOLS,                   )
 4                             )
              Plaintiffs,  )
 5                             )
     v.                        )   Civil Action No.
 6                             )   1:14-cv-12041
     MONSANTO COMPANY,          )
 7   SOLUTIA INC., and          )
     PHARMACIA                  )
 8   CORPORATION,               )
                               )
 9            Defendants.  )
10            TUESDAY, APRIL 5, 2016
                      - - -
11
12            Videotaped deposition of Robert G.
13   Kaley, II, Ph.D., held at the offices of HUSCH
14   BLACKWELL, L.L.C., 190 Carondelet Plaza,
15   Suite 600, St. Louis, Missouri, commencing at
16   9:05 a.m., on the above date, before Carrie
17   A. Campbell, Registered Merit Reporter,
18   Certified Realtime Reporter, Illinois,
19   California & Texas Certified Shorthand
20   Reporter, and Missouri Certified Court
21   Reporter.
22                    - - -
              GOLKOW TECHNOLOGIES, INC.
23       877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24
```

Robert G. Kaley, II, Ph.D.

1    1935.

2              And then Monsanto also built a

3    plant in Sauget, Illinois, in 1936.

4         Q.    Tell us, what is a plasticizer.

5         A.    What is a plasticizer?

6              My understanding is that a

7    plasticizer is essentially a solvent for a

8    plastics.  Most plastics are hard, brittle

9    materials, and a plasticizer, as well other

10   modifiers, are added to that material to give

11   it desired properties.

12        Q.    And what type of products might

13   plasticizers be utilized in?

14        A.    I mean, they're basically

15   probably utilized in every plastic material

16   that's manufactured.

17        Q.    And also in paints?

18        A.    There would be plasticizers or

19   could be plasticizers in paint.

20        Q.    And sealants?

21        A.    Yes.

22        Q.    And adhesives?

23        A.    Yes.

24        Q.    And caulking?

Robert G. Kaley, II, Ph.D.

1   exterior applications because that's where

2   the PCB properties would be most useful.

3            But it could be, you know -- I

4   mean, I understand that it was used between

5   building panels in construction.  It may have

6   been used for window glazings.  Those kinds

7   of applications.

8        Q.    And unlike with paint, caulking

9   utilizing PCB plasticizers were sometimes

10  used indoors around windows; is that true?

11       A.    My understanding is that they

12  have been.  I don't know the extent of that

13  use.  I think, again, they were primarily

14  used externally, but I'm certainly aware of

15  indoor caulks that have had PCBs measured in

16  them.

17       Q.    And what kind of buildings are

18  we talking about, office buildings?

19       A.    That's primarily office

20  buildings and there are some literature

21  reports on schools.

22       Q.    When utilizing plasticizers

23  with caulk, do you know or do you have a

24  basis to know how the plasticizer gets added

Robert G. Kaley, II, Ph.D.

1    to the caulk, in terms of is it the caulk

2    manufacturer that adds it or the applicator?

3              Do you have any understanding

4    of how that works?

5        A.    My understanding is that would

6    be the formulator of the caulk itself.

7        Q.    So they would purchase the

8    PCB-containing plasticizer, incorporate it

9    into a caulk product, and then sell that

10   product to whatever entity might utilize it?

11       A.    That's my understanding, yes.

12       Q.    And what are you basing that

13   understanding on?

14       A.    Just basic understanding, I

15   guess.  I don't really know that I have any

16   specific reference.  That's just my

17   understanding.

18              I know Monsanto was selling

19   PCBs as plasticizers to various

20   manufacturers.  I mean, they weren't selling

21   caulk.  So to the extent that the PCBs did

22   end up in some caulk products, that would be

23   my understanding.

24       Q.    Have you ever heard of a

Robert G. Kaley, II, Ph.D.

1    situation where a caulk is applied at a

2    building where the caulk product and the PCB

3    product were mixed at the site?

4                Have you ever heard of that

5    before?

6         A.     I've heard that allegation.  I

7    frankly can't conceive of that being true,

8    but I've heard that, yes.

9         Q.     But you've heard that, but in

10   your understanding, that's not accurate?

11        A.     I don't know whether it's

12   accurate or not.  In my understanding, it

13   just doesn't make much sense chemically.

14        Q.     Can you tell us, what is a PCB?

15        A.     What is a PCB?

16        Q.     The layman's term.  I'm just

17   trying to lay a foundation.  I don't need a

18   very big scientific, just give us a little

19   blurb.

20                What is PCB?

21        A.     Well, PCB is a chemical based

22   on what's called a biphenyl backbone, which

23   is essentially two benzene rings hooked

24   together -- I mean, it's getting very

Robert G. Kaley, II, Ph.D.

1    technical very quickly -- and then to that

2    biphenyl backbone, various amounts of

3    chlorine are added to give a product called

4    polychlorinated biphenyls.

5         Q.     And Monsanto sold many

6    different types of plasticizers, yes?

7         A.     Yes.  Definitely, yes.

8         Q.     Approximately 80 at least at

9    one point?

10        A.     Yes, 80 to 100 I believe is a

11   reasonable number.

12        Q.     And some of Monsanto's

13   plasticizers contained PCBs?

14        A.     Some of them did, yes.

15        Q.     And some of them did not?

16        A.     That is correct.

17        Q.     Monsanto had a trademark for

18   some of their plasticizers that they called

19   Aroclor, correct?

20        A.     Well, the Aroclor trademark was

21   for their PCB products, but they also sold

22   plasticizers under the Aroclor trademark.  So

23   not all Aroclor products were plasticizers.

24        Q.     Okay.  Let me try to break it

Robert G. Kaley, II, Ph.D.

1       A.      That is correct.

2       Q.      Do you know which ones had

3   PCBs?

4       A.      Not specifically.  There were

5   dozens of them with numbers.  I don't really

6   know for sure which ones.

7       Q.      I want to make sure I have a

8   understanding of the different players

9   involved in the sale, marketing, promotion

10  and warnings of plasticizers.

11              Who were the types of customers

12  of Monsanto's with respect to plasticizers?

13      A.      Well, without sounding like a

14  smart aleck, I guess, people that were making

15  plastic products.  I don't know how else to

16  answer that.

17      Q.      Okay.  So some of Monsanto's

18  customers were the companies that

19  manufactured the end product into which the

20  PCB-containing plasticizer was utilized?

21      A.      Certainly some.  And then

22  others were probably manufacturing products

23  containing PCBs that were then sold to other

24  companies manufacturing other products.  I

Robert G. Kaley, II, Ph.D.

1    don't know specifically the chain.  But that

2    would be correct, yes.

3           Q.      And Monsanto also sold

4    PCB-containing plasticizers to distributors,

5    correct?

6           A.      That is correct.

7           Q.      And then those distributors

8    would then sell the product directly to

9    entities that might utilize it in end

10   products?

11          A.      That's my understanding, yes.

12          Q.      Any other types of customers

13   that wouldn't fall into either a direct user,

14   direct manufacture utilizing it or a

15   distributor?

16          A.      Not that I know of.

17          Q.      Okay.  In reviewing the

18   documents, there appeared to be to me several

19   instances of research product -- research

20   being done on potential PCB-containing

21   plasticizer usage.

22                  Was there a group that solely

23   did that type of research at Monsanto?

24          A.      Well --

Robert G. Kaley, II, Ph.D.

1          Q.     And they made -- they made

2   recommendations to what entity that made the

3   final decision?

4          A.     Well, the final decision would

5   have been at the corporate management

6   committee level or something like that.

7          Q.     Physically how were

8   PCB-containing plasticizers sold?

9                 What types of containers?

10         A.     Certainly probably everything

11  from research samples in small containers to

12  5-gallon drums to 55-gallon drums, and --

13  that would be the only ones I know for sure.

14                It's conceivable they were sold

15  in tank car, railroad tank car, lots or truck

16  lots.

17                My guess is largely 55-gallon

18  drums for the major customers and major

19  applications.

20                MS. EVANGELISTI:  Okay.  We've

21         been going an hour; so let's take a

22         break.

23                THE WITNESS:  That's fine.

24                VIDEOGRAPHER:  The time is

Robert G. Kaley, II, Ph.D.

1    not what the law was?

2         A.     Okay.  My -- I believe that

3    Monsanto felt that by warning their customers

4    that were using PCBs that that -- that was

5    what they needed to do, and that's what they

6    did do.

7         Q.     So let's -- I want to get an

8    overview of the information provided to your

9    customers about PCB-containing plasticizers

10   so that we can put our arms around what

11   information was, in fact, provided.

12        A.     Okay.

13        Q.     And I have read every

14   deposition that I was able to get my hands on

15   to try to educate myself on the facts; so I'm

16   going to try to speed things up.

17               So I understand that there were

18   application bulletins that were provided,

19   correct?

20        A.     That's correct.

21        Q.     Can you tell us what an

22   application bulletin is?

23        A.     Well, basically it was a

24   bulletin describing a potential use of a

Robert G. Kaley, II, Ph.D.

1  product that might be of interest to a

2  potential customer.  Usually fairly focused

3  rather than a broad, general, "We sell

4  plasticizers, and you might want to use

5  them."

6          Q.      Was one of the purposes of the

7  application bulletin to give potential

8  customers suggestions and ideas on the

9  various ways and products in which Monsanto's

10 plasticizers could be utilized?

11         A.      I think that's a fair

12 characterization, yes.

13         Q.      And then there were also

14 technical bulletins.

15                 Can you tell us what those are?

16         A.      Well, those are more general, I

17 think, than an application bulletin.  They

18 basically contain information that's of a

19 broader nature and describing wider uses, but

20 in less detail than something specific to an

21 application.

22                 They would contain also

23 technical information, physical property

24 information, et cetera, about the products.

Robert G. Kaley, II, Ph.D.

1          Q.      Going back, am I correct that

2      the application bulletin was given to

3      potential customers?

4          A.      Oh, well, it was probably given

5      to -- primarily given to salesmen to

6      distribute as they saw appropriate.  So,

7      yeah, I mean, probably potential customers.

8      I mean, the ongoing customers would already

9      know what their application was.

10          Q.      And the technical bulletins,

11      did they -- I'm trying to get a sense of, did

12      every customer get an application bulletin?

13          A.      I have no idea.  You know, I'm

14      having a little trouble distinguishing

15      product bulletin versus technical bulletin

16      versus application bulletin.  I know there

17      are specific application bulletins, I'm not

18      sure if you're distinguishing between the

19      product bulletins and technical bulletins.

20                  But would every customer get

21      one?  Probably most, and they would

22      probably -- some people that weren't

23      customers would probably get them.

24          Q.      And then you mentioned product

Robert G. Kaley, II, Ph.D.

1    bulletin.

2              Is that different than a

3    technical bulletin?

4         A.    Well, that's what I was saying.

5    I don't know if you're making that

6    distinguishment -- distinguishment, that's

7    not a word -- distinction or not.

8              There are a number of

9    bulletins.  I would call them product

10   bulletins.  If there's something called a

11   technical bulletin, then, you know, I could

12   look at it and see if there's a difference

13   between what I'm talking about.  I would put

14   them basically in the same category.

15        Q.    And I have a number of copies

16   of different bulletins, and I'm not going to

17   mark all of them because there's a bunch.

18   But I'm trying to get -- I'll later go

19   through them and get a sense of the different

20   types of documents.

21        A.    Okay.  Well, that may clarify

22   what you're asking me for both of us.

23        Q.    And other ways of providing

24   information would be product labels; is that

Robert G. Kaley, II, Ph.D.

```
1    correct?

2         A.     Well, yes.  Primarily, that

3    would be mostly safe handling information for

4    the customers, yes.

5         Q.     And then, in reading through

6    the depositions, I understand that if a

7    customer, potential customer, had questions,

8    they had an opportunity to reach out to

9    Monsanto directly to get information; is that

10   correct?

11        A.     Certainly, that's correct.

12        Q.     And in those instances, I

13   understand that there was a directive that

14   those questions would make their way to the

15   medical department and Dr. Kelly's group; is

16   that accurate?

17        A.     Certainly not all questions

18   would be directed to him.  If they were

19   medical questions, they very likely could

20   have been.  I don't know that they all --

21   there was a requirement that there were.

22   There might have been, I don't know.

23              But certainly that would make

24   sense that if there were a medical question,
```

Robert G. Kaley, II, Ph.D.

1    it would be directed to Dr. Kelly or someone

2    in his department, yes.

3         Q.     In addition, in reviewing the

4    documents and the depositions, I understand

5    that there were letters sent directly to

6    customers and distributors in 1970 providing

7    certain information about environmental

8    concerns, correct?

9         A.     That's correct.

10        Q.     Okay.  And in addition,

11   Monsanto put out advertisements in magazines

12   that might contain some information about

13   their PCB-containing plasticizers?

14        A.     With regard to environmental

15   concerns or --

16        Q.     No.

17        A.     -- just in general?

18        Q.     I started the discussion saying

19   let's try to identify all information

20   provided to customers or potential customers

21   about PCB-containing plasticizers.

22        A.     Yeah.

23        Q.     In general.

24        A.     Okay.

Robert G. Kaley, II, Ph.D.

1          Q.      And we identified application

2     bulletins are information provided, correct?

3          A.      Yes.

4          Q.      And technical bulletins?

5          A.      Yes.

6          Q.      And there are labels on the

7     packages?

8          A.      Yes.

9          Q.      And sometimes people,

10    customers, potential customers, reached out

11    to Monsanto and received information back?

12         A.      Right.

13         Q.      And we identified specific

14    letters that were sent out in the 1970s?

15         A.      Right.

16                 And I was -- I was putting

17    those two together.  If you're completely

18    off, yes, Monsanto did place advertisements

19    in various documents, certainly.

20         Q.      Okay.  And they advertised --

21    these are some that I read in the

22    documents -- in American Paint Journal?

23         A.      I believe that's correct.

24         Q.      In Rubber Red Book?

Robert G. Kaley, II, Ph.D.

1  languages; so they called it a multi-language

2  label.

3          Q.      Regarding these labels, just so

4  we're clear, that label was affixed to the

5  PCBs or the PCB-containing Aroclors that were

6  sold to either distributors or to the

7  customers that took that product and put it

8  into manufacturing other product, correct?

9              MR. GOUTMAN:  Objection.  I

10          think you meant to say containers

11          containing PCBs.

12  QUESTIONS BY MS. EVANGELISTI:

13          Q.      Let me start over again.

14              The labels that we've been

15  talking about now, they were affixed to

16  containers that Monsanto -- the containers in

17  which Monsanto sold PCBs, correct?

18          A.      Yes.

19          Q.      So those labels were given

20  to -- with the products that they sold to

21  distributors, correct?

22          A.      Yeah.  I mean, the one that I

23  mentioned says it was used on five-gallon

24  cans, these particular labels, so, that's

Robert G. Kaley, II, Ph.D.

1    end product which utilized Monsanto's

2    PCB-containing plasticizers?

3                   MR. GOUTMAN:  As rephrased, the

4           question calls for this witness to

5           speculate as to legal prohibition,

6           which this witness is not an expert

7           in, nor has he been designated to

8           testify to as a 30(b)(6) witness.

9                   You may answer.

10                  MS. EVANGELISTI:  I was only

11          following up because the lack of

12          foundation objection, so...

13                  THE WITNESS:  Well, I don't

14          know -- frankly, I don't know what

15          regulations or prohibitions or things

16          govern warnings; so I don't know

17          whether -- what kind of requirements

18          they would have had or would not have

19          had.

20                  As far as I know, there was no

21          prohibition that they do such a thing,

22          but I would say that Monsanto's

23          understanding was that they were

24          warning the people that they were

Robert G. Kaley, II, Ph.D.

1          selling the products in its pure form,

2          and that after that, they had no idea

3          what the concentrations or physical

4          properties of those products were; so

5          they might not have even known how to

6          warn, so...

7     QUESTIONS BY MS. EVANGELISTI:

8          Q.     So that's where it ended, with

9     their own customer?

10          A.     As far as I know, that's

11     correct.

12          Q.     Okay.

13          A.     Well, again, with time frame,

14     after -- after Monsanto was withdrawing from

15     the market and putting the environmental

16     label on, they told their distributors to

17     tell their customers about the prohibitions

18     or the recommendations for proper disposal

19     and stuff.  So certainly with regard to that,

20     there was a pass-through.

21          Q.     So exactly.

22               They could have made such a

23     requirement and did so later?

24               MR. GOUTMAN:  Objection.  Calls

Robert G. Kaley, II, Ph.D.

1    I'll assume it's correct.

2         Q.      You don't have any reason to

3    doubt if Monsanto produced a document that

4    it, in general, is what it purports to be; is

5    that correct?

6         A.      That's correct.

7         Q.      Okay.  And are those water

8    towers in that picture?

9         A.      I don't know.  They could be.

10   I guess they could be gas towers, liquified

11   natural gas towers.  I don't know what kind

12   of towers they are.  Could be oil towers.

13   They look very much like what you see in

14   refineries.  So that would be my first guess

15   is they're refinery towers.

16        Q.      If you look at the first

17   paragraph of that advertisement, it says,

18   "Their ability to resist exposure to weather,

19   water, acids, alkalis and other corrosive

20   influences make Aroclors highly desirable in

21   the formulation of maintenance paints for

22   all-around protection to metal surfaces."

23            Do you see that?

24        A.      Yes.

Robert G. Kaley, II, Ph.D.

```
1        Q.      Again, in this advertisement in
2   1964, Monsanto is representing that its
3   Aroclors are completely inert and
4   nonvolatile, correct?
5                MR. GOUTMAN:  Where are you?
6                MS. EVANGELISTI:  In the middle
7        section, right in the very middle of
8        the document.
9                THE WITNESS:  I see that.
10               MR. GOUTMAN:  I don't see it
11       yet.  Let me just catch up.
12               MS. EVANGELISTI:  Second
13       column.
14               MR. GOUTMAN:  Yes.
15               MS. EVANGELISTI:  Second
16       paragraph.
17  QUESTIONS BY MS. EVANGELISTI:
18       Q.      And I'll read it, "They all are
19  fire resistant and completely inert to
20  chemicals, water and weather.  They impart
21  these properties directly to formulations in
22  which they're used.  Most important, since
23  they are virtually non-oxidizable and
24  nonvolatile, the properties stay."
```

Robert G. Kaley, II, Ph.D.

1   beautiful partial stack of bulletins.

2            Previously I handed you

3   Exhibit 6.

4            Have you seen this document

5   before?

6        A.    Yes, I have.

7        Q.    Can you identify it for us,

8   please?

9        A.    It's a product -- what I would

10  call a product bulletin describing the

11  various Aroclor products.

12       Q.    And can you tell us what year

13  this was in use?

14       A.    Well, all I can go by is the

15  handwritten notation on the front cover,

16  which suggests that it was issued in 1960 and

17  reissued in 1962; so that's all of the

18  information I have.

19       Q.    Again, this is a document that

20  would go to prospective customers of

21  Monsanto's, correct?

22       A.    And customers.

23       Q.    And those customers would be

24  the entities that ultimately might purchase

Robert G. Kaley, II, Ph.D.

1   they weren't needed for those uses?

2          A.      That's basically correct, yes.

3   I don't know that it was never used, but it

4   was not one that was widely used in the

5   electrical industry.

6          Q.      Switching gears a little bit.

7                  I want to follow the process of

8   plasticizers going into caulk and caulk going

9   into a building.  So just bear with me.  I

10  haven't asked a question yet.  There's the

11  background.

12         A.      Okay.

13         Q.      Monsanto has sold its

14  PCB-containing plasticizers to companies that

15  make caulk, correct?

16         A.      Or make components of caulk,

17  yes.

18         Q.      Educate me a little bit.

19                 When you say "components of

20  caulk," how --

21         A.      Well, again, I don't -- I don't

22  know that -- once it leaves Monsanto, I don't

23  really know the stepwise.  But certainly they

24  sold to people who were blending them with

Robert G. Kaley, II, Ph.D.

1    plastics, the base material, that could go

2    into caulk, but it seems logical, if not for

3    sure to me, that those people might not be

4    making caulk.  They may be selling their

5    plasticized caulk to a further manufacturer

6    who had his own formula for making particular

7    caulks for a particular application.

8            Do I have documentation of

9    that?  No.  But I believe that certainly

10   happened.

11       Q.    Okay.  So to companies that

12   were involved in the manufacturing of caulk

13   or caulk ingredients?

14       A.    I would -- yeah, I'll agree

15   with that, sure.

16       Q.    And then, ultimately, a caulk

17   product is created, in our hypothetical,

18   contains PCB-containing plasticizers.

19            Okay?

20       A.    Okay.

21       Q.    So that product is then

22   presumably purchased by somebody who intends

23   to utilize it in a building?

24            MR. GOUTMAN:  Objection.

Robert G. Kaley, II, Ph.D.

 1          Hypothetical.  Assumes facts of

 2          record.  Vague and ambiguous.

 3   QUESTIONS BY MS. EVANGELISTI:

 4          Q.     I'm just trying to identify

 5   potential parties in the chain of the product

 6   making its way to a building.

 7          A.     Well, again, I'm kind of

 8   creating this in my own mind a little bit.

 9                 But, yeah, I think basically

10   that's true, that they would sell it maybe to

11   a distributor, who would sell it to a

12   building contractor, who would then market it

13   as the acceptable caulk to somebody -- a

14   contractor on a specific job.

15                 I mean, I don't know, but I

16   could certainly conceive of all of those

17   steps being in a chain.

18          Q.     Okay.  So in the chain of caulk

19   making its way to a building, you have a

20   company that manufactures the -- or companies

21   involved in the manufacture of the caulk

22   product, correct?

23          A.     Yes.

24          Q.     And then you would have people

Robert G. Kaley, II, Ph.D.

1    who purchase that caulk product, correct?

2        A.    Correct.

3        Q.    And they might be the same

4    person.

5              But you've got the contractor

6    on the site of the building being built,

7    correct?

8        A.    Yes.

9        Q.    And somebody approves the specs

10   for what products should make their way into

11   the building?

12       A.    Presumably, yes.

13       Q.    And then you have somebody who

14   literally applies the caulk on the building,

15   correct?

16       A.    Correct.

17       Q.    Okay.  And then you've got the

18   building owner.

19             Okay?

20       A.    Okay.

21       Q.    Okay.  Is it true that with

22   respect to -- unless a company was a direct

23   manufacturer of Monsanto, so --

24             MR. GOUTMAN:  Sorry, direct

Robert G. Kaley, II, Ph.D.

1  know how you would change it if -- you know,

2  "Don't stick your arms in it"?  I don't know.

3          But as far as I know, there was

4  no specific information addressing that

5  particular concern.

6          (Kaley Exhibit 16 marked for

7      identification.)

8  QUESTIONS BY MS. EVANGELISTI:

9      Q.    I've handed you Deposition

10  Exhibit 16.

11          Have you seen this before?

12      A.    Yes, I have.

13      Q.    Can you identify it for the

14  record, please?

15      A.    It's a 1955 report of -- from

16  the research department regarding -- as its

17  titled, "Aroclor and gases."

18      Q.    We touched on this earlier, but

19  the research department, at times, when there

20  were potential uses of Monsanto's

21  PCB-containing plasticizers, might do studies

22  to find out more information about the

23  prospective use; is that correct?

24      A.    That's fair.

Robert G. Kaley, II, Ph.D.

1        Q.     And this document is an example

2    of an instance where that occurred?

3        A.     Yes, I would agree with that.

4        Q.     And this isn't a one-time deal.

5    They did that pretty routinely.

6               When customers had questions

7    about uses, Monsanto might do some research

8    products to give -- to get more information?

9        A.     I don't know how frequently it

10   was, but it's -- I don't think -- this was

11   not probably a one-shot deal.  I agree with

12   that.

13       Q.     And who was HB Richards?

14       A.     Other than the fact that he

15   authored this document, I don't know.  It's

16   from long ago in Anniston; so I really don't

17   know.  Presumably he was a chemist.

18       Q.     Where does it say -- where are

19   you getting Anniston?

20              What am I missing?

21       A.     You missed nothing.

22       Q.     Oh, second page.

23       A.     Oh, okay, right.

24       Q.     So this document, this report,

Robert G. Kaley, II, Ph.D.

1   came out of the research department in the

2   phosphate division in Anniston, Alabama?

3        A.      Correct.

4        Q.      Was the phosphate division one

5   which included PCBs?

6        A.      It did, at this particular

7   time, yes.  It was -- go ahead.

8        Q.      Was there a research department

9   at other -- at the Sauget plant, too?

10       A.      I don't specifically know.  I

11  don't know.

12       Q.      Was there a research department

13  at the headquarters in St. Louis as well?

14       A.      Probably not at that particular

15  time.

16       Q.      Was there a time when there

17  was?  Later did they --

18       A.      Yes, definitely.  I mean, there

19  was a plasticizer research department in the

20  research center at world headquarters,

21  certainly at the time I was there, presumably

22  sometime before that, but I don't know when

23  it actually started.

24       Q.      When you say "world

Robert G. Kaley, II, Ph.D.

1    headquarters," that's St. Louis?

2         A.     Yeah, that's Creve Coeur,

3    St. -- Creve Coeur, yes.

4         Q.     Say that again.

5         A.     It's Creve Coeur, C-r-e-v-e.

6    You probably know how to spell it, so you

7    know.  It's a suburb of St. Louis.

8         Q.     And it says "chemists" on that

9    second page, AM Ellenburg.

10               Do you know who that is?

11        A.     I don't know.  He was a chemist

12   at Anniston.

13        Q.     So if you turn to the page that

14   ends in 949.

15               MR. GOUTMAN:  That ends what?

16               MS. EVANGELISTI:  949.

17               THE WITNESS:  Okay.

18   QUESTIONS BY MS. EVANGELISTI:

19        Q.     It says, "Introduction.  Dow

20   Chemical Company is interested in using

21   Aroclor as a plasticizer in styrene latex

22   paint systems.  Research at the plastics

23   division's Springfield laboratories has

24   indicated that use of such paints in enclosed

Robert G. Kaley, II, Ph.D.

1    areas under certain conditions results in

2    Aroclor vapor concentrations above the

3    accepted safe maximum for continuous

4    exposure.  For this reason, Dow is dubious

5    about the use of Aroclor for its application.

6              "The sales department,

7    therefore, requested that experiments be

8    carried out in the Aroclor plant at Anniston

9    to determine the Aroclor vapor concentration

10   to which the operating personnel are normally

11   exposed.  This data can be submitted as

12   evidence that exposure to this concentration

13   has had no apparent toxic effects upon the

14   operators."

15             Do you see that?

16        A.    I do.

17        Q.    What is the plastics division

18   Springfield laboratories?

19        A.    It's another Monsanto

20   laboratory.  I mean, there's -- Springfield

21   is another Monsanto plant where they had a

22   plastics division laboratory.

23        Q.    So presumably, this laboratory

24   did a study involving paints which contained

Robert G. Kaley, II, Ph.D.

 1    Aroclors, am I understanding that correctly,

 2    previous to this report?

 3        A.      It suggests that that happened,

 4    yes.

 5        Q.      Have you ever seen that report?

 6        A.      No, I have not.

 7        Q.      Do you know --

 8        A.      And there may not be a report.

 9    It may have just been transmitted by phone or

10    some other mechanism.  I don't know whether

11    there's a report or not.

12        Q.      If you will look at the next

13    page, the third reference says, "Monsanto

14    Chemical Company, plastics division,

15    confidential report on Aroclor vapor in air

16    from paints" --

17        A.      There you go.

18        Q.      -- "1952."

19        A.      Okay.

20        Q.      Would that --

21        A.      That would seem to be it.

22        Q.      That there is a report in

23    existence on this somewhere?

24        A.      Well, I don't know if it's in

Robert G. Kaley, II, Ph.D.

1   existence or not.  There was a report in

2   1952.

3        Q.      At one point?

4        A.      At some point there was

5   apparently a report.

6        Q.      Okay.  Do you have any idea why

7   that report was done?

8        A.      I guess not really.  I was

9   going to say because Dow was interested, but

10  it doesn't say that.  So, no, I don't really

11  know why that was done.

12       Q.      In any event, we know Dow

13  Chemical was interested in using Aroclor as a

14  plasticizer in styrene latex paint.

15              Can you tell us what styrene

16  latex paint is?

17       A.      Other than what the words say,

18  no, not really.

19              I mean, styrene is a

20  chemical-starting material, and latex paints

21  are water-based paints with latex as the

22  plastic basically.

23       Q.      So the phrase "styrene latex

24  paint" doesn't indicate to a chemist that

Robert G. Kaley, II, Ph.D.

1    it's an outdoor use only?

2              That's what I'm trying to

3    figure out.

4         A.    Oh, no.

5         Q.    Is this regular paint?

6         A.    I don't know.  Certainly latex

7    paint was a regular paint.  I don't know

8    that -- you know, as I sit here, I don't know

9    what the styrene modifier does to that.  I

10   don't -- but I can't sit here and tell you it

11   was strictly an indoor use -- or an outdoor

12   use, I am sorry.  I don't know.

13        Q.    So if you go to the second

14   paragraph under "summary."

15        A.    Okay.

16              MR. GOUTMAN:  Sorry, what page

17        are you on?

18              MS. EVANGELISTI:  949.

19   QUESTIONS BY MS. EVANGELISTI:

20        Q.    "It was found, however, that

21   the Aroclor vapor concentration in the air at

22   the sample points" --

23              And this is referring to sample

24   points taken at the Aroclor plant, correct?

Robert G. Kaley, II, Ph.D.

1          A.      Yes.

2          Q.      -- "is seldom below the .5 to

3   1 milligram per cubic meter level, which is

4   the maximum tolerable concentrations

5   according to Elkins," he references, and

6   "often is as high as" -- I can't read that.

7                  Can you?

8          A.      3 to 5 milligrams per cubic

9   meter is how I read it.

10         Q.      "These higher concentrations

11  are extremely irritating to the eyes, nose

12  and throat.

13                 "On the basis of these facts,

14  it is difficult to conceive that

15  concentrations in the range of 1 to

16  5 milligrams per cubic meter reported by the

17  plastics division as a result of painting

18  with an Aroclor-containing paint could be

19  attained under normal conditions with this

20  type paint."

21                 Do you see that reference?

22         A.      I do.

23         Q.      So we don't have the plastics

24  division study, but looking at this, is it

Robert G. Kaley, II, Ph.D.

1    fair to assume that the results of the study

2    were that, as a result of painting with an

3    Aroclor-containing paint, concentrations in

4    the range of 1 to 5 milligrams per cubic

5    meter were reported?

6         A.    Yes, I would agree.  That's

7    basically what it says.

8         Q.    And then the authors of this

9    report were questioning that result?

10        A.    Correct.

11        Q.    Okay.  So it says, at the end

12   of that paragraph, it says, "It is

13   recommended that this laboratory secure a

14   sample of the paint under question and make

15   tests with it to determine the resulting

16   Aroclor vapor concentration in the air,"

17   correct?

18        A.    Yes.

19        Q.    And that follow-up study was

20   done; is that right?

21        A.    I believe so, yes.

22              (Kaley Exhibit 17 marked for

23        identification.)

24

Robert G. Kaley, II, Ph.D.

1    QUESTIONS BY MS. EVANGELISTI:

2        Q.    I know I just handed you an

3    exhibit, but I want to go back to the one

4    that's marked 16.

5        A.    Okay.

6        Q.    So at this point in 1953,

7    Monsanto was aware, through its discussion

8    with Dow Chemical, that they were interested

9    in using Aroclor in a paint that might end up

10   inside rooms; is that fair to assume, latex

11   paint is regular household paint?

12       A.    Well, latex paint can be

13   regular household paint.  I don't know if

14   that's particularly what Dow was interested

15   in.  I have no idea specifically whether they

16   were looking for interior paints or -- I

17   mean, latex paint can clearly be used

18   outdoors, too.

19       Q.    There are documents that we'll

20   get to where it's stated that Monsanto, in

21   the US, was not recommending PCBs to

22   utilize -- to be utilized in indoors paints.

23       A.    I'm familiar with those.

24       Q.    So I'm trying to figure out

Robert G. Kaley, II, Ph.D.

1    when that recommendation began.

2              Do you know when --

3         A.    I -- sorry.

4              MR. GOUTMAN:  Wait until she's

5         done.

6              THE WITNESS:  I am.  Sorry.

7    QUESTIONS BY MS. EVANGELISTI:

8         Q.    Do you know when it was decided

9    within Monsanto to not recommend PCBs for use

10   in indoor paint?

11        A.    Not specifically, but before

12   those documents were written.

13        Q.    And do we know why they stopped

14   making that -- well, I'm assuming.

15             Do we know why they -- they

16   recommended against it for use in indoor

17   paints?

18        A.    I don't specifically know.

19   I've never seen background documents for that

20   decision.

21        Q.    And in your preparation for the

22   corporate representative deposition, this or

23   prior ones, you haven't learned about people

24   who have firsthand knowledge about what

Robert G. Kaley, II, Ph.D.

1    occurred?

2         A.    Not leading up to that

3    particular decision, no.

4         Q.    We know, at least in this

5    document, which was dated June of 1953, that

6    there was no discussion in here about

7    Monsanto not recommending it for use in

8    paint, correct?

9              MR. GOUTMAN:  For use in paint?

10             MS. EVANGELISTI:  Use indoor --

11        sorry, for paint indoors.

12             THE WITNESS:  I believe --

13        without reading every word in here, I

14        believe that's correct, yes.

15   QUESTIONS BY MS. EVANGELISTI:

16        Q.    And if that internal decision

17   at Monsanto had been made, it probably would

18   have been -- I'm trying to put a time frame

19   on it.

20        A.    I understand.

21        Q.    So it's probably post this

22   document where Monsanto decided to not

23   recommend PCBs for use in indoor paint?

24             MR. GOUTMAN:  Objection.

Robert G. Kaley, II, Ph.D.

1        There's no foundation that DuPont was

2        interested in indoor paint.  I think

3        the witness has already said that.

4             So the assumption in the

5        question misstates the prior -- the

6        witness' prior testimony.

7             You can answer.

8             THE WITNESS:  Well --

9    QUESTIONS BY MS. EVANGELISTI:

10       Q.    Let me lay a foundation because

11   I think I failed to do that.

12            Is it accurate that at some

13   point Monsanto made a business decision to

14   not recommend PCBs be used in indoor paint?

15       A.    Yes, that's my understanding.

16       Q.    And we haven't been able to

17   nail down what time that decision was made,

18   correct?

19       A.    That's correct.

20       Q.    And do you know what Monsanto

21   did in regards to letting its customers know

22   about that recommendation that it not be

23   used?

24            MR. GOUTMAN:  Objection to

Robert G. Kaley, II, Ph.D.

1              form.

2                      You may answer.

3                      THE WITNESS:  Not specifically

4              without reviewing product bulletins

5              and seeing whether that recommendation

6              occurred or not.  I don't know.

7                      As I sit here, I don't know of

8              any specific action to communicate

9              that information.

10      QUESTIONS BY MS. EVANGELISTI:

11              Q.      Back to Exhibit 17, have you

12      seen this document before?

13              A.      Yes.

14              Q.      Was this -- for the record,

15      this is a research department phosphate

16      division short form report regarding

17      compatibility of various Aroclors and

18      Santowax M in mineral oil, correct?

19              A.      Yes.

20              Q.      It is dated in the 1953 time

21      frame?

22              A.      Correct.

23              Q.      And the investigators are

24      Ellenburg and Richards, the same two

Robert G. Kaley, II, Ph.D.

1    individuals involved in the document we were

2    just talking about?

3         A.    Yes.

4         Q.    And my only point for bringing

5    this to your attention, is this another

6    example of a research project done by the

7    research department at Monsanto in order to

8    assist a customer to determine what

9    plasticizer they might want to use in their

10   end product?

11        A.    Yes.

12              (Kaley Exhibit 18 marked for

13        identification.)

14   QUESTIONS BY MS. EVANGELISTI:

15        Q.    Handing you Exhibit 18, have

16   you seen this document before?

17        A.    I have.

18        Q.    Okay.  So this is a letter from

19   Elmer Wheeler to Art E. Mather, dated

20   September -- does your say 1?

21        A.    Mine says 1.

22        Q.    -- 1, 1953, correct?

23        A.    Yes.

24        Q.    And Elmer Wheeler was an

Robert G. Kaley, II, Ph.D.

```
1    industrial hygienist in the medical

2    department with Dr. Kelly?

3         A.      That's correct.

4         Q.      And Mr. E. Mather was at

5    Monsanto in England?

6         A.      Belgium.

7         Q.      Belgium?

8         A.      I think.  Well, no, Ruabon.  I

9    don't know.  We had both facilities.  I

10   thought --

11        Q.      Ruabon, wherever that is?

12        A.      Yeah, I think that's actually

13   UK.  I think you're right.  It's UK, England.

14        Q.      And the subject is "Aroclors

15   Toxicity," correct?

16        A.      Yes.

17        Q.      And Wheeler is responding to a

18   letter from Mather of August 11, 1953,

19   correct?

