# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CITY OF HARTFORD and | : | |
| HARTFORD BOARD OF EDUCATION, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No.  3:15-cv-01544-RNC |
| | : | July 23, 2018 |
| vs. | : | |
| | : | |
| MONSANTO COMPANY, | : | |
| SOLUTIA INC., and | : | |
| PHARMACIA CORPORATION, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Home Assur. Co. v. Hapag Lloyd Container Linie, GmbH,*
  446 F.3d 313 (2d Cir. 2006) ................................................................................................ 9

*America Unites for Kids v. Lyon,*
  No. CV 15-2124 PA, 2016 WL 4571409 (C.D. Cal. Sept. 1, 2016) .................................... 3

*Argueta v. Overhead Door Corp.,*
  No. CV 000370126, 2000 WL 1207261 (Conn. Super. Ct. July 28, 2000)................................. 11, 31

*Avoletta v. State,*
  152 Conn. App. 177 (2014) ................................................................................................ 36

*Bagley v. Adel Wiggins Grp.,*
  327 Conn. 89 (2017) ...................................................................................................... 20, 24

*BellSouth Telecommunications, Inc. v. W.R. Grace & Co.-Conn.,*
  77 F.3d 603 (2d Cir. 1996) ....................................................................................... *passim*

*Beyer v. Anchor Insulation Co.,*
  238 F. Supp. 3d 270 (D. Conn. 2017) ............................................................................... 24

*Bifolck v. Philip Morris, Inc.,*
  324 Conn. 402, 152 A.3d 1183 (2016) ....................................................................... *passim*

*Board of Education v. Dow Chemical Co.,*
  40 Conn. Supp. 141 (Super. Ct. 1984)............................................................................. 34

*Calabrese v. McHugh,*
  170 F. Supp. 2d 243 (D. Conn. 2001) ............................................................................... 13

*Considine v. City of Waterbury,*
  279 Conn. 830 (2006) ................................................................................................... 33, 34

*Couture v. Bd. of Educ. of Town of Plainfield,*
  6 Conn. App. 309, 505 A.2d 432 (1986) ........................................................................... 33

*Densberger v. United Techs. Corp.,*
  297 F.3d 66 (2d Cir. 2002) ................................................................................................ 31

*Envtl. Def. Fund, Inc. v. Envtl. Prot. Agency,*
  636 F.2d 1267 (D.C. Cir. 1980) .......................................................................................... 2

*Evans v. Lorillard Tobacco Co.,*
  465 Mass. 411, 990 N.E.2d 997 (2013) ............................................................................. 9

*Falk v. Keene Corp.,*
  113 Wash. 2d 645, 782 P.2d 974 (1989)........................................................................... 20

*Ferri v. Pyramid Const. Co.,*
    186 Conn. 682, 443 A.2d 478 (1982)................................................................38

*Gajewski v. Pavelo,*
    36 Conn. App. 601, 652 A.2d 509 (1994) ...............................................24, 28

*Genereux v. American Beryllia Corp.,*
    577 F.3d 350 (1st Cir. 2009) ........................................................................10

*Gnazzo v. G.D. Searle & Co.,*
    973 F.2d 136 (2d Cir. 1992) .........................................................................36

*Hubbard-Hall, Inc. v. Monsanto Co.,*
    98 F. Supp. 3d 480 (D. Conn. 2015) ...............................................8, 13, 36

*Izzarelli v. R.J. Reynolds Tobacco Co.,*
    321 Conn. 172, 136 A.3d 1232 (2016) ................................18, 20, 22, 23

*Junk v. Terminix Int'l Co. P'ship,*
    No. 4:05-CV-0608-JAJ, 2008 WL 5191865 (S.D. Iowa Nov. 3, 2008) ............22

*Karavitis v. Makita U.S.A., Inc.,*
    243 F. Supp. 3d 235 (D. Conn. 2017) .....................................................20, 22

*Leslie v. Hartford Bd. of Educ.,*
    No. HHDCV146047423, 2016 WL 301376 (Conn. Super. Ct. Jan. 5, 2016)................33

*Mailman's Steam Cleaning Carpet Corp. v. Lizotte,*
    616 N.E.2d 85 (Mass. 1993) ........................................................................39

*Parish v. ICON Health & Fitness, Inc.,*
    719 N.W.2d 540 (Iowa 2006) ......................................................................22

*Pitterman v. GM LLC,*
    2016 WL 1732710 (D. Conn. April 29, 2016)................................................18

*Potter v. Chicago Pneumatic Tool Co.,*
    241 Conn. 199, 694 A.2d 1319......................................................................18

*San Francisco Unified Sch. Dist. v. W.R. Grace & Co.,*
    37 Cal. App. 4th 1318, 44 Cal. Rptr. 2d 305 (1995) ....................................36

*Savage v. Scripto-Tokai Corp.,*
    266 F. Supp. 2d 344 (D. Conn. 2003) .....................................................11, 31

*Sharp v. Wyatt, Inc.,*
    31 Conn. App. 824, 627 A.2d 1347 (1993)................................10, 25, 27, 38

*State v. Lombardo Bros. Mason Contractors, Inc.,*
    307 Conn. 412 (2012) ...................................................................................33

*Town of Westport v. Monsanto Co.,*
    No. CV 14-12041, 2017 WL 1347671 (D. Mass. Apr. 7, 2017), aff'd, 877 F.3d 58 (1st Cir. 2017)8, 9, 10, 11

*Transwestern Pipeline Co. v. Monsanto Co.*,
    46 Cal. App. 4th 502, 53 Cal. Rptr. 2d 887 (1996) .......................................................................*passim*

*Vitanza v. Upjohn Co.*,
    257 Conn. 365 (2001) ...........................................................................................................................28

*Vivenzio v. City of Syracuse*,
    611 F.3d 98 (2d Cir. 2010) .....................................................................................................................8

*Water Pollution Control Auth. of City of Norwalk v. Flowserve US Inc.*,
    No. 3:14-CV-00549 (VLB), 2018 WL 1525709 (D. Conn. Mar. 28, 2018) ....................................20

*West Haven School District v. Owens-Corning Fiberglas Corp.*,
    721 F. Supp. 1547 (D. Conn. 1988).....................................................................................................34

**Statutes**

15 U.S.C.A. § 2641..................................................................................................................................14

15 U.S.C. § 2605......................................................................................................................................3

Conn. Gen. Stat. Ann. § 22a-463.............................................................................................................2

Conn. Gen. Stat. Ann. § 52-572q.............................................................................................10, 24, 25, 28

Conn. Gen. Stat. § 52-577a................................................................................................................32, 34

Conn. Gen. Stat. § 52-577c................................................................................................................32, 34

**Other Authorities**

40 C.F.R. § 761.20...................................................................................................................................3

Fed. R. Civ. P. 56(a)................................................................................................................................8

**INTRODUCTION**

In its Second Amended Complaint, Plaintiffs City of Hartford and Hartford Board of Education (collectively, "Hartford") allege that one of its school buildings, Clark Elementary School ("Clark"), and a number of building materials within the school building are contaminated with polychlorinated biphenyls (or "PCBs") that were manufactured by Monsanto and used in Clark as plasticizers in sealants.[1]   Hartford alleges that Defendants (collectively, "Monsanto") defectively designed the PCB-plasticizers detected at Clark and failed to warn of their dangers, stating causes of action under the Connecticut Product Liability Act ("CPLA") for design defect, failure to warn, and negligence.   Monsanto now moves for summary judgment on all causes of action. ECF 267. Hartford submits this Opposition in response.

**A.  The Contamination of Hartford's Clark Elementary School**

Hartford closed Clark over winter break during the 2014-2015 school year and has not reopened its North End school building for classes since.  The reason? Clark is contaminated with PCBs, a highly regulated environmental contaminant.  The contamination at Clark is pervasive; PCBs have been found in the School's building materials, dust, and even air.  Additional Material Fact 38 ("AMF" 38)

The specific PCBs at Clark have been identified as being from two Monsanto products – Aroclor 1248 and Aroclor 1254.[2] Defendants' Statement of Undisputed Material Fact 70 ("SOF" 70).  Monsanto's PCB-products are components of sealants that were used around windows, doors, and in wall joints during Clark's construction in 1971.  AMF 38.  When used in sealants, PCBs inevitably evaporate (or "volatilize") from the sealant into air or nearby materials. AMF 2.  This volatilization process begins as soon as the sealant is applied and continues for decades. AMF 2. Once PCBs volatilize, they exist in the air as vapor or adhere to other building products and surfaces such as brick, drywall, and even indoor dust, which inevitably moves into air and circulates throughout an entire building. AMF 2.  As a result, the entire Clark school building, along with its

---

[1] Although sealant is more commonly known as "caulk," Monsanto's documents refer to the product as "sealant."  For clarity, this Memorandum uses the term "sealant" also.
[2] Both Aroclor 1248 and Aroclor 1245 are made up of only PCBs.  SOF 6.

1

building materials – including brick, concrete, paint, ceiling tiles, spray applied fire proofing, and air filters – are now contaminated by Monsanto's PCBs.  AMF 38.[3]

Hartford was not aware of Clark's contamination until Fall 2014.  AMF 38.  After spending over $1,000,000 on a renovation project, Plaintiffs' Response to Defendants' Statement of Fact 61 ("RSOF" 61), Hartford decided to further update Clark by installing a fire suppression system.  SOF 69.  At that time, as a condition of providing State funding for this project, the State's Office of School Facilities required Hartford to test for PCBs and other hazardous contaminants in any materials that might be impacted by the renovation project.  RSOF 70.  Initial tests detected Monsanto's PCBs in paint, and subsequent tests demonstrated that Monsanto's PCBs had contaminated the air and building materials throughout Clark. AMF 38. In fact, PCBs were detected in the air at levels that exceeded EPA's Health Protective Values for Indoor Air in Schools.  RSOF 73.  As a result, Hartford was forced to close Clark in January 2015 and redistribute its students among several Hartford-area schools. RSOF 83. Since then, Hartford has spent considerable amounts of money as a result of the PCB contamination at Clark and will continue to do so.  AMF 39 and RSOF 138.

PCBs are ubiquitous environmental contaminants, heavily regulated by the federal and state governments.  In response to PCBs' threats to environmental and human health, Congress enacted the Toxic Substances Control Act ("TSCA"), 15 U.S.C.A. § 2601, et seq., which banned the manufacture and most uses of PCB-containing products as of January 1, 1979.  *See Envtl. Def. Fund, Inc. v. Envtl. Prot. Agency*, 636 F.2d 1267, 1271 (D.C. Cir. 1980) ("The special attention accorded to PCBs in the Toxic Substances Control Act resulted from the recognized seriousness of the threat that PCBs pose to the environment and human health.").  In addition, states including Connecticut have laws governing the manufacture and use of PCBs. *See* Conn. Gen. Stat. Ann. § 22a-463 through 22a-469a.  EPA has promulgated federal regulations governing the use, remediation, and disposal of PCBs and PCB-contaminated materials; the Connecticut Department of the Energy & Environment

---

[3] Monsanto was the sole  PCB manufacturer in the United States. AMF 26

Protection (CT DEEP) regulates on the state level.  *See id.*; 15 U.S.C. § 2605(e)(1) (authorizing EPA to implement PCB rules); 40 C.F.R. § 761 (EPA PCB regulations).

These laws and regulations require remediation of buildings like Clark that contain PCBs. EPA prohibits the use of materials originally manufactured with PCBs, like the sealant at Clark, where that material contains PCBs at levels greater than or equal to 50 parts per million ("ppm").  40 C.F.R. § 761.20.[4]  EPA's regulations also prohibit the use of materials contaminated by the products originally containing PCBs – for example, the brick at Clark – if the contaminated material contains PCBs at a level above 1 ppm. RSOF 102.  The CT DEEP sets an even stricter standard, instructing property owners to address PCB contamination <u>in any material</u> found to contain PCBs at levels greater than 1 ppm – even if that material was intended to contain PCBs, such as the sealant at Clark.  *Id.*  By simply allowing the PCB-contaminated building materials to remain in place, Hartford is "using" prohibited materials in violation of state and federal law. *See* EPA, Consent Agreement and Final Order, *In the Matter of the City of New York*, TSCA-02-2010-9201 (requiring City to develop remediation plan for PCB-sealant in schools after finding that "PCB Caulk that remains in use in school buildings constitutes a continued use of PCBs under Section 6(e) of TSCA and its implementing regulations at 40 C.F.R. Part 761."), attached to Plaintiffs' Local Rule 56(A)2 Statement of Facts in Opposition to Summary Judgment as Hartford Exhibit 66; *see also America Unites for Kids v. Lyon*, No. CV 15-2124 PA (AJWX), 2016 WL 4571409, at *10 (C.D. Cal. Sept. 1, 2016) (allowing parents to bring citizen suit against school district; the school "used" PCBs in violation of TSCA by allowing to remain in place sealant containing levels of PCBs above 50 ppm).

