UNITED STATES DISTRICT COURT

**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CITY OF HARTFORD and HARTFORD BOARD OF EDUCATION, | ) ) ) | |
| Plaintiffs | ) ) | CIVIL ACTION NO. |
| v. | ) ) | 3:15-CV-01544(RNC) |
| MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA CORPORATION, | ) ) ) | June 23, 2018 |
| Defendants. | ) ) | |

## LOCAL RULE 56(A)2 STATEMENT OF FACTS IN OPPOSITION TO SUMMARY JUDGMENT

As an initial matter, Plaintiffs City of Hartford and Hartford Board of Education ("Hartford") object to Defendants' Local Rule 56(a)1 Statement of Undisputed Material Facts on the grounds that the statements, for the most part, violate Local Rule 56(a)(1). The statements of Defendants Pharmacia LLC, Solutia Inc., and Monsanto Company (collectively, "Defendants" or "Monsanto") are not concise statements of material fact as required by Local Rule 56(a)(1). In addition, many of Monsanto's statements are not material to the decision of Monsanto's motion for summary judgment. And most of Monsanto's statements are conclusions and arguments that mischaracterize the documents or significance of the documents cited by Monsanto for support. Monsanto's failure to comply with the local rules will result in a cluttered record and is sufficient grounds for denying Monsanto's motion for summary judgment. *See Gomez v. City of Norwalk*, No. 3:15CV1434 (MPS), 2018 WL 780213, at *1 (D. Conn. Feb. 8, 2018) (acknowledging that "the local rules grant the Court the power to summarily deny a party's motion for summary judgment over a party's failure to comport with Local Rule 56(a).)".

Hartford submits the following:

1.      The John C. Clark Elementary School ("Clark School") is a two-story educational facility for pre-kindergarten through eighth grade students. Construction of the school was completed in 1971. Eagle, "Draft Executive Summary Polychlorinated Biphenyl Pilot Study Area", at 2, Mar. 16, 2016, attached as Exhibit 1. The Clark School was designed to support a capacity of approximately 750 students. Harrall-Michaiowski Assoc., "Analysis of the Hartford Public Schools

Facilities Capital Improvements Program: Final Report ("CIP Final Report") at 24, Table 14, Feb. 2006, attached as Exhibit 2.

**Response**:  Admit.

2.      City of Hartford and Hartford Board of Education (collectively "Plaintiffs") claim that PCB-containing caulk was the primary source of PCBs within Clark School. Expert Report of Ross Hartman ("Hartman Rpt.") at 12, July 17, 2017, attached as Exhibit 3; Deposition of Robert Herrick, Sc.D. ("Herrick Dep.") at 234, Aug.25, 2017 & Feb. 16, 2018, excerpts attached as Exhibit 4.

**Response**:  Admit

3.      Plaintiffs cannot identify the manufacturer, distributor, supplier or installer of this caulk.  *See* Plts' Amended Resps. to Defs' First Set of Request for Admissions, Nos. 41, 47   and 50 (Aug. 31, 2017), attached as Exhibit 5. Plaintiffs cannot identify when the caulk was manufactured or installed.  Id. No. 94.

**Response**:  Admit in part and deny in part.  Hartford objects that this statement is vague regarding the caulk to which it refers.   Hartford responds assuming this statement addresses the PCB-containing caulk at Clark School.   Hartford objects that Defendants' statement misrepresents Hartford's admissions to which Defendants cite; Hartford's admissions relate to the identity of "the specific brand-name" of the PCB-products used at Clark.  ECF 268-5 at 26-27, Nos. 41, 47, and 50. Hartford admits that it cannot identify the specific manufacturer of the caulk at Clark School. Hartford admits that it cannot identify a distributor or supplier of the caulk at Clark School. Hartford admits that it cannot identify the installer of the Caulk at Clark School. Hartford objects to Defendants' characterization of its admission to Request No. 94.  ECF 268-5 at 27.  PCB-containing caulk at Clark School was applied during the time of its construction, which was completed in 1971, but Hartford admits that it does not know the specific date when the PCB-containing caulk was applied. *Id.* Hartford admits that it does not know when the PCB-containing caulk was manufactured, but it would have been before Clark's construction in 1971.

4.      PCBs were an industrial product sold in bulk to sophisticated manufacturers of electrical and other industrial equipment as well as manufacturers of building products, such as

caulk. *See Deposition of Robert G. Kaley, II Ph.D. Volume I, Town of Westport v. Monsanto et al.*, 1:14-cv-12041 ("Kaley Dep. Vol. I") at 72, Apr. 5, 2016 , excerpts attached as Exhibit 6; Deposition of Robert G. Kaley, II, Ph.D. Volume II, *Town of Westport v. Monsanto et al.*, 1:14- cv-12041 ("Kaley Dep. Vol. II") at 573-74, Apr. 6, 2016, excerpts attached as Exhibit 7; Expert Report of Maureen Reitman, Sc.D. ("Reitman Rpt.") at 14-15, 18-19, 26-27, Oct. 30, 2017, attached as Exhibit 8; Deposition of Jerome M. Klosowski ("Klosowski Dep.") at 31, 79, 179-80, Aug. 29, 2017, excerpts attached as Exhibit 9; Deposition of Jack Matson ("Matson Dep.") at 105, 107, Sept. 1, 2017, excerpts attached as Exhibit 10.

**Response**: Admit in part and deny in part. Admit to the extent this statement contends PCBs were sold to other product manufacturers for inclusion in other products. Admit that some PCBs were sold in bulk. Hartford denies Defendants' statement to the extent it contends that all of its customers were sophisticated manufacturers. See ECF 268-5 at 262 (129: 9-15) (Plaintiff's expert pointing out that one of Monsanto's sealant formulator customers had a "very small staff."); PCB Presentation to Corporate Development Committee, November 17, 1969, TOWOLDMON0052202-42 at 52218, attached as Hartford Exhibit 31 (describing plasticizer customers as "small") .

5.     PCBs are a class of 209 compounds, called congeners, consisting of chlorinated hydrocarbons with a biphenyl nucleus on which one to ten of the hydrogens have been replaced, by chemical reactions, with chlorine. Kaley Dep. Vol. I at 55-56; Reitman Rpt. at 15; Expert Report of Jack V. Matson, Ph.D., PE ("Matson Rpt.") at 5-6, July 17, 2017, attached as Exhibit 11; *see* Matson Dep. at 15.

**Response**: Admit.

6.     Pharmacia, d/b/a Monsanto Company, began the manufacture and sale of PCB mixtures in 1935 when it purchased the Swann Chemical Company. Reitman Rpt. at 13; Matson Rpt. at 6. The Pharmacia PCB mixtures were sold under the registered trademark of Aroclor. Kaley Dep. Vol. I at 50; Reitman Rpt. at 13. The Pharmacia PCB-containing Aroclor numbers included 1016, 1221, 1232, 1242, 1248, 1254, 1260, 1262, and 1268. *See* Reitman Rpt. at 16, n. 8; Matson Rpt. at 7-8. Each PCB-containing Aroclor was a pure PCB product comprised of a mixture of different

PCB congeners. Matson Dep. at 15. With the exception of 1016, the last two digits of the Aroclor series number correspond to the percent of chlorine. Reitman Rpt. at 16, n. 8; Matson Rpt. at 7. For example, Aroclor 1254 contains 54% chlorine by weight. Reitman Rpt. at 16, n. 8; Matson Rpt. at 7.

**Response**: Admit in part and deny in part. Hartford denies to the extent this statement represents that Monsanto sold PCB mixtures only under the "Aroclor" name; Monsanto sold PCB-products under a number of other names, including Pydraul and Therminol, among others. Erickson, "Applications of polychlorinated biphenyls," ECF 268-6 at 95-96. Hartford denies that the nine Aroclor numbers listed in Defendants' statement constitutes all Monsanto PCB mixtures; Monsanto's Aroclor 2565, Aroclor 4465, and Aroclor 6000, among others, also contained PCBs. Id. at ECF 268-6 at 94-95. Hartford denies that all PCB-containing Aroclors were pure PCB products; a number of the Aroclors were mixtures of PCB and another chemical, PCT. *Id.* Otherwise, Hartford admits.

7.    PCB production in the United States began in response to the electrical industry's need for improved dielectric insulating fluids which would also provide increased fire resistance when used in transformers and capacitors. *See* Reitman Rpt. at 13; Kaley Dep. Vol. II at 568. As the unique functional characteristics of these materials became more fully understood additional uses were found. *See* Reitman Rpt. at 16-17. Their non-flammability made them an excellent choice in high pressure hydraulic applications associated with high risk of fire such as die casting and steel production. *See* Matson Rpt. at 8. Their thermal stability and non- flammability were valuable in heat transfer systems. *See* Kaley Dep. Vol. II at 567-68. Their non-flammability, thermal stability and viscosity characteristics made their use desirable in hot melt adhesives and other plasticizer applications. Erickson, "Applications of polychlorinated biphenyls", 18 ENVIRON SCI POLLUT RES. 135, 147 (2011), attached as Exhibit 12; *see* Kaley Dep. Vol. II at 571-72. PCBs therefore evolved as a unique class of chemicals which met important needs for both industry and society. *See* Matson Rpt. at 8, 14; Kaley Dep. Vol. II at 567-69, 571-72.   In many instances fire and building codes required PCBs for the protection of life and property. Kaley Dep. Vol. II at 569; Deposition of Jack Vincent Matson, *Town of Westport v. Monsanto et al.*, 1:14-cv-12041 ("Matson Westport

Dep."), at 48-49 Sept 9, 2016, excerpt attached as Exhibit 5.

Case 3:15-cv-01544-RNC   Document 278   Filed 07/23/18   Page 5 of 70

**Response**:  Hartford objects that this statement is a series of conclusions and arguments rather than facts.  However, Hartford will attempt to address the facts mentioned within.  Hartford admits the first two sentences.  Hartford admits that PCBs were used in hydraulic applications because of their low flammability, and in heat transfer systems because PCBs are a good conductor of heat for high temperature processes.  Admit as to the characteristics which made PCBs desirable in plasticizer applications.  Whether "PCBs therefore evolved as a unique class of chemicals which met important needs for both industry and society" is a conclusory argument without a fact to admit or deny.  Hartford admits that codes exist calling for the use of PCBs, but Hartford objects that evidence Defendants' cite is inadmissible to prove the truth of the matter asserted.

8.    PCBs used in building products such as caulk, even if they have volatilized from the caulk, are invisible and have no scent. *Town of Westport v. Monsanto et al.*, 877 F.3d 58, 65-66 (1st Cir. 2017).

**Response**:  Admit. However, Hartford objects that Defendants' evidence does not prove its assertion.

9.    PCBs were produced in many countries, including: USA (1930-1977);West Germany (1930-1983); Russian Federation (1939-1993); France (1930-1984); United Kingdom (1954-1977); Japan (1954-1972); Italy (1958-1983); Democratic Republic of Korea (1960s- 2012); Spain (1955-1984); former Czechoslovakia (1959-1984); China (1965-1980); Poland (1966-1977). International Agency for Research on Cancer ("IARC (2016)"), "Polychlorinated and Polybrominated Biphenyls", Vol. 107 at 72, Table 1.14 (2016), excerpt attached as Exhibit 14; INTERDEPARTMENTAL TASK FORCE ON PCBS, POLYCHLORINATED BIPHYENLS AND THE ENVIRONMENT, COM-72-10419, at 84 (May 1972) ("ITF Rpt."), excerpts attached as Exhibit 15. PCBs were also manufactured in Poland, East Germany and Austria in unknown amounts. Breivik et al., "Towards a global historical emission inventory for selected PCB congeners–a mass balance approach", 290 THE SCIENCE OF THE TOTAL ENVIRONMENT 181, 183 (2002), attached as Exhibit 16.

---

[1] Matson adopted his admissions from the *Town of Westport* case.  Matson Dep. at 10, 12.

10.     In 1966, PCBs were first detected in the environment by Swedish scientists using experimental equipment. *See* S. Jensen, "The PCB Story," *Ambio* at 123 (Aug.1972), attached as Exhibit 17. In 1970, in response to growing information regarding PCBs in the environment, Pharmacia began to voluntarily phase out the sale of PCBs for various applications. Letter, Monsanto Company to customers (Feb. 27, 1970), attached as Exhibit 18.  Sales of PCBs for use in building products such as caulk were phased out as of August 1970. Letter, Monsanto Company to customers (June 1, 1970), attached as Exhibit 19. By 1972, Pharmacia had ceased the manufacture and sale of PCBs for all uses other than as a dielectric fluid for use in enclosed electrical equipment. *See* Kaley Dep. Vol. II at 644-45. Sales of PCBs for electrical equipment continued because, according to the United States Government and the electrical industry, a cessation of sales would shut down the United States electrical power grid and cripple United States industry. ITF Report at 4; St. Louis Meeting with General Electric Co., "The PCB- Pollution Problem ", Jan. 21 & 22, 1970, attached as Exhibit 20.

**Response**: Hartford objects that this statement is largely conclusory and argumentative.  Some of this statement also speaks to the motives of Monsanto, which is hardly a "fact." Hartford will "admit" or "deny" to the extent it can distill facts from Monsanto's statement.

Monsanto admits that PCBs were detected in the environment by Swedish scientists in 1966. Monsanto's evidence does not support an assertion that PCBs were found using "experimental equipment," and such an issue is not material to Monsanto's motion; therefore, Hartford can neither admit nor deny that statement.

Hartford admits that Monsanto phased out of PCB sales for certain plasticizer uses, such as caulk, in 1970.  However, the transition was not completely voluntary. Mounting pressure from the government also played a role in Monsanto's decision to stop selling PCBs as plasticizers. See MONS036714-19, at 18, attached as Hartford Exhibit 85; Hartford Exhibit 43 at DSW 164917.  In addition, before stopping sales, Monsanto sold large quantities of PCBs to its plasticizer customers, allowing them to stockpile and keep reserves of PCBs to be used as plasticizers long after Monsanto's "phase out."  ECF 268-6 at 42; see TOWOLDMON0047362, attached as Hartford

Exhibit 89, PEX\_PLY14-N0061\_C , attached as Hartford Exhibit 88; TOW-PHARM-N0053377, attached as Hartford Exhibit 93; see Papageorge Dep. at 88. Monsanto sold more PCBs in 1970 than it did in any other year. Broadhurst, Use and Replaceability of Polychlorinated Biphenyls, October 1972, attached as Hartford Exhibit 94.

Hartford admits that Monsanto ceased manufacture and sale of PCBs for all uses other than as dielectric fluid by 1972. Hartford can neither admit nor deny Pharmacia's motives for continuing to sell PCBs for electrical equipment --- such motives are not facts.

11. Pharmacia voluntarily ended the manufacture and sale of PCBs for all uses in 1977 after the electrical industry identified alternative dielectric fluids. Kaley Dep. Vol. II at 644-45. Before that time, the termination of sales for dielectric uses would have resulted in severe economic and social dislocation. Kaley Dep. Vol. II at 640-41.

**Response**: Hartford objects that this statement does not contain facts material to the decision of Defendants' motion. Hartford's claims relate to PCBs in caulk, not PCBs in the electrical industry. Hartford admits that Monsanto ended the manufacture and sale of PCBs in 1977. Monsanto's evidence – a statement by Monsanto's corporate representative -- does not, however, prove that before that time, the termination of sales for dielectric uses would have resulted in severe economic and social dislocation.

12. Jerome M. Klosowski, Plaintiffs' formulator expert, and Dr. Jack Matson, Plaintiffs' chemical waste expert, agree that PCBs had many useful properties and were included by manufacturers and formulators in a wide array of products including caulks and sealants. Reitman Rpt. at 20-21, 26, 28; Matson Rpt. at 14; Klosowski Dep. at 51.

**Response**: Deny. Hartford admits that PCBs were used in a number of products, including caulks and sealants, but Hartford rejects Defendants' contention that Hartford's experts "agree that PCBs had many useful properties." Defendants misstate the evidence cited for support.

13. With respect to building products such as caulk, PCBs were used as plasticizers. A plasticizer is a raw material used as part of various industrial mixtures. Reitman Rpt. at 20-21, 26; Matson Rpt. at 14. At no time in its corporate history did Pharmacia manufacture, formulate, sell, or market caulks or paints. Kaley Dep. Vol. II at 575; Matson Dep. at 84. It did sell plasticizers used

by formulators in these products. Reitman Rpt. at 24-25; Letter, Maureen Reitman, ScD., to Richard

Campbell, "City of Hartford et al v. Monsanto et al", at 3, (Mar. 16, 2018)  ("Reitman Sur-

Rebuttal"), attached  as  Exhibit 21; Matson Rpt. at 8. Pharmacia manufactured dozens of

different plasticizers for use by industry. Reitman Rpt. at 18-19; *see* Matson Rpt. at 8.

**Response**:  Admit.

14.     Caulk compositions were determined by formulators, not  Pharmacia,  and typically

included multiple interacting components, including the base resin, one or more fillers, one or more

plasticizers, and other additives. Kaley Dep. Vol. II at 575-76; Reitman Rpt. at 25- 26; Klosowski

Dep. at 30-32. The specific composition, including the chemical types and  relative amounts of the

components, affects physical and chemical properties of the caulk, including durability and lifetime

of the caulk. Reitman Rpt. 23-27; Klosowski Dep. at 31-32, 61- 69, 216-17.

**Response:**  Admit.

15.     Because PCB plasticizers for use in polysulfide caulks "showed almost ideal

behavior", "nearly all the early polysulfide sealants produced during the period from the early 1950s

to the late 1970s contained 5% to 30% polychlorinated biphenyls". Klosowski Dep. at 51- 53; *see*

*also* Reitman Rpt. at 28, Matson Rpt. at 13.

**Response:**  Admit.

16.     In 1970, when Pharmacia withdrew PCB plasticizers from the market, there was no

one-for-one replacement for polysulfide caulks, such that products made with PCBs had to be

discontinued or reformulated to have different properties and characteristics. Reitman Rpt. at 29,

51; Reitman Sur-Rebuttal at 4; Klosowski Dep. at 122; Kaley Dep. Vol. II at 523-24.

**Response:**  Admit.  However, Defendants' reliance of testimony from Klosowski is misleading.  He

said that he did not use PCBs, so he could not name a one-for-one substitute for PCBs.  ECF 268-5

at 256.  He did not say there was no one-for-one substitute.  Id.  In addition, he acknowledged in his

deposition that chlorinated paraffins were suitable plasticizer alternatives: "Chlorinated paraffins with

chlorine content greater than about 40% were found to be quite good alternatives and were relatively

low priced." Klosowski Dep. at 82-83.

17.     Product  formulators  selected  PCBs  because  of  PCBs'  unique  and  desirable

combination of properties. One reason formulators chose PCBs for caulks was their low volatility and large molecular weight, which meant PCBs stayed put in mixtures and rendered caulk formulations longer lasting, more flexible and durable. Reitman Rpt. at 16-17, 23, 28; Klosowski Dep. at 35-39, 53, 51-69, 124-29, 216-18; Kaley Dep. Vol. II at 571-72. PCBs also imparted chemical, biological and flame resistance onto caulk formulations.  Reitman Rpt. at 16-17; Klosowski Dep. at 35-39, 53, 51-69, 124-29, 216-18; Matson Westport Dep. at 308-09; Kaley Dep. Vol. II at 576. PCBs have low water solubility and low vapor pressures. Reitman Rpt. at 16-17; Klosowski Dep. at 162-70.

