# UNITED STATES DISTRICT COURT
## for the
## District of Connecticut

CITY OF HARTFORD and HARTFORD
BOARD OF EDUCATION,

   *Plaintiffs*

v.

MONSANTO COMPANY, SOLUTIA INC.,
and PHARMACIA CORPORATION,

   *Defendants*

:
:
:
:
:
: Case No.  3: 15-CV-01544(RNC)
:
:
:
:
:
:

---

## REPLY IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

---

**WHITE AND WILLIAMS LLP**
Thomas M. Goutman (*pro hac vice*)
Richard L. Campbell (*pro hac vice*)
Kim Kocher (*pro hac vice*)
1650 Market Street, Suite 1800
Philadelphia, PA 19103
*Attorneys for Defendants
Monsanto Company; Solutia Inc.;
and Pharmacia LLC*

**DAY PITNEY LLP**
Paul D. Williams (ct05244)
Elizabeth C. Barton (ct07660)
Michael L. Miller (ct29137)
Elizabeth P. Retersdorf (ct29178)
242 Trumbull Street
Hartford, CT 06103
*Attorneys for Defendants
Monsanto Company; Solutia Inc.;
and Pharmacia LLC*

**CAPES, SOKOL, GOODMAN
& SARACHAN, P.C.**
Adam E. Miller, Esquire
7701 Forsyth Blvd., 12th Fl.
St. Louis, MO 63105
*Attorneys for Defendants
Monsanto Company; Solutia
Inc.; and Pharmacia LLC*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Authorities ...................................................................................................ii

INTRODUCTION ........................................................................................................1

I.  Plaintiffs Failed, as a Matter of Law, to Establish a Design Defect Claim .......................3

    A.  Plaintiffs Failed to Establish an Alternative Design Claim ...................................3

    B.  Plaintiffs Failed to Establish a Manifestly Unreasonable Design Claim................7

    C.  Plaintiffs Failed to Establish a Consumer Expectations Claim .............................8

II.  Plaintiffs Failed, as a Matter of Law, to Establish a Failure to Warn Claim .....................9

    A.  No Duty to Warn of the Alleged Harm Existed in 1970.........................................9

    B.  Defendants Discharged any Duty to Warn by Warning Their Customers...............9

    C.  Plaintiffs Failed to Establish Causation ...............................................................11

III.  Plaintiffs Failed, as a Matter of Law, to Establish a Negligence Claim ..........................12

    A.  Plaintiffs Failed to Establish a Post-Sale Warning Claim ...................................12

    B.  Plaintiffs' Failure to Test Claim Is Not Cognizable .............................................13

IV.  Plaintiffs Failed, as a Matter of Law, to Establish a Compensable Injury........................14

V.  Plaintiffs' Damage Claims Should be Dismissed in Their Entirety and, in  the Alternative, Capped at the Fair Market Value of the Clark School.......................................................19

VI.  Plaintiffs' Claims Are Time-Barred as a Matter of Law ..................................................19

    A.  Plaintiffs Are Not Immune from the Statute of Limitations..................................19

    B.  Plaintiffs Knew or Should Have Discovered the Alleged Harm Before 2012 ......20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*America Unites for Kids v. Lyon*,
    2016 U.S. Dist. Lexis 118447 (C.D. Cal. Sept. 1, 2016) ......................................................15

*Argueta v. Overhead Door Corp.*,
    2000 WL 1207261 (Conn. Super. Ct. July 28, 2000) ...........................................................12

*Bagley v. Adel Wiggins Grp.*,
    327 Conn. 89 (2017) ...............................................................................6, 7, 9, 13, 18

*Barrett v. Danbury Hospital*,
    232 Conn. 242 (1995) .............................................................................................14

*Bd. of Ed. v. Dow Chem. Co.*,
    40 Conn. Supp. 141 (1984) ......................................................................................19

*BellSouth Telecomms. v. W.R. Grace & Co.*,
    77 F.3d 603 (2d Cir. 1996)....................................................................................16, 17

*Berk v. St. Vincent's Hosp. and Med. Center*,
    380 F. Supp. 2d 334 (S.D.N.Y. 2005)...........................................................................2

*Bifolck v. Philip Morris, Inc.*,
    324 Conn. 402 (2016) .......................................................................................5, 7, 12, 13

*Bowerman v. United Illuminating*,
    1998 Conn. Super. LEXIS 3575 (1998) (unpub'd)..............................................................17

*Calabrese v. McHugh*,
    170 F. Supp. 2d 243 (D. Conn. 2001)..........................................................................16

*City of Philadelphia v. Lead Indus. Ass'n*,
    1992 U.S. Dist. LEXIS 5849 (E.D. Pa. Apr. 23, 1992) .........................................................4

*Cofield v. Lead Indus. Ass'n, Inc.*,
    2000 U.S. Dist. LEXIS 23405 (D. Md. Aug. 17, 2000) ........................................................4

*Considine v. Waterbury*,
    279 Conn. 830 (2006) .............................................................................................19

*Courture v. Bd of Educ. of Town of Plainfield*,
    6 Conn. App. 309 (1986) .........................................................................................19

*Davidson v. Ga. Pac. LLC*,
    2014 U.S. Dist. LEXIS 95559 (W.D. La. July 11, 2014) ......................................................17

*Falk v. Keen Corp.*,
   782 P.2d 974 (Wash. 1989)...............................................................................5

*Fed. Trade Comm'n v. Wellness Support Network, Inc.*,
   2013 WL 5513332 (N.D. Cal. Oct. 4, 2013)...................................................18

*Ferrari v. Johnson & Johnson, Inc.*,
   2017 WL 6884118 (Conn. Super. Ct. Nov. 28, 2017)......................................8

*Frederick v. Deco Salon Furniture, Inc.*,
   2018 WL 2750319 (D. Conn. Mar. 27, 2018) ..................................................8

*Gajewski v. Pavelo*,
   36 Conn. App. 601 (1994) .........................................................................10, 11

*Glastetter v. Novartis Pharm. Corp.*,
   252 F.3d 986 (8th Cir. 2001) .........................................................................18

*Goodall v. United Illuminating*,
   1998 Conn. Super. LEXIS 3584 (1998)..........................................................14

*Hollander v. Sandoz Pharm. Corp.*,
   289 F.3d 1193 (10th Cir. 2002) .....................................................................18

*Hollander v. Sandoz Pharm. Corp.*,
   95 F. Supp. 2d 1230 (W.D. Okla. 2000), *aff'd in part and remanded,* 289 F.3d
   1193 (10th Cir. 2002).....................................................................................18

*Hubbard Hall, Inc. v. Monsanto*,
   98 F. Supp. 3d 480 (D. Conn. 2015) ..............................................................16

*Izzarelli v. R.J. Reynolds Tobacco Co.*,
   321 Conn. 172 (2016) ............................................................................4, 8, 13

*Jarmie v. Troncale*,
   306 Conn. 578 (2012) .....................................................................................13

*Leslie v. Hartford Bd. of Educ.*,
   2016 WL 301376 (Conn. Super. Ct. Jan 5, 2016)...........................................20

*Lindstrom v. A-C Prod. Liab. Tr.*,
   424 F.3d 488 (6th Cir. 2005) .........................................................................17

*Madden v. Abate*,
   800 F. Supp. 2d 604 (D. Vt. 2011)..................................................................13

*Mailman's Steam Carpet Cleaning Corp. v. Lizotte*,
   415 Mass. 865 (1993) .....................................................................................19

*Major League Baseball Properties, Inc. v. Salvino*,
   542 F.3d 290 (2d Cir. 2008)........................................................................17

*Maraj v. Massachusetts*,
   953 F. Supp. 2d 325 (D. Mass. 2013) .........................................................13