20        A.      Yes.

21        Q.      It says at the top, "As I'm

22   sure you know, Aroclors cannot be considered

23   nontoxic."

24                Do you see that?
```

Robert G. Kaley, II, Ph.D.

1     A.     I do.

2     Q.     And then it says, at the

3   bottom, last paragraph, "As you indicated, we

4   are watching the use of Aroclors as

5   plasticizers in emulsion paints.  We do not

6   recommend that they be used in paints which

7   might be applied in confined or unventilated

8   areas, particularly if the paints might be

9   used on heated surfaces."

10            Do you see that reference?

11    A.     I do.

12    Q.     And this memo or this letter is

13  three months after the interim report on

14  Aroclor and gases marked as Exhibit 16 to

15  your deposition, correct?

16    A.     Correct.

17    Q.     Do you know what -- is it

18  Dr. Wheeler or Mister?

19    A.     It's Mister.

20    Q.     -- Mr. Wheeler was referring to

21  when he says, "We are watching the use of the

22  Aroclors as plasticizers in emulsion paints"?

23            Do you think he's referring to

24  the studies that we were talking about

Robert G. Kaley, II, Ph.D.

1    earlier?

2         A.     I don't really know.  It could

3    be.  I don't know.

4         Q.     What is the phrase "emulsion

5    paints"?

6         A.     That would be -- a latex would

7    be an emulsion paint.  It's a -- water-based

8    paints are emulsion paints.  They're not true

9    mixtures.  They're -- it's like vinegar and

10   oil.  It's an emulsion rather than a true

11   mixture.

12        Q.     Isn't it fair to assume that

13   Elmer Wheeler, in the medical department,

14   when he states, "We do not recommend that

15   they be used in paints which might be applied

16   in confined or unventilated areas,

17   particularly if the paints might be used on

18   heated surfaces," was the result of the

19   findings done by the plastics division

20   Springfield laboratories on paints containing

21   Aroclors in enclosed areas?

22             MR. GOUTMAN:  Objection.  Calls

23        for speculation.  No foundation.

24             THE WITNESS:  It's not

Robert G. Kaley, II, Ph.D.

1          unreasonable, but I don't know that

2          that's the case.

3     QUESTIONS BY MS. EVANGELISTI:

4          Q.     There's nothing else in the

5     documentation that we could point a finger to

6     other than that; is that fair to say?

7          A.     That's fair to say, as far as I

8     know, yes.

9               (Kaley Exhibit 19 marked for

10         identification.)

11    QUESTIONS BY MS. EVANGELISTI:

12         Q.     I'm handing you Exhibit 19.

13              Have you seen this document

14    before?

15         A.     I have.

16         Q.     This is a letter from Emmet

17    Kelly to HR Newman dated February 12, 1954.

18              And Dr. Kelly was head of the

19    medical department at Monsanto, correct?

20         A.     Correct.

21         Q.     And who is HR Newman?

22         A.     I believe he was a medical

23    officer at the UK plant.

24         Q.     The chief medical officer in

Robert G. Kaley, II, Ph.D.

```
1    London, does that make sense?

2         A.    That very well could be, yes.

3    I think I've seen that in other documents.

4         Q.    It states, "We do not know what

5    the maximum allowable concentration of

6    Aroclor is.  1 milligram per cubic meter has

7    been set up.  We've run animal -- animals for

8    about 60 days at seven times this and found

9    some liver damage.  We're now running this at

10   a lower level."

11             Do you see that?

12        A.    I do.

13        Q.    Is it fair to say that in

14   February of 1954, Monsanto did not know yet

15   the maximum allowable concentration of

16   Aroclor?

17             MR. GOUTMAN:  Objection.

18        Misstates prior testimony.

19             THE WITNESS:  Well, it -- I

20        mean, that's what the letter states.

21        Clearly there was a level that had

22        been set up and Monsanto clearly knew

23        it.

24             But I guess the truth is, I
```

Robert G. Kaley, II, Ph.D.

1           don't really understand what that

2           first sentence means, the way he wrote

3           it.  I mean, it seems to me that we've

4           not pushed it up higher to see whether

5           1 milligram is too low, but I'm not

6           sure what -- exactly what he meant.

7           But the letter speaks for itself.

8           That's what he said.

9    QUESTIONS BY MS. EVANGELISTI:

10          Q.    The last part of the second

11   paragraph says, "In painting a room, we have

12   found 1 to 2 milligrams for a day or so, but

13   after that, the level drops down to nothing."

14               Do you see that reference?

15          A.    I do.

16          Q.    And I assume that he means 1 to

17   2 milligrams per cubic meter, since --

18          A.    Yeah, since that's the numbers

19   they have been talking about in other paint

20   documents, I would assume that's correct,

21   yes.

22          Q.    Do you know what other -- do

23   you know whether he's referring to this study

24   that was talked about earlier or yet a

Robert G. Kaley, II, Ph.D.

1    different study?

2         A.     I don't know.

3         Q.     So in any event, at this point

4    in time, Monsanto is looking at the effects

5    of PCBs coming out of paint when used in

6    enclosed spaces in this 1954 time frame?

7         A.     I don't know that I agree with

8    that characterization.

9              I think there's two different

10   things.  They're concerned about air

11   concentrations of paint, but that's -- the

12   studies they're referring to are not

13   necessarily those studies.  They're studies

14   of air concentrations of PCBs, not

15   necessarily from paint.

16             I am sorry, is that totally

17   confusing?

18        Q.     Maybe, but it's probably

19   because it's late.

20             MR. GOUTMAN:  Can you repeat

21        the question?

22             MS. EVANGELISTI:  I'll withdraw

23        the question and start over.

24

Robert G. Kaley, II, Ph.D.

1  QUESTIONS BY MS. EVANGELISTI:

2      Q.    Is that fair to say in the late

3  1953, early 1954, Monsanto is investigating

4  the potential for PCBs to come out of paints

5  utilizing Aroclors when painted in an indoor

6  room?

7              MR. GOUTMAN:  During the

8        painting?

9              Objection.  Form of the

10       question.

11             THE WITNESS:  All right.  I

12       mean, based on this sentence, "in

13       painting a room we have found," that's

14       a logical deduction that, yes, they

15       are measuring the air -- the level of

16       PCBs in air after painting a room in a

17       day or so.

18             But what I was going on to was

19       we are now running this at a lower

20       level.  That's a different study.

21  QUESTIONS BY MS. EVANGELISTI:

22      Q.    I understand that.

23      A.    Okay.  That's fine.  That's all

24  I was trying to clarify.

Robert G. Kaley, II, Ph.D.

1      Q.      They're talking about

2  toxicology studies, what effect on an animal

3  exposed to Aroclors, and he's talking about

4  lowering the levels for those animal studies.

5              That's what you're talking

6  about?

7      A.      Yes, that's correct.

8      Q.      And I was merely focusing on

9  his reference to painting a room.

10     A.      They -- apparently somebody --

11  it says "we," so apparently somebody at

12  Monsanto has painted a room and made those

13  measurements.

14     Q.      And they're looking into that

15  issue at this time?

16     A.      Correct.

17              (Kaley Exhibit 20 marked for

18      identification.)

19  QUESTIONS BY MS. EVANGELISTI:

20     Q.      Handing you Exhibit 20.

21              Have you seen this document

22  before?

23     A.      Yes, I have.

24     Q.      And this is a Monsanto letter

Robert G. Kaley, II, Ph.D.

1   from AM Ellenburg to Mr. E. Mather dated

2   March 15, 1954, correct?

3        A.    Correct.

4        Q.    And Ellenburg was one of the

5   two research people involved in the Aroclor

6   and gases tests that we marked as an exhibit

7   to your deposition?

8        A.    Yes.

9        Q.    I know I asked, and I forgot,

10  who is Mr. E. Mather again?

11       A.    If you asked, I've forgotten

12  also, and I don't really know what his

13  position was.  Obviously somebody in the PCB

14  plasticizer business group, but other than

15  that, I don't know.

16       Q.    And it says at the top, "The

17  final report on the problem of checking the

18  concentration of Aroclor vapors in the air

19  has been written and is now in the process of

20  being typed.

21            "In the report the method of

22  determining the Aroclor concentration in the

23  air is given in detail.  You will also find

24  those methods in the interim report by

Robert G. Kaley, II, Ph.D.

1    HD Richards, Jr., dated June 17, 1953."

2              Do you see that reference?

3         A.    Yes.

4         Q.    And would you agree that he's

5    referring to Exhibit 16 to your deposition

6    when he makes reference to the interim

7    report?

8         A.    Yes.

9         Q.    And the final report on the

10   problem of checking the concentrations is

11   likely a report that he's referring to in the

12   interim report, the recommended study that

13   they do?

14        A.    Yes.

15              MR. GOUTMAN:   Object to the

16        form.

17              You may answer.

18              THE WITNESS:   I think that's

19        fair.

20   QUESTIONS BY MS. EVANGELISTI:

21        Q.    And it says, "No work has been

22   done since last October on this project.  In

23   fact, Mr. Richards has left the company and

24   this has cut the work a little short."

Robert G. Kaley, II, Ph.D.

1                    Do you see that?

2          A.     I do.

3          Q.     Do you happen to know why

4    Mr. Richards left the company?

5          A.     No, I do not.

6          Q.     Any idea where he might be

7    today, if he's living?

8          A.     I have no idea.

9                    Other than his name on these

10   pieces of paper, I don't have any idea who he

11   is.

12                   MR. GOUTMAN:  If he's still

13        living, God bless him.

14                   MS. EVANGELISTI:  You never

15        know.

16   QUESTIONS BY MS. EVANGELISTI:

17         Q.     And it goes on to say, "In

18   connection with the room painted with Lustrex

19   latex paint containing Aroclor" --

20         A.     1248.

21         Q.     -- "1248, the sampling

22   operation shows that the concentration falls

23   off in a few days to the limit of less than

24   1 milligram" --

Robert G. Kaley, II, Ph.D.

1    A.    Correct.

2    Q.    -- "per cubic meter.  There is

3  definitely an Aroclor odor in the room after

4  being freshly painted, and the odor persists

5  for several days before it disappears with

6  natural air movements.  In forced

7  ventilation, the story might be different."

8          Do you see that reference?

9    A.    I do.

10   Q.    The second to the last

11 paragraph says, "My opinion on the use of

12 Aroclor in paint is that each paint would

13 have to be tested in a room.  If the odor of

14 Aroclor is present, then caution would have

15 to be exercised before the paint is

16 distributed freely for household use."

17         Do you see that reference?

18   A.    I do.

19   Q.    Would you agree with me -- is

20 it Ellenburg, is that Doctor or Mister?

21   A.    I have no idea.

22   Q.    That the chemists involved

23 working at the research division at the

24 Anniston plant in 1954, was opining that, to

Robert G. Kaley, II, Ph.D.

1    the extent there was interest in using

2    Aroclors in paint, that each product would

3    have to be tested to make sure that the

4    Aroclors wouldn't come out of the paint when

5    used in an indoor room?

6                    MR. GOUTMAN:  Objection.  That

7            isn't what the document says.  The

8            document speaks for itself.

9                    You may answer.

10                   THE WITNESS:  Not that I -- not

11           whether they come out of the paint,

12           but if they come out of the paint at a

13           level that is below whatever they

14           considered to be acceptable.

15   QUESTIONS BY MS. EVANGELISTI:

16           Q.    Is there any -- looking for the

17   scientific word and I can't think of it.

18                   Is there any reason why PCBs

19   utilized in caulk wouldn't have the same

20   concerns?  A scientific reason?  A chemistry

21   reason?

22           A.    Oh, yeah, I believe there is.

23           Q.    Can you teach me?

24           A.    Well, I would just say that

Robert G. Kaley, II, Ph.D.

1    each chemical has an inherent volatility or

2    vapor pressure, but that is modified by

3    whatever it's in, whether it's in a, you

4    know, a liquid matrix or a solid matrix.  For

5    instance, in a paint, there are things in

6    paints that are made to evaporate.  I mean,

7    obviously we want paint to dry.  So -- so as

8    that paint is drying, there may very well be

9    materials in there that actually carry some

10   level of PCBs out with them.  It's called

11   codistillation.

12           So in caulk, which is a --

13   almost a solid matrix and things are bound

14   into that matrix, it would be a lot less

15   likely that materials would come out of that

16   caulk matrix.

17       Q.    Is the reason that Ellenburg is

18   saying "each paint would have to be tested"

19   because all paints have different ingredients

20   and you don't really know the propensity for

21   the Aroclors to volatilize out unless you put

22   it all together and test it?

23       A.    Perfect.

24       Q.    Okay.  So likewise, in this

Robert G. Kaley, II, Ph.D.

1    time frame in 1954, why didn't Monsanto do

2    the same thought process with other products

3    utilized in rooms such as caulk?

4          A.    Well, I don't know that they

5    didn't.  There's no documents that suggest

6    they did, but I don't know that they didn't.

7                I think they were -- obviously

8    had an odor problem with the Aroclors in

9    paints, and, you know, again, I don't want to

10   speculate, but I suggest that it -- that odor

11   problem would have not occurred in caulk; so

12   there wouldn't have been an issue they were

13   addressing.

14         Q.    At this point did Monsanto do

15   tests on every paint in which Aroclor might

16   be added to determine what would happen if a

17   room was painted?

18         A.    Well, I don't know, but I don't

19   think it suggests that Monsanto should do

20   those tests.  I just think it's the paint

21   should be tested.  I mean, Monsanto -- again,

22   Monsanto wasn't making the paints, so...

23         Q.    But it -- sorry, go ahead.

24         A.    No, that was it.

Robert G. Kaley, II, Ph.D.

1        Q.     At some point Monsanto stopped

2   recommending that it be used in paint.

3               Do you believe it was as a

4   result of --

5               MR. GOUTMAN:  This is latex

6        paint.

7               Objection, misstatement.

8               MS. EVANGELISTI:  No, I'm

9        agreeing with you.

10               MR. GOUTMAN:  Okay.

11               MS. EVANGELISTI:  I was

12        listening to you because you're

13        probably right.  I'm going to start

14        over again.

15   QUESTIONS BY MS. EVANGELISTI:

16        Q.     We already established that at

17   some point Monsanto made a recommendation

18   that PCBs should not be utilized in indoor

19   paint, correct?

20        A.     Yes.

21        Q.     Do you believe it was because

22   of the concerns expressed in these documents

23   that that recommendation was made?

24        A.     Generally speaking, I believe

Robert G. Kaley, II, Ph.D.

1    that's correct, yes.

2              Again, we don't know exactly

3    when that decision was made, but, I mean,

4    clearly those concerns would lead -- could or

5    lead to that kind of decision.

6         Q.    I've beat that horse to death;

7    so we're going to move on.

8              MR. GOUTMAN:  You've been going

9         for about an hour.

10             MS. EVANGELISTI:  Okay.  Take a

11        break?

12             MR. GOUTMAN:  Did you have

13        something you want to finish up with?

14             MS. EVANGELISTI:  No.  Off the

15        record.

16             VIDEOGRAPHER:  The time is

17        2:41.  We're going off the record.

18         (Off the record at 2:41 p.m.)

19             VIDEOGRAPHER:  The time is

20        2:55, and we're back on the record.

21             (Kaley Exhibit 21 marked for

22        identification.)

23    QUESTIONS BY MS. EVANGELISTI:

24        Q.    I've handed you Deposition

Robert G. Kaley, II, Ph.D.

1    Exhibit 21.  I didn't; I lied.  I put it on

2    the table.

3              Have you seen this document

4    before?

5         A.    I have.

6         Q.    And is this the final report on

7    Aroclor and gases referred to in the previous

8    couple of documents?

9         A.    It is, as far as I know, yes.

10        Q.    And it's dated March 15, 1954,

11   and it's -- has HB Richards as the --

12   presumably the author of the report?

13        A.    Yes, correct.

14        Q.    If you look at the

15   introduction, which is on page 88, Bates

16   number ends in 88.

17        A.    Yes.

18        Q.    "Introduction.  Dow Chemical

19   Company is interested in using Aroclor as a

20   plasticizer in manufacture of their Saran" --

21        A.    Vinylidene.

22        Q.    -- "vinylidene chloride,

23   plastics, but is hesitant for fear that the

24   Aroclor vapor might produce toxic effects

Robert G. Kaley, II, Ph.D.

1    upon the personnel in their plant."

2              Do you see that reference?

3         A.    I do.

4         Q.    First of all, I thought they

5    were talking about Dow using PCBs in paints.

6              Do you know the reference to

7    the Saran plastics?

8         A.    I don't know other than what's

9    in this document.

10        Q.    It says, "At the request of the

11   sales department, this work was undertaken to

12   determine the Aroclor vapor concentration in

13   the Anniston plant under usual working

14   conditions.  This data would then be used in

15   an attempt to convince Dow that the use of

16   Aroclor in their plant would be safe."

17             Do you see that reference?

18        A.    I do.

19        Q.    And do you agree it indicates

20   in this document that the purpose of doing

21   these studies was to convince Dow that the

22   use of Aroclor in their plant would be safe?

23        A.    It's a reasonable inference.

24        Q.    And then it goes on to say, "An

Robert G. Kaley, II, Ph.D.

```
 1    outgrowth of the problem was the

 2    determination of the Aroclor vapor present in

 3    a room which had been painted with a styrene

 4    latex paint using Aroclor as the

 5    plasticizer."

 6              Do you see that?

 7         A.    I do.

 8         Q.    At the very bottom it states,

 9    "Sampling of the air in the room revealed

10    that the Aroclor vapor concentration rapidly

11    reached maximum and then generally decreased

12    to a relatively safe low level after three

13    days."

14              Do you see that reference?

15         A.    Yes, I do.

16         Q.    So the results of Monsanto's

17    study on the Aroclor vapor concentration

18    after a room was painted with a paint

19    containing Aroclors, that there were still

20    low levels of Aroclor vapor in the room three

21    days later, correct?

22         A.    Yes.

23         Q.    If you look at the last page of

24    this document, it's -- I am sorry, it's page
```

Robert G. Kaley, II, Ph.D.

1    that ends in Bates number 98, it's page 11 of

2    the document.

3         A.     Okay.

4         Q.     Under "Conclusions," number 5

5    says, "The Aroclor vapor concentration in the

6    room painted with Lustrex latex paint was

7    sufficiently high, greater than 1 milligram

8    per cubic meter, to make the room unusable

9    for about three days.  After this, the odor

10   and concentration of Aroclor 1248 diminished

11   to a safe limit."

12             Do you see that?

13        A.     Yes.

14        Q.     Do you know what level was

15   determined by the author to be a safe limit

16   that the vapors diminished to?

17        A.     Well, my reading of this

18   particular conclusion would be that it's

19   1 milligram per cubic meter.

20        Q.     Meaning after three days, the

21   level reduced to below that number?

22        A.     That's how I read it, yes.

23        Q.     And it says at the end,

24   "Recommended," this is signed by Richards and

Robert G. Kaley, II, Ph.D.

1    Ellenburg, "Since the room painted with

2    Lustrex latex paint contained Aroclor, 1248

3    definitely has an odor of Aroclor for several

4    days after painting.  Caution should be

5    exercised in recommending Aroclor for this

6    use."

7              Do you see that reference?

8         A.    I do.

9         Q.    And that was what being made --

10   this recommendation was being made by the

11   individuals that did the research studies for

12   Monsanto, correct?

13        A.    Correct.

14        Q.    I'm finished with that.

15             (Kaley Exhibit 22 marked for

16        identification.)

17   QUESTIONS BY MS. EVANGELISTI:

18        Q.    I'm handing you Exhibit 22.

19             Have you seen this document

20   before?

21        A.    Yes, I have.

22        Q.    This is a document from

23   DVN Hardy to Dr. JW Barrett, dated August 19,

24   1955, correct?

Robert G. Kaley, II, Ph.D.

1      A.      Correct.

2      Q.      DVN Hardy was at Monsanto in

3   London?

4      A.      In the United Kingdom

5   somewhere.  I'm not sure exactly where.

6      Q.      Do you know what his position

7   was?

8      A.      I think he was a business

9   director, but I could be wrong.

10      Q.      And JW Barrett?

11      A.      I don't know.

12      Q.      And this document sets forth

13   the position of the Monsanto entity in the UK

14   in regards to Aroclor vapor toxicity; is that

15   right?

16      A.      Yes.

17      Q.      It states, "I have indicated in

18   my summary of the two reports by the

19   Kettering laboratory that prolonged exposure,

20   seven hours a day for 150 days, to

21   Aroclor 1254 vapor at 1.5 milligrams" --

22      A.      Yes.

23      Q.      -- "per cubic meter caused

24   slight, but positive, signs of injury in test

Robert G. Kaley, II, Ph.D.

1    animals, and that similar experiments with

2    Aroclor 1242 gave negative results at

3    1.9 milligram per cubic meter."

4              Do you see that?

5      A.      I do.

6      Q.      And that was their

7    understanding at that time of the results of

8    the Kettering laboratory studies?

9      A.      It's his understanding, yes.

10     Q.      "His" being DVN Hardy?

11     A.      Right.  Correct.

12     Q.      It says, "During the near

13   future, at any rate" -- this is the third

14   paragraph -- "our consideration of the

15   suitability of Aroclors for specific

16   applications must be governed by this finding

17   that prolonged exposure to Aroclor vapor at

18   1.5 milligrams per cubic meter can produce

19   damage to the liver and kidneys of test

20   animals.

21              "In translating this finding to

22   human being" -- it should say human beings,

23   but it says "to human being it is the

24   recognized practice to employ a safety factor

Robert G. Kaley, II, Ph.D.

1    of ten.  In other words, when the maximum

2    safe concentrations for test animals has been

3    located, the corresponding value for the

4    human being is taken as one-tenth of it.

5                    "With 1254, we now know that

6    1.5 milligrams per cubic meter is above the

7    maximum permissible concentration for test

8    animals; so that the maximum for human beings

9    must be placed below .15 milligrams per cubic

10   meter and must be regarded as applying to all

11   Aroclors on account of their similar chemical

12   constitution."

13                   Do you see that reference?

14        A.      I see it.

15        Q.      And at this point in August

16   of 1955, at the Monsanto entity in London,

17   they were discussing that the toxicity tests

18   of Aroclors needed to be taken into

19   consideration when making specific

20   applications -- specific recommendations with

21   respect to how PCB-containing Aroclors --

22   PCB-containing plasticizers should be

23   utilized.

24                   Is that fair to say?

Robert G. Kaley, II, Ph.D.

1        A.      I believe that's fair, yes.

2        Q.      And it says, second paragraph

3   on the second page, "Our own analytical work,

4   with a room painted with Aroclor 1248,

5   plasticized Lustrex latex paint, affords

6   evidence that Aroclor concentrations of the

7   order of .5 milligrams per cubic meter can

8   prevail for a month."

9                Do you see that reference?

10       A.      I see it.

11       Q.      And "our own," would that be

12  presumably Monsanto entity in the UK?

13       A.      I believe that's correct, yes.

14       Q.      So we have yet another study

15  done on what would happen if PCB-containing

16  paints were utilized inside a room, would you

17  agree with me?

18       A.      Inside this particular test

19  room, yes.

20       Q.      Have you ever seen any other

21  documentation of that study?

22       A.      No, I have not.

23       Q.      In any event, we know that

24  vapors of .5 milligrams per cubic meter in

Robert G. Kaley, II, Ph.D.

1  that test prevailed for over a month; is that

2  right?

3       A.    That's what the document says.

4       Q.    And the paint presumably would

5  have dried -- I'm not a chemist.  I'm asking

6  you.  It's not a -- it's not a snarky

7  question.

8            Wouldn't the paint have been

9  dry by then?

10      A.    I would say it would have been

11 mostly dry.  I don't know, you know -- with

12 this particular paint, whether the room was

13 totally enclosed, it doesn't -- I don't

14 remember that it says whether it was

15 ventilated or not.  Obviously if it's

16 ventilated, it's going to dry a lot faster,

17 but obviously latex paints tend to dry

18 relatively quickly, so I'm sure it was pretty

19 dry.

20      Q.    Isn't this evidence, in August

21 of 1955, that PCBs can volatilize out of

22 products incorporating PCB-containing

23 plasticizers when used indoors long after

24 it's dry?

Robert G. Kaley, II, Ph.D.

1           MR. GOUTMAN:  Objection.  No

2      foundation.

3           You may answer.

4           THE WITNESS:  No.  We just

5      talked about whether it was dry or

6      not, and obviously part of the

7      consideration is ventilation.

8           So if it were a closed room,

9      and I don't know whether it was or

10     not, the PCBs that were in that room

11     are going continue to circulate.

12          So I can't draw that conclusion

13     from what I'm reading as we go along

14     here.

15 QUESTIONS BY MS. EVANGELISTI:

16     Q.     If you go on to the third full

17 paragraph, the fourth of the paragraphs, it

18 says, "However, we now have to reckon with a

19 fairly long exposure to concentrations above

20 the new maximum, and hence, the hazard must

21 be rated much greater.  There is yet a

22 further consideration that is always taken

23 into account by health authorities, and this

24 relates to the idosyncratcy -- idiosyncrasy

Robert G. Kaley, II, Ph.D.

1    factor.  So far, we have considered the

2    average human being, but there will always be

3    a minor proportion more susceptible than the

4    rest."

5                Do you see that reference?

6        A.    Yes.

7        Q.    And would you agree that

8    children would fall into the category of a

9    proportion of humans more susceptible than

10   the average?

11               MR. GOUTMAN:  Objection.

12          Overly broad.  Calls for speculation.

13          No specification as to susceptible to

14          what, at what concentrations, under

15          what conditions and so forth.

16               You can answer it, unless you

17          think it is too speculative to answer.

18               THE WITNESS:  I don't know that

19          I would totally agree with that.

20               Certainly there are lots of

21          documents out there that suggest

22          children are more sensitive to some

23          things than others, but for this

24          particular case, I don't know.

Robert G. Kaley, II, Ph.D.

```
 1   QUESTIONS BY MS. EVANGELISTI:

 2        Q.     In any event, the folks in

 3   Monsanto UK were taking -- were recognizing

 4   internally that you have to take into

 5   consideration the minor proportion of humans

 6   that are more susceptible than the rest when

 7   making recommendations in terms of what

 8   products the PCB-containing plasticizers

 9   should be utilized in, correct?

10             MR. GOUTMAN:  Objection.

11        Speculation.

12             I want that question read back

13        because I didn't follow it.  It's

14        probably my fault, but if you just

15        read it back.

16             (Court Reporter read back

17        question.)

18             MS. EVANGELISTI:  Utilized in.

19             MR. GOUTMAN:  Objection.  Calls

20        for speculation.

21             You may answer, if you can.

22             THE WITNESS:  Well, I would say

23        that they're recognized in that the UK

24        health authorities take that position.
```

Robert G. Kaley, II, Ph.D.

1          I don't know that they're necessarily

2          buying into that position.

3    QUESTIONS BY MS. EVANGELISTI:

4          Q.     It goes on to say, "If the

5    argument I have presented above is accepted,

6    then we must now line up with MCC in

7    withdrawing our recommendation that Aroclors

8    be used as plasticizers in Lustrex latex

9    paints."

10               Do you see that reference?

11         A.     Yes, I do.

12         Q.     So he's saying Monsanto UK has

13   to line up with what Monsanto in the US is

14   doing in terms of withdrawing a

15   recommendation that Aroclors be used in latex

16   paints, correct?

17         A.     That's correct.

18         Q.     Then it says, "As regards the

19   use of Aroclors in PBA paints, we have so far

20   made no -- made no measurements of Aroclor

21   concentrations in painted rooms, but I see no

22   reason for believing that materially reduced

23   concentrations would be found."

24               Do you see that reference?

Robert G. Kaley, II, Ph.D.

1        A.      I do.

2        Q.      Do you know what "PBA paints"

3    refers to?

4        A.      No, I'm sorry, I don't.  I

5    should, but I don't.

6        Q.      "We have still to examine the

7    position of Aroclors in ordinary paints.

8    Here I've argued that the rate of

9    volatilization will be greatly reduced and

10   probably governed by the rate of migration

11   within the dry paint.  It now seems possible

12   that a hazardous concentration could be

13   contained in a room in which a large area is

14   painted with Aroclor-containing paint.

15   Certainly we must say that these paints must

16   not be used on hot surfaces such as radiators

17   and hot water pipes."

18            Do you see that reference?

19       A.      I do.

20       Q.      So DVN Hardy is stating in this

21   letter that Monsanto in the UK should look at

22   the possibility that Aroclors in ordinary

23   paint might be a hazard as well; is that

24   correct?

Robert G. Kaley, II, Ph.D.

```
 1              MR. GOUTMAN:  Objection.  The
 2         document speaks for itself.
 3              THE WITNESS:  Well, it says
 4         they haven't done it.  I'm not sure
 5         it's saying that they should do it.
 6    QUESTIONS BY MS. EVANGELISTI:
 7         Q.    It says, "We have to still
 8    examine the position of Aroclors in ordinary
 9    paints"?
10         A.    Right, that's what it says.
11         Q.    "It now seems possible that a
12    hazardous concentration could be attained."
13              MR. GOUTMAN:  Objection.
14         Objection.  Document speaks for
15         itself.
16              THE WITNESS:  Yeah, I mean,
17         that's what the document says.
18              But he's argued that that may
19         not be the case.  So, yeah, you don't
20         know unless you do the experiments.
21              It comes down to what I said
22         earlier, the rate of the evaporation,
23         if any, is going to depend on the
24         matrix.
```

Robert G. Kaley, II, Ph.D.

1    QUESTIONS BY MS. EVANGELISTI:

2         Q.    Do you know if Monsanto in the

3    UK did the test on ordinary paints?

4         A.    I don't know.  I've not -- as I

5    recall, I've not seen any documents

6    suggesting they did.

7                (Kaley Exhibit 23 marked for

8         identification.)

9    QUESTIONS BY MS. EVANGELISTI:

10        Q.    Handing you Exhibit 23.

11               Have you seen this document

12   before?

13               MR. GOUTMAN:  Take your time

14        and look at it.

15               THE WITNESS:  I have seen it.

16   QUESTIONS BY MS. EVANGELISTI:

17        Q.    Do you want more time to look

18   at it or --

19        A.    I'm relatively familiar with

20   it.  Depending on what your question is, I

21   might.

22               Go ahead.

23        Q.    Sorry, I'm thinking.  After

24   three o'clock, my brain gets really mushy.

Robert G. Kaley, II, Ph.D.

```
 1        A.     Mine, too.  We're even.

 2             MR. GOUTMAN:  Doctor, if you

 3        are too tired to proceed, I'm sure

 4        you're going to tell us, right?

 5             THE WITNESS:  No, I'm fine.

 6        Yeah, I'm just going to be more

 7        careful.

 8             MS. EVANGELISTI:  We'll just be

 9        slower.  At least I will.

10   QUESTIONS BY MS. EVANGELISTI:

11        Q.     Okay.  This is a follow-up

12   letter from DVN Hardy to Dr. Barrett,

13   follow-up to the letter that we were just

14   talking about dated August 19, 1955, marked

15   as Exhibit 22 to your deposition; is that

16   correct?

17        A.     That's correct.

18        Q.     And apparently Dr. Newman, who

19   presumably is a health -- medical person at

20   Monsanto UK?

21        A.     Yes, I believe we agree with

22   it.

23        Q.     -- had discussed with

24   Dr. Kelly, from the medical department at
```

Robert G. Kaley, II, Ph.D.

1  Monsanto in the US, the significance of the

2  Kettering results in relation to Monsanto

3  thought and policy; is that right?

4       A.     Correct.

5       Q.     I'm trying to summarize, make

6  sure I understand it.

7              Is it -- is this document

8  indicating that previously Monsanto had

9  thought and had represented in its product

10  bulletins that toxicity decreased with the

11  degree of chlorination?

12             MR. GOUTMAN:  Objection.

13        Document speaks for itself.

14             THE WITNESS:  Apparently there

15        was some -- I mean, they're quoting a

16        statement on page 2 that says,

17        "Experimental work on animals

18        indicates that it's lower," but I

19        don't -- I don't think there's a

20        general understanding of that.

21             There was, in the early days,

22        an understanding that the more highly

23        chlorinated were more toxic.  I think

24        it depends on the test and what

Robert G. Kaley, II, Ph.D.

```
 1              toxicity they're looking at and the

 2              concentrations and a whole bunch of

 3              things.

 4                   I don't -- as I sit here today,

 5              as myself, and as a representative of

 6              Monsanto, I don't think there's any

 7              generation that could be made on

 8              toxicity the PCBs based on chlorinated

 9              levels.  It's higher for some -- for

10              lower chlorinated, and there's more

11              toxicity for some for higher

12              chlorinated.

13                   So this document says what it

14              says, but I'm not sure that it really

15              represents the true state of affairs.

16                   Did that make any sense?

17         QUESTIONS BY MS. EVANGELISTI:

18              Q.    Yes.

19                   So regardless of the status of

20         what the studies said and everybody's

21         understanding of it, this document on page 2,

22         the third paragraph states, "We have tended

23         to draw distinction between the use of

24         Aroclors in latex paints on the one hand and
```

Robert G. Kaley, II, Ph.D.

1    in conventional paints on the other.  The

2    consensus of opinion being that the rate of

3    volatilization from the former is greater

4    than from the latter, and as a result, we are

5    no longer recommending Aroclors for latex

6    paints.

7                    "The decision now before us is

8    to -- is whether we should continue to sell

9    Aroclors for use in conventional paints."

10                   Do you see that --

11        A.    I do.

12        Q.    -- reference?

13                   And then it says, "On this

14   issue, a recent decision by ICI to

15   discontinue their usage of Aroclors in

16   ordinary paints is considered to be an

17   indication of the line that may well be taken

18   by our other customers."

19                   Do you see that reference?

20        A.    Yes.

21        Q.    Do you know what he's referring

22   to when he makes reference to the recent

23   decision in that time of -- in 1955 of "ICI

24   to discontinue their usage of Aroclors in

Robert G. Kaley, II, Ph.D.

```
1    ordinary paints"?

2         A.    Other than what it says, not

3    really, no.

4         Q.    So you don't -- in your

5    preparing for this deposition or others, in

6    your knowledge of Monsanto, you don't have

7    any other information about what occurred

8    there other than what's stated in this

9    document?

10        A.    Not that I recall, no.

11        Q.    It states, "There must clearly

12   be circumstances under which the use of

13   Aroclor-containing paints will constitute a

14   health hazard, particularly to individuals

15   who for one reason or another are

16   constitutionally less resistant than the

17   norm."

18             Do you see that reference?

19        A.    Yes.

20        Q.    And this statement in that

21   document written by DVN Hardy was copied to a

22   number of individuals as reflected on the

23   first page; is that correct?

24        A.    Yes, definitely.
```

Robert G. Kaley, II, Ph.D.

1          Q.     If you look at the next page,

2    so it ends in 190.

3          A.     Yes.

4          Q.     Actually, going back to the --

5          A.     Yeah, I was --

6          Q.     -- paper before that.

7          A.     Right.

8          Q.     It indicates that "the ICI

9    decision must have been influenced quite

10   materially by a copy from Dr. -- of a letter

11   from Dr. Kelly to Dr. Roy Witterschein dated

12   July 15, 1955."

13              Do you see that reference?

14         A.     I do, yes.

15              MR. GOUTMAN:  I think it's

16         Mister.

17              MS. EVANGELISTI:  I don't even

18         know --

19              THE WITNESS:  Mr. Roy.  You

20         said Doctor.  It's Mister.

21   QUESTIONS BY MS. EVANGELISTI:

22         Q.     Mr. Roy Witterschein of

23   July 15, 1955.

24              Do you see that?

Robert G. Kaley, II, Ph.D.

```
 1          A.     Yes.

 2          Q.     So we've been unable to obtain

 3    a copy of that actual letter.

 4                 But is it fair to assume that

 5    the quotations on the next page come from a

 6    letter written by Dr. Kelly, the medical

 7    director at Monsanto?

 8                 MR. GOUTMAN:  Objection.  Calls

 9          for an assumption and speculation.

10                 Answer, if you can.

11                 THE WITNESS:  I believe that's

12          a reasonable inference.

13    QUESTIONS BY MS. EVANGELISTI:

14          Q.     So Dr. Kelly's statements are

15    the first two paragraphs of that letter; is

16    that right?

17          A.     That's how I would read this

18    letter, yes.

19          Q.     And then ICI in -- made the

20    conclusions at the bottom of that page; is

21    that correct?

22                 So those aren't Dr. Kelly's

23    statements; those are ICI's statements?