### B.  Monsanto knew PCBs were environmental contaminants by the late 1960s.

PCBs are regulated, and must be removed, because they are environmental contaminants. Although Monsanto no longer sold PCBs by the time Congress banned their production in 1979, Monsanto knew PCBs were environmental contaminants long before it ceased sales in 1977. Monsanto knew of the characteristics that would cause PCBs to become environmental contaminants even earlier.

---

[4] Sealant at Clark was found to contain PCBs at levels as high as 190,000 ppm.  AMF 38.

As discussed below, Monsanto manufactured, marketed, and sold millions of pounds of its PCBs for end uses, like sealants, from which PCBs will inevitably migrate into the environment. Once in the environment, PCBs persist and do not break down, which leads to human exposure. Once in the human body, PCBs can persist for decades and cause disease, like cancer. Given what Monsanto knew about PCBs' toxicity and persistence early on, Monsanto never should have promoted and sold PCBs for use in certain products, like sealants, where PCBs would inevitably escape into the environment.

        1.   <u>PCBs are toxic.</u>

PCBs are known human carcinogens and are linked to a host of other non-cancer health effects.   AMF 1. Exposure is particularly dangerous to children, who are susceptible to developmental disorders and, compared to adults, have much smaller fat depots for sequestering PCBs such that PCBs store at higher concentrations in children. Id.  Monsanto has known that PCBs are toxic since at least the 1930s; during that timeframe, deaths following exposure to PCBs prompted studies of the chemical's toxicity. AMF 7.  Evidence of the chemicals' toxicity mounted through additional studies performed in the 1930s, 1940s, and 1950s, some of which Monsanto conducted.   AMF 8.  These studies consistently demonstrated that PCBs cause systemic adverse health effects. *Id.*  At no point was a "safe" level of exposure to PCBs established; in the mid-1950s, Monsanto's Medical Director summarized the company's views regarding PCB toxicity: "We know Aroclors are toxic but the actual limit has not been precisely defined."  *Id.*  In fact, in spite of the "hundreds of toxicological tests" Monsanto points to in support of its position that PCBs are safe, *see* ECF 267 at 23-23, Monsanto's Medical director admitted in 1967 that there was "no information available on the action of nanograms of Aroclor in the human body over a lifetime."[5]  AMF 9.

Humans are not the only ones harmed -- PCBs also pose a threat to the health of birds, fish, and other wildlife.  Monsanto recognized as much in the 1960s, cavalierly commenting that PCBs were toxic to some species at extremely low levels. AMF 11.

        2.   <u>PCBs are persistent.</u>

---

[5] The same individual lectured about concerns of chronic low-level exposure to hazardous materials in 1947. AMF 10.

Once released from its intended application, PCB compounds do not readily biodegrade or otherwise break down in the natural environment. AMF 6. Neither do they readily metabolize; PCBs persist in the human body for decades. *Id.* Furthermore, PCBs store in fat and biomagnify, meaning those at the top of the food chain are most exposed. *Id.*

 Monsanto understood these facts well before Clark was built. As Monsanto pointed out in 1969, PCBs persist in the environment due to their "chemical stability." AMF 22. Monsanto knew early on that PCBs are chemically stable and do not readily break down – in fact, it raved about that characteristic in product bulletins and advertisements. AMF 12. The same documents show Monsanto knew that PCBs are not broken down by light, water, or other biological processes. *Id.* Monsanto utilized PCBs' persistence in the environment for insecticide uses in 1953; it "believed that Aroclor may increase the effective life of [an insecticide], 10 to 20 times." AMF 14. The same document noted that Aroclors have "high resistance . . . to water and corrosive influences" and that those characteristics "account[] for the unusually good weather durability of the [insecticide]-Aroclor residue." *Id.* Monsanto even seemed to contemplate the persistence of PCBs in the environment in 1938 when it applied PCBs to soil in a "soil poison" study relating to a potential termite repellant application. AMF 13. Twenty-five years later, in 1963, Monsanto noted the buried PCBs were unchanged and still visible to the naked eye. *Id.*

And by 1966, Monsanto knew that PCBs would store in the human body. AMF 24. That year, Monsanto's internal documents noted that PCBs had been found in humans across the globe. *Id.* Those documents also showed that PCBs accumulated in animals, with those higher in the food chain exhibiting greater PCB levels. AMF 15.

>    3.   <u>Monsanto sold vast quantities of PCBs --- with the knowledge that they were toxic, persistent, and would contaminate the environment.</u>

Given PCBs' toxicity and persistence, Monsanto should have never sold PCBs for uses where the chemical could enter the environment. But they did. Monsanto sold millions of pounds of PCBs for use as a "plasticizer" in products such as sealant, paint, carbonless copy paper, and book-binding adhesives. AMF 16. PCBs migrate out of these "open" uses and into nearby

environments.   AMF 16.  Now, millions of pounds of PCBs have entered, and persist, in the environment. AMF 17.

By the time Clark was built in 1971, Monsanto not only knew the characteristics that would make PCBs environmental contaminants --- Monsanto in fact *knew* PCBs had already become environmental contaminants.   Monsanto first learned that PCBs were detected widespread in the natural environment in 1966. AMF 24.   In 1969, an internal PCB Ad Hoc committee reported the "growing incrimination" of PCBs "as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds."  AMF 19.

The committee's report left no question about PCBs' status as an environmental contaminant:

1.  The committee [] concluded that the identification of PCB's (sic) as an environmental contaminant is certain.
2.  Toxicity to some biological species at extremely low levels (a few parts per billion) is significant.
3.  The PCB's (sic) are persistent once they become a part of the environment and the rate of degradation is extremely low.
4.  There is little likelihood that the PCB's appear in the environment as a result of "natural" origin . . . .

AMF 21.

Monsanto also knew that PCBs escaping open uses was a primary contributor to environmental contamination. AMF 23.   This and government pressure led Monsanto eventually to cease sales of PCB-plasticizers in open use products, like sealants, in August 1970.  RSOF 10.  Prior to stopping PCB sales, however, the company decided to maximize the sales of these profitable products:   "There are, however a number of actions which must be undertaken to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series."  AMF 19.  Monsanto allowed its customers to stockpile PCB-plasticizers in the Spring and Summer of 1970.  RSOF 10.  Monsanto sold more PCBs for use as plasticizers in 1970 than it did in any other year.  *Id.*

Clark was constructed one year later and with products containing Monsanto's PCB-plasticizers. Monsanto never should have sold PCBs for use in sealant. But it did. At the very least, Monsanto should have immediately stopped selling PCB-plasticizers once PCBs were found to exist widespread in the environment. But instead, Monsanto pushed its product harder, allowing customers to maintain a PCB stockpile. RSOF 10. Because of Monsanto's decisions, Hartford has spent, and will spend, considerable amounts of money to properly address and dispose of PCB contaminated materials at Clark.

### C.  Procedural History

Monsanto moved for summary judgment arguing that Hartford cannot prevail on its strict liability and negligence claims under the CPLA. In addition, it argues that Hartford cannot show property damage as a matter of law unless it shows that PCBs volatilize out of the sealant at Clark at dangerous levels. For both of these arguments, Monsanto improperly relies on principles of Massachusetts law that Connecticut has specifically rejected, so these arguments fail legally. In addition, as detailed in this Memorandum, Hartford has presented abundant evidence establishing that: Monsanto's PCBs have damaged Clark and the building materials within; Monsanto should have never sold PCBs for use in sealants; Monsanto should have stopped selling PCBs once they were detected widespread throughout the environment; and that Monsanto should have taken additional actions to prevent further environmental contamination after learning of their pervasiveness. This evidence creates a number of material fact questions, including whether PCBs should have been used in sealants at the time of Clark's construction; whether Monsanto's warnings sufficiently warned its customers about potential PCB contamination; whether Monsanto should have performed additional tests to determine the toxicity of PCBs; and whether Monsanto acted appropriately by continuing to sell PCBs for use in sealant even after knowing it to be a widespread environmental contaminant.

Next, Monsanto contends Hartford's claims are barred by the statute of limitations. As a municipal entity acting in a governmental capacity, Hartford is not bound by periods of limitation as a matter of law. And even if it was, Hartford brought its claims within two years of discovering

PCBs at Clark, well within any applicable period of limitation.  If nothing else, the question of when Hartford had notice of contamination is one of fact to be determined by the jury.

Finally, Monsanto argues that any damages should be capped at $1.  Hartford has presented fact and expert evidence supporting its claimed recoverable damages.  On this issue, too, there remain questions of fact that cannot be resolved on summary judgment.

## LEGAL ARGUMENT

### I.      Standard

A court may grant summary judgment only where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Hubbard-Hall, Inc. v. Monsanto Co.*, 98 F. Supp. 3d 480, 492 (D. Conn. 2015).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  And "the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.*  If there is any evidence that could support a verdict for the nonmoving party, summary judgment must be denied.  *Am. Home Assur. Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006).

### II.     The *Westport* case is not instructive.

Monsanto would like the Court to consider this case as *Westport* redux.  In both cases, PCB-containing sealant led to contamination in the air and throughout the school.  But that is where the similarities end. Connecticut law differs from Massachusetts law to an extent such that the ruling in *Westport* is inapplicable to Hartford's case.  *See Town of Westport v. Monsanto Co.*, No. CV 14-12041, 2017 WL 1347671 (D. Mass. Apr. 7, 2017), aff'd, 877 F.3d 58 (1st Cir. 2017).

Applying Massachusetts law, the *Westport* court granted Monsanto's motion for summary judgment, dismissing Westport's claims for defective design, failure to warn, and negligence.  *Id.* The court dismissed all claims because Westport failed to show that its harm was reasonably

foreseeable at the time sealant was installed at the school.[6] *Id.* at \*8, \*9, and \*11. As discussed below in Section II.A, Connecticut law does not require proof of foreseeability for strict liability claims.

In addition, the court dismissed Westport's design defect claim on the basis that Westport failed to demonstrate the existence of a feasible alternative design to PCBs. *Id.* at \*4-\*8. Connecticut law, on the other hand, does not require proof of alternative design. The court also dismissed Westport's failure to warn claim on the additional basis that Monsanto, as a bulk supplier, reasonably relied upon sophisticated intermediary manufacturers to pass on warning to end users.  *Id.* at \*9-\*11. Such a warning is not an affirmative defense in Connecticut. And finally, the court dismissed Westport's post-sale failure to warn claim on the additional basis that Westport failed to show how Monsanto could have identified Westport as an end user of its product.  *Id.* at \*10-\*11.  But again, such a showing is not required in Connecticut.

As discussed below, for all bases of dismissal in *Westport*, Connecticut and Massachusetts product liability law differ such that Monsanto's Motion for Summary Judgment against Hartford's claims cannot be granted on similar grounds.