**Response:**  Hartford objects that the first sentence is largely a conclusive argument without facts. Otherwise, Hartford admits.

18.    At all times relevant to this matter, formulators were not interested in one specific property imparted by a plasticizer, but rather a range of properties. Klosowski Dep. at 76-77. At all times relevant to this matter, including the time when formulators selected PCBs for use as a plasticizer in its caulk formulations, formulators knew that all plasticizers, including PCBs, could volatilize to some degree from the consumer product. Klosowski Dep. at 71, 79, 162-70; Matson Dep. at 95; Matson Rpt. at 15; Matson Westport Dep. at 308-09, 318.

**Response:**  Admit.

19.    Klosowski, Plaintiffs' formulator expert, testified that formulators knew that all plasticizers volatilize at some rate. Klosowski Dep. at 79. Matson, Plaintiffs' chemical waste expert, testified that it was common knowledge in science and industry that all plasticizers will volatilize to some degree.  Matson Westport Dep. at 318-19.

**Response:**  Admit.

20.     Matson, Plaintiffs' chemical waste expert, testified that he could not determine whether any caulk manufacturer would not have used Aroclor 1254 as a plasticizer if they were presented with vapor pressure extrapolations from Southern Research Institute as opposed to the vapor pressure presented in Pharmacia's technical bulletins, because he could not "reconstruct what was in the minds of plasticizer purchasers back in the 1950s". Matson Westport Dep. At 310-11. Klosowski testified that when formulating a product, it did not matter whether an ingredient's

**Response:** Hartford admits as to Matson's testimony. Hartford denies as to Klosowski's testimony. He did not say whether an ingredient's vapor pressure was 10-4 or 10-5 did not matter.  ECF 268-5 at 249.

21.     The rate at which PCBs volatilize from a formulation like caulk depends on  a large number of factors, including the selection and quantities of other chemicals in the formula and the end use conditions where it was used (e.g., the thickness with which the caulk is  applied, the surface area of its application, and the temperature, air circulation, and humidity where applied). Klosowski Dep. at 80, 162-70; Herrick Dep. at 278-79; Reitman Rpt. at 23-24; *see* Matson Rpt. at 15-16, 19; Matson Westport Dep. at 188, 326-28; Kaley Dep. Vol. II at 583-84.

**Response:**  Admit.

22.     Because the composition of a formulation will affect the rate at which PCBs volatilize, PCB volatilization rates vary from substance to substance. Reitman Rpt. at 23-24; Reitman Sur-Rebuttal at 2-3; *see* Matson Rpt. at 15-16, 19.

**Response:**  Admit.

23.     Neither the formulation nor the end use conditions could be defined or controlled by Pharmacia. Reitman Rpt. at 23-24; Klosowski Dep. at 163, 167-68; Herrick Dep. at 278-79; Matson Westport Dep. at 326-28. Therefore, even if Pharmacia knew the specifics of the caulk application including the temperature, humidity, and other conditions of the space in which it is applied, Pharmacia could not predict the rate of volatilization of PCBs from caulk. Reitman Rpt. at 23-24, 30; *see* Matson Rpt. at 15-16; Kaley Dep. Vol. I at 106-07.

**Response:**  Admit, to the extent this statement contends that Monsanto could not predict the *exact* rate at which PCBs could volatilize from sealant.  Deny, to the extent this statement contends Monsanto could not predict general ranges at which PCBs could volatilize from sealant. Monsanto's own research regarding PCBs in sealants indicate Monsanto knew of the general rates at which PCBs may volatilize out of sealants.  Memo from Paton, February 12, 1969, HARTOLDMON0029371-72, attached as Hartford Exhibit 1(discussing Monsanto's studies regarding volatility of Aroclors in polysulfide sealants); Polysulfide Modifiers: Special Report from Monsanto Research,

24.     Beginning in the 1930s, Pharmacia sent its customers product bulletins with the results of its own weight-loss tests on PCBs and PCB-containing products. *See e.g.* Memo, Cumming Paton to NW Touchette, "Thiokol Work Request 69-22" (Feb. 12, 1969), HARTOLDMON0029371 attached as Exhibit 22; Al Morgan, Norman Touchette, Gene Wilde, "Polysulfide Modifiers: Special Report from Monsanto Research", HARTOLDMON0029395, attached as Exhibit 23; Monsanto, "Monsanto Modifiers for Thiokol polysulfide liquid polymers", Technical Bulletin No. Pl-331 (Apr. 1962), TOWOLDMON0005003, attached as Exhibit 24. Weight loss testing of PCB containing products has also been discussed in the scientific literature. *See* Matson Rpt. at 16.

**Response:**  Deny to the extent the statement discusses bulletins sent "beginning in the 1930s," as Monsanto's evidence does not support such a contention.  The bulletins cited by Monsanto are from the 1960s. Otherwise, Hartford admits to the first sentence.  Hartford admits to the second sentence as phrased.  But, the weight loss testing referenced in Matson's report on page 16 dealt with plasticizers in resin sheets, not sealant. ECF 268-6 at 19.

25.     At all times relevant to this matter, it was standard practice among formulators to perform weight loss tests to determine the rate of plasticizer loss from their products.  Klosowski Dep. at 72, 177-79. It was the formulators' responsibility to test their final products and not to simply rely on the properties of the individual components to determine the properties of their formulations.  Klosowski Dep. at 72, 177-78; Reitman Rpt. at 18; Reitman Sur-Rebuttal at 1-2.

**Response:**  Admit to the first sentence, to the extent it refers to sealant formulators.  Hartford objects to the second, and can neither admit nor deny, as it is conclusory and unclear as to what fact it intends to state.  To the extent the second sentence contends that that sealant formulators test their final products, Hartford admits.

26.     Specifications promulgated by the federal government in the 1960's required caulk manufacturers to perform weight loss tests on their products. Matson Report at 16; Federal Specification, "Sealing Compound, Synthetic-Rubber Base, Single Component, Chemically Curing (for Calking [sic], and Glazing in Building Construction)", TT-S-00230(a)  (Feb.  3, 1964), attached

**Response:**  Admit.

27.     Klosowski testified that it is "[t]he responsibility of the formulator to determine the toxicity of the product they're putting on the market."  Klosowski Dep. at 215:12-17.

**Response:**  Admit that Klosowski said those words, but Defendants do not give the full context.

> Q: Is it, by the way, the responsibility of the formulator to determine the toxicity of a product that it's putting out on the market?
>
> A: The responsibility of the formulator to determine the toxicity of the product they're putting on the market?  Yes, generally speaking.

ECF 268-5 at 281.  Klosowski has further explained this issue, saying a formulator relies on the warnings of manufacturers of component parts, like Monsanto, when considering whether the formulator's product is safe.  Deposition of Jerome M. Klosowski ("Klosowski Dep."), Aug. 29, 2017 at 116-117, attached as Hartford Exhibit 3; Expert Report of Jerome M. Klosowski ("Klosowski Rpt."), July 17, 2017, page three, opinions A.1 and A.3, attached as Hartford Exhibit 4. In addition, Mr. Klosowski explains a reasonable sealant formulator would not have used PCBs as plasticizers for indoor sealants if it knew that PCBs were systemically toxic and would persist in indoor environments.  Klosowski Rpt. at Opinion I.

28.     Caulk formulations were proprietary to their manufacturer. Reitman Rpt. at 14- 15; Klosowski Dep. at 31-32, 243-245; Matson Westport Dep. at 58-60; Kaley Dep. Vol. I at  53-54. Formulators included the PCBs as one component within a proprietary formula for products such as caulk and sealants. Reitman Rpt. at 25-26; Matson Westport Dep. at  58-60.  Formulators, not Pharmacia, made decisions as to which chemicals – including plasticizers –  they would include in their formulae. Klosowski Dep. at 30-32; Reitman Rpt. at 14-15, 18-19, 26-27; Matson Westport Dep. at 156; Kaley Dep. Vol. II at 575-76. Formulators did not share their proprietary formula with Monsanto.  Klosowski Dep. at 245.

**Response:**  Admit as to sentences one, two, and three.  Deny as to the last sentence.  Defendants' reference to Klosowski's deposition testimony does not support their statement. Further, Monsanto had a "Plasticizer Council" which developed solutions for their formulator clients' plasticization problems. Monsanto Technical Bulletin O/PL-332A, June 1969, TOWOLDMON0026030-63, at

26033 and 26067, attached as Hartford Exhibit 25. Monsanto's customers used the Plasticizer

Council as an extension of their own technical facilities. *Id.* ("There are many sound reasons why it

will pay you to consider Monsanto's Plasticizer Council as an extension of your own technical

facilities – as many major plastics processors regularly do."). In addition, Monsanto provided

formulation recommendations for polysulfide sealants – the type found in Clark – in one of its

technical bulletins. Technical Bulletin No. PL – 331, "Monsanto Modifiers for Thiokol polysulfide

liquid polymers," ECF 268-8 at 30.

29. Pharmacia shipped its raw PCBs in 55 gallon drums (or railroad cars or tank trucks)

to distributors and product manufacturers (or "formulators"). Kaley Dep. Vol. I at 72; *see* Reitman

Rpt. at 14. Polysulfide caulk manufacturers, such as PRC and Thiokol were large sophisticated

companies, which employed large staffs of scientists who determined the specific formulas used to

manufacture their products. Kaley Dep. Vol. II at 573-74; Reitman Rpt. at 14- 15, 18-19, 26-27;

Matson Rpt. at 13; Klosowski Dep. at 31, 79, 179-80; Matson Dep. at 105, 107; *see* Kaley Dep. Vol.

I at 196-97; Matson Westport Dep. at 28, 154, 156, 318-19; Products Research & Chemical

Corporation, Annual Report (1968), attached as Exhibit 26.

**Response:** Admit that some PCBs were shipped in 55 gallon drums, but deny to the extent the

first sentence contends all PCBs were shipped in 55 gallon drums. Monsanto's corporate

representative said they were also sold in "small containers to 5-gallon drums." ECF 268-5 at 39.

Deny as to the second sentence to the extent it contends that all polysulfide caulk manufacturers

were large sophisticated companies, employing large staffs of scientists. While some of their clients

may have had a large staff of scientists who determined product formulations, that is not the case

for every customer. See ECF 268-5 at 262 (Klosowski noting two specific Monsanto customers as

have "very small" staffs).

30. Pharmacia provided its customers with many technical bulletins describing the

chemical properties of its Aroclors, such as their vapor pressure and solubility, as well as their

toxicity. Reitman Rpt. at 14, 18-19; Klosowski Dep. at 102-03, 218-25.

**Response:** Admit that Monsanto provided its customers with technical bulletins that described

certain chemical properties of Aroclors. Whether the information in these bulletins was adequate,

13

31.     Formulators resold the PCB-containing products they formulated to other manufacturers who incorporated them into another product, or to distributors, who might sell the products to general contractors, who sold the caulk to contractors, builders, and architects, and who then resold the caulk to subcontractors who ultimately included the product into a building. Kaley Dep. Vol. I at 54, 60-61, 196-99.

**Response:**     Deny. Hartford objects that this is a general, conclusory statement without a confirmable factual element.  Hartford presents evidence that sealant manufacturers during the 1960s and 1970s typically sold architectural grade sealants either directly to a contractor, or to a distributor who sold the sealant to a contractor. Klosowski Rpt. at Opinion III. Defendants' only support involves testimony from  Monsanto's corporate representative, Dr. Robert Kaley, who admitted that, "once [a PCB-plasticizer] leaves Monsanto, I don't really know the stepwise."  ECF 268-5 at lines 21-23.

32.     PCBs have been and continue to be inadvertently manufactured as a byproduct of a number of chemical processes that involve carbon, chlorine and high temperatures. CCA Expert Report ("CCA Rpt.") at 69, Oct 30, 2017, attached as Exhibit 27.

**Response:**     Admit. However, Plaintiffs' expert Lisa Rodenburg provides testimony that the PCB tests performed on building materials at Clark School do not indicate the presence of inadvertent PCBs and, in addition, that it is impossible for only inadvertent PCBs to be present at Clark School. Rebuttal Expert Report of Dr. Lisa Rodenburg ("Rodenburg Rpt."), January 15, 2018, at 1, attached as Hartford Exhibit 7.  Dr. Rodenburg's report is in rebuttal to Defendants' expert's opinion that certain building materials contain inadvertent PCBs. See CCA Expert Report at ECF 268-10 at 4-5, 70-71.

33.     Currently, the EPA allows products manufactured today to contain up to 50 ppm of inadvertent PCBs.  CCA Rpt. at 69.

**Response:**  Admit.

34.     There are over 100  different  PCB congeners  associated  with  inadvertent PCBs. Some of those congeners are also found in Pharmacia manufactured Aroclors. CCA Rpt. at 69.

EPA Method 8082, the preferred method for identifying PCBs, looks for three to five characteristic peaks. *See* City of Spokane Wastewater Management Department, "PCBs in Municipal Products, Revised" ("Spokane Rpt.") at Figure 20, Figure 23, Figure 26, July 21, 2015, attached as Exhibit 28. Because it is unclear to which congeners those peaks correspond, it is not possible to determine whether those congeners are also associated with inadvertently produced PCBs or Pharmacia-manufactured Aroclors. *See id.*

**Response:** Admit to the first three sentences. Deny to the last sentence. Certain other factors must be considered to determine whether a given PCB congener is associated with an Aroclor or inadvertent production. Regarding the PCBs in Clark School, Plaintiffs' expert Lisa Rodenburg provides testimony that the PCB tests performed on building materials at Clark School do not indicate the presence of inadvertent PCBs and, in addition, that it is impossible for only inadvertent PCBs to be present at Clark School. Rodenburg Rpt. at 1. Dr. Rodenburg's report is in rebuttal to Defendants' expert's opinion that certain building materials contain inadvertent PCBs. See CCA Expert Report at ECF 268-10 at 4-5, 70-71.

35. Inadvertent PCBs are ubiquitous. Spokane Rpt. at 5. Up to 375 different products manufactured today contain inadvertent PCBs, including those associated with the manufacture of products as diverse as surfactants, fungicides, fuel additives, PVC, solvents, lubricants, adhesives, coatings, paint pigments, flame retardants used in plastics, paints, adhesives, sealants and caulks, and numerous consumer products from toothpaste to antifreeze. *See generally* Spokane Rpt.; Hu, D., Hornbuckle, K.C., *Inadvertent polychlorinated biphenyls in commercial paint pigments*, 44 ENVIRON. SCI. TECHNOL. 2822, 2825 (2010), attached as Exhibit 29; Reitman Rpt. at 43; CCA Rpt. at 69.

**Response:** Deny to the first sentence – the evidence to which Monsanto cites says that PCBs are ubiquitous, not that *inadvertent* PCBs are ubiquitous. ECF 268-10 at 135 and 139. Deny that inadvertent PCBs are found in sealants and caulks. Defendants' evidence does not suggest that inadvertent PCBs have been detected as part of the manufacture of sealants and caulks. Admit that inadvertent PCBs have been found in a number of different products, not in excess of 375.

36. Ongoing sources of inadvertent PCBs found in paint and other material are present in schools. CCA Rpt. at 69-70.

**Response:** This statement is a generally conclusory statement without an apparent fact. Hartford contends there is no evidence that inadvertent PCBs exist at Clark. Further, inadvertent PCBs are not even mentioned in Monsanto's motion, therefore this statement is not material to the decision of Monsanto's Motion for Summary Judgment.

37. All substances, including industrial chemicals, are systemically toxic at some dose, but simply because a product is capable of causing systemic toxicity does not mean that the product should be removed from the market. Deposition of James R. Olson, PhD., Town of Westport v. Monsanto et al., 1:14-cv-12041 ("Olson Westport Dep.") at 55-56, 135, 225, 228, Aug. 24, 2016, excerpts attached as Exhibit 30. Olson, Plaintiffs' toxicologist, testified: "[T]he dose differentiates the poison from the remedy." Olson Westport Dep. at 55-56.

**Response:** Hartford objects that this statement is an argument and conclusory, not a statement of fact. Hartford admits that all industrial chemicals can by systemically toxic at some dose.

38. Beginning in the 1930s, Pharmacia commissioned hundreds of toxicological tests of PCBs from leading institutions such as the Harvard School of Public Health and the Kettering Institute of the University of Cincinnati. Expert Report of John D. Schell, Ph.D. ("Schell Rpt.") at 38-41, 43, Oct 30, 2017, attached as Exhibit 31. Those tests disclosed that PCBs, like all industrial chemicals, were capable of causing systemic toxicity at high doses, but could be safely manufactured and used. See Olson Westport Dep. at 137, 155, 182-83, 225, 228-29.

**Response:** Admit that Monsanto commissioned hundreds of studies between the 1930s and now. Admit that the tests disclosed that PCBs were capable of causing systemic toxicity at high doses. Deny that those tests disclosed that PCBs could be safely manufactured and used. The testimony cited in support does not provide evidence in support of Monsanto's proposition. And in fact, studies in the 1930s and 1940s established PCBs as toxic. Expert Report of James Olson ("Olson Rpt."), July 17, 2017, at pages 5-6, attached as Hartford Exhibit 8. Monsanto's early studies did not establish a safe level of PCB exposure. Id. at 8.

39. At all times relevant to this case, there was no legal requirement, government or industry standard, or recommendation from any source that required long-term toxicology tests of chronic low-level exposures to PCBs prior to its sale. Olson Westport Dep. at 121-22, 143, 229-31,

**Response:**  Deny. The evidence cited by Monsanto does not prove Monsanto's statement . This statement is adopted as an opinion by Monsanto's expert toxicologist, Dr. John Schell. ECF 268-10 at 259.  Hartford's expert, Dr. DeGrandchamp, rebuts Dr. Schell's opinion by providing evidence that other major chemical companies performed long term, lifetime animal cancer studies when analyzing chemicals like PCBs from as early as the 1930s. Rebuttal Expert Report of Richard L. DeGrandchamp, PhD ("DeGrandchamp Rpt."), January 29, 2018, pages 4-7, attached as Hartford Exhibit 9.  In addition, he explains that by as early as 1938 and no later than 1944, numerous unique and early hallmarks of cancer in PCB animal studies should have triggered Monsanto to conduct long term animal cancer studies. DeGrandchamp Rpt. at 4. He explains that standardized methods for animal cancer testing had been in existence for decades by August of 1970 and that had Monsanto conducted animal cancer tests in the 1930s and 1960s, the tests would have shown strong evidence of cancer.  Id.

40.	At all times relevant to this case, Pharmacia supplied Aroclor product bulletins and warning labels to each of its customers. Reitman Rpt. at 18-19; Kaley Dep. Vol. I at 85-87, 90-91. These bulletins contained then-known toxicological information regarding exposures to PCBs and information on their safe handling. *See e.g.* L.A. Watt (Oct. 11, 1937) (warning) MONS 046543, attached as Exhibit 32. These bulletins also provided physical and chemical characteristics for the Aroclors. Reitman Rpt. at 14; Kaley Dep. Vol. I at 85-87. Pharmacia also issued warnings on its labeling for barrels and tank cars.  Kaley Dep. Vol. I at 88-89, 102.