*Marmo v. Tyson Fresh Meats, Inc.*,
   457 F.3d 748 (8th Cir. 2006) ......................................................................13

*Matter of N.Y.C. Asbestos Litig.*,
   2015 NY Slip Op 25125, 48 Misc. 3d 460, 11 N.Y.S.3d 416 (N.Y. Sup. Ct.
   1995) ...........................................................................................................17

*McClain v. Metabolife Int'l, Inc.*,
   401 F.3d 1233 (11th Cir. 2005) ..................................................................18

*McIndoe v. Huntington Ingalls Inc.*,
   817 F.3d 1170 (9th Cir. 2016) ....................................................................17

*Palmer v. Sena*,
   474 F. Supp. 2d 347 (D. Conn. 2007)...........................................................2

*Pitterman v. GM LLC*,
   2016 U.S. Dist. Lexis 57165 (D. Conn. April 29, 2016) .....................5, 6, 7

*Potter v. Chicago Pneumatic Tool Co.*,
   241 Conn. 199 (1997) ..........................................................................5, 6, 7, 9

*Rider v. Sandoz Pharm. Corp.*,
   295 F.3d 1194 (11th Cir. 2002) ..................................................................18

*Rost v. Ford Motor Co.*,
   151 A.3d 1032 (Pa. 2016).............................................................................17

*Ruiz-Guzman v. Amvac Chemical Corp.*,
   7 P.3d 795 (Wash. 2000)..........................................................................4, 5

*Russell v. McKenna*,
   1998 WL 96314 (Conn. Super. Ct. Feb. 26, 1998) ....................................19

*Savage v. Scripto-Tokai Corp.*,
   266 F. Supp. 2d 344 (D. Conn. 2003)..........................................................12

*Schwartz v. Honeywell Int'l, Inc.*,
   2018-Ohio-474 .............................................................................................17

*Sharpe v. Wyatt, Inc.*,
   31 Conn. App. 824 (1993) ............................................................................10

*State v. Lombardo Bros. Mason Contractors*,
  307 Conn. 412 (2012) ...........................................................................................19

*Town of Lexington v. Pharmacia Corp.*,
  133 F. Supp. 3d 258 (D. Mass. 2015) ...................................................................4

*Transwestern Pipeline Co. v. Monsanto*,
  46 Cal. App. 4th 502 (1996) ...................................................................15, 16, 17

*Wagner v. Clark Equip. Co.*,
  243 Conn. 168 (1997) ...........................................................................................18

*West Haven Sch. Dist. v. Owens-Corning Fiberglas Corp.*,
  721 F. Supp. 1547 (D. Conn. 1988) ......................................................................19

*Westport v. Monsanto*,
  2017 U.S. Dist. Lexis 53815 (D. Mass. Apr. 7, 2017), *aff'd*, 877 F.3d 58 (1st
  Cir. 2017) ....................................................................................1, 1, 3, 4, 14

*Wm. R. Peterson Oil Co. v. Chadwick*,
  1994 Conn. Super. Lexis 1449 (June 7, 1994) (unpub'd)......................................19

**OTHER AUTHORITIES**

Guidelines for Carcingen Risk Asssement, 51 Fed. Reg. 33992 .................................18

David Eaton, *Scientific Judgment and Toxic Torts – A Primer in Toxicology for
  Judges and Lawyers,* J.L. & Pol'y 5 (2003) ........................................................18

## INTRODUCTION

Plaintiffs acknowledge that this case is factually indistinguishable from *Westport v. Monsanto*, 2017 U.S. Dist. Lexis 53815 (D. Mass. Apr. 7, 2017), *aff'd*, 877 F.3d 58 (1st Cir. 2017). As in *Westport*, Plaintiffs' experts admit that there are no scientific studies that purport to demonstrate that PCBs volatilize from caulk at levels capable of causing human disease or that PCB levels in the school were unsafe; PCBs had great utility as plasticizers; and no removal of PCB-containing material, or any of the remediation activity, was required by any regulatory authority. Even more compelling than in *Westport*, Plaintiffs' experts' admit in this case that: All federal, state, and local health authorities certified the Clark School as safe with respect to PCBs; the EPA and Connecticut DEEP did not require, or even recommend, the closure of the school due to the presence of PCBs; and Pharmacia's customers, plasticizer formulators, knew of the very properties of PCBs about which Plaintiffs claim Defendants failed to warn, *i.e.*, PCBs could be systemically toxic, volatilize from their formulations, and persist in the environment.

To attempt to save this case, Plaintiffs point to distinctions without a difference between Connecticut and Massachusetts law. Plaintiffs contend that no proof of alternative design is required when the Connecticut Supreme Court has identified the alternative design theory as one of three design defect theories and the theory that governs most cases. Plaintiffs contend that foreseeability is not an element of their burden of proof but fail to acknowledge that Connecticut law requires the plaintiff to establish the likelihood and severity of the risk measured by the state of knowledge at the time of design. Plaintiffs also contend that the bulk supplier doctrine is not an affirmative defense when the Connecticut Products Liability Act ("CPLA") factors the sophisticated user doctrine into the plaintiff's burden of proof. Plaintiffs otherwise invite this Court to abandon Connecticut law in favor of contradictory Washington state law and distinguishable California law, and to create three new definitions of compensable injury not recognized in Connecticut.

Plaintiffs argue positions based on their experts' reports when their experts admitted the exact opposite at their depositions.[1]   In particular, Plaintiffs' caulk expert, Jerome Klosowski, admitted that Pharmacia warned its customers, plasticizer formulators, of the properties of PCBs about which Plaintiffs claim Defendants failed to warn.   (SOF¶¶25,30,44,45).   Plaintiffs' toxicology expert, James Olson, also admitted that he never did a risk assessment of the Clark School and could not render an opinion as to risk.   (RAMF¶1).   Plaintiffs simply ignore their experts' fatal admissions that no scientific studies purport to demonstrate that PCBs volatilize from caulk at levels capable of causing human disease or that the levels found in the Clark School cause human disease.   (SOF¶¶46-51,77).

Plaintiffs failed to establish an alternative design defect claim because Plaintiffs do not propose an alternative design to PCB plasticizers, but impermissibly challenge PCBs as PCBs. Plaintiffs failed to establish a manifestly unreasonable design defect theory, which permits recovery in the rare case where the risk of harm greatly outweighs the utility of the product, because Plaintiffs' experts admit that PCBs used in caulk had great utility and, as for risk, admit that no scientific studies establish that PCBs volatilize from caulk at levels capable of causing human disease or that the PCB levels found in the Clark School were capable of causing human disease.   Plaintiffs failed to establish the applicability of the consumer expectations theory because alleged property damage from the migration of PCBs from caulk is not a *res ipsa*-type claim and requires expert testimony.   Plaintiffs failed to establish a failure-to-warn claim because, if any duty to warn arose, Plaintiffs' experts admit that Pharmacia warned its customers about the properties which Plaintiffs claim Pharmacia failed to warn, e.g., persistence, toxicity, and volatilization.   Plaintiffs failed to establish any negligence-based claim due to the lack of

---

[1]Plaintiffs improperly cite their expert reports, avoiding all reference to their experts' depositions, which contradict the conclusory opinions set forth in their experts' reports.  *See Palmer v. Sena*, 474 F. Supp. 2d 347, 351 (D. Conn. 2007) ("unsworn expert report is an insufficient basis for opposing a summary judgment motion."); *see also Berk v. St. Vincent's Hosp. and Med. Center*, 380 F. Supp. 2d 334, 352-353 (S.D.N.Y. 2005).

foreseeability in 1971, or even today, that PCBs volatilize from caulk at levels capable of causing human disease. Plaintiffs also failed to establish their new theory of a post-sale failure-to-warn architects and contractors in the absence of evidence that architects and contractors were identifiable to Pharmacia at any time post-sale or in a better position than formulators to take precautions or provide warnings to end users like Plaintiffs.