24          A.     I believe that's a fair
```

Robert G. Kaley, II, Ph.D.

1    reading.

2         Q.    So ICI had apparently written a

3    letter that states, at letter B, "Apart from

4    questions of spraying, there appear to be

5    cases where Aroclor-containing paints would

6    involve toxic hazards either during

7    application or subsequently and where

8    cautionary advice would be appropriate.  The

9    need for special precautions would limit the

10   use of Aroclor paints in these cases."

11              Do you see that reference?

12        A.    I do.

13        Q.    And then the ICI letter

14   apparently went on to say, "As far as the

15   paints in question are concerned, it is

16   impossible to know how any particular -- how

17   any particular can may be eventually used; so

18   every can would need to show the warnings and

19   precautions for all foreseeable

20   eventualities.  The presence of these

21   warnings would tend to deter people from

22   using the paints, even in cases where no

23   special precautions were needed."

24              Do you see that reference?

Robert G. Kaley, II, Ph.D.

1           A.      Yes.

2           Q.      And that information or those

3    opinions of ICI were relayed to Monsanto in

4    this time frame; is that correct?

5           A.      Well, they must have been if

6    Monsanto obviously knew about them, so...

7           Q.      And Hardy is relaying those

8    opinions of ICI to other individuals at

9    Monsanto?

10          A.      Correct.

11                  VIDEOGRAPHER:  Two minutes

12          remaining on the disc.

13   QUESTIONS BY MS. EVANGELISTI:

14          Q.      And DVN Hardy is recommending,

15   on the last page, that Monsanto UK

16   discontinue the sale of Aroclors for use in

17   the manufacture of all other paints; is that

18   correct?

19          A.      Other than what is recommended

20   1 or 2, yes.

21                  MS. EVANGELISTI:  Very good.

22          Okay.  Thank you.

23                  VIDEOGRAPHER:  It's 3:25.

24          We're going off the record.

# EXHIBIT 7

Robert G. Kaley, II, Ph.D.

```
 1          UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2

    TOWN OF WESTPORT and    )
 3  WESTPORT COMMUNITY      )
    SCHOOLS,                )
 4                          )
            Plaintiffs,     )
 5                          )
    v.                      )  Civil Action No.
 6                          )  1:14-cv-12041
    MONSANTO COMPANY,       )
 7  SOLUTIA INC., and       )
    PHARMACIA               )
 8  CORPORATION,            )
                            )
 9          Defendants.     )
10          WEDNESDAY, APRIL 6, 2016
                     - - -
11
12          Videotaped deposition of Robert G.
13  Kaley, II, Ph.D., Volume II, held at the offices
14  of HUSCH BLACKWELL, L.L.C., 190 Carondelet
15  Plaza, Suite 600, St. Louis, Missouri,
16  commencing at 9:00 a.m., on the above date,
17  before Carrie A. Campbell, Registered Merit
18  Reporter, Certified Realtime Reporter,
19  Illinois, California & Texas Certified
20  Shorthand Reporter, and Missouri Certified
21  Court Reporter.
22                   - - -
            GOLKOW TECHNOLOGIES, INC.
23      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24
```

Robert G. Kaley, II, Ph.D.

```
 1              VIDEOGRAPHER:  All right.
 2         We're now on the record.  Today's date
 3         is April 6, 2016, and this is the
 4         continuation of Robert Kaley's
 5         deposition.
 6              You may proceed.
 7          DIRECT EXAMINATION (continued)
 8    QUESTIONS BY MS. EVANGELISTI:
 9         Q.    Dr. Kaley, good morning.
10         A.    Good morning.
11         Q.    You understand you're still
12    under oath?
13         A.    I do.
14              VIDEOGRAPHER:  And the time is
15         nine o'clock.
16    QUESTIONS BY MS. EVANGELISTI:
17         Q.    Before I move on to the next
18    subject, I'd like to do a little bit of
19    follow-up from yesterday.
20              In the 1952 through the 1955
21    time frame, Monsanto did at least three
22    research projects focused on determining the
23    ability of PCB congeners to come out of paint
24    in which PCB-containing plasticizers were
```

Robert G. Kaley, II, Ph.D.

1    used; is that correct?

2         A.    Well, I would agree that they

3    did PCBs.  I don't think they were looking at

4    specific congeners.  Obviously there were

5    congeners coming out, so maybe we're

6    quibbling where we shouldn't be.

7              And I would say that some of

8    those experiments were done in Great Britain

9    and not in the United States, but other that,

10   I would agree with that.

11        Q.    And Monsanto US learned about

12   the studies that were done in Britain around

13   that same time frame?

14        A.    Yes, they did.  Yeah, sure.

15        Q.    In one of those studies, the

16   PCB congeners were still being detected in a

17   room painted with PCB-containing paint one

18   month after the painting was done; is that

19   correct?

20              MR. GOUTMAN:  Objection to the

21        use of the word "congener" since it

22        wasn't a congener-specific analysis,

23        but you may answer.

24              THE WITNESS:  Yes.  The

Robert G. Kaley, II, Ph.D.

1            document states that.  It doesn't

2            state the conditions in that room, but

3            it does state that they were still

4            detectable.

5    QUESTIONS BY MS. EVANGELISTI:

6            Q.    And as a result of those

7    studies, Monsanto recommended against using

8    PCB-containing plasticizers in paint indoors;

9    is that correct?

10           A.    Well, again, Monsanto Chemical

11   Company, the US, had already made that

12   determination before most of those studies

13   were reported from Great Britain, but as a

14   result of those studies, I believe the UK

15   facility did make that recommendation, yes.

16           Q.    And we also know that Monsanto

17   UK discussed recommending against

18   recommending PCB-containing plasticizers in

19   all paints as a result of those studies?

20   They discussed it at least?

21                 MR. GOUTMAN:  Are you referring

22           to a document?

23                 Objection.  Misstates prior

24           testimony.

Robert G. Kaley, II, Ph.D.

```
 1                THE WITNESS:  Can I go back and
 2         look and see?
 3                MS. EVANGELISTI:  Oh, sure,
 4         absolutely.
 5                THE WITNESS:  I'm sorry.  I
 6         just want to be sure.  Okay.  Could
 7         you repeat your specific question?
 8                (Court Reporter read back
 9         question.)
10                THE WITNESS:  Okay.  If I'm
11         looking at the correct document, which
12         is Exhibit 23, there were three
13         recommendations, and one was to
14         continue to sell Aroclors for the use
15         in manufactured paints based on
16         chlorinated rubber, continue to sell
17         Aroclors for production of paints
18         intended for exterior application, and
19         discontinue sale of Aroclors for use
20         in the manufacture of all other
21         paints.
22                So not all paints, but other
23         than those two.
24
```

Robert G. Kaley, II, Ph.D.

1            to give their customers a chance to

2            find substitutes.  They would have

3            shut down those customers' businesses

4            had they just done it without warning

5            and giving them some time.

6     QUESTIONS BY MS. EVANGELISTI:

7            Q.    And there were alternative

8     plasticizers available in that time frame

9     even earlier than 1970.

10           In 1968, was there alternative

11    plasticizers available that could have been

12    utilized by Monsanto's customers in their --

13    to meet their plasticizer needs?

14           MR. GOUTMAN:  Objection.

15    Overly broad as to all plasticizers.

16    All plastics.

17           Go ahead.  You can answer.

18           THE WITNESS:  Well, there were

19           other plasticizers available, but

20           these manufacturers had chosen PCBs

21           for a particular reason for their

22           particular product.

23           So was there a one-for-one for

24           each application for PCB plasticizers?

Robert G. Raley, II, Ph.D.

1           I don't know.  I doubt it.

2      QUESTIONS BY MS. EVANGELISTI:

3           Q.    Moving back to Exhibit 56.

4      This is a --

5                 MS. EVANGELISTI:  I'm going to

6           to ask counsel, were you able to find

7           the Bates numbers of the documents?

8                 MR. GOUTMAN:  Which documents?

9                 MS. EVANGELISTI:  Oh, the

10          handwritten one from Cumming Paton,

11          the handwritten documents from the PCB

12          meeting of August 25th, and the letter

13          discussing the presentation to field

14          sales.  I gave you the Bates numbers

15          earlier.

16                MR. CAMPBELL:  Are they still

17          looking?

18                MS. SAVINELLI:  We're looking.

19                MS. EVANGELISTI:  So you're

20          unable to find them at this point in

21          the production?

22                MR. GOUTMAN:  I'm still

23          looking.  I'm not saying we're unable

24          to find them.  We're still looking.

Robert G. Kaley, II, Ph.D.

1          objected to every single one of my

2          questions?

3                    MS. EVANGELISTI:  Because

4          they're all objectionable.

5                    MR. GOUTMAN:  And she will

6          continue to do so even though I've

7          given her a stipulation that she will

8          have -- she has every objection as to

9          form for this deposition.

10   QUESTIONS BY MR. GOUTMAN:

11          Q.    Now, sir, with respect to PCBs,

12   those, in your view, reliable sources of

13   estimates of PCBs around the world, what is

14   the percentage of PCBs that were manufactured

15   abroad versus domestically?

16                    MS. EVANGELISTI:  Objection.

17          Lacks foundation.  Compound.

18                    THE WITNESS:  Approximately

19          60 percent.

20   QUESTIONS BY MR. GOUTMAN:

21          Q.    Were manufactured abroad?

22          A.    Yes.

23          Q.    With respect to Monsanto's

24   production of PCBs, what percentage of PCB

Robert G. Kaley, II, Ph.D.

1    production by Monsanto related to PCBs used

2    as plasticizers?

3         A.     I believe it's about 7 percent.

4         Q.     And what were the other

5    applications for which PCBs were used?

6         A.     Well, by far the largest

7    application was for electrical equipment.  I

8    believe around 77 percent or so.  They were

9    also used as hydraulic fluids or in hydraulic

10   fluids and heat transfer fluids.

11        Q.     With respect those

12   applications, what, if anything, was there

13   about PCBs that made producers of electrical

14   equipment put PCBs in them?

15             MS. EVANGELISTI:  Objection.

16        Lacks foundation.  Calls for

17        speculation.

18             THE WITNESS:  Primarily they

19        were -- I mean, the biggest reason for

20        their use in electrical equipment was

21        their fire resistance.  Their

22        nonflammability.  But they were also

23        very good electrical fluids.  They

24        have high dielectric constants.

Robert G. Kaley, II, Ph.D.

1    QUESTIONS BY MR. GOUTMAN:

2         Q.    To this day, has anyone ever

3    discovered a nonflammable dielectric fluid

4    like PCBs?

5              MS. EVANGELISTI:  Objection.

6         Calls for speculation.  Lacks

7         foundation.  And calls for

8         speculation.

9              THE WITNESS:  No, they have

10        not.

11   QUESTIONS BY MR. GOUTMAN:

12        Q.    Now, were nonflammable

13   dielectric fluids required by building codes

14   and fire safety codes and electrical codes

15   around the country?

16             MS. EVANGELISTI:  Objection.

17        Calls for expert testimony.  Lacks

18        foundation.  Calls for speculation.

19        Calls for legal conclusion.

20             THE WITNESS:  Yes, they were.

21   QUESTIONS BY MR. GOUTMAN:

22        Q.    Who owned the patent for

23   dielectric uses of PCBs in the 1930s, or who

24   took out of the original patent?

Robert G. Kaley, II, Ph.D.

```
 1              MS. EVANGELISTI:  Objection.

 2      Argumentative.

 3  QUESTIONS BY MR. GOUTMAN:

 4      Q.      The question -- go ahead.

 5              Do you understand the question?

 6      A.      Yes.

 7              Those specifications were

 8  determined by the electrical equipment

 9  manufacturers.

10      Q.      Now, with respect to PCBs used

11  for plasticizers, could you tell us what

12  physical properties were present in

13  plasticizers -- excuse me, in PCBs that would

14  warrant their use in plasticizers?

15      A.      Well, in many cases --

16      Q.      As plasticizers?

17      A.      In many cases, they were

18  nonflammable.  That was one of the

19  application -- or one of the reasons that

20  someone would use them.

21              They also had good flowability

22  characteristics, good adhesion

23  characteristics.  They were, for all

24  practical purposes, nonvolatile, and they
```

Robert G. Kaley, II, Ph.D.

1  stuck around.  They were in the product and

2  stayed in the product for years.

3      Q.    What happens to a

4  plasticizer -- what happens to the plastic,

5  the matrix, if the plasticizer volatilizes?

6              MS. EVANGELISTI:  Objection.

7      Lacks foundation.  Calls for expert

8      testimony.

9              THE WITNESS:  It cracks and

10     dries up.

11  QUESTIONS BY MR. GOUTMAN:

12     Q.    Would -- based upon your review

13  of documents and literature, who were

14  Monsanto's customers generically for PCBs

15  used in plasticizer applications?

16     A.    Well, they were -- generically

17  they were large chemical companies or

18  manufacturer entities.

19     Q.    And did those entities, did

20  they have their own teams of scientists and

21  engineers?

22             MS. EVANGELISTI:  Objection.

23     Lack of foundation.  Calls for

24     speculation.

Robert G. Kaley, II, Ph.D.

1              THE WITNESS:  Yes, they did.  I

2         think some of the documents we've

3         examined talk about your research

4         department needs to investigate these

5         other applications -- or other these

6         other possibilities.  So clearly they

7         have research departments.

8    QUESTIONS BY MR. GOUTMAN:

9         Q.     And how is it that their

10   research departments would go about choosing

11   a plasticizer, a particular plasticizer, as

12   one of the many ingredients that might go

13   into a plastic product, be it adhesive caulk,

14   paint, and so forth?

15              MS. EVANGELISTI:  Lacks

16         foundation.  Calls for speculation.

17         Compound.

18              THE WITNESS:  Well, they would

19         need -- I mean, they would -- they

20         would know what their target audience

21         was and what their target product was,

22         and they would have a suite of options

23         to choose from and would make those

24         choices based on the specific

Robert G. Kaley, II, Ph.D.

1        application.

2   QUESTIONS BY MR. GOUTMAN:

3        Q.    Did Monsanto provide those --

4   would you call them sophisticated

5   manufacturers of products?

6              MS. EVANGELISTI:  Objection.

7        Leading.

8              THE WITNESS:  Yes, I believe

9        they were.  They had their own

10       research departments.

11  QUESTIONS BY MR. GOUTMAN:

12       Q.    Well, how would you

13  characterize them, those companies, that made

14  paint, plastics and caulk and the like?

15             MS. EVANGELISTI:  Objection.

16       Compound and vague.

17             THE WITNESS:  Well, they knew

18       their business, and they knew what

19       properties they needed for their

20       various components, including

21       plasticizers.  So surely they were,

22       you know, advanced, sophisticated as

23       they needed to be for their product

24       line.

Robert G. Kaley, II, Ph.D.

 1              MS. EVANGELISTI:  Objection.

 2        Nonresponsive.  Move to strike.

 3   QUESTIONS BY MR. GOUTMAN:

 4        Q.    Are -- this is unreal.

 5              Are -- were PCB -- excuse me,

 6   did Monsanto ever manufacture the finished

 7   products, that is to say the adhesive, the

 8   paint, the caulk, that would contain PCBs?

 9              MS. EVANGELISTI:  Objection.

10        Compound.

11              THE WITNESS:  No, they did not.

12   QUESTIONS BY MR. GOUTMAN:

13        Q.    Did -- how is it that PCBs then

14   got into those products?

15              MS. EVANGELISTI:  Objection.

16        Oh, sorry, withdrawn.

17              MR. GOUTMAN:  No, just keep on

18        objecting.

19              Go ahead.

20              THE WITNESS:  Well, as we

21        were -- as we discussed, the PCBs

22        would get into those products because

23        the formulator, the company making the

24        particular product, would choose PCBs

Robert G. Kaley, II, Ph.D.

1        as -- among other options, and either

2        order them from Monsanto or from a

3        distributor.

4    QUESTIONS BY MR. GOUTMAN:

5        Q.    Now, with respect to their

6    volatility or lack of volatility, as you

7    said, what is it about PCBs that would make

8    PCBs attractive to a formulator?

9              MS. EVANGELISTI:  Objection.

10        Calls for speculation.  Lacks

11        foundation.  Calls for expert

12        testimony.

13              THE WITNESS:  They -- I think

14        it goes back to the -- once they're

15        integrated into the plastic

16        formulation, they stay in there for

17        all practical purposes.  They're

18        really kind of locked into a matrix

19        and do not evaporate.

20    QUESTIONS BY MR. GOUTMAN:

21        Q.    Now, going forward in time, was

22    that Monsanto's understanding as to the fate,

23    if you will, of PCBs once they were put into

24    a plastic matrix?

Robert G. Kaley, II, Ph.D.

1   how low PCB volatility is?

2                   MS. EVANGELISTI:  Vague.

3                   THE WITNESS:  Well -- sorry.

4                   MS. EVANGELISTI:  It's also

5          leading.

6                   Sorry, go ahead.

7                   THE WITNESS:  Well, the example

8          I like to use is if you had a dish of

9          water on a table, let it sit to the

10         open atmosphere for several days, when

11         you came back, it would be gone.  It

12         would have evaporated.  But if you

13         put, for instance, the same amount of

14         Aroclor 1254 in that dish and came

15         back months or even years later, you

16         wouldn't be able to tell that the

17         volume had changed.

18  QUESTIONS BY MR. GOUTMAN:

19      Q.    And what if you had put that

20  pure PCBs in the matrix of a plastic, how

21  would that affect its volatility?

22                  MS. EVANGELISTI:  Incomplete

23         hypothetical and calls for expert

24         testimony.  Lacks foundation.

Robert G. Kaley, II, Ph.D.

```
 1              THE WITNESS:  It would even

 2         have less volatility because of its

 3         interaction with the plastic matrix.

 4    QUESTIONS BY MR. GOUTMAN:

 5         Q.    In Exhibit 6 that you were

 6    asked about, you were shown a chart at

 7    Bates 5604, approximate vapor pressures

 8    calculated, 100 Fahrenheit for various

 9    Aroclor mixtures; is that right?

10         A.    Yes, I was.

11         Q.    Following up on my earlier

12    question, what would be the effect -- and is

13    that for pure Aroclors or Aroclors

14    incorporated into a plastic matrix?

15         A.    Oh, no, that's pure Aroclors.

16         Q.    What effect would that -- would

17    incorporating PCBs in a plastic matrix such

18    as caulk have on that?

19              MS. EVANGELISTI:  Calls for

20         expert testimony.  Lacks foundation.