### A. Reasonable Alternative Design and Foreseeability are not product liability elements under Connecticut law.

Quite simply, Connecticut and Massachusetts have different product liability standards, and the Supreme Court of Connecticut has expressly rejected the standard applied in *Westport*. Massachusetts follows the Restatement (Third) of Torts for design defect claims, whereas Connecticut law is based on Restatement (Second) of Torts.  *Compare Evans v. Lorillard Tobacco Co.*, 465 Mass. 411, 428, 990 N.E.2d 997, 1014 (2013) (following Restatement (Third)) with *Bifolck v. Philip Morris, Inc.*, 324 Conn. 402, 423, 152 A.3d 1183, 1196 (2016) (rejecting Restatement (Third), noting that Connecticut has followed Restatement (Second)'s strict liability standard "for more than five decades").  Restatement (Third) has two requirements not present in the Restatement (Second) - - first, proof that the harm was foreseeable; and second, proof that a reasonable alternative design

---

[6] As discussed in Section III, the Westport court incorrectly defined harm in the PCBs-in-schools context by saying that PCBs in sealant only cause property damage when they volatilize at levels sufficient to cause human harm.  The court in *Westport* ignored that PCBs cause environmental harm and that PCBs cause harm to humans in large part due to their persistence in a room, which is wholly unrelated to the rate at which they volatilize from sealant.

existed that would have reduced or avoided the danger. *Bifolck* at 420-421. Essentially, the Restatement (Third) requires proof of negligence whereas the Restatement (Second) is a true strict liability standard. *Id.* at 420-422. The Supreme Court of Connecticut has explicitly rejected the Restatement (Third) --- along with its alternative design and foreseeability requirements --- and has retained a strict liability standard. *Id.* at 434.[7] Therefore, the "foreseeability" and "alternative design"[8] analyses from *Westport* are irrelevant to Hartford's strict liability claims as a matter of law, and these grounds will not support summary judgment for Monsanto.

### B. Sophisticated User Doctrine is not an affirmative defense under Connecticut law.

In some states, but not Connecticut, the sophisticated user doctrine provides an affirmative defense such that warnings are not required "when the supplier has reason to believe that the purchaser of the product will recognize the dangers associated with the product." *Sharp v. Wyatt, Inc.*, 31 Conn. App. 824, 847, 627 A.2d 1347, 1359 (1993), *aff'd*, 230 Conn. 12, 644 A.2d 871 (1994) (*citing Goodbar v. Whitehead Bros.*, 591 F. Supp. 552, 561 (W.D.Va. 1984). Unlike in Massachusetts, the sophisticated user doctrine does not offer product sellers an affirmative defense in Connecticut. *Compare id.* at 849 (doctrine not an affirmative defense in Connecticut) with *Genereux v. American Beryllia Corp.*, 577 F.3d 350 (1st Cir. 2009) (doctrine an affirmative defense under Massachusetts law). Instead, for Connecticut failure to warn claims, a purchaser's sophistication is one of several factors analyzed by the trier of fact. *Sharp* at 848-849 (discussing Conn. Gen. Stat. Ann. § 52-572q). Given the difference between Massachusetts and Connecticut law, *Westport*'s sophisticated user analysis is not instructive to Hartford's case.[9] Nor does this argument provide a basis for this Court to grant

---

[7] In reaching its decision in *Bifolck*, the Supreme Court of Connecticut critically discussed Restatement (Third)'s elements of reasonable alternative design and foreseeability. The court held that a foreseeability element would be "manifestly inconsistent" with the court's "concern . . . about the burdens of expert testimony and its unequivocal determination that policy considerations favored adherence to strict liability." 324 Conn. 402, 428 (2016) . The court also disapproved of the alternative design requirement -- "such a rule would preclude valid claims for products for which there is no alternative design." *Id.* at 29. Specifically, the court disapprovingly pointed out that "the Restatement (Third) would seem to immunize certain classes of products like novel products for which there is no alternative design." *Id.* at 429. This last concern came to fruition in *Westport*, where PCB-plasticizers were essentially immunized from design defect claims. *Westport*, 2017 WL 1347671 at *4-*6 (D. Mass. Apr. 7, 2017).

[8] As discussed in Section IV.1.A.i, a claimant may use proof of an alternative design to prove a design defect claim, but there is no requirement that it *must*.

[9] Sufficiency of Monsanto's warnings is further discussed in Section IV.2.

summary judgment in Monsanto's favor; fact issues remain regarding whether Monsanto provided adequate warnings of the harm suffered by Hartford.

### C. Connecticut law does not require identification of the product's ultimate user for a post-sale negligence claim.

The First Circuit in *Westport* interpreted Massachusetts law as requiring proof that the school was an identifiable end user of Monsanto's product for a negligence claim based on Monsanto's post-sale duty to warn.  877 F.3d at 67-68.  No such proof is required here.  Rather, under Connecticut law, claims may be based on a general failure to recall a product without reference to a manufacturer's ability to identify specific end users.  *See, e.g., Savage v. Scripto-Tokai Corp.*, 266 F. Supp. 2d 344, 351 (D. Conn. 2003) (involving a defective lighter) ("Inasmuch as a claim of breach of the post-sale duty to warn is analogous to a claim of failure to recall, plaintiffs' theory has legal viability in Connecticut.");  *Argueta v. Overhead Door Corp.*, No. CV 000370126, 2000 WL 1207261, at *1 (Conn. Super. Ct. July 28, 2000) (affirming viability of a failure to recall theory under the CPLA).[10]

Given the differences between Massachusetts and Connecticut law, *Westport* is not instructive.  As discussed below, Hartford's CPLA claims are proper under Connecticut law, and Hartford's evidence creates genuine issues of material fact to be determined by the jury.

### III.   Monsanto's PCBs Damaged Hartford's Property.

Monsanto contends that Hartford cannot prove that its school building has been damaged without demonstrating that "PCBs volatilized at dangerous levels[.]"  ECF 267 at 32.  This misstates Hartford's burden.  Hartford's claims are for property damage – not personal injury.   Monsanto's artificially high burden comes from *Westport*, where the court found that property damage was *not foreseeable* unless Monsanto could have foreseen PCBs volatilizing out of sealant at concerning levels. *Id.* at 6-8.  This analysis incorrectly fixates on PCBs' volatility instead of PCBs' persistence in indoor spaces.   Once PCBs volatilize out of sealant, regardless of the rate, they persist in indoor environments resulting in constant human exposure.  It is this cumulative, long-term exposure that creates a risk to human health.  Furthermore, and as explained in more detail below, the *Westport*

---

[10] See Section IV.3.b for evidence supporting Hartford's post-sale failure to warn claim.

analysis completely ignores two key aspects of property damage that occur when PCBs volatilize out of sealant: PCBs from sealant bind to and damage other building materials, such as brick; and the PCBs released from sealant cause the entire school building to become an environmental hazard, such that the entire school building is damaged.

At Clark, PCBs have migrated from the sealants into which PCBs were intentionally added, resulting in contamination of other building materials that did not originally contain PCBs, including bricks/masonry material, ceiling tiles, paint, spray-applied fireproofing material, roofing material, and air handling unit filters.[11] AMF 38. PCBs have been detected in the indoor air and dust throughout the school at hazardous levels. AMF 38. The PCBs within Clark can also contribute to contamination outside the school building, especially if special measures are not taken both currently and during the eventual demolition and disposal of Clark. AMF 42.

Therefore, the damage to Hartford's property may be conceptualized in three distinct ways, each of which on its own gives rise to liability under Connecticut law:

1) Certain building materials in Clark Elementary School now contain PCBs at levels prohibited by federal law as a result of PCBs migrating from sealant to other building materials.

2) The entire school building, considered as a whole, has been damaged because the PCBs in the air and on surfaces in Clark Elementary School pose a hazard of additional environmental contamination.

3) The entire school building, considered as a whole, has been damaged because the PCBs in the air and on surfaces in Clark Elementary School pose a health hazard to building occupants.

**1. Certain materials at Clark, like bricks, have been contaminated by Monsanto's PCBs.**

As a result of PCBs migrating away from caulk, a number of building materials that did not originally contain PCBs are now contaminated. Because these materials contain PCBs at levels prohibited by federal regulations, Hartford must spend money to remediate the contaminated materials. Those building materials with PCBs at levels not allowed by PCB regulations are pieces of

---

[11] PCBs can also migrate out of the contaminated building materials, contaminating the air and other building materials --- that is, emitted from an affected brick that was itself contaminated by PCBs released from the sealant. This process is called secondary contamination. AMF 2.

property that have been damaged through PCB contamination.  *See, e.g., Hubbard-Hall*, 98 F. Supp.

3d at 496 (PCB-contaminated building material and soil as basis for tort property damage claim);

*Calabrese v. McHugh*, 170 F. Supp. 2d 243 (D. Conn. 2001) (PCB-contaminated soil basis for tort

property damage claim); *Transwestern Pipeline Co. v. Monsanto Co.*, 46 Cal. App. 4th 502, 53 Cal. Rptr.

2d 887 (1996).

A PCB contamination case from California is instructive.  *See Transwestern Pipeline Co. v.

Monsanto Co.*, 46 Cal. App. 4th 502, 53 Cal. Rptr. 2d 887 (1996).  There, Transwestern contaminated

a gas company's pipeline with gas containing PCBs.  Due to PCB regulations, the gas company had

to spend one million dollars every year to address the contamination within its pipeline.  *Id.* at 510

Specifically, the gas company had to collect, store, and dispose of contaminated "condensate,"

which is liquid inside the pipeline.  *Id.*  Transwestern and the gas company settled, and then

Transwestern sought equitable indemnity from the PCB manufacturer, Monsanto.  *Id.*  A jury found

in favor of Transwestern on theories of strict liability design defect and negligent failure to warn of

the environmental hazards of PCBs and found Monsanto to be 37.5 percent responsible for the

PCB contamination.  *Id.* at 508.  Monsanto appealed, in part arguing that the gas company's damages

were for economic loss, not property damage, and that economic loss was not recoverable under

Transwestern's strict liability and negligence claims.  *Id.* at 523. The court found Monsanto's

argument unpersuasive and held that the PCB contamination constituted property damage.  *Id.* at

530.  In so finding, the court explained that the harm "was clearly in the nature of property damage

because the PCB's contaminated the [gas company's] pipelines and the condensate within the

pipelines, both of which were the property of [the gas company]."  *Id.*

Just as the condensate in *Transwestern* was considered damaged property, so should the

contaminated building materials at Clark.  In both instances, specific materials within a contaminated

larger system – a pipeline in *Transwestern*, a school in the instant case – have been harmed due to the

presence of PCBs.  And in both instances, significant costs are associated with addressing the

contaminated materials to comply with federal regulations.

Monsanto cites no case to support its position that Clark's contaminated bricks and other materials are not "damaged."   It relies instead on an asbestos property damage case where this "contaminated materials" aspect of property damage was not at issue.[12]   In *BellSouth Telecommunications, Inc. v. W.R. Grace & Co.-Conn.*, the court considered only whether friable asbestos in a building poses a threat to human health and did not address contamination of other building materials, as Hartford has alleged. 77 F.3d 603, 610 (2d Cir. 1996) (asbestos damaged entire building once it posed a potential health hazard to occupants) (see Section III.3 for discussion of this aspect of property damage in the PCB context).   Nothing in *BellSouth* indicates that asbestos fibers migrate from one material and bind to, and damage, another material as PCBs do. *Id.*   Additionally, unlike PCB regulations, federal asbestos regulations and law do not ban the mere presence of asbestos in building materials; rather, asbestos laws regulate the substance once it becomes breaks down (i.e., "friable") such that people can inhale asbestos fibers.   *See, e.g.*, 15 U.S.C.A. § 2641(b) (showing purpose of TSCA Asbestos Hazard Emergency Response subchapter relates to human health).

### 2. The entire Clark Elementary School building has been damaged because PCBs pose a risk to the environment.

In addition, because the PCB contamination at Clark is extensive and poses a risk for further environmental contamination, the entire building, and not only certain materials, is considered to have been damaged.   In *Transwestern*, a California appellate court held that the presence of PCBs in a pipeline system constituted property damage.   46 Cal. App. 4th at 508 ("we find contamination of the gas company's pipeline system constituted property damage . . . .").   The court agreed that costs Transwestern incurred in remediating the contamination were recoverable as property damage.   *Id.* at 526-527.   In its analysis, the court favorably cited cases that considered an entire building to have been damaged due to the presence of asbestos and applied a similar approach to find the pipeline system had been damaged due to the presence of PCBs.   *Id.* at 527.   However, rather than focusing on potential human health effects of the PCBs, as is done in asbestos property damage cases, the

---

[12] Hartford has also suffered the type of property damage discussed in *BellSouth* because increased exposure to PCBs at Clark creates an increased risk of disease.  However, the BellSouth type of property damage is separate and distinct from the contaminated material aspect of property damage, where PCBs from sealant have damaged other building materials.

harm in *Transwestern* was premised largely on PCBs' status as environmental hazards.  *Id.* at 508-509, 530-531. This makes sense, given that PCB laws have a "chemical control nature" and exist in large part to "reduce the chance that additional PCBs will enter the environment." AMF 41; *see* "Polychlorinated Biphenyls; Criteria Modification; Hearings," Federal Register Vol. 44 No. 106 at 31516 (May 31, 1979) (" . . . Congress intended that EPA address the problem of contamination of the environment by PCBs to the greatest extent possible . . . .").