**Response:**  The L.A. Watt memo (ECF 268-10 at 388) is an internal memorandum discussing a warning.  It is not itself a warning and there is no evidence it went to customers.  Further, Hartford denies that all bulletins contained "then-known" toxicological information to the extent such statement implies Monsanto warned of all known toxicological information.  For example, Monsanto was aware of the potential for Aroclors to enter the human food supply as early as 1961 when Aroclors were implicated in chick edema, Memo from Eby, July 18, 1961, MONS 096859, attached as Hartford Exhibit 10, but Monsanto did not mention this risk in their technical bulletins, see, e.g,. Monsanto Technical Bulletin O/PL-306, Aroclor Plasticizers, January 1968,

17

admits.

However, Hartford contends that these warnings were not adequate. Monsanto's warnings to its direct customers, like sealant formulators, addressed only PCB toxicity in the industrial setting, not harm to potential users of end-products who are subject to lower exposure levels. Compilation of Aroclor Warnings, attached as Hartford Exhibit 90

41.    In 1937, Pharmacia warned its customers: "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects." Watt (Oct. 11, 1937) (warning). This warning was repeated in a 1943 application data bulletin, in which Pharmacia warned: "Experimental work on animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects." Monsanto Chemical Company, "The Aroclors: Physical Properties and Suggested Applications", No. P-115 (Apr. 1943), attached as Exhibit 33. In a 1955 technical bulletin, Pharmacia provided the following warning: "The vapors emitted by Aroclor 1248 heated to elevated temperatures are injurious to the liver on prolonged exposure and should not be breathed." Monsanto Chemicals Plastics, "An Indirect Aroclor Heater for Unit Chemical Operators", Monsanto Technical Bulletin No. O-130, at 4 (Oct 1955), attached as Exhibit 34. In a 1966 technical bulletin, Pharmacia warned: "If these precautions are neglected acne may develop and excessive exposure may cause liver damage." Monsanto, "Aroclor for Capacitors" at 23 (1966), attached as Exhibit 35.

**Response:**    Deny as to the first sentence; the L.A. Watt document from 1937 is an internal memorandum discussing what should be in the warning, but it is not a warning itself. ECF 268-10 at 388. Admit as to the rest. Although, the 1955 technical bulletin downplayed the toxicity of PCBs by saying that if Aroclor 1248 "is spilled on the skin, there are no noticeable ill effects." ECF 268-11 at 5. Additionally, the 1955 technical bulletin addressed Aroclors as a heat-exchange liquid, not as a plasticizer. Id. at 3. The 1966 bulletin addressed Aroclors for use in capacitors, not sealants or other uses in which PCBs were used as plasticizers. Its warnings were also downplayed the toxicity of Aroclors by saying, "Aroclor made by Monsanto has been used for over 33 years

42.     In early 1970, Pharmacia issued warning letters to all of its known customers and distributors alerting them to the developing information regarding the environmental presence of PCBs. Letter, Monsanto Company to customers (Feb. 27, 1970), *supra* para. 10. Pharmacia encouraged its customers to provide similar information to the customers of their customers.  Id.

**Response:**  Admit to the first sentence. However, Hartford contends that such warnings were inadequate. Monsanto failed to address the severity of contamination, failed to acknowledge that PCB products other than Aroclor 1254 and 1260 could result in environmental contamination, and failed to acknowledge that PCBs used as in open uses, such as sealants, could result in environmental contamination upon its ultimate application.  ECF 268-7 at 65-66.   Instead, Monsanto's February 1970 letter focused on advising its customers to maintain "good manufacturing practice[s]."  Id at 66.

Deny to the second sentence; the letter does not advise its customers to provide similar information to the customers of their customers.

43.     In March 1970, Pharmacia reissued its Aroclor technical bulletins, including Technical Bulletin o/PL-306A entitled, Aroclor Plasticizers. Attached as Exhibit 36. In that bulletin, Pharmacia included the following Environmental Hazard warning:

> **Environmental Hazards**
>
> Aroclor 1232, Aroclor 1242, Aroclor 1248, Aroclor 1254, Aroclor 1260, Aroclor 1262, Aroclor 1268, Aroclor 4465, and Montar 1 all contain polychlorinated biphenyls (PCB) of various types and in varying amounts. PCB residues in small amounts have been found in the environment and some studies have indicated that they may be harmful to certain forms of animal life. Extreme care should therefore be taken by all users of PCB-containing products to prevent any entry into the environment through spills, leakage, use, disposal, vaporization or otherwise. Further, the products in which PCB materials are used, or which are formulated using PCB materials as a component, should be given careful study to eliminate the possibility that PCB might reach the environment as a result of use in a given application.
>
> Some specific applications where the use of PCB should definitely be avoided are in paints and sealants for swimming pools, paints and waterproofing agents in silos and other buildings where food products for humans or animals are stored, and as a component of any container or wrapping used in the packaging of food products.

**Response:**  Deny.  The referenced document (ECF 268-11 at 37-51) was not reissued in March of 1970.  A Monsanto internal memorandum shows that as of April 3, 1970, the revised Aroclor Plasticizer bulletin had not been released yet.   Memo from Paton, April 3, 1970,

TOWOLDMON0049983-84, attached as Hartford Exhibit 11.  The author explained the Aroclor bulletin was "long out of date" and that an updated version would be published later. *Id.* The earlier version of the document cited by Monsanto,  "Monsanto Technical Bulletin O/PL-306" attached as Hartford Exhibit 6, does not include a warning that PCBs are environmental hazards.  In fact, a document dated March 30, 1970 from R. Emmet Kelly, M.D., Monsanto's Medical Director, further indicates that Monsanto had not yet issued such warnings: "This brings us to a very serious point. When are we going to tell our customers not to use any Aroclor in any paint formulation that contacts food , feed, or water for animals or humans? I think it is very important that this be done." Memo from Kelly, March 30, 1970, MONS 099541, attached as Hartford Exhibit 12.

44.    Klosowski, Plaintiffs' expert formulator, testified that Pharmacia warned formulators that PCBs could pose serious health consequences from exposure. Klosowski Dep.  at 103.

**Response:**  Hartford objects that this statement is incomplete and misleading.  Mr. Klosowski's testimony to which Monsanto cites is as follows:

```
 6  Q.   My question was simply this:  By Monsanto saying that
 7       its product was systemically toxic, you as a
 8       formulator knew or took that to mean that the product
 9       could pose serious health consequences from exposure,
10       yes or no?
11              MR. LAND:  Objection; misleading,
12       incomplete hypothetical, asked and answered.
13              THE WITNESS:  From exposure -- in some
14       conditions, yes.
```

ECF 268-5 at 253.

45.    Pharmacia advised its customers of PCBs' chemical properties, including their low vapor pressure, resistance to chemical and biological breakdown, and stability, calling them "virtually indestructible," all of which Klosowski described as the "definition of persistent". Klosowski Dep. at 219-25; "Genie" of a Thousand and One Engineering Feats, Chemical and Engineering News: Industrial Research, 60-OMC-2790, TOWOLDMON0047971, attached as

**Response:**    Admit that Monsanto's advertisements included such information about PCBs' chemical properties. Deny to the extent Defendants contend that an advertisement is a warning. Admit to Klosowski's statement.    However, there is no indication sealant formulators would understand such an advertisements to mean that PCBs would persist in the environment outside of its application.    In addition, this advertisement in no way suggests that PCBs should not be used for open uses, like sealants.    Rather, it advertises PCBs for open uses such as in journal boxes, insecticides, and as dust catchers on air filters.    ECF 268-11 at 53. Jerome Klosowski reviewed Monsanto's historical warning labels and technical bulletins and concluded that a reasonable sealant formulator would not have been placed on notice that PCBs should not be used as plasticizers in indoor sealants.    Klosowski Rpt., pg. 2, Opinion I.    Further, he explains that a reasonable sealant formulator would rely on such warnings and would not be aware of potential hazards otherwise. Klosowski Rpt., pg. 2 Opinion I.B.

46.    There are no scientific studies, either during the period of Pharmacia's manufacture of PCBs or today, that purport to demonstrate that PCBs in indoor air and surfaces from PCB-containing building products cause human disease. Klosowski Dep. at  119,  198; Olson Westport Dep. at 54-55, 104-05, 245; Matson Westport Dep. at 122, 201, 332;   Deposition of Robert F. Herrick, *Town of Westport v. Monsanto et al.*, 1:14-cv-12041 ("Herrick Westport Dep.")[2]  at 151 & 152, Aug. 18, 2016, excerpts attached as Exhibit 38.

**Response:**    Admit, but this statement is misleading.    Studies have not been conducted to determine specifically whether, alone, levels of PCBs found at Clark School would cause human disease.    A study looking solely at such air levels would ignore the fact that people are inevitably exposed to PCBs from a number of sources, including dietary and dermal exposure.    Dr. Olson explained this in his deposition:    "the studies don't allow one to segregate exposures due to air inhalation exposure, dermal exposure, and dietary exposure."  Deposition of Dr. James Olson ("Olson Dep."), August 22, 2017, pages 98-100, attached as Hartford Exhibit 13.    Studies have shown PCBs causing adverse health effects at environmental "background" exposure.    Id. at 98-102, 217-218, 224.

---

[2] Herrick adopted his admissions from the *Town of Westport* case.  Herrick Dep. at 9, 11.

47.     There are no scientific studies, either during the period of Pharmacia's manufacture of PCBs or today, that purport to demonstrate that the levels of PCBs found at Clark School cause human disease. Klosowski Dep. at 119, 198; Deposition James Raymond Olson ("Olson Dep.") at 221-22, 224, 227, 229, 230-31, Aug.22. 2017, excerpts attached as Exhibit 39; Herrick Westport Dep. at 151 & 152; Olson Westport Dep. at 54-55, 104-05, 245; Matson Westport Dep. at 122, 201, 332.

**Response:**  Admit, but this statement is misleading.  Studies have not been conducted to determine specifically whether, alone, levels of PCBs found at Clark School would cause human disease.  A study looking solely at such air levels would ignore the fact that people are inevitably exposed to PCBs from a number of sources, including dietary and dermal exposure.  Dr. Olson explained this in his deposition:  "the studies don't allow one to segregate exposures due to air inhalation exposure, dermal exposure, and dietary exposure." Olson Dep. at 98-100. Studies have, however, shown PCBs causing adverse health effects at environmental "background" exposure.  Id.  at 98-102, 217-218, 224.

48.     Matson, Plaintiffs' chemical waste expert, admitted that, during the period of Pharmacia's manufacture of PCBs, there were no scientific studies that showed injury to humans due to exposure to environmental levels of PCBs. Matson Westport Dep. at 122.   Matson also admitted that there are no scientific studies that demonstrate adverse health effects caused by PCBs volatilizing from building products.  Matson Westport Dep. at 201-02.

**Response:**  Admit as to the first sentence. Deny as to the second sentence.  When asked whether he was aware of any scientific studies that purport to demonstrate that PCBs volatilizing from building products cause adverse health effects, Matson, who is not a toxicologist, said he was "not aware one way or the other."  ECF 268-6 at 120-121.

49.     Herrick, Plaintiffs' industrial hygiene expert, testified that there are no studies which demonstrate that PCBs found in buildings cause health problems. Herrick Westport Dep. at 151-52.

**Response:**  Deny.  Herrick testified that he did not cite papers that purport to demonstrate that PCBs found in buildings cause health problems because, to his knowledge, those studies haven't been done.  ECF 268-11 at 57-58.

50. Olson, Plaintiffs' toxicologist, admitted that he could not testify as to whether PCBs caused any adverse human condition. Olson Dep. at 43. Olson also testified that if Pharmacia had commissioned toxicity studies of PCBs at ambient dosage levels, it would not have found any adverse health effects. Olson Westport Dep. at 245. Olson acknowledged at his deposition that, by "low-level exposure," he was not referring to levels to which one might be exposed from PCB building products, but to levels in laboratory animal studies which are orders of magnitude higher. Olson Westport Dep. at 159, 242-245.

**Response:** Admit that Dr. Olson said he would not be testifying as to "causation," however, Dr. Olson provides testimony that PCBs cause an increased risk in developing certain adverse health effects. Olson Rpt. at 38. As a toxicologist, he does not prove "causation," because in his field, "causation" is an opinion to be offered by a physician when stating the cause for an injury or disease in a specific individual patient. Affidavit of James R. Olson, Ph.D., July 18, 2018 ("Olson Affidavit"), attached as Hartford Exhibit 14; Olson Dep. at 23-26. His opinion in this case is that PCBs cause an increased risk of a number of adverse health effects, including cancer, developmental effects, diabetes, liver injury, immune system dysfunction, neurobehavioral effects, impaired thyroid function, reproductive system impairment, cardiovascular disease, and chloracne. Olson Rpt. at 38 in "Conclusion" section.; Olson Affidavit. This opinion is based on peer reviewed experimental animal studies and observational epidemiological studies of human populations. Olson Affidavit. Further, Dr. Olson testifies that any increase in exposure to PCBs results in an increased risk of developing the above-listed health effects. Id.; Olson Rpt. at 38.

51. Klosowski, Plaintiffs' formulator expert, testified that there are no studies which demonstrate that PCBs volatilizing from building products cause human disease. Klosowski Dep. at 119-20, 198-99.

**Response:** Deny. Mr. Klosowski, who is not a toxicologist, specifically said that he did not know whether such studies existed. ECF 268-5 at 254-255.

52. During the period of Pharmacia's manufacture of PCBs from the 1930s to the 1960s, the available analytical methods that might be used to detect PCBs in the environment measured chlorine and could not distinguish between chlorine molecules originating from PCBs as

opposed to numerous other substances found in the environment that contain chlorine. Klosowski

Dep. at 188-90. The first scientific test investigating PCB volatilization from caulk did not occur

until the 2000s. Herrick Dep. at 155; Klosowski Dep. at 229, 231; Matson Dep. at 168, 175, 177;

Matson Westport Dep. at 188.

**Response:**   Deny.   As to the first sentence, Monsanto cites absolutely no supportive evidence.

Whether such analytical methods existed was not discussed in Mr. Klosowski's deposition.  Seemingly,

Defendants are referring to testimony discussing paint studies in the 1950s: "Q: . . . am I correct that

the analytical technique used back then was such that they were measuring chlorine concentrations

that could not distinguish between Aroclors and other chlorinated hydrocarbons . . . . A: Yeah, I'm

not sure of that but that's probably right."  ECF 268-5 at 276. This response refers only to the 1950s

and is not an admission that available analytical methods could not distinguish between PCBs and

chlorine in the environment. As to the second sentence, Monsanto itself investigated PCBs

volatilizing from sealant during the period in which it sold PCBs for use as plasticizers in sealant.  See

Hartford Exhibit 2 at HARTOLDMON0029403; Hartford Exhibit 1 at HARTOLDMON0029371-

72; Supplemental Expert Report of Jack V. Matson, Ph.D., PE, January 11, 2018, at pages 3-4,

attached as Hartford Exhibit 15.

53.     Paint studies conducted by Pharmacia in the 1950s involved experimental PCB-

containing latex paints that were never marketed. Mem. DVN Hardy to Dr. J.W. Barrett, "Aroclors

– Toxicological Examination" at 2 (Aug. 19. 1955), MONS09521, attached as Exhibit 40; Stanley C.

Ballard, AROCHLOR IN AIR ("Ballard Rpt."), Monsanto Chemical Company, Plastics Division

(Dec. 31, 1952), MONS061753, attached as Exhibit 41. The conditions of the tests included little or

no ventilation, and in ambient temperatures that exceeded 80°F. Ballard Rpt. at 1; Kaley Dep. Vol.

II at 345-48; Kaley Dep. Vol I at 229-288; *see also* H.B. Richards, Jr., "Final Report on Aroclor in

Gases", Report No. 2970 (Mar. 15, 1954), TOWOLDMON0054584- 4607 (Report No. 2970, Mar.

15, 1954), attached as Exhibit 42.

**Response:**   Deny as to the first sentence.  Monsanto cites a document indicating that it marketed

PCBs for use in latex paint at some point.  ECF 268-11 at 73 ("If the argument I have presented

above is accepted then we must now line up with M.C.C. in withdrawing our recommendation that

Aroclors be used as plasticizers in Lustrex Latex paints.") (emphasis added).  Deny as to the second

sentence.  The study to which Monsanto cites indicates that sampling took place in a room with

normal ventilation and in a room with a room temperature "approximately 70 degrees F."  ECF

268-11 at 83.

54.     PCBs are resistant to water and latex paints are water-based.  Kaley Dep. Vol. I.  at

110, 149, 235, 249.  Klosowski, Plaintiffs' expert chemist and formulator, testified that it is

impossible to predict volatilization rates from caulk based on volatilization rates from paint tests.

Klosowski explained that comparing volatilization from latex paint and polysulfide caulk is like

comparing "an apple and an orange." Klosowski Dep. at 184:10-19. Matson testified that he is not

aware of any information that would suggest that when PCBs were used in non-latex paint they

would readily volatilize. Matson Westport Dep. at 268.

**Response:**  Admit as to the first sentence.  Deny as to the second sentence.  The transcript reads,

"Q: Does paint have a higher evaporation coefficient than caulk; it's impossible to say? A: It's the

same formula you're saying? Q: No. Say a, say a latex paint and a polysulfide caulk.  I can't compare

an apple and an orange. The answer is I don't know."  ECF 268-5 at 275.  As to the third sentence,

admit that Matson said those words, but it was said in the context of past Monsanto paint studies.

Deposition of Jack Vincent Matson, Town of Westport v. Monsanto et al., 1:14-cv-12041,

("Matson Westport Dep."), September 9, 2016, pages 267-268,  attached as Hartford Exhibit 16.

55.     Further, the test methods made it impossible to distinguish PCB molecules from

molecules containing chlorine from other sources, such as solvents or pesticides. Ballard Rpt. at 1.

**Response:**  It is not clear to what test methods this statement relates.  To the extent this statement

contends that that the paint studies measured chlorine in the air, Hartford admits.  However, the

evidence to which Defendants cite does not mention whether the type of test used made it

impossible to distinguish PCB molecules from chlorine molecules.  See ECF 268-11 at 83.

56.     Prior to any testing for PCBs, the Clark School was scheduled to be renovated "as

new." Claudio Bazzano, Executive Director of Facilities for the Hartford Public Schools, explained

that this meant that "you basically gut everything out" and "the only thing standing is the

foundation, the exterior walls of the building, and everything else within it [is] replaced"; complete

systems are taken out and replaced. Deposition of Claudio Bazzano ("Bazzano Dep.") at 9, 47, 150-51, Apr. 13, 2017, excerpts attached as Exhibit 43. The Clark school required a complete overhaul of all its internal systems, such as the HVAC system. Bazzano Dep. at 45-47, 150-51.

**Response:** Deny that Clark School was scheduled to be renovated as new. Hartford contemplated renovations using State funds, but it did not plan and allocate money for such renovations. See Bazzano Dep. 42-48. It was Hartford's "hope" to perform renovations, but there was never a project in place to actually renovate Clark to "as new" condition. Id. at 48.

Admit to the second sentence.

Deny that Clark School required a complete overhaul of all its internal systems, such as the HVAC system. Clark's HVAC system was functional and regularly maintained. See Plaintiff's response to statement 90, below.