Plaintiffs also rely on non-actionable definitions of compensable injury. As both the District Court and First Circuit recognized in *Westport* under equivalent Massachusetts law, the products liability plaintiff cannot recover for alleged property damage caused by an imperceptible substance absent proof that the substance renders the building unsafe. Plaintiffs do not dispute that there is no proof that PCBs volatilize at levels in the Clark School capable of causing human disease. Instead, Plaintiffs' entire case is built on the unsound foundation that admittedly voluntary remediation of PCBs constitutes property damage. To that end, Plaintiffs propose three novel theories of property damage that do not establish compensable injury as a matter of law: (1) removal of building materials containing greater than 1 ppm or 50 ppm of PCBs, undisputedly not required by any regulation; (2) prevention of speculative future environmental contamination, unsubstantiated by any expert testimony; (3) increased risk of "cumulative" indoor exposure, contradicted by Plaintiffs' own admissions that the PCB levels in the building were not unsafe.

Plaintiffs also are not immune from the statute of limitations and their claims should be dismissed for untimeliness.

## I.   PLAINTIFFS FAILED, AS A MATTER OF LAW, TO ESTABLISH A DESIGN DEFECT CLAIM[2]

### A.   Plaintiffs Failed to Establish an Alternative Design Claim

#### 1.   *No Alternative Design Existed for PCBs*

---

[2] Plaintiffs' burden of proving product defect is inextricably linked to proof of compensable harm. As discussed below, Plaintiffs' novel theories of property damage do not constitute compensable injuries under Connecticut law.

Plaintiffs concede that Connecticut, like Massachusetts, does not permit categorical product liability under an alternative design theory. *See Izzarelli v. R.J. Reynolds Tobacco Co.*, 321 Conn. 172, 204-06 (2016). Plaintiffs admit that Defendants' product at issue, PCB plasticizer, consists of pure PCBs. (Doc. 277 at 1 n.2). Like the *Westport* plaintiffs, Plaintiffs do not point to any design aspect of PCBs, other than the PCBs themselves, as defective. Instead, Plaintiffs proffer non-PCB plasticizers as alternatives. In other words, Plaintiffs contend that caulk manufacturers should have used a different product as a plasticizer in polysulfide caulk or made a different caulk product than polysulfide caulk. Because Plaintiffs do not propose an alternative design to PCB plasticizer, but an entirely different replacement product, they failed to establish an alternative design claim under Connecticut law.

Plaintiffs' challenge to the use of PCBs as plasticizers, (Doc. 277 at 20 n.16), does not change the fact that Plaintiffs proffer a completely different replacement product for plasticizer in caulk.[3] *See, e.g.*, *Westport*, 2017 U.S. Dist. Lexis 53815, at *18-*21; *Town of Lexington v. Pharmacia Corp.*, 133 F. Supp. 3d 258, 271-72 (D. Mass. 2015); *see also Cofield v. Lead Indus. Ass'n, Inc.*, 2000 U.S. Dist. LEXIS 23405, *11-12 (D. Md. Aug. 17, 2000) (collecting cases finding "there can be no design defect in lead pigment, as lead is intrinsic to its nature" and "lead pigment is 'essentially a processed lump of lead'").[4]

Plaintiffs urge this Court to overturn *Izzarelli*, which explicitly rejects categorical product liability, *Izzarelli*, 321 Conn. at 204-06, and adopt Washington state law, which sanctions proof of a design defect with an alternative product, *Ruiz-Guzman v. Amvac Chemical Corp.*, 7 P.3d

---

[3]In unappealed decisions, the District Courts in both *Westport* and *Lexington* rejected the identical argument under the equivalent Massachusetts alternative design theory. *See Westport*, 2017 U.S. Dist. Lexis 53815, at *18-*21 ("While Westport attempts to meet their alternative design burden by claiming that the defective feature product at issue (PCBs) is not the product but rather an application of the product (plasticizers), such an argument does not undermine the legal reasoning that this Court applied to a similar claim against the same defendants in Lexington.") (citing *City of Philadelphia v. Lead Indus. Ass'n*, 1992 U.S. Dist. LEXIS 5849, at *3 (E.D. Pa. 1992)).
[4]Unlike the cigarettes at issue in *Izzarelli*, which were manipulated by the manufacturer to contain varying levels of nicotine, tar, flavorants, additives, and tobacco blends, *Izzarelli*, 321 Conn. at 207, PCB plasticizers are pure PCBs. No component of PCBs can be changed without changing the product.

795 (Wash. 2000).  Plaintiffs fail to recognize that the Washington Supreme Court based its decision in *Ruiz-Guzman* on specific language set forth in the Washington Products Liability Act, RCW 7.72.030, that is not found in the CPLA.[5]

### 2.    No Defect Existed at Time of Sale

Defendants do not, as Plaintiffs mistakenly contend, seek to impose on Plaintiffs the burden of proving foreseeability of harm to establish an alternative design claim, but do seek to hold Plaintiffs to their burden of proving that the absence of an alternative design rendered PCBs unreasonably dangerous.  *Bifolck v. Philip Morris, Inc.*, 324 Conn. 402, 434-35 (2016).

To establish unreasonable dangerousness, the plaintiff is required to prove that the product was dangerous for its intended use at the time of sale, *Potter v. Chicago Pneumatic Tool Co.*, 241 Conn. 199, 223 (1997), and, to establish unreasonable dangerousness at the time of sale, the plaintiff must show the likelihood and severity of the risk as measured by "evidence concerning injuries or knowledge of the danger of the product in that time," *Pitterman v. GM LLC*, 2016 U.S. Dist. Lexis 57165, *18 (D. Conn. April 29, 2016).  In *Potter*, the Supreme Court of Connecticut expressly recognized that the state of the art – the level of relevant scientific, technological, and safety knowledge – that exists at the time of design provides an "objective standard" by which to measure whether a product is defective and unreasonably dangerous. *Potter*, 241 Conn. at 250, 252 (finding reversible error for trial court's refusal to admit state-of-the-art evidence in design defect case).  The Supreme Court recognizes that "state-of-the-art evidence may be dispositive on the facts of a particular case . . . ." *Id*. at 253.

Plaintiffs incongruously claim that proof that PCBs volatilize from caulk at dangerous levels constitutes a "false" burden; yet, Plaintiffs themselves couch their property damage claim in terms of the alleged danger to human health caused by the presence of PCBs in the Clark

---

[5]Plaintiffs otherwise cite *Falk v. Keen Corp.*, 782 P.2d 974, 979 (Wash. 1989), which merely held that the Washington Products Liability Act embodies a strict liability standard.

School.[6]  As dictated by Plaintiffs' own claims, therefore, Plaintiffs bear the burden of proving the likelihood and magnitude of the harm – volatilization of PCBs from caulk at harmful levels – that makes the product unreasonably dangerous for its intended use.

Plaintiffs simply ignore the fact that their experts concede that there are no scientific studies even today that purport to demonstrate that PCBs volatilizing from caulk cause human disease.  (SOF¶¶47,77; RSOF¶46).  Based on Plaintiffs' own expert admissions, Plaintiffs failed to establish that PCBs rendered the Clark School unsafe, *Potter*, 241 Conn. at 223 (defining defective product as one that is unreasonably dangerous for its "intended use"); *Bagley v. Adel Wiggins Grp.*, 327 Conn. 89, 103-04  (2017) ("the plaintiff's case lacked essential expert testimony to prove a vital fact in support of her negligence and strict liability claims, that respirable asbestos ***fibers in a quantity sufficient to cause mesothelioma*** were released from [the product] FM-37 when it was used in the manner that it was in the . . . blade shop during the decedent's tenure there.") (emphasis added), based on evidence in existence at the time of sale, *Pitterman,* 2016 U.S. Dist. Lexis 57165 at *18, as required by Connecticut law.