21         Incomplete hypothetical.

22              THE WITNESS:  It would

23         significantly reduce those vapor

24         pressures.
```

Robert G. Kaley, II, Ph.D.

1    Q.    What did -- by the way, up --

2    did Dr. Jensen or anyone else discover --

3    which Aroclors were discovered by Dr. Jensen

4    and others up to, say, 1970?

5    A.    The ones that were being

6    reported were Aroclor 1254 and Aroclor 1260.

7    Q.    Okay.  So the executive

8    committee of -- or whatever the corporate

9    management committee was called, what did

10   they decide in late 1960 -- excuse me, 1969

11   after they had received the ad hoc

12   committee's report?

13   A.    They decided they should quit

14   making those two Aroclors.

15   Q.    Now, in January of 1970, could

16   you tell us whether Monsanto met with

17   representatives of General Electric?

18         MS. EVANGELISTI:  Leading and

19     irrelevant.

20         THE WITNESS:  Yes, they did.

21   QUESTIONS BY MR. GOUTMAN:

22   Q.    And what, if anything, was

23   Monsanto advised about Monsanto's decision to

24   get out of the PCB market for the Aroclors

Robert G. Kaley, II, Ph.D.

1    that had been detected in the environment?

2         A.    General Electric told them that

3    they couldn't do that, that it would lead to

4    a complete shutdown of the American

5    electrical system grid.

6         Q.    Two years after that, was there

7    something called the Interdepartmental Task

8    Force?

9         A.    Yes, it was an agency put

10   together by the federal government -- or not

11   an agency, but a task force.

12        Q.    And how many departments of the

13   federal government were represented?

14        A.    Seven or so, I believe.  Give

15   or take one or two.

16        Q.    And what, if any, conclusions

17   did they reach concerning PCBs?

18             MS. EVANGELISTI:  Objection.

19        Beyond the scope because it goes

20        beyond just plasticizer use.

21   QUESTIONS BY MR. GOUTMAN:

22        Q.    Go ahead.

23        A.    That they said that PCBs for

24   electrical equipment had to keep being

Robert G. Kaley, II, Ph.D.

1    frame, at least.

2          Q.     Were PCBs continued to be

3    manufactured and sold throughout the world

4    after Monsanto got out of the market?

5          A.     Long after.

6          Q.     With respect to Monsanto's --

7    when did Monsanto announce that it was

8    finally getting out of the electrical use PCB

9    market, the only market it still had?

10              MS. EVANGELISTI:  Objection.

11         Beyond the scope because it doesn't

12         deal with plasticizers.

13   QUESTIONS BY MR. GOUTMAN:

14         Q.     Go ahead.

15         A.     I believe the formal

16   announcement was in January of '76.

17         Q.     And what, if any,

18   communications had it received from the

19   producers of electrical equipment as to

20   whether any substitutes had been found?

21              MS. EVANGELISTI:  Objection.

22         Beyond the scope because it doesn't

23         deal with plasticizers.

24              THE WITNESS:  They were -- they

Robert G. Kaley, II, Ph.D.

1          had told Monsanto that they had what

2          they thought were acceptable

3          substitutes.

4     QUESTIONS BY MR. GOUTMAN:

5          Q.     At the time Monsanto got out of

6     the PCB market, was it legal to manufacture

7     and sell PCBs in the United States?

8                MS. EVANGELISTI:  Objection.

9          Calls for a legal conclusion.  Lacks

10         foundation.

11               THE WITNESS:  Yes, it was.

12    QUESTIONS BY MR. GOUTMAN:

13         Q.     Are you -- with respect to

14    Exhibit 50, which is the presentation to

15    field sales document, are you familiar with

16    any testimony from Cumming Paton as to

17    whether that document was ever actually used

18    in the sales force?

19               MS. EVANGELISTI:  I am sorry,

20         can you read that question back before

21         you answer?

22               (Court Reporter read back

23         question.)

24               THE WITNESS:  Yes, I've seen --

# EXHIBIT 8

*Polymer Science and Materials Chemistry*



E$^x$ponent®

**Expert Report of
Maureen Reitman, Sc.D.**

**In the matter of the City of
Harford and Hartford Board of
Education v. Monsanto
Company, Solutia Inc, and
Pharmacia Corporation**



**Expert Report of
Maureen Reitman, Sc.D.**

**In the matter of the City of Harford
and Hartford Board of Education
v. Monsanto Company, Solutia Inc,
and Pharmacia Corporation**

Prepared for

Richard L. Campbell
White and Williams
101 Arch Street Suite 1930
Boston, MA 02110

Prepared by

Maureen T.F. Reitman, Sc.D.
Exponent, Inc.
9 Strathmore Rd,
Natick MA 01760

October 30, 2017

© Exponent, Inc.

# Contents

| | | Page |
|---|---|---|
| **List of Figures** | | **iii** |
| **List of Tables** | | **iv** |
| **Limitations** | | **v** |
| **Summary and Opinions** | | **6** |
| **1** | **Scope and Qualifications** | **10** |
| | 1.1 Scope of Work | 10 |
| | 1.2 Qualifications | 10 |
| | 1.2.1 Compensation | 11 |
| | 1.3 Information Considered | 11 |
| **2** | **Background** | **13** |
| | 2.1 Monsanto Company | 13 |
| | 2.2 Aroclors | 15 |
| | 2.2.1 Aroclor Uses | 16 |
| | 2.2.2 Aroclor Technical Information | 18 |
| | 2.3 Plasticizers | 19 |
| | 2.3.1 Historical Sales and Growth of Polymers and Plasticizers | 19 |
| | 2.3.2 Plasticizer Effects | 20 |
| | 2.3.3 Aging Effects | 23 |
| | 2.4 Caulks and Sealants | 25 |
| | 2.4.1 History of Construction Sealants | 27 |
| | 2.4.2 Aging of Caulks and Sealants | 30 |
| **3** | **Inspection** | **33** |
| | 3.1 Clark Elementary School Inspection | 33 |
| | 3.2 Caulks/ Sealants at Clark Elementary School | 34 |
| | 3.3 Other Materials at Clark Elementary School | 37 |
| **4** | **Material Analysis** | **41** |

4.1   Compositional Analysis                                                          41

4.2   Asbestos Content                                                                43

4.3   PCB Content                                                                     43

**5      Response to Opposing Experts                                              47**

5.1   Response to Mr. Klosowski                                                    47

5.1.1 Mr. Klosowski's Report                                                          47

5.1.2 Mr. Klosowski's writing and testimony support Exponent's analysis and
opinions                                                                              51

5.2   Response to Dr. Matson                                                       56

# List of Figures

Page

Figure 1      Chemical structure of a polychlorinated biphenyl                                                16

Figure 2.     Polymer and plasticizer production in the US (all manufacturers and all
              types) between 1960 and 1969.                                                                   20

Figure 3.     Effect of plasticizer concentration on initial mechanical properties of a
              polymercaptan based sealant,DMP-1002 (solid and dashed lines), andthe
              LP-2 polysulfide formulation (red circles) described in Table 2.                                22

Figure 4.     Diffusion coefficient of PCBs [open symbols] and polycyclic aromatic
              hydrocarbons (PAH) [closed symbols] in low density polyethylene (LDPE)
              and polysiloxane as a function polymer molecular weight.  Triangles [▲]
              and squares [■] represent polysiloxane, circles [●] represent LDPE.                             25

Figure 5.     Gray caulking between a brick wall and a window frame, and similar gray
              caulking between the brick wall and a concrete column in Room 102                               35

Figure 6.     Multiple types of sealants found in joints of a counter top installed in room
              100                                                                                             35

Figure 7.     Cracked caulking showing signs of cohesive failure in the Main Office                          36

Figure 8.     Cracked exterior caulking found between brick and an air handling vent on
              the roof of Clark Elementary School                                                            36

Figure 9.     Exterior caulking between brick joints on the roof of Clark Elementary
              School                                                                                          37

Figure 10.    Paint obtained from a hallway column.  Note the multiple colors of yellow
              paint indicating multiple paint coats.                                                         38

Figure 11.    Paint obtained from electrical box from Room 117                                               38

Figure 12.    Paint obtained from the AHU inside Mechanical Room 2                                            39

Figure 13.    Typical fireproofing sample, this example was obtained outside of
              Mechanical Room 2                                                                               39

Figure 14.    Successive sampling of the fireproofing material above ceiling tiles in the
              hallway outside of the gymnasium.  A) prior to sampling, B) entire layer
              sampled, C) top layer sampled, D) bottom layer sampled                                         40

# List of Tables

Page

Table 1.    Empirical formula, molecular weight, and number of homologs for each
            PCB.                                                                16

Table 2.    Effect of Aroclor concentration on physical properties of a polysulfide
            sealant (LP-2 polymer).                                             21

Table 3.    Expected lifetimes of various caulks/sealants.                      32

Table 4.    General classification of building materials collected by Exponent at Clark
            Elementary School                                                   33

Table 5.    Types of building material obtained from Clark Elementary School by
            Exponent.                                                           42

Table 6.    Asbestos containing materials, per EPA method 600/R-93/116, acquired
            from Clark Elementary School.                                       43

Table 7.    Ranges of PCB concentrations measured for non-polysulfide samples
            acquired by Exponent at Clark Elementary School that measured > 50 ppm
            total PCBs.                                                         44

Table 8.    PCB concentrations measured for polysulfide samples acquired by
            Exponent at Clark Elementary School that measured > 50 ppm total
            PCBs.                                                               44

Table 9.    Breakdown of the samples tested for full PCB congener profile       46

# Limitations

Exponent, Inc. ("Exponent") was retained by White and Williams on behalf of Monsanto Company to review documents and testimony, conduct an inspection, perform analysis, and provide opinions related to polychlorinated biphenyls (PCBs) used as plasticizers, including those in caulk or sealant compounds and other building materials, the formulation effects on the release of PCBs from these materials during the working lifetime of the caulk or sealant, and the condition and composition of these materials found at Clark Elementary School in Hartford, Connecticut. This report summarizes work performed to-date and presents the findings resulting from that work. The findings presented herein are made to at least a reasonable degree of scientific certainty. Exponent reserves the right to supplement this report and to expand or modify opinions based on review of additional material as it becomes available through ongoing discovery and/or through any additional work or review of additional work performed by others.

# Summary and Opinions

Clark Elementary School was constructed in 1971. This dispute relates to the materials present in the building and their alleged risk to the health of the building occupants decades after construction.  The building was partially remediated for asbestos in 1979. It was slated for comprehensive renovation in the early 2000s due to aging and the specific condition of various systems, though this was not performed.  Later, around 2015, a variety of tests or pilot evaluations were performed, some of which identified PCBs in the school.  Building condition, maintenance, and standards and regulations related to the school environment will be addressed by other experts.

Exponent was retained to review documents and testimony, conduct an inspection, perform analysis, and provide opinions related to the use of PCBs as plasticizers in building materials such as caulk[1] compounds, Monsanto's role in supplying PCB plasticizers to formulators, the effects of formulation on the release of PCBs from caulk during the working lifetime of caulk, and an assessment of the condition and composition of the caulks and other building materials at Clark Elementary School in light of function and expected lifetime.

Monsanto was a supplier of a wide range of chemical products, including many plasticizers, to the plastics industry.  Aroclor PCBs were one type of plasticizer used in industrial applications because of a unique and desirable combination of properties, including low vapor pressure, low water solubility, chemical and oxidation resistance, thermal stability, adhesion promotion, and flame retardancy.  Monsanto supplied PCBs as a plasticizer until sales were voluntarily discontinued in August, 1970.

A plasticizer is a raw material used as part of various industrial mixtures.  Monsanto provided standard chemical and physical property data and other typical information directed to the chemists and formulators at companies that purchased its plasticizers, including Aroclor PCB plasticizers.  These technical staff members at these companies had specialized knowledge and training related to formulating, and determined the type and amount of Aroclor that, when

---

[1] For the purposes of this report, the term caulk is used interchangeably with the term sealant.

1605740.000 - 7562

combined with their choice of base resin and other components such as fillers, stabilizers, and curing agents, would provide the specific combination of properties for the particular end use of that company's product.  Monsanto's role in the supply chain for caulks and other building materials was as a raw material supplier, and not a formulator or seller of finished products. Monsanto did not determine the formulations or sell the caulks used in Clark Elementary School.

Caulk compositions were determined by formulators, and typically included multiple interacting components, including the base resin, one or more fillers, one or more plasticizers, and other additives.  In some formulations, PCBs were used as a plasticizer because of the combination of compatibility and desirable effect on the performance and durability of the caulk.  The specific composition, including the chemical types and relative amounts of the components, affects physical and chemical properties of the caulk, including durability and lifetime of the caulk. Aging behaviors, such as the rate of release of the plasticizer, depend on the caulk formulation.

Release of PCBs from PCB-containing caulks depends not only on the vapor pressure of the particular Aroclor used, but also on the composition of the original caulk, as well as end use conditions.  PCB congeners volatilize at different rates, with higher chlorinated congeners tending to stay in the condensed phase compared to lower chlorinated congeners, especially at room temperature.  Monsanto, as the supplier of only one component, (i.e., a PCB plasticizer), would not have enough information about overall composition or specific end use conditions to predict the properties of the formulated product, including the potential release of PCB congeners from the product.

Regardless of composition, the lifetime of commercially available caulks is generally accepted to be less than 30 years.  Some of the caulk at CES is likely original, because it contains functional levels of PCBs and PCBS were not available from Monsanto for plasticizer applications after 1970. Any caulk from the original construction of Clark Elementary School, which was completed in 1971, is over 40 years old, and should have been replaced during maintenance activities prior to the 2015 testing. PCBs remaining in the original caulk demonstrates the permanence of the PCB plasticizer in the formulations.

1605740.000 - 7562

Based on the information available, inspection of Clark Elementary School and testing performed to date, Exponent has determined that:

- PCB plasticizers were selected for use in certain caulks because of a unique and desirable combination of properties, including low volatility.

- Monsanto provided appropriately comprehensive relevant information to enable formulators to evaluate PCBs directly and in comparison to other plasticizer in compositions intended for various end uses according to industry standard and other methods reflected in the literature as well as methods proprietary to the formulating company.

- Monsanto was not the formulator of any caulk installed in Clark Elementary School. Monsanto manufactured PCBs that were only one component of some types of caulk and therefore could not reasonably know the composition, properties, or specific end use conditions anticipated for caulks formulated by its customers.

- When Monsanto withdrew PCB plasticizers from the market, there was no one-to-one replacement, such that products made with PCBs had to be discontinued or reformulated to have different properties and characteristics.

- Release of PCBs in caulk installed at Clark Elementary School would depend on caulk formulation as well as end use conditions at the school (e.g., temperature, air circulation, available surface area, etc.) which could not reasonably be defined or controlled by Monsanto.

- To the extent PCBs were released from the caulks, the release would have occurred more rapidly at the time of application and shortly thereafter, and surface depletion over time would further reduce PCB release.  Further, to the extent PCBs were released from the caulks, the lower chlorinated homologs are more likely to be released than the higher chlorinated homologs due to their lower molecular weight.

- Caulk in Clark Elementary School from original construction was past the expected useful life in the early 2000s, even before the school was evaluated for the presence of

PCBs.  Any caulks formulated with PCBs were more than 40 years old at the time of the remediation and should have been replaced regardless of composition.

- Polysulfide sealants were the only type of building material at CES found to contain functional amounts of PCBs.

- Polysulfide sealants were integral to the construction industry in the timeframe leading up to and including the construction of CES because of utility and functionality that would not have been possible without PCB plasticizers.

- Mr. Koslowski's testimony and published writings contradict the opinions he expressed in his report related to technical information expected by formulators, the relative roles of suppliers and formulators, and the information provided by Monsanto related to PCB plasticizers.

- Dr. Matson's opinions regarding formulators' singular reliance on individual component properties contradict reasonable and expected practices of formulators during the time PCBs were marketed as plasticizers to sealants.

1605740.000 - 7562

# 1    Scope and Qualifications

## 1.1   Scope of Work

Exponent, Inc. ("Exponent") was retained by White and Williams on behalf of Monsanto Company to review documents and testimony, conduct an inspection, perform analysis, and provide opinions related to Monsanto PCBs used as plasticizers as they relate to the Clark Elementary School in Hartford, Connecticut.  This report summarizes the results of Exponent's work to date, as well as my qualifications and experience, in relation to the subject matter of the above-referenced investigation.  In the course of my analysis, Exponent has reviewed and relied upon documents, testimony, and examination and testing of physical items.  My findings are based on information presently provided, and as discovery progresses they may be updated if new information becomes available.

## 1.2   Qualifications

I am a Principal Engineer, Corporate Vice President and the Director of the Polymer Science and Materials Chemistry Practice at Exponent, the largest engineering firm in the United States dedicated primarily to the analysis and prevention of failures of an engineering or scientific nature.  Exponent is a publicly traded company that employs over 1000 full-time staff worldwide, including about 800 degreed professionals, more than 500 of whom hold doctorates in their field.

I hold two academic degrees: (1) a Bachelor of Science in Materials Science and Engineering from the Massachusetts Institute of Technology (MIT), and (2) a Doctor of Science in Materials Science and Engineering, with a thesis in the field of polymers, from MIT.  I have been practicing in the field of polymer science and engineering for more than 20 years as a researcher at MIT, in a variety of technical roles at the 3M Company, and as a consultant with Exponent.  I am a licensed Professional Engineer in the state of Maryland and a Fellow of the Society of Plastics Engineers.

I provide consulting engineering services in all aspects of polymer science and engineering including, but not limited to, material selection, product design and development, mechanical and chemical testing, microscopy and non-destructive imaging, failure analysis, polymer chemistry, polymer physics, and polymer processing.  I have experience in evaluation and testing of the physical properties and durability of polymers, in the determination of the formulation and chemistry that control these properties, and in the selection and specification of polymers for different applications.  I have experience formulating and evaluating polymer compositions, testing their properties and assessing chemical compatibility.  I have been directly involved in product development, product line extensions, transfer of new products to manufacturing, qualification of alternative materials and manufacturing equipment, evaluating customer complaints, and performing root cause investigations.  I have lectured on the topics of material selection, plastics failure analysis, and chemically-enhanced failures.  I am an active member of two Underwriters Laboratory Standard Technical Panels, STP 746 (Polymeric Materials) and STP 758 (Appliance Wiring), and the UL task force on Long Term Thermal Aging.

My *curriculum vitae* is provided in Appendix A.  A list of previous testimony is provided in Appendix B.

### 1.2.1     Compensation

Exponent currently charges a rate of $575 per hour for my time.  Additional Exponent staff members with lower billing rates have assisted me in this project.  No portion of our compensation is dependent on the outcome of this matter.

## 1.3   Information Considered

In the course of my analysis, Exponent has reviewed and relied upon documents, testimony, and examination and testing of physical items.  A list of materials considered is provided in Appendix C.

1605740.000 - 7562

Although I have not prepared trial exhibits at this time, I may use any and all of the information described or referenced in this report.  Additionally, I may use existing materials for demonstrative purposes.

1605740.000 - 7562

# 2    Background

Clark Elementary School (CES) of Hartford, Connecticut was constructed in 1971.  In 2015 CES began a pilot scale PCB remediation of one section of the school, which included testing for PCBs within the remediation zone and an attempt to lower airborne PCB levels.  After the pilot scale remediation, the school was closed.

Plaintiffs allege that Monsanto dictated the use of specific plasticizers to their customers, that PCBs as plasticizers rapidly volatize out of sealants in which they were formulated, and that Monsanto failed to appropriately warn formulators of specific properties and hazards of PCBs, causing property damage and presenting an exposure risk to teachers and students in Clark Elementary School.

In the report that follows, I provide an overview of Monsanto's relationship to the formulated products at CES and the alleged exposures by describing Monsanto's PCB plasticizers, Monsanto's role as a component supplier to formulators, how plasticizers are used in caulks and sealants, and factors impacting performance and durability of these materials.  I also provide an overview of Exponent's inspection of CES, information about the materials collected at CES, and a response to plaintiff's allegations related to PCB plasticizers.

## 2.1   Monsanto Company

Since the early 1900's, Monsanto produced a variety of chemicals for industry, a portion of which were used as additives within the plastics industry.  In 1935, Monsanto acquired Swann Chemical Company, a producer of PCBs. PCBs were originally used mainly as a flame retardant dielectric fluid in transformers and capacitors but, as specific uses became needed, a portion of the PCBs were sold to the plastics industry as a plasticizer under the trade name Aroclor.

Monsanto was a major plasticizer producer, offering a wide variety of chemistries and nearly 80 different plasticizers to industrial customers who would combine them with other components to

make a range of products.[2]  A small portion of Monsanto's plasticizer offerings were Aroclors.
These were specialty chemicals representing approximately 1% of the total plasticizer market in
the 1950's and 1960's.[3]  As a supplier of bulk raw materials, Monsanto did not sell Aroclors as
end use products.  Instead, they were sold as additives for property modification of plastics.

Monsanto provided technical information related to the properties of the raw material in its pure,
non-formulated form to its customers.[4]  For plasticizers such as Aroclors, this information
included physical and chemical data such as density, compatibility, vapor pressure, boiling
point, compatibility, flash point, etc., as well as regulatory[5] and industrial health information.[6]
The information could be used by Monsanto's customers, or more specifically their formulators,
as a guide for their own product development.  Monsanto also offered access to internal
knowledge of Monsanto's broad plasticizer product lines in the form of its Plasticizer Council, a
technical service described as providing knowledge and insight into which plasticizers may be
applicable for potential uses.  Combined, the Plasticizer Council and product brochures offered
a wide range of experience and knowledge that aided customers in navigating the large selection
of plasticizers and related materials offered by Monsanto.  This expertise assisted formulators in
narrowing options, but in no way directed or determined the actual formulations to be used by
Monsanto customers.  Proper formulation was governed by the material manufacturers and
confirmed through testing and experimentation.  All formulation, acceptance testing, and sales
of formulated products was performed or directed by Monsanto's customers.

Importantly, the chemical and physical properties of mixtures differ from those of pure raw
materials.  In some cases raw material suppliers, such as Monsanto, would provide sample
formulations for generic products to aid in guidance and to demonstrate compositional effects of

---

[2] For example, Modern Plastics Encyclopedia Vol. 48: No. 10A October 1971, Plasticizers Chart p.653 – 664 and
    Suppliers Index p.707.

[3] US Tariff Commission - Synthetic Organic Chemicals - US Production and Sales, 1958-1971and
    ("Polychlorinated Biphenyls and the Environment", Interdepartmental Task Force on PCBs, Washington, DC,
    May 1972, COM-72-10419.

[4] For example, Plasticizer Blue Book – 1969 MONS077721

[5] For example; STLCOPCB4046288, MONS090481

[6] For example; TOWOLDMON0001620, TOWOLDMON0001622, LEXOLDMON001172,
    LEXOLDMON001182

additives on final product performance.  These formulations were not commercial products but could be used by formulators as basic demonstrations of different additives and plasticizers for broad uses.

Formulators rely on their own experience, end-use testing, and other information specific to the intended final product as well as an understanding of anticipated end use conditions for the final product when selecting and evaluating raw materials for use.  Monsanto's customers determined the types, amounts, usage, co-ingredients, and overall formulation of the end-use products (e.g., caulks) they were selling to finished goods customers.  Monsanto did not provide these formulations to their customers, and could not reasonably predict the chemical or physical behavior of the vast number of commercial products that might include Aroclor as a plasticizer.

## 2.2   Aroclors

Aroclors are one trade name for a family of PCBs and PCTs[7].  A PCB is a molecule containing two benzene rings with a varying number of chlorine atoms attached.  Because of the chemical structure of the biphenyl ring, an example of which is shown in Figure 1, a PCB can contain 1 to 10 chlorine molecules.  The chlorine atoms can be arranged along the biphenyl ring in various configurations.  There are 209 unique combinations of the number and arrangement of chlorines, which are referred to as congeners.  Congeners containing the same number of chlorines (i.e. having the same molecular weight) are referred to as homologs.  Table 1 lists the chemical formula, molecular weight, and number of homologs of the various PCBs.

---

[7]PCTs are polychlorinated terphenyls and therefore contain an additional benzene ring compared to PCBs.

1605740.000 - 7562

Figure 1        Chemical structure of a polychlorinated biphenyl

Table 1.        Empirical formula, molecular weight, and number of homologs for each PCB.

| Empirical Formula | Homolog MW (g mol⁻¹) | # Congeners With This Formula |
|---|---|---|
| $C_{12}H_9Cl$ | 189 | 3 |
| $C_{12}H_8Cl_2$ | 223 | 12 |
| $C_{12}H_7Cl_3$ | 258 | 24 |
| $C_{12}H_6Cl_4$ | 292 | 42 |
| $C_{12}H_5Cl_5$ | 326 | 46 |
| $C_{12}H_4Cl_6$ | 361 | 42 |
| $C_{12}H_3Cl_7$ | 395 | 24 |
| $C_{12}H_2Cl_8$ | 430 | 12 |
| $C_{12}HCl_9$ | 464 | 3 |
| $C_{12}Cl_{10}$ | 499 | 1 |

## 2.2.1    Aroclor Uses

Aroclors, which were sold as a mixture of congeners with a specific 4-digit naming system,[8] were recognized for their use as flame retardant insulating fluids in transformers and capacitors. However, due to the flame retarding properties of the material, combined with other beneficial attributes including low vapor pressure, miscibility with a wide range of materials, adhesive

---

[8]   Within the naming convention, the first two digits described the molecule type and the second two digits described the weight percent chlorine. Thus, the 1200 series indicated only biphenyl rings, the 2500 series indicated a blend of 75:25 biphenyl:triphenyl, the 4400 series indicated a 60:40 biphenyl:triphenyl mixture and the 5400 series indicated all triphenyls. For example, Aroclor 1254 consisted of all biphenyl rings and contained and average of 54% by weight chlorine.

1605740.000 - 7562

promotion, and thermal, chemical, oxidation, weather, mold and water resistance, the Aroclor family of compounds found use as additives in certain plastics to impart specific properties desired by formulators for particular applications.  Moreover, Aroclors were known to impart substantial improvements in extending cure time, making previously difficult to work-with building materials much more available to the construction industry.[9]  Aroclors were used as a plasticizer to modify physical, chemical, and durability performance in paints, coatings, caulks, sealants, and bulk plastics.  The Aroclors at issue here, Aroclor 1248 and 1254, were sold as pure PCBs.

In the United States, Aroclors were used in industrial paints and coatings because of their valuable attributes such as compatibility, low volatility, low water solubility, heat stability and fire retardant properties and antimicrobial resistance.  They were not, however, recommended for use as household paints.[10]  Further, despite the unique uses of Aroclors, they were not intended for use in food packaging.[11]

Aroclor plasticizers were used to meet military specifications, especially for specialty coatings and wire insulation.[12]  They were important enough that the United State Secretary of War deemed PCBs "…necessary in the interests of national defense."[13]  Indeed, the U.S. government ordered Monsanto to provide defense contractors with shipments of Aroclors years after Monsanto had voluntarily removed them from the market.[14]  The U.S. government also awarded Monsanto commendations for the manufacture and supply of PCBs to the government.[15]

---

[9] US Patents 3,331,782 and 3,455,854

[10] MONS 0951888-MONS 095191

[11] STLCOPCB4046288, MONS090481

[12] STLCOPB0022834, STLCOPCB0022824-STLCOPCB0022833, STLCOPCB0022838

[13] HAGOV0001391-HAGOV0001403

[14] STLCOPCB0022822- STLCOPCB0022823; STLCOPCB0022820

[15] HAGOV0000159, HAGOV0000160, HAGOV0000192-HAGOV0000194

17

## 2.2.2    Aroclor Technical Information

Monsanto offered nearly 100 different plasticizers and related materials in the 1960s,[16] 8 of which were PCB containing Aroclors.[17]  To aid customers and formulators in determining which plasticizers may be appropriate for each application, Monsanto provided many technical bulletins describing the uses and properties of all their manufactured plasticizers, including their Aroclor line of plasticizers.  This information could also be found in the published literature of the time.[18]  Information presented in these bulletins included the chemical make-up of the plasticizers (the Aroclors were identified as chlorinated biphenyls and chlorinated polyphenyls[19]) as well as information on density, vapor pressure, solubility, corrosivity, dielectric properties, flammability, and toxicity, among other attributes.  Aroclors were unique and specialty plasticizers.  No direct, one-to-one replacement existed for Aroclor plasticizers.

Information was also available from Monsanto[20,21], as well as in the published literature,[22] describing the volatility of materials formulated with PCBs (i.e., weight loss as a function of temperature and time).  These literature sources and documents demonstrate that formulators were recognized  the need to independently test individual formulations for properties of the bulk material, and not to simply rely on the properties of individual components of a formulation to determine the overall formulated material properties.

Aroclors were industrial chemicals, sold to customers familiar with chemical technology. When Aroclors were sold to formulators, they were accompanied not only by associated technical data

---

[16] MONS080640 – Monsanto Plasticizers

[17] MONS077721 – MONS077781, (MONS077728-MONS077730) The Plasticizer Blue Book

[18] Buttrey DN, Plasticizers, Franklin Publishing Company, Palisade New Jersey, 1960

[19] MONS0019629-MONS0019673, (MONS019631) – The Aroclors Compounds

[20] Monsanto Letter Dated February 12, 1969, Thiokol Work Request 69-22, Priority A; HARTOLDMON0029396 – HARTOLDMOND0029404, Polysulfide Modifiers, Special Report form Monsanto Research

[21] Scientists at Monsanto were well known as experts in plasticizers and published regularly in the literature. For example, JR Darby and JK Sears, Encyclopedia of Polymer Science and Technology, vol 10, 1969, and JR Darby and JK Sears, The Technology of Plasticizers, 1982

[22] For example, Doolittle AK, The Technology of Solvents and Plasticizers, John Willey and Sons, New York, New York, 1945; Mellan I, Industrial Plasticizers, The Macmillan Company, New York New York, 1963; Mellan I, Plasticizer Evaluation and Performance, Noyes Development Corporation, Park Ridge, New Jersey, 1967; Kirk-Othmer Encyclopedia of Chemical Technology, 2nd Edition, Vol 15, John Willey and Sons, 1968

regarding properties, but also warnings explaining potential risks associated with use. Monsanto included reasonable warnings and similar information related to Aroclors consistent with the chemistry and customer,[23,24]  In addition to this information, Monsanto also reminded end users that formulations and testing provided by Monsanto was specific to the materials used in their testing and that individual formulators would need to independently evaluate their own formulated materials.[25]

## 2.3   Plasticizers

Plasticizer selection is but one choice of many that must be made by a formulator when developing a new material for a specific application.  The complicated nature of formulation requires the knowledge of experienced personnel to control the material specifications being manufactured and sold to their customers.

### 2.3.1      Historical Sales and Growth of Polymers and Plasticizers

Sales of polymers and plasticizers were increasing at a rapid rate in the 1900s.[26] For example, between 1960 and 1969 sales of polymers within the United States increased over 150%, from approximately 8.7 billion lbs in 1960 to over 23 billion lbs in 1969 (Figure 2).[3]  Plasticizer demand, and subsequent sales, increased similarly from 600 million lbs to 1.4 billion lbs,[3] an increase of approximately 130%.

To keep up with increasing demand and increasing uses of polymers, the number of plasticizers increased rapidly during this time.  In 1960, 70 different companies reported selling over 880 plasticizers in the US, but by1969 at least 85 different companies reported selling over 1360 plasticizers, a greater than 50% increase.  However, the number of Aroclor PCB plasticizers did

---

[23] For example: LEXOLDMON001172, LEXOLDMON001189, LEXOLDMON001190

[24] For Example: The Aroclors, Physical Properties and Suggested Applications – MONS080132-MONS080153 (specifically pg MONS080153); Aroclor Compounds Specialty Data Report, 1963 - 0509197-0509207 (specifically pg 0509207); The Aroclors, 1953 – MONS071714-MONS071740  (Specific Page MONS071733)

[25] For Example: Polysulfides Special Report from Monsanto Research, HARTOLDMON 00292396 - HARTOLDMON00292404 (Specific Page HARTOLDMON0029402); Aroclor Compounds Specialty Data Report, 1963 - 0509197-0509207 (Specifically Page 0509197)

[26] JR Darby and JK Sears, Encyclopedia of Polymer Science and Technology, vol 10, 1969

not increase.  Despite their unique properties, Aroclors were only a specialty plasticizer, accounting for only slightly more than 1% of total plasticizer sales in the US during this time.[3]



Figure 2.     Polymer and plasticizer production in the US (all manufacturers and all types) between 1960 and 1969.

### 2.3.2     Plasticizer Effects

Plasticizers are ubiquitously used in the polymer industry, and thousands have been commercially available since at least the 1940's.[27]  The primary function of this additive class is to increase plasticity or fluidity of a material, though other material properties will be affected and these must be balanced.  Specific formulations can be complex, depending on the desired combination of end product attributes and the interactions of the various components, and this is the basis for the wide range of products encountered in the sealants, adhesives, coatings and

---

[27]   Handbook of Plasticizers, 2nd Edition, G. Wypych, Chemtech Publishing, Toronto 2012. Handbook of Plastics by Simonds and Ellis

other plastics markets. Trade, technical and patent literature provides examples of the effects of plasticizer type and amounts on physical properties.

Table 2 and Figure 3, from a 1967 textbook, depict some of these effects for two types of sulfur-based sealant resins, one from Thiokol and the other from Diamond Shamrock.  Table 2 shows the effect of plasticizer concentration of an Aroclor on mechanical properties in a polysulfide sealant.  Figure 3 then demonstrates the effects of different plasticizers within a similar material, polymercaptan,[28].  These provide a comparative example of the substitution effect on four different physical properties in a formulation; the mechanical properties of the sealant are sensitive to overall formulation, both plasticizer concentration and type.  Additionally, each property changes at a different rate depending on the plasticizer added.  These three plasticizers were commercially offered by Monsanto and others during the time of Clark School construction.

Table 2.    Effect of Aroclor concentration on physical properties of a polysulfide sealant (LP-2 polymer).[29]

|  | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| LP-2 polymer | 100 | 100 | 100 | 100 | 100 | 100 |
| ''Aroclor'' 1254 | —— | 10 | 20 | 30 | 40 | 50 |
| ''Witcarb'' RC | 50 | 50 | 50 | 50 | 50 | 50 |
| C-5 catalyst | 15 | 15 | 15 | 15 | 15 | 15 |
| *Physical Properties on Cast Sheets, ASTM D-412-62T* | | | | | | |
| Tensile strength, psi | 575 | 475 | 400 | 320 | 250 | 150 |
| 300% modulus, psi | 200 | 175 | 150 | 120 | 110 | 100 |
| Elongation, % | 750 | 700 | 650 | 600 | 570 | 560 |
| Shore A hardness | 49 | 40 | 36 | 32 | 28 | 25 |

---

[28]  Polymercaptans have been described as an "intermediate between polysulfides and the polyurethanes"Sealants, Adolfas Damusis, Reinhold Publishing Corp. 1967 pg 196

[29] Sealants, Adolfas Damusis, Reinhold Publishing Corp. 1967 pg 181

21



Figure 3.    Effect of plasticizer concentration on initial mechanical properties of a polymercaptan based sealant, DMP-1002 (solid and dashed lines),[30] and the LP-2 polysulfide formulation (red circles) described in Table 2.

Even with this type of information, a formulator would have to prepare candidate formulations to assess the full range of characteristics and determine which candidate formulation was appropriate for commercialization based on market or end customer requirements.  For example, a formulator would still be expected to address other important characteristics of caulks, such as

---

[30] Sealants, Adolfas Damusis, Reinhold Publishing Corp. 1967 pg 205

film forming tendencies, flowability related to application, mixture stability, pot life, adhesion to various surfaces, stability during high and low temperature cycling, resistance to chemical attack, leaching by water, oxidation, burning, fire spread, etc. A formulator would also be expected to assess longer term durability, as aging affects these properties to an extent that is related to the environmental conditions encountered in use (e.g., heat, humidity, airflow, sunlight, etc) as well as component and formulation stability against these challenges. It is not unusual for formulations to appear similar in short term testing but differ significantly after aging.

### 2.3.3    Aging Effects

One effect of aging is associated with plasticizer loss, which leads to local hardening, embrittlement or other changes. Compatibility, vapor pressure, diffusion behavior and water solubility are factors that impact plasticizer loss, with higher compatibility, lower volatility or vapor pressure, slower diffusion and minimal external solubility (e.g., in water) leading to more stable compositions. PCBs exhibit a unique and desirable combination of these factors for minimizing plasticizer loss.

Volatility is a measure of how quickly a material will evaporate from a liquid composition to a gas, and depends on chemical structure and molecular weight, as well as interaction with the components of a formulation and interaction with the surrounding environment.[31] Typically, loss of plasticizer within a resin or formulated blend is slower than loss of plasticizer in a pure material.[32] The more complex the formulation, however, the more difficult it will be to predict the volatility of any individual component. Because the composition and use conditions affect volatility, the rate of evaporation of Aroclors in a sealant is dependent on formulation[33] and use conditions that are not and cannot be controlled by Monsanto. The need for formulators to test

---

[31]   K Denbigh, The Principles of Chemical Equilibrium, Cambridge University Press 1981

[32]   Handbook of plasticizers, 2nd edition, 2012 Pg 253-4

[33]   HF Payne, Organic Coating Technology, Vol 1, 1954 Wiley.

complete formulations and not rely on properties of individual components of a system was expressed Doolittle[34] in his 1954 book;

> *"The determination of the volatility of the pure plasticizer from an open dish is of qualitative value, but evaporation from a plasticized resinous specimen is influenced so much by polymer-plasticizer attraction and by the rate of diffusion within the plastic mass that a true evaluation of volatility must be made by means of tests on plasticized specimens."*

The rate at which a plasticizer migrates through a caulk is also specific to the type of caulk.  Migration or diffusion of the molecules within the compound is affected by temperature,[35] the initial concentration in the sealant/caulk, and, in many cases, interaction with fillers.[36]  The rate of plasticizer release is governed by both diffusion to the surface and subsequent removal from the surface. For a diffusion limited system, surface removal is reduced or prevented by a depleted surface region.  As exemplified in Figure 4, the diffusion rate is formulation dependent and cannot be predicted based on the knowledge of a single component. Indeed the diffusion coefficient can vary by orders of magnitude using different base polymers.[37]  Thus, a raw material supplier, especially an additive supplier, cannot reasonably predict diffusion behavior for an undefined formulation.

---

[34]   Doolittle AK, The Technology of Solvents and Plasticizers, John Willey and Sons, New York, New York, 1954, pg 883

[35]   Brandrup, Immergut, and Grulke, Polymer handbook 4th edition volume 2 Permeability and Diffusion Data, page VI-545, Table 3 Permeability coefficients of various organic compounds through low-density poly(ethylene)

[36]   Handbook of Plasticizers, Effect of plasticizers on other components of formulation – Plasticizer consumption by fillers. pg 187

[37]   WR Brown, GS Park, J. Paint. Tech. 1970; 42:16. and AC Newns, J. Poly. Sci.:Part C 22 927-937 (1969),  P Dole et al, Food Addit. and Contam. 2006, 23(2): 202-211



Figure 4.    Diffusion coefficient of PCBs [open symbols] and polycyclic aromatic hydrocarbons (PAH) [closed symbols] in low density polyethylene (LDPE) and polysiloxane as a function polymer molecular weight.[38]  Triangles [▲] and squares [■] represent polysiloxane, circles [●] represent LDPE.

## 2.4    Caulks and Sealants

Caulk is a term for elastomeric compositions used to fill gaps and seal joints or seams in structures.  Caulks are provided by manufacturers in a pourable or easily extrudable form, typically in accordance with one or more standard specification.  Upon curing, the caulk adheres to the adjacent substrates and forms a barrier.  In present industry, caulk is most commonly used in building construction wherever a structural unit requires thermal insulation, control of water penetration, and noise mitigation.[39]

---

[38]   TP Rusina, F Smedes, J Klanova, J. App. Polym. Sci. 116, 1803-1810 (2010)

[39]   K. L. Mittal, A. Pizzi, Handbook of Sealant Technology, CRC Press 2009

Each additive incorporated into the formulation has a particular function to impart desired material properties to the sealant, though these additives may provide synergistic or antagonistic effects. Fillers are a common additive used to control properties such as structural integrity, refractive index, cost, and color control.[40] A second common additive is a plasticizer. A plasticizer is defined as an additive that increases plasticity or fluidity of a material – as such, the number of materials available for use as a plasticizer for caulking/sealant applications are vast.[41] Plasticizers are primarily used to reduce embrittlement and prevent chipping/flaking; however, other properties, such as improved adhesion, enhanced flow, pot life regulation, and increased flame retardant properties can also be imparted.[42] The plasticizer used can have an important effect on material durability and other attributes related to function and safety.

Caulks/sealants are used in multiple applications and the caulk performance standards vary depending on the application as well as environmental exposure. For each situation, a sealant is required to achieve different performance standards and the formulator must prioritize the desired properties and choose appropriate additives based on performance, cost, and the synergistic effects of mixing with other additives. Formulations varied by type of ingredient and quantity of any given component relative to the curable polymer.[43,44]

Literature available during the timeframe surrounding the construction of Clark Elementary School demonstrates the range in industrial uses and caulking formulations available.[45] The number of additives used in a caulk/sealant and final formulation depends on the application and

---

[40] Examples of commonly used fillers are carbon black, titanium dioxide, calcium carbonate, or silica. Sealants, Adolfas Damusis, Reinhold Publishing Corp. 1967.

[41] Handbook of Plastics by Simonds and Ellis p 251 lists the number of plasticizers to be close to 20,000 in 1943

[42] Plasticizers can increase film forming tendencies, soften the film, impart flow (improve gunning), allow for homogeneous blending all components, and regulate pot life US Patent #s 3276870,3455854, 3267063.

[43] For example, US Patent No. 3770678 states "A polysulfide latex based caulking composition consisting essentially of… (c) from about 50 to about 300 parts by weight per 100 parts by weight of total polymer solids in the composition of special purpose additives selected from the group consisting of fillers, plasticizers, whiteners, adhesive additives, and latex stabilizers."

[44] US Patent 3,348,351

[45] For example, US Patent No. 3717617 states "The curable compositions of the present invention can also contain various types of inert materials commonly employed in polysulfide based sealant and caulking compositions such as fillers, plasticizers, pigments, ultraviolet light stabilizers, cure accelerators, and the like. Representative examples of the above type of compounds include calcium carbonate, titanium oxide, silica, tris-(dimethylamino)phenol, carbon black, dibutyl phthalate, chlorinated hydrocarbons, sulfur, alumina, polyethylene, polystyrene, zirconia, and the like."

26

desirable physical properties, as well as the experience and preferences of the formulator.  As such, the formulation may be as simple as a 4-component system, as complex as a 16-component system, or some other propriety combination.[46]

The formulation of any commercially available caulk is determined by experienced employees (i.e., formulators) with training and skills relevant to the specific company selling the caulk. The manufacturers of the additives in the caulk, which are raw material suppliers such as Monsanto, are rarely aware of the formulation, and cannot reasonably predict the specific composition or behavior of the formulated end-use products.  Raw material suppliers, such as Monsanto, would provide technical literature containing data associated with the pure form of their chemical product (i.e. density, compatibility, vapor pressure, boiling point, compatibility, flash point, etc) for use by chemists and formulators intending to create company-specific combinations as part of development and production as a commercial end-use product.

## 2.4.1    History of Construction Sealants

Basic sealants have been used throughout history, dating back to the earliest recorded times where natural materials such as grass and bitumen were used to seal openings in early building construction, and tar was used to seal ships.[47]  Eventually, formulations using natural oils like linseed oil were found to be useful as sealants and putties, although their serviceable lifespan was often only a few years.[48]  Only when synthetic polymers were developed and commercially available were sealants capable of providing longer useful life, improved adhesion, and the increased joint movement capability necessary to facilitate construction of taller and lighter buildings.[49]  Two-component polysulfide sealants were the first major sealants to penetrate the construction industry, and are considered to be an integral component of the development of curtain wall construction.[50]  As stated by plaintiff's expert, Jerome Klosowski[51]:

---

[46] US Patent # 3282902, Sealants, Adolfas Damusis, Reinhold Publishing Corp. 1967

[47] Handbook of Sealant Technology (2009), The History of Sealants, Klosowski J.M. and Wolf A.T., pgs 4-5

[48] Ibid

[49] Ibid

[50] Handbook of Sealant Technology (2009), The History of Sealants, Klosowski J.M. and Wolf A.T., pg 9

[51] Handbook of Sealant Technology (2009), The History of Sealants, Klosowski J.M. and Wolf A.T., pgs 9-10

*Building sealants based on liquid polysulfide polymers came to the market in the late 1940s. They were the first high-performance elastic sealants to be commercialized. Their market introduction occurred at the beginning of curtain wall construction in the United States, which is often credited with creating the need for high-performance sealants. However, one could also suggest that the novel polysulfide sealant, which allowed a moving joint to be sealed successfully, enabled this new construction technique and led to the popularity of the curtain wall. The answer to the question of the driver or driven is not certain, but surely one could not exist without the other. In either case, in the 1950s, polysulfides became the sealant of choice in the new curtain wall construction, as well as in cars, trains, and planes.*"

From use in curtain walls to use in sealing fuel tanks, the widespread adoption of polysulfide sealants was directly related to the formulation characteristics. By the early 1960s polysulfide sealants were available in one and two component formulations, with components such as plasticizers added to improve a range of properties. Because of solubility limitations, PCBs were virtually the only material available to plasticize polysulfide.[52] As a result, almost all polysulfide sealants produced in the 1950s – 1970s contained PCBs, with ranges between roughly 3%[53] and 30%[52] PCBs as a plasticizer. PCBs also imparted other property enhancements including durability[52], fire retardancy[54], adhesion[54], easily modified mechanical properties[54], and improved pot life.[55] Sealants were selected for these and other attributes. For example, one-component formulations allowed for ease of use, but two-component formulations typically offered greater elongation and resiliency.[56] The utility and use of polysulfide sealants[57]

---

[52] Sealants in Construction, 2nd ed, (2016) Klosowski K., Wolf A.T. pg 198

[53] US Patent 3,499,864

[54] Chemical Materials for Construction, Maslow P, (1974) pg 228

[55] US Patent 3,331,782

[56] Chemical Materials for Construction, Philip Maslow, 1974, tables on pages 184-187

[57] For example: MIL-S-8784A, Sealing Compound, Aluminum Integral Fuel Tanks and Fuel Cell Cavities, Low Adhesion, Accelerator Required, Dated May 24, 1956; MIL-C-18255A(SHIPS) Military Specification Calking Compound, Synthetic Rubber Base, Wooden Deck Seam Application, dated October 6, 1959; MIL-C-22804(SHIPS) Military Specification Cement, Sealing, Double Planking, dated February 15, 1961.

and PCBs as plasticizers in polysulfide sealants[58] is reflected in multiple federal and military specifications.[59]

Meanwhile, alternative sealants available in the early 1960s such as silicones and polyurethanes, suffered from a range of undesirable attributes that affected market acceptance.[60]  For example, silicone sealants produced sharp odors, caused corrosion on metallic surfaces, could lack adhesion and did not have equal joint movement properties compared to polysulfides.[61] Polyurethane sealants had shelf-life issues, were subject to discoloration after sunlight exposure, and were sensitive to moisture (e.g., rain or other excessive moisture could cause a polyurethane sealant to expand and froth, compromising the integrity of the joint).[61]  Acrylic latex sealants were another material to enter the market in the 1960s; however, these sealants physically dried rather than chemically cured after application.  Consequently, these sealants hardened over time and did not have good durability or long-term performance.[62] Thus, alternative sealants presented a variety of technical challenges to performance and were slow to gain acceptance.

Despite industrial research to find alternatives, the removal of PCBs from the market in 1970 affected the quality and functionality of available polysulfide sealants through the 1970s.[63] Chlorinated paraffins and phthalate esters were investigated as PCB replacements, but those materials introduced difficulties such as stability, miscibility, and volatilization.[64]  Even in the late 1970s, research was still underway to find replacement materials that imparted the same properties in polysulfide sealants as PCBs.[65]  No one-to-one replacement was identified.

---

[58] Military Specification MIL-L-7146A(MR) Lacquer; Hydraulic Fluid Resistant (For interior Aircraft Use), dated Nov 3, 1964.

[59] For example: MIL-S-8784A, Sealing Compound, Aluminum Integral Fuel Tanks and Fuel Cell Cavities, Low Adhesion, Accelerator Required, Dated May 24, 1956; MIL-C-18255A(SHIPS) Military Specification Calking Compound, Synthetic Rubber Base, Wooden Deck Seam Application, dated October 6, 1959; MIL-C-22804(SHIPS) Military Specification Cement, Sealing, Double Planking, dated February 15, 1961.

[60] Sealants in Construction, 2nd ed, (2016) Klosowski K., Wolf A.T. pgs14-15 and 17

[61] Sealants in Construction, 2nd ed, (2016) Klosowski K., Wolf A.T. pg 5

[62] Sealants in Construction, 2nd ed, (2016) Klosowski K., Wolf A.T. pg 199

[63] Chemical Materials for Construction, Maslow P, (1974) pg 228

[64] US Patent 4,189,407

[65] US Patent 4,189,407

29

## 2.4.2     Aging of Caulks and Sealants

Caulks are formulated to achieve certain properties associated with application reliability, short term properties and longer term durability.  However, caulks and sealants have finite lifetimes, which are generally determined by resistance to environmental exposure conditions (e.g., sunlight, moisture, temperature-driven expansion/contraction, etc. [66]) and the overall stability of the formulation (e.g., separation, component loss by migration and/ or volatilization).  Sealant lifetimes can also be affected by overcoating with paints or other materials (e.g., due to incompatibilities, or imposed damage from aging and cracking of the over-material.)  Aging affects functionality, and once a sealant/caulk can no longer perform its function it should be replaced.  Typically, for building caulk/sealants, failure is defined as the point when the seal allows moisture to penetrate due to cracking or debonding.[67]

White and colleagues at the National Institute of Standards and Technology (NIST) have identified that "Predicting the service life of building joint sealants exposed to service environments in less than real time has been a need of the sealant community for many decades."[68] Test methods have been around since the early 1900's to investigate volatile compounds loss at accelerated temperatures[69] with results reported throughout the literature, [70] and more detailed accelerated aging methods are continually being developed and updated.[71] The primary reason for this difficulty is due to the synergistic effect that different environmental

---

[66]  AT Wolf, Durability of Building Sealants, Taylor and Francis Group 1997; AT Wolf, Durability of testing sealants, Dow Corning, http://www.dowcorning.com/content/publishedlit/durability_testing_of_sealants_10132004.pdf

[67]  CC White et al, A Systematic Approach to the Study of Accelerated Weathering of Building Joint Sealants, Journal of ASTM International, Vol. 9, No. 5.

[68]  CC White et al, Durability of Building Joint Sealants, Chapter 8 Service Life Prediction of Polymeric Materials 2009, pp 115-128

[69]  Standard Test for Loss on Heating of Oil and Asphaltic Compounds, ASTM D 6-20, Adopted 1911; Tentative Method of Test for Volatile Loss from Plastic Materials, ASTM Designation D 1203-52T, Issued 1952

[70]  For example, Doolittle AK, The Technology of Solvents and Plasticizers, John Willey and Sons, New York, New York, 1945; Mellan I, Industrial Plasticizers, The Macmillan Company, New York New York, 1963; Mellan I, Plasticizer Evaluation and Performance, Noyes Development Corporation, Park Ridge, New Jersey, 1967; Kirk-Othmer Encyclopedia of Chemical Technology, 2nd Edition, Vol 15, John Willey and Sons, 1968; Buttrey DN, Plasticizers, Franklin Publishing Company, Palisade New Jersey, 1960

[71]  CC White et al, Durability of Building Joint Sealants, Chapter 8 Service Life Prediction of Polymeric Materials 2009, pp 115-128

factors have on the degradation of a sealant/caulk.  Because of this, even today, it is very difficult to predict the service life of a caulk/sealant compound based on its components.

White and colleagues further state that "Studies in the construction industry in the past few decades have shown a 50% sealant failure rate within 10 years and a 95% sealant failure rate within 20 years after installation."[72]  Reports identified by Exponent that address life expectancies and service lifetimes of caulks fall in line with these failure rates.[73]  Although there are likely a significant number of other examples in the literature, Table 3 highlights the breadth of applications where caulk is used as well as the diversity in performance.  None of the sealants listed in this table have an upper bound life expectancy over 30 years.

---

[72]   CC White et al, A Systematic Approach to the Study of Accelerated Weathering of Building Joint Sealants, Journal of ASTM International, Vol. 9, No. 5

[73]   Sealants, Adolfas Damusis, Reinhold Publishing Corp. 1967 and Case study window sealing systems by Henkel AG & Co. KGAA (http://www.pcf-projekt.de/files/1298483592/pcf_henkel_sealant.pdf).

Table 3.        Expected lifetimes of various caulks/sealants.[74]

| Sealant type | Movement Accommodation Factor (%) | Character | Life expectancy (years) | Joint suitability |
|---|---|---|---|---|
| **Oil-based** | 10 | Plastic | 1–10 | Perimeter pointing. |
| **Butyl-based** | 10 | Plastic | 15–20 | Concealed joints. (not UV resistant.) |
| **Acrylic** Water-based | 15 | Plastic | 10–15 | Internal joints, plaster cracks, etc. |
| Solvent-based | 20 | Plastic | 15–20 | Perimeter pointing, concrete, stone cladding, etc. |
| **Polysulphide** One-part | 20–25 | Elasto-plastic and elastic | 20–25 | Perimeter pointing, structural joints, stone cladding, etc. |
| Two-part | 25–30 | Elasto-plastic and elastic | 20–25 | Structural joints, stone and cladding, joints subject to early high movement. |
| Two-part high modulus | 10–20 | Elasto-plastic and elastic | 20–25 | Paving, traffic, floor joints, etc. |
| **Polyurethane** One-part | 10–30 | Elastic and elasto-plastic | 20–25 | Light cladding, curtain walling, structural joints, stone cladding etc. |
| Two-part | 20–30 | Elastic | 20–25 | Light cladding, curtain walling, paving, etc. |
| **Silicone** Low modulus | 50–70 | Elastic and elasto-plastic | 25–30 | Perimeter pointing, curtain walling, stone and concrete cladding, structural joints, etc. |
| High modulus | 20–30 | Elastic | 25–30 | Glazing, sanitary ware, etc. |
| **Flexible epoxy** | 5–15 | Elasto-plastic | 10–20 | Floor joints, traffic areas, etc. |

---

[74] Resealing of Buildings, a Guide to Good Practice, Oxford Brookes University 1994

1605740.000 - 7562

# 3    Inspection

## 3.1   Clark Elementary School Inspection

Exponent inspected CES from October 3 through October 6, 2016.  The inspection included a visual inspection of the entire building with photo documentation of the overall building state. During the inspection, Exponent collected samples of building materials, including interior and exterior caulk, paint, and fireproofing insulation.  Exponent also performed 3-Dimensional scans of the ceiling areas of remediated and unremediated rooms.

Each room, when available, was individually inspected and photo documented.  First and second floor rooms on the south side of CES were part of a prior pilot remediation, and the majority of sealant materials and fireproofing insulation had been removed from this section. The majority of the school, however, showed no signs of PCB-based remediation attempts.

Exponent collected 103 samples during the inspection.  Sampling was performed to collect sealants representing a general overview of those present at CES, as well as material from locations that had been previously sampled by Eagle Environmental.  Additionally, fireproofing present at various locations throughout the building was collected, as well asother building materials that provided an overview of materials present at CES.  Generalized categories of the samples are shown in Table 4 below.

Table 4.     General classification of building materials collected by Exponent at Clark Elementary School

| Building Material | Number Collected |
|---|---|
| Caulking / Sealants | 52 |
| Paint/Coatings | 25 |
| Fireproofing | 17 |
| Other | 9 |

## 3.2   Caulks/ Sealants at Clark Elementary School

A total of 52 sealant samples were collected throughout the school (37 samples from the interior of the building, and 15 samples from the exterior of the building).  Sampling was performed in a variety of locations to obtain sealant samples indicative of the differences in joint seam materials. Interior joint seam locations included a variety of adjoining materials/structures such as brick-metal, brick-cinderblock, cinderblock-cinderblock, brick-wall, etc.  Similarly, exterior joint seam locations contained adjoining materials/structures including brick-metal, brick-brick, brick-concrete, etc.

A list of sampling locations, test results and images of obtained samples is provided in Appendix D.  Sealant colors included clear, white, brown, black and grey.  Based on physical condition and surrounding materials, the sealants are likely a combination of original material (e.g., where brick joined concrete columns or other segments of brick) and materials installed in later years, including as part of the recent remediation.  The interior sealant condition and functionality ranged from adequate to failing, as visually determined by observations of cracking and adhesive or cohesive failure.  Outdoor sealant condition and functionality similarly ranged from adequate to failing, with some of the sealant cracking and delaminating from the building while other sealant was intact and generally functioning as intended.  A larger fraction of the exterior samples compared to interior sealants, including some of those determined to be polysulfide, were in states of disrepair, including exhibiting signs of cohesive and adhesive failures.  Despite their significant age, all the polysulfide samples investigated that contained functional amounts of PCBs were found to have retained compliance and elasticity.  The other materials exhibiting signs of failure were found to be more brittle than the PCB containing polysulfide materials.  Representative images of caulking and sealant samples obtained are shown in Figure 5 through Figure 9.



Figure 5.      Gray caulking between a brick wall and a window frame, and similar gray caulking between the brick wall and a concrete column in Room 102



Figure 6.      Multiple types of sealants found in joints of a counter top installed in room 100



Figure 7.    Cracked caulking showing signs of cohesive failure in the Main Office



Figure 8.    Cracked exterior caulking found between brick and an air handling vent on the roof of Clark Elementary School



Figure 9.        Exterior caulking between brick joints on the roof of Clark Elementary School

## 3.3   Other Materials at Clark Elementary School

Materials other than sealants were also collected at Clark Elementary School, most notably paint samples obtained throughout the school, and fireproofing material obtained from above the drop ceiling throughout the school.  Destructive sampling generally revealed that multiple layers of paint were applied over the course of the school lifetime, although some paint appeared to be original to either the school or the installed equipment from which the paint was obtained. Examples of paint samples are shown in Figure 10 through Figure 12. Fireproofing, shown in Figure 13 and Figure 14, was obtained from multiple locations above the drop ceiling throughout the school, including in a layer-by-layer sampling process.  This sampling technique is demonstrated in Figure 14.



Figure 10.    Paint obtained from a hallway column.  Note the multiple colors of yellow paint indicating multiple paint coats.



Figure 11.    Paint obtained from electrical box from Room 117

38



Figure 12.    Paint obtained from the AHU inside Mechanical Room 2



Figure 13.    Typical fireproofing sample, this example was obtained outside of Mechanical
Room 2

1605740.000 - 7562



Figure 14.    Successive sampling of the fireproofing material above ceiling tiles in the
              hallway outside of the gymnasium.  A) prior to sampling, B) entire layer sampled,
              C) top layer sampled, D) bottom layer sampled

40

# 4   Material Analysis

In addition to visual inspection, Exponent performed or directed microscopic and chemical analysis of samples to assess basic composition, asbestos content, and PCB content.  A total of 94 samples representing interior and exterior sealants, interior paints and fireproofing were evaluated.  A summary of all testing is provided in Appendix E.

## 4.1   Compositional Analysis

To determine the types of sealants and other materials used at Clark Elementary School, samples of the materials were analyzed using Fourier Transform Infrared (FTIR) spectroscopy.[75]  Exponent tested each of the sealant samples, paint or coating samples, as well as a representative subset of the obtained fireproofing samples.  Spectra were evaluated for functional groups and similarity to reference spectra for known types of materials and then grouped by general type.  A summary of the distribution of samples by general type is shown in Table 5.

While FTIR analysis of the 52 sealant samples indicated the majority of the materials sampled were polysulfide, several other types of caulk including silicone, acrylic, polyurethane, and PVC were identified.  Polysulfide sealants in general were compliant, with some instances of cracking and delamination.  In some interior samples, newer sealant encapsulated older, hardened material.  Frequently, the FTIR signature of the hardened material was dominated by calcium carbonate ($CaCO_3$), a common filler in construction sealant formulations with a high IR absorbance in the 1000-2000 $cm^{-1}$ wavenumber range.

---

[75] Fourier Transform Infrared Spectroscopy was performed in general accordance with ASTM E573 on a Nicolet 6700 spectrometer using a DLaTGS detector. The IR-range was 4000-400 $cm^{-1}$ at a resolution of 4 $cm^{-1}$. Data was analyzed using the OMNIC-Atlµs 8.3 software package and each of the presented spectra represents the average of 128 sequentially collected scans. FTIR is a spectroscopic technique that identifies chemical groups present at the top few microns of a sample surface. FTIR can assist in the identification of materials and can provide a comparative assessment of chemical differences between samples. FTIR spectra are compared to reference spectra to identify components in a mixture, however, identifications are not intended to be indicative of all components or specific to a brand or grade of a material.

Table 5.          Types of building material obtained from Clark Elementary School by Exponent.

| Building Material | Basic Composition | Number Identified |
|---|---|---|
| Caulking / Sealants | polysulfide | 34 |
| | Silicone | 8 |
| | Acrylic | 5 |
| | PVC | 1 |
| | Polyurethane | 1 |
| | Butyl Rubber | 2 |
| | Hydrocarbon-based | 1 |
| Paint/Coatings | Polyvinyl acetate | 19 |
| | Epoxy | 1 |
| | Polyurethane | 1 |
| | Asphalt/tar based | 1 |
| | $CaSO_4$+additional material | 1 |
| | $CaCO_3$+additional material | 1 |
| | Styrene/acrylic | 1 |
| Fireproofing[76] | Calcium carbonate and Kaolin | 17 |

25 paint or coating samples were also obtained from CES.  These materials were obtained from walls, air handling units, and mechanical equipment.  Wall paints were most commonly acrylic-based, and in layers indicative of multiple coats and maintenance recoating.  Chemistries more commonly associated with higher performance (e.g., epoxy and polyurethanes) were observed in a mechanical room on air handling equipment, on the roof and in the library wall.   The asphalt-type coating was located on the roof surrounding an air handling vent, while 2 other wall samples were indicative of calcium sulfate or calcium carbonate and other not readily identified materials.

---

[76] 17 fireproofing materials were sampled.  Visual inspection indicated similar consistency between the fireproof samples.  6 samples were selected for FTIR analysis, indicating a primary composition of Kaolin and $CaCO_3$.

1605740.000 - 7562

## 4.2   Asbestos Content

A total of 87 samples obtained during Exponent's inspection of Clark Elementary School were evaluated for asbestos content according to EPA method 600/R-93/116 using polarized light microscopy.  Based on this method, 5 samples contained some amount of chrysotile type asbestos (Table 6). Four samples were associated with various indoor sealants while one sample was from a wall within Room 116.

Table 6.        Asbestos containing materials, per EPA method 600/R-93/116, acquired from Clark Elementary School.

| Asbestos Containing Material | % Chrysotile | Description |
|---|---|---|
| Butyl Rubber | 4% | Sealant on Room 101 door |
| Polysulfide | 2% | Wall to door sealant, room 219 |
| Butyl Rubber | 2% | Wall to airduct seal, Mechanical room 4 |
| $CaCO_3$ + Kaolin | 2% | Wall, Room 116 |
| Polysulfide | <1% | Column to wall seal, mechanical room 4 |

## 4.3   PCB Content

94 samples obtained by Exponent during its inspection of Clark Elementary School were analyzed for total PCB content according to EPA method 8082 for overall content (70 samples) or EPA 1668 for congener profile (24 samples).  PCBs were not detected in 13 samples.  PCBs were detected in 81 samples, though 14 samples of these were associated with levels less than 50 ppm.  Fireproofing contained only one sample with greater than 50 ppm PCBs and 6 samples with no PCBs, while little or no PCBs were detected in the coatings and most sealants other than polysulfides.  A summary of measured PCB levels for materials other than polysulfide caulks is provided in Table 7.  All of the PCB levels found in non-polysulfide caulks were non-functional; that is, they were not present in levels that indicate they were intentionally added.

Table 7.      Ranges of PCB concentrations measured for non-polysulfide samples acquired by Exponent at Clark Elementary School that measured ≥ 50 ppm total PCBs.

| Building Material | Composition | Number of Samples Identified with < 50 ppm PCBs | Range of PCB levels in samples with > 50 ppm | |
|---|---|---|---|---|
| | | | PPM | % |
| Caulking / Sealants | Silicone | 7/8 | 115 | 0.0115 |
| | Acrylic | 2/5 | 2020-3800 | 0.202-0.3800 |
| | PVC | 0/1 | 103 | 0.0103 |
| | Polyurethane | 1/1 | - | - |
| | other | 1/3 | 72.8-207 | 0.00728-0.0207 |
| Paint/ Coatings | Polyvinyl acetate | 6/19 | 59.2-162 | 0.0059.2-0.0162 |
| | Epoxy | 0/1 | 238 | 0.0238 |
| | Polyurethane | 0/1 | 101 | 0.0101 |
| | Asphalt/tar based | 1/1 | - | - |
| | Other | 2/3 | 64.9 | 0.00649 |
| Fireproofing | Inorganic Material | 16/17 | 143 | 0.0143 |

Concentrations associated with functional levels of plasticizer were measured in 32 samples, all of which were polysulfide-based (Table 8).[77]  Within the limits of the method, the plasticizers of every polysulfide sample with functional amounts of PCBs were identified as Aroclor 1254. These samples are likely to be well over 40 years old, and are well past the expected functional lifetime of any sealant.  The observed PCB concentrations are consistent with the low volatility of PCBs, generally, and the long term stability of PCB-stabilized polysulfide formulations. However, any original caulk at Clark was still long past its expected useful life.

Table 8.      PCB concentrations measured for polysulfide samples acquired by Exponent at Clark Elementary School that measured > 50 ppm total PCBs.

---

[77] Testing performed on one sample (Exponent ID: 173226) from an interior window sill in Room 103 was inconclusive as the test indicated no PCB content but also no recovery of the surrogate in the test due to dilution (limited remaining sample prevented further repeat testing).  Polysulfide sealant sampled from the bottom of a window sill in room 111 (Exponent ID: 173230) contained 0.4% PCBs.  These two sealants were the only polysulfide samples from joint seams connecting a window frame to a ceramic window sill, a different type of use and a joint type that may have been installed after the original construction.

| Location | Exponent ID | Percentage of PCBs | Location | Exponent ID | Percentage of PCBs |
|---|---|---|---|---|---|
| Room 111 | 173230 | 0.406 | Room 104 | 173227 | 9.77 |
| Exterior - Rm 140/141 | 173203 | 3.66 | Room 208 | 173237 | 9.8 |
| Roof | 173212 | 4.18 | Room 215 | 173240 | 9.94 |
| Room 100 | 173215 | 4.61 | Room 203 | 173235 | 10 |
| Room 212 | 173238 | 6.56 | Main Entrance | 173250 | 10.1 |
| Exterior - Room 145 | 173205 | 6.96 | Exterior - Room 116 | 173202 | 10.3 |
| Room 219 | 173241 | 7.69 | Room 100 | 173214 | 10.3 |
| Mechanical Room 4 | 173252 | 7.73 | Room 101 | 173223 | 10.9 |
| Room 103 | 173225 | 7.74 | Hall Door - Stair 1 | 173245 | 11.2 |
| Room 227 | 173243 | 7.85 | Room 101 | 173222 | 11.5 |
| Room 111 | 173229 | 7.88 | Room 130 | 173234 | 12 |
| Roof - SE Entrance | 173211 | 8.14 | Exterior - Room 100 | 173201 | 12.2 |
| Room 212C | 173239 | 8.48 | Boiler Room | 173249 | 12.7 |
| Exterior - Rm 140/141 | 173204 | 8.72 | Exterior - Main office | 173208 | 13.5 |
| Room 126 | 173233 | 8.89 | Room 206 | 173236 | 15.6 |
| Room 104 | 173228 | 9.01 | Exterior - Room 101 | 173199 | 21.4 |
| Room 101 | 173220 | 9.14 | | | |

Exponent had 24 samples tested for full congener profiles.[78]  A breakdown of all samples tested for full congener profiles is shown in Table 9.  Congener data indicates that homolog data of the polysulfide materials closely resembles Aroclor 1254, indicating little PCB loss over the life of the sealant.  Further, all samples contained PCBs that may be unintentionally produced. For example, PCB 11 was detected in 9 of the 24 samples, a PCB congener not in Aroclors that is known to be unintentionally produced.  Like the general PCB testing, congener testing confirmed that functional amounts of PCBs remained in the polysulfide caulks despite their age. Other materials contained much lower, or non-detectible, amounts of PCBs.

---

[78] Tested using EPA method 1668A

Table 9.        Breakdown of the samples tested for full PCB congener profile

| Sample Type | Tested for Full Congener Profile |
|---|---|
| Fire Proofing | 6 |
| Paint | 6 |
| Polysulfide Sealant[79] | 8 |
| Silicone Sealant[80] | 2 |
| Acrylic Sealant[81] | 1 |
| Butyl Rubber | 1 |

When testing the fireproofing, 4 areas were tested in a manner to investigate the PCB content depth profile of the material (as described above in Figure 14).  In this investigation, no appreciable difference was found between the outer edges of the fireproofing compared with the underlying material closer to the supporting substrate.

---

[79] One of the polysulfide samples was an exterior sample

[80] The silicone sealant was an exterior sample

[81] The acrylic sealant was an exterior sample

46

# 5    Response to Opposing Experts

## 5.1    Response to Mr. Klosowski

I have reviewed the report submitted by Jerome Klosowski on July 17, 2017 and his subsequent deposition taken on August 29th, 2017.  My responses to Mr. Klosowski are limited to the areas that overlap with my expertise and are organized by responses to the opinions contained within his report, and his responses in deposition that address my own stated opinions regarding this case.

### 5.1.1 Mr. Klosowski's Report

Mr. Klosowski's opinions are related to the likely actions of a reasonable formulator and the role of PCBs in the sealant industry.  He did not inspect CES or evaluate the materials from CES.  As outlined below, Mr. Klosowski's broad opinions are not supported by his own research and publication, or the documents and information associated with this matter.  Mr. Klosowski's testimony and historical writings describing the type of information Monsanto would be expected to provide to formulators, the importance of end-use testing performed by formulators, and the availability of suitable alternative materials for replacing both polysulfide sealants and PCBs are consistent with my analysis and opinions, yet repeatedly contradict his own expert report.

**Reasonable Formulators**

Mr. Klosowski's first opinion states that a reasonable formulator would not have used PCBs as plasticizers if Monsanto warned that PCBs were systemically toxic and persistent in indoor environments.  His report suggests that Monsanto did not provide expected information to sealant formulators, including appropriate technical information and appropriate product warnings.  However, in deposition he directly identifies information Monsanto regularly provided as the information formulators would consider before performing formulation specific assessments, and agreed that even advertisements by Monsanto provided appropriate

information for formulators to determine that Aroclors were persistent.[82]  His report goes further to state that "A reasonable formulator relies on plasticizer manufacturers' warnings of hazards….when formulating a sealant" but in deposition described how he, as a formulator, focused on product specific testing to assess volatility and other factors that may affect availability and health impact of a composition. Indeed, Mr. Klosowski testified that multiple characteristics of a formulation and application including diffusion coefficients of individual constituents, surface area, thickness, chemical compatibility, temperature, time, amount of plasticizer, and individual vapor pressures would all affect the volatility of a component.[83]  He further indicated in his deposition testimony that PCBs were known to have a low volatility[84] because, as described in more detail below, PCBs were large and stayed put.[85] He then confirmed that that as a formulator himself, he was not interested in one specific property, but rather a range of properties that may include generalized knowledge of a material rather than specific values.[86] Mr. Klosowski further acknowledge that a reasonable formulator would know that a material with a lower vapor pressure would be more persistent than one with a higher vapor pressure,[87] which directly contradicts his expert report that Monsanto provided insufficient warnings regarding persistence.   He stated that a formulator would know about the general properties of all materials in their formulations and that the formulator would have tested and known the rate of material loss from their product using tests that had been known in industry for many years.[88]

Mr. Klosowski opines that a reasonable sealant formulator with knowledge of Monsanto's paint studies involving PCBs would not have made PCB-containing sealants for indoor use, but fails to demonstrate the similarities between the composition, application conditions and environment associated with the paint information compared to the sealants that are at issue at CES.  Styrene-acrylic based latex paints and polysulfide sealants are noticeably different in their chemistry and

---

[82] Deposition of Jerome Klosowski, August 29, 2017.  pg 224-225

[83] Deposition of Jerome Klosowski, August 29, 2017.  pg 162-170

[84] Deposition of Jerome Klosowski, August 29, 2017. pg 162-170

[85] Deposition of Jerome Klosowski, August 29, 2017.  pg 218

[86] Deposition of Jerome Klosowski, August 29, 2017. pg 76-77

[87] Deposition of Jerome Klosowski, August 29, 2017.  pg 219-221

[88] Deposition of Jerome Klosowski, August 29, 2017. pg 72 & pg 177-178

chemical characteristics including molecular diffusion, volatility, solubility, surface area coverage, and the presence or non-presence of a carrier (solvent) agent.  Mr. Klosowski even states the difficulties of comparing the properties of a latex paint with a polysulfide caulk in his deposition testimony;[89]

> Q. No. Say a, say a latex paint and a polysulfide caulk.
>
> A. I can't compare an apple and an orange. The answer is I don't know.
>
> Q. That is an apple and orange, right, a latex paint and a polysulfide caulk?
>
> A. For most comparisons you're asking that's an apple and an orange.

Mr. Klosowski provided no information about why the detection of chlorine in an enclosed space, which may or may not have emanated from PCB-containing paint, would be an appropriate means of determining the presence or safety aspects of PCBs in sealants. The study Mr. Klosowski references in his report considered a PCB-containing latex paint that was applied on all the walls of an enclosed room with minimal, if any, air flow.  The intentional high mobility, high surface area and hardening via drying are associated with the particular paint formulation and intended use and differ measurably from more viscous, gap filling, curable systems formulated as caulks.  Differences in filler, binder, and other additives further distinguish between the materials in the two applications.

Regarding warnings, Mr. Klosowski stated in his expert report[90] that Monsanto did not provide adequate warnings regarding potential toxicity.  However, in his deposition Mr. Klosowski contradicted his expert report, stating that as a formulator he understood that statements indicating a material, such as PCBs, could be systemically toxic indicated the material could

---

[89] Deposition of Jerome Klosowski, August 29, 2017.  pg 184
[90] Expert Report of Jerome Klosowski, dated July 17, 2017

pose serious health consequences,[91] and that he was aware Monsanto did provide this
information to their customers.[92]

**Unique utility of PCBs in construction sealants**

Mr. Klosowski's second opinion stated that "At no point were PCBs critical to the sealant
industry for general construction."  This is in stark contrast to his own publications and
deposition testimony, as well as the information I have previously described about the utility
and widespread use of PCB-plasticized materials, especially in the timeframe immediately
preceding the construction of CES.  For example, in the 1950s, polysulfides became the sealant
of choice in the new curtain wall construction, as well as in cars, trains, and planes.  As stated in
his own book, PCBs provided the necessary combination of wide ranging solubility, bleed
resistance and other properties for polysulfide sealants, such that "nearly all the early
polysulfide sealants produced during the period from the early 1950s to the late 1970s contained
5%-30% polychlorinated biphenyls (PCBs)."[93] Indeed, Mr. Klosowski's published literature
suggests, "that the novel polysulfide sealant, which allowed a moving joint to be sealed
successfully, enabled this new construction technique and led to the popularity of the curtain
wall" noting that "one could not exist without the other."  He also stated in his deposition that
PCBs do indeed contain all the beneficial properties that I have discussed in my report,[94] impart
durability as a plasticizer,[95] and stay put for a long time as a plasticizer.[96]

Although Mr. Klosowski identifies silicone and polyurethane sealants as suitable alternatives to
PCB-plasticized polysulfides in the 1950s through 1970, he has written about the variety of
issues preventing widespread use and commercialization in the 1950s-1970s.  These issues
included odor, insufficient unprimed adhesion, concerns related to joint movement
accommodation, and corrosivity for silicone sealants, and moisture sensitivity, changes due to

---

[91] Deposition of Jerome Klosowski, August 29, 2017.  pg 102-103

[92] Deposition of Jerome Klosowski, August 29, 2017.  pg 103

[93] Sealants in Construction, 2nd ed, (2016) Klosowski K., Wolf A.T. pg 198

[94] Deposition of Jerome Klosowski, August 29, 2017.  Pgs 61-69

[95] Deposition of Jerome Klosowski, August 29, 2017.  Pgs 216-217

[96] Deposition of Jerome Klosowski, August 29, 2017.  Pg 217

sunlight, and concerns with shelf life for polyurethanes.[97]  Many of these concerns were not commercially addressed until the 1980s, well after reformulation efforts were initiated due to the voluntary withdrawal of PCBs from the plasticizer market.  Mr. Klosowski also points out that the ability of polysulfides to cure without exact stoichiometric mixing was "a strong advantage over the addition cure system utilized in polyurethanes, which requires close maintenance of the mix ratio." [98]

Monsanto's removal of PCBs from the market also caused concerns for downstream formulators because as Mr. Klosowksi echoed in his own book,[99] few plasticizers are compatible with polysulfide.  Letters from Monsanto customers indicated this inability to find a suitable one-to-one replacement for the customer's particular formulations.[100]  While further research led to the use of chlorinated paraffins and low-volatility phthalate esters as PCB alternatives in polysulfide sealant, this research was still underway nearly 10 years after Monsanto voluntarily pulled PCBs from the market,[101] indicating the difficulty with finding alternative plasticizers for polysulfides. Further, studies into the health effects of these chemicals have pushed research to continue to seek suitable alternatives.[102]

## 5.1.2 Mr. Klosowski's writing and testimony support Exponent's analysis and opinions

For clarity, I have structured this section to individually list my opinions as stated in the beginning of this report (by bullet point) and provide reference and discussion to Mr. Klosowski's response to each of these opinions.

---

[97] Sealants in Construction, 2nd ed, (2016) Klosowski K., Wolf A.T. pg 5

[98] Sealants in Construction, 2nd ed, (2016) Klosowski K., Wolf A.T. pg 202

[99] Sealants in Construction, 2nd ed, (2016) Klosowski K., Wolf A.T. pg 198

[100] For example, TOWOLDMON0053042, TOWOLDMON0054001, TOWOLDMON0054003

[101] Yaggi, Jr. US Patent 4,189,407, issued Feb 19, 1980

[102] Sealants in Construction, 2nd ed, (2016) Klosowski K., Wolf A.T. pg 199

**PCB plasticizers were selected for use in certain caulks because of a unique and desirable combination of properties, including low volatility.**

As previously referenced in this report, Mr. Klosowski acknowledges in his published literature[103] that nearly all commercial polysulfide caulks in the 1950s to 1970s contained PCBs due to their unique properties and that polysulfides were integral to the development of the construction industry, particularly the use of the curtain wall.  Mr. Klosowski also acknowledges the low volatility of PCBs in his testimony,

> *"Question: So PCBs tended to stay in the product; is that what this is saying?*
>
> *Mr. Klosowski: PCBs are high molecular weight just because they're polychlorinated. So they're heavy.  They stay.  They have low volatility, so they stay."*[104]

Thus, Mr. Klosowski agrees both to the reasons behind using PCBs as plasticizers and specifically to their low volatility.

**Monsanto was not the formulator of the caulk installed in Clark Elementary School. Monsanto manufactured PCBs that were only one component of some types of caulk and therefore could not reasonably know the composition, properties, or specific end use conditions anticipated for caulks formulated by its customers.**

Monsanto's role in the supply chain was not as a formulator, but as a material supplier.  A specific formulator is responsible for deciding which materials and the particular concentrations of that material that are needed for a formulation to serve a particular application/function.  Mr. Klosowski agrees with this statement in his testimony,

> *"Question: Assuming that the supplier has the quantity and type of ingredient that you want, it is up to you, the formulator, and not the supplier to determine, A, that you want that ingredient and, B, how much to use of it, right?*
>
> *Mr. Klosowski: I got to think again.  Yeah, if it satisfies everything that I want to satisfy, and there's a list that you have.  It's not just a simple name but it's got to satisfy everything you want.  So you then have to have – you talk to your supplier to make sure that it satisfies your whole list."*[105]

---

[103] J.M. Klosowski, A.T. Wolf. The History of Sealants; within K. L. Mittal, A. Pizzi, Handbook of Sealant Technology, CRC Press 2009

[104] Deposition of Jerome Klosowski, August 29, 2017.  pg 55-56

[105] Deposition of Jerome Klosowski, August 29, 2017.  pg 31-32

He goes on further to acknowledge that he is not aware of any role that Monsanto would have played in specific formulations for an end use of a polysulfide caulk when he answered the following question,

> "*Question: Are you aware of any instance where a formulator of polysulfides shared with Monsanto a proprietary formula, yes or no?*
>
> *Mr. Klosowski: No.*"[106]

**When Monsanto withdrew PCB plasticizers from the market, there was no one-to-one replacement, such that products made with PCBs had to be discontinued or reformulated to have different properties and characteristics.**

One-to-one replacement refers to the substitution of one plasticizer for an alternative with no subsequent change to the chemical and physical properties of the formulation.  As Mr. Klosowski writes in his book, "a limited range of plasticizers is compatible with polysulfides."[107]  Further, compatibility does not equate to functionality, such that alternative plasticizers could not impart equivalent levels of desired properties that PCBs provided including fire retardancy, enhanced adhesion, and easily modified mechanical properties.[108]  Mr. Klosowski's testimony echoes this problem of one-to-one replacement when he agrees that he cannot name a one-to-one substitute for PCBs.[109]

**Release of PCBs in caulk installed at Clark Elementary School would depend on caulk formulation as well as end use conditions at the school (e.g., temperature, air circulation, available surface area, etc.) which could not reasonably be defined or controlled by Monsanto.**

As a formulator, Mr. Klosowski understands that the formulation characteristics (i.e. plasticizer migration, vapor pressure of components, cure characteristics, etc.), application characteristics (surface area, thickness, painted layers, etc.) and external factors (i.e. temperature, air circulation, humidity, etc.) all affect the volatility of a particular chemical within a sealant formulation.  Thus, a single vapor pressure of a chemical constituent absent a formulation does not singularly determine its volatility within a formulation.  Mr. Klosowski acknowledges the

---

[106] Deposition of Jerome Klosowski, August 29, 2017.  pg 245

[107] Sealants in Construction, 2nd ed, (2016) Klosowski K., Wolf A.T. pg 198

[108] Chemical Materials for Construction, Maslow P, (1974) pg 228

[109] Deposition of Jerome Klosowski, August 29, 2017.  pg 122

complexities in the release of PCBs in his deposition when he agrees that factors including vapor pressure, surface area, diffusion coefficients, thickness, temperature, time, air-flow, method of application, chemical formulation, concentrations, and type of PCB would affect the volatility.[110]

**To the extent PCBs were released from the caulks, the lower chlorinated homologs are more likely to be released than the higher chlorinated homologs.  Additionally, surface depletion over time would further reduce PCB release.**

General rates of release between specific PCBs is related to the chlorine content as higher chlorine content means higher molecular weight and thus lower rate of volatilization.  Mr. Klosowski acknowledged the role chlorine plays in affecting volatility when he testified, "PCBs are high molecular weight just because they're polychlorinated.  They're heavy.  They stay. They have low volatility, so they stay."[111]  He further stated in response to a question on why PCBs are retained within a polysulfide sealant that, [112]"PCBs are – they came in a variety of molecular weights and a variety of chain links and a variety of numbers of chlorine on them, the polychlorinated biphenyl.  So depending on the chlorine content, depending on the chain length, your answer is going to vary as you through these."  Thus, he agrees with my stated opinion about the effects of chlorine content on PCB release from caulks.

**Caulk in Clark Elementary School from original construction was past the expected useful life in early 2000s, even before the school was evaluated for the presence of PCBs.  Any caulks formulated with PCBs were more than 40 years old at the time of the remediation and should have been replaced regardless of composition.**

From Mr. Klosowski's experience as a sealant formulator, he testifies that after submitting an application for a warranty, his employer (Dow Corning) may provide a warranty for 20 years,[113] which is less than half the length of use for some of the caulk found in the Clark Elementary School.  While factors including weathering, application type, etc. may affect the useful life, it

---

[110] Deposition of Jerome Klosowski, August 29, 2017.  pg 163-170.

[111] Deposition of Jerome Klosowski, August 29, 2017.  pg 56

[112] Deposition of Jerome Klosowski, August 29, 2017.  pg 66

[113] Deposition of Jerome Klosowski, August 29, 2017.  pg 39

54

is evident that the caulk installed in the Clark Elementary School at the time of construction would not be warranted for use greater than the 40 years it has experienced.

**Polysulfide sealants were the only type of building material found to contain functional amounts of PCBs at the Clark Elementary School.**

PCB levels below a few percent are not in line with functional levels.  While lower levels of PCBs were found in other materials, Exponent testing indicated only polysulfide sealants at Clark Elementary School contained these elevated levels of PCBs.  Meanwhile, Mr. Klosowski testified that he has not visited the Clark School and does not know about materials present at the school:

> "*Question: --first of all, have you ever gone to the Clark School that's the subject matter of this litigation?*
>
> *Mr. Klosowski: No.*
>
> *Question: Do you know anything about it?*
>
> *Mr. Klosowski: No.*
>
> *Question: Do you know anything about the sealants found in that building?*
>
> *Mr. Klosowski: Not really.*"

**Polysulfide sealants were integral to the construction industry in the 1950s through the 1970s, and their utility was facilitated by the use of PCBs as plasticizers.**

As previously discussed, Mr. Klosowski writes in his own book about the importance of polysulfide in the construction industry in the 1950s to 1970s.[114]  Further, he discusses the ubiquitous use of PCBs as plasticizers in polysulfides due to their "almost ideal behavior", miscibility, and durability.[115]

---

[114] Sealants in Construction, 2nd ed, (2016) Klosowski K., Wolf A.T. pg 196
[115] Sealants in Construction, 2nd ed, (2016) Klosowski K., Wolf A.T. pg 198

1605740.000 - 7562

## 5.2   Response to Dr. Matson

Dr. Matson's report opined on multiple aspects of PCB use and toxicity, as well as what Monsanto knew prior to the construction of the Clark School.  For the purpose of this report, I will discuss Dr. Matson's opinions from the standpoint of the chemical functionality of PCBs, and specifically Aroclors, used in construction materials as well as the knowledge during the timeframe in question regarding acceptable use and needed use of Aroclors.

**Volatility and Vapor Pressure**

Dr. Matson's report discusses the ability of Aroclor PCBs to volatilize from formulated product, though his analysis appears to lack understanding of Monsanto's role in the supply chain, chemical and physical principals related to formulation, and the relevance of certain statements or articles to materials and conditions actually present at Clark.  In particular, Dr. Matson's assertion that PCBs have high volatility ignores the technical data for these materials and the physical evidence from CES, as well as the statements and testimony of Mr. Klosowski.  Indeed, PCBs remain in the sealant at detectable levels even after more than 40 years due to their chemical compatibility with polysulfides and relatively low volatility.  Plaintiff's expert Dr. Klosowski has stated that PCBs stay put "for a long time",[116] and Dr. Matson himself even stated that PCBs have a "very low or insignificant volatility".[117]

Pure materials can be characterized by their vapor pressure, which is a measure of volatility, or conversion of the material to the gas phase, under specific conditions.  Vapor pressure is related to the material's chemistry, size, and temperature.  Indeed, for some materials, including Aroclors, vapor pressure is too low to be measured at room temperature; elevated temperature are required to obtain measurements that may be used to extrapolate estimated values for the pure material at a selected set of conditions.  Interaction forces due to chemical attraction and physical limitations on mobility also impact volatility.  Perhaps more importantly, the concentration that actually develops in the airspace around a material depends further on factors such as surface area, concentration gradients due to diffusion limitations, air quality,

---

[116] Deposition of Jerome Klosowski, August 29, 2017.  pg 217

[117] Deposition of Jack Matson, September 9, 2016, pg 308-309

temperature, effective air volume and ventilation.  Thus, a simplistic assessment of the vapor
pressure of a pure material cannot be used to reliably predict air concentrations of that material
released from a mixture in a ventilated space.  A formulator would not singularly rely on
quantitative vapor pressures estimated for very low volatility pure materials to understand the
expected behavior of the particular formulations he or she were developing for an end use.

Room temperature measurements of vapor pressures as low as those of PCBs are difficult tests,
which can have results that vary between laboratories, operators and test methods.  Further, the
mixture of congeners with different molecular weights and different individual vapor pressures
additionally convolutes the test method and results.  As explained by Plaintiff's expert Mr.
Klosowski, vapor pressures of $10^{-4}$ and $10^{-5}$ mmHg are both recognized as low enough that any
differences in reported values is inconsequential a formulator's choices;  formulators relied on
general knowledge of materials, such as the knowledge a molecule is large and will stay put,
more so than specific individual values.[118]  Further, Mr. Klosowski stated that vapor pressure is
not the only factor formulators evaluated when selecting candidate components for a
formulation.[119]  Indeed, he affirmed that formulators like himself would test their final materials
(i.e., their end product) for properties such as material loss with well-known industry tests.[120]

**Paint is not the source of PCB's at CES**

Dr. Matson has suggested that paint is a source of PCBs at Clark, though the analytical testing
indicates that is not the case.  Notably, Monsanto did not recommend Aroclor PCBs for interior
latex paints,[10] which were the types of paints used at Clark.  Even if Aroclors were in a paint,
volatiles from painting would be at a maximum when the liquid was sprayed during application,
and decrease as the surface area is reduced and the material solidifies.  Further, with a low
volatility PCB plasticizer in a cured paint, normal ventilation prevents PCB buildup in the air.
Saturation conditions are unlikely to be reached in this situation.

---

[118] Deposition of Jerome Klosowski, August 29, 2017. pg 76-77

[119] Deposition of Jerome Klosowski, August 29, 2017.  pg 60

[120] Deposition of Jerome Klosowski, August 29, 2017. pg 72 & pg 177-178

Monsanto provided information related to Aroclor PCBs including chemistry, handling, and properties such as vapor pressure, as well as comparative information for pure materials and non-commercial example formulation made with different plasticizers to its customers, the formulators.  The chemical information provided Monsanto's technically trained customers with details that would inform their subsequent use and handling.[4]  All plasticizers have a vapor pressure, and Monsanto's data showed that Aroclor PCB plasticizers beneficially offered low vapor pressure along with desirable properties for modifying polymer formulations' performance.

The volatility of PCB plasticizers from formulated materials like caulk will depend on many factors that Monsanto cannot reliably know or control.  Indeed, Dr. Matson references various weight loss tests associated with end-use markets rightly noted in his report that, "The volatilization losses were determined not only by the plasticizer alone, but by the plasticizer resin combination and the thickness of the finished product (Reed, 1943; Craver, 1948; Boyer, 1949; Doolittle, 1954; MONS 080627, 1961; American Chemical Society, 1965; Mellan, 1961)."[121]  Plaintiff's expert Mr. Klosowski agreed with this assessment in his deposition when he acknowledged that multiple factors (including chemical compatibility, diffusion coefficients, etc.) in a formulation would affect volatilization.[122]  Thus, Monsanto's customers decided if an Aroclor PCB was appropriate for a particular use, and assessed the performance and limitations of their specific products.  For example, as Dr. Matson noted,[123] several customers assessed formulations containing Aroclor 1254 for sealing doubled paned windows and found that the windows fogged over time.  While fogging can be the result of offgassing of one or more components from sealants, other factors can also create this visual defect.  Regardless, these examples demonstrate that the formulators, not the raw material suppliers, were assessing their compositions and making decisions about which formulations to commercialize.

---

[121] Matson report, p. 15

[122] Deposition of Jerome Klosowski, August 29, 2017.  p 170

[123] Matson report, p 40

**Formulators make independent technical decisions**

Dr. Matson has suggested that Monsanto's technical communications to potential customers and internal communications related to potential new markets demonstrate that Monsanto was making independent decisions about and the composition and use of formulated products sold by its customers. This is not true, and contradicts Plaintiff's other expert, formulator Mr. Koslowski. Monsanto provided reference and comparative information and customer-driven technical support related to its plasticizer products in a variety of forms, including tables of standardized data, technical brochures that included health and safety guidance, approvals with various regulations (e.g., Various communications and formal documents confirm that Monsanto did not recommend Aroclor plasticizers for food contact applications), and other typical chemical information, including information about volatility and permanence of the pure plasticizers. Aroclors were used in industrial application requiring particular combinations of properties that were determined and assessed by Monsanto's customers in light of their particular applications.

**There was no one-to-one substitute for Aroclor plasticizers**

Dr. Matson goes on to discuss that there were suitable substitutes for Aroclors in nearly all products, and references Broadhurst[124] as his example. Dr. Matson fails to recognize that the Broadhurst paper is merely discussing chemical compatibilities within his 1972 paper and not discussing the functionality of the plasticizers. Broadhurst discusses chemical compatibility and physical characteristics such as density, dielectric strength, thermal conductivity, etc., but does not discuss any resulting composition properties such as plasticizer efficiency, elongation, strength, toughness, weatherability, etc. Dr. Matson is confusing compatibility with functionality. Plasticizer compatibility does not make a plasticizer functional for a particular end use, though lack of compatibility can eliminate a candidate plasticizer. This is one reason why discontinuation of a raw material can be disruptive for product manufacturers. In the case of materials with unique attributes, it is not unusual to stockpile a certain amount of material when notified of a pending change in order to mitigate the risk associated with finding a

---

[124] Broadhurst, M.G., Enviro Health Persp, pg.80-102, October (1972)

replacement.  Multiple documents exist in which Monstanto customers state that they cannot find suitable alternatives to the Aroclor PCBs for their products.[125]

---

[125] For example, TOWOLDMON0053042, TOWOLDMON0054001, TOWOLDMON0054003

# EXHIBIT 9

Page 1

1                    JEROME M. KLOSOWSKI

2              UNITED STATES DISTRICT COURT

3                 DISTRICT OF CONNECTICUT

4

5    CITY OF HARTFORD and HARTFORD

6    BOARD OF EDUCATION,

7                        Plaintiffs,

8            vs.              Case No. 3:15-cv-01544 (RNC)

9

10   MONSANTO COMPANY, SOLUTIA INC.,

11   and PHARMACIA CORPORATION,

12                        Defendants.

13   _____

14

15

16        The Videotaped Deposition of JEROME M. KLOSOWSKI,

17        Taken at 300 Town Center Drive,,

18        Dearborn, Michigan,

19        Commencing at 10:05 a.m.

20        Tuesday, August 29, 2017

21

22

23

24   Reported By: Lezlie A. Setchell, CSR-2404, RPR, CRR.

25   Job No: 129443

                      JEROME M. KLOSOWSKI

1

2    Q.   I'll do my best, sir.  Have you given a deposition

3         before?

4    A.   Yes.

5    Q.   Okay.  We'll get into that later but, sir, you're here

6         pursuant to subpoena in which you were asked to bring

7         with you documents, and I believe some were produced

8         before the deposition.  Did you consciously withhold

9         any documents that were the subject of that subpoena?

10   A.   No.

11   Q.   Now, sir, I'm going to ask you a bunch of questions,

12        and I'll ask you not to answer any questions that you

13        don't completely hear and understand.  If you do

14        respond, everyone here will assume that you've heard

15        the question, understood it and are responding to the

16        best of your ability.  Fair enough?

17   A.   Yeah.

18   Q.   Now, sir, what is your date of birth?

19   A.   3-30-40.

20   Q.   And as I understand it.  You have master's degrees in

21        mathematics and chemistry; is that correct?

22   A.   Yes.

23   Q.   From is it Western Michigan?

24   A.   The master's in math is from Central Michigan, and the

25        master's in chemistry is from Wayne State University.

1                    JEROME M. KLOSOWSKI

2    Q.    Got it.  You don't have a Ph.D.?

3    A.    Correct.

4    Q.    And as I understand it, you went to work for Dow

5          Corning in around 1966?

6    A.    Correct.

7    Q.    And you retired in around 2000?

8    A.    Correct.

9    Q.    So you have not worked for any company since 2000, is

10          that correct, almost 17 years?

11   A.    Other than my own.

12   Q.    Okay, your own and you're a consultant?

13   A.    I do contract research and consulting.

14   Q.    What percentage of your work is related to consulting

15          in litigation?

16   A.    Consulting in litigation, that's -- let's define the

17          consulting.  Most of my consulting is based on

18          forensics.  If a sealant is a problem, then they call

19          me in to find out why the sealant failed.  So that's

20          one aspect.  And this kind of work like today is a

21          very small percentage.  But consulting forensics,

22          determination of failure, half my time, half of my

23          working time.

24   Q.    The consulting and forensics, does that often involve

25          litigation?

Page 12

JEROME M. KLOSOWSKI

 1

 2   A.   Almost never.  It settled.

 3   Q.   Are you retained by lawyers in the context of that

 4        forensic consulting?

 5   A.   Most of the time but not exclusively.

 6   Q.   And so what percentage of your work as a consultant

 7        involves work in which you've been retained by

 8        lawyers?

 9   A.   I said most of the time.  Probably maybe half the time

10        I would say, maybe a little more.

11   Q.   And how about the work, your work in which you've been

12        retained by insurance companies?

13   A.   Not at all.

14   Q.   Okay.  Have you ever been involved in a case like

15        this?

16   A.   No.

17   Q.   Sir, as I understand it, you were hired in December of

18        2015 by Baron & Budd; is that correct?

19   A.   I'm not sure of the date but they hired me a while

20        ago, yes.

21   Q.   And you were disclosed as an expert sometime earlier

22        this year.  What have you been doing for Baron & Budd

23        all that time?

24   A.   Reading over the materials they sent me and answering

25        their questions.