Although manmade, PCBs are present widespread throughout the environment. They have been detected in soil, sediment, air, food, animals, people, and water across the globe.  AMF 5. PCBs bioaccumulate and biomagnify, resulting in species higher in the food chain having higher concentrations of PCBs.  AMF 6.  PCBs have been widely documented in animals.  AMF 5.  Now, virtually all people have PCBs in their body, and those PCBs will remain for decades.  AMF 6. Because Monsanto was the sole US manufacturer of PCBs, their actions created this grim reality.

Here, the PCBs in Clark represent a hazard to the environment --- if Hartford does not address the PCBs in the air, dust, and building materials at Clark, those PCBs will further contribute to the ubiquity of PCBs in the environment. PCBs migrate out of sealants and create a continuous cycle of contamination within a building.  AMF 2. PCBs inside a building migrate outside the building, whether it be through an HVAC system or otherwise, into the outdoor environment. AMF 42. PCBs have been detected in exterior sealant at Clark, which can directly result in environmental contamination. *Id.*  Furthermore, unless Hartford undertakes proper remediation and disposal procedures, the PCBs in Clark will further disperse into the environment upon eventual demolition. *Id.*

3. **The entire Clark building has been damaged because PCBs pose a risk to the health of its occupants.**

The entirety of the Clark building may also be considered damaged because the presence of PCBs creates an increased risk to the health of those inside the building.  Students at Clark are subject to PCB exposure through three pathways: inhalation, digestion, and absorption.  AMF 4. According to Hartford's expert toxicologist, Dr. James Olson, PCBs in the air at 100 ng/m3 result

in 10 excess life time cancer cases in 1,000,000 people, RSOF 73; the PCBs in the air at Clark were detected at levels as high as 571 ng/m3, AMF 38. This significantly exceeds EPA's current Health Protective Values for Indoor Air in Schools.  RSOF 73.  It is of especial concern that children are exposed.  AMF 1.  In addition, given PCBs' widespread distribution throughout the environment, and the inevitability that humans are exposed through a variety of ways – including diet -- any increased exposure to PCBs at Clark school results in increased risk for a wide range of cancer and non-cancer conditions.  RSOF 50.

The Second Circuit has recognized that an entire building is damaged due to the presence of a contaminant when that contaminant poses a hazard to the health of the building's occupants.  *See BellSouth Telecommunications, Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 605 (2d Cir. 1996).   In *BellSouth*, building owners sought to recover costs associated with a building-wide asbestos abatement from manufacturers of asbestos-containing materials.  *Id.*  The district court dismissed on statute of limitations grounds, and on appeal the Second Circuit analyzed when the plaintiff would have been aware of its harm.  *Id.*  The court explained that in asbestos-abatement cases, the "harm" that results from the use of asbestos-containing products is the contamination of the entire building and the consequent health risk to those inside.  *Id.* at 610.  The court explained that asbestos may create a health hazard when asbestos containing materials become friable, such that asbestos fibers or dust are released into the air and lodge in the lungs and respiratory tract, which over time may cause asbestosis, mesothelioma, and lung cancer. *Id.* at 606.

Clark's damage is similar to the building in *BellSouth*.  In both instances, contaminants migrated from building materials and created a hazardous condition throughout the building.  In *BellSouth*, this harm meant that plaintiff's entire building had been damaged.  Similarly here, the presence of hazardous PCBs throughout Clark means that the entire building has been damaged.

Monsanto argues that Hartford must prove that PCBs volatilize from sealants at dangerous levels to prove a compensable injury.  ECF 267 at 32.  This false burden is not supported by Connecticut law and does not make sense in the PCB context, where the chemical's persistence causes it to exist in an indoor space for long periods of time.  Under Connecticut law, an entire

building is damaged when the presence of a contaminant creates an increased risk to the building's occupants. *See BellSouth* at 610-11. The rate at which a chemical enters the air does not matter; rather, the question for the jury is whether Hartford has shown that the PCBs in Clark pose an increased risk to human health.

Hartford has presented evidence of property damage. The Clark building has been damaged as a whole because it poses a hazard to its occupants and the environment. Additionally, specific materials within the school have been contaminated by PCBs that have migrated out of sealant. Because Hartford's evidence demonstrates a fact issue regarding the existence and extent of the property damage at Clark, summary judgment is improper.

### IV. Hartford's CPLA Causes of Action

All of Hartford's claims fall under the CPLA. Hartford brings design defect and failure to warn claims under theories of strict liability and negligence. In addition, Hartford brings negligence claims addressing Monsanto's failure to test PCBs' toxicity and Monsanto's post-sale duty to warn about the hazards of PCBs. As set forth below, Monsanto has not met its burden to prove it is entitled to summary judgment as a matter of law.

#### 1. Strict Liability Design Defect

PCBs are toxic, persistent chemicals that, when used as plasticizers in sealants, will contaminate air and nearby materials, like brick, paint, concrete, and air filters. AMF 2. Hartford contends that these characteristics make PCBs defective when used as plasticizers in sealant.

To prove a strict liability claim for design defect, Connecticut law requires proof of five elements:

> "(1) the defendant was engaged in the business of selling the product; (2) <u>the product was in a defective condition unreasonably dangerous to the consumer or user</u>; (3) the defect caused the injury for which compensation was sought; (4) <u>the defect existed at the time of the sale</u>; and (5) the product was expected to and did reach the consumer without substantial change in condition."

*Bifolck*, 324 Conn. 402, 434 (2016) (citing § 402A of the Restatement (Second) of Torts) (emphasis added). Defendants contend that Plaintiffs cannot prove elements two and four, ECF 267 at 7, but do not dispute elements one, three, and five.

As to element four, Monsanto does not dispute that Hartford has sufficient facts to establish that the defect existed at the time of sale; rather, Monsanto asks this Court to adopt a new, self-serving, Monsanto-invented burden that does not exist under Connecticut law.  Monsanto argues first that Hartford must prove that its injury was foreseeable based on the knowledge existing at the time of PCBs' manufacture. This argument is unfounded, however, because the Supreme Court of Connecticut specifically rejected a "foreseeability" burden in *Bifolck. Id.*, 324 Conn. 402, 428, 152 A.3d 1183, 1199 (2016) (citing *Potter v. Chicago Pneumatic Tool Co.*, 241 Conn. 199, 217–18, 694 A.2d 1319).  Monsanto then urges this Court to require Hartford to show what was known about PCBs' at the time Monsanto sold PCBs.[13]  However, as with foreseeability, this is simply not an element of proof needed under Connecticut law. The Supreme Court in *Potter* declined to adopt this as an element*, explaining that a claimant need <u>not</u> show what was known about a product at the time of sale; rather, such information -- the "state of the art" of the product -- "is merely one factor for the jury to consider" and "would not, as a matter of law, warrant a judgment for a defendant." *Id.* at 253-254.[14]

The only element in dispute is the second --- whether PCBs used as plasticizers in sealant are unreasonably dangerous to the consumer or user. The Supreme Court of Connecticut has established two separate tests through which a plaintiff can prove this element – the risk-utility test and the consumer expectation test. *Bifolck at 434.*  Plaintiff need only prove the "unreasonably dangerous" element through one test, but a judge can instruct a jury to consider both tests if supported by the evidence.  *Izzarelli v. R.J. Reynolds Tobacco Co.,* 321 Conn. 172, 201–02, 136 A.3d 1232, 1248-49 (2016). Here, Hartford has established sufficient evidence that PCBs used as plasticizers in sealants are "unreasonably dangerous" under both tests.

---

[13] ECF 267 at 19 ("the plaintiff bears the burden of proving that the defect existed at the time of sale, and, therefore, the safety of the product must be measured by what was known at the time of sale") (citations omitted).

[14] For support, Defendants cite an unpublished opinion that predates *Bifolck's* discussion of foreseeability. *See* ECF 267 at 10 (citing *Pitterman v. GM LLC*, 2016 WL 1732710, *5 (D. Conn. April 29, 2016)).  Regardless, the portion of *Pitterman* cited by Defendants relates to a motion to exclude expert testimony and does not address whether foreseeability of harm is an element in Connecticut strict liability design defect claims.  *Id.*

**a.  Hartford's strict liability claim can be proven through the risk-utility test.**

A product can be unreasonably dangerous under the risk-utility test if either

1.  A <u>reasonable alternative design</u> was available that would have avoided or reduced the risk of harm and the absence of that alternative design renders the product unreasonably dangerous. . . . ; <u>or</u>

2.  The product is a <u>manifestly unreasonable design</u> in that the risk of harm so clearly exceeds the product's utility that a reasonable consumer, informed of those risks and utility, would not purchase the product.

*Bifolck* at 434-35 (emphasis added).  These two theories are not mutually exclusive, *id.*,  and Hartford brings its design defect claim under both theories. *Cf. id.* at 432 (permitting plaintiff to elect the theory through which it proves a product is unreasonably dangerous).

i.  <u>Adequate alternatives to PCB-plasticizers existed.</u>

Hartford's evidence proves alternative plasticizers existed for the type of sealant used at Clark (polysulfide sealant).  In fact, Monsanto's own documents prove that a number of non-PCB plasticizers existed for use in polysulfide sealant, and that Monsanto even sold a number of these alternatives.  Monsanto's technical bulletins provide its customers with a list of plasticizers for polysulfide sealants – some contain PCBs, some do not. AMF 27. And when Monsanto stopped selling PCBs, it provided its customers with a number of non-PCB alternative plasticizers for use in polysulfide sealants. *Id.*

One type of alternative plasticizer – chlorinated paraffins – posed an especial threat to Monsanto's PCB-plasticizer market. As early as 1955, Monsanto considered these and Aroclors as "natural competitors" --- "competitive in performance and price." AMF 29. Decades before it stopped selling PCB-plasticizers, Monsanto acknowledged that Aroclors suffer from poorer volatility and vapor toxicity when compared to chlorinated paraffins. *Id.*  In 1970, Monsanto foresaw chlorinated paraffins displacing PCBs in polysulfide sealants months before it stopped selling PCBs as plasticizers. *Id.* Monsanto explained the likely displacement was due to chlorinated paraffins' "price and equivalent if not slightly improved performance," and expressed concern about being able to "protect[] this Aroclor market without depressing Aroclor prices across the board." *Id.*

Hartford's sealant expert, Jerome Klosowski, acknowledged chlorinated paraffins as suitable plasticizer alternatives in his deposition:  "Chlorinated paraffins with chlorine content greater than about 40% were found to be quite good alternatives and were relatively low priced."  RSOF 16.[15]

Monsanto argues that because the product at issue is a plasticizer made entirely of PCBs, the "alternative design" must be a design that somehow changes that "design" of PCBs.  ECF 267 at 15.  Monsanto would impose upon Hartford the burden of showing that the chemical composition of Monsanto's product could be changed.[16]  A supreme court from another state has rejected this argument in a design defect case arising out of pesticide exposure.  In *Ruiz Guzman v. Amvac Chemical Corp.*, the plaintiffs argued that they should not have to show how the pesticide's chemical composition should be altered because "it would impose 'too onerous a burden' on plaintiffs in design defect cases to show not just that other products are adequate substitutes for the defendant's product, but that the chemical composition in the defendant's product could be altered to make the product safer and just as effective." 7 P.3d 795, 799, 141 Wash.2d 493, 501 (Wash. 2000).  The court agreed, relieving the plaintiffs of the burden Monsanto suggests here:

> If another product can more safely serve the same purpose as the challenged product at a comparable cost and in a similar manner, a jury should be able to conclude that the risks of the challenged product outweigh its utility.