57.     The first planned renovate-as-new project for the Cark School was scheduled during the 2004/2005 school year and budgeted to cost $24,200,000. CIP Final Report at 22, Table 12. Beginning in the early 2000s, the Facilities Department recommended replacing the ventilation system, exhaust fans, rooftop units, air compressors and cooling towers at the Clark School. None of this was ever done.     Bazzano Dep. at 172-73.     None of the estimated $24,200,000 allocated for necessary Clark repairs for the 2004/2005 year was ever spent to renovate Clark School.  Bazzano Dep. at 177.

**Response:** Admit that in 2000, Clark school was scheduled to be renovated in 2004/2005 and the renovation was estimated to cost $24,200,000. Deny to the second sentence. For support, Monsanto cite Mr. Bazzano's deposition testimony regarding a 1999 Hartford Public Schools Facility Study, Facility Condition Analysis Report performed by Jeter, Cook & Jepson Architects, Inc., which recommended repairing or replacing exhaust fans and rooftop units, and listed replacing the control air compressor and cooling tower. ECF 268-11 at 138, 158. The report makes no mention of the ventilation system at Clark School.  And Hartford objects that Mr. Bazzano's testimony does not prove that none of the repairs/replacements took place.  Mr. Bazzano specifically said that he did not know whether they took place, and that he does not know what repairs/replacements would have occurred during the 10 year gap between the 1999 Report and his

tenure as Director of Buildings and Grounds. Excerpt of Deposition of Claudio Bazzano ("Bazzano Dep."), April 19, 2017, pages 173-174, attached as Hartford Exhibit 57. In fact, the cooling tower at Clark was replaced in 2001. Permits regarding cooling tower, City of Hartford Department of Licenses and Inspections, October 16, 2001, attached as Hartford Exhibit 72. Deny the last sentence. That figure is an estimation of costs to renovate – not a statement that money was actually allocated. See generally Bazzano Dep. at 42-46.

58.  A second planned renovate-as-new project for the Clark School was scheduled for the 2010/2011 school year and budgeted to cost $35,000,000. CIP Final Report at 23, Table 13.

**Response:** Admit that in 2006, Clark school was scheduled to be renovated in 2010-2011 at an estimated cost of $35,000,000. At this point, Clark was found in the CIP Final Report to be in "Fair" condition. ECF 268-1 at 40.

59.  The Clark School was next scheduled to be renovated as new beginning in 2019. Bazzano Dep. at 45-46.

**Response:** Admit that Hartford's Ten Year Capital Improvement Plan (2012-2021) contemplated Clark School being renovated in 2020-2021, with grant submissions to be placed in June 2019. Email, from Bazzano to Slater, July 8, 2013, attached as Hartford Exhibit 56. However, formal plans were never finalized. Bazzano Dep. at 48.

60.  In 1999, Plaintiffs commissioned a facilities study by Jeter, Cook and Jepson Architect, Inc., which identified Clark School as one of eighteen schools in need of major renovations. Jeter, Cook and Jepson Architects, Inc., "1999 Hartford Public Schools Facilities Study" ("Jeter Report") at 19, (July 22, 1999), attached as Exhibit 44. The report listed all the major building systems as in need of repair or replacement. It recommended: replacing all built- up roofs, exhaust fans and rooftop units, replacing oil pumps and cooling tower, upgrading emergency exterior and emergency lighting, resealing wall control joints, repointing masonry, repainting exterior doors, frames, and railings, and providing interior painting, new resilient floor tile and ceiling tiles. Id.

**Response:** Deny to the extent the statement contends that the Jeter Report recommended that general exhaust fans and rooftop units be replaced. Rather, it recommended that they be repaired

61.     Of those deficiencies identified in the report only the roof was replaced. None of the other recommended work was ever completed. Jeter Report at 19; Letter, Patrick Craffey to Brett Land, "Rebuttal to John Leary's appraisal review report, dated Oct. 30, 2017" at 3, (Jan. 11, 2018), attached as Exhibit 45.

**Response:**  Admit to the roof being replaced.   Deny as to that being the only "deficiency" addressed.   Between 1999 and the time Clark closed in 2015, a number of renovation, repair, and upgrade projects occurred at Clark.  For example:

- In the Summer 2014, CREC undertook an extensive renovation at CREC. ECF 268-12 at 3 (Project Synopsis); ECF 268-14 at 2 (General Construction Notes & Project Scope). This project included the following tasks: door hardware replacement; site maintenance; flooring replacement and restoration; a concrete wall adjacent to a handicap ramp was cut down and replaced with a new code compliant guard rail; interior painting; replacement of glass with bullet-resistant glass; removal of asbestos; removal of ceiling pads; grit painting; new clocks in the classroom; new toilet partitions; installation of new smartboard whiteboards; locker painting; a new security desk; re-glazing of all exterior windows and doors; replacement of any damaged plumbing; repair of the parking lot; and replacement of ceiling tiles. *Id.*  In all, the project cost in excess of $1,000,000.  Excerpt of Deposition of Jack Butkus, August 24, 2017, page 52, attached as Hartford Exhibit 98.

- Permits from the City of Hartford show several projects were performed at Clark in 2000, including: the installation of a new ductless split system air conditioning system in certain rooms; replacement of temperature controls panels in boiler room and on HVAC units; and removal and replacement of boiler burners.  Permits from 2000, City of Hartford Department of Licenses and Inspections, 2000, attached as Hartford Exhibit 73. Additionally, Clark's cooling tower was replaced in 2001.  Hartford Exhibit 72.

62.     In March 2008, the CT DEP conducted an inspection of Clark School in response to complaints about indoor air quality, rodent infestation and poor sanitation practices. Letter, Edna Pestana, CT DEP, to Dr. Alexander Nardone, Hartford Public Schools, "Re: Inspection

Report of the John C. Clark School Facility (Apr. 8, 2008), attached as Exhibit 46. Several staff members complained about poor indoor air quality during the inspection. Id. at 5. The inspection found an accumulation of dust and debris in classrooms, the gym, the gym equipment storage room, throughout the boys' locker room and in the air vents/registers throughout the building. Id. at 4-5. Human feces were observed on stairs; carpet was stained with vomit. Id. at 4. The inspection also found mouse droppings in classrooms, in multiple locations in the teacher's lounge, in the gym equipment storage room, and in a stair case. Id. The lead custodian of the Clark School catches two or three rodents every month. Deposition of Edwin Arroyo ("Arroyo Dep.") at 40-41, Apr. 20, 2017, excerpts attached as Exhibit 47. The CT DEP noted  that several of these conditions violated Connecticut Statutes. Letter, Pestana (Apr. 8, 2008), at 2-4.

**Response:** Admit.

63.     In 2014, six years after the 2008 CT DEP inspection, the Clark School was identified by the CREC as a school in need of intervention. *See generally* Hartford Public Schools and CREC, Mem. Understanding (June 18, 2014), HRTFDSCHL036274, attached as Exhibit 48. CREC took over management of Clark School and undertook a cosmetic upgrade of the building.  Id.

**Response:**  Deny that Clark School was identified by CREC as a school in need of intervention, but admit that CREC took over management of Clark.  See ECF 268-11 at 220.  Deny that CREC only undertook cosmetic upgrades.  See Response to Statement 61.

64.     Paul Drummey, the CREC employee assigned to the 2014 summer renovations at the Clark School, testified that in his lifetime, he had "never seen a school in such disrepair." Deposition of Paul M. Drummey ("Drummey Dep.") at 22, 55-56, Apr. 19, 2017, excerpts attached as Exhibit 48. The Clark School was "a sad, dark and dreary place that needed a lot of work". Drummey Dep. at 47-48, 52.

**Response:**  Admit that Drummey said what the statement purports.  However, Drummey explained that Clark was "dark" because there wasn't too much light coming through windows and with respect to the maintenance and upkeep of the school, Drummey cited only that the school could "use . . . some paint on the walls."  Excerpt of Deposition of Paul M. Drummey ("Drummey Dep."), April 19, 2017, pages 47-49, attached as Hartford Exhibit 58.

65. The CREC project was intended to be a cosmetic update to extend life of school by 3 years until it was again scheduled to be gutted and renovated. Construction drawings, Capital Region Education Council, "Clark Street Elementary School Cosmetic Upgrades" (General Construction Notes & Project Scope), HRP001070, attached as Exhibit 50. The upgrades included interior painting, replacement of glass with bullet-resistant glass, removal of asbestos, removal of ceiling pads, grit painting, new clocks in the classrooms and replacement of ceiling tiles. Id.

**Response:** Deny as to the first sentence. Hartford did not expect that Clark would be gutted and renovated in 2017. See Plaintiffs' response to Statement 56, *supra*. Admit as to the second sentence. The project also included a number of other tasks. See Response to Statement 61.

66. CREC intentionally did not test for PCBs since PCB testing was not required for any work performed. CREC did not know that its work could disturb building materials containing PCBs. Drummey Dep. at 126; Email, Mason Thrall, CREC, to Claudio Bazzano, Hartford Schools, "Clark School Sequence – revised" (Jan. 14, 2015), HRTFDSCHL044426, attached as Exhibit 51; HRP handwritten notes ("Bob Saunder [CREC]: do NOT sample for PCBs"), HRP1001, attached as Exhibit 52; 30(b)(6) Deposition of Claudio Bazzano, Volume I & II ("Bazzano Dep. Vol. I") at 219-21, Sept. 12, 2017 & Oct 13, 2017 excerpts attached as Exhibit 53.

**Response:** Deny to the first sentence. Monsanto's evidence does not show why CREC did not sample for PCBs. Admit to second sentence.

67. Consequently, the CREC project spread PCBs throughout the building. *See* Email, Pete Folino, Eagle, to Sal Salafia, Arcadis, "Re: Clark Phoenix AIR results" (Dec. 15, 2015), HRTFRDSCHL062061, attached as Exhibit 54; Email, Paul Drummey to Robert Saunders, "Clark" (Jan. 12, 2015), CREC00001308, attached as Exhibit 55; Drummey Dep. at 133; John P. Woodyard, PE, Expert Report ("Woodyard Rpt.") at 24-25, attached as Exhibit 56.

**Response:** Deny. Aside from their expert's report, the evidence cited for this statement shows that Hartford was considering whether the CREC project resulted in PCBs spreading but that Hartford did not actually know one war or the other. Hartford's expert Ross Hartman provides testimony that the caulk at the school is most likely the source of PCBs in Clark School. ECF 268-2 at 14.

68.   CREC commissioned environmental testing and balancing to inspect the HVAC system at the Clark School which revealed an obsolete and non-functional HVAC system. Bazzano Dep. at 49. The report noted multiple problems with the HVAC system, including: blocked air louvers, dirty grilles, missing branch dampers, inoperable air handling units, fans unable to operate long enough for testing, and motors that do not work. Environmental Testing and Balancing, Inc., Certified Testing and Balancing Report ("ETB Report"), at 1-2 (Sept. 2, 2014), EES00003651, attached as Exhibit 56; Deposition of Ross A. Hartman ("Hartman Dep. Vol. I") at 189-91, Sept. 11, 2017, excerpts attached as Exhibit 58; *see* para. 90, *infra*.

**Response:** Hartford objects that Monsanto's Bazzano Dep at 49 has nothing to do with CREC commissioning an HVAC inspection. See ECF 268-11 at 117.  Hartford denies that the ETB Report revealed an obsolete and non-functional HVAC system.  Rather, the report revealed a number of HVAC system repairs that should be performed.  A number of those repairs were performed. Compilation of AirTemp invoices from 2014-2016, at AirTemp0001-15, attached as Hartford Exhibit 55. Admit to the second sentence.

69.   In the summer of 2014, following the cosmetic upgrade project by CREC, Plaintiffs decided to install a fire protection system at the Clark School. Drummey Dep. at 133- 34, 138. The project was managed by Jack Butkus, the senior program manager  at  Arcadis/O&G, which is an entity retained by Plaintiffs to manage construction projects at all Hartford schools. Deposition of Jack Butkus, Volume I ("Butkus Dep. Vol. I") at 65, 111, 140- 41, June 22, 2017, excerpts attached as Exhibit 59.

**Response:** Admit.

70.   As part of the project, Peter Folino, the principal of Eagle, Plaintiffs' on-call environmental consultant, unnecessarily tested paint in several locations for PCBs. Letter, Peter Folino, Eagle, to Sal Salafia, Arcadis/O&G, "RE: Polychlorinated Biphenyl (PCB) Containing Materials 'Source' Sampling and Analysis Report: Clark School – Fire Protection Project", at 2 (Oct. 22, 2014) (encl.), EE00000009, attached as  Exhibit 60; Deposition of Peter J. Folino ("Folino Dep.") at 43-44, 65-66, June 2, 2017, excerpts attached as Exhibit 61. The bulk tests identified Aroclor 1248 and Aroclor 1254 in caulk. Letter, Peter Folino (Oct. 22, 2014); CCA Rpt. Appendix

**Response:**  Admit that Folino tested paint and detected Aroclor 1248 and Aroclor 1254.  Deny that such a test was unnecessary.  When Hartford decided to install a fire suppression system, it was required to perform a PCB investigation in order to receive grant funds from the state.  See ECF 268-3 at 220 (PCB investigation report for Clark); ECF 268-2 at 59-61 (PCB investigation checklist from the Connecticut Office of School Facilities); Hartford Report pg 6 at ECF 268-2 at 8.

71.     After PCBs were discovered in the paint in October 2014, Eagle conducted additional unnecessary air and dust sampling at the Clark School in December 2014.  Folino  Dep. at 65-66; Eagle, "Polychlorinated Biphenyl (PCB) Investigation Summary Report John C. Clark Elementary School", at 2 (Jan. 29, 2015), HRTFDSCHL020654, attached as Exhibit 62; Hartman Dep. Vol. I at 40-44; Folino Dep. at 43-46, 65-66; Woodyard Rpt. at 9.

**Response:**  Admit that air and dust sampling was conducted in December 2014, but deny that such air and dust sampling was unnecessary.  Although not required by EPA regulations, Hartford had to perform air tests to determine whether those inside Clark School were exposed to PCBs in the air.  This is in accordance with Hartford's obligation to provide a safe school setting. See Connecticut General Statute § 10-220.

72.     Dr. Tung Nguyen, Interim Health Director for the City of Hartford Department of Health and Human Services, testified as a 30(b)(6) designee for Harford.  He testified that independent reviews of the PCB conditions at Clark School by the Department Connecticut Department of Public Health ("CT DPH"), the City of Hartford Department of Health and Human Services ("HHS"), the Hartford Board of Education and the Agency for Toxic  Substances and Disease Registry ("ATSDR ") (a division of the Centers for Disease Control) confirmed that PCBs did not present at health risk at the Clark School. *See* 30(b)(6) Deposition of Tung Nguyen ("Nguyen Dep.") at 7, 31-34, 36-40, 44-46, Sept. 12, 2017, excerpts attached as Exhibit 63.

**Response:**  Admit to the first sentence.  Deny to the second sentence.  Dr. Nguyen did, however, acknowledge the existence of the two documents discussed below in SOF 73 and 75.

73.     In January 2015, the CT DPH published a fact sheet that was provided to parents that addressed PCB levels in the air at the Clark School, which stated: "The CT Department of

Public Health reviewed the air tests. Even the highest level of 571 nanograms per cubic meter in air found in hallway is way below level that could cause health problems." CT DPH, "Understanding PCB Exposures at Clark School" (Jan. 2015) ("CT DPH Publication"), attached as Exhibit 64; Nguyen Dep. at 31-34. The publication stated that the PCBs in the air were almost 200 times lower than the dose required to cause minor symptoms in laboratory studies, and "several thousand times lower than the PCB dose that caused serious harm to laboratory animals." CT DPH Publication; Nguyen Dep. at 36-37.

**Response:** Admit to the first sentence. Deny to the second sentence; the publication stated that the PCBs in the air at Clark was almost 20 times lower, not 200. ECF 268-17 at 300.

However, the detection of 571 ng/m3 far exceeds EPA's Health Protective Values for Indoor Air in Schools, which is 200 ng/m3 for children less than six but older than three. ECF 268-2 at 51. In addition, Dr. Olson explains that PCBs in school air at 100 ng/m3 result in 10 excess life time cancer cases in 1,000,000 people. Olson Rpt. at 38.

74. The HHS regularly monitors the health of the City of Hartford residents through several surveillance systems from the Center for Disease Control and the CT DPH. Nguyen Dep. at 9. The HHS found no epidemiologic evidence that the health of students and staff at Clark School had been adversely affected by PCBs or had an unusual incidence of disease. Id. at 10-11. The HHS agreed with the CT DPH's conclusions that the PCBs in the air at the Clark School would not adversely affect human health. Id. at 32.

**Response:** Admit to the first sentence. Admit to the second sentence, although, there is no indication an epidemiologic study has been undertaken to determine whether individuals had been adversely affected by PCBs. Admit to the third sentence.

75. In January 2015, David Medina, the Director of External Communications for the Hartford Public Schools ("HPS"), addressed PCBs in the Clark School with parents at the Clark School Open House. Nguyen Dep. at 44. On behalf of the HPS, David Medina advised: "Although the Connecticut Department of Public Health has informed us that PCB levels at the school are nowhere near high enough to pose an immediate or long-term health risk and that treatment to correct the situation could have been carried out with the building occupied, **we decided to**

**relocate students out of an abundance of caution to avoid unnecessary disruptions that remediation would take place.**" Email, David Medina, HPS, to Kelvin Roldan, HPS, "Subject: Revised talking points" (Jan. 21, 2015) (emphasis added), MHIS-7352, attached as Exhibit 65; *see also* Nguyen Dep. at 45-46.

**Response:** Admit.

76.   In March 2015, the ATSDR reviewed the PCB test data. Nguyen Dep. at 39. ATSDR confirmed that PCBs at the Clark School did not present a health risk. "ATSDR Technical Assistance Form" (Mar. 10, 2015), CDC000003, attached as Exhibit 66; Nguyen Dep. at 39-40. ATSDR concluded: "Our primary message to health care providers was that medical testing was not warranted based on the exposures at the school." ATSDR Technical Assistance Form.

**Response:** Admit to the first sentence. Deny to the second sentence; ATSDR did not say there was no health risk associated with the PCBs at Clark. See 268-17 at 307. Admit to the third sentence.

77.   Plaintiffs' experts admit that there are no scientific studies which demonstrate that PCB-containing building products either cause disease or that PCB levels found in the Clark School will cause disease. Olson Dep. at p. 221-22, 224, 227, 229, 230-31; Herrick Dep. 160-61; Olson Westport Depo. at 159; Herrick Westport Dep. at 151; *see* paras. 46-51, *supra*.

**Response:** Deny. Most of Defendants' citations do not even reference studies of PCBs in building products. One does – Dr. Herrick's Westport deposition, at 151 – and there Dr. Herrick testifies only that he was not aware of studies looking at whether PCBs cause health problems. ECF 268-11 at 57-58. In addition, Dr. Olson explains that PCBs in school air at 100 ng/m3 result in 10 excess life time cancer cases in 1,000,000 people. Olson Rpt. at 38.