### 3.    *No Safe Alternative Existed in 1970*

Even if Connecticut law permitted Plaintiffs to establish an alternative design with a completely different product, Plaintiffs proffer an alternative product – chlorinated paraffin – which their own caulk expert, Klosowski, admitted had significant functional and toxicology problems.[7]

---

[6](Doc. 277 at 11) ("exposure that creates a risk to human health"); (Doc. 277 at 12) ("PCBs have been detected . . . at hazardous levels"); (Doc. 277 at 12)  ("PCBs in the air and on surfaces in Clark Elementary School pose a health hazard to building occupants"); (Doc. 277 at 14 n.12) ("PCBs at Clark creates an increased risk of disease,"); and (Doc. 277 at 15)  ("the presence of PCBs creates an increased risk to the health of those inside the building").

[7]*See, e.g*, (RAMF¶27)(paraffins have not been successfully incorporated as plasticizer in polysulfide sealant formulations because of incompatibility with cured polysulfide caulk); (RAMF¶27)(paraffins are more prone to bleeding (fluid migration within the sealant product), which affects both the sealant and substrate); (RAMF¶27)(there is clear evidence of carcinogenicity in chlorinated paraffins).  Klosowski otherwise identified entirely different products to polysulfide caulk, polyurethane and silicone caulks, which pertain to the design of the caulk, not an alternative plasticizer design.  Klosowski also admitted that technical problems with polyurethane caulk were not resolved until the 1970s – after the construction of the Clark School – and polyurethane sealants were not commercialized until a decade later in the 1980s.  (RAMF¶30).  Klosowski similarly admitted that one-

**B.      Plaintiffs Failed to Establish a Manifestly Unreasonable Design Claim**

The manifestly unreasonable design defect theory applies only in the rare case where the product's risks clearly outweigh its utility.  *Bifolck*, 324 Conn. at 432.  Plaintiffs admit that no Connecticut court has applied the manifestly unreasonable design theory to any product. Plaintiffs failed to establish that this is the rare type of case to which the manifestly unreasonable design theory would apply.

Plaintiffs admit that the reasonableness of the design is measured from the formulator's perspective.  (Doc. 277 at 21).  Under Connecticut law, the likelihood and severity of the risk must be measured by the formulator's knowledge of the danger of the product, *Potter,* 241 Conn. at 252; based on evidence in existence at the time of sale, *Pitterman,* 2016 U.S. Dist. Lexis 57165 at *18*;* and, not in the abstract, but in the setting in which it is intended to be used, *Potter*, 241 Conn. at 223; *Bagley*, 327 Conn. at 103-04, which, in this case, is PCBs used as a plasticizer in caulk.

Plaintiffs collapse their manifestly unreasonable design claim into a failure-to-warn claim, which, as discussed below, is not viable.  Apart from the adequacy of Pharmacia's warnings, Plaintiffs failed, as a matter of law, to establish that the alleged risk of harm clearly outweighed the utility of PCBs, as required to state a claim under the manifestly unreasonable design theory.

Citing only Klosowski's report, Plaintiffs ignore their experts' admissions that establish the great utility of PCBs and Plaintiffs' inability to prove risk of harm.  Plaintiffs' caulk expert, Klosowski, and chemical waste engineer, Jack V. Matson, PE, conceded that PCBs had many positive characteristics that made them well-suited as plasticizers for building products such as caulk, including low volatility, durability, flame-resistance, low solubility, and resistance to

---

component silicone sealants were not introduced until the early 1970s, after the Clark School was constructed, and had numerous functional problems, including corrosiveness, an inability to adhere to masonry, and a pungent odor that prevented its use in many markets.  (RAMF¶27).

chemical and bacterial degradation. (SOF¶¶12,17; RSOF¶15). And, Plaintiffs' toxicology expert, James R. Olson, Ph.D., and industrial hygiene expert, Robert F. Herrick, Ph.D., admitted that there exist no scientific studies that purport to demonstrate that PCBs volatilizing from building products cause human disease. (SOF¶¶46-51).

### C.    Plaintiffs Failed to Establish a Consumer Expectations Claim

Plaintiffs fail to address Connecticut law that the consumer expectation theory is not available in cases involving scientific issues that are beyond the ken of a lay juror.[8]  Plaintiffs' claims involve complex issues of chemistry, polymer science, toxicology, and epidemiology and, therefore, this is not a *res ipsa*-type case.[9]

Plaintiffs' own experts identify factors affecting the volatilization of PCBs to other building materials that would require expert testimony, including formulation characteristics (i.e. plasticizer migration, vapor pressure of components, cure characteristics, etc.), application characteristics (surface area, thickness, painted layers, etc.), and external factors (i.e. temperature, air circulation, humidity, etc.) (SOF¶¶21,22).  Plaintiffs additionally do not even suggest that they can establish their claimed harm from the migration of PCBs to other buildings materials without expert testimony.

This plainly is not a *res ipsa*-type case where the inference of a defect can be drawn from the mere occurrence of an alleged product-related injury.   No lay juror would have any

---

[8](Doc. 276 at 15-16) (citing cases); *see also Frederick v. Deco Salon Furniture, Inc*., 2018 WL 2750319, *7 (D. Conn. Mar. 27, 2018) ("the salon chair at issue in this matter does not represent the rare res ipsa case that would utilize the minimum consumer expectation test because it is not dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics) (internal quotation marks omitted); *Ferrari v. Johnson & Johnson, Inc*., 2017 WL 6884118, *3 (Conn. Super. Ct. Nov. 28, 2017)(in a case involving spinal surgery, spinal anatomy, and spinal implant that includes rods, screws, and other components, finding the product's complexity and use dictate application of the default risk-utility test).

[9]Plaintiffs erroneously contend that this case is like the hypothetical cause of action, posited by the Court in a footnote in *Izzarelli*, involving cigarettes before federally-mandated cigarette warnings.  (Doc. 277 at 23). In *Izzarelli*, the Court simply noted that a cause of action would not necessarily be *defeated* if there were no evidence of consumer knowledge of the danger at the time of sale.  *Izzarelli*, 321 Conn. at 203 n.16.  Under *Izzarelli*, the plaintiff must still affirmatively establish that "'the everyday experience of the product's users permits a conclusion that the product's design violated minimum safety assumptions . . . .'"  *Id*. at 202-03 (citations omitted).

expectation as to the chemical properties of a component part in caulk used in the construction of a school.  Indeed, no inference that Plaintiffs even sustained their claimed harm could be drawn by a lay jury without expert testimony.  The consumer expectation theory is not available where there is a failure of proof of expert testimony, but where expert testimony is required.  Plaintiffs' consumer expectations theory would, in effect, require a lay jury to contradict their own experts' conclusions that no scientific evidence establishes that PCBs made the building unsafe.