```
                        JEROME M. KLOSOWSKI
 1
 2   Q.   And the documents that you produced to us, your
 3        attorneys produced to us, would be the entire universe
 4        of documents that Baron & Budd sent you to review; is
 5        that correct?
 6   A.   Would you repeat that, please?
 7   Q.   The documents that Baron & Budd sent to us as your
 8        reliance materials would have been the entire universe
 9        of documents that Baron & Budd had supplied to you; in
10        other words, they didn't supply you documents that are
11        not included in that production?
12               MR. LAND:  Are you talking about including
13        those mentioned on the report?
14               MR. GOUTMAN:  Yes.
15               MR. LAND:  Okay.
16               THE WITNESS:  Yeah.  I'm not sure exactly
17        what they all sent to you so I, you know, I don't know
18        what was in the mails.
19               MR. GOUTMAN:  Well, rather than go through
20        it, can you state, counsel, for the record that we
21        have been provided with all the materials that you
22        provided --
23               MR. LAND:  Yes.
24               MR. GOUTMAN:  -- the witness.
25               MR. LAND:  Sorry but yes you have.
```

Page 14

1              JEROME M. KLOSOWSKI

2              MR. GOUTMAN:  Thank you.

3              MR. LAND:  Including those that were listed

4       on the report, yes.

5              MR. GOUTMAN:  Understood.

6  BY MR. GOUTMAN:

7  Q.   Sir, did you do any independent research to find

8       Monsanto documents?

9  A.   No.

10 Q.   So all the Monsanto documents that you reviewed were

11      ones that were sent to you by Baron & Budd; is that

12      correct?

13 A.   Yes.

14 Q.   Now, sir, I understand reading your resume that -- are

15      you familiar with the term formulator?

16 A.   Yes.

17 Q.   Were you a formulator?

18 A.   Yes.

19 Q.   Is a formulator somebody who invents products?

20 A.   Correct.

21 Q.   So you're an inventor?

22 A.   Yes.

23 Q.   And in particular, you invented sealants; is that

24      correct?

25 A.   Among other things, yes.

1                    JEROME M. KLOSOWSKI

2   Q.   With respect to sealants, did you ever invent any

3        nonsilicone-based sealants?

4   A.   Now when we talk about inventions, are we talking

5        about those that are patented?

6   Q.   Well, we can start with that.

7   A.   I have 34 patents, and I'm trying to think.  One of

8        those might be for a nonsilicone-based sealant, yes.

9   Q.   Did Dow Corning ever sell nonsilicone-based sealants?

10  A.   Dow Corning International did, yes.

11  Q.   Are you drawing a distinction between Dow Corning and

12       Dow Corning International?

13  A.   Dow Corning US and Dow Corning Europe, I don't know --

14       I don't know this but I don't -- as best I know and

15       I'm pretty good at this, I don't know that we ever

16       sold a nonsilicone in the US.

17  Q.   Okay.  So all of your work in sealants was with

18       respect to silicone-based sealants as opposed to

19       polysulfide, polyurethane, acrylic?

20  A.   No, that's not true.

21  Q.   Okay.  Can you tell me your experience in the

22       production and sale of polysulfide sealants?

23  A.   Okay.  There seems to be two issues.  All of my work,

24       I did a lot of work on a bunch of things, but let's

25       ask the question -- your last question was what is my

1                    JEROME M. KLOSOWSKI

2       work on polysulfides?

3    Q.  Well, let me step back since apparently we're not

4        communicating, and I'm sure it's my fault.  I

5        understood you to say that Dow Corning with whom you

6        worked from 1966 to 2000 here in Michigan did not

7        manufacture or sell nonpolysulfide sealants.  Did I

8        understand your testimony correctly?

9    A.  Did not manufacture -- the way you said it, you didn't

10       mean to say it, did you?

11   Q.  Let me try it again.

12   A.  Didn't you -- go ahead.

13   Q.  Let me try it again.  Did I understand you correctly

14       that the Dow Corning that you worked for from 1966 to

15       2000 did not sell sealants that did not contain

16       silicone?

17                    MR. LAND:  Objection.  I think you used a

18       double negative there.

19   BY MR. GOUTMAN:

20   Q.  Do you understand my question?

21   A.  I think I understand your question.  Dow Corning in

22       the US did not sell or manufacture nonsilicones --

23   Q.  Okay.

24   A.  -- in the US.

25   Q.  Okay.  So all of your work then with respect to

1                    JEROME M. KLOSOWSKI

2      sealants for Dow Corning would have involved silicone

3      sealants, correct?

4  A.  No, that's not true.

5  Q.  Well, why don't you tell me your experience in

6      polysulfide sealants?

7  A.  In Dow Corning, I did competitive analysis.  So I

8      would look at the sealants that were available for

9      which Dow Corning competed, and I would look at

10     products other than silicones.

11 Q.  What do you mean by look at them?

12 A.  I would do a material evaluation, how good are they.

13 Q.  How would you do that?

14 A.  How would I do that?  I would cure them.

15 Q.  So you'd purchase it, what, over the counter or

16     otherwise obtain a sample, and you would spread it out

17     on a table?

18 A.  Spread it out.

19 Q.  Or some surface?

20 A.  On a surface, cure it up.

21 Q.  Cure it, let it dry, is that what you mean by cure?

22 A.  Cure means achieve the rubber properties or whatever

23     properties it's supposed to achieve.

24 Q.  And then what would you do?

25 A.  Then I would evaluate it by a variety of techniques.

1                    JEROME M. KLOSOWSKI

2       Depending on where the sealant was going to be used,

3       you would determine which techniques you would use to

4       evaluate it.

5  Q.   Tell me those techniques.

6  A.   If you were to use a sealant on a building outdoors

7       that had significant moving joints, then the joint

8       movement ability of that sealant would be very

9       important.  So you would then study joint movement

10      ability.

11 Q.   How would you do that?

12 A.   Well, there are a variety of techniques.  The most

13      common official technique is to use ASDMC-719 which is

14      a test for adhesion and cohesion with joint movement.

15 Q.   When was that promulgated?

16 A.   C-719?

17 Q.   Yeah.

18 A.   ASDMC-719 came out of the specifications put forth by

19      the National Bureau of Standards in the late '60s and

20      into the early '70s, and then in the beginning of

21      1980, we had a new President at the time, Reagan came

22      in, and he said we will be out of the specification

23      testing business as a government, and we will let the

24      industry test and govern itself, and then the C-719

25      test really came under ASTM control at that point, but

                                                            Page 19

 1                      JEROME M. KLOSOWSKI

 2         it was already in the books getting ready for this

 3         change in the mid '70s.

 4    Q.   Getting back to, I guess, a point I was trying to

 5         make, and maybe we can shorten this, am I correct that

 6         other than testing competitor, competitors'

 7         polysulfide sealants, you never formulated a

 8         polysulfide sealant yourself?

 9    A.   That's correct.

10    Q.   The only sealants that you formulated would have been

11         silicone sealants?

12    A.   Oh, that's not correct.

13    Q.   Okay.  Can you explain why that's not correct?

14    A.   Well, there are hybrids.  There are urethanes.  There

15         are acrylics.  And over my career within Dow Corning

16         and since Dow Corning, I have made some of each of

17         those kinds for various projects and things, yes.

18    Q.   Okay.  So are you now telling me that Dow Corning

19         manufactured and sold acrylic sealants?

20    A.   No, I didn't say that.  I said I worked in it.  That

21         doesn't mean we sold it.  That means I evaluated it to

22         see if we might want to get into it.  I tried to make

23         maybe better versions than was on the market, and if I

24         couldn't do that, then we didn't get into the

25         business.

Page 13

JEROME M. KLOSOWSKI

1

2  Q.   And the documents that you produced to us, your

3        attorneys produced to us, would be the entire universe

4        of documents that Baron & Budd sent you to review; is

5        that correct?

6  A.   Would you repeat that, please?

7  Q.   The documents that Baron & Budd sent to us as your

8        reliance materials would have been the entire universe

9        of documents that Baron & Budd had supplied to you; in

10       other words, they didn't supply you documents that are

11       not included in that production?

12              MR. LAND:  Are you talking about including

13       those mentioned on the report?

14              MR. GOUTMAN:  Yes.

15              MR. LAND:  Okay.

16              THE WITNESS:  Yeah.  I'm not sure exactly

17       what they all sent to you so I, you know, I don't know

18       what was in the mails.

19              MR. GOUTMAN:  Well, rather than go through

20       it, can you state, counsel, for the record that we

21       have been provided with all the materials that you

22       provided --

23              MR. LAND:  Yes.

24              MR. GOUTMAN:  -- the witness.

25              MR. LAND:  Sorry but yes you have.

1              JEROME M. KLOSOWSKI

2              MR. GOUTMAN:  Thank you.

3              MR. LAND:  Including those that were listed

4       on the report, yes.

5              MR. GOUTMAN:  Understood.

6    BY MR. GOUTMAN:

7    Q.   Sir, did you do any independent research to find

8         Monsanto documents?

9    A.   No.

10   Q.   So all the Monsanto documents that you reviewed were

11        ones that were sent to you by Baron & Budd; is that

12        correct?

13   A.   Yes.

14   Q.   Now, sir, I understand reading your resume that -- are

15        you familiar with the term formulator?

16   A.   Yes.

17   Q.   Were you a formulator?

18   A.   Yes.

19   Q.   Is a formulator somebody who invents products?

20   A.   Correct.

21   Q.   So you're an inventor?

22   A.   Yes.

23   Q.   And in particular, you invented sealants; is that

24        correct?

25   A.   Among other things, yes.