*Id.*  Although that court applied Washington law, the Washington Products Liability Act's emphasis on the state of the product rather than the manufacturer's conduct mirrors Connecticut's commitment to product-focused strict liability.  *See Falk v. Keene Corp.*, 113 Wash. 2d 645, 653, 782

---

[15] Hartford provides expert testimony regarding alternatives to PCB-plasticizers, but it disputes Monsanto's contention that it must --- Monsanto's documents and admissions alone prove that that alternatives existed. The cases cited by Monsanto do not purport to require that an expert prove the existence of an alternative.  *Karavitis* acknowledges that it is unclear whether expert testimony is required for *a risk-utility analysis*, but even if an expert is necessary to assist the jury's understanding of the PCB-product for a risk utility analysis, this is not the same as requiring expert testimony to prove an alternative design. 243 F. Supp. 3d 235, 252 (D. Conn. 2017).  *Flowserve* likewise did not hold that a plaintiff must establish an alternative design through expert testimony. *Water Pollution Control Auth. of City of Norwalk v. Flowserve US Inc.*, No. 3:14-CV-00549 (VLB), 2018 WL 1525709, at *25 (D. Conn. Mar. 28, 2018) (holding no material question of fact as to whether a feasible alternative was available where plaintiff failed to show that another kind of pump that would work at plaintiff's water treatment plant).  Defendants also cite *Bagley*, but that opinion does not address whether expert testimony is necessary for proving an alternative design. 327 Conn. 89, 108 (2017).  In fact, the word "alternative" is not even in the opinion.

[16] For support, Monsanto cites *Izzarelli*, 321 Conn. at 204-06.  *Izzarelli* disapproved of a categorical attack on all cigarettes, but this ruling does not affect Hartford's claim.  Hartford contends that PCBs should not have been used as plasticizers in <u>sealants</u> and in other <u>open</u> uses, not that PCBs are categorically defective for all uses.

P.2d 974, 979 (1989) (affirming WPLA's commitment to strict liability).

Hartford's evidence demonstrates several fact questions regarding the availability of a reasonable alternative design. Summary judgment is improper on this basis.

ii.   PCBs are manifestly unreasonable as a plasticizer in sealants.[17]

Under the risk-utility test, a product may also be unreasonably dangerous if "the design of the product marketed is manifestly unreasonable in that the risk of harm from the product so clearly exceeds its utility that a reasonable, informed consumer would not purchase the product[.]" *Bifolck* at 432. This analysis focuses on whether a "reasonable consumer" to whom the product is marketed would purchase a product. *Id.* at n.18. Here, Hartford contends that the risk of harm from PCBs when used as plasticizers in sealants so clearly exceeds its utility that a reasonable, informed sealant manufacturer would not purchase the product.

PCBs pose a risk to human and environmental health when used in sealants. When used as plasticizers, PCBs will inevitably migrate out of sealants and persist in indoor environments. People are subject to ongoing exposure, resulting in an increased risk to their health, when inside buildings that were made with PCB-containing sealants. RSOF 73. If not addressed, the PCBs from Clark inside will add to the already-existing levels of PCBs in the environment. AMF 42.

These environmental and health risks would clearly outweigh the utility of PCBs as a plasticizer to a reasonable sealant formulator. According to Plaintiffs' sealant formulator expert, Jerome Klosowski, a reasonable sealant formulator would not have used PCBs as plasticizers for indoor sealants if it knew that PCBs were systemically toxic and would persist in indoor environments. RSOF 27. In addition, a jury could find that a reasonable sealant formulator would not have used PCBs if it knew that PCBs are toxic at low concentrations, persist in the environment, and that millions of pounds had been sold for uses from which PCBs would inevitably escape. Furthermore, PCB-plasticizers were not, and have never been, critical to the sealant industry; non-PCB containing sealants existed and properly functioned before, during, and after the time of Clark's

---

[17] That Hartford did not plead a manifestly unreasonable design theory is of no consequence here. Hartford filed its operative Second Amended Complaint on September 9, 2016. ECF 71. The Supreme Court of Connecticut did not express its preference that plaintiffs allege the theory under which it intends to prove that a product is unreasonably dangerous until *Bifolck* was decided on December 29, 2016, after Hartford filed its SAC. *Id.* at 432.

construction.  AMF 30.  According to Mr. Klosowski, the two types of sealants that ultimately became the primary sealants in the construction industry -- silicone and polyurethane sealants -- never required PCB-plasticizers.  *Id.*  Both types of sealants were introduced and used years before Clark's construction in 1971.  *Id.*  Regardless of whether PCBs possessed positive characteristics as a plasticizer, given their risks, a reasonable sealant formulator would not have used PCBs in sealants.  At the very least, Hartford's evidence creates an issue of fact to be determined by the jury.

Because the Connecticut Supreme Court only recently created the "manifestly unreasonable" standard, only one court has considered it. *See Karavitis v. Makita U.S.A., Inc.*, 243 F. Supp. 3d 235, 252 (D. Conn. 2017), *aff'd*, 722 F. App'x 53 (2d Cir. 2018).  There, the plaintiff cut his thumb while using a circular saw and sued the saw's manufacturer.  *Id.*  Citing extensive prior use without injury (50-100 times over a fifteen year period), the court rejected application of the manifestly unreasonable test. Hartford's case is different.  *Id.*  The PCB-plasticizers in Clark have contaminated building materials and the air in Clark regularly since Clark was constructed in 1971 – at no point have Monsanto's PCBs been used at Clark without incident because PCBs began to volatilize upon application.[18] AMF 2.

    **b.  <u>Hartford's strict liability claim can be proven through the consumer expectation test.</u>**

Hartford may also use the consumer expectation test to prove that PCBs as plasticizers in sealants are unreasonably dangerous to users and consumers.  This test is not the default test, but it is appropriate in situations like Hartford's where a product "fails to meet a consumer's legitimate, commonly accepted minimum safety expectations." *Izzarelli*, 321 Conn. 172, 202–03 (2016).  Here, a jury may find that a reasonable consumer would not expect component parts of sealants to contaminate other building materials and the air in a building.

---

[18] Monsanto also cites two Iowa cases that discuss a "manifestly unreasonable" test, but those courts were discussing the Restatement (Third)'s manifestly unreasonable test, which is considerably more restrictive than Connecticut's test. *Compare Bifolck* at 419-420 (describing Restatement (Third)'s standard as applying only where product has "marginal utility and [] a high degree of risk") with *id.* at 432 (Connecticut's standard is "not limited to products of marginal utility; it applies to any product in which its risks clearly exceed its utility."). Therefore, the Iowa cases Defendants cite are not instructive. *See Parish v. ICON Health & Fitness, Inc.*, 719 N.W.2d 540, 543 (Iowa 2006) (Supreme Court of Iowa adopted Restatement (Third)); *Junk v. Terminix Int'l Co. P'ship*, No. 4:05-CV-0608-JAJ, 2008 WL 5191865, at *3 (S.D. Iowa Nov. 3, 2008) (same).

The facts here are distinguishable from those in *Izzarelli*. There, the court found the consumer expectation test inappropriate where the product at issue was a cigarette and when the person began smoking after warning labels for cigarettes were mandated by federal law, such that the disease-related health risks of smoking were common knowledge. *Id.* at 194. By that point in time, a reasonable consumer would know that a cigarette exposes the user to carcinogens and the attendant risk of cancer. *Id.* However, the *Izzarelli* court acknowledged that "a different conclusion might be warranted in cases in which the plaintiff . . . began smoking before warning labels were mandated by federal law." *Id.* at n. 16.

The PCB contamination at Clark is akin to the theoretical situation in *Izzarelli* where a person began smoking before warning labels accompanied the purchase of cigarettes. Clark was built in 1971. RSOF 3. At that point, it would not have been common knowledge that PCBs could migrate out of sealants and persist in indoor environments. Despite Monsanto's longtime knowledge, this threat has only recently gained the public's attention. AMF 3. Furthermore, PCBs were not banned for use in sealants at that point in time, but they were known by Monsanto to be persistent, toxic and found widespread throughout the environment.[19] AMF 21. Given these facts, a jury could reasonably find that the sale and use of PCBs as a sealant component, such that PCBs would contaminate open air and other building materials, would fail to meet an ordinary consumer's legitimate, commonly accepted minimum safety expectations.

Monsanto correctly points out that the consumer expectation test typically applies where no expert is necessary to prove causation, such as *res ipsa* cases. ECF 267 at 20-21. Monsanto then states that the consumer expectations test is inapplicable here because an expert is necessary to show health risks associated with PCBs volatilizing from sealant in order to demonstrate harm. *Id.* Not so. As discussed in Section III.1, Hartford need not show that PCBs volatilizing from sealants cause disease, rather, Hartford must only show that its building and/or building materials have been contaminated by PCBs.

---

[19] Monsanto provides no evidence suggesting that an ordinary consumer would have known that PCBs were toxic and widespread contaminants, nor that PCBs would persist and cycle in indoor environments.

Furthermore, the cases on which Monsanto relies are distinguishable – in those cases, an expert was necessary to establish that defendants' product, and not something else, injured plaintiffs. *See Bagley v. Adel Wiggins Grp.*, 327 Conn. 89, 108 (2017) (expert testimony necessary to prove that product could emit asbestos fibers when sanded); *Beyer v. Anchor Insulation Co.*, 238 F. Supp. 3d 270, 294 (D. Conn. 2017) (expert testimony necessary to prove disease was caused by defendant's product).  Here, Hartford does not need expert testimony to show Monsanto's product caused the harm at issue – it is undisputed that PCBs inevitably migrate out of sealant through normal use, SOF 19, and the same Monsanto PCBs in Clark's sealant (Aroclor 1248 and Aroclor 1254), SOF 70,  were detected in Clark's air and building materials, AMF 38.

### 2. Strict Liability Failure to Warn

Strict liability failure to warn is a statutory cause of action in Connecticut. *See* Conn. Gen. Stat. Ann. § 52-572q.  For a claim under Section 52-572q, Hartford must prove Monsanto's PCBs were defective for use in sealants because adequate warnings or instructions were not provided, and that had adequate warnings or instructions been provided, Hartford would not have suffered harm. *Id.* In determining whether warnings from Monsanto's warnings were adequate, a jury may consider three factors:

> (1) The likelihood that the product would cause the harm suffered by the claimant;
>
> (2) the ability of the product seller to anticipate at the time of manufacture that the expected product user would be aware of the product risk, and the nature of the potential harm; and
>
> (3) the technological feasibility and cost of warnings and instructions.

*Id.* at § 52-572q(b).  Warnings must be "devised to communicate with the person best able to take or recommend precautions against the potential harm."  *Id.* at § 52-572q(d).

Here, a question of fact exists regarding who could have best taken precaution to prevent the contamination of Clark – whether that be the sealant manufacturer, architects, contractors, individuals applying sealant, or Hartford itself. *See Gajewski v. Pavelo*, 36 Conn. App. 601, 614-15, 652 A.2d 509, 516 (1994), *aff'd,* 236 Conn. 27, 670 A.2d 318 (1996) (holding jury instruction as proper

where trial court instructed that it was for the jury to determine the person best able to take precaution against any potential harm).[20]

Monsanto provided product information only to their customers – here, sealant manufacturers.  SOF 40.  A genuine question of material fact exists as to whether Monsanto's warnings were adequate. Monsanto's warnings to intermediary sealant manufacturers addressed only PCB toxicity in the industrial setting, not harm to potential users of the end-products:

> Caution! Contains chlorinated hydrocarbons
> Avoid prolonged breathing of vapors or mists.
> Avoid contact with eyes or prolonged contact with skin.
> If skin contact occurs, remove by washing with soap and water.
> Following eye, contact flush with water.
> If clothing becomes soaked with fluid, launder before wearing again.

Hartford Exhibit 90, at TOWOLDMON0001622.

Hartford's sealant formulator expert, Jerome Klosowski, reviewed Monsanto's historical PCB warning labels and technical bulletins and concluded that a reasonable sealant formulator would not have been placed on notice that PCBs should not be used as plasticizers in indoor sealants.  RSOF 45.  He further explains that a reasonable sealant formulator would rely on such warnings and would not be aware of potential hazards otherwise.  *Id.* Simply put, a formulator trusts that a plasticizer is safe for use in sealants if the manufacturer markets and sells the plasticizer for use in sealants. Klosowski concludes that if Monsanto had issued instructions that PCBs should not be used as plasticizers in indoor sealants, a reasonable sealant formulator would not have included PCB-plasticizers in indoor sealants.[21]  RSOF 27. Questions of fact exist regarding whether Monsanto's warnings adequately apprised consumers of the risks of volatilization, contamination of

---

[20] The court in *Sharp* contemplated a situation where a "trier of fact could even find that adequate warnings under § 52-572q requires that the manufacturer condition the initial product sale on the wholesaler's assurance that it would issue a particular set of warnings to subsequent purchasers." *Id.* at 850. Such a warning would make especial sense here should the fact finder determine that someone down the chain from the sealant manufacturer would be in the best place to prevent PCB-containing sealant from being used indoors.