78.   The pre-pilot air levels at the Clark School averaged 195 ng/m3. Hartman Dep. Vol. I at 49-50, 50; Herrick Dep. at 250-251; Woodyard Rpt. at 11. These levels are below the EPA Evaluation Level for indoor PCB air level of 200 ng/m$^3$ for children between 3 years and less than 6 years old. *See* EPA, "Public Health Levels for PCBs in Indoor School Air" (Sept. 25, 2009), attached as Exhibit 67. Donald Slater, Chief Operating Officer for Hartford Public Schools,

admitted that there were no children less than 5 years of age attending Clark School." 30(b)(6) Deposition of Donald Slater ("Slater Dep.") at 18, 43, 23-25, Sept. 27, 2017, excerpts attached as Exhibit 68; Woodyard Rpt. at 11; Schell Rpt. at 3

**Response:** Admit to the last sentence. Deny to the rest. Monsanto derives the 195 ng/m3 figure from their expert's report, which looked at 25 air samples between 12/19/2014 and 10/13/2015. ECF 268-10 at 66. The use of averaging here is misleading as CCA did not look solely at where students may be exposed. For example, CCA's calculation included one air sample from a mechanical room where no PCBs were found. See ECF 268-10 at 102-103. Not including samples from mechanical rooms, the average is over 200 ng/m3. Id. Additionally, averaging all samples from locations throughout the school would not be reflective of any one student's exposure to PCBs while at school.

79.      The EPA has explained that its PCB evaluation levels "are not meant to be interpreted or applied as a 'bright line' or 'not-to-exceed' criteria." EPA, "PCBs in Building Materials – Questions and Answers" (July 28, 2015), attached as Exhibit 69. The EPA further stated that "[i]solated or infrequent indoor air PCB measurements that exceed the exposure levels would not signal unsafe exposure to PCBs", but measurements above these levels may trigger the need for further investigation. Id. These indoor school air levels do not represent real risk because they encompass a safety factor of 3,000; the risk may be zero. Schell Rpt. at 3, 30.

**Response:** Admit to the extent Defendants' quote the document in the first two sentences. Admit that measurements above the EPA exposure levels triggers the need for further investigation. Specifically, the document cited by Defendants explains that a detection of PCBs at a level in excess of EPA exposure levels "suggest the need for the further investigation of PCB sources in the school building and other actions to reduce exposure." ECF 268-17. Deny that indoor air levels do not represent real risk. As explained by Plaintiffs' expert toxicologist Dr. James Olson, an increase in exposure to PCBs increases the risk for a wide range of cancer and non-cancer health effects. Hartford Exhibit 8 at page 38; Hartford Exhibit 14.

80.      Pre-pilot PCB wipe samples of occupied spaces were all non-detect. Folino Dep. at 68; Eagle, "Polychlorinated Biphenyl (PCB) Investigation Summary Report John C. Clark

Elementary School, at 54 (Feb. 23, 2015), attached as Exhibit 70. Pre-pilot wipe samples for

surfaces within the ventilation system averaged 2.42 μg/100 cm$^2$. Schell Rpt. at 4; Woodyard Rpt. at

11. None of the wipe samples taken prior to the pilot study exceeded the regulatory level of 10

μg/100 cm$^2$. Herrick Dep. at 92, 107; Woodyard Rpt. at 8, 11; Hartman Dep. Vol. I at 53.

**Response:** Admit.

81. Pre-pilot bulk sampling of the ceiling tile averaged 0.5 ppm; bulk samples of paint

averaged 48 ppm; bulk samples of air handling unit filters averaged 18.38 ppm; bulk samples of

sprayed-on insulation averaged 10.83 ppm. CCA Rpt., Appendix C Hartford PCB Data.

**Response:** Admit.

82. In January 2015, the Plaintiffs voluntarily closed the Clark School. Slater Dep. at 36,

61, 109. John Motley, chairman of the Hartford School Building Committee, testified that neither

the EPA nor the CT DEEP, nor any other governmental authority, mandated that the Clark School

be closed. 30(b)(6) Deposition of John Motley, Volume I & II ("Motley Dep.") at 38, 76, Oct. 12 &

19, 2017, excerpts attached as Exhibit 71; *see also* Slater Dep. at 36, 61; Bazzano Dep. at 119;

Deposition of Jack Butkus, Volume II ("Butkus Dep. Vol. II") at 430, Aug.13, 2017, excerpts

attached as Exhibit 72.

**Response:** Admit. In January 2015, Clark closed as a school and redistributed its students among

other Hartford-area schools. ECF 268-17 at 303-304.

83. In March 2016, the Clark School's enrollment was reported to be 247. *See* Achieve

Hartford (Mar. 3, 2016), Arcadis00000156, attached as Exhibit 73. In December, 2017, it was

announced that the Clark School would be one of a number of Hartford schools to be permanently

closed as part of a school consolidation plan to address under-enrollment. Kathleen Megan, "New

Reorganization Plan Would Close Hartford Schools, Consolidate Programs", HARTFORD

COURANT (Dec. 19, 2017), available at http://www.courant.com/education/hc-news-hartford-

schools-consolidation-20171218-story.html, attached as Exhibit 74.

**Response:** Admit.

84. In January 2015, Ross Hartman of Strategic Environmental Services learned about

PCBs being found at Clark and solicited the EPA for work at the Clark School, the EPA then recommended Hartman to Eagle. Email, Ross Hartman, JM Env. Corp., to Kim Tisa, EPA, Re: Hello (Jan. 9. 2015), HRTFDSCHL063627, attached as Exhibit 75; Email, Pete Folino, Eagle, to Kim Tisa, EPA, "Re: Availability Friday" (Jan. 12, 2015), EPACLARK0165, attached as Exhibit 76. On January 14, 2015, Eagle hired Hartman to help address the PCBs in the Clark School. Contract, JM Env. Corp., Inc. and Eagle (Jan. 14, 2015), EE00009461, attached as Exhibit 77.

**Response:**  Ross Hartman's email to Kim Tisa said, "I had a friend who lives close to Hartford tell me about the Clark school closing.  If I can be of any assistance, please do not hesitate to ask." ECF 268-18 at 27.  Admit that Kim Tisa gave Pete Folino the name of Ross Hartman, along with the names of three other consultants/environmental firms.  ECF 268-18 at 29.  Admit to the last sentence.

85.     One day before he was hired by Eagle, Hartman signed a consulting agreement with Plaintiffs' lawyers Baron & Budd. Hartman Dep. Vol. I at 135-37; Letter, Mitchell E. McCrea, Baron & Budd, to Ross Hartman, JM Env. Corp. Inc., "Re: Consultant Retention Agreement" (Jan. 12, 2015), attached as Exhibit 78.

**Response:**  Admit that Hartman signed a consultant retention agreement on January 12.  Deny all implication that it was related at all to Eagle hiring Ross Hartman.  At the time, Ross Hartman  was a consultant for Plaintiffs' counsel, Baron & Budd, relating to a lawsuit involving PCBs in a school in Westport, Massachusetts. Excerpt of Deposition of Ross Hartman ("Hartman Dep."), September 11, 2017, pages 83, 106-109, attached as Hartford Exhibit 54.

86.     Hartman never disclosed this conflict to Hartford or Eagle. Hartman Dep. Vol. I. at 104, 106, 111; Folino Dep. at 96; Bazzano Dep. at 126; Slater Dep. at 49.

**Response:**  Deny. This is a conclusory, argumentative statement claiming that a conflict existed. Hartman's consultant work in Baron & Budd's Massachusetts case did not present a conflict in Hartman's work for Eagle or Hartford. Regardless, Hartman told Folino about working with Baron & Budd on another case in early January 2015.  Hartman Dep. at pages 106-107.

87.     Upon being engaged by Eagle to offer advice on the Clark School, Hartman immediately began soliciting Folino to introduce Baron & Budd lawyers to Plaintiffs. Folino Dep. at

**Response:** Deny. Hartman mentioned Baron & Budd in response to an inquiry about PCB lawsuits made by a Hartford selectwoman at a town meeting. At no point did Hartman "solicit" Folino to introduce Baron & Budd lawyers to Hartford. Hartman Dep. at 106-109; 121-122.

88.    Hartman also solicited Folino on behalf of Baron & Budd for other Connecticut schools where Eagle had done PCB testing. Folino Dep. at 109; Email, Pete Folino to Ross Hartman, "Re: Hello and PCB testing" (July 5, 2016), EE00007617, attached as Exhibit 79.

**Response:** Deny. The cited email was sent well after Baron & Budd had been retained by Hartford (the lawsuit had been filed over 8 months earlier) and discusses <u>only</u> Hartford. No other town or school is referenced. See 268-18 at 37.

89.    Shortly after being retained by Eagle, Hartman and Folino recommended that Hartford conduct a pilot project on remediation of PCBs at the Clark School. Folino Dep. at 98; *see generally* Eagle (Jan. 29, 2015), *supra* para. 71.

**Response:** Deny. According to Folino, he suggested that Hartford conduct a pilot project. ECF 268-17 at 251. There is no indication that Hartman participated in that suggestion.

90.    The HVAC system was original to the Clark School. Butkus Dep. Vol. II at 356. HVAC systems require replacement after 20 to 25 years. Slater Dep. at 90. Thomas Welcome, the facility manager at the Hartford Public Schools, testified that there were no written policies or procedures for maintaining the boilers, chiller, HVAC system, exhaust fans or air handling units or for inspecting the same. Deposition of Thomas Welcome ("Welcome Dep.") at 102, 106-07, 188, Jul 13, 2017, excerpts attached as Exhibit 80; Arroyo Dep. at 47, 56. Air filters were not replaced and heating coils were never cleaned. Welcome Dep. at 188; Arroyo Dep. at 47, 56. Many exhaust fans were broken, which prevented air from moving out of the building; the air handling units were blocked, which prevented outside air from coming into the building. Welcome Dep. at 190-92. The air handling units were scheduled to be replaced in 2014 or 2015 because they had outlived their useful life. Welcome Dep. at 143.

**Response:** Admit to the first sentence. While the system was original, renovations and repairs had been made to the HVAC system. Excerpt of Deposition of Claudio Bazzano ("Bazzano Dep. II"),

September 12, 2017, at pages 28, 30-31, attached as Hartford Exhibit 59; HVAC maintenance and repairs 1992-1993, COHDPW00004413-4425, 4845-4849, attached as Hartford Exhibit 60 (outlining two HVAC maintenance/repair projects, one involving motor replacement and the other automatic temperature controls). Deny as to second sentence. For support, Defendants cite testimony from Donald Slater, who did not say that HVAC systems require replacement after 20-25 years. In fact, Mr. Slater specifically stated that he has no expertise in HVAC systems and that he did not know anything about the maintenance and servicing of Clark's HVAC system. Excerpt of Deposition of Donald Slater ("Slater Dep."), September 12, 2017, at pages 51-52, attached as Hartford Exhibit 61. HVAC systems do not require replacement if they continue to operate, as Clark's did. See Bazzano Dep. II at 104. Hartford provided for an HVAC company to visit Clark once or twice a month to perform repairs and maintenance on the HVAC system at Clark. 62.

Excerpt of Deposition of Edwin Arroyo ("Arroyo Dep."), April 20, 2017, at pages 73-74, attached as Hartford Exhibit 62. Admit to the third sentence. Deny to the fourth sentence; air filters were regularly replaced and coils would have been cleaned whenever it was necessary for the HVAC to function properly. Excerpt of Deposition of Thomas Welcome ("Welcome Dep."), July 13, 2017, at pages 102-104, 226, 229, attached as Hartford Exhibit 63. The fifth sentence is a misleading, general statement that does not specify a time period; the cited testimony is in reference to a balancing report from a specific time period in 2014. Admit to the extent the fifth sentence relates only to that time period, otherwise deny. Deny to the sixth sentence; Defendants' statement is misleading. Clark's HVAC system was operational and regularly maintained. Id.; see, e.g., Hartford Exhibit 55 (documenting repairs of maintenance system between 2014 and 2016).

91. In 2014 and 2015, AirTemp Mechanical Services Inc. (Airtemp) was hired to "feed as much outside air into the school as possible." AirTemp Mechanical Serv. Inc., Call Slip (Dec. 29, 2014), AirTemp036-37, attached as Exhibit 81. AirTemp technicians unsuccessfully attempted to repair the rooftop exhaust fans, but the fans continued to have an overload shutdown after running for a short while. Id.; ETB Report. AirTemp technicians also opened all outside dampers and closed all return dampers, which effectively left the indoor air with nowhere to escape and resulted in elevated PCB in air levels. See AirTemp Call Slip; Eagle, at 2 (Feb. 23, 2015),

EE0000044, supra para. 30; see Second Expert Report of Wayne Hubbard, Table at 2, 9-9 (Mar. 16, 2018), attached as Exhibit 82.

**Response:** Admit to the first sentence. Deny to second sentence; the AirTemp invoice to which Monsanto refers states that AirTemp "found most exhaust fans running with no issues." ECF 268-18 at 52. Deny to the third sentence; AirTemp's invoices document a series of repairs performed to ensure operation of the Clark HVAC system. Notably, AirTemp ensured exhaust fans operating properly and took actions to vent the Clark school building. Exhibit 55 at AirTemp 0037 and 0039.

92. Other structural issues and deferred maintenance at the Clark School include:

a. A degraded roof in need of replacement due to structural issues, age and roof leaks, David Peraza, PE, "Structural Evaluation of John C. Clark Elementary School" ("Peraza Rpt."), at 4, 7, 8 (Oct. 27, 2017), attached as Exhibit 83;

b. Absence of a lateral structural support system, Peraza Rpt. at 6-7;

c. Degradation of exterior building façade including deteriorated mortar joints, cracking bricks, missing caulk along construction joints, graffiti, damaged and dented door units, scratched and broken Lexan window panels on the windows, some with bullet damage, CCA Rpt. at 15;

d. Water stains and water damage on ceiling tiles from roof leaks, CCA Rpt. at 17, 26-27; and

e. Deteriorated or missing asbestos floor tiles, CCA Rpt. at 31.

**Response:** Hartford objects to the first clause as a conclusory, argumentative sentence without a fact.

a. Deny. According to Defendants' experts at CCA, the roof was replaced on or around 1999, and the average useful life span for roofs is 25 years. ECF 268-10 at 20.

b. Admit. However, the structure of Clark is within code such that there are no structural issues preventing Clark from being reoccupied. See Rebuttal Expert Report of Mark W. Tebbets ("Tebbets Rpt."), January 15, 2018, at page 5, attached as Hartford Exhibit 75

c. Admit as to the state of Clark when inspected by Defendants' experts in October and November of 2016 and June 2017, however, this does not reflect the condition of Clark when it operated as a school. See ECF 268-10 at 11.

d. Admit as to the state of Clark when inspected by Defendants' experts in October and November of 2016 and June 2017, however, this does not reflect the condition of Clark when it operated as a school. See ECF 268-10 at 11.

e. Admit as to the state of Clark when inspected by Defendants' experts in October and November of 2016 and June 2017, however, this does not reflect the condition of Clark when it operated as a school. See ECF 268-10 at 11.

93. In total, the Clark School would require approximately $36,900,000 to renovate its obsolete building systems. CCA Rpt. at 5. These repairs include:

a. Removal and replacement of all exterior windows and exterior doors ($1,329,530);

b. Removal and replacement of all HVAC Systems, including ductwork, air handling units, exhaust units, and energy management controls ($4,749,423);

c. Removal and replacement of vinyl asbestos floor tile and asbestos containing floor mastic ($358,499);

d. Removal and replacement of ceilings ($569,717);

e. Roof replacement ($1,217,916);

f. Installation of lateral bracing to remedy design flaw creating structural instability ($57,233);

g. Accessibility improvements ($1,188,224);

h. Asbestos, lead, and mold abatement ($726,745);

i. Replacement of spray applied fireproofing ($2,684,531);

j. Renovation of locker rooms ($65,818);

k. Replacement of boilers, chillers, and cooling tower ($1,216,201);

l. Replacement of all water piping and original plumbing fixtures ($596,562);

m. Replacement of fire alarm system ($1,160); 

n. Electrical system upgrades ($4,302,519);

o. Installation of automatic fire suppression systems throughout the building ($1,988,542); and

p. Interior reconstruction, selective demolition, additional construction, elevator work, furnishings, fixtures and equipment, and exterior improvements to provide an "As - New" pre-kindergarten through eighth grade school environment ($15,676,841).

CCA Rpt. at 5.

**Response:**  Deny.  This is the opinion of Defendants' expert and not a "fact".  Prior to the detection of PCBs, Clark was a functional school building. There was no need for these types of renovations to be made for the school to continue functioning.  See Tebbets Rpt. at 2 ("Summary: Clark Elementary School is in good to average condition for a school of its age.").

94.     In addition, the Clark School is afflicted with numerous other issues that impacted the health and safety of its occupants, including:

a. Lead in the drinking water, the highest sample result was 275,000 ppb, which is 2,000 times higher than the Maximum Contaminant Limit for lead in public water systems under the Safe Drinking Water Act. Schell Rpt. at 5; CCA Rpt. at 58. Lead is a well-known health hazard, to which children are particularly vulnerable. Herrick Dep. at 133.

b. Asbestos, a known carcinogen, present in many building products, including floor tile, caulk, insulation and mastic. CCA Rpt. at 50-51; Bazzano Dep. Vol. I at 97; Herrick Dep. at 135. Friable asbestos was also present in two of the air handling units.  CCA Rpt. at 56.

c. Mold and fungi in several air handling units. Mold is a human health hazard because it is allergenic, may cause extrinsic asthma, and may be associated with disease in humans. Schell Rpt. at 5; Herrick Dep. at 137.

**Response:**  Hartford objects that this statement is a conclusory argument, not a statement of fact. Hartford denies as to the statement about lead in drinking water.  The level Monsanto's expert

purported to detect is 2,360 ppb, not 23,600 ppb, which was found from the sink in Clark's

restroom. ECF 268-10 at 59.  Notably, this sample was taken on October 3, 2017 – over two and a

half years after Hartford closed Clark.  Id. at 58.  Admit as to the statement regarding asbestos.

However, to the extent friable asbestos exists in Clark, there is no evidence it existed at the time

Clark was open, as Monsanto's inspection occurred in October 2016 and June 2017. ECF 268-10 at

57.  Admit as to the mold and fungi entry, although, Monsanto's inspection occurred after the school

had been closed for over two and a half years.  Id. There is no indication mold or fungi were present

in the air handling units at the time Clark was open.

        95.      The Toxic Substances Control Act and the regulations promulgated thereunder by

the EPA are the sole source of authority on what is required in a PCB remediation project. *See*

Woodyard Rpt. at 8. Guidance documents do not supersede published regulations and do not have

the force of law. Woodyard Rpt. at 8; Deposition of Ross Hartman, *Town of Westport v. Monsanto et*

*al.*, 1:14-cv-12041 ("Hartman Westport Dep.")[3]  at 244, Sept. 8, 2016, excerpts attached as

Exhibit 84; *see generally* Mem. US DOJ, "Limiting Use of Agency Guidance Documents in

Affirmative Civil Enforcement Cases" (Jan. 25, 2018), attached as Exhibit 85.

**Response:**  Deny to the first sentence. In addition, Connecticut state regulations address PCBs.

Connecticut General Statute §§ 22a-463 through 469a.  Admit that guidance documents do not have

the force of law.

        96.      In Connecticut, the Connecticut General Statute §§ 22a-463 through 469a is the sole

source of authority on what is required with PCB-containing building products. While there is a

statutory prohibition on use of PCBs in open systems, this prohibition is subject to certain limited

exemptions, including the request for waiver of this requirement.   *See* Conn. Gen.   Stat. §§ 22a-

463 through 469a.