## II.   PLAINTIFFS FAILED, AS A MATTER OF LAW, TO ESTABLISH A FAILURE TO WARN CLAIM

### A.   No Duty to Warn of the Alleged Harm Existed in 1970

Plaintiffs admit that the CPLA requires proof that Pharmacia could have reasonably anticipated the risk of harm in 1970, but misleadingly contend that Plaintiffs need only prove knowledge of the "general" nature of the harm.  Instead, Connecticut law requires proof of harm when the product is used as intended, here, PCBs as a plasticizer in caulk.  *See Potter*, 241 Conn. at 223; *Bagley*, 327 Conn. at 103-04.  Because it is impossible to warn of an unknown risk, the Supreme Court of Connecticut recognizes that a manufacturer cannot be held to a duty-to-warn standard that exceeds the limits of scientific knowledge at the time of manufacture.  *Potter,* 241 Conn. at 244-45.  Plaintiff must, therefore, establish that Pharmacia could have reasonably anticipated in 1970 that PCBs would volatilize at levels capable of causing human disease, which Plaintiffs cannot do when their own experts admit that, even today, there exist no scientific studies purporting to demonstrate that PCBs are capable of volatizing from caulk at levels that cause human disease.

### B.   Defendants Discharged any Duty to Warn by Warning Their Customers

Assuming a duty to warn existed in 1970, the admissions of Plaintiffs' own caulk expert, Klosowski, establish that Pharmacia warned its customers about the very properties of PCBs

which Plaintiffs claim Pharmacia failed to warn, (Doc. 267 at 17-20).[10]   Citing Klosowski's report, Plaintiffs contend that Pharmacia's warnings to formulators were inadequate, but Plaintiffs, once again, fail to address Klosowski's numerous deposition admissions where, when confronted with Pharmacia's actual warnings, he conceded that Pharmacia warned its customers that PCBs could be systemically toxic, volatilize from their formulations, and persist in the environment.  (Doc. 267 at 18-20) (detailing Klosowski's admissions).[11]   Plaintiffs also fail to address the admissions of Klosowski, Matson, Olson, and Herrick that establish that there was nothing to warn about.   (SOF¶46; RSOF¶46).  Because Plaintiffs' experts conceded that Defendants' formulator customers were aware of any alleged risks about which Plaintiffs claim Defendants failed to warn, Plaintiffs failed as a matter of law to establish their failure-to-warn claim.  *See Gajewski v. Pavelo*, 36 Conn. App. 601, 616 (1994) (noting there is no duty to warn of facts known to knowledgeable user).[12]

Faced with their experts' admissions that Pharmacia discharged any duty to warn by warning its customers, Plaintiffs raise the irrelevant contention that Pharmacia should have warned architects, contractors, installers, or end users like Plaintiffs.[13]   Plaintiffs cannot even establish, given the complex PCB supply chain, (Doc. 267 at 23), that architects, contractors, installers, or end users like Plaintiffs were identifiable to Pharmacia.   To the contrary, Plaintiffs,

---

[10]Plaintiffs concede that the CPLA expressly factors the sophisticated user/bulk supplier doctrine into the plaintiff's burden of proof.  (Doc. 277 at 27-28).

[11]Plaintiffs misstate Klosowski's opinions as to whether knowledge of Pharmaica's paint test would have affected formulator use of PCBs.  (Doc. 277 at 25 n.21).  By Klosowski's own admissions, the paint tests would not have changed formulator behavior because, as Klosowski admitted, it is impossible to predict volatilization rates from caulk based on volatilization rates from paint tests.  (SOF¶54).  Rather, Klosowski explained that comparing volatilization from latex paint to polysulfide caulk is like comparing "an apple and an orange." (SOF¶54).

[12]Although the sophisticated user doctrine is not an affirmative defense in Connecticut, Plaintiffs fail to recognize that where, as here, the sophisticated user is fully aware of the dangers of the product, this knowledge mandates the grant of summary judgment.  *Sharpe v. Wyatt, Inc.*, 31 Conn. App. 824, 850 n.18 (1993) ("if the [supplier of petroleum products] were to put forth undisputed evidence that the [wholesaler or fuel retailer] were fully aware of the dangers of deoxygenation and disregarded this knowledge, the lack of cause in fact would support the granting of summary judgment.").

[13]Plaintiffs cite *Gajewski v. Pavelo*, 36 Conn. App. 601 (1994), which merely held that a jury instruction was appropriate in that case because there was a controverted fact as to who was in the best position to warn a home owner of dangers arising from use of a boiler.

in fact, admit that they cannot even identify who manufactured, sold, or installed the caulk used at the Clark School, (SOF¶3).

Plaintiffs' bald assertion that not all Defendants' customers were "sophisticated" does not create an issue of fact when it is the *knowledge* of the formulators that establishes they were in the best position to take precautions or provide warnings to prevent any potential harm to end users. *Gajewski v. Pavelo*, 36 Conn. App. 601, 616 (1994) (noting "sophisticated" user doctrine turns on "knowledge" of user). The undisputed facts establish that the formulators were in the best position to take any appropriate precautions when Klosowski admitted that Pharmacia sold a bulk chemical product to formulator customers, (RSOF¶¶4,12); polysulfide caulk formulators had proprietary formulas, (RSOF¶28); formulation characteristics (i.e. plasticizer migration, vapor pressure of components, cure characteristics, etc.), application characteristics (surface area, thickness, painted layers, etc.), and external factors (i.e. temperature, air circulation, humidity, etc.) all affect the volatility of a particular chemical within a sealant formulation (RSOF¶¶21,22); federal specifications required formulators to test for volatilization, (SOF¶¶24-26); and formulators would focus on product-specific testing to assess volatility and other factors that may affect availability and health impact of a composition, (RSOF¶¶25-27,44).

## C. Plaintiffs Failed to Establish Causation

Citing Klosowski's report (RSOF¶27), Plaintiffs contend that formulators would not have used PCBs if Pharmacia had told them PCBs were systemically toxic and would persist in indoor environments, but, again, Plaintiffs fail to address Klosowski's deposition testimony where he admitted that Pharmacia warned its customers about that which Plaintiffs claim Pharmacia failed to warn, and still decided to use PCBs as plasticizers because of their many beneficial qualities. (RSOF¶¶17-20); (Doc. 267 at 18-20) (detailing Klosowski's admissions).[14]

---

[14]Plaintiffs' chemical waste expert, Matson, also admitted that it is "unknowable" whether additional warnings would have changed formulator use of PCBs, (SOF¶20).

## III.   PLAINTIFFS FAILED, AS A MATTER OF LAW, TO ESTABLISH A NEGLIGENCE CLAIM[15]

### A.   Plaintiffs Failed to Establish a Post-Sale Warning Claim

To the extent a post-sale duty to warn survived the CPLA, Plaintiffs recognize that foreseeability of harm is an element of their burden of proof, but admittedly cannot establish the foreseeability of PCBs volatilizing from caulk at levels capable of causing human disease at any time post-sale.   Instead, Plaintiffs contend only that a duty to warn arose as of 1971 when Pharmacia knew or should have known that PCBs volatilize from caulk and that PCBs were widespread in the environment, but, again, Plaintiffs fail to acknowledge that their own experts admit that Pharmacia's customers knew about volatilization and environmental persistence. (Doc. 267 at 18-20) (detailing Klosowski's admissions)).   And, if any duty arose post-sale, Pharmacia discharged its duty by notifying its customers, by letter, that it began to phase out the manufacture and sale of PCBs in 1970.  (SOF¶10).

Plaintiffs not only failed to establish that any duty to warn arose post-sale, but admittedly cannot establish that end users, like Plaintiffs, were identifiable to Defendants – a bulk supplier of PCBs which were distributed and formulated through a complex supply chain before ultimate sale to end users – after 1971.  (SOF¶¶3,29,31).  Instead, Plaintiffs contend that Connecticut law does not require proof that end users were identifiable post-sale, but cite no case law addressing the elements of a post-sale warning claim.[16]  Absent any case law to the contrary, the general principles of negligence require Plaintiffs to prove that they were identifiable consumers/users to

---

[15]Plaintiffs have abandoned any negligent design or failure-to-warn claim.   As the Connecticut Supreme Court applies the "unreasonably dangerous" standard to negligent design and warning claims, *Bifolck v. Philip Morris, Inc.*, 324 Conn. 402, 445 n.23 (2016), any such negligence-based claim would fail for the same reasons as Plaintiffs' strict liability design defect and failure-to-warn claims.