```
 1                    JEROME M. KLOSOWSKI
 2  Q.   With respect to sealants, did you ever invent any
 3       nonsilicone-based sealants?
 4  A.   Now when we talk about inventions, are we talking
 5       about those that are patented?
 6  Q.   Well, we can start with that.
 7  A.   I have 34 patents, and I'm trying to think.  One of
 8       those might be for a nonsilicone-based sealant, yes.
 9  Q.   Did Dow Corning ever sell nonsilicone-based sealants?
10  A.   Dow Corning International did, yes.
11  Q.   Are you drawing a distinction between Dow Corning and
12       Dow Corning International?
13  A.   Dow Corning US and Dow Corning Europe, I don't know --
14       I don't know this but I don't -- as best I know and
15       I'm pretty good at this, I don't know that we ever
16       sold a nonsilicone in the US.
17  Q.   Okay.  So all of your work in sealants was with
18       respect to silicone-based sealants as opposed to
19       polysulfide, polyurethane, acrylic?
20  A.   No, that's not true.
21  Q.   Okay.  Can you tell me your experience in the
22       production and sale of polysulfide sealants?
23  A.   Okay.  There seems to be two issues.  All of my work,
24       I did a lot of work on a bunch of things, but let's
25       ask the question -- your last question was what is my
```

JEROME M. KLOSOWSKI

1

2    as broad as they are, that covers everything, and it

3    would be difficult to formulate based just on the

4    claims, but on the examples, you certainly could get

5    -- they have to be workable or the patent isn't valid.

6  Q.  Am I correct that you as the formulator would have the

7    final say as to what ingredients go into your formula,

8    correct?

9  A.  I have to think about that for a minute.

10              That's not quite correct.  A final say

11   within a corporation requires your marketing, your

12   toxicology, your engineering.  If it doesn't work in

13   engineering, it doesn't work, you know, if it's hard

14   to do.  You have to put in the business people.

15   Everybody looks at it.

16  Q.  Maybe I inartfully phrased my question.  Am I correct

17   that the company that makes the sealant has the final

18   say about the ingredients in the sealant?

19  A.  The company that makes the sealant --

20  Q.  Yes.

21  A.  -- has the final say on the ingredients?  Unless it's

22   --

23  Q.  That's pretty straightforward, isn't it?

24  A.  Well, unless it's regulated by some law, but if it's

25   out -- if it's not controlled by some law other than

                    JEROME M. KLOSOWSKI

1

2       that in the company, I would say that's correct.

3   Q.  Am I correct that raw material suppliers used in these

4       formulas don't have the power to dictate what is in

5       that formula, correct?

6   A.  The raw material -- the raw material suppliers do not

7       dictate what's in my formula --

8   Q.  Correct.

9   A.  -- you're saying?

10  Q.  They supply -- you tell them what you want and they

11      supply it to you, right?

12  A.  If they have it.

13  Q.  Of course.  So to answer my question, those suppliers

14      don't dictate to you what your final formula is going

15      to be, correct?

16  A.  Not in the concentration or the type, the specific,

17      you know, if I'm going to -- if I'm going to use a

18      silica as a filler, then you talk to your silica

19      filler, and they'll tell you what you can have

20      available at the quantities you want, and then you

21      might adjust your formula based on what you think you

22      can get from your supplier.

23  Q.  Okay.  Assuming, assuming that the supplier has the

24      quantity and the type of ingredient that you want, it

25      is up to you, the formulator, and not the supplier to

```
 1                    JEROME M. KLOSOWSKI

 2          determine, A, that you want that ingredient and, B,

 3          how much to use of it, right?

 4     A.   I got to think again.  Yeah, if it satisfies

 5          everything that I want it to satisfy, and there's a

 6          list that you have.  It's not just a simple name but

 7          it's got to satisfy everything you want.  So you then

 8          have to have -- you talk to your supplier to make sure

 9          that it satisfies your whole list.

10     Q.   And in fact -- as a formulator, you understand that

11          these formulations, your formulations can have

12          multiple ingredients, correct?

13     A.   All my formulations have multiple ingredients.

14     Q.   And changing one ingredient to another might affect

15          the properties that you desire from that sealant,

16          correct?

17     A.   When you change one ingredient to another, you look

18          for, depending on what you're trying to do, if you're

19          trying to make the same product with another

20          ingredient, then you look for an ingredient that is

21          very, very similar to the one that you're trying to

22          get rid of.  So then you try to do this head-on-head

23          comparison, and after you do that, then you formulate

24          that in the product to see if it really did, if it was

25          a one-to-one match or do you have to change
```

```
 1                    JEROME M. KLOSOWSKI
 2   Q.   And you've commented about some of the desired
 3        qualities of sealants, correct?
 4   A.   Yes.
 5   Q.   And am I correct that one of the foremost desired
 6        qualities of a sealant is durability, correct?
 7   A.   Yes.
 8   Q.   That means it will last long, correct?
 9   A.   Not necessarily.  It lasts as long as it's intended to
10        last.
11   Q.   Sure.  And part of what makes a product durable is
12        that its components stay where they are, stay put?
13                    MR. LAND:  Objection; vague.
14                    You can answer.
15   BY MR. GOUTMAN:
16   Q.   Its ingredients stay put, correct?
17   A.   Yes and no.  That's not -- that's not a yes or no.
18        That's not a -- because you put some ingredients in
19        that you expect to leave, and you put some ingredients
20        in that you expect to stay.  So when you put it
21        together, you can't say everything I put together is
22        going to stay there, I want it to stay there.  You
23        plan your formula based on the characteristics of the
24        material that you put in it.
25   Q.   How about a plasticizer and polysulfide caulk; you
```

Page 36

1                    JEROME M. KLOSOWSKI

2         want the plasticizer to stay in there a long time to

3         impart durability, correct?

4    A.   Okay.  Basically that's true, you want the plasticizer

5         to stay there.

6    Q.   And is another quality of a good sealant resistance to

7         degradation, chemical or weather degradation?

8    A.   Yeah, that's another quality.

9    Q.   Well, these are not the questions I didn't think that

10        you've written --

11   A.   No, no.  I mean, there are so many ways to look at

12        this.  So I'm trying to give you the best I can give

13        you, and because when you're talking about this

14        durability and this kind of thing, it's durability

15        under what conditions.  So I'm thinking of this

16        general versus the specific in each time.  I spent my

17        whole life in sealants, so I have this --

18   Q.   I know and your writings are very straightforward, and

19        I'm trying to be straightforward --

20   A.   Sure.

21   Q.   -- in my questions for you, and I don't think I'm

22        asking really complicated questions.  You've written

23        about the fact that a positive quality of a good

24        sealant is its resistance to degradation, correct?

25   A.   Yes.

1                    JEROME M. KLOSOWSKI

2    Q.   And that would include chemical degradation,

3         weathering and the like, correct?

4    A.   Yeah.

5    Q.   And another important feature of a good sealant is

6         flexibility, maintaining flexibility?

7    A.   Okay, yeah, but we got to back up a minute.  Those are

8         talking about -- those characteristics are the

9         characteristics for an outdoor sealant in a moving

10        joint.  Now you would have different characteristics

11        for an indoor sealant.  You would have different

12        characteristics for -- and if you look at the book,

13        there's a whole list that I ask you to look at and

14        saying which on this whole list of properties are

15        important in that application.

16   Q.   That's right because specific applications demand, may

17        demand different products, correct, and different

18        formulas?

19   A.   Different characteristics.

20   Q.   Different characteristics which would be known to the

21        formulator, correct; in other words, the formulator

22        has to know the application to know what kind of

23        product to formulate, right?

24   A.   If he's going to do a good job, that's probably true.

25   Q.   And he will adjust his recipe accordingly?

1                    JEROME M. KLOSOWSKI

2    A.    If he wants to sell in that market.

3    Q.    Sure.  But generally speaking, durability is a good

4          feature for a good sealant, correct?

5    A.    Durability in the application, yes, but the word --

6          again, the word "durability" takes on a whole new

7          meaning with each application.

8    Q.    Can you think of an application where you don't want

9          durability?

10   A.    Yeah.  If you are a seller of sealants or an

11         applicator of sealants, you want the sealant to be

12         destroyed as quickly as possible so you get repeat

13         business.

14   Q.    Okay.

15   A.    And that's really not funny.  It is an absolute truth

16         that people want to have repeat business.

17   Q.    Isn't it -- so did Dow Corning purposely formulate its

18         sealants so that they wouldn't last long and they

19         would get repeat business as a result; are you telling

20         us that?

21   A.    I didn't say that at all.

22   Q.    What companies did that if not Dow Corning, purposely

23         made sealants that wouldn't be durable so that the

24         sealant would fail and more product would be

25         purchased?

```
 1                    JEROME M. KLOSOWSKI

 2   A.   I don't know of anybody who did that.  I just know of

 3        generic types that have less durability.

 4   Q.   What warranties did Dow Corning give for its sealant

 5        in terms of how long it would last, sealants?

 6   A.   Often with Dow Corning if you apply for the warranty,

 7        and then you have to do special things in application,

 8        etcetera, etcetera, but if you apply and get the

 9        warranty, you can get a 20-year warranty.

10   Q.   Sir, I want to -- generally is that the expected life

11        of a building sealant or caulk, 15 to 20 years?

12                    MR. LAND:  Objection; vague.

13                    You can answer.

14                    THE WITNESS:  Yeah, it's a -- yes and no.

15        Sealants that I made and I worked with in 1970 are

16        still working fine today.  So you say talk about

17        expected lifetime, that's durable, but the durability

18        of the sealant depends on where it's being used.  So

19        if you ask me how long it would last if you sealed

20        that corner in this room, you'd get a whole different

21        answer using that same sealant if you sealed that

22        joint outside on the south side of the building

23        getting the full effect of the sun and the wind and

24        the rain and this kind of thing.  So what you're

25        looking at is durability in an application.
```

1                           JEROME M. KLOSOWSKI

2          some applications you want high-stress relaxation and

3          in other applications you don't, they would formulate

4          a product to meet those different needs, correct, or

5          may formulate a product to meet those different needs,

6          correct?

7     A.   They would formulate maybe different products to meet

8          those needs.

9     Q.   That's what I meant to say.

10    A.   Yeah.

11    Q.   Thank you.  That's all I -- that's all I wanted to

12         know.

13                    Now, now as we know, PCBs were used as a

14         plasticizer in polysulfide sealants, correct?

15    A.   Yes.

16    Q.   And am I correct that only a limited range of

17         plasticizers is compatible with polysulfides because

18         the solubility parameter of an aliphatic polymer is

19         high?

20    A.   Yes.

21    Q.   And, in fact, I'm just reading that from page 198.

22    A.   Yes.

23    Q.   So it's not a trick question.

24    A.   But just, it's aliphatic.

25    Q.   Aliphatic?

1                    JEROME M. KLOSOWSKI

2    A.   Yeah.

3    Q.   What did I say, alipathic?

4    A.   Something like that.

5    Q.   Sorry about that.  I've got to get these glasses

6         cleaned.

7                    And what does that mean, solubility

8         parameter of an aliphatic polymer being high?

9    A.   Well, in the sentence you said ahead of time pretty

10        much explains it.  Not all solvent materials will be

11        good solvents for polysulfides.  Not all plasticizers

12        will be good plasticizers for polysulfides.  That's

13        true, by the way, of every polymer system.  Not

14        everything works with every system.  So you go through

15        the maze of plasticizers available, and you have a

16        category of plasticizers, a group that you choose from

17        to satisfy the needs.

18   Q.   Am I correct and I'm just reading your book next

19        states:  Nearly all of the early polysulfide sealants

20        produced during the period from the 1950s to the late

21        1970s contained 5% to 30% polychlorinated biphenyls,

22        parens, PCBs; did I read that right?

23   A.   Where are you reading that from?

24                    MR. LAND:  On 198.

25   BY MR. GOUTMAN:

1                    JEROME M. KLOSOWSKI

2    Q.   198, last full paragraph, the second sentence of the

3         last full paragraph starting with nearly all:  Nearly

4         all the early polysulfide sealants produced during the

5         period from the 1950s to the late 1970s contained 5%

6         to 30% polychlorinated biphenyls, parens, PCBs; did I

7         read that correctly?

8    A.   You read that correct.

9    Q.   And then it goes, further it says:  These plasticizers

10        showed almost ideal behavior.  They were miscible --

11                    Does that mean soluble?

12   A.   Not necessarily.

13   Q.   Let me finish reading it, and then we can unpack it.

14   A.   Sure.

15   Q.   These plasticizers showed almost ideal behavior.  They

16        were miscible up to high levels and imparted good

17        durability to the sealant.

18                    Did I read that correctly?

19   A.   Yes.

20   Q.   What do you mean by when you say they were miscible up

21        to high levels, and why was that an aspect of ideal

22        behavior?

23   A.   Okay.  Miscible means if you mix a couple of things

24        together and they're intimately mixed, they probably

25        won't settle out and get separation.  They're

Page 54

1                    JEROME M. KLOSOWSKI

2        miscible.  They're totally mixed one within the other.

3        So that would be miscible.

4    Q.  And you don't want ingredients in a sealant to start

5        to separate, do you?

6    A.  That's a problem sometimes, yes.

7    Q.  Yeah, that's the durability issue, right, and

8        performance?

9    A.  Yeah, it's a problem sometimes in application.  If

10       you're having things separated.  It depends on the

11       rate of separation.

12                   MR. LAND:  We've been going for about an

13       hour.  Do you have another question you want to ask

14       before we take a break?

15                   MR. GOUTMAN:  Yeah, I just want to finish

16       this.

17                   MR. LAND:  Go ahead.

18   BY MR. GOUTMAN:

19   Q.  And it says:  And imparted good durability to the

20       sealant?

21                   What did you mean by that?

22   A.  If --

23                   MR. LAND:  Where are we on here?  Oh, I see

24       it.  My fault.

25                   MR. GOUTMAN:  I earlier read this.  I'm

Page 55

1                    JEROME M. KLOSOWSKI

2          just breaking the sentence up now.

3    BY MR. GOUTMAN:

4    Q.    You said:  These plasticizers showed almost ideal

5          behavior.  They were miscible up to high levels.

6                    We've already discussed that.  And then it

7          says:  And imparted good durability to the sealant.

8                    Could you explain what you meant by that?

9    A.    Okay.  Remember, I didn't write it.  So I'm going to

10         try to explain what my co-author meant by that.

11   Q.    Okay.

12   A.    I'm going to try to explain what he meant by that.

13   Q.    Okay.

14   A.    Okay, and I don't know this for sure, but this is how

15         I would have interpreted it because it's true that if

16         you have a plasticizer that stays in the product, then

17         it tends to keep the properties that its plasticized.

18         A plasticizer means it makes it more plastic, more --

19   Q.    Flexible?

20   A.    -- flexible and so if it stays in, that keeps the

21         properties there longer.  If your plasticizer was more

22         solvent like, that would quickly come out.  Then you

23         would have a quick change of properties from the time

24         you installed it to some shorter time in the field.

25   Q.    So PCBs tended to stay in the product; is that what

Page 56

1                         JEROME M. KLOSOWSKI

2          this is saying?

3     A.    PCBs are high molecular weight just because they're

4          polychlorinated.  So they're heavy.  They stay.  They

5          have low volatility, so they stay.

6                         MR. GOUTMAN:  Thank you.  We can take a

7          break.

8                         VIDEO TECHNICIAN:  Going off the record at

9          11:12 a.m.

10                        (Recess taken at 11:12 a.m.)

11                        (Back on the record at 11:25 a.m.)

12                        VIDEO TECHNICIAN:  Going back on the record

13         at 11:25 a.m.  This is the beginning of disk two.

14    BY MR. GOUTMAN:

15    Q.    Did you have a good break?

16    A.    It was a nice break.

17    Q.    Good.  Making sure my phone is off.

18                        Sir, getting back to your book, at the

19         bottom of page 198, last partial paragraph, it says:

20         Because of their good durability, polysulfide sealants

21         containing PCBs are still installed today on joints in

22         many buildings that were sealed during the 1950s to

23         1970s.

24                        Is that what it says?

25    A.    That's correct.

```
 1                    JEROME M. KLOSOWSKI
 2   Q.   Now is it your understanding that PCBs were an
 3        industrial chemical?
 4   A.   Could you define what you mean by industrial chemical?
 5   Q.   Well, let me put it this way.  You couldn't go to your
 6        local Ace Hardware, a consumer couldn't, and buy a
 7        bucket of PCBs, could you?
 8   A.   I don't think so.
 9   Q.   PCBs were an industrial chemical sold in bulk to
10        manufacturers of other products, correct?
11               MR. LAND:  Objection; compound, vague.
12               You can answer.
13               THE WITNESS:  I think so.  I'm not an
14        expert on that back in that day.
15   BY MR. GOUTMAN:
16   Q.   And some of the benefits of PCBs in plastics for
17        formulators included, and I think you mentioned this
18        before, maybe you did, wide chemical compatibility;
19        would that be a benefit?
20   A.   Wide chemical compatibility, now that's an interesting
21        question.  It was compatible with some chemicals and
22        incompatible with others.
23   Q.   Do you know whether it has wide chemical compatibility
24        or not?
25   A.   I don't know exactly what it wasn't compatible with.
```

1                    JEROME M. KLOSOWSKI

2        I know it wasn't chemical with hydrocarbons.  That's

3        why you use them in hydrocarbon applications.  So when

4        you say wide chemical compatibility, you just looked

5        at a minute ago where you used it, and you said you

6        used it in hydrocarbon applications because it wasn't

7        compatible with hydrocarbons and it didn't swell in

8        hydrocarbons.  So wide is a big -- I don't know what

9        the word means.

10   Q.   Fair enough.  Another benefit is the chemical's low

11        volatility, correct?

12   A.   Yes --

13                    MR. LAND:  Objection; vague.

14                    You can answer.

15                    THE WITNESS:  -- again, well, it actually

16        is vague in the fact that there was a variety of PCBs

17        that had a variety of vapor pressures.  So you would

18        have the whole gamut in there, and the materials, the

19        data sheets from Monsanto indicated that.

20   BY MR. GOUTMAN:

21   Q.   Yeah, and -- well, let me get some, maybe some

22        definitions on this from you.  Quantitatively speaking

23        as a formulator, is there, is there a number that you

24        define, decide to an ingredient that you believe had

25        low volatility in terms of vapor pressure?

```
 1                        JEROME M. KLOSOWSKI

 2   A.    No.

 3   Q.    Well, would you say something that has vapor pressure

 4         of 10 to the minus 4, would that be something with low

 5         vapor pressure?

 6   A.    Yeah, yes, but it depends on the application.  Is it

 7         low enough for this application?  So when you're using

 8         -- low is kind of a relative number, you know.  It

 9         might be low here but it wouldn't be low in another

10         application.  It's lower than what I need.  It's as

11         low as I need.  It's as high as I need.  It's higher

12         than I need.  So these are relative words.  When

13         you're saying how would I define it, I would still

14         define it relative to the application.

15   Q.    Okay.  Relative, I know that's one way to define it,

16         relative to the spectrum of vapor pressures that

17         chemicals have, would you say 10 to the minus 4 is a

18         low vapor pressure?

19   A.    And you're talking about millimeters of mercury; is

20         this what you're talking about?