[21] Monsanto's paint studies are particularly noteworthy to Mr. Klosowski. In the 1950s, Monsanto conducted a series of studies to determine whether paint plasticized with PCBs could result in dangerous air levels.  SOF 53.  In one of these studies, PCBs were detected in a room thirty days after application of the PCB-containing paint, signifying that the PCBs migrated from the paint and persisted in the room.  AMF 44.  According to Mr. Klosowski, a reasonable sealant formulator with knowledge of these studies would not have made PCB-containing sealants for indoor use.  *Id.*

other building materials and indoor air, and human exposure when the PCBs were used in construction products such as sealants.

A question of fact also exists as to whether Monsanto properly provided warnings to its customers about the environmental threat of PCBs in sealants after learning PCBs were found widespread throughout the environment. *See Transwestern*, 46 Cal. App. 4th at 531, 53 Cal. Rptr. 2d 887 (affirming judgment where jury found Monsanto failed to adequately warn of PCBs' environmental hazards). Monsanto knew of PCBs in the environment as early as 1966. AMF 24. By 1969 at the latest, Monsanto knew that open uses, such as PCBs in sealants, were major contributors to environmental contamination. AMF 23. At that point, Monsanto internally admitted they had not provided proper warnings, saying that "[a]ll customers using [PCB products] have not been officially notified about known effects nor do our labels carry this information." AMF 32. Monsanto feared that such a warning would cause some customers to be "'scared off' to other competitive products." *Id.*

Eventually Monsanto recognized there would be legal liability for not warning, so it provided warning letter to which they could point if sued, but then did their very best to prevent the warnings from being effective. In Monsanto's own words, Monsanto wanted to undertake a "reasonable action that will not unduely [sic] alarm the market but reduce the exposure in terms of liability." AMF 33. More directly, Monsanto admitted: "Confidentially, our Legal Department believes this will minimize and, hopefully, eliminate claims made against us for environmental pollution damage. *Id.*

Monsanto did not issue letters alerting customers to the presence of PCBs in the environment until February 1970. SOF 42. And even then Monsanto did not explain that sealants and other open uses of PCBs were leading to environmental contamination. Rather, Monsanto's letter indicated that widespread environmental contamination was the result of manufacturing processes. RSOF 42. Just months earlier, however, Monsanto's Ad Hoc committee noted PCBs "leaching" (i.e., migrating) from open use products as a source of environmental contamination. AMF 23. Monsanto even acknowledged in 1969 that PCBs in sealants contaminate the environment through "long-term leaching." AMF 23. Furthermore, the February letter addresses only two

Monsanto PCB products – Aroclor 1254 and Aroclor 1260.  AMF 34.  The letter does not address environmental risks associated with lower chlorinated PCB products, such as the Aroclor 1248 plasticizer that was found in Clark. *Id.*  Rather, Monsanto specifically said that Aroclors with a lower chlorine content "appear to present no potential problem to the environment." *Id.* This is in sharp contrast to what the Ad Hoc concluded just a few months prior: "There is no question as to the non or low biogradability (sic) of the PCB's – particularly the higher chlorinated members of the series including Aroclors 1254 and 1260 <u>and probably 1248</u>." *Id.*

Even once Monsanto issued "warning" letters, it worked to minimize any effect the letter may have on Aroclor sales:

> You will note how we presented information on this customer letter to our regional managers in the U.S. They have been asked to keep the circulation of this information to a minimum. Please do likewise. . . .  [The salesman] have been instructed to answer only those questions they are asked and <u>not</u> to put those answers in writing.  They have been told not to bring up the subject of the PCB letter during calls and not to volunteer information not covered in the questions/answers list. … Please follow Aroclor sales to your customers closely, however, and if they fall off, please investigate. We don't anticipate they will.  . . .

AMF 35.  Monsanto blatantly admitted it wanted to "minimize the effect of this letter" and wanted to "continue selling all Aroclors – therefore play down the replacement bit and try to calm the customer."  AMF 36.  Monsanto instructed its salesman that "there may be some panicky reaction to start with. Your job will be to calm it down.  To do that, you have to be confident our Aroclor sales have increased every year for ten years – in boom or recession.  We want 1970 to be no different. Let's not enter a new decade with a down-turn."  AMF 36. Monsanto was successful in minimizing the effect of its "warning" letter.  As of March 31, 1970, Monsanto reported that it received "little response to [their] PCB letter."  AMF 36. In fact, Monsanto sold a record high 19,537,000 pounds of PCB plasticizers in 1970.  AMF 37.

Monsanto argues that it did not need to warn of potential risks because its customers were sophisticated users. ECF 267 at23 -26. This is not persuasive.  First, the sophisticated user doctrine to which Monsanto refers is <u>not</u> an affirmative defense in Connecticut, rather, the knowledge of an intermediary manufacture is only <u>one of multiple factors a jury considers</u> under Connecticut's failure

to warn statute. Conn. Gen. Stat. Ann. § 52-572q(b); *Sharp v. Wyatt*, Inc., 31 Conn. App. 824, 850, 627 A.2d 1347, 1360–61 (1993), *aff'd*, 230 Conn. 12, 644 A.2d 871 (1994) ("In short, summary judgment cannot rest solely on the anticipated awareness of an expected product user."); *Gajewski v. Pavelo*, 36 Conn. App. 601, 617, 652 A.2d 509, 517 (1994), *aff'd*, 236 Conn. 27, 670 A.2d 318 (1996) ("the sophisticated user doctrine is not an affirmative defense under Connecticut's product liability law"); *see also Vitanza v. Upjohn Co.*, 257 Conn. 365, 390-93 (2001) (distinguishing learned intermediary affirmative defense from the sophisticated user doctrine). Second, Monsanto failed to show that sealant formulators using PCBs as plasticizers would know enough about the characteristics of PCBs such that its danger in sealants would be considered open and obvious. Monsanto presents very little information about the sophistications of its own customers, rather, Monsanto uses Mr. Klosowski's deposition testimony to suggest that formulators would have been aware of PCBs' potential for harm. ECF 267 at 24-26. This fails to eliminate any fact question regarding knowledge; at best Monsanto's evidence shows that it may not have known the exact rate at which PCBs migrate out of sealants due to proprietary sealant formulations. But this does not change the fact that Monsanto knew that PCBs would, inevitably, migrate out of sealant and into surrounding environments. AMF 23. A sealant formulator may have known PCBs are generally stable in sealant, but Monsanto offers no evidence indicating the formulator would know that PCBs are persistent in an indoor, or outdoor, environment once it migrates away from its intended use. Furthermore, Monsanto – not sealant formulators – knew that over 140,000,000 pounds of PCBs were sold for uses from which they would inevitably migrate into the environment, AMF 37, resulting in contamination of virtually all people in the United States, AMF 6.[22]

In sum, the jury will determine several questions of fact, including who Monsanto should have warned and whether their warnings adequately advised of potential risks to end-users.

---

[22] Monsanto also argues that it could not have warned of PCBs volatilizing out of sealant at levels sufficient to harm human health because it lacked proof of that possibility. First, this misinterprets Hartford's property damage harm here. See Section III. Second, Connecticut law does not require proof that defendants should have foreseen the exact harm, rather, the plaintiff must only prove that its harm is "of the same general nature as that which a reasonably prudent person in the defendant's position should have anticipated[.]" Connecticut Judicial Branch Civil Jury Instructions, Instruction 3.1-4 (Proximate Cause – Foreseeable Risk); *Bifolck*, 324 Conn. 402, 443 (2016).

**3.  Negligence**

In negligence, a duty to care arises "from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm *of the general nature of that suffered* was likely to result from his act or failure to act." *Bifolck*, 324 Conn. 402, 443 (2016) (emphasis added).  Monsanto should have foreseen harm of the general nature of that suffered by Hartford.  Specifically, Monsanto should have foreseen that PCBs could migrate out of open uses, like sealant, contaminate other property and pose a hazard to human health and the environment, with the result being property owners like Hartford incurring costs to remediate contaminated property.

**a.  Hartford's harm was foreseeable in 1971.**

According to Monsanto, Hartford must prove that it was foreseeable in 1971 that PCBs could migrate out of sealant at levels that cause human disease.  ECF 267 at 27.  This does not accurately reflect Hartford's burden.  Under the required analysis, Hartford must only show that Monsanto should have anticipated that harm "of the general nature as that suffered was likely to result from his act or failure to act." *Bifolck* at 442-43.

Hartford's evidence shows that, years before Clark's construction, Monsanto knew or should have known that selling of PCBs for use in sealants would result in migration of PCBs from that sealant, the persistence of PCBs in indoor environments, and even widespread environmental contamination.  Indeed, in 1969 the company's Ad Hoc Committee recognized that PCB "may be a global contaminant" based on detections of the compounds in "fish, oysters, shrimp, [and] birds," and "along coastlines of industrialized areas such as Great Britain, Sweden, Rhine River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife."  AMF 20.  Monsanto knew that PCBs would inevitably migrate out of open uses, like sealants.  AMF 23.  Monsanto knew that PCBs would not readily breakdown by natural processes and would therefore persist, AMF 12, and Monsanto even knew that PCBs could persist for long periods of time in an indoor environment, AMF 44.  Years before Clark was built, Monsanto knew that by selling millions of pounds of PCBs as plasticizers in open-use applications --- like sealants and paints --- across the United States,

millions of pounds of PCBs would inevitably migrate out of their intended use and end up persisting in both indoor and outdoor environments.  In 1969, the Ad Hoc Committee noted that, "In one application alone (highway paints), one million lbs/year are used. Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."  AMF 23.

Monsanto also knew or should have known that cumulative PCB exposure – like that which individuals receive from constant environmental exposure – may cause adverse health effects. Monsanto knew since the 1930s that PCB exposure is dangerous, even in comparison to other industrial chemicals. AMF 7. Yet, Monsanto never determined a safe level of exposure to PCBs. RSOF 38.

Taken together, Hartford's evidence shows that Monsanto should have foreseen PCBs becoming a widespread environmental contaminant that poses a health risk given its ubiquity and potential for toxic effects at low levels in people.  Therefore, Monsanto could have anticipated harm of a general nature as that suffered by the Plaintiffs here --- where PCB-plasticizers have migrated out of an "open use," forcing a city and school board to incur remediation costs in order to protect the health of its students and to prevent further environmental contamination.[23]

Hartford's evidence demonstrates that Monsanto must have foreseen the exact harm that Clark suffers.  At a minimum, Hartford has demonstrated a fact issue.

### a.  **Monsanto breached its post-sale duty to warn.**

In 1970, one year before Clark's construction, Monsanto stopped selling PCBs for use as plasticizers in sealants and other "open uses" due to concerns about PCBs in the environment.  SOF 10.  At this point, Monsanto knew that PCBs were ubiquitous environmental contaminants and that PCBs from open uses, like sealants, would inevitably escape and contribute further to ubiquitous PCB contamination.  AMF 23.  Yet, rather than issue strong warnings and encourage its customers to stop using PCB-plasticizers immediately, Monsanto downplayed the potential harm connected to

---

[23] Monsanto contends that Hartford's failure to warn claim is not cognizable because it is preempted by the CPLA. Memo at 21.  No case has held as much.  Otherwise, Monsanto's arguments for negligent design defect and failure to warn are the same as for their strict liability claims. ECF 267 at 27-28.

PCBs and allowed its customers to stockpile the chemical for further use after Monsanto stopped selling PCBs as plasticizers.  RSOF 10.

Connecticut law allows for a claim to address Monsanto's post-sale failure to warn of the dangers relating to PCBs used as plasticizers in open uses, like sealants.  *See Densberger v. United Techs. Corp.*, 297 F.3d 66, 70 (2d Cir. 2002) ("It follows that the post-sale duty to warn exists in negligence, and is cognizable under the CPLA.").  Monsanto contends that Hartford's claim fails because Hartford cannot show that it was an identifiable consumer/user to whom a post-sale duty to warn would have run.  Memo at 23.  First, this argument misinterprets Connecticut law and places a false burden on Hartford.  Second, even under Monsanto's test, Hartford has provided sufficient evidence to create a question of fact.