**Response:**  Deny to the first sentence. In addition, EPA regulations provide PCB requirements.

Admit to the second sentence.

        97.      Folino, the principal of Eagle, told Plaintiffs that paint had to be tested in

conjunction with the sprinkler project. *See* Folino Dep. at 16, 64-65. However, Folino admitted that

---

[3] Hartman adopted his admissions from the *Town of Westport* case.  Hartman Dep. Vol. I at 11.

no regulation required that testing. Id. at 69-06. Folino mistakenly believed that paint testing was required for the school to get funding for the sprinkler project. Id. at 41-42. Yet, the Office of School Facility only required such PCB testing when the project impacted caulk. Id. at 43-46. Caulk was not impacted by the sprinkler project. Folino Dep. at 46.

**Response:** Admit. However, at the time that Hartford decided to perform the sprinkler project, Hartford would have been required to test paint. See Plaintiffs' response to Statement of Fact 70, *supra*. At the time Mr. Folino began to work on the environmental portions of this project, existing requirements called for the testing of any material that may contain PCBs that would be disturbed during a renovation project; the requirements shifted to require only the testing of caulk less than two weeks before PCB tests were initially performed at Clark, which was months after Folino developed his plan for the environmental sampling portion of the sprinkler project. Cf. Email, from Claudio Bazzano, August 5, 2014, HRTFDSCHL036229-30, attached as Hartford Exhibit 74 (explaining State required Hartford to conduct a PCB inspection of painted walls in August 2014) and Folino Dep. at 44 (acknowledging the rules changed in mid-September 2014).

98.     The additional air, bulk, and wipe tests performed were not required by Connecticut or federal law. Hartman Dep. Vol. I at 40-44; Herrick Dep. at 64-65, Folino Dep. at 65-66.

**Response:** Deny.

Federal and Connecticut law prohibit the use of PCBs.

Once a building is known to contain PCBs, EPA and CT DEEP call for additional measures to be taken to identify the contamination's extent and address the contamination. CT DEEP, Connecticut DEEP Caulk Guidance, March 5, 2013, attached as Hartford Exhibit 67[4]; ECF 268-17 at 336-38 (EPA Questions and Answers, questions 18, 21); Rebuttal Expert Report of Ross Hartman, January 15, 2018, at page 2-3, attached as Hartford Exhibit 65. If these actions were not taken and EPA guidance was not followed, EPA could have brought an enforcement action against Hartford. See EPA, Consent Agreement and Final Order, *In the Matter of the City of New York*, TSCA-02-2010-9201 (requiring City to develop remediation plan for PCB-sealant in schools), attached as Hartford Exhibit 66.

---

[4]http://www.ct.gov/deep/lib/deep/waste_management_and_disposal/construction_renovation_demolition/deep_pcb_caulk_regulation_chart.pdf (last accessed July 21, 2018)

99. There was no state or federal regulatory requirement to test the paint for PCBs prior to the sprinkler installation project. Folino Dep. at 44-46; Hartman Dep. Vol. I at 38-45; Hartman Rpt. at 2; Herrick Dep. at 65; Woodyard Rpt. at 4.

**Response:** Admit. However, as discussed *supra*, use of PCBs is prohibited by federal and state law. EPA and CT DEEP provide guidance that encourages testing for PCBs in materials involved in repair/renovations. Hartford Exhibit 67; ECF 268-17 at 336 (Q.18).

In addition, as discussed in Plaintiffs' Response to Statement 97, at the time the decision to test paint was made, Connecticut's Office of School Facilities required PCB testing in order to receive grant funds from the State.

100. None of the PCB testing conducted by Eagle at the Clark School was required by Connecticut or EPA regulation. *See* Hartman Dep. Vol. I at 40-44; Motley Dep. at 173; Folino Dep. at 43-46, 65-66.

**Response:** Admit. However, as discussed *supra*, the testing was performed to comply with CT DEEP and EPA guidance.

101. There was no state or federal regulatory requirement to test for PCBs in the air. Woodyard Rpt. at 4-5; Hartman Dep. Vol. I at 41-42.

**Response:** Admit. However, EPA encourages air testing once PCBs are detected in a school building. ECF 268-17 at 337-338. The PCB Coordinator for EPA Region 1 recommended that Hartford test the Clark air for PCBs. ECF 268-2 at 5; ECF 268-3 at 220;

102. The regulations do not mandate that building owners remove all PCB-containing building products once they are discovered. Hartman Westport Dep. at 238; Woodyard Rpt. at 6.

**Response:** Deny. PCB regulations prohibit the use of PCBs at certain levels. EPA regulations prohibit the use of materials contaminated by the products originally containing PCBs if the contaminated material contains PCBs at a level above 1 ppm. 40 C.F.R. § 761; ECF 268-2 at 6. CT DEEP instructs property owners to address PCBs in any materials containing PCBs at levels >1 ppm. Hartford Exhibit 67. Once PCBs are discovered at those levels, the materials must be removed or else the building owner remains in violation of PCB laws and can be subject to an EPA enforcement action or a citizen suit. See Hartford Exhibit 66; *America Unites for Kids v. Lyon*, No. CV

15-2124 (BCD, 2014 WL 4494409, at *10 (C.D. Cal. Sept. 17, 2014) (allowing parents to bring

citizen suit against school district; the school "used" PCBs in violation of TSCA by allowing to

remain in place sealant containing levels of PCBs above 50 ppm).

103.    Finally, the regulations do not require building owners to notify the EPA or to

submit a PCB remediation plan for the EPA's review. Woodyard Rpt. at 5-7; Folino Dep. at 65- 66;

Hartman Dep. Vol. I at 41-42.

**Response:**  Admit.  However, EPA guidance instructs that a school administrator contact its EPA

Regional PCB Coordinator if it finds PCB levels in excess of EPA's guidance levels for indoor air at

schools.  ECF 268-17 at 337-338.

104.    None of the activities performed during the pilot test were required under any  state

or federal regulations.  Woodyard Rpt. at 6; Hartman Dep. Vol. I at 44-45.

**Response:**  Admit.  The US EPA and CT DEEP, however, encouraged Hartford to perform a pilot

test and provided guidance to Hartford when performing the pilot test.  In fact, the PCB

Coordinator for EPA Region 1 and a representative from CT DEEP visited and inspected Clark

school prior to the pilot study.  Excerpt of Deposition of Ross Hartman ("Hartman Dep. II"),

September 13, 2017, at pages 268-271, attached as Hartford Exhibit 53; see generally ECF 268-4 at

8-14, 69-73 and ECF 268-3 at 2-110 (communications between Hartford consultants and the PCB

Coordinator for EPA Region 1, Kimberly Tisa regarding the pilot study).

105.    Herrick, Plaintiffs' industrial hygiene expert, testified that the pilot project "was not

driven by the regulation".  Herrick Dep. at 143.

**Response:**  Admit.

106.    Ross Hartman, Plaintiffs' designated remediation expert, admitted that none of

those steps in the pilot project were required under any EPA regulation. Hartman Dep. Vol. I at 44-

45.

**Response:**  Admit.

107.    The EPA did not take any enforcement actions against Plaintiffs concerning the

Clark School. *See* Email, Kim Tisa, EPA, to Pete Folino, Eagle, "Clark ES Status Update" (Mar. 2,

2016), EE00029453, attached as Exhibit 86; Woodyard Rpt. at 9-10.

108.    Environmental contractors should understand and adopt their client's objectives as their own. Deposition of Ross A. Hartman ("Hartman Dep. Vol. II") at 42, Sept. 13, 2017, excerpts attached as Exhibit 87; Folino Dep. at 36-37. They have an ethical obligation to provide their clients with the most effective and least expensive option. Hartman Dep. Vol. I at 133-34; Folino Dep. at 36.

**Response:**  Object that this statement is a conclusory opinion and not a statement of fact permitted by Local Rule 56(a).

109.    Plaintiffs' purpose for engaging Eagle and Hartman to conduct the pilot project was to lower PCBs air levels at the school. Motley Dep. at 75, 153; Press Release, Hartford Public Schools, "Superintendent Seeks Board Approval to Address Air Quality Issues at Clark School" (Mar. 6, 2015), attached as Exhibit 88; Letter, Schiavino-Narvaez, Superintendent, to Hartford Public Schools Family (Mar. 13, 2015), attached as Exhibit 89; Eagle, "Polychlorinated Biphenyl (PCB) Investigation Summary Report John C. Clark Elementary School", at 2 (Jan. 23, 2015), EE00014720, attached as Exhibit 90; Eagle, at 2 (Jan. 29, 2015), *supra* para. 71; Eagle, at 2 (Feb. 23, 2015), EE00000424, *supra* para. 80; Eagle, "Polychlorinated Biphenyl (PCB) Investigation Summary Report John C. Clark Elementary School", at 2 (Mar. 6, 2015), HRTFDSCHL041443, attached as Exhibit 91.

**Response:**  Deny.  The pilot project's purpose was to evaluate the efficacy of remediation efforts and its effects on the indoor air quality and dust. ECF 268-2 at 10. Therefore, lowering PCBs in the air was *one aspect* of the pilot study.  Hartman Dep. at 210.

110.    Douglas Roger of CREC provided Eagle and Arcadis with a copy of the Clark Balancing Report. *See* Email, Douglas Roger to Thomas Welcome & Mason Thrall, "Re: Clark school information" (Jan. 20, 2015) (list of attachments), EE00009369, attached as Exhibit 92.

**Response:**  Admit.  Also, CREC reported that the HVAC system was balanced as part of the renovation work performed in the summer of 2014.  ECF 268-2 at 7; ECF 268-3 at 157, 227.

111.    To address PCBs in air in schools, the EPA's best management practices recommend "ensur[ing] that ventilation systems are operating properly and are regularly inspected

and maintained according to system manufacturer instructions and guidelines. Hartman Dep. Vol.

I at 170, 172; EPA, "PCBs in Building Materials – Questions and Answers" (July 28, 2015), *supra*

para. 79.

**Response:** Admit.

112. The HVAC inspection commissioned by CREC identified numerous problems that

rendered the Clark School HVAC system non-functional and those problems were never resolved.

ETB Report; Hartman Dep. Vol. I at 189, 190-91. None of the environmental consultants

recommended fixing the HVAC system prior to remediation, and Eagle did not do anything to

ensure that the HVAC system worked properly. Hartman Dep. Vol. I at 190-91; Slater Dep. at 62;

Bazzano Dep. Vol. I at 198-99; Folino Dep. at 15, 76. As a result, between September 2014 and

January 2015, significant problems with the HVAC system were left unaddressed. Bazzano Dep.

Vol. I at 54-55.

**Response:** Admit that the HVAC inspection identified problems but deny that they rendered the

Clark School HVAC system non-functional. Clark's HVAC system was operational and regularly

maintained. *See* Hartford Exhibit 55 (invoices from HVAC maintenance company).

Deny to the second sentence. Eagle investigated whether the HVAC system worked properly and

was informed the HVAC system was balanced in the summer of 2014. ECF 268-3 at 157, 227.

Deny. First, Hartford objects that this statement is vague and unclear – what are the "significant

problems"? Second, Hartford employed an HVAC maintenance company to address problems

with the HVAC system between September 2014 and January 2015. Exhibit 55 at AirTemp0001-

43.

113. Plaintiffs spent $270,986 to develop and execute the pilot study. Hartman Rpt. at

14. It would cost about $25,000 to fix the HVAC system as recommended by EPA. CCA Rpt. at

4, 48. Doubling the amount of fresh air in a room would cut the PCBs in air by half, reducing the

PCB air levels from an average of 195 ng/m$^3$ to an average of 97.5 ng/m$^3$. CCA Rpt. at 65;

Hartman Dep. Vol. I at 46-47, 195-96; Herrick Dep. at 53, 79.

**Response:** Admit to the first sentence.

Deny to the second sentence – EPA has not recommended that Hartford fix the HVAC system at Clark. Admit that Defendants' expert says that Clark's HVAC system could be repaired for $25,000. Admit to the general proposition that doubling fresh air in a room would dilute PCB concentrations. Deny to the average used by Defendants in this statement. As discussed supra in Plaintiffs' response to Statement 78, the average concentration used by Defendants (195 ng/m3) is misleading, incorrect figure.

114.     Another reason that the Clark School pilot project was poorly designed and poorly executed was that it removed multiple PCB-containing materials at the same time, rather than one at a time, which made it impossible to determine which individual PCB source contributed to PCB in air concentrations. Woodyard Rpt. at 18; Hartman Dep. Vol. I at 220; Herrick Dep. at 129.

**Response:**   Object that whether the pilot study was poorly executed – this is a qualitative statement and not a fact. Admit that multiple PCB-containing materials were removed at one time, but deny that the pilot study was poorly designed. As discussed in Plaintiffs' response to Statement 104, Hartford received guidance from the EPA and CT DEEP prior to performing the pilot project to ensure proper design. Both EPA and CT DEEP even provided comments to the pilot study design plan. ECF 268-3 at 41-66.

115.     Eagle and Hartman were absent from the Clark School work site for long periods of time, leaving the workers of the remediation contractor, AAIS, unsupervised during the pilot project tasks. *See* Foley Dep. at 97; Appendix E: Eagle Daily Logs, attached as Exhibit 93.

**Response:**   Deny. The Eagle Daily Logs do not support the contention that AAIS was unsupervised for long periods of time during the pilot project tasks. As Eagle's Pete Folino explained in his deposition, just because his name was not on a log does not mean that he was not present. Excerpt of Deposition of Pete Folino ("Folino Dep."), June 2, 2017, at pages 140-141, attached as Hartford Exhibit 68.

116.     Consequently, the specifications of the pilot project were not followed. For example, AAIS did not provide a work plan as required by the specifications. Folino Dep. at 143; Deposition of Gilbrato DeValle ("DeValle Dep.") at 86, Apr. 25, 2017, excerpts attached as Exhibit 94; J.C. Clark Elementary School: PCB Pilot Remediation Study, REV 2 at 18 (May 18, 2015)

("Specifications"), AA18-01022, excerpts attached as Exhibit 95.) John Terrill, an Eagle employee,
testified that duct cleaning was not performed under the supervision of air systems cleaning
specialist following the National Air Duct Cleaner's Association duct cleaning protocol as required
by the specifications. Deposition of John M. Terrill ("Terrill Dep.") at 23-24, Apr.  27, 2017,
excerpts attached as Exhibit 96; DeValle Dep. 146; Folino Dep. at 138-39; Specifications at 15. To
clean ducts, the National Air Duct Cleaner's Association also requires a combination of mechanical
air whips and ball whips; these were never used. NADCA, "ACR: The NADCA Standard for
Assessment, Cleaning, Restoration of HVAC Systems" at 16 & 25, (2013), attached as Exhibit 97;
Folino Dep. 143; DeValle Dep. at 151-52.

**Response:**  Admit that certain specifications of the pilot project were not followed.  Admit to the
second sentence.  Admit to the third sentence.  Deny to the fourth sentence.  NADCA does not
require the use of a combination of mechanical air and ball whips. According to Defendants'
evidence, NADCA calls for use of a "suitable agitation device," ECF 268-20 at 214, which is
defined as "A tool used to dislodge or move contaminants and debris within the HVAC system.
Examples . . . include, brushes, whips, compressed air and contact vacuum attachments," ECF 268-
20 at 223. In compliance with NADCA's requirements, AAIS used brushes and a vacuum.  Excerpt
of Deposition of Gilbrato DeValle ("DeValle Dep."), April 25, 2017, pages 158-159, attached as
Hartford Exhibit 69.

117.    DeValle, the AAIS foreman on site supervising the workers performing the pilot
project, was not involved in PCB remediation projects prior to being employed by  AAIS. DeValle
Dep. at 23, 27-28, 65-66. As an AAIS employee, 80 percent of his time was spent on asbestos
projects while the remaining 20 percent of the projects involved mold and PCBs. DeValle Dep. at
40-41. AAIS used inappropriate asbestos abatement practices at the Clark School, including the use
of leaf blowers to clean dust from hard-to-reach areas immediately before air tests, resulting in
elevated PCB in air test results. Appendix E: Eagle Daily Logs (Oct. 28, 2015), *supra* para. 115;
Hartman Dep. Vol. II at 163-64; Terrill Dep. at 9, 91, 102-04; DeValle Dep. at 131-32, 137.

**Response:**  Admit to the first and second sentences.  Admit that AAIS used leaf blowers during its
final clean to address dust in hard-to-reach areas, but there is no indication that this cleaning was

performed immediately before testing. The leaf blowers stirred up dust which was then wiped

away. DeValle Dep. at 137-138. And there is no evidence that this dust contributed to the PCB in

air test results. In fact, any stirred-up dust would not have affected the PCB air levels, because the

type of air test performed at Clark detects vapor, not dust. Excerpt of Deposition of Robert

Herrick, Sc.D. (" Herrick Dep. II"), Feb. 16, 2018, at 273-275, attached as Hartford Exhibit 70.

118.    Hartman admitted that when you have negative air exchange and containment in

PCB remediation projects, you run the negative air exchange 24/7. Hartman Dep. Vol. I at  241-

42.  During the Clark pilot project, the negative air machines were turned off at the end of the work

day. DeValle  Dep. at 105; Terrill Dep. at 27; Hartman Dep. Vol. I at 244. As a result of  the

abatement activities, dust moved outside the containment area and PCB air levels increased. Terrill

Dep. at 68-69; Appendix C: DustTrak Reports (Nov. 3-5, 9-10, 2015), excerpts attached  as Exhibit

98; Hartman Dep. Vol. I at 212-13; Email, Folino to Salafia (Dec. 15, 2015),

HRTFRDSCHL062061, *supra* para. 67.

**Response:**  Deny to the first sentence.  Hartman explained that, in instances like at Clark, where

overnight safety is a concern, you do not run the negative air exchange 24/7. Hartman Dep. II at 142-

146.  Admit to second sentence. Admit to the last sentence that PCB air levels increased following the

abatement activities; however, the elevated PCB air levels are likely not due to dust, because the type

of air test performed detects vapor, not dust. Herrick Dep. II at 273-275.

119.   Other deviations from the pilot study specifications contributed to increased   dust

levels:

   a.   Negative air filter was not changed with sufficient frequency, Folino Dep. at 144 - 45;

   b.   Debris was not appropriately bagged, Deposition of Erik J. Foley at 87, Apr. 28, 2017,
        excerpts attached as Exhibit 99;

   c.   Visible dust was present during the pilot project, Terrill Dep. at 88-89;

   d.   The Dustrak was not calibrated properly to monitor the dust, Terrill Dep. at 77- 79; and

   e.   Dust machines were turned off at night, Hartman Dep. Vol. I at 243-44.

**Response:**  The initial statement is a conclusory argument and not an appropriate statement of fact.

Hartford responds to the remaining statements as follows:

a. Deny. The filters were changed at least three times a day, and more if required. DeValle Dep. 106-110.

b. Admit that at some point debris was not appropriately bagged.

c. Admit that at some point visible dust was present. This issue was addressed during the pilot project and corrected. ECF 268-20 at 190.

d. Admit that at certain points the DUSTRAK needed to be re-calibrated to monitor dust. As noted in Terrill's deposition, the faulty readings occurred only "on occasion." ECF 268-20 at 187-189.

e. Admit.