[16]Plaintiffs rely on inapposite case law questioning the existence of a cause of action for failure to recall, which contain no discussion of the plaintiff's burden of proving a product recall claim. *See, e.g.*, *Savage v. Scripto-Tokai Corp.*, 266 F. Supp. 2d 344 (D. Conn. 2003) (permitting the plaintiff to proceed with a failure to recall claim despite absence of case law establishing it as a separate basis for liability); *Argueta v. Overhead Door Corp.*, 2000 WL 1207261 (Conn. Super. Ct. July 28, 2000) (questioning existence of cause of action for failure to recall).  Plaintiffs, in particular, cite no case law extending product recall jurisprudence to the bulk supplier of a component part in a complex chain of distribution. Plaintiffs proffer nothing but speculation that any notification, like a product recall, regarding a component part in caulk used in building construction would have reached the end user like Plaintiffs.

whom a post-sale duty to warn would have run. *See Jarmie v. Troncale*, 306 Conn. 578, 596 (2012) ("proof that the victim was an identifiable target is ordinarily an essential element of an action in negligence.").

Plaintiffs, otherwise, proffer a new, purely speculative theory that, as of 1971, Pharmacia could have asked its formulator customers to identify the "architects and contractors" who purchased PCB-containing caulk to whom Pharmacia could then have provided warnings. (Doc. 277 at 31-32). Plaintiffs, again, simply ignore the undisputed fact that Pharmacia sold PCBs in a complex supply chain to its formulator customers who then resold the PCB-containing products to other manufacturers, who incorporated them into another product, or to distributors, who might sell the products to general contractors, who sold the caulk to contractors, builders, and architects, and who then resold the caulk to subcontractors, who ultimately included the product into a building. (SOF¶¶3,29,31). There is no evidence that Pharmacia could have identified the architects and contractors or that the architects and contractors could have taken appropriate precautions or provided appropriate warnings to end users like Plaintiffs.

### B.     Plaintiffs' Failure to Test Claim Is Not Cognizable

Plaintiffs ignore that no independent claim for negligent failure to test survived the CPLA. *See Bagley*, 327 Conn. at 111-13 (addressing negligent failure to test claims that pre-dated *Bifolck* and *Izzarelli*). But, even if a failure to test theory exists, Plaintiffs failed, as a matter of law, to establish the breach of any duty or cause of any harm. Plaintiffs cite the report of their rebuttal expert, Richard DeGrandchamp Ph.D., which Plaintiffs cannot, as a matter of law, rely upon to establish a *prima facie* claim.[17] As for causation, Plaintiffs' expert, Olson, also

---

[17]*See Maraj v. Massachusetts*, 953 F. Supp. 2d 325, 328 (D. Mass. 2013) ("The only expert evidence that Plaintiff offers is a rebuttal expert report . . . . Plaintiff's rebuttal evidence does not save its § 1983 claim because this evidence is not admissible in Plaintiff's case-in-chief, but is limited to Plaintiff's rebuttal case."); *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759 (8th Cir. 2006) ("rebuttal evidence may be used to challenge the evidence or theory of an opponent -- and not to establish a case-in-chief.") (cited with approval in *Madden v. Abate*, 800 F. Supp. 2d 604, 611 n.4 (D. Vt. 2011)).

admitted that, if it had conducted testing, Pharmacia would not have found PCBs cause cancer and adverse health effects at ambient levels of exposure.[18]

## IV.    PLAINTIFFS FAILED, AS A MATTER OF LAW, TO ESTABLISH A COMPENSABLE INJURY

Plaintiffs cannot survive summary judgment absent proof of a compensable injury.[19]   As the First Circuit recognized under equivalent Massachusetts law, because PCBs are imperceptible, "no property damage results – unless the PCB contamination in a building poses an actual health risk." *Westport*, 877 F.3d at 65-66.[20]   In other words, Plaintiffs must prove that the alleged product defect, which Plaintiffs define as toxicity, volatilization, and persistence, caused harm, i.e., made the building unsafe.    (Doc. 267 at 24-26)(citing case law). Acknowledging their failure to prove that PCBs rendered the building unsafe, Plaintiffs instead proffer three novel, and non-actionable, theories of harm in the abstract.

### A.    Plaintiffs Cannot Recover for Removal of Other Building Materials

Plaintiffs erroneously claim that the Toxic Substances Control Act ("TSCA") requires removal of building materials containing 50 ppm of PCBs, EPA regulations require removal of building materials contaminated with 1 ppm, and the DEEP requires removal of all building materials containing 1 ppm of PCBs.  Plaintiffs cite no authority that supports their self-serving interpretation of the law and regulations and ignore their own experts' contradictory admissions.

Plaintiffs fail to acknowledge that their own environmental remediation expert, Ross A. Hartman, admitted that neither the TSCA, EPA regulations, nor the Connecticut guidelines require the removal of any PCB-containing materials, (SOF¶¶102,106), and that Plaintiffs' costly Pilot Project, pursuant to which Plaintiffs gutted a quarter of the building, was not required by

---

[18]Plaintiffs ignore Olsen's testimony where he defines low levels of exposure as those used in chronic animal bioassays which are orders of magnitude higher than the ambient levels found in schools.  (RSOF¶50).
[19]*Goodall v. United Illuminating*, 1998 Conn. Super. LEXIS 3584, *7 (1998) (citing *Barrett v. Danbury Hospital*, 232 Conn. 242, 252-53 (1995)).
[20]Plaintiffs have it backwards when they contend that the *Westport* formulation of compensable harm was tied to foreseeability, (Doc. 277. at 11), when, instead, the *Westport* plaintiff's burden of proving foreseeable harm was tied to the Court's independent formulation of compensable injury, *Westport*, 2017 U.S. Dist. Lexis 53815 at *26 n.2; *Westport*, 877 F.3d at 66.

federal or state law, (SOF¶104).  Plaintiffs claim they followed EPA "guidance" but Plaintiffs' experts admit that, while regulations passed pursuant to TSCA are legally binding, authoritative, and enforceable by the EPA, EPA "guidance" is not authoritative, does not have the force of law, and cannot be the subject of an enforcement action. (RAMF¶41).[21]

Even if Plaintiff were correct, that the TSCA, EPA regulations, and Connecticut law require the removal of building materials containing PCBs, the TSCA was not enacted until 1976, the EPA regulations were not promulgated until 1979, and the Connecticut statute was not enacted until 1976.  If Plaintiffs claim property damage because they are required to remove the PCB-contaminated building materials under federal and state law, Plaintiffs cannot claim that a product defect caused the harm because the regulations did not exist at the time of sale.  In other words, under Plaintiffs' theory, it was the regulations, not a product defect that that caused the alleged harm.  Likewise, Plaintiff cannot establish a failure to warn because Plaintiff's alleged harm – TSCA/EPA/DEEP-mandated remediation – did not exist at the time of sale.