21   Q.    Yes.

22                   MR. LAND:  Objection; vague.

23                   You can answer.

24                   THE WITNESS:  Yeah.

25   BY MR. GOUTMAN:
```

1                    JEROME M. KLOSOWSKI

2    Q.   And obviously 10 to the minus 5 would be a low vapor

3         pressure, too?

4    A.   You would think so.

5                    MR. LAND:   Objection, vague.

6    BY MR. GOUTMAN:

7    Q.   Lower still.  And it is the formulator who decides

8         what vapor pressure is appropriate for a given

9         ingredient for a given application, correct?

10   A.   That isn't the principal criteria for judging a

11        plasticizer.  There are -- there's more to it than

12        just the vapor pressure.

13   Q.   Well, is it a factor?

14   A.   It is a factor.

15   Q.   Okay.  And I didn't really ask you whether it was the

16        only factor but what I asked you was:  Is it the

17        formulator who decides what vapor pressure is

18        necessary or appropriate for a given application?

19   A.   I suppose the answer would be yes, but in choosing

20        plasticizers, I don't -- that's not my main criteria.

21        It's one of the series.  So I don't want it to sound

22        like I looked at the vapor pressure and then made my

23        decision.

24   Q.   Have you ever chosen an ingredient -- well, let me ask

25        you this.  Strike that.  I'll move on.

1                    JEROME M. KLOSOWSKI

2                    Would the PCBs impart resistance to heat?

3    A.   Not that I know of.

4    Q.   So you doesn't know whether PCBs were classified as

5         nonflammable, do you?

6    A.   Those two are not the same question.  Did you hope to

7         tie those two questions together?

8    Q.   Do you know whether PCBs were classified as

9         nonflammable?

10   A.   Oh, yes, I do.

11   Q.   So what you're referring to is resistance to flame as

12        opposed to resistance to heat?

13   A.   Correct.

14   Q.   Is that the distinction you wanted to make?

15   A.   Yes, yes.

16   Q.   Okay.  Do you know that they were, PCBs were resistant

17        to flame?

18   A.   Yes.

19   Q.   And classified as nonflammable?

20   A.   Yes.

21   Q.   And was that in some applications a positive attribute

22        for building products?

23                    MR. LAND:  Objection; vague.

24                    You can answer.

25                    THE WITNESS:  If it made the whole product

1                         JEROME M. KLOSOWSKI

2          nonflammable or less flammable, it would be -- it

3          would be handy in some applications.

4    BY MR. GOUTMAN:

5    Q.    So the answer is yes, it would be a benefit?

6    A.    In some applications.

7    Q.    Okay.  Did PCBs impart resistance to chemicals?

8                    MR. LAND:  Objection; vague.

9                    You can answer.

10                   THE WITNESS:  Yes.  Again, it's specific

11         chemicals.

12   BY MR. GOUTMAN:

13   Q.    Okay.  Did it impart resistance to water?

14   A.    PCBs in the formula didn't impart it.  It was the

15         whole formula that did it.  But PCBs are not water

16         soluble, so yes to that extent.

17   Q.    Did it -- why don't we just say contribute instead of

18         impart.  Did it contribute to resistance to sunlight?

19   A.    Contribute to resistance to sunlight, not that I know

20         of.

21   Q.    Did it contribute to resistance of mold, to mold?

22   A.    That I believe is true.  I don't know that so I've got

23         to go with I don't know.  I just think it.  I haven't

24         studied the PCB mold situation.

25   Q.    Did it contribute to resistance to mildew?

1                    JEROME M. KLOSOWSKI

2    A.   As I read, yes.  I haven't studied it again.

3    Q.   Did it contribute to resistance to fungus?

4    A.   I don't know that.

5    Q.   Did it promote ease of coating?

6    A.   Did it promote ease of coating?  Better or worse than

7         other materials or just as the material stands as

8         itself?  I do need a clarification.

9    Q.   Actually I want you to answer my question and not some

10        other question that may be --

11   A.   Just for clarification --

12   Q.   -- popping around your head.  Did it promote ease of

13        coating?

14                   MR. LAND:  Objection; vague.

15                   You can answer.

16                   THE WITNESS:  Plasticizers do that and it

17        was a plasticizer, so it did that.

18   BY MR. GOUTMAN:

19   Q.   Did it have the characteristic of being nondrying?

20                   COURT REPORTER:  Non --

21                   MR. GOUTMAN:  Nondrying.

22                   COURT REPORTER:  Thank you.

23                   MR. LAND:  Objection; vague.

24                   You can answer.

25                   THE WITNESS:  Yes, characteristic, yeah.

1                    JEROME M. KLOSOWSKI

2     BY MR. GOUTMAN:

3     Q.   Did it promote flexibility and stretchability?

4                    MR. LAND:  Objection; compound, vague.

5                    You can answer.

6                    THE WITNESS:  Generally speaking, within

7          the parameters of that product, yes.

8     BY MR. GOUTMAN:

9     Q.   Did it increase adhesion?

10                   MR. LAND:  Objection; vague.

11                   You can answer.

12                   THE WITNESS:  Not that I know of.

13    BY MR. GOUTMAN:

14    Q.   Did it protect against corrosion?

15                   MR. LAND:  Objection; vague again.

16                   You can answer.

17                   THE WITNESS:  Not that I know of.

18    BY MR. GOUTMAN:

19    Q.   Was it useful for electrical insulation?

20                   MR. LAND:  Objection; vague.

21                   You can answer.

22                   THE WITNESS:  Are we talking about the

23         sealant or just PCBs?

24    BY MR. GOUTMAN:

25    Q.   PCBs.  I was talking about PCBs.  What did you think I

1                       JEROME M. KLOSOWSKI

2          was talking about?

3     A.   Well, the question in my mind, are we talking about

4          PCBs in a sealant or PCBs just as a general material?

5     Q.   Actually in terms of electrical insulation, I was

6          talking about PCBs used as a plasticizer.

7     A.   In a sealant?

8     Q.   In any product.

9     A.   Okay.  Now --

10    Q.   Did it have -- did it have useful electrical

11         insulation capabilities?

12                    MR. LAND:  Objection, vague.

13                    THE WITNESS:  Yeah, I think -- and I don't

14         know what the data, what's good or bad.  I haven't

15         studied the electrical properties, so I can't tell you

16         that.

17    BY MR. GOUTMAN:

18    Q.   Okay.  Now you mentioned earlier that PCBs tended to

19         remain in the product.  Would one of the reasons be

20         its compatibility with resins?

21    A.   One of the reasons it stays in is it is compatible

22         with the resin, yes, that's correct.

23    Q.   Another reason is its molecular structure, I think you

24         mentioned molecular weight, it is a large molecule

25         that moves slowly?

JEROME M. KLOSOWSKI

1

2   A.   You're talking about, excuse me, but for

3        clarification, you're talking about PCBs as if it's a

4        separate entity.  PCBs are -- they came in a variety

5        of molecular weights and a variety of chain links and

6        a variety of numbers of chlorine on them, the

7        polychlorinated biphenyl.  So depending on the

8        chlorine content, depending on the chain length, your

9        answer is going to vary as you go through these.  So

10       when you say just PCBs, that's very difficult to

11       answer.

12  Q.   Well, I'm talking about Aroclor 1254.

13  A.   Okay.  Now define for me Aroclor 1254.

14  Q.   Have you ever heard of it?

15  A.   Of course.

16  Q.   Why do I have to define it for you; do you know what

17       it is?

18  A.   It's a polychlor -- it's a PCB.

19  Q.   What is it?

20  A.   Let me see a data sheet and I will tell you.  I don't

21       memorize the numbers.  I memorize the --

22  Q.   Well, let's get down to basics.  Was it a product sold

23       by Monsanto.

24  A.   As far as I know.  I don't remember all of their

25       products.  I assume that that was correct because

```
 1                    JEROME M. KLOSOWSKI
 2         you're suggesting it is.
 3    Q.   Well, do you know?
 4    A.   That it was sold?
 5    Q.   Was it a product sold by Monsanto?
 6    A.   If I could look at the Monsanto sheet, I could tell
 7         you that.
 8    Q.   Well, can you tell me now?
 9    A.   Not without referring.  I don't know if it's 1245 or
10         1246 or 1572.  These numbers don't carry weight with
11         me.  It's formulas that carry weight with me.  I just
12         don't remember formula names.  That's not a chemical
13         name.  That's a trade name and I don't memorize
14         products typically by trade names.
15    Q.   Do you know what Monsanto product was used as a
16         plasticizer in polysulfide caulks?
17    A.   I read in the reports from Monsanto which
18         polysulfides, which PCBs they used in polysulfide
19         caulks, and there were a variety of them.
20    Q.   What were they?
21    A.   I don't know the numbers.  I can't give you the
22         numbers unless you give me the data to refer back to.
23         You don't want me to guess.
24    Q.   I want you to know -- what we're doing here is I'm
25         trying to see what you know and what you don't know,
```

1                    JEROME M. KLOSOWSKI

2         okay?  If you don't know the answer to a question, you

3         can say I don't know.

4    A.   Yes.

5    Q.   That's fine.  You don't know?

6    A.   I don't know the specific product they used in each of

7         these formulas, no.

8    Q.   Am I correct that PCBs were resistant to breakdown?

9                    MR. LAND:  Objection; vague.

10                   You can answer.

11                   THE WITNESS:  They are reported in the

12        literature as being resistant to breakdown, so that is

13        my knowledge of that.

14   BY MR. GOUTMAN:

15   Q.   And that would be a benefit to a formulator in

16        choosing a plasticizer, correct?

17   A.   That's a benefit in a plasticizer.

18   Q.   And that would be another reason why PCBs would tend

19        to stay put within the sealant matrix, correct?

20   A.   Yeah, relatively, yes, that's one of the reasons.

21   Q.   And PCBs were resistant to chemical extraction,

22        correct?

23   A.   With some chemicals that's correct.

24   Q.   And that would be another reason why PCBs tended to

25        stay put within the sealant matrix, correct?

                    JEROME M. KLOSOWSKI

1

2    A.   In applications where those chemicals were being

3         contacted with them, that would be a reason, yes.

4    Q.   And I think you mentioned solubility.  PCBs had really

5         negligible water solubility, correct?

6    A.   Yes.

7    Q.   And that would be another reason why PCBs would tend

8         to stay put within the sealant matrix, correct?

9    A.   Water solubility is typically not one of the, one of

10        the points we look to when we're looking at stability

11        into a common chemical matrix, not with the chemical

12        cures.  With an acrylic maybe but not with the

13        chemical cures.

14   Q.   And I think you already mentioned low vapor pressure

15        and low volatility; PCBs had low vapor pressure and

16        low volatility, correct?

17   A.   Depending --

18              MR. LAND:  Objection, vague, compound.

19              You can answer.

20              THE WITNESS:  Depending on which one, then

21        they had a variety of vapor pressures typically on the

22        low side.

23   BY MR. GOUTMAN:

24   Q.   Do you know the difference between Aroclor 1254 and

25        Aroclor 1242?

```
 1                    JEROME M. KLOSOWSKI

 2   Q.   How about polysulfide sealants?

 3   A.   I don't know that for sure.  I only know what I read

 4        that they used, and what I read they used is that

 5        there were a variety of materials available, and in

 6        the process, they provided a variety of alternatives

 7        to them because there was a variety of PCBs that were

 8        being displaced in the '70s, and they provided a

 9        variety of alternatives to the various PCBs.  They had

10        a whole table on them.

11                    MR. GOUTMAN:  Move to strike as

12        nonresponsive.

13   BY MR. GOUTMAN:

14   Q.   The question was, sir, a very simple one.  In terms of

15        chlorine content, which PCBs were used as plasticizers

16        in polysulfide sealants?  You've given me a range of

17        40s to high 60s.  Which were used?

18   A.   I don't know exactly.

19   Q.   Now did you as a formulator have an understanding of

20        the vapor pressure of all the ingredients of your

21        sealant?

22   A.   Did I understand the vapor pressures of all the

23        ingredients?

24   Q.   Yeah.

25   A.   Typically the answer is yes and no.  Let me try the
```

Page 72

1                    JEROME M. KLOSOWSKI

2          yes first.

3                    I knew the vapor pressure, not necessarily

4          as a number, but I knew the rate of weight change as a

5          function of the materials being released, and I knew

6          the rate at which materials were being released.  So

7          as a formulator, that was very key to me, how fast did

8          you lose any of the ingredients you put in there, and

9          I knew it also as a function of room temperature and

10         at accelerated temperatures.

11   Q.    So how would you determine weight loss; would you do

12         that in your laboratory?

13   A.    I did and I -- it's kind of a standard test.

14   Q.    Is that a standard test that formulators used in

15         developing for market sealants?

16   A.    I don't know what other formulators did, but if they

17         were good formulators and were conscientious about

18         their product, then they would have known the rate at

19         which things left their product, yes.

20   Q.    And that would be the ASTM weight test; is that what

21         you're referring to?

22   A.    That would be a very good way of determining it.

23   Q.    What other ways did you determine it as a formulator?

24   A.    Sometimes you would put things into, well, again, it's

25         kind of an oven, and you would test these things in

```
                         JEROME M. KLOSOWSKI
 1
 2   A.   I don't know.  Maybe around that.
 3   Q.   Did you also have a staff of toxicologists?
 4   A.   In what year?
 5   Q.   1960s.
 6   A.   There may have been one or two on the staff.  It
 7        wasn't a big department, I think, in the 1960s.
 8   Q.   And their role was to determine whether the, among
 9        other things, the sealants that Dow Corning sold were
10        safe for consumers, correct?
11   A.   Again, that's a yes and no.  Can I answer both?
12   Q.   I want an answer to my question.
13   A.   Okay.  So the answer is no, they wouldn't test
14        everything I made.  They would only test the things
15        that I thought should be tested.  If I thought
16        something should be tested, then they would test it.
17   Q.   Okay.  We'll pick up on that later.  In terms of the
18        rate of weight loss, that was determined on the whole
19        product, correct?
20   A.   Yes.
21   Q.   Now going back to my earlier question, do I take your
22        testimony -- do I understand your testimony correctly
23        that you would not necessarily have with respect to
24        all of the raw ingredients that go into your formula a
25        vapor pressure number, correct?
```

```
 1                    JEROME M. KLOSOWSKI
 2   A.   I could have it.  I probably did have it.  It was --
 3        when you buy a raw material, you get the
 4        specifications that the company supplies you with.  So
 5        you know about the material from the supplier, so if
 6        they supplied B with it.  If it was a key thing for
 7        me, then I would have looked at it.  If it wasn't a
 8        key thing, if I had some intuition relative to it,
 9        then I probably would say, Oh, this is a big heavy
10        molecule, I don't have to test it.  If it's a light
11        molecule, I might want to test it.  I might want to
12        look at their data actually.  I wouldn't test it
13        myself.  Why would I test it?  I wouldn't do that.  I
14        would look at their data.
15                  MR. GOUTMAN:  Move to strike as
16        unresponsive.
17   BY MR. GOUTMAN:
18   Q.   My question was simply this:  Did you have vapor
19        pressure numbers for all of the ingredients that you
20        used in sealants?
21                  MR. LAND:  Objection; asked and answered.
22                  You can answer.
23   BY MR. GOUTMAN:
24   Q.   It's either yes or no; you either did have it for all
25        of them or you didn't?
```

```
 1                    JEROME M. KLOSOWSKI
 2   A.   "All" is a big number.  So when you say "all" and not
 3        "most", I'm going to say no.
 4   Q.   Now when you say that a product, a raw material
 5        supplier gave you specifications that might contain
 6        vapor pressures and you said if it's, I don't recall
 7        what you said, if it's a big heavy molecule or a light
 8        molecule, that might affect your decision.  What was
 9        the dividing line between that would trigger further
10        investigation?  First of all, did I understand your
11        testimony correctly?
12   A.   You did, but it wasn't clear-cut.  I never did that
13        kind of thing saying I'm only going to use these and
14        not these.  I looked at the material, and then I
15        looked at my composition, and then I looked at my
16        weight loss in the compositions and decided if that
17        was consistent, and you studied these as a function of
18        time --
19   Q.   Sure.
20   A.   -- so you can tell the rate of change.
21   Q.   So you never, for example, said this ingredient is
22        vapor pressure of 10 to the minus 4, I really want 10
23        to the minus 5; that sort of thought process never
24        happened, correct?
25   A.   Yeah, that's correct.
```

                        JEROME M. KLOSOWSKI

1

2   Q.   Okay.  Now would you agree with me that as a

3        formulator, you knew that anything with a vapor

4        pressure will volatilize, correct?

5   A.   At some rate.

6   Q.   Okay.

7   A.   Varying rates.

8   Q.   Sure.  And you knew as a formulator that all

9        plasticizers -- well, first of all, all plasticizers

10       had vapor pressures, correct, known or unknown, but

11       they all had vapor pressures, right?

12  A.   High or very low but yes.

13  Q.   And formulators would know that all plasticizers would

14       volatilize at some rate, correct?

15  A.   At some rate.

16  Q.   That's what I said.  So the answer is yes?

17  A.   Yes, at some rate.

18  Q.   And was -- were these weight loss tests that you

19       described, were they -- that wasn't unique to Dow

20       Corning, was it?

21  A.   Well, the weight loss tests are standard tests in the

22       industry.  I assumed other companies used them.  I

23       don't know that they used them, but I assumed they did

24       since it was a standard test in the industry.

25  Q.   And what would carry more weight for you as a

1                    JEROME M. KLOSOWSKI

2          formulator, a number given in specifications in an

3          ingredient or the results of a weight loss test?

4                    MR. LAND:  Objection; incomplete

5          hypothetical.

6                    You can answer.

7                    THE WITNESS:  My weight loss test to show

8          me the rates of actual loss in there is what I based,

9          what I based my data on.  My decisions were based on

10         that kind of thing.

11   BY MR. GOUTMAN:

12   Q.    And am I correct, and I guess this is just sort of

13         basic chemistry, that the vapor pressure of a raw

14         ingredient will change based upon its co-ingredients

15         in the sealant matrix, correct?

16   A.    Yes and no, depending on how it interacts with those

17         other ingredients.  So it's a yes and no answer again.

18         It's not clear.

19   Q.    Well, how about PCBs?

20   A.    PCBs in --

21   Q.    The rate at which they will volatilize would depend

22         upon other ingredients in the sealant matrix, correct?

23   A.    It might.

24                    MR. LAND:  Objection; incomplete

25         hypothetical.

```
 1                    JEROME M. KLOSOWSKI
 2        Monsanto's statement that PCBs were systemically toxic
 3        to mean that they're real bad.  That's essentially
 4        what you said, right?
 5   A.   Uh-huh --
 6   Q.   Is that yes?
 7   A.   -- yes.
 8   Q.   And, and you as a formulator took that to mean that
 9        the product PCBs could --
10                    (Off the record at 12:42 p.m.)
11                    (Back on the record at 12:42 p.m.)
12   BY MR. GOUTMAN:
13   Q.   You took that to mean as a formulator that the product
14        PCBs could pose serious health consequences from
15        exposure, correct?
16   A.   Would you restate that?  I'm trying to --
17   Q.   I'm sorry.  You took that to mean, that is Monsanto's
18        statement that PCBs were systemically toxic, you took
19        that as a formulator to mean that PCBs could pose
20        serious health consequences from exposure, correct?
21                    MR. LAND:  Objection; misleading
22        hypothetical.
23                    You can answer.
24                    THE WITNESS:  Yes, but that's not the whole
25        thing.  When they said that and then withdrew the
```

1                    JEROME M. KLOSOWSKI

2         product, it gave you an idea of the magnitude of the

3         problem.

4                    MR. GOUTMAN:  Move to strike.

5    BY MR. GOUTMAN:

6    Q.   My question was simply this:  By Monsanto saying that

7         its product was systemically toxic, you as a

8         formulator knew or took that to mean that the product

9         could pose serious health consequences from exposure,

10        yes or no?

11                   MR. LAND:  Objection; misleading,

12        incomplete hypothetical, asked and answered.

13                   THE WITNESS:  From exposure -- in some

14        conditions, yes.

15   BY MR. GOUTMAN:

16   Q.   Now you're aware, are you not, that Monsanto first

17        started to tell its customers that PCBs could be

18        systemically toxic in the 1930s; are you aware of

19        that?

20   A.   I don't think I was aware of it until the '50s.

21   Q.   Okay.  And what was your awareness of PCB systemic

22        toxicity in the 1950s?

23   A.   I read it in the Monsanto reports.

24   Q.   So you in the 1950s knew that PCBs could be

25        systemically toxic, correct?

1                   JEROME M. KLOSOWSKI

2        something that's toxic are more toxic, so the answer

3        would be typically yes.

4   BY MR. GOUTMAN:

5   Q.   So the fact that PCBs may be systemically toxic in

6        laboratory animal studies would not mean necessarily

7        that PCBs incorporated into an adhesive would

8        volatilize to the extent that would cause injury,

9        correct?

10                  MR. LAND:  Objection; lacks foundation.

11                  THE WITNESS:  I don't know that.

12   BY MR. GOUTMAN:

13   Q.   And do you know, for example, in the studies that

14        studied the toxicity of PCBs, that they had to heat up

15        the PCBs because otherwise they wouldn't volatilize

16        enough to cause a toxic response in laboratory

17        animals; did you know that?

18                  MR. LAND:  Objection; lacks foundation,

19        calls for speculation.

20                  THE WITNESS:  I know they heated them, but

21        they heated them to get enough material out to get a

22        response within the time they were studying it.  We

23        also know that -- well, that's enough.

24   BY MR. GOUTMAN:

25   Q.   Sir, are you aware of any study to this day that

1                    JEROME M. KLOSOWSKI

2        demonstrates that PCBs volatilizing from building

3        products cause human disease?

4                    MR. LAND:  Objection; lacks foundation,

5        calls for speculation.

6                    THE WITNESS:  I don't know that personally.

7    BY MR. GOUTMAN:

8    Q.   Do you know what plaintiffs' other experts have said

9         about that?

10   A.   No, I don't.

11   Q.   Sir, would it be important as a formulator -- is it

12        important as a formulator to market a product that you

13        believe will not cause injury to consumers of that

14        product?

15   A.   Yeah, that's correct.

16   Q.   And as a formulator, did you pass on to your customers

17        warnings provided by your raw material providers?

18                    MR. LAND:  Objection; vague.

19                    You can answer.

20                    THE WITNESS:  If the material was

21        persistent after the formula, so what we're talking

22        about, the raw material can go in and then it can be

23        reacted so that it's not there anymore, so then you

24        don't have to pass on the warning, but if the material

25        is still there, then you pass on the warning, but it

1                    JEROME M. KLOSOWSKI

2    BY MR. GOUTMAN:

3    Q.    Can you name one plasticizer that was a one-for-one

4          replacement for PCBs in any plastic application?

5    A.    I have never compounded polysulfides, so I can't

6          answer that about one-to-one plasticizers in

7          polysulfides or anything else.  I didn't use PCBs.

8    Q.    So you can't name any chemical that was a one-for-one

9          substitute for PCBs, correct?

10                   MR. LAND:  Objection; asked and answered.

11                   THE WITNESS:  Correct.

12                   MR. GOUTMAN:  Now I'd like to show you some

13         other documents that may not have been shown to you by

14         plaintiffs' counsel.  Are we up to 9?

15                   COURT REPORTER:  Yes.

16                   MARKED FOR IDENTIFICATION:

17                   EXHIBIT 9

18                   Sales call to Product Research

19                   1:11 p.m.

20   BY MR. GOUTMAN:

21   Q.    Then this is a Monsanto document.  Am I correct that

22         plaintiffs' counsel never showed you this document?

23   A.    I've never seen it before.

24   Q.    And it's a, basically a sales call to Products

25         Research.  Do you know who Products Research was?

1                     JEROME M. KLOSOWSKI

2        samples but they have not evaluated.  Their position

3        is not to evaluate unless they get into an extremely

4        difficult reformulation problem.

5                     Do you know that Japanese Kanechlors meant

6        Japanese PCBs; do you know that?

7   A.   No, I didn't.  I never heard of Japanese Kanechlors

8        before.

9   Q.   I want you to assume for purposes of this testimony,

10       for purposes of this question that I don't think

11       there's any dispute that Kanechlors refer to Japanese

12       PCBs.

13  A.   Okay.

14  Q.   Am I correct that this document indicates that PRC was

15       -- had in, in fact, bought samples of Japanese PCBs

16       for evaluation?

17                     MR. LAND:  Objection; calls for

18       speculation.

19                     THE WITNESS:  I don't know they bought

20       them.  But it says they had them.

21  BY MR. GOUTMAN:

22  Q.   They obtained them some way?

23  A.   Yeah.

24  Q.   Do you know the extent to which sealant manufacturers

25       imported PCBs from other countries when Monsanto got

Page 125

1                    JEROME M. KLOSOWSKI

2       out of the business?

3    A.   I do not know that.

4                    MR. GOUTMAN:  This is Number 9.

5                    MR. DIMURO:  I think it's 10.  What are we

6       up to?

7                    COURT REPORTER:  10.

8                    MR. GOUTMAN:  Number 10.

9                    MARKED FOR IDENTIFICATION:

10                   EXHIBIT 10

11                   Monsanto Call Report -

12                   Organic Division

13                   1:14 p.m.

14   BY MR. GOUTMAN:

15   Q.   So we've marked as Exhibit 10 another sales call.

16        This is to Sonneborn Building Products.  Are you

17        familiar with them?

18   A.   Yes, I am.

19   Q.   And they were a large formulator, were they not?

20   A.   Correct.

21   Q.   With their own staff of scientists, correct?

22                   MR. LAND:  Objection; calls for

23        speculation.

24   BY MR. GOUTMAN:

25   Q.   Correct?

1                    JEROME M. KLOSOWSKI

2    A.   They did have their own staff.

3    Q.   And it says, this is dated 7-21-71, it says:  Conntech

4         Corp, C-O-N-N-T-E-C-H Corp, is going to market

5         Sonneborn products but probably will not manufacture

6         them.  It has definitely been decided to close the

7         Belleville location as of November 1.  Until then,

8         S-261 will continue to be used here.  Aroclor

9         inventory ran out and Japanese Aroclor has been

10        purchased.

11                   Did I read that correctly?

12   A.   Yeah.

13   Q.   Would that indicate to you that Conntech Corp was

14        purchasing Japanese PCBs to use in their products?

15                   MR. LAND:  Objection; calls for

16        speculation.

17                   THE WITNESS:  I'm reading it over again.

18                   The last sentence says they bought some

19        Japanese version of Aroclor, yes, it does.

20   BY MR. GOUTMAN:

21   Q.   It says, Aroclor inventory ran out and Japanese

22        Aroclor has been purchased, correct?

23   A.   That's what it says.

24   Q.   Now can you tell from this document or -- oh, did you

25        make sales calls when or visit customers?

```
 1                    JEROME M. KLOSOWSKI
 2  A.   Did I?
 3  Q.   Yeah.
 4  A.   Yes, I did.
 5  Q.   And that was to, I think we had gotten into this
 6       earlier, to determine what features your customers
 7       wanted in their sealants, correct?
 8  A.   Correct.
 9  Q.   Can you tell whether they're referring to Sonneborn
10       purchasing Japanese PCBs or Conntech?
11                    MR. LAND:  Objection; calls for
12       speculation.
13                    THE WITNESS:  As I read it, that's one of
14       the things I was looking for and I couldn't be sure.
15  BY MR. GOUTMAN:
16  Q.   Okay.  Do you know the extent to which Sonneborn
17       imported Japanese PCBs after Monsanto got out of the
18       market?
19  A.   Not a clue.
20                    MR. GOUTMAN:  This is Number 11.
21                    MARKED FOR IDENTIFICATION:
22                    EXHIBIT 11
23                    Monsanto Call Report -
24                    Organic Division
25                    1:17 p.m.
```

```
 1                    JEROME M. KLOSOWSKI
 2   BY MR. GOUTMAN:
 3   Q.   This is Exhibit 11, is another call report, this one a
 4        few months later, 11-10-71.  Customer's name is
 5        Polymeric Systems - Sonneborn.  Was Polymeric Systems
 6        a subdivision of Sonneborn?
 7   A.   I don't know if it was at that time.
 8   Q.   Well, is it a fair inference from customer name
 9        Polymeric Systems - Sonneborn that the two companies
10        were in some way related?
11                    MR. LAND:  Objection; lacks foundation,
12        calls for speculation.
13                    THE WITNESS:  I can't speculate.  I looked
14        at them as two separate companies.
15   BY MR. GOUTMAN:
16   Q.   Okay.  It says here:  Results.  1, These two companies
17        -- I guess that's Polymeric Systems and Sonneborn --
18        manufacture polysulfide adhesives and presently are
19        buying Kaneclor by the truckload.
20                    Does it say that?
21   A.   These two companies presently are buying Kaneclor by
22        the truckload, yes, it says that.
23   Q.   So would it be a fair interpretation of this document
24        that as of November, 1971, Polymeric Systems and
25        Sonneborn were purchasing Japanese Kanechlors by the
```

                                                          Page 129

1                        JEROME M. KLOSOWSKI

2        truckload?

3    A.   That's what it says, so yeah.

4    Q.   And would that indicate that those companies were

5         having a difficult time formulating their product

6         without Monsantos PCBs?

7                     MR. LAND:  Objection; calls for

8         speculation, lacks foundation.

9                     THE WITNESS:  I don't know that because

10        some people have small staffs.  I know Polymeric

11        Systems had a very small staff.  Sonneborn had a very

12        small staff.  So whether they formulated and couldn't

13        find it or they didn't take the time to reformulate it

14        and just stayed with what they had, I don't know the

15        answer.

16                     MR. GOUTMAN:  This is 12.

17                     MR. LAND:  Yeah, this is 12.

18                     MARKED FOR IDENTIFICATION:

19                     EXHIBIT 12

20                     Monsanto Memo dated January 20,

21                     1972, to W.S. Clark from C. Paton

22                     1:19 p.m.

23   BY MR. GOUTMAN:

24   Q.   Now this is a memo from C. Paton, P-A-T-O-N, regarding

25        Sonneborn PCBs, January 20, 1972.  It's to W.S. Clark:

Page 162

1                         JEROME M. KLOSOWSKI

2   Q.   Have you reviewed any of the reports or deposition

3        testimony of any of the defendants' experts in

4        Westport?

5   A.   No.  And I say that because I don't recall any.  I

6        don't know of any.  It doesn't bring anything to mind.

7   Q.   So let me go back to our discussion of vapor pressure

8        and polymerization.

9                    Would it be fair to say that if we were to

10       look at your patents, some of them included chemicals

11       that had higher vapor pressure than PCBs?

12  A.   My patents?

13  Q.   Yeah.

14  A.   Materials in it that had higher vapor pressure than

15       PCBs?  Yes.

16  Q.   And would that mean that all things being equal, and I

17       know things are never equal in a formula, those

18       materials would more readily volatilize than PCBs?

19  A.   Okay.  In my formulas, I make things and they are like

20       one-part sealants.  So until they're totally cured,

21       there are things that come out that have higher vapor

22       pressure than PCBs.  Then after they're cured, some

23       might have higher vapor pressure but some might even

24       have lower vapor pressure than PCBs.

25  Q.   True.

```
 1                    JEROME M. KLOSOWSKI
 2   A.   So I don't know how to answer you other than that
 3        statement I made.
 4   Q.   That's fine.  And we touched on this but I wasn't -- I
 5        don't remember your answer clearly, so I apologize if
 6        I'm plowing over the same ground.  Once a chemical is
 7        put in a sealant matrix, that would tend to lower the
 8        vapor pressure because of its coherence within that
 9        matrix; is that correct?
10   A.   No.  The material always has the same vapor pressure.
11        It's just a question of when it gets to the surface to
12        vaporize.
13   Q.   Okay.  And that's important because the amount of a
14        chemical that might vaporize is dependent in part upon
15        that amount of material that's on the surface and
16        available to vaporize, correct?
17   A.   Uh-huh.
18   Q.   Did you say yes?
19   A.   Yes.
20   Q.   And I'd like to go over with you some of the, if I can
21        find it, factors that would affect the rate of
22        vaporization from a sealant, okay?
23   A.   Uh-huh.
24   Q.   Is that yes?
25   A.   Yes.  Excuse me.  I will enter yes instead of uh-huh.
```

1                      JEROME M. KLOSOWSKI

2    Q.   Okay.  And one of them is the diffusion coefficient,

3         correct?

4    A.   Yes.

5    Q.   And we just touched upon this, that a component will

6         not volatilize unless it's on the surface of the

7         product, correct?

8    A.   Basically that's true.

9    Q.   And am I correct, therefore, that one of the factors

10        that might affect extended volatilization would be a

11        surface area of application or use?

12   A.   Restate that.  I think --

13   Q.   One of the factors that would affect, can affect rates

14        of volatilization or amount of volatilization would be

15        the surface area of use?

16   A.   The amount of volatilization, yes.

17   Q.   Yeah, and so, for example, if you paint a room as

18        opposed to caulking a corner, more surface area would

19        be exposed by painting as opposed to caulking a joint,

20        correct?

21   A.   Yes.

22   Q.   And that would enhance the degree to which a

23        constituent might volatilize, larger surface area?

24   A.   To the extent it would volatilize within a certain

25        period of time.

```
 1                    JEROME M. KLOSOWSKI

 2   Q.   Correct, that's what I'm talking about.

 3   A.   Correct, as a function of time.

 4   Q.   Yeah, and I'm also correct that the thickness of

 5        application would affect volatilization; that is to

 6        say, and I'm trying to pick up on the diffusion

 7        coefficient, if a molecule has less distance to travel

 8        within a matrix, again all things being equal, a

 9        larger amount will volatilize as opposed to something

10        that's thick?

11   A.   Pretty much that's true.

12   Q.   Okay.  And I know we're just talking about general

13        concepts here.

14   A.   General concepts.

15   Q.   Obviously one of the things that affects amounts and

16        rates of volatilization are what ingredients you're

17        using together, correct?

18                    MR. LAND:  Objection; vague.

19                    You can answer.

20                    THE WITNESS:  Some ingredients will affect

21        it; some won't.