As an element of a negligence claim, Hartford must show that a manufacturer's failure to issue a post-sale warning contributed to the claimant's harm.  *See Bifolck* at 442-443 (listing causation as element in negligence claims).  However, there is no support in Connecticut law for Defendant's proposition that Hartford must prove that Monsanto, a component-part manufacturer, could have identified Hartford as the specific ultimate end user of its PCB-plasticizers.  Memo at 22-23.  Instead, courts considering post-sale failure to warn claims under Connecticut law have allowed claimants to argue that defendant manufacturers should have issued broad, general warnings, such as product recalls.  *See Savage v. Scripto-Tokai Corp.*, 266 F. Supp. 2d 344, 351 (D. Conn. 2003) (involving a defective lighter) ("Inasmuch as a claim of breach of the post-sale duty to warn is analogous to a claim of failure to recall, plaintiffs' theory has legal viability in Connecticut.");  *Argueta v. Overhead Door Corp.*, No. CV 000370126, 2000 WL 1207261, at *1 (Conn. Super. Ct. July 28, 2000) (affirming viability of a failure to recall theory under the CPLA).

Regardless, Hartford's claim is sufficient even under Defendants' theory, as Hartford has provided evidence that Monsanto could have identified the end users of its PCB products. Hartford's sealant formulator expert, Jerome Klosowski, provides testimony that a reasonable sealant manufacturer in the 1960s and 1970s would have been able to identify the distributors and customers that purchased PCB-containing sealants. AMF 31.  Thus, Monsanto could have asked its

customers for a list of end users – such as specific architects and contractors -- to whom Monsanto could have warned directly.  This evidence demonstrates fact issues to be resolved by a jury.

**b.  Monsanto failed to perform chronic, long-term toxicity tests.**

Monsanto did not perform tests to investigate consequences to human health stemming from chronic low-level exposure to PCBs – such as cancer tests – until the 1970s.[24]  AMF 10.  Plaintiffs' expert toxicologist, Dr. James Olson, explains that peer reviewed literature from the 1930s through the 1960s did not identify a dose or exposure to PCBs that was safe or without toxicity.  AMF 8.  He also contends that additional studies investigating the effects of low levels of exposure to PCBs would have shown a wide range of cancer and non-cancer effects.  *Id.*

In defense, Monsanto argues that its failure to perform such tests – such as cancer tests -- fits with the standards of the day, SOF 39, but that is not accurate.  Members of the industrial chemical industry had conducted long-term, lifetime animal cancer studies when analyzing industrial chemicals like PCBs by the late 1930s.  RSOF 39.  Plaintiffs' rebuttal expert toxicologist, Dr. Richard DeGrandchamp, explains that as early as 1938 and no later than 1944, numerous unique and early hallmarks of cancer in PCB animal studies should have triggered Monsanto to conduct long-term animal cancer studies.  RSOF 39.  He explains that standardized methods for animal cancer testing had been in existence for decades by August of 1970 and that had Monsanto conducted animal cancer tests in the 1930s and 1960s, the tests would have shown strong evidence of cancer.  RSOF 39.  Instead, when confronted with the option to investigate harms associated with low levels of exposure to PCBs, Monsanto decided to forgo testing. AMF 9.

**V.    Statute of Limitations**

Hartford filed its initial complaint on October 23, 2015 after discovering PCBs in Clark for the first time in 2014.  ECF 1.  Hartford's claims, therefore, were timely filed regardless of the applicable limitations period. *See* Conn. Gen. Stat. § 52-577a (three-year statute of limitations applicable to product liability claims) and Conn. Gen. Stat. § 52-577c (two-year statute of limitations

---

[24] Monsanto addresses only a claim premised on a failure to test the rate at which PCBs migrate out of sealant.  This misses the point of Hartford's failure to test claim.  PCBs are environmental contaminants, hazardous to human health primarily because of long-term, low-level exposure.  Hartford contends that Monsanto was negligent in failing to study the human health consequences resulting from chronic low-level exposure.

applicable to claims for property damage caused by exposure to a hazardous chemical substance "released into the environment").

Hartford is immune from statutes of limitation and, even if it is not, Hartford did not have knowledge, actual or constructive, of PCB contamination at Clark until 2014.

### 1.  Hartford is immune from periods of limitation.

Hartford is immune from periods of limitation as a matter of law because it acts in a governmental capacity when addressing the PCB contamination at Clark.  *See State v. Lombardo Bros. Mason Contractors, Inc.*, 307 Conn. 412, 416-17 (2012).  Under the common law doctrine of *nullum tempus ocurrit regi* ("no time runs against the king"), the State of Connecticut is immune from periods of limitation.  *State v. Lombardo Bros. Mason Contractors, Inc.*, 307 Conn. 412, 416-417 (2012).  This immunity is imputed to municipalities when they act in a governmental, rather than a proprietary, capacity.  *Id.* at 431 (*citing State v. Goldfarb*, 160 Conn. 320, 326 (1971)).[25]  The Connecticut Supreme Court has explained that a municipality's "activities [that] were meant to improve the general health, welfare **or education** of the municipality's inhabitants" are undertaken in a governmental capacity. *Considine v. City of Waterbury*, 279 Conn. 830, 846 (2006).

Here, Hartford acts in a delegated governmental capacity pursuant to a legislatively-created duty to provide an appropriate learning environment for its students.  *See* Connecticut General Statute § 10-220 (commanding boards of education to "maintain good public elementary . . . schools" and to "provide an appropriate learning environment . . . which includes (1) adequate . . . facilities . . . (3) proper maintenance of facilities, and (4) a safe school setting"); *see also Couture v. Bd. of Educ. of Town of Plainfield*, 6 Conn. App. 309, 312–13, 505 A.2d 432, 434 (1986) ("[M]unicipalities, by providing public education, are engaged in a governmental duty. The state is required by article VIII, § 1, of the Connecticut constitution to provide free elementary and secondary education. By statutory enactment the legislature has delegated this responsibility to the local boards.") (citations omitted); *Leslie v. Hartford Bd. of Educ.*, No. HHDCV146047423, 2016 WL 301376, at *4 (Conn.

---

[25] For further discussion about the *nullum tempus* doctrine under Connecticut law, see Plaintiffs' Opposition to Defendants' Motion to Dismiss the First Amended Complaint.  ECF 37 at 5-6.

Super. Ct. Jan. 5, 2016) (finding school acted in governmental capacity when hosting haunted house event to raise money for its senior class – "the underlying purpose of the event was to support school activities, which is part and parcel of the municipality's delegated duty from the state to provide education.").[26]  Therefore, Hartford's claims here cannot be barred by a limitation period regardless of when it discovered the PCB contamination at Clark.[27]

### 2.  Hartford did not know of Clark's contamination until 2014.

Notwithstanding the fact that Hartford is immune from limitation periods under the *nullum tempus* doctrine, Hartford's claim for contamination at Clark is timely.  Limitation periods under the CPLA begin to run when property damage is first discovered or in the exercise of reasonable care should have been discovered.  Conn. Gen. Stat. §§ 52-577a, 52-577c.

In September 2014, Hartford tested paint that would be disturbed during a project to install a fire suppression system. AMF 38. In October 2014, Hartford received the results of those tests, which detected Aroclors 1248 and 1254.  AMF 38.  Hartford filed its claim approximately one year later. ECF 1.

To get around this fact, Monsanto first argues that Hartford had actual knowledge of PCB contamination in its school system prior to 2012.  For this argument, Monsanto does not contend that PCBs were discovered or should have been discovered in Clark prior to 2014[28], rather,

---

[26] For further discussion about Hartford's duty, see Plaintiffs' Opposition to Defendants' Motion to Dismiss the First Amended Complaint, ECF 37 pages 7-9.

[27] Two pre-*Considine* decisions indicating that maintenance of a school would not be a "governmental" function are no longer instructive after *Considine. See Board of Education v. Dow Chemical Co.*, 40 Conn. Supp. 141 (Super. Ct. 1984) and *West Haven School District v. Owens-Corning Fiberglas Corp.*, 721 F. Supp. 1547 (D. Conn. 1988).  In both cases, municipal plaintiffs brought actions against manufacturers of asbestos products for property damage linked to asbestos contamination. *Id.* In both instances, the courts found that maintenance of a school was a proprietary function because it was a local function for the particular benefit of the school's inhabitants. *Id.* With the new governmental/proprietary analysis in *Considine*, the rationale in these cases no longer holds – now, a local action may still be considered "governmental" so long as it is in accordance with State legislation that pursues a general policy for the benefit of the people at large.

[28] Monsanto's reference to knowing of PCB-containing light ballasts at Clark is a red herring. First, Monsanto provides no evidence that PCB-containing light ballasts actually existed in Clark. Monsanto cites to a 1992 document providing detailed specifications of a project to replace lighting systems in Clark.  ECF 268 at 36, SOF 125. The document shows only that a lighting retrofit project likely took place, not that Clark contained PCB-light ballasts.  ECF 268-21 at 2. Furthermore, even if Clark had PCB-containing light ballasts, Monsanto provides no evidence suggesting any of the contamination at Clark was caused by such light ballasts. Unlike PCB-containing sealant, which regularly emits PCBs, PCB-containing capacitors and ballasts will not emit PCBs, and thus not result in contamination, if functioning properly. RSOF 125.

Monsanto recasts Hartford's injury to be "the presence of PCBs in their school properties" such that harm occurred when PCBs were detected in other Hartford school buildings.  ECF 267 at 38. This argument confuses the facts of the case.  Hartford's lawsuit seeks damages relating *only* to PCB contamination at Clark; Hartford does not seek damages for contamination at any other school building.  ECF 71 at 1.  Detection of PCBs at other properties cannot equate to actual knowledge of PCB contamination at Clark.  Given that the property at issue is Clark, not all Hartford public school buildings, the cases cited by Monsanto are inapposite.[29]

Monsanto next argues that Hartford should have known of the contamination at Clark at some point prior to 2012.  The evidence Monsanto provides in support of this argument fails to establish that, as a matter of law, Hartford had constructive knowledge of PCB contamination at Clark prior to 2014.[30]

> i.   PCBs at other schools does not give notice of contamination at Clark.

Monsanto's argument that the detection of PCBs at other schools prior to 2014 gave Hartford notice of contamination at Clark is essentially the same unsuccessful argument it made in its Motion to Dismiss.  *See* ECF 30 at 7-11.  Monsanto argues that the presence of PCBs at other schools places Hartford on constructive notice that PCBs could be present in all other buildings built within the same general time period.  ECF 267 at 39-42.  This argument was not successful at

---

[29] *BellSouth* involved a single office building, and the court found an injury was actionable only after learning of airborne asbestos in several rooms within the same building.  *Id.*, 77 F.3d 603, 612-613 (2d Cir. 1996). Under the same rationale, Hartford had an actionable claim only after detecting PCBs in Clark in 2014. In *Peerless Insurance Co. v. Tucciarone,* the court held that owners reasonably discovered what caused their property damage after a fire marshal issued a report identifying the fire's cause.  *Id.*, 48 Conn. App. 160 (1998). This case is not helpful -- Hartford contends discovery occurred at the time of PCB detection, not when Hartford learned Monsanto caused the contamination.  Another case cited by Monsanto, *Burns v. Hartford Hospital,* explains that additional harm stemming from a single injury will not trigger a new limitation period.  *Id.*, 192 Conn. 451, 460 (1984). This tenet is not instructive.  Monsanto does not contend that PCB contamination at Clark is the result of contamination at another school, rather, the presence of PCBs at Clark and the presence of PCBs at other Hartford schools are entirely separate and each the result of PCB-containing materials in each separate school. In *City of San Diego v. U.S. Gypsum Co.*, the plaintiff sought damages relating to 1,000 public buildings. 30 Cal. App. 4th 575, 583-584, 35 Cal. Rptr. 2d 876, 881-882 (1994). Hartford seeks only damages for contamination at Clark.

[30] Monsanto cites neither legal nor factual support for its statement that "Plaintiffs were aware that PCBs were a potential hazard in their schools for decades,"  ECF 268 at 36, based on an "admission" by Hartford's corporate representative Donald Slater. SOF 123.  In Mr. Slater's deposition, Monsanto's counsel read an email authored by an employee of the State Department of Construction Services – not Hartford – that said, "The Bureau of School Facilities and school districts and their consultants have been aware of the presence of PCBs as a potential hazard in the school environment for decades." RSOF 123. Monsanto's counsel then asked Mr. Slater if he had "any reason to disagree or dispute that statement."  *Id.* Slater said he did not.  *Id.* But that was not Hartford's statement about Hartford's knowledge; at best, the State document reflected the State's knowledge about PCBs.

the Motion to Dismiss stage, ECF 45, and neither should it be here.  Knowledge of PCBs at a building on an entirely different campus, miles away from Clark does not equate to knowledge of PCB contamination at Clark. *See San Francisco Unified Sch. Dist. v. W.R. Grace & Co.*, 37 Cal. App. 4th 1318, 1335-1336, 44 Cal. Rptr. 2d 305, 315 (1995) (remanding to determine when contamination occurred at each of plaintiff's schools).

Monsanto incorrectly analogizes Hartford's situation to that of the plaintiff in *Hubbard-Hall, Inc. v. Monsanto Co.,* 98 F. Supp. 3d 480, 496 (D. Conn. 2015). There, the Court found plaintiff Hubbard-Hall was placed on notice of PCB contamination after receiving several reports noting PCB contamination on the same exact property for which Hubbard-Hall sought to recover damages. *Id.* at 495.  *Hubbard-Hall* does not support the proposition that PCBs detected in building materials on one school campus gives notice that an entirely different school campus is contaminated by PCBs.[31]

> ii.   <u>General guidance and advisory documents do not give notice of contamination at Clark.</u>

Unlike Hubbard-Hall, Hartford received no reports, or information of any kind, signaling that Clark was contaminated until it tested for PCBs in 2014.  To argue Hartford should have known about PCBs at Clark, Monsanto points to three guidance documents issued by state and federal agencies: a document from the Connecticut Department of Environmental Protection ("CT DEP"),[32] a document from the State Department of Education ("SDE"), and an EPA press release. None of these documents reference Clark or otherwise provide notice that Clark was contaminated by PCBs.  The CT DEP document is a general advisory focusing on PCBs in electrical equipment. ECF 268-21 at 111-114.  The first sentence shows the document's purpose:

---

[31] *Vector–Springfield Properties, Ltd. v. Central Illinois Light Co., Inc.* is distinguishable on similar grounds.  *Id.*, 108 F.3d 806 (7th Cir.1997).  There, plaintiff received notice of contamination after a consultant engaged to evaluate the subject property issued a letter revealing a likelihood of contamination, and the plaintiff's principal acknowledged that he was "aware *in fact* of the probable injury."  *Id.* at note 4. Hartford received no notice as to the likelihood of PCBs at Clark prior to 2014, and no evidence suggests Hartford was aware *in fact* of a probable injury at Clark. The remaining cases cited by Monsanto involved claimants that were aware of the underlying injury well before the applicable periods of limitation. *See Avoletta v. State*, 152 Conn. App. 177, 192 (2014) (statute of limitations began to run after "discovery and knowledge of the occurrence of the alleged actionable harm underlying their claim."); *Gnazzo v. G.D. Searle & Co.*, 973 F.2d 136, 138 (2d Cir. 1992) (awareness of disease and knowledge of causal connection to device commenced accrual).

[32] Now known as the Connecticut Department of Energy and Environmental Protection.

> The Department of Environmental Protection (DEP), encourages you to inspect timekeeping systems and other older pieces of <u>electrical equipment</u> in schools and other municipal buildings due to the possible presence of compounds containing polychlorinated biphenyls (PCBs).

*Id.* at 112 (emphasis added).  This document explains that PCBs *may* be in electrical equipment, but that is not relevant here.  Monsanto presents no evidence that electrical equipment contaminated Clark. Furthermore, Monsanto provides no indication that Hartford actually received this document – Monsanto allegedly received this document in response to a public records request to the State of Connecticut Department of Administrative Services, <u>not</u> from Hartford.[33]

Next, the SDE manual is designed to help schools receive grant money for construction projects.  ECF 268-21.  It does not "notif[y] school administrators about the potential of encountering PCBs," rather, it includes PCBs in a list of "hazardous materials" which "should be planned for in almost every project <u>involving demolition</u>."  *Id.* (emphasis added).  It mentions nothing about the potential for PCB release from products that remain in use in building materials, nor does it discuss potential hazards relating to PCBs in the air.

Finally, Monsanto points to a 2009 EPA press release titled "Preventing Exposure to PCBs in Caulking Material," which explains that PCBs have been found in schools and other buildings built or remodeled before 1978.  ECF 268-21 at 108.  However, Defendants provide no evidence that Hartford received or was even aware of the 2009 EPA press release.  Instead Monsanto illogically implies that, by citing the press release in its First Amended Complaint in 2015, Hartford must have had knowledge of the press release in 2009.  ECF 267 at 41.[34]

Monsanto has failed to show no genuine issue of material fact exists as to when Hartford knew, or should have known, of the PCB contamination at Clark.[35]  Rather, Hartford is entitled to jury questions on these issues.

---

[33] Hartford questions the authenticity of this document.  Monsanto failed to provide Hartford with a certificate of authenticity and does not attach one to its Statement of Facts.

[34] Monsanto also argues that the existence of a newspaper clipping in someone's file at the Hartford Public Schools Director of Facilities office signals that Hartford "apparently investigated the [PCB] issue somewhat."  ECF 267 at 41.  The clipping is of an article in the Boston Globe on September 6, 2009 titled "PCB risk feared at older N.E. schools."  ECF 268-21 at 116.  It makes no mention of Hartford schools, much less Clark.

[35] Monsanto also references EPA's PCB regulations in 1979 as providing notice.  This theory results in absurdity, with essentially every person/entity in America being put on notice of essentially any kind of PCB-contamination in 1979.

**VI.    Monsanto is Not Entitled to Partial Motion for Summary Judgment**

    **1.    Plaintiff is entitled to remediation damages.**

Hartford implemented upgrades to Clark costing over $1,000,000 just months before detecting PCBs in the building. RSOF 61.  In fact, Hartford was in the middle of and starting other projects to improve Clark – installation of a fire suppression system – when it first detected PCBs. SOF 69.

If not for Monsanto's PCBs, the Clark school building would have been a functional facility valued at $5,800,000.  AMF 43.  Clark has incurred $1,210,194.14 in past damages for the costs to assess PCB contamination and the costs associated with the closure of Clark.  AMF 39.  The cost of remediating the PCBs from the building is $9,599,110 plus $364,864.50 to bus students to other schools for five years.  Hartford seeks $11,172,308.64 in damages.[36]

    **a.    Fair market value does not limit costs that must be incurred to remediate contaminated property.**

In Connecticut, property damage is typically measured by the resultant diminution in value, and the fair market value acts as a cap on damages. *Ferri v. Pyramid Const. Co.*, 186 Conn. 682, 689, 443 A.2d 478, 482 (1982).  However, there are certain circumstances, as here, when an innocent party is required by law to remediate property damaged by another, where it is unjust to limit the innocent landowner's recovery to the fair market value of his land when remediation costs exceed the land's value.

Such was the case in *Wm. R. Peterson Oil Co., Inc. v. Chadwick*, in which an oil company discharged 800 gallons of heating oil into the basement of a property owner's home, causing hundreds of thousands of dollars in damage for which both the oil company and property owner were liable.  *See id.*, No. 71804, 1994 WL 260701, at *2 (Conn. Super. Ct. June 7, 1994).  When an arbitration panel was asked to decide "[]whether the defendant's recovery is limited as a matter of law to the market value of the property immediately prior to the oil discharge …" the panel

---

[36] In the alternative, should Hartford decide to demolish the school building, Hartford will seek $11,664,508.64, which includes $1,210,194.14 in past damages, future costs to bus for five years ($364,864.50), costs to demolish and dispose of the building ($4,289,450), and the reduction of property value caused by the presence of PCBs at Clark ($5,800,000).

unanimously awarded the property owner an amount over double the fair market value of the property prior to the oil discharge. *Id.* at *1. On appeal, the court affirmed, explaining that "[w]hen property has been damaged by oil or other hazardous waste and the cost of restoration exceeds the value of the property, diminution in market value is not always a satisfactory measure of tort damages." *Id.* (quoting *Mailman's Steam Cleaning Carpet Corp. v. Lizotte*, 616 N.E.2d 85,88 (Mass. 1993)).

In *Mailman's*, a property owner sought damages under a breach of warranty claim for costs to remediate property contaminated by oil. 616 N.E.2d 85,88 (Mass. 1993). Damages were awarded to the plaintiff in excess of the property's fair market value, and the judgment was appealed. *Id.* In affirming the judgment, the Massachusetts Supreme Court explained that tort law did not apply, but that even under tort law diminution in value is not necessarily an appropriate measure of damages where the costs to remediate contaminated property exceed the property's fair market value. *Id.*

Under the logic set forth in *Peterson* and *Mailman's*, Hartford seeks remediation costs in excess of the fair market value of Clark. As discussed throughout, Hartford must address the PCB contamination at Clark. Hartford's expert Ross Hartman estimates it will cost $9,957,250 to bring Clark within compliance of EPA's PCB regulations; this is more than the estimated $5,800,000 fair market value of Clark had it not been contaminated. Therefore, if Hartford's damages are capped at Clark's fair market value, Hartford would be unable to recover the amount it may be required to spend to address the PCB violation in its school. Such a result would be patently unjust.

  **b. The question of Clark's fair market value is ultimately an issue of fact to be determined by a jury.**

Even if fair market value is determined to be a cap on damages, Monsanto's proposed $1 fair market value of a non-contaminated Clark school property is ridiculous. The property tax assessment of Clark indicates that it is worth $8,937,530. AMF 40. Hartford hired an appraisal expert, Patrick Craffey, to assess Clark's value, and he found Clark to have a fair market value of $5,800,000. AMF 43.

Plaintiff's expert appraiser Patrick Craffey utilized the Sales Comparison Approach to develop the approximate fair market value of Clark.  AMF 43.  He developed an indication of market value by analyzing closed sales, listings, or pending sales of properties similar to the subject property.  *Id.*  After analyzing six comparable properties which were purchased for continued school use, Mr. Craffey concluded that the Clark school's value would be approximately $60 per square foot, or $5,800,000 total. *Id.*

Monsanto's characterization of Clark Elementary as a "monument to deferred maintenance" is unfounded, and its attacks on Hartford's expert Patrick Craffey's appraisal are without merit.  To suggest that Mr. Craffey  "ignor[ed] recognized and accepted appraisal methodology" is simply untrue.  ECF 267 at 34.  What is true, is that Mr. Craffey and Defendants' appraisal expert relied on two different valuation methods and reached different conclusions. Who is correct, and what amount should be awarded are questions of fact to be decided by a jury.

## **CONCLUSION**

Monsanto made and sold PCBs with actual knowledge that the compounds would escape from end products.  The company's documents show that decisionmakers knew in the 1960s that this migration had already caused worldwide environmental contamination and threatened human and environmental health.   Yet the company calculated that its interests in continued sales outweighed the damage those sales would do.  Hartford has shown that Monsanto sold PCBs with full knowledge but without warnings, without justification, and without concern for the consequences to Hartford or anyone else.

Dated July 23, 2018

Respectfully submitted,

  /s/  Brett Land

Scott Summy (Pro Hac Vice)
Celeste A. Evangelisti (Pro Hac Vice)
Carla Burke Pickrel (Pro Hac Vice)
Brett Land (Pro Hac Vice)
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Tel:  (214) 521-3605

Fax:  (214) 520-1181
ssummy@baronbudd.com
cevangelisti@baronbudd.com
cburkepickrel@baronbudd.com
bland@baronbudd.com


Howard G. Rifkin
CORPORATION COUNSEL
CITY OF HARTFORD
550 Main Street, Suite 210
Hartford, CT  06103
Tel:  (860) 757-9700
Fax:  (860) 722-8114
Howard.Rifkin@Hartford.gov

## CERTIFICATE OF ELECTRONIC FILING

I hereby certify that on July 23, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/  Brett Land
Brett Land (Pro Hac Vice)
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Tel:  (214) 521-3605
Fax:  (214) 520-1181
bland@baronbudd.com