120.    Eagle had no prior experience with drafting or participating in a PCB pilot study prior to the Clark School. Folino Dep. at 24. Eagle employees did not follow standard methods and procedures when conducting PCB sampling. Field blanks required by EPA rules and standards were not collected. Terrill Dep. at 36-37, 39-40. The standard for characterizing typical exposures is to conduct representative sampling. Woodyard Rpt. at 16; Hartman Dep. Vol. I at 47-50. But instead of a representative sampling, Eagle employees only collected samples from locations that had the highest potential PCB levels. Terrill Dep. at 52; Woodyard Rpt. at 16. Also, Eagle employees failed to analyze the air samples in a manner that would distinguish between vapor phase PCBs from particulate PCBs. Woodyard Rpt. at 16.

**Response:** Admit to first sentence. Object to the second sentence as it is conclusory and not supported with specific factual evidence. Admit that for some wipe samples during the pilot study, field blanks were not collected, but there is no evidence suggesting that such blanks were required. Admit that representative sampling supports characterizing typical exposures. To the extent the fifth sentence contends that Eagle performed wipe samples on dusty surfaces in order to investigate "worst case" scenarios, admit. Deny that these samples had the highest PCB levels – the results were non detect. Excerpt of Deposition of John Terrill ("Terrill Dep."), April 27, 2017, at pages 52-53, attached as Hartford Exhibit 71. Deny to the last sentence. Herrick Dep. II, *supra* at 117.

121.    PCB surface and air concentrations continued to "spike upward significantly" after the pilot test. Email, Sal Salafia (Dec. 15, 2015), HRTFRDSCHL06206, *supra* para. 67. As a result

of the abatement activities post pilot study, PCB air levels increased twenty-four, ranging from 1828

ng/m$^3$ to 4290 ng/m$^3$.  CCA Rpt., Appendix C Hartford PCB Data;   Hartman Dep. Vol. I at 212-

13; *see also* Bazzano Dep. at 157; Terrill Dep. at 103; Welcome Dep. at 160; Woodyard Rpt. at 4, 19,

27.

**Response:**  Admit.

122.     After hundreds of thousands of dollars spent remediating PCB-containing  building

materials without any reduction in PCB in air levels, the pilot project was considered a failure.

Bazzano Dep. at 157; Motley Dep. at 159; Deposition of Sal Salafia at 166-67, Apr. 18, 2017,

excerpts attached as Exhibit 100; Welcome Dep. at 160; Terrill Dep. at 103.

**Response:**  Deny.  The purpose of the pilot study was to investigate the efficacy of remediation

efforts. ECF 268-2 at 10.  The study demonstrated to Hartford that its students at Clark may still be

exposed to PCBs even after a costly, school-wide remediation and successfully prevented Hartford

from spending more money on extensive remediation.  ECF 268-2 at 13.

123.     Plaintiffs were aware that PCBs were a potential hazard in their schools for decades.

Slater Dep. at 128, 130.

**Response:**     Deny.   Monsanto misstates the evidence to which it cites.  In the deposition,

Monsanto's counsel read an email authored by an employee of the State Department of

Construction Services – not Hartford – that said, "The Bureau of School Facilities and school

districts and their consultants have been aware of the presence of PCBs as a potential hazard in the

school environment for decades."  Slater Dep. at 128-130.  Monsanto's counsel then asked Slater if

he had "any reason to disagree or dispute that statement." Id. Slater said he did not. Id.

124.     In 1979, the EPA issued regulations relating to PCBs in building products, such as

paints and caulks. *See e.g.* 40 CFR § 761 *et seq.*

**Response:**  Admit.

125.     In 1992, Plaintiffs contemplated the disposal of PCB-containing fluorescent light

ballasts from the Clark School. Ventana Corp., "Lighting Systems Retrofit Detailed Specifications:

Clark Elementary School, Simpson Waverly Elementary School" at 3, July 27, 1992,

COHDPW00001960, excerpts attached as Exhibit 101; Plts' Amended Resps. to Defs' First Set of

Request for Admissions, No. 150 (Jan. 29, 2016), attached as Exhibit 102.

Case 3:15-cv-01544-RNC   Document 278   Filed 07/23/18   Page 54 of 70

**Response:**  Admit that such disposal was accounted for in the Lighting Systems Retrofit document, but deny to the extent Defendants contend this document proves that PCB-containing fluorescent light ballasts existed within Clark.  Regardless, there is no indication that the light ballasts contributed to contamination at Clark. PCB-containing capacitors and ballasts will not emit PCBs if functioning properly. ECF 268-6 at 97.

126.    In 2008, Plaintiffs were notified about the discovery of PCBs at the M.D. Fox School during asbestos remediation. Bazzano Dep. at 194-99. In 2011, Plaintiffs proposed a self-implementing clean-up plan to address PCBs at the M.D. Fox School. *See* Letter, James T. Owens III, EPA, to James A. Kearney, Jr., Director of Capital Projects, "Re: PCB Cleanup and Disposal Approval under 40 CFR §§ 761.61(a) and 761.79(h), M.D. Fox School" (Aug. 24, 2011), TRC-000101, attached as Exhibit 103; TRC Mem., "PCB Testing; Facility Name M.D. Fox Elementary School, Hartford" (Apr. 11, 2011), TRC-000121, attached as Exhibit 104;  TRC, "Self-Implementing Cleanup Plan M.D. Fox School" (May 2011), TRC-0001480, attached as Exhibit 105.

**Response:**  Deny to the first sentence. Defendants' evidence does not support its statement.  The testimony to which it cites discusses a document indicating caulk at MD Fox contained asbestos. See ECF 268-11 at 136 discussing Email, Keaney to Mena, MD Fox, December 23, 2008, attached as Hartford Exhibit 64. The document does not indicate that PCBs were detected. Admit to the second sentence.

127.    On September 2009, the EPA issued a pamphlet titled, "Preventing Exposure to PCBs in Caulking Material", which informed schools that "[c]aulk containing high levels of PCBs (polychlorinated biphenyls) has been found in many schools and other buildings built or remodeled before 1978." EPA, PREVENTING EXPOSURE TO PCBS IN CAULKING MATERIAL, EPA- 747-F-09-005, Sept. 2009, attached as Exhibit 106.

**Response:**  Admit. However, Defendants provide no evidence that Hartford received or was even aware of the 2009 EPA press release.  Instead Monsanto illogically implies that, by citing the press release in its First Amended Complaint in 2015, Hartford must have had knowledge of the press release in 2009.  ECF 267 at 41

128. In 2009, the Connecticut Department of Environmental Protection ("CT DEP")[5] issued an advisory to Connecticut school superintendents recommending inspections of school buildings for the potential presence of PCBs in certain equipment and building materials. CT DEP, "Advisory – PCBs in Schools and Municipal Buildings" at 1 (Dec. 18, 2009),  CTDAS3558, attached as Exhibit 107. In September 2009, the Boston Globe published  an  article on the risk of PCBs in caulk found at older New England Schools. Beth Daley, "PCB risk feared at older N.E. schools", BOSTON GLOBE, at A11 (Sept. 6, 2009), HPSDF0125, attached as Exhibit 108.

**Response:**  Admit to the first sentence. Specifically, the advisory encouraged superintendents to inspect "timekeeping systems and other older pieces of electrical equipment. . . ."  ECF 268-21 at 112.  Admit to the second sentence.

129.    In 2009, the Connecticut State Department of Education's Bureau of School Facilities issued the Plan Review Checklist for PCBs in schools. CT SDE, "Overview: School Construction Process" at 7 & 9 (Jan. 23, 2009), attached as Exhibit 109. It notified school administrators about the potential of encountering PCBs during projects funded through the construction grant process and during demolition projects. *See id.*

**Response:**  Deny as to Defendants' characterization of the document, admit that the document located at ECF 268-21 at 119 was issued in 2009.  The document does not create a "Plan Review Checklist for PCBs in schools," rather, it includes PCBs in a list of hazardous materials for which a school must test in order to receive grant funds from the State Department of Education. See ECF 268-21 at 125.

130.    In 2011, Plaintiffs tested four schools for PCB-containing building products – Quirk Middle School, M.D. Fox School, International Baccalaureate School, and Barbour School. Plts The City of Hartford and Hartford Bd. of Ed.'s Am. Resps. To   Monsanto Company's First Set of Interrogatories, No. 4 (May 22, 2018), attached as Exhibit 110. The Hartford School Board Committee was notified about the discovery of PCBs at the International Baccalaureate School the M.D. Fox School, and received EPA approvals to manage and dispose of

---

[5] Now known as the Connecticut Department of Energy and Environmental Protection ("CT DEEP").

the PCBs. Motley Dep. at 447; RNC-2d; see Letter, James T. Owens, EPA, to James A. Kearney Jr., City of Hartford, "PCB Cleanup and Disposal Approval under 50 CFR §§ 761.61(a) and (c) and § 761.79(h) – International Baccalaureate School", EPAIBS0215, (Sept. 8, 2011), attached as Exhibit 111; Letter, James T. Owens (Aug.24, 2011), *supra* para. 126.

**Response:** Admit.

131.    Plaintiffs also implemented a PCB Abatement Plan at the Barbour School to address PCBs in caulking compounds. Letter, Chris Liberti, Eagle, to John H. Motley, Hartford School Building Committee, "Re: Pre-Renovation Hazardous Building Materials Inspection, Former Barbour School" at 13-14 (Mar. 30, 2011) (with encl.), HRTFDSCHL020430, attached as Exhibit 112; Contract Documents, "Abatement of PCB-Containing Interior/Exterior Materials: Journalism & Media Academy" (July 15, 2011), HRTFDSCHL083781, attached as Exhibit 113.

**Response:** Admit.

132.    During the Barbour PCB abatement, Eagle reported to Plaintiffs:

"PCB's have been identified by the USEPA as a concern in caulking compounds. The USEPA has identified numerous cases where PCBs have been added to caulk compounds between 1950 and 1977 to improve adhesion and flexibility."

Letter, Chris Liberti, at 3 (Mar. 30, 2011), *supra* para. 131.

**Response:** This text was in a report for the hazardous materials inspection conducted at the Former Barbour School, which was prior to and not "during the Barbour PCB abatement." Otherwise, admit.

133.    In 2014, Claudio Bazzano, Executive Director of Facilities for the Hartford Public Schools, was notified about PCBs at the Simpson-Waverly School. Bazzano Dep. at 101-05. Air and dust sampling were never conducted at the Simpson-Waverly School; the PCBs were never addressed. Id.; Woodyard Rpt. at 5. At present, the Simpson-Waverly School remains open to students. Bazzano Dep. at 105.

**Response:** Admit to the first and second sentences. Deny to the third sentence; Simpson-Waverly School is no longer open. See ECF 268-18 at 22.

134.    Plaintiffs filed this action on October 23, 2015. Compl., Doc. 1.

**Response:** Admit.

135.   Defendants' damages expert, John J. Leary, MAI, CRE, provided an appraisal that was consistent with the Uniform Standards of Professional Appraisal Practice. John J. Leary, "Real Property Appraisal Report: John C. Clark Elementary School", Oct. 30, 2017 ("Leary Rpt."), attached as Exhibit 114. Leary reviewed historical documents evaluating the deteriorating condition of the Clark School over time; he conducted an inspection of the building and its environs, aided by expert assessments of complex buildings systems including boilers, HVAC systems and the roof. Leary Rpt. at 3-4, A-17.  Leary also evaluated, among other factors, declining enrollment in the Hartford Public Schools, excess school capacity in neighborhoods served by the Clark School as reflected by the Clark School operating at 50% capacity, and the comparable sale of an adjacent school building and lot for $1.00. Leary Rpt. at A-22, A-23. Leary determined that the fair market value of the Clark School is $1.00.  Leary  Rpt. at 3, A-30

**Response:**  Admit.

136.   It is standard practice to assess the condition of the property before an appraisal because the extent of deferred maintenance significantly affects its market value. Deposition of Patrick S. Craffey ("Craffey Dep.") at 75-76, Aug. 17, 2017 & Jan. 17, 2018, excerpts attached  as Exhibit 115. A prudent, knowledgeable purchaser would want to know the condition of major building systems. Craffey Dep. at 62-63. A prudent knowledgeable purchaser would  pay no more for a property than the cost to acquire a comparable site and construct improvements of a similar utility, less building depreciation.  *See id.*; Leary Rpt. at A-25.

**Response:**  Plaintiffs object this Statement is a general conclusory statement rather than a statement of fact.  The statement misleadingly implies that Hartford's expert appraiser, Patrick Craffey, failed to follow industry standard when conducting his appraisal of Clark.  Expert Report of Patrick Craffey, July 13, 2017, attached as Exhibit 76.  As explained by Mr. Craffey in his rebuttal expert report, his appraisal report for Clark complies with industry standards.  ECF 268-11 at 192-196.

137.   Patrick Craffey, Hartford's designated damages expert and professional appraiser, did not review reports documenting the dilapidated condition of the facilities including the heating

and cooling systems, age of the roof, plumbing and electrical systems. Craffey Dep. at 75-77, 80, 83, 88, 135, 159-60. Even though Craffey admitted to having no expertise in the function or design of plumbing systems, HVAC systems, building envelopes, roofing, boiler systems or electrical systems, he did not consult any experts to assess the condition of those systems at the Clark School before coming to his value opinion. Craffey Dep. at 66-67, 83, 88, 135, 159-60. His value opinion is based on assumptions that the heating and cooling systems and electrical and plumbing systems were adequate and functional. Craffey Dep. at 256-60. His inspection of the building lasted less than an hour and did not include an inspection of the roof. Craffey Dep. at 83. Craffey valued the school at $5,800,000. Valbridge Property Advisers, Appraisal Report ("Craffey Rpt.") at 3, July 13, 2017, attached as Exhibit 116.

**Response:** Admit that Mr. Craffey did not review what Defendants have called supra the "ETB Report" from 2015 and the "Jeter Report" from 1999. Deny to the extent this statement implies that Mr. Craffey did not investigated the building's condition. Mr. Craffey performed a physical inspection of Clark. Excerpt of Deposition of Patrick Craffey ("Craffey Dep."), August 17, 2017, pages 84-88, attached as Hartford Exhibit 76. He investigated the age of the school's roof and inquired as to whether it was functioning properly. Id. During his site inspection, he also inquired as to the functionality of the building's systems, including the HVAC system and the boiler, and inspected the school's electrical system. Id. He also reviewed public records available from the City of Hartford, including various permits documenting renovations to the school, including a permit allowing for complete replacement of Clark's roof. ECF 268-11 at 194.

As to the second sentence, admit that Mr. Craffey did not consult with other experts, but deny to the extent it implies that Mr. Craffey's appraisal report was deficient as a result. As Mr. Craffey explained, while he is not an "expert" in those fields, it is part of his expertise to inspect those aspects of a building. Craffey Dep. at 66. In his Rebuttal Expert Report, Mr. Craffey explains that the scope of his inspection and review of the Clark building was consistent with industry standards. ECF 268-11 at 194.

Admit to the third, fourth, and fifth sentences.

138.   Hartman estimates that it will cost approximately $9,599,110 to fully remediate and

abate the PCBs at Clark. Hartman Rpt. at 13. This abatement is hypothetical because in December 2017, it was announced that the Clark School would be permanently closed due to under-enrollment. *See* para. 83, *infra*. The hypothetical abatement also includes costs for replacing or repairing the roof, floor tiles, ceiling, HVAC and electrical systems. Hartman Rpt., Exhibit 9.

**Response**:  Admit that Hartman estimates it will cost approximately $9,599,110 to fully remediate and abate the PCB contamination at Clark.  Deny as to the second sentence.  Clark School was not permanently closed due to under-enrollment.  Clark was initially closed because of PCB contamination, and as a result of the PCB contamination, the school was included in a list of schools to be permanently closed.  See ECF 268-18 at 24.

139.    Hartman estimates that it will cost approximately $4,289,450 to demolish and dispose of Clark School.  Hartman Rpt. at 13.

**Response:**  Admit.

1.      PCBs are known human carcinogens and are linked to a number of other non-cancer health effects. Olson Rpt. at 38; International Agency for Research on Cancer ("IARC (2016)"), "Polychlorinated and Polybrominated Biphenyls", excerpt attached as Hartford Exhibit 79. Children are susceptible to developmental disorders and, compared to adults, have much smaller fat depots for sequestering PCBs such that PCBs store at higher concentrations. Herrick Rpt. at 20.

2.      PCBs evaporate (or "volatilize") from sealant into either the air or nearby materials. ECF 268-17 at 332 (Q.8); Expert Report of Robert F. Herrick ("Herrick Rpt."), at pg 13, attached as Hartford Exhibit 46. Rebuttal Expert Report of Robert F. Herrick, at page 1, attached as Hartford Exhibit 47; ECF 268-6 at 6-7. Once PCBs volatilize, they exist in the air as vapor or adhere to other building materials and surfaces such as brick, drywall, and even indoor dust, which inevitably moves into air and circulates throughout an entire building. Id. This volatilization process begins as soon as the sealant is applied and continues for decades. ECF 268-6 at 6. PCBs can also migrate out of the contaminated building materials, contaminating the air and other building materials. Herrick Rpt. at 13; ECF 268-17 at 333-334. This process is called secondary contamination. Id. Once in an indoor environment, PCBs persist for long periods of time. Herrick Rpt. at 12-13.

3.      The threat of PCBs migrating out of sealants into indoor environments only recently gained the public's attention. See generally ECF 268-17 at 309 and ECF 268-21 at 107.

4.      PCBs can enter the human body through three pathways: inhalation, digestion, and absorption. Herrick Rpt. at 6; see TOWOLDMON0007919, attached as Hartford Exhibit 51.

5.      PCBs are manmade and do not exist naturally in the environment. Herrick Rpt. 6. PCBs have been detected in soil, sediment, air, food, animals, people, and water across the globe. Id. at 6, 8-10.

6.      PCB compounds do not readily biodegrade or otherwise break down in the natural environment. ECF 268-6 at 97; Herrick Rpt. at 6; Matson Rpt. at 5. PCBs store in fat and biomagnify, meaning those at the top of the food chain are most exposed. Herrick Rpt. at 9; Olson Rpt. at 4. PCBs can persist in the human body for decades. Olson Rpt. at 4; Excerpt of Deposition of John Schell ("Schell Dep."), pages 202-203, attached as Hartford Exhibit 95. Virtually all people have PCBs in their body. Herrick Rpt. at 10.

7.     In the 1930s, deaths following exposure to PCBs and another chemical prompted studies of the chemical's toxicity. The Problem of Possible Systemic Effects from Certain Chlorinated Hydrocarbons, September 1937, TOXSTUDIES0005-33, at 05-06, attached as Hartford Exhibit 48. Dr. Cecil Drinker of Harvard University stated that PCB "is certainly capable of doing harm in very low concentrations and is probably the most dangerous," at TOXSTUDIES 0018, and that "these experiments leave no doubt as to the possibility of systemic effects from . . . [PCBs]," at TOXSTUDIES0020. Id. Dr. Drinker ultimately recommended permissible concentrations for the air in workrooms, and Aroclor 1254 was among those designated as most dangerous. TOXSTUDIES0085-90, at 88, attached as Hartford Exhibit 49.

8.     Studies during the 1930s, 1940s, and 1950s consistently found PCBs to cause systemic adverse health effects.  Olson Rpt.  4-11.  One study found that "intermittent but fairly long continued 'mild' exposure is not innocuous." MONS 097316-17, at 17, attached as Hartford Exhibit 99. At no point, was a "safe" level of exposure to PCBs established. Olson Rpt.. at 2 (Opinion 3).  Monsanto's Medical Director said, "We know Aroclors are toxic but the actual limit has not been precisely defined." MONS 095196-97, attached as Hartford Exhibit 41.   In 1953, Monsanto's Elmer Wheeler wrote, "As I am sure you know, Aroclors cannot be considered nontoxic."  MONS 095187, attached as Hartford Exhibit 50.  According to Dr. Olson, additional studies investigating the effects of low levels of exposure to PCBs would have shown a wide range of cancer and non-cancer effects.  Olson Rpt. at 2.

9.     In 1967, Monsanto's Medical Director, R. Emmet Kelly, M.D., said there "just was no information available on the action of nanograms of Aroclor in the human body over a lifetime." MONS 096495, attached as Hartford Exhibit 17.  Dr. Kelly said "we should fight the battle of the analytical method first before we get too involved with toxicology." MONS097694, attached as Hartford Exhibit 82.

10.     Dr. Kelly lectured about concerns of chronic low level exposure to hazardous materials in October 1947. Hartford Exhibit 15 at page 9. He said that "In plastics, animal experimentation involving, in some cases, two-year feeding tests, must be made before they can be marketed."  Id. at 10. Monsanto did not conduct two year feeding tests for PCBs until decades after 1947. See ECF 268-10 at 376 (report of John Schell, listing first two year study in 1971).  In 1957, Monsanto's industrial

hygienist wrote an article for "Industrial Wastes" where he contemplated long term effects on human life after consuming low concentrations of a compound over many years. Toxicity Considerations in Pollution Control, at 17, attached as Hartford Exhibit 52. He also discussed long term animal feeding studies, and that if "the manufacturer finds that data on the material in question are not available, it would be prudent to initiate action to obtain them." Id. at 18.

11.     In 1969, Monsanto recognized that "[f]rom the standpoint of reproduction, the PCB's (sic) are highly toxic to birds," Hartford Exhibit 31 at TOWOLDMON0052202, and that "PCB's (sic) are particularly toxic to shrimp," Id. at TOWOLDMON0052227. Monsanto also noted that "From a chronic toxicity standpoint, the PCB's may be considered 'moderately toxic' to man, animals and fish." Id. at TOWOLDMON0052231. In the 1960s, it was known by Monsanto that PCBs were toxic to some species at extremely low levels. DSW164905-37, at 164929, attached as Hartford Exhibit 43

12.     Monsanto's product bulletins and advertisements explain that PCBs are very stable and are not easily broken down by light, water, or other biological processes. TOWOLDMON0047981, attached as Hartford Exhibit 30; Compilation of Aroclor Plasticizer Advertisements attached as Hartford Exhibit 92; Hartford Exhibit 6 at TOWOLDMON0033682-83. "The Ubiquitous Aroclor Genie" advertisement states the following: "Secret of the Sorcery? Utter inertness! The Aroclor chlorinated polyphenyl compounds . . . are just about the most unreactive materials ever synthesized. They stubbornly refuse to volatilize, oxidize, hydrolyze, harden, disintegrate, burn, condense, or corrode anything!" The advertisement also explains that Aroclors can inhibit a "microorganism attack." Hartford Exhibit 30.

13.     Monsanto buried PCBs in 1938. TOWOLDMON0060992-99, attached as Hartford Exhibit 26. In 1963, Monsanto noted that they remained unchanged. TRAN 008733, attached as Hartford Exhibit 27. In 1969, Monsanto tested the PCB-laden soil and found that the Aroclor had "not migrated to any significant degree." MONS 089532-33, at 089533, attached as Hartford Exhibit 28.

14.     In 1953, Monsanto analyzed Aroclor for use as an insecticide extender. Monsanto stated it "believed that Aroclor may increase the effective life of lindane, 10 to 20 times." TOWOLDMON0037820-23, at 37823, attached as Hartford Exhibit 29. In the same document,

Monsanto wrote, "The high resistance of Aroclors to water and corrosive influences, no doubt, accounts for the unusually good weather durability of the lindane-Aroclor residue as noted in the preliminary work." Id. at 37820.

15.    In 1969, Monsanto noted "The Swedes say that larger fish eating such smaller ones show a 10 increase in the amount of PCB in their tissues.  Birds then eating these fish show 100 fold concentrations of PCB from that in the fish which they have eaten."  Hartford Exhibit 31 at TOWOLDMON0052232.

16.    Monsanto sold millions of pounds of PCBs for use as a "plasticizer" in products such as sealant, paint, carbonless copy paper, and book-binding adhesive. Hartford Exhibit 43 at DSW 164924-25.  PCB plasticizers were also used in: heel lacquers for women's shoes, floor wax, icicle for Christmas Trees, adhesives for envelopes and cartons, and asphalt. LEXOLDMON005375-93, at 78, 79, 81, attached as Hartford Exhibit 91.  PCBs will inevitably migrate out of these open uses into nearby environments.  ECF 268-6 at 8.

17.    Millions of pounds of PCBs now exist in the environment. Herrick Rpt. at 7. Monsanto first learned that PCBs were detected in the natural environment in 1966. MONS 090520-22, attached as Hartford Exhibit 42. By 1969 at the latest, Monsanto knew that PCBs were detected across the United States in the environment, in people, and in animals.  Hartford Exhibit 43 at 164907-08. The company called it a "global environmental contaminant," Hartford Exhibit 83 at TOWOLDMON0047674, and a "worldwide ecological problem," Hartford Exhibit 31 at TOWOLDMON0052226.

18.    Monsanto assembled an "Ad Hoc" committee in 1969 in response to PCBs being found throughout the environment. TOWOLDMON0047671-83, at 73, attached as Hartford Exhibit 83. The first objective of this meeting was to "protect continued sales and profits of Aroclors." Id.

19.    The Ad Hoc committee reported the "growing incrimination" of PCBs "as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds."  Id. at TOWOLDMON0047674.  The committee also reported that "There are, however a number of actions which must be undertaken to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series."  Id.

20.    Monsanto's Ad Hoc Committee recognized that PCB "may be a global contaminant" based on detections in "fish, oysters, shrimp, [and] birds," and "along coastlines of industrialized areas such as Great Britain, Sweden, Rhine River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife."  MONS 030483-86, at 83, attached as Hartford Exhibit 84.

21.    The committee's report in an October 15, 1969 report stated:

1.   The committee [] concluded that the identification of PCB's as an environmental contaminant is certain.
2.   Toxicity to some biological species at extremely low levels (a few parts per billion) is significant.
3.   The PCB's are persistent once they become a part of the environment and the rate of degradation is extremely low.
4.   There is little likelihood that the PCB's appear in the environment as a result of "natural" origin.

   Hartford Exhibit 43 at DSW164929.

22.    In 1969, Monsanto listed "chemical stability" as evidence for the persistence of Aroclors in the environment. Hartford Exhibit 43 at DSW164912.

23.    PCBs inevitably vaporize and migrate out of "open" uses.  See ECF 268-6 at 8, 18-20 (Matson Rpt.). In 1969, Monsanto's PCB Ad Hoc committee noted PCBs "leaching" from open use products as a source of environmental contamination.  Hartford Exhibit 43 at DSW164925.  Monsanto also acknowledged "long-term leaching" of PCBs from sealants as a source of environmental contamination.  Hartford Exhibit 31 at TOWOLDMON0052220.  Monsanto acknowledged that PCBs escaping from open uses was a primary contributor to environmental contamination. Deposition of Papageorge ("Papageorge Dep."), Nov. 12, 1997, at 167, excerpts attached as Hartford Exhibit 86. It also noted that "In one application alone (highway paints), one million lbs/year are used. Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."  Hartford Exhibit 84 at MONS030485.

24.    By 1966, Monsanto knew that PCBs were in the environment and would store in the human body. Hartford Exhibit 42 at MONS 090521; see also MONS 098136-38 at 098136, attached as Hartford Exhibit 44, referencing LKB Press Release, January 10, 1967, MONS062162-165, attached as Hartford Exhibit 45 (citing PCBs as having "hardly any metabolism in living organisms. Can have a steady build-up in the human body and traces have been found in both adults and children.").  In November 22, 1967, Monsanto authorized an expansion of Aroclor production facilities costing

25.     Prior to discovering PCBs in the natural environment, Monsanto was aware of DDT being found throughout the natural environment, "in practically every living organism and in the air, water and soil across the face of the globe." Hartford Exhibit 31 at TOWOLDMON0052229.

26.     Monsanto was the "sole producer and supplier of polychlorinated biphenyls in the United States and Great Britain." Hartford Exhibit 31 at TOWOLDMON0052231. An internal document stated that Monsanto "is most probably responsible for the U.S. contamination . . . ." Hartford Exhibit 18 at MONS 035377.  Another letter confirmed that Monsanto was the only producer of PCBs in the Western Hemisphere. TOWOLDMON0053035, attached as Hartford Exhibit 89.

27.     Monsanto's technical bulletins provide its customers with a list of plasticizers for polysulfide sealants – some contain PCBs, some do not. ECF 268-8 at 23-33, page 25; Hartford Exhibit 2 at HARTOLDMON0029403-04. When Monsanto stopped selling PCBs, it provided its customers with a number of non-PCB alternative plasticizers for use in polysulfide sealants. TOWOLDMON0034332-34339, attached as Hartford Exhibit 32; TOWOLDMON0020462-74, attached as Hartford Exhibit 33.

28.     By 1969, Aroclor 1254 was considered as "not good enough for some [polysulfide sealant] applications" in the light construction area. DSW 593169-78, at 593176, attached as Hartford Exhibit 34.  Several of Monsanto's customers complained about Aroclor 1254 having high volatility and fogging.      TOWOLDMON0053039-53040,     attached     as     Hartford     Exhibit     35; TOWOLDMON0054094, attached as Hartford Exhibit 36; TOWOLDMON0053421-23, attached as Hartford Exhibit 37. In response, Monsanto offered non-PCB plasticizers for use in polysulfide sealants. Hartford Exhibit 37 at TOWOLDMON0053421.

29.     Monsanto considered chlorinated paraffins and Aroclors as "natural competitors," "competitive in performance and price." HARTOLDMON0005166-5198, at 5181, attached as Hartford Exhibit 38; HARTOLDMON0005150-65, at 5153, attached as Hartford Exhibit 39. Aroclors suffer from poorer volatility and vapor toxicity when compared to chlorinated paraffins. Hartford Exhibit 38 at HARTOLDMON0005172. In 1970, Monsanto noted the likely displacement of Aroclors in polysulfide sealants due to chlorinated paraffins' "price and equivalent if not slightly improved performance," and asked whether there were "any ideas on protecting this Aroclor market

without depressing Aroclor prices across the board." PARTROS19MON004? [sic] attached as Hartford Exhibit 40.  Paraffins are still allowed for use in polysulfide sealants.  Klosowski Dep. 83.

30.     PCB-plasticizers were never critical to the sealant industry; non-PCB containing sealants existed and properly functioned before and after the time of Clark's construction. Id. at Opinion II. The types of sealants that ultimately were used in the construction industry -- silicone and polyurethane -- never required PCB-plasticizers, because both types were introduced and used years before Clark's construction in 1971. Id.

31.     Had Monsanto asked, its sealant formulator customers could have traced PCB-containing sealant through the chain of sales to an ultimate end-user, to whom Monsanto could have issued a warning. Klosowski Rpt. at page 2, Opinion III.

32.     In 1969, Monsanto said that "[a]ll customers using [PCB products] have not been officially notified about known effects nor do our labels carry this information."  MONS 035372-92, at 035376, attached as Hartford Exhibit 18.  The document expressed concern about customers being "'scared off' to other competitive products." Id. Monsanto said, "The law in the field of manufacturer's liability is changing rapidly. Although the law is unsettled, the present rule is that if a manufacturer knows or should know that a product of its manufacture may cause damage if not properly used, he has a duty to give adequate warning to consumers and users." TOWOLDMON0051139-51141, at 51140, attached as Hartford Exhibit 19.

33.      In Monsanto's own words, Monsanto wanted to undertake a "reasonable action that will not unduly [sic] alarm the market but reduce the exposure in terms of liability." Hartford Exhibit 18 at MONS 035384. More directly, Monsanto admitted: "Confidentially, our Legal Department believes this will minimize and, hopefully, eliminate claims made against us for environmental pollution damage." TOWOLDMON0046386-46410 , at 46388, attached as Hartford Exhibit 20.

34.     Monsanto's February 1970 letter addresses Aroclor 1254 and 1260, but it does not address environmental risks associated with lower chlorinated PCB products. ECF 268-7 at 65.   In fact, Monsanto specifically said that Aroclors with a lower chlorine content "appear to present no potential problem to the environment."  Id. This is in sharp contrast to what the Ad Hoc concluded just a few months prior: "There is no question as to the non or low biogradability (sic) of the PCB's – particularly the higher chlorinated members of the series including Aroclors 1254 and 1260 and

probably PCBs. Hartford Exhibit 45 at DSW 161908.

35.    Monsanto stated the following:

You will note how we presented information on this customer letter to our regional managers in the U.S. They have been asked to keep the circulation of this information to a minimum. Please do likewise. . . . [The salesman] have been instructed to answer only those questions they are asked and <u>not</u> to put those answers in writing.  They have been told not to bring up the subject of the PCB letter during calls and not to volunteer information not covered in the questions/answers list. … Please follow Aroclor sales to your customers closely, however, and if they fall off, please investigate. We don't anticipate they will.  . . .

DSW 318222.55-.56, attached Hartford Exhibit 21.

36.    Regarding the February 1970 letter, Monsanto said it wanted to "minimize the effect of this letter" and wanted to "continue selling all Aroclors – therefore play down the replacement bit and try to calm the customer." DSW 318257-58 at 58, attached as Hartford Exhibit 23. Monsanto instructed its salesman that "there may be some panicky reaction to start with. Your job will be to calm it down. To do that, you have to be confident our Aroclor sales have increased every year for ten years – in boom or recession.  We want 1970 to be no different. Let's not enter a new decade with a down-turn." Hartford Exhibit 20 at TOWOLDMON0046395. As of March 31, 1970, Monsanto reported that it received "little response to [their] PCB letter." DSW 318184, attached as Hartford Exhibit 24.

37.    Monsanto sold more PCB plasticizers in 1970 (19,537,000 pounds) than in any previous year. MONS 061333-061359 at 061338, attached as Hartford Exhibit 25. In a letter listing questions and answers to salesman, Monsanto explained, "We can't afford to lose one dollar of business." MONS 100123-124 at 124, attached as Hartford Exhibit 22.  Between 1958 and 1971, Monsanto sold 144,494,000 pounds of PCBs for use as a plasticizer.  Hartford Exhibit 25 at MONS061337-38.

38.    Monsanto's Aroclor plasticizers are components of sealants that were used around windows, doors, and in wall joints during Clark's construction. Expert Report of Maureen Reitman, ECF 268-5 at 149, 150, 196; ECF 268-17 at 265, 349-350. Hartford first learned of the presence of PCBs at Clark Elementary school in October 2014 after testing paint in September 2014 that would be disturbed during a project to install a fire suppression system. PCB Detection Report attached as Hartford Exhibit 77. Caulk at Clark was found to contain PCBs at levels as high as 190,000 ppm.  ECF 268-2 at 14; ECF 268-2 at 69. PCBs have been detected in a number of other building materials contaminated by the PCBs migrating from the caulk, including ceiling tiles, air handling unit filters, spray applied fire proofing, roofing material, paint, and brick/masonry material. ECF 268-17 at 352, 355-356; ECF 268-2 at 9- 10, 14, 69. PCBs have also been detected in dust. ECF 286-17 at 356-357.  PCBs were detected

in the air at levels as high as 57.7 ng/m3. ECF 268-47 at 202. Rests of Clark's air, dust, and building materials detected Aroclor 1248 and Aroclor 1254.  See ECF 268-10 294-348 for CCA's spreadsheet of PCB detections in Clark's air, dust, and materials.

39.    Hartford has incurred $1,210,194.14 in past damages for the costs to assess PCB contamination and the costs associated with the closure of Clark. Plaintiffs' Damages Analysis, July 17, 2017, at 3-5, at Hartford Exhibit 78.  It will cost $364,864.50 to bus students to other schools for five years.  Id.

40.    The current property tax assessment of the Clark property lists its value as $8,937,530. Property Record Card, 75 Clark Street[6], attached as Hartford Exhibit 80.

41.    PCB laws have a "chemical control nature" and serve to "reduce the chance that additional PCBs will enter the environment, and limit the harm to health and the environment when entry does occur."  Polychlorinated Biphenyls Penalty Policy, US EPA, April 9, 1990, at page 2, attached as Hartford Exhibit 97.

42.    PCBs were detected in exterior sealant at Clark, ECF 268-5 at 186-187; ECF 268-10 at 79, which may result in environmental contamination. Herrick Rpt. at 13. Because PCBs cycle through indoor environments as vapor and bind to dust and, PCBs inside a building may migrate out of the building. See Herrick Rpt. at 13. Unless Hartford undertakes proper remediation and disposal measures, PCBs in Clark will disperse into the environment upon demolition. Herrick Rpt. at 6, 21.

43.    Using the sales comparison approach Plaintiff's expert appraiser Patrick Craffey estimated Clark's value at about $60 per square foot, or $5,800,000 total. ECF 268-23 at 35.  Craffey developed an indication of market value by analyzing closed sales, listings, or pending sales of properties similar to the subject property; Mr. Craffey analyzed six comparable properties which were purchased for continued school use.  Id. at 68.

44.    PCBs were detected in a room one month after application of the PCB-containing paint, signifying that the PCBs migrated from the paint and persisted in the room.  ECF 268-11 at 73. According to Jerome Klosowski, Plaintiffs' sealant formulator expert, a reasonable sealant formulator with knowledge of these studies would not have made PCB-containing sealants for indoor use.  Klosowski Rpt. at Opinion I.D.

---

[6] http://assessor1.hartford.gov/default.asp (last accessed July 21, 2018)

Respectfully submitted,

_/s/  Brett Land_

Scott Summy (*Pro Hac Vice*)
Celeste A. Evangelisti (*Pro Hac Vice*)
Carla Burke Pickrel (*Pro Hac Vice*)
Brett Land (*Pro Hac Vice*)
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
Tel:  (214) 521-3605
Fax:  (214) 520-1181
ssummy@baronbudd.com
cevangelisti@baronbudd.com
cburkepickrel@baronbudd.com
bland@baronbudd.com

Howard G. Rifkin
**CORPORATION COUNSEL**
**CITY OF HARTFORD**
550 Main Street, Suite 210
Hartford, CT  06103
Tel:  (860) 757-9700
Fax:  (860) 722-8114
Howard.Rifkin@Hartford.gov

<u>CERTIFICATE OF ELECTRONIC FILING</u>

       I hereby certify that on July 23, 2018, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                       /s/  Brett Land
                                  Brett Land (*Pro Hac Vice*)
                                  **BARON & BUDD, P.C.**
                                  3102 Oak Lawn Avenue, Suite 1100
                                  Dallas, TX  75219
                                  Tel:  (214) 521-3605
                                  Fax:  (214) 520-1181
                                  bland@baronbudd.com