Plaintiffs misconstrue the California Court of Appeal's decision in *Transwestern Pipeline Co. v. Monsanto*, 46 Cal. App. 4th 502 (1996), which addressed the economic loss doctrine.  In *Transwestern*, there was no holding that the detection of PCBs in condensate inside a pipeline mandated the removal of the condensate or the PCBs.  To the contrary, the PCBs posed no danger inside pipeline.  *Id.* at 524.  Rather, the pipeline operator regularly removed the condensate from its pipes to prevent clogging in the normal course of its operations *prior* to the

---

[21]No legal authority supports Plaintiffs' interpretation of federal and state law.  Plaintiffs cite only conclusory and non-binding statements regarding federal law in *America Unites for Kids v. Lyon,* 2016 U.S. Dist. Lexis 118447 (C.D. Cal. Sept. 1, 2016), and the Consent Agreement and Final Order entered in *In the Matter of the City of New York*, TSCA-02-2010-9201.  By its express terms, the New York City Consent Agreement is not an enforcement action for caulk removal, but a voluntarily-entered commitment by the City to implement best management practices to evaluate and manage PCB-containing caulk in the City's schools.  *See* Consent Agreement, ¶ 3 (Pls.' Ex. 66). The Consent Agreement itself recites that the TSCA and related regulations do not require the sampling of caulk for PCBs.  *See* Consent Agreement, ¶ 20 (Pls.' Ex. 66).  And, with respect to Connecticut law, Plaintiffs fail to acknowledge that the DEEP permits products containing 1 ppm of PCBs to remain in place.  *See* Con. Gen. Stat. §§ 22a-465(c), 22a-466; CT DEEP Caulk Guidance (Pls.' Ex. 67).

detection of PCBs.  *Id.* at 510.  Nothing, therefore, in *Transwestern* supports Plaintiffs' claim that the mere presence of PCBs in other building materials constitutes compensable harm.[22]

Plaintiffs flatly contradict their own admissions by contending they were "forced" to close the Clark School due to the detection of PCBs at levels that exceeded EPA's Health Protective Values for Indoor Air in Schools, (Doc. 277 at 2).  Plaintiffs admit that they *voluntarily* closed the school and that neither the EPA, the DEEP, nor any other governmental authority mandated, or even recommended, the closure of the school.  (RSOF¶¶72,74,75,76,82). Rather, Plaintiffs' own admissions establish that Plaintiffs permanently closed the school due to a school consolidation plan. (RSOF¶¶82-83).

### B.    Plaintiffs Cannot Recover for Environmental Contamination

Plaintiffs also erroneously claim that Defendants are liable for remediation of the Clark School because PCBs in the caulk may leave the building and escape into the environment.  In other words, Plaintiffs seek to impose liability on Defendants to prevent Plaintiffs' speculative future pollution of the environment.  No Connecticut law permits Plaintiffs to recover as "property damage" remediation costs of the caulk to prevent hypothetical future environmental contamination.  Nor do Plaintiffs have expert support for the proposition that volatilization from caulk in the Clark School could cause environmental health risks.  To the contrary, Plaintiffs experts admit that no study establishes that PCBs in the levels found inside the Clark School cause human disease.  Nor do Plaintiffs have expert support for the proposition that PCBs from the interior of the Clark School will migrate to the outside of the building, let alone that those

---

[22]Plaintiffs also misplace reliance on *Calabrese v. McHugh*, 170 F. Supp. 2d 243 (D. Conn. 2001), which, unlike this case, involved the recovery of EPA/DEP-mandated remediation costs, and *Hubbard Hall, Inc. v. Monsanto*, 98 F. Supp. 3d 480 (D. Conn. 2015), and *BellSouth Telecomms. v. W.R. Grace & Co.*, 77 F.3d 603 (2d Cir. 1996), both of which found the property owner was on notice of a cause of action due to high or dangerous levels of contamination for purposes of the statute of limitations.

PCBs will migrate in concentrations that cause harm. (RAMF¶42).[23] The Clark School is not alleged to violate any environmental regulation.[24] And, no expert opines that harmful levels of PCBs have actually migrated to the environment from the caulk in the Clark School in the over 40 years since PCBs allegedly began volatilizing from caulk in school.

### C.   Plaintiffs Cannot Recover for Cumulative Human Exposure

Plaintiffs also erroneously contend that the exposure of building occupants to PCBs in the Clark School coupled with background environmental exposure to PCBs would be unsafe, that is cause human disease, which is refuted by the admissions of Plaintiffs' own experts and the pronouncements of federal, state, and local authorities that reviewed the test data and EPA's guidance documents. In addition, Plaintiffs' cumulative exposure theory does not establish a compensable injury as a matter of law.[25]

Courts around the country have rejected Plaintiffs' cumulative exposure theory, which would permit recovery for exposure to as little as one molecule of a substance above background levels, because it would violate the substantial factor causation burden of proof.[26] The

---

[23]*Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 311 (2d Cir. 2008) ("An expert's opinions that are without factual basis and are based on speculation or conjecture are . . . inappropriate material for consideration on a motion for summary judgment.").

[24]Plaintiffs again misconstrue *Transwestern Pipeline Co. v. Monsanto*, 46 Cal. App. 4th 502 (1996). It does not, as Plaintiffs contend, stand for the proposition that Plaintiffs are entitled to recover the cost of removing PCBs from the school to prevent potential future environmental contamination. Again, in *Transwestern*, the PCBs detected in the operator's pipeline posed no danger to the pipeline and did not have to be removed. *Id.* at 524. Nothing in *Transwestern* requires the removal of PCBs from the Clark School.

[25]Plaintiffs misrepresent that *BellSouth* stands for the proposition that the mere presence of a contaminant in a building constitutes compensable injury when the Second Circuit in *Bellsouth*, which involved the accrual of a cause of action for asbestos contamination, determined that the property owner was on notice of a cause of action when it found "dangerously high levels" of asbestos-containing dust and that the airborne asbestos posed a serious health risk. *BellSouth*, 77 F.3d. at 610.

[26]*See, e.g., Rost v. Ford Motor Co.*, 151 A.3d 1032, 1049 (Pa. 2016) (surveying state and federal courts); *Schwartz v. Honeywell Int'l, Inc.*, 2018-Ohio-474, ¶ 22 (citing *Lindstrom v. A-C Prod. Liab. Tr.*, 424 F.3d 488, 493 (6th Cir. 2005) and other cases) (it does "not take into account other exposures that might have caused the harm" and would "render the substantial factor test meaningless."); *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1177-78 (9th Cir. 2016) (the "each and every exposure" theory of causation "is precisely the sort of unbounded liability that the substantial factor test was developed to limit."); *see also Matter of N.Y.C. Asbestos Litig.*, 2015 NY Slip Op 25125, ¶¶ 17-18, 48 Misc. 3d 460, 488-91, 11 N.Y.S.3d 416, 437-39 (N.Y. Sup. Ct. 1995) (citing cases and law review articles); *Davidson v. Ga. Pac. LLC*, 2014 U.S. Dist. LEXIS 95559, *10-11 (W.D. La. July 11, 2014) (listing cases that reject "every exposure" theory); *see also Bowerman v. United Illuminating*, 1998 Conn. Super. LEXIS 3575, *21-22 (1998) (unpub'd) (stating that a plaintiff's prior exposure to asbestos "may actually preclude the

- 17 -

Connecticut Supreme Court has implicitly rejected it, *Bagley*, 327 Conn. at 103-04, and no Connecticut Court has adopted it.[27]

As a factual matter, the EPA explicitly takes cumulative exposure (indoor plus background levels) into account when determining its school PCB evaluation.  Dfs.' Ex. 69 at 14-15.  The EPA states that its Evaluation Levels are safe – "without appreciable risk" – and that air levels above the Evaluation Levels are not unsafe (not a "bright-line criteria").  *Id*.  Plaintiffs' experts admit that the PCB levels in the Clark School were on average lower than the EPA Evaluation Levels.  (SOF¶50; RAMF¶38).[28]

The Connecticut Department of Public Health, the Hartford Department of Health and Human Services, the Hartford Board of Education, and the Agency for Toxic Substances and Disease Registry all confirmed that the levels of PCBs found at the Clark School did not present a health risk.  (SOF¶¶72-74).  The Connecticut Department of Public Health, in fact, publicly announced that "the highest level of 571 nanograms per cubic meter in air found in hallway is way below level that could cause health problems."  (SOF¶73).

---

establishment of proximate cause if a plaintiff's exposure in the present case was minimal in comparison to his total exposure to asbestos over his work life.").

[27]The plaintiff must establish that the defect in the defendant's product was a substantial factor in causing harm under Connecticut law.  *Wagner v. Clark Equip. Co.*, 243 Conn. 168, 178 (1997).

[28]Plaintiffs mistakenly base their claim of property damage on the EPA risk assessment of a 10 in 1 million risk of cancer at 100 ng/m3 air levels.  EPA risk estimates are hypothetical and may not show actual risk, which may be zero.  *See* Guidelines for Carcinogen Risk Assessment, 51 Fed. Reg. 33992, p. 21 (U.S. Envtl. Protection Agency 1986).  The EPA's acceptable risk range is between $10^{-4}$ and $10^{-6}$.  (RAMF¶1).  "Acceptable" risks do not require remediation.  Olson testified that he has no idea what even hypothetical PCB risks (both cancer and non-cancer) are at the Clark School because he has not performed a risk assessment.  (RAMF¶1).  Courts routinely reject proof of actual risk based on regulatory hypothetical risks.  *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1249-50 (11th Cir. 2005) ("the procedures commonly used in 'risk assessment' for the purpose of establishing public health guidelines that represent 'acceptable' exposure levels for large populations are often … of marginal relevance in estimating 'causation.'") (quoting David Eaton, *Scientific Judgment and Toxic Torts – A Primer in Toxicology for Judges and Lawyers*, 12:1 J.L. & Pol'y 5 (2003) ("Because a number of protective, often 'worst case' assumptions . . . are made in estimating allowable exposures for large populations, these criteria and the resulting regulatory levels . . .generally overestimate potential toxicity levels for nearly all individuals.")); *Fed. Trade Comm'n v. Wellness Support Network, Inc.*, 2013 WL 5513332, *10 (N.D. Cal. Oct. 4, 2013) (excluding expert testimony based on regulatory requirements instead of scientific principles under *Daubert*); *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1201 (11th Cir. 2002); *accord Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 991 (8th Cir. 2001); *Hollander v. Sandoz Pharm. Corp.*, 95 F. Supp. 2d 1230, 1234 n. 9 (W.D. Okla. 2000), *aff'd in part and remanded*, 289 F.3d 1193 (10th Cir. 2002); *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1215 (10th Cir. 2002).  On the issue of actual causation of human disease, Olson acknowledged at his deposition (contrary to his report) that, as a toxicologist, he has not addressed general or specific causation.  (SOF¶50; Dfs.' Ex. 30 at 50).

## V.   PLAINTIFFS' DAMAGE CLAIMS SHOULD BE DISMISSED IN THEIR ENTIRETY AND, IN THE ALTERNATIVE, CAPPED AT THE FAIR MARKET VALUE OF THE CLARK SCHOOL

Plaintiffs concede that, under general Connecticut law, the diminution in fair market value acts as a cap on recovery for property damage in products liability cases.  (Doc. 277 at 38). Plaintiffs cite inapposite case law that does not establish any exception to the fair market value cap on damages applicable to products liability actions for harm to property.  *See, e.g., Wm. R. Peterson Oil Co. v. Chadwick,* 1994 Conn. Super. Lexis 1449 (June 7, 1994) (unpub'd) (involving joint and several liability of plaintiff and defendant for statutorily-mandated remediation of oil spill on plaintiff's property); *Mailman's Steam Carpet Cleaning Corp. v. Lizotte*, 415 Mass. 865 (1993) (involving contractual damages).[29]

## VI.   PLAINTIFFS' CLAIMS ARE TIME-BARRED AS A MATTER OF LAW

### A.   Plaintiffs Are Not Immune from the Statute of Limitations

Plaintiffs are acting in a proprietary capacity to recover for alleged property damage in this lawsuit and, therefore, improperly invoke the doctrine of *nullum tempus ocurrit regi* to avoid the statute of limitations.  *See West Haven Sch. Dist. v. Owens-Corning Fiberglas Corp.*, 721 F. Supp. 1547, 1551 (D. Conn. 1988) (rejecting municipal corporation's claim to immunity from the statute of limitations to recover the costs of state-mandated asbestos removal from public school buildings, finding "the problem is no different from many other construction retrofit or rehabilitation projects undertaken by a local entity").[30]   Like the municipality's asbestos remediation in *West Haven*, this lawsuit is not an act of an agent of the state but of a municipal corporation acting in its own corporate interest.[31]

---

[29]Defendants otherwise rely on their principal arguments.  (Doc. 267 at 26-32).

[30]*See also Bd. of Ed. v. Dow Chem. Co.*, 40 Conn. Supp. 141, 143 (1984) (school board not immune from statute of limitations when seeking to "recover damages arising from the construction of the physical plant of a school building"); *Russell v. McKenna*, 1998 WL 96314, *4 (Conn. Super. Ct. Feb. 26, 1998) (collecting cases and holding that school board enjoys no immunity for maintenance of school property).

[31]Plaintiffs rely on inapposite case law that does not involve the construction, repair, or rehabilitation of school buildings by a municipal corporation.  *See State v. Lombardo Bros. Mason Contractors*, 307 Conn. 412, 426 (2012) (invovling a *state* university); *Considine v. Waterbury*, 279 Conn. 830, 841-42 (2006) (no immunity for municipality leasing property to private entity); *Courture v. Bd of Educ. of Town of Plainfield*, 6 Conn. App. 309, 312–13 (1986)

### B.    Plaintiffs Knew or Should Have Discovered the Alleged Harm Before 2012

Plaintiffs' admitted knowledge of the presence of PCBs at schools similar to Clark alone should have alerted Plaintiffs to the likelihood of PCBs at Clark before 2012.  (SOF¶¶126,130).  Taken together with guidance documents issued by state and federal agencies, including notification addressed directly to the Superintendent of Hartford Public Schools about the potential presence of PCBs, (SOF¶¶127-29), the information in Plaintiffs' possession should undisputedly have led them to the discovery of PCBs at Clark.

Respectfully submitted,

/s/ Thomas M. Goutman
**WHITE AND WILLIAMS LLP**
Thomas M. Goutman (*pro hac vice*)
Richard L. Campbell (*pro hac vice*)
Kim Kocher (*pro hac vice*)
1800 One Liberty Place
Philadelphia, PA 19103-7395
215-864-7000
*Attorneys for Defendants*
*Monsanto Company; Solutia Inc.;*
*and Pharmacia LLC*

**DAY PITNEY LLP**
Paul D. Williams (ct05244)
Elizabeth C. Barton (ct07660)
Michael L. Miller (ct29137)
Elizabeth P. Retersdorf (ct29178)
242 Trumbull Street
Hartford, CT 06103
860-275-0100
*Attorneys for Defendants*
*Monsanto Company; Solutia Inc.;*
*and Pharmacia LLC*

---

(involving municipality's sponsorship of a football game); *Leslie v. Hartford Bd. of Educ.*, 2016 WL 301376, at *4 (Conn. Super. Ct. Jan 5, 2016) (involving municipality's sponsorship of a haunted house).

**CAPES, SOKOL, GOODMAN & SARACHAN, P.C.**
Adam E. Miller (*pro hac vice)*
7701 Forsyth Blvd., 12th Floor
St. Louis, MO 63105
314-721-7701
*Attorneys for Defendants*
*Monsanto Company; Solutia Inc.;*
*and Pharmacia LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served upon all counsel of record via the ECF system on August 22, 2018

/s/ Thomas M. Goutman