22   BY MR. GOUTMAN:

23   Q.   Okay.  Would you agree with me that, and I think you

24        already picked up on this this morning, ambient

25        temperature will increase, as ambient temperature
```

```
 1                      JEROME M. KLOSOWSKI
 2        increases, rates of volatilization increase, correct?
 3   A.   Yes.
 4   Q.   And amounts of volatilization over time?
 5   A.   Given time.
 6   Q.   Yes.  Would you agree with me that just as ambient
 7        temperature may affect rates and amounts of
 8        volatilization, the temperature of the surface upon
 9        which the product is applied would affect
10        volatilization, correct?
11   A.   That's very iffy, that answer is, that it might or not
12        be, but generally it's not too correct because you
13        have the bulk of the sealant, okay, and these are
14        quite insulating.  So the surface doesn't transmit
15        this heat throughout the bulk quickly.
16   Q.   Okay.  How about a paint, though; if you were to paint
17        a heated metal surface, would that tend to enhance
18        volatilization of its constituents as opposed to
19        painting the wall in this room that might be 70
20        degrees?
21   A.   Painting a warm metal surface?
22   Q.   Yeah.
23   A.   As opposed to painting this room?
24   Q.   Yeah.
25   A.   It would volatilize faster on the warm metal surface,
```

1                     JEROME M. KLOSOWSKI

2         yes.

3    Q.   Would airflow increase volatilization?

4    A.   Not really in the absolute -- well, in the absolute

5         sense of the word maybe but not practically.

6    Q.   Would airflow or air exchange as used in HVAC

7         terminology, would that affect the amount of a

8         chemical present in a room that may have volatilized

9         from a building product?

10                   MR. LAND:  Objection; lacks foundation.

11                   THE WITNESS:  Could you restate, please?

12   BY MR. GOUTMAN:

13   Q.   Are you familiar with what HVAC systems do?

14   A.   You're talking about air-conditioning and --

15   Q.   Yeah, yeah.

16   A.   Yeah.

17   Q.   In a building like this, the air is exchanged every so

18        often?

19   A.   Uh-huh.

20   Q.   Correct?

21   A.   Yes.

22   Q.   And that would affect, the rate of air exchange would

23        affect the amount of a chemical present in the air

24        that may have volatilized from a building product,

25        correct?

1                    JEROME M. KLOSOWSKI

2    A.    Absolutely.

3    Q.    Would the manner of application affect volatilization;

4          for example, spray painting a paint versus applying a

5          caulk through a caulk gun?

6    A.    Generally that's true.

7    Q.    And the extent to which the product is cured or dried

8          will affect volatilization, correct?

9    A.    Now I have to get clarification.  You're saying -- let

10         me see if you're saying this.  I don't know what

11         you're saying.

12               You're saying if a sealant is cured, that

13         the volatilization will be different than if it's

14         uncured?

15   Q.    Yes.

16   A.    I don't know that's true.  Let me ask the question,

17         are you talking about the volatilization of the

18         plasticizers; is that what we're dealing with?

19   Q.    Let's say a plasticizer.

20   A.    Yeah, I don't know that that's true.

21   Q.    What constituents of a sealant are volatilizing during

22         the curing process?

23   A.    What constituents of a sealant --

24   Q.    -- volatilize during the curing process?

25   A.    It depends on the cure system, and depending on how

1                    JEROME M. KLOSOWSKI

2        you're curing, I mean, you can get a variety of

3        leaving groups, and you could make a whole list of

4        leaving groups that come off during the curing

5        process.

6    Q.  So it varies product to product?

7    A.  Absolutely.

8    Q.  And product type from product type?

9    A.  Correct.

10   Q.  And product, even within the same product, say a

11       polysulfide caulk, depending on the formulation, it

12       may vary, correct?

13   A.  The materials given off in the curing process you're

14       saying?

15   Q.  Yeah.

16   A.  Restate it now.

17   Q.  Well, I'll withdraw the question.

18   A.  Okay.

19   Q.  Because it wasn't clear.

20               Would the amount of, say, a plasticizer

21       used affect the amount that might eventually

22       volatilize?

23   A.  Yes.

24   Q.  Would, in talking about PCBs, would the type of PCB

25       used affect the rate of volatilization?

1                      JEROME M. KLOSOWSKI

2    A.   Yes.

3    Q.   Would the vapor pressure of each ingredient within the

4         finished product affect the rate of vaporization?

5    A.   Yes.

6    Q.   I think we've gone through by my count about 12

7         factors that might affect rates or amounts of

8         volatilization.  You don't have to take my word for

9         it.  The record will speak for itself.  Can you think

10        of any others that I've left off?

11   A.   No.  If I was, I'd have to look at the whole and study

12        it, but you talked about a lot of good things.

13   Q.   Okay.  Without knowing all of those factors, would it

14        be possible to scientifically determine the rates and

15        amounts of volatilization in any particular use?

16                  MR. LAND:  Objection; vague.

17                  You can answer the question.

18                  THE WITNESS:  But I would like you to ask

19        that question again.  I've got to think about what

20        you're saying and what it means.

21   BY MR. GOUTMAN:

22   Q.   Okay.  We've identified now by my list a list of about

23        a dozen factors that you say will affect rates,

24        amounts of volatilization or concentrations of a

25        chemical as a result of that process.  Without knowing

```
 1                    JEROME M. KLOSOWSKI
 2        tell you whether that fits my definition of scientific
 3        accuracy.
 4   A.   Okay.  If I was putting together a sealant and I
 5        wanted to know about it, the first thing I would do
 6        would be to put together a prototype, and I would
 7        check it to see if I was in the ballpark, and the
 8        ballpark would be then within a percent or two --
 9   Q.   Weight loss?
10   A.   -- weight loss over a given period of time.  If I was
11        in that, depending on what I was going to do with the
12        sealant, if I would be within that, within that range
13        with that prototype, then I say that's the range I
14        want to be in.  Then I would continue developing and
15        get a more precise formula.
16   Q.   Okay.  But my question is:  You are testing the weight
17        loss under the conditions of the experiment, correct?
18   A.   Under the conditions of the experiment, yes.
19   Q.   Correct, and is this weight loss test, say, done --
20        you're doing these in the '70s and '80s and '90s; is
21        that correct?
22   A.   You mean in the years?
23   Q.   Yeah.
24   A.   Or at the temperatures?
25   Q.   In the 1970s?
```

1                    JEROME M. KLOSOWSKI

2   A.   1970s, '80s, '90s, 2000, and 2010.  I've done them all

3        along.

4   Q.   And that's been an industry practice for decades and

5        decades, correct?

6   A.   I would think so.  It's certainly been my practice.

7   Q.   Have you ever released a new sealant formulation

8        without conducting this weight loss test that you

9        described?  By "you", I mean Dow Corning.

10                   MR. LAND:  Objection to the extent it calls

11       for speculation.

12                   THE WITNESS:  I'm thinking.  Let me give a

13       thought.

14                   I don't think anything's gone out the door

15       without some kind of weight loss test.

16  BY MR. GOUTMAN:

17  Q.   Now I think I asked you, these weight loss tests

18       measure weight loss under the conditions of the

19       experiment, correct?

20  A.   Under the conditions of the experiment, yes.

21  Q.   Okay.  And to the extent to which the conditions of

22       the experiment don't match the conditions of real-life

23       application, the results will differ, correct?

24  A.   I wouldn't do an experiment that didn't have the

25       real-life temperatures.  That would be useless,

Page 179

1                    JEROME M. KLOSOWSKI

2       wouldn't it?

3    Q.  Well, you mentioned temperature.  How about all these

4       other factors?

5    A.  A lot of that is built into the formula you're using

6       already, so that would be built in, and then I'm

7       designing the test, so I'd look at the area of use,

8       and I'm saying what temperatures will be encountered

9       at the area of use, high temperatures, medium

10      temperatures, and I test it.

11   Q.  Okay.  Was that basically the industry standard as you

12      knew it, that is to test the sealants before marketing

13      for weight loss?

14   A.  There is no what you call industry standard where

15      everybody tests their products the same way before

16      they go out relative to weight loss and composition.

17   Q.  Let me --

18   A.  It was Dow Corning's standard because I set it as a

19      standard, and I was in charge.

20   Q.  Okay.  I guess I'll rephrase the question.  Was it a

21      common industry practice to do that, to test for

22      weight loss before introducing products into the

23      market?

24   A.  I don't know.  I would think so but I don't know that.

25   Q.  Is that a -- let me ask you this way.  Why is it that

Page 184

1                    JEROME M. KLOSOWSKI

2  A.  I don't know to the extent that that happens.

3  Q.  You don't know one way or the other?

4  A.  I don't know the extent that it happens, no.

5  Q.  So it does happen; you just don't know the extent, is

6      that what you're saying?  I'm trying to decipher --

7  A.  With some materials it happens.

8  Q.  Okay.

9  A.  With some it doesn't very well.

10  Q.  Does paint have a higher evaporation coefficient than

11      caulk; it's impossible to say?

12  A.  It's the same formula you're saying?

13  Q.  No.  Say a, say a latex paint and a polysulfide caulk.

14  A.  I can't compare an apple and an orange.  The answer is

15      I don't know.

16  Q.  That is an apple and orange, right, a latex paint and

17      a polysulfide caulk?

18  A.  For most comparisons you're asking that's an apple and

19      an orange.

20  Q.  Thanks.  Now you had referenced some paint tests

21      performed by or on behalf of Monsanto or by Monsanto

22      in the 1950s; do you remember referencing that in your

23      report?

24  A.  Yeah, I think we talked about it this morning.

25  Q.  I don't recall talking about it, but anyway, maybe my

1                    JEROME M. KLOSOWSKI

2                    Is that correct?

3    A.   Yes, that's what it reads.

4    Q.   And the other one involved a hood that was painted on

5         three walls.  The exhaust fan on the hood was not

6         operated and two 1,000-watt electric hot plates were

7         turned on in the hood to heat the air during the

8         sampling operation; is that correct?

9    A.   Yes.

10   Q.   And that would tend to increase vaporization, correct,

11        heating a metal surface?

12   A.   Yes.

13   Q.   And in discussion on number, on page 9, am I correct

14        that the analytical technique used back then was such

15        that they were measuring chlorine concentrations that

16        could not distinguish between Aroclors and other

17        chlorinated hydrocarbons?

18             MR. LAND:  Objection; lacks foundation,

19        calls for speculation.

20             THE WITNESS:  Yeah, I'm not sure of that

21        but that's probably right.

22   BY MR. GOUTMAN:

23   Q.   Why don't we read it:  The conditions of the test and

24        limitations of the apparatus are such that absolute

25        determinations of chlorinated hydrocarbons are not

Page 189

1                        JEROME M. KLOSOWSKI

2          possible.  Comparative determinations of the total

3          chlorine in the air during any specific test period

4          can be made.  The chlorine detected by this apparatus

5          can be attributed to three sources, chlorinated

6          hydrocarbons in the air, parens, Aroclors, or any

7          other chlorinated hydrocarbon, chlorine in the air as

8          free CL2 or as HC1 or HCL, excuse me, and chlorine ion

9          present in the absorption solution and wash water.

10                       Correct?

11    A.   Uh-huh.

12    Q.   Now in any given room, there may be numerous sources

13         of chlorine other than PCBs, correct?

14                       MR. LAND:  Objection; calls for

15         speculation, lacks foundation.

16                       THE WITNESS:  Yeah, I don't know that room,

17         so I don't know how many other sources are available

18         nor their concentration.

19    BY MR. GOUTMAN:

20    Q.   Well, let me ask you this.  Do pesticides contain

21         chlorine atoms?

22    A.   Some.

23    Q.   Do solvents contain chlorine atoms?

24    A.   Some.

25    Q.   Does chlorine contain chlorine atoms?

Page 190

                    JEROME M. KLOSOWSKI

1

2  A.   We'll go with a yes.

3  Q.   Okay.  So in any event, what they're saying is that

4       all we're doing is testing the amount of chlorine in

5       the air, right; we can't tell which is PCB and which

6       is some other chlorine, right?

7  A.   Correct.  Could I make a comment?

8  Q.   No, you can't.

9  A.   Okay.

10 Q.   Am I correct that after three days, the concentration

11      of Aroclor 1248 diminished to a safe limit?  And go to

12      page 11, paragraph 5.

13 A.   Yes, I read that.

14 Q.   Am I correct that unlike caulk, this involved the

15      painting of large surface areas?

16              MR. LAND:  Objection; incomplete

17      hypothetical.

18              THE WITNESS:  It seems that way, yes.

19 BY MR. GOUTMAN:

20 Q.   Am I correct that PCBs have very low water solubility?

21 A.   Yes.

22 Q.   Am I correct that latex paint is water-based?

23 A.   Yes.

24 Q.   Am I correct, therefore, as a matter of simple

25      chemistry that PCBs would not be retained in a

1                    JEROME M. KLOSOWSKI

2    BY MR. GOUTMAN:

3    Q.   So I'm going to direct you, I've attached as Exhibit

4         19 a couple pages of his sworn testimony in the

5         Westport matter, if you'd turn to page 151 on the

6         bottom and line 24, it says -- and this deposition was

7         taken in 2016, about a year ago, okay, and I asked

8         him:  Did you cite any papers that purport to

9         demonstrate that PCBs found in buildings causes health

10        problems?

11                   And the answer was:  I didn't cite any.

12        That's because there really haven't -- those studies

13        haven't been done.

14                   Now did I read that correctly?

15   A.   That's what's written, yes.

16   Q.   Do you have any basis to disagree with what

17        Dr. Herrick said under oath in this deposition?

18                   MR. LAND:  Objection; lacks foundation.

19                   You can answer.

20                   THE WITNESS:  I have no idea what -- I

21        can't object to that.  It was written.

22   BY MR. GOUTMAN:

23   Q.   Sir, are you aware of any studies, scientific studies

24        that purport to demonstrate that PCBs volatilizing

25        from building products cause human disease?

```
 1                    JEROME M. KLOSOWSKI
 2   A.   I'm not aware of the studies.
 3   Q.   Am I correct, sir, that -- I'm going to try to do this
 4        without showing you documents, but if necessary, I
 5        will show you documents, okay?
 6   A.   Okay.
 7   Q.   According to my count, there were one, two, three,
 8        four, five, six of your patents that use a chemical
 9        called dibutyltin dilaurate; is that correct?
10   A.   Yes.
11   Q.   And am I correct that that has been shown to be, have
12        reproductive toxicity?
13             MR. LAND:  Objection; lacks foundation,
14        calls for speculation.
15             THE WITNESS:  I don't know that.
16   BY MR. GOUTMAN:
17   Q.   What did you do before patenting these six or so
18        products that used dibutyltin dilaurate to satisfy
19        yourself that it was, did not cause systemic toxicity?
20   A.   That the whole formula as such didn't you're saying?
21   Q.   That the ingredients that you used in the formula did
22        not cause systemic toxicity.
23   A.   If no ingredient in the formula is deemed toxic, then
24        you make the assumption that the whole formula is not
25        toxic, and at the time that that was patented, there
```

1               JEROME M. KLOSOWSKI

2     to think.  Go ahead.  I want to hear the question

3     again, please.

4  BY MR. GOUTMAN:

5  Q.   Would you agree with me that chemicals that do not

6       readily biodegrade are more persistent?

7               MR. LAND:  Objection; calls for

8       speculation, vague, and lacks foundation.

9               THE WITNESS:  I can't -- I can't answer

10      that because I don't know if they are more persistent.

11  BY MR. GOUTMAN:

12  Q.   Is it, by the way, the responsibility of the

13       formulator to determine the toxicity of a product that

14       it's putting out on the market?

15  A.   The responsibility of the formulator to determine the

16       toxicity of the product they're putting on the market?

17       Yes, generally speaking.

18  Q.   You've used the word persistence today and throughout

19       your report.  Could you give me the scientific

20       definition of persistence or persistent?

21  A.   Persistent is like good.  It's relative to something.

22       So when you say persistent, it's persistent relative

23       to what?

24  Q.   I'll ask it again and I'll ask it however many times

25       it takes for you to give me an answer.

1                    JEROME M. KLOSOWSKI

2                    Define persistence or persistent.

3                    MR. LAND:  Objection; asked and answered.

4                    THE WITNESS:  Persistence, staying a long

5          time.  Would that satisfy you?

6     BY MR. GOUTMAN:

7     Q.   Define persistence quantitatively.

8     A.   I can't do that.  That's a relative term.  I don't

9          know a quantitative way of defining it.

10    Q.   So when you say a long time, does that have any

11         quantitative meaning?

12    A.   It depends on the application what a long time is.

13    Q.   No.  I'm talking about persistent as used throughout

14         your report and today.  When you say a chemical is

15         persistent, you said that it lasts a long time; is

16         that what you said?

17    A.   It lasts a long time.

18    Q.   Okay.  Is there any quantitative definition of what

19         you mean by long in hours, months, years, decades?

20    A.   A quantitative definition that I can say that's the

21         same definition I'll use all the time, and the answer

22         to that is no, there is no quantitative definition

23         that I can say that's my definition of persistence

24         because that is application dependent.

25    Q.   Would you agree with me that for a chemical to persist

1                    JEROME M. KLOSOWSKI

2         in the environment, a chemical present in a sealant

3         matrix, it would first have to escape out of that

4         matrix to become available to persist in the

5         environment, correct?

6    A.   Yes, it has to eventually escape, unless the material

7         in that environment is used as such.  If, for

8         instance, you were going to eat the sealant, then it

9         wouldn't have to escape to be a problem, but if you

10        weren't going to eat the sealant, then maybe it would

11        have to escape to be a problem.

12   Q.   Do you eat sealant?

13   A.   Not often.

14   Q.   Do you know anybody who does?

15   A.   Not often.

16   Q.   So, sir, would you agree with me then that for an

17        ingredient of sealant to become persistent in the

18        environment, it must first enter the environment?

19   A.   Yes.

20   Q.   It must first escape the matrix of the sealant that is

21        otherwise holding it in there, correct?

22   A.   Yes.

23   Q.   And would you agree with me that -- I think you stated

24        in your book, you stated in your book that PCBs were

25        used because they, among other things, imparted good

1                    JEROME M. KLOSOWSKI

2          durability to the sealant.  That's what you said

3          quoting, imparted good durability to the sealant,

4          correct?

5     A.   Yes.

6     Q.   And that meant the PCBs tended to stay put and do its

7          job as a plasticizer, correct?

8     A.   For a long time.

9     Q.   And, sir, with respect to whether a chemical is

10         persistent, what would a chemist working for a

11         formulator like you have to know to determine whether

12         the ingredients he was using might be persistent in

13         the environment?

14                    Let me ask you this.  Would one of them be

15         vapor pressure?

16    A.   Yes and no because we talked about persistent being a

17         relative term.  So in some applications, vapor

18         pressure would be an indication, but in others, if the

19         materials have very little vapor pressure, then you

20         have long term, short term.  The persistence depends

21         on the application and what you're expecting out of

22         the material.

23    Q.   Okay.  I'm talking about persistence of an ingredient

24         in that material, okay, like PCBs?

25    A.   Uh-huh.

```
 1                    JEROME M. KLOSOWSKI
 2   Q.   Would a chemist know that chemicals with lower vapor
 3        pressure, all things being equal, be more persistent
 4        than chemicals with higher vapor pressure?
 5   A.   You would think that, yes.
 6   Q.   Would chemists working for formulators like you know
 7        that chemicals, ingredients that are resistant to
 8        breakdown would be more persistent?
 9                    MR. LAND:  Objection; vague.
10                    THE WITNESS:  State it again because I want
11        to think about what you said.
12   BY MR. GOUTMAN:
13   Q.   Would chemists working for formulators --
14   A.   Yes.
15   Q.   -- such as yourself know that chemicals that are
16        resistant to breakdown tend to be more persistent than
17        chemicals that are not resistant to breakdown?
18                    MR. LAND:  Objection; vague.
19                    THE WITNESS:  That would be a generally
20        true statement.
21   BY MR. GOUTMAN:
22   Q.   Is there anything else a chemist like yourself would
23        want to know to determine whether an ingredient you
24        incorporate into a sealant would become
25        environmentally persistent?
```

Page 220

```
 1                    JEROME M. KLOSOWSKI
 2   A.   I would want to know how it broke down.
 3   Q.   Well, we discussed that.  I said anything else.
 4        Resistance to breakdown, that would be
 5        biodegradability, among other things, correct?
 6   A.   That's one aspect.
 7   Q.   Chemical stability, correct?
 8   A.   That's another aspect.
 9   Q.   Okay.  Is there anything else other than vapor
10        pressure and --
11   A.   You didn't mention weatherability.
12   Q.   Okay, weatherability, okay.  Anything else?  What do
13        you mean by weatherability by the way?
14   A.   Will it break down in the presence of sunlight, heat,
15        and water.
16   Q.   That's part of chemical stability, correct?  Maybe I
17        don't understand chemical stability.
18   A.   Well, chemical stability is typically mentioned when
19        you're talking about this chemical or that chemical,
20        but the weathering is a synergism between the heat,
21        the water, and the ultraviolet.
22   Q.   Okay.  So other than those various forms of breakdown
23        and vapor pressure, is there anything else that you as
24        a chemist working for a formulator would have to know
25        to be able to determine whether a chemical might be
```

1                    JEROME M. KLOSOWSKI

2      environmentally persistent?

3  A.  So we talked about weathering, let's go through them

4      again, and we talked about biological.

5  Q.  Biodegradation.

6  A.  And we talked about chemical.

7  Q.  And we talked about vapor pressure.

8  A.  And we talked about vapor pressure.

9  Q.  Anything else?

10  A.  Nothing comes to mind.  I'm not saying there isn't

11      anything else.  Just nothing comes to mind.

12  Q.  Sure.

13                    (Off the record at 4:42 p.m.)

14                    (Back on the record at 4:42 p.m.)

15  BY MR. GOUTMAN:

16  Q.  First of all, you are aware that Monsanto provided in

17      its product bulletins quantitative information about

18      vapor pressure, correct?

19  A.  I saw that.

20                    MR. GOUTMAN:  And let's mark this as

21      Exhibit 23.

22                    MARKED FOR IDENTIFICATION:

23                    EXHIBIT 23

24                    The Ubiquitous Aroclor Genie

25                    Does it Again

1                    JEROME M. KLOSOWSKI

2                    4:43 p.m.

3    BY MR. GOUTMAN:

4    Q.    This is an advertisement by Monsanto Bates labeled

5          TOWOLDMON0047981, and it says -- and it's from 1961;

6          am I correct?

7    A.    That's the date on it, yes.

8    Q.    Yeah, and this is the sort of advertisement that would

9          go to formulators, right, or be published in trade

10         magazines like the ERC, Chemical & Engineering News,

11         Adhesives Age, Industrial Research,

12         Research/Development, so forth, correct?

13                   MR. LAND:   Objection; calls for

14         speculation.

15                   MR. GOUTMAN:   Well, it says so on the

16         bottom.

17                   MR. LAND:   Right, right.

18   BY MR. GOUTMAN:

19   Q.    Did I read that right?

20   A.    It says all those things.

21   Q.    Yeah, and these would be publications that formulators

22         would receive, correct?

23   A.    I would imagine, yes.

24   Q.    And it says here about the Aroclor in the middle of

25         the first paragraph that Aroclor stubbornly refused to

 1                         JEROME M. KLOSOWSKI
 2          volatilize, oxidize, hydrolyze, harden, disintegrate,
 3          burn, condense, or corrode anything, correct?
 4     A.   That's what it says.
 5     Q.   So which publications did you or Dow Corning receive;
 6          which industry publications did you or Dow Corning
 7          receive?
 8     A.   You mean relative to normal publications?
 9     Q.   Scientific trade publications.
10     A.   American Chemical Society.
11     Q.   I'm not asking you whether you got the New York Times.
12     A.   The American Chemical Society.  In my area, it would
13          be Adhesives Age.  It would be a variety of whatever
14          was out there, but those Adhesives Age was the -- give
15          me a timeframe.
16     Q.   1970.
17     A.   Okay.  Then you're in Adhesives Age, Journal of the
18          American Chemical Society were the typical things I
19          got in my lab.
20     Q.   You got the Journal of the American Chemical Society?
21          What did you say?  I didn't --
22     A.   Yes, JCS.
23     Q.   In this advertisement that ran in Adhesives Age in
24          1961, Monsanto is basically saying that PCBs are
25          resistant to breakdown, correct?

Page 224

1                    JEROME M. KLOSOWSKI

2    A.    Yes.

3    Q.    And they're also saying that it has a very low,

4          essentially very low vapor pressure?

5    A.    Yes.

6                    MARKED FOR IDENTIFICATION:

7                    EXHIBIT 24

8                    "Genie" of a Thousand and

9                    One Engineering Feats

10                   4:46 p.m.

11   BY MR. GOUTMAN:

12   Q.    So we've marked as Exhibit 24 another advertisement

13         for Aroclors, and this appeared in the various

14         publications if you look at the lower right, Machine

15         Design, Product Engineering, Mechanical Engineering,

16         Industrial Research, Chemical & Engineering News; is

17         that correct?

18   A.    That's what it says.

19   Q.    And it says in part in the middle paragraph there

20         describing Aroclors, it says, quote:  Virtually

21         indestructible, colon, resists breakdown from heat and

22         mechanical stress/resists burning/rebuff electricity

23         with their high resistivity, R-E-S-I-S-T-I-V-I-T-Y,

24         refuse to oxidize, volatilize, hydrolyze or otherwise

25         react with highly-reactive chemicals.

Page 225

1                    JEROME M. KLOSOWSKI

2              Is that correct?

3  A.   I wish you would have shown me this earlier.  That's

4       the definition of persistent maybe.

5  Q.   Okay, thank you, and that's something that a chemical

6       formulator would understand, correct?

7  A.   You would go through each of those.

8              MR. LAND:  Objection; vague.

9              THE WITNESS:  It's vague but I would

10      understand some of this.

11 BY MR. GOUTMAN:

12 Q.   Okay.  Thank you.  Now am I -- I just want to go

13      through some history with you.

14              Do you know whether it was in late 1966

15      that scientists first discovered PCBs in the

16      environment, Swedish scientist by the name of Jenson

17      and Widmore; does that ring a bell?

18 A.   I don't know when they found that.  I don't know.

19 Q.   Do you know whether it was not until 1974 when a

20      researcher by the name of Dr. Kimbrough was the first

21      to identify statistically excess cancerous tumors in

22      laboratory animals exposed to PCBs; do you know that?

23 A.   I don't know that, no.

24 Q.   And again, you're not an expert in PCB toxicology or

25      epidemiology, correct?

1                  JEROME M. KLOSOWSKI

2                  MR. GOUTMAN:  Okay.

3    BY MR. GOUTMAN:

4    Q.   You can look off my book.

5    A.   Sure.

6    Q.   You'd be happy to know that I purchased one of your

7         books.  I'm sure you get some royalty from that, don't

8         you?

9    A.   $10.

10   Q.   Oh, really?

11   A.   You paid 136?

12   Q.   I stole it.  No.  I'm just kidding.

13   A.   Where am I looking?

14   Q.   Footnote 32.  Footnote 32 is a paper written in

15        German, correct?

16   A.   Certainly looks that way.

17   Q.   And the study by Fromme further down, that study is

18        written in German, right?

19   A.   Correct.

20   Q.   To your knowledge were there any studies investigating

21        the hypothesis that PCBs might volatilize from

22        building products and cause elevated PCB

23        concentrations in indoor air; do any such studies

24        predate 1990 to your knowledge?

25   A.   Not to my knowledge.  I have no knowledge of that.

                        JEROME M. KLOSOWSKI

 1

 2    Q.    When, do you know when the first, the date of the
 3          first or year of the first scientific chamber test to
 4          determine under the conditions of a heated chamber the
 5          extent of volatilization of PCBs from sealants?
 6    A.    I don't know when they did that.
 7    Q.    Okay.  Are you aware of any study that predates 2011?
 8    A.    I'm not aware of any.
 9    Q.    Have you ever published anything on -- let's see --
10          have you ever published anything on warnings?
11    A.    I don't know exactly what you mean.
12    Q.    Well, have you ever published a treatise or paper on
13          the standards that would guide one in drafting or
14          issuing product warnings?
15    A.    No.
16    Q.    Have you done a historical review of standards or
17          industry practices in the '30s, '40s, '50s, and '60s
18          concerning warnings?
19    A.    No.
20    Q.    And you're don't hold yourself out as an expert in
21          that field, do you?
22    A.    Correct.
23    Q.    Do you have any formal training in the field of human
24          factors?
25    A.    I don't know what that means.

```
 1                    JEROME M. KLOSOWSKI

 2  Q.  And would that distribution chain include sales to,

 3      for example, wholesalers and then retailers?

 4  A.  No.

 5  Q.  Okay.  What was your distribution chain?

 6  A.  The distribution chain for the sealants?

 7  Q.  Yeah.

 8  A.  Now I have to -- I am speaking now of sealants in the

 9      architectural line, not the do-it-yourself.  If you

10      had a sealant that -- the architectural line is the

11      line that would compete with a polysulfide or a

12      urethane.  The architectural line of sealants were

13      sold through distribution.  The distribution would

14      sell it to the contractor who applied it.  It was a

15      very short chain.

16  Q.  Sir, we talked about proprietary formulas that

17      formulators would come up with and make products; do

18      you recall that discussion this morning?

19  A.  You got to tell me which part of it.  I'm trying to

20      remember.

21  Q.  Okay.  Well, formulators would invent -- formulators

22      were inventors, I think we started there, right?

23  A.  Uh-huh.

24  Q.  Is that yes?

25  A.  Yes.
```

Page 244

1                    JEROME M. KLOSOWSKI

2   Q.   And to the extent that they have invented a

3        proprietary formula that has some commercial value, a

4        formulator would want to protect that value, correct,

5        from its competitors, right?

6   A.   Yes.

7   Q.   And would you agree that, generally speaking, you

8        would not share your proprietary formulas with your

9        competitors, correct?

10  A.   Not unless you were patent protected.

11  Q.   Okay.  And you would generally not share your

12       proprietary formulas with the raw material

13       manufacturers, correct?

14  A.   Not necessarily true.

15  Q.   Because you don't know what they would do with it, do

16       you?

17  A.   Not necessarily true.  That's not correct.

18  Q.   Okay.  You said that unless they signed a contract,

19       right?

20  A.   If the raw material supplier working with you on a new

21       formula or something, if they were working with you

22       and you were going to give them the exact formula so

23       they could play with that, then they would have to

24       sign the secrecy agreement.

25  Q.   And do you know whether any polysulfide

JEROME M. KLOSOWSKI

1

2      manufacturer/formulator shared with Monsanto any

3      proprietary formulas at any time?

4  A.  Share it with Monsanto, a formulator share with

5      Monsanto?

6  Q.  Its proprietary formulas at any time during the period

7      of time that Monsanto made PCBs?

8  A.  That's an interesting -- most of the formulas came out

9      of Thiokol, and Thiokol helped the formulators make

10     their formulas.  Thiokol was a wonderful supplier of

11     PC, of the polymer, but they helped.

12 Q.  My question was:  Are you aware of any instance where

13     a formulator of polysulfides shared with Monsanto a

14     proprietary formula, yes or no?

15 A.  No.

16 Q.  You're not aware?

17 A.  I'm not aware.

18              MR. GOUTMAN:  That's all I have.

19              THE WITNESS:  That's it?

20              MR. GOUTMAN:  Yeah.

21              MR. LAND:  All right.  Let's go off the

22     record.

23              THE WITNESS:  You ain't the worst one that

24     ever got a hold of me.  You want that on the record?

25              MR. GOUTMAN:  We're going back on briefly.

1                    JEROME M. KLOSOWSKI

2                UNITED STATES DISTRICT COURT

3                 DISTRICT OF CONNECTICUT

4

5   CITY OF HARTFORD and HARTFORD

6   BOARD OF EDUCATION,

7                        Plaintiffs,

8          vs.               Case No. 3:15-cv-01544 (RNC)

9

10  MONSANTO COMPANY, SOLUTIA INC.,

11  and PHARMACIA CORPORATION,

12                       Defendants.

13  _____

14

15

16      The Videotaped Deposition of JEROME M. KLOSOWSKI,

17      Taken at 300 Town Center Drive,,

18      Dearborn, Michigan,

19      Commencing at 10:05 a.m.

20      Tuesday, August 29, 2017

21

22

23

24  Reported By: Lezlie A. Setchell, CSR-2404, RPR, CRR.

25  Job No: 129443

# EXHIBIT 10

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF CONNECTICUT

3

4    CITY OF HARTFORD and          )

     HARTFORD BOARD OF EDUCATION,)

5                                  )

               Plaintiffs,   )Civil Action No.

6                            )3:15-CV-01544(RNC)

          vs.                )

7                            )

     MONSANTO COMPANY,        )

8    SOLUTIA INC., and        )

     PHARMACIA CORPORATION,    )

9                            )

               Defendants.    )

10   ---------------------------)

11

12

13

14          VIDEOTAPED DEPOSITION OF

15          JACK V. MATSON, PH.D., P.E.

16          State College, Pennsylvania

17          Friday, September 1, 2017

18

19

20

21

22

23   Reported by:

24   Stacey L. Daywalt

25   JOB NO. 128910

1                       J. Matson

2        A.    Yes.

3        Q.    All right.  And do I take it that

4    your role in both the Westport case and this

5    port [sic] is generally the same?

6        A.    Yes.

7        Q.    Okay.  And the opinions that you

8    expressed in the Westport case, whether in the

9    report or deposition, are similar to the

10   opinions that you've expressed in the report

11   that you've issued in the Hartford case and are

12   prepared to testify about here.  Is that

13   correct?

14       A.    Yes.

15       Q.    All right.  And when you were asked

16   questions by Mr. Goutman about 51 weeks ago in

17   the Westport case, you obviously provided the

18   full, complete and honest truth to all the

19   questions that he asked of you.  Is that right?

20       A.    Yes.

21       Q.    And you have taken an oath to do the

22   same here today.  Is that right?

23       A.    Yes.

24       Q.    Okay.  Doctor, I want to mark for

25   our record here Exhibit Number 2.

1                    J. Matson

2        A.    (Reviewing document.)

3              No.

4        Q.    All right.  Doctor, let me go back

5    for a second.

6              Has -- strike that.

7              Have your opinions changed in a

8    material way in the Hartford case from what you

9    expressed in your report and deposition in the

10   Westport case?

11       A.    When you say "material way," could

12   you explain that?

13       Q.    Well, I noticed that there are some

14   additional references that you provided,

15   various references that are excluded from the

16   Hartford case that were included in the

17   Westport case.

18             But just to shortcut this deposition

19   today, can we agree that the responses that you

20   gave to deposition questions posed to you by

21   Mr. Goutman are -- will you adopt those for

22   this deposition today so that I don't have to

23   repeat all of them?

24       A.    I didn't review my deposition that

25   way, but I'd say that it's substantially

1                         J. Matson

2    those are PCB products manufactured by

3    Monsanto.  Is that correct?

4         A.    Yes.

5         Q.    The two Aroclors that you mentioned,

6    1242 and 1248, those were pure PCB products.

7    Is that correct?

8              In other words, the products were a

9    combination of PCB congeners.  Correct?

10        A.    Yes.

11        Q.    Sometimes Aroclors are referred to

12   or refer to products that included

13   polychlorinated terphenyls, is that right,

14   PCTs?

15        A.    Yes.

16        Q.    All right.  But the Aroclors, 1242,

17   1254, 1260, 1268, those were pure PCB products?

18   In other words, they were combinations of PCB

19   congeners?

20        A.    Yes.

21        Q.    When -- well, strike that.

22              Did you provide testimony on behalf

23   of the insurance company or the plaintiffs in

24   that matter who were seeking insurance

25   coverage?

Page 84

1                          J. Matson

2       Q.    Let me start that over.

3              In the various cases in which you've

4  served as an expert witness against Monsanto

5  and looked at documents relating to Monsanto's

6  business practices with respect to the

7  manufacture and sale of PCBs, you know that

8  Monsanto did not manufacture caulk that

9  contained PCBs.  Is that correct?

10      A.    Well, first I want to correct you

11  when you say that I was against Monsanto.

12             I was a objective expert in

13  testifying in those cases.

14             MR. MILLER:  Well, let me move to

15  strike that.

16      Q.    Let me ask the question that I want

17  to ask, which is:  Are you aware of any

18  information that supports a conclusion that

19  Monsanto ever manufactured caulks that

20  contained PCBs?

21      A.    No.

22      Q.    Okay.  And is it your testimony that

23  you do not -- you did not, for the purposes of

24  this case, make an effort to identify the

25  manufacturers of the caulk that went into the

1                          J. Matson

2          Q.    Doctor, take a look at Exhibit 28 --

3    I'm sorry -- Exhibit 5.  This is the affidavit

4    that you provided in the Westport case.

5          A.    (Complying.)

6          Q.    Okay.

7          A.    Okay.  Where are you directing me

8    to?

9          Q.    Paragraph 28.

10         A.    (Reviewing document.)

11               Okay.

12         Q.    Do you agree that you wrote here

13   that your testimony in the past has been that

14   the sealant industry was aware that

15   plasticizers used in plastics will volatilize?

16         A.    Yes.

17         Q.    Do you agree that sealant and

18   coatings manufacturers generally had on staff

19   trained chemists who served as formulators of

20   their products?

21               MR. LAND:  Objection, calls for

22   speculation.

23               THE WITNESS:  Well, I don't know if

24   they were trained chemists or not.  There were,

25   in these companies, people who did the

1                        J. Matson

2   negatives in there.  Let me hear it one more

3   time.

4              It's not a simple question.

5              (The record was read as requested.)

6              THE WITNESS:  It's a question I

7   can't answer yes or no because just as I stated

8   to you -- and I'll try to state it more

9   simply -- there was no formulator, at least in

10  the discovery material I had, that questioned

11  Monsanto's wrong number on volatilization.

12             MR. MILLER:  Move to strike.

13      Q.    Doctor, this is a very simple

14  question.

15             Are you aware of a single

16  manufacturer who did not test the whole product

17  for its volatilization rates before its

18  formulation left the door?

19             MR. LAND:  Objection, misleading,

20  asked and answered, calls for speculation.

21             THE WITNESS:  My answer, I think, is

22  no.  I'm still not quite sure of how it was

23  formulated, but the -- the answer is that the

24  fact that I found no documentation where

25  Monsanto's number was ever questioned --

1                        J. Matson

2            If you can reform the question in a

3    way that he can answer it, he is more than

4    happy to do it in a straightforward manner, I

5    am sure.

6    BY MR. MILLER:

7        Q.    All right.  Let -- we've made our

8    records here.

9            I'm going to ask you this question:

10   Name for me the standard tests a reasonably

11   prudent manufacturer of paints and coatings

12   would have run on its formulations before it

13   left the door.

14       A.    Well, a reasonable test in my

15   opinion would have been what is the

16   volatilization rate from the caulk that they

17   are manufacturing.

18       Q.    And can you name a single

19   manufacturer that didn't undertake a test of

20   that nature before it allowed a formula to

21   leave its building for sale?

22           MR. LAND:  Objection, misleading.

23           THE WITNESS:  Well, I looked -- I

24   looked for that, and I could not find a single

25   manufacturer who had reported back to Monsanto

1                              J. Matson

2    don't recall it being toxic and that -- there

3    being any safety issues associated with it.

4         Q.    That wasn't my question.

5              MR. MILLER:   I'll move to strike.

6         Q.    What were the tests that were done

7    to make those determinations?

8         A.    I don't know.

9         Q.    All right.  Is polypropylene

10   persistent?

11        A.    Yes, in a number of ways it is

12   persistent, the resin itself.

13        Q.    How about the products that are made

14   with polypropylene?  Are they as persistent as

15   the polypropylene itself?

16        A.    I haven't followed that, so I don't

17   know the answer.

18        Q.    You refer in your report to dust as

19   a secondary source of PCBs?

20        A.    Yes.

21        Q.    On Page 4 you refer to volatilized

22   PCBs that can attach to dust particles and:

23   "As the PCB-contaminated dust circulates in the

24   air, a fraction lands on surfaces, walls,

25   floors, furniture and humans."

1                          J. Matson

2              There's no indication one way or the

3         other.

4         Q.    Are you aware that it was ever used

5         in a household application?

6              MR. LAND:  Objection, asked and

7         answered.

8              THE WITNESS:  I'm not -- no, I'm not

9         aware.

10        Q.    All right.  Now, Doctor, the reason

11        you've cited this whole issue in your report

12        was not that PCBs absorb to dust, but that also

13        PCBs can volatilize from dust.  Correct?

14        A.    Yes, partially correct.

15             Also, that PCBs, when they're

16        volatilized, attach to dust in the air and then

17        can re-volatilize from that dust.

18        Q.    And Doctor, the first reference you

19        have to the phenomenon of PCBs volatilizing

20        from dust was 2014.  Correct?

21        A.    Yes.

22             And it's -- that's obvious from the

23        science and knowledge of volatilization of PCBs

24        that it's going to re-volatilize.  It's that

25        these papers were reflecting on dust, I think

Page 177

1                              J. Matson

2     few tenths of a percent controls the dusting of

3     calcium hypochlorite."  Correct?

4          A.    Yes.

5          Q.    What this refers to is the addition

6     of an Aroclor to this calcium hypochlorite to

7     keep it from dusting.  Correct?

8          A.    (Reviewing document.)

9                Yes.

10         Q.    Okay.  You'd agree with me that the

11    first reference you cite in your report to any

12    building material adhering to dust --

13               (Discussion was held off the

14    record.)

15         Q.    Doctor, you agree that the first

16    scientific paper that you report referring to

17    PCBs volatilizing out of building materials and

18    adhering into dust is 2014.  Correct?

19         A.    Yes.

20               (Discussion was held off the

21    record.)

22               THE WITNESS:  Did you ask that

23    question to me?

24         Q.    Probably.

25               Anyway, there's no question